JUDGE KOELTL

07 CIV 8224

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - -

ADRIANA AGUILAR, ANDRES LEON,        )
ELENA LEON, ERIKA GABRIELA GARCIA-   )
LEON through her Next Friend Adriana Aguilar,  )
CARSON AGUILAR through his Next Friend  )
Adriana Aguilar, NELLY AMAYA,        )
MARIO PATZAN DeLEON, DAVID LAZARO    )
PEREZ, JOHN DOE #1, JANE DOE #1, JOHN  )
DOE #2 through his Next Friend Jane Doe #1,  )
JOHN DOE #3 through his Next Friend Jane  )
Doe #1, JOHN DOE #4, and JOHN DOE #5 on  )
behalf of themselves and all others similarly  )
situated,                            )
                                     )
                          Plaintiffs  )
                                     )
        -against-                    )
                                     )
IMMIGRATION AND CUSTOMS              )
ENFORCEMENT DIVISION OF THE UNITED   )
STATES DEPARTMENT OF HOMELAND        )
SECURITY, JULIE L. MYERS, Assistant Secretary)
of Homeland Security for Immigration and Customs)
Enforcement, JOHN P. TORRES, Director of the  )
Office of Detention and Removal Operations,  )
Immigration and Customs Enforcement,  )
CHRISTOPHER SHANAHAN, New York Field  )
Office Director for Detention and Removal  )
Operations, and JOHN and JANE DOE ICE  )
AGENTS ## 1-30,                      )
                                     )
                          Defendants.  )
- - - - - - - - - - - - - - - - - - - - - - - - -

Civil Action No.

RECEIVED
SEP 20 2007
U.S.D.C. S.D. N.Y.
CASHIERS

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon,

Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, David Lazaro Perez, John Does ##1-5

and Jane Doe #1 on behalf of themselves and all others similarly situated, through their

undersigned attorneys allege as follows:

## INTRODUCTION

1.      This class action seeks declaratory, injunctive and other relief to redress

Defendants' reckless deprivation of Plaintiffs' rights arising under the laws and Constitution of

the United States.  This action arises out of a pattern and practice of harassment, intimidation and

unlawful arrest by Defendants of persons of Latino origin in the New York City and surrounding

suburban areas.  As described in detail below, Defendants' wrongful actions include, *inter alia,*

unreasonable and unlawful entries into the homes of Plaintiffs and other Latinos in the

New York area in violation of the Fourth Amendment to the U.S. Constitution, unlawful

detainment, psychological and physical abuse, and the destruction of private, personal property.

2.      In 2006, the Immigration and Customs Enforcement Division of the Department

of Homeland Security (commonly known as "ICE") initiated a program titled "Operation Return

to Sender."  Under this program, Defendants conducted and have continued to conduct

unconstitutional and abusive raids of homes occupied by persons of Latino origin in New York

City and the surrounding areas, including the homes of the named Plaintiffs.

3.      The raids are ostensibly performed to arrest and remove fugitive aliens, *i.e.,*

immigrants who have been previously ordered to leave this country.  However, the raids are

performed in a manner that tramples on Fourth Amendment rights and leaves a trail of harm

2

affecting innocent members of our society, including U.S. citizens and/or persons who have been granted permanent residency in the United States, and/or other lawful immigration status.

4.      The *modus operandi* of "Operation Return to Sender" is to have teams of six to ten armed ICE agents raid homes of Latinos without court-issued search warrants and to do so in a manner that will obtain entry to the targeted homes without providing the occupants an opportunity to consent or refuse entry.

5.      The raids are conducted late at night or in the pre-dawn hours.  Though the agents know the occupants are likely to be Spanish-speaking, ICE does not ensure that Spanish-speaking agents are present.  Acting in a manner that terrifies sleeping residents, ICE agents pound on and/or break down doors and windows while screaming as loudly as possible, often representing themselves as "police," which of course they are not.  When the unsuspecting residents have the opportunity to open the door to inquire about what is going on, the agents then bully or force their way into homes without first obtaining the occupants' consent to entry.

6.      Without explanation or lawful justification, the agents immediately sweep through the home, searching the premises as if an armed fugitive were present, even though they have no reasonable basis for such belief.  All of these actions are conducted without good cause in a manner highly abusive and psychologically harmful to both the adults and children present.

7.      Moreover, despite the inherently intrusive nature of these raids, the agents do not conduct an investigation prior to the raid to ensure that the fugitive alien they might be seeking is in fact inside the target home.  As a result, the agents regularly raid homes where the fugitive is not present and could not reasonably have been believed to be present.  Instead, the unstated goal

of these raids is to gain access to constitutionally protected areas in the hope of seizing as many undocumented persons as possible. In this manner, the agents try to meet the increased arrest quotas recently imposed upon them by their superiors at ICE.

8.      While ICE has been aggressively increasing the number of raids performed, ICE has not kept pace in providing adequate training to its agents to protect the constitutional rights of persons affected by ICE's actions.

9.      ICE has similarly failed to promulgate adequate rules and procedures for conducting these raids within permissible constitutional limits.

10.     ICE's failures have been repeatedly identified by such entities as the Department of Homeland Security Office of Inspector General, which have cited ICE's lapses in training and information gathering that have contributed to the constitutional violations raised herein.

11.     Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, and Carson Aguilar are members of the Leon/Aguilar family. Each is either a U.S. citizen or legal permanent resident of the United States and each is a person of Latino origin who has been victimized by ICE's constitutional violations.

12.     On or about February 20, 2007, armed ICE agents pounded on the door of the Leon/Aguilar home located at 30 Copeces Lane, East Hampton, New York between 4:30 and 5:00 a.m. The ICE agents entered the Leon/Aguilar family home without a search warrant, consent, or any exigent circumstances, conducted an unlawful search and illegally detained the Leon and Aguilar families. The agents never explained the family members' rights, prevented them from contacting a lawyer or the police, and failed to allow them to review what the ICE

agents said was a warrant. Having once been victimized by ICE, the Aguilar and Leon families live in constant fear that ICE agents will return and again try to unlawfully enter their home.

13.    Plaintiff Nelly Amaya is of Latino origin. She too is a victim of ICE's constitutional violations.

14.    On or about February 20, 2007, armed ICE agents pounded on the door of her home located at 20 Boatsteerer's Court, East Hampton, New York between 4:00 and 5:00 a.m. The ICE agents forcibly entered her home without a search warrant, consent, or any exigent circumstances by kicking the entry door open. The ICE agents entered her home, physically abused her, and arrested her in retaliation for Nelly's demand to see a warrant. Nelly was never shown a warrant by ICE and lives in constant fear that ICE agents will again try to unlawfully enter her home.

15.    Plaintiff Mario Patzan DeLeon is of Latino origin. He too is a victim of ICE's constitutional violations.

16.    On or about April 18, 2007, armed ICE agents pounded on the door of his home located at 417 East Avenue, Riverhead, New York at about 4:30 a.m. The ICE agents forcibly entered his home without a search warrant, consent, or any exigent circumstances, by ramming through the back door. The ICE agents arrested him, placed him in chains, and transported him to Manhattan, where he was placed in a cell, questioned, and released later that evening. The agents never explained his rights and failed to produce a warrant of any kind. Having once been victimized by ICE, Mario lives in constant fear that ICE agents will return and again try to unlawfully enter his home.

17.    Plaintiff David Lazaro Perez is of Latino origin.  He too is a victim of ICE's constitutional violations.

18.    On or about March 18, 2007, armed ICE agents pounded on the door of his home located at 165 Main Street, Mount Kisco, New York at about 4:00 a.m.  The ICE agents then forcibly entered his home without a search warrant, consent, or any exigent circumstances.  The ICE agents arrested David, placed him in handcuffs, and transported him to Manhattan, where he was detained for several hours and then transported to a New Jersey detention center, from which he was released the next day.  The agents never explained his rights and failed to produce a warrant of any kind.  Having once been victimized by ICE, David lives in constant fear that ICE agents will return and again try to unlawfully enter his home.

19.    Plaintiffs John Does ## 1-5 and Jane Doe #1 (collectively the "Doe Family") are of Latino origin and are members of two generations of the Doe Family.  John Does ## 1, 4 and 5 and Jane Doe #1 are adults without immigration status.  John Doe #2, age three, and John Doe #3, age one, are U.S. citizens.  The members of the Doe Family are also victims of ICE's constitutional violations.

20.    In early winter 2007, armed ICE agents pounded on the door of the Doe Family home located in Suffolk County, New York at about 5:30 a.m.  The agents had first entered the home of another family downstairs and, upon information and belief, had detained the person the ICE agents claimed they were looking for.  Then, without a warrant or any exigent circumstances, the ICE agents attempted to break down the Doe Family apartment door and forcibly enter their apartment, but the locks held.  The ICE agents then tried to cajole the Doe

Family into opening the door, but the Doe family refused.  The agents ultimately left without explaining the Doe Family's rights or producing a warrant.  Having once been targeted by ICE for an unlawful entry, the Doe family lives in constant fear that ICE agents will return and attempt to unlawfully enter their apartment again.

21.     As a result of the raids on their homes, Plaintiffs have been profoundly traumatized, and remain extremely fearful that the ICE agents will return to inflict further harm. Indeed, while they were illegally inside the Leon and Aguilar family home, the ICE agents threatened that they would return.

22.     Without judicial intervention there will be no end to ICE's unlawful and unconstitutional activities, and there is a credible threat of recurrent injuries to Plaintiffs and the class.  By all appearances, ICE is continuing its aggressive, Latino-targeted program and increasing its unconstitutional enforcement activities without regard to the constitutional rights of those affected.  The named Plaintiffs, like the other members of the class, are at real risk of further Fourth Amendment violations at the hands of ICE because they are Latino and/or associate with individuals of Latino descent.

23.     ICE agents have conducted, and continue to conduct, similar raids against innocent and unsuspecting Latinos throughout ICE's New York City Region.  To put an end to these unlawful activities, Plaintiffs seek on behalf of themselves and all others similarly situated a permanent injunction restraining agents in ICE's New York City Region from conducting home raids until they have established appropriate procedures and standards governing the

conduct of ICE agents in performing home raids so as to assure that Plaintiffs and the class will not be subjected to the unlawful practices complained of herein.

24.    Plaintiffs also seek compensation for their own damages suffered as a result of the raids on their homes.

## JURISDICTION AND VENUE

25.    Jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331.

26.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because *inter alia* (1) at least one of the defendants resides in this judicial district and (2) at least one of the Plaintiffs resides in this district and no real property is involved in this action.

## PARTIES

27.    Plaintiff ADRIANA AGUILAR is a citizen of the United States.  At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York. She appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17 (c), as Next Friend for (a) her five-year-old son, Plaintiff CARSON AGUILAR and (b) her thirteen-year-old daughter, Plaintiff ERIKA GABRIELA GARCIA-LEON.

28.    Plaintiff CARSON AGUILAR is a citizen of the United States.  At all times relevant to this action, he was and is a resident of East Hampton, Suffolk County, New York, living with his mother, Plaintiff Adriana Aguilar.

29.    Plaintiff ERIKA GABRIELA GARCIA-LEON  ("Gabriela") is a lawful permanent resident of the United States, whose citizenship application is currently pending.  At

all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York, living with her mother, Plaintiff Adriana Aguilar.

30.     Plaintiff ANDRES LEON is a citizen of the United States. At all times relevant to this action, he was and is a resident of East Hampton, Suffolk County, New York.

31.     Plaintiff ELENA LEON is a citizen of the United States. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York.

32.     Plaintiff NELLY AMAYA is of Latino origin. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York.

33.     Plaintiff MARIO PATZAN DeLEON is of Latino origin. At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

34.     Plaintiff DAVID LAZARO PEREZ is of Latino origin. At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

35.     Plaintiff JOHN DOE #1 is of Latino origin. At all times relevant to this action, he was and is a resident of Suffolk County, New York. Plaintiff JOHN DOE #1 is married to Plaintiff JANE DOE #1.

36.     Plaintiff JANE DOE #1 is of Latino origin. At all times relevant to this action, she was and is a resident of Suffolk County, New York. Plaintiff JANE DOE #1 is married to Plaintiff JOHN DOE #1. Plaintiff JANE DOE #1 appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17 (c), as Next Friend for (a) her three-year-old son, Plaintiff JOHN DOE #2 and (b) her one-year-old son, Plaintiff JOHN DOE #3.

9

37.    Plaintiff JOHN DOE #2 is a citizen of the United States.  At all times relevant to this action, he was and is a resident of Suffolk County, New York, living with his parents, Plaintiffs JOHN DOE #1 and JANE DOE #1.

38.    Plaintiff JOHN DOE #3 is a citizen of the United States.  At all times relevant to this action, he was and is a resident of Suffolk County, New York, living with his parents, Plaintiffs JOHN DOE #1 and JANE DOE #1.

39.    Plaintiff JOHN DOE #4 is of Latino origin.  At all times relevant to this action, he was and is a resident of Suffolk County, New York.  Plaintiff JOHN DOE # 4 is Plaintiff JANE DOE #1's brother.

40.    Plaintiff JOHN DOE #5 is of Latino origin.  At all times relevant to this action, he was and is a resident of Suffolk County, New York.  Plaintiff JOHN DOE # 5 is Plaintiff JANE DOE #1's brother.

41.    Defendant IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY ("Defendant ICE") is headquartered in Washington, D.C., with an Office of Detention and Removal Operations Field Office located in New York, New York.

42.    Defendant JULIE L. MYERS ("Defendant Myers") is the Assistant Secretary of Homeland Security for Immigration and Customs Enforcement in Washington, D.C.  Defendant Myers is, among other things, charged with the constitutional and lawful implementation of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, and with the administration of the

10

division of Immigration and Customs Enforcement. Defendant Myers is sued in her official capacity.

43.    Defendant JOHN P. TORRES ("Defendant Torres") is the Director of the Office of Detention and Removal Operations for ICE in Washington, D.C. Defendant Torres is responsible for the apprehension, detention and removal of foreign nationals charged with violation of immigration law and the supervision of sworn law enforcement officers assigned to the Detention and Removal field offices, including the field office based in New York County, New York. Defendant Torres is sued in his official capacity.

44.    Defendant CHRISTOPHER SHANAHAN is the Field Office Director for the Detention and Removal Operations Field Office based in New York County, New York. Defendant Shanahan is responsible for managing enforcement activities of ICE in the downstate New York area, including Suffolk and Westchester Counties.

45.    Upon information and belief, Defendant Shanahan was personally involved in and/or personally ordered or authorized the conduct of ICE agents at the homes of the named Plaintiffs as complained of herein. At a minimum, Defendant Shanahan was grossly negligent in managing the training and activities of the ICE agents under his supervision. Defendant Shanahan is sued individually.

46.    At all times relevant to the incidents complained of in this action, Defendants JOHN and JANE DOE ICE AGENTS ## 1-30 were federal law enforcement agents employed by Defendant ICE.

47.    Defendants John and Jane Doe ICE Agents ## 1-30 are sued individually.

11

48.    The true names of Defendants John and Jane Doe ICE Agents ## 1-30 are unknown to Plaintiffs, and therefore, Plaintiffs sue these Defendants by such fictitious names.

49.    Upon information and belief, each Defendant is responsible for the injuries and damages suffered by Plaintiffs caused by the acts alleged in this complaint.

50.    Plaintiffs will amend their complaint to state the true names of Defendants John and Jane Doe ICE Agents ## 1-30 after those names have been identified.

51.    In committing the acts alleged in this complaint, Defendants John and Jane Doe ICE Agents ## 1-30 were acting on behalf of Defendant ICE.

52.    Further, upon information and belief, Defendants John and Jane Doe ICE Agents ## 1-30 were acting under the immediate supervision of Defendants Torres and Shanahan and pursuant to their authorization.

53.    Defendants John and Jane Doe ICE Agents ## 1-30 and Shanahan knew or should have known that committing the acts alleged in this complaint violated Plaintiffs' clearly established constitutional rights.

## FACTS

### Background on ICE

54.    ICE is a division of the Department of Homeland Security and was formed in March 2003.  ICE is comprised of four divisions, one of which is the Office of Detention and Removal Operations ("DRO").

12

55.     The DRO has been running the National Fugitive Operations Program since February 2002.  The goal of the National Fugitive Operations Program is to eliminate the backlog of fugitive aliens.

56.     In August 2003, the DRO announced that it would step up its activities in locating and deporting fugitive aliens.

57.     Since announcing its plan in 2003, ICE's DRO has pursued its goal to increase the number of persons removed from this country.

58.     As of January 2006, each Fugitive Operations Team was expected to arrest 1,000 fugitive aliens per year.  By comparison, in 2003, each team was expected to make only 125 arrests.

59.     However, ICE's DRO has implemented neither a corresponding increase in training nor procedures sufficient to protect the rights of persons affected by their activities. Moreover, members of the Fugitive Operations Teams are permitted to take part in home raids without first completing whatever little training that ICE provides on how to lawfully conduct such raids.

60.     Furthermore, the DRO and Fugitive Operations Teams rely on a database that purports to contain relevant information concerning, among other things, the location of fugitive aliens.

61.     Much of the information in this database, however, is outdated, inaccurate and incomplete.

13

62.    Upon information and belief, the DRO has procedural manuals that are used to provide guidance to the Fugitive Operations Teams in conducting apprehension operations.

63.    Upon information and belief, these procedural manuals are inadequate and incomplete in that, among other things, they do not contain adequate specific instructions for determining how to obtain consent to enter a private home or how ICE agents are to conduct themselves within a private home.

64.    The Department of Homeland Security Office of Inspector General (the "Inspector General") has criticized ICE for its incomplete and inaccurate background information, understaffing, and incomplete and inadequate training.  Specifically, in its report of March 2007, the Inspector General noted that:

(a)    the DRO immigration database contained inaccurate and incomplete information on fugitive aliens;

(b)    data exchanged between the DRO and its federal partners have not been reconciled on a regular basis to ensure the identity and background information on the fugitive alien is valid;

(c)    Fugitive Operations Teams are not fully staffed;

(d)    headquarters and other locations that support Fugitive Operations Teams are not fully staffed;

(e)    not all Fugitive Operations Team members have completed the Fugitive Operations Training Program; and

14

(f)    there is no national refresher course for those Fugitive Operations Team members who have attended the program.

## The ICE Raid on the Leon/Aguilar Family Home

65.    The Leon and Aguilar Plaintiffs are members of three generations of a Latino family. With one exception, all are United States citizens. The one exception is a young girl who is a lawful permanent resident of the United States and whose citizenship application is pending.

66.    On the morning of February 20, 2007, the Leon and Aguilar Plaintiffs were all asleep in the Leon/Aguilar family home.

67.    Between about 4:30 and 5:00 a.m., several ICE agents pulled their unmarked cars onto the road outside the family home, blocking the driveway.

68.    They parked their cars in such a way as to prevent any of the cars already in the driveway from exiting the driveway.

69.    The ICE agents then repeatedly rang the doorbell and pounded on the front door of the Leon/Aguilar family home.

70.    Elena Leon had been asleep and was startled awake by the noise of pounding and doorbell-ringing, and went to the door.

71.    When she opened the door, Elena witnessed several uniformed men standing outside the door.

72.    The men were wearing sidearms, which were clearly visible.

73.    Elena was stunned and terrified.

15

74.    The armed, uniformed men were ICE agents.

75.    As soon Elena opened the door, two of the ICE agents crossed the threshold of the front door and entered the Leon/Aguilar family home.

76.    The others quickly followed.

77.    The ICE agents entered the Leon/Aguilar home without permission or voluntary consent.

78.    None of the ICE agents told Elena that she had the right to refuse them permission to enter her home.

79.    At no time did any of the ICE agents show Elena a warrant that granted permission for them to enter the Leon/Aguilar family home.

80.    There were no exigent circumstances that may have permitted the ICE agents to enter the Leon/Aguilar family home without a valid warrant or voluntary consent.

81.    The ICE agents proceeded into the lower floor of the home, pounding on and opening bedroom doors.

82.    When she heard the noise, Erika Gabriela Garcia-Leon ("Gabriela") opened her bedroom door to see what was happening.  Still in her nightclothes, and seeing men storming through the hallway, she slammed the door and leapt back into bed.  The ICE agents opened the door.  Gabriela was twelve years old at the time.

83.    Andres Leon was also awakened and opened his door.  He saw two agents entering the hallway from the basement door.  It was apparent that the agents had been in the basement without permission.

16

84.     At the same time, some of the agents entered the bedroom of Adriana Aguilar, where she was asleep with her son, Carson, who was four years old.

85.     The ICE agents pulled covers off of her bed and shone flashlights into her face and the face of her son, who began to cry.

86.     The ICE agents searched the Aguilar/Leon family home without the consent of the Leon or Aguilar families.

87.     Startled awake, frightened and confused, Adriana repeatedly asked the ICE agents who they were and what they were doing.

88.     The ICE agents gathered Adriana, Andres and Gabriela in the office space on the ground floor of the house.

89.     The ICE agents positioned themselves so that the exits leading out of the office area were blocked.

90.     Adriana and Andres were not free to leave the office area.

91.     The agents would not say who they were despite being asked to identify themselves.

92.     The ICE agents would not permit Adriana to call the police or a lawyer.

93.     When Adriana attempted to open a drawer to get the telephone number of a lawyer, the agents put their hands on their weapons.

94.     One agent ordered her not to move.

17

95.     Only after the ICE agents had Adriana in the office area did they indicate that they were looking for someone specific.  They listed the names of several men whom they were looking for, including a man named "Wilson Garcia."

96.     Adriana thought they might have been referring to her first husband, whose name is Wilson Patricio Garcia, but who went by his middle name, "Patricio."

97.     Adriana had divorced him five years earlier in 2002.

98.     Adriana's divorce from Wilson Patricio Garcia, her subsequent marriage to her current husband Norman Aguilar, and her purchase of the Aguilar/Leon family home together with Norman are all matters of public record easily available to ICE had they checked.

99.     It was entirely unreasonable for the ICE agents to believe that they would find Wilson Patricio Garcia in the Leon/Aguilar family home at the time of the raid.

100.    In the office area, the ICE agents questioned Andres, Adriana and Gabriela about Wilson Garcia.

101.    While in the office area, Adriana asked the ICE agents to see a warrant.

102.    One of the agents told her that they would show her the warrant.

103.    However, the agents did not show her any warrant.

104.    Andres also asked the ICE agents to see a warrant.

105.    The ICE agents did not permit Andres to read a warrant.

106.    Instead, one of the ICE agents opened and then quickly closed a manila folder containing papers that the ICE agents claimed was a warrant.

18

107.    The quick display of the contents of the folder did not allow Andres to confirm the existence of a warrant or the opportunity to read any of the contents.

108.    Upon information and belief, the ICE agents did not have a warrant that permitted them to enter or search the Leon/Aguilar family home or to detain the Leon/Aguilar family without voluntary consent or exigent circumstances.

109.    A Freedom of Information Act request seeking a copy of any such warrant was made to ICE and has been outstanding since early July 2007.

110.    To date, ICE has yet to produce a copy of any such warrant.

111.    As the ICE agents were leaving the office area, Adriana asked one of the agents in Spanish where the warrant was.  In English, he indicated to one of his colleagues that she was asking for the warrant.

112.    The ICE agents never provided any member of the Leon or Aguilar families with a copy of a warrant.

113.    On the way out of the office area, one of the ICE agents, turned to twelve-year-old Gabriela and said that they would be back.  Adriana Aguilar and Andres Leon heard the agent say this clearly, in English.

### The ICE Raid on the Amaya Household

114.    Nelly Amaya rents a basement apartment at 20 Boatsteerer's Court in East Hampton, Suffolk County, New York.  The apartment has three bedrooms.  She has lived in this apartment since July 2006.

19

115.    At the time of the raid (described herein), Nelly shared this apartment with her ex-husband, Giovany Vicuña, her father, Antonio Amaya, and her brother-in-law, Marlon Vicuña.

116.    On the morning of February 20, 2007, the residents of the Amaya household were all asleep.

117.    Between about 4:00 and 5:00 a.m., several ICE agents forcibly entered the Amaya household by kicking the entry door open.

118.    The ICE agents entered Nelly's home without permission or voluntary consent from her or any other member of the household.

119.    The ICE agents did not explain to any member of the family that they had the right to refuse them permission to enter her home.

120.    Nelly was sleeping and was awakened by the agents screaming the name of her brother-in-law, Marlon Vicuña as they entered her apartment.

121.    Nelly saw several uniformed men blocking her bedroom door.

122.    The men were wearing sidearms, which were clearly visible.

123.    The men shone a flashlight in Nelly's eyes while at the bedroom door.

124.    The ICE agents then entered her bedroom.

125.    Nelly was wearing only a t-shirt and underwear when the men entered her bedroom.

126.    Immediately after crossing the threshold of Nelly's bedroom, the two ICE agents began questioning her and repeatedly asked for Marlon Vicuña.  Nelly asked who they were but they did not identify themselves.

127.    Nelly was ordered to go to the living room.

128.    Nelly threw on pajama pants and a sweatshirt before being pulled by her arm into the living room.  After being pulled into the living room, she asked permission to use the bathroom and was not allowed to do so privately.

129.    When Nelly attempted to go to the bathroom to use the toilet, the ICE agents refused to let her close the door.

130.    Nelly asked the agents for a warrant, but the agents refused to show her any warrant.

131.    After she requested to see a warrant, one of the ICE agents asked Nelly her name.

132.    Nelly responded, "Nelly Amaya."

133.    The ICE agent started laughing and said, "Nelly Amaya, this is your arrest order. You are under arrest."

134.    At no time did any of the ICE agents show Nelly a warrant that granted permission for them to enter or search her home or to arrest her.

135.    There were no exigent circumstances that may have permitted the ICE agents to enter Nelly's home without a valid warrant or voluntary consent.

136.    The ICE agents searched the Amaya family home without permission or consent from the Amaya family.

137.    The ICE agents did not say who they were.

138.    One of the ICE agents put Nelly against the wall to frisk her.

139.    The ICE agent twisted Nelly's arm behind her.

21

140.    Nelly's arm was already injured before the raid.  During her waking hours, Nelly wore a sling, which was next to her bed when the ICE agents stormed into her bedroom.

141.    The agent's actions exacerbated Nelly's injuries.

142.    The ICE agents arrested, handcuffed and detained Nelly.

143.    The handcuffs caused Nelly's arm to swell and turn purple.

144.    Nelly was then transported to the Wainscott police station where the ICE agents changed their clothes.

145.    During the car ride, Nelly suffered an asthma attack.

146.    The ICE agents called an ambulance while at the Wainscott police station.  An emergency medical services worker took Nelly's pulse but did not give her any treatment, and did not even look at her swollen arm.

147.    Nelly was then transported from the Wainscott police station to 26 Federal Plaza in Manhattan.

148.    At 26 Federal Plaza, Nelly was fingerprinted and questioned by a female officer.

149.    The female officer asked, "Why did they take you in? You have a clean record."

150.    During the course of questioning the female officer also said, "You shouldn't have asked for a warrant."

151.    While under detention, Nelly was having difficulty breathing because of her asthma.  She was also still in pain from the damage to her arm.

152.    She told the ICE agents on duty that she felt congested because of her asthma.

153.    Approximately 10 hours after initially detaining Nelly and without providing her any medical treatment for her asthma or her injured arm, the ICE agents released her.

154.    Nelly was left to find transportation home on her own. She was dressed in her nightclothes and had no money or even a coat to keep her warm as she tried to hail a cab in the February cold.  After more than an hour without success, Nelly finally was able to convince a cabdriver to take her to Queens, where a friend of hers paid the fare.

155.    Nelly suffered a great deal of physical and psychological pain and discomfort and humiliation as a result of the raid, arrest and detention.

### The ICE Raid at 417 East Avenue, Riverhead, NY

156.    Mario Patzan DeLeon rents a room on the second floor of a rooming house at 417 East Avenue in Riverhead, Suffolk County, New York.  The door to his room has a lock and a private key.

157.    On April 18, 2007, at about 4:30 in the morning, Mario was awakened to the sound of shouts and loud banging.  He ran into the hallway and looked out the window, where he saw several cars outside.  Large lights were shining into the rooming house.

158.    Mario went back into his bedroom and locked the door.

159.    From his bedroom, Mario could hear the shouting and loud banging and ramming against the outside doors.  After some time, Mario heard and felt men screaming and pounding against his bedroom door.

160.    Two men with uniforms who indicated that they were ICE burst into his room. They asked Mario for identification and took his wallet.  Then they told him to go down to the kitchen because they just wanted to speak with him.

161.    In the kitchen, Mario and seven others were placed in handcuffs.  At no point were they shown a warrant or court order permitting the ICE agents to enter the house without consent.  They were led outside to waiting vehicles.

162.    The group of cars continued to four more houses to conduct additional raids. From the van, Mario could hear similar banging and shouting at these houses.

163.    After the raids, the ICE agents stopped in a parking lot.  While the men they had picked up waited in the car, the ICE agents had some coffee and donuts.

164.    Mario asked an officer if he could use the bathroom.  He was placed in chains and told to relieve himself outdoors, while the agents observed.  Mario remained in chains for the rest of the journey.

165.    After about 90 minutes, the cars arrived at 26 Federal Plaza in Manhattan.  The men were taken inside the building to be interrogated.  They were placed in a cell to wait while each individual was questioned, one by one.

166.    Mario was released several hours later, in the evening.  He had no money to return home, nor did most of the others.  One of the men had managed to keep some money in his pocket, and he lent the others money to take the train home to Riverhead.  They did not return home until about one o'clock in the morning of April 19, 2007.

167.    Once home, Mario learned from the other tenants in the rooming house that no one had opened the door to the agents.  He observed that the front door of the house was dented and damaged from the ramming by the agents, and that one of the double locks on the front door had been pounded so hard that it left a large hole in the plaster of the doorframe.  It seemed that the agents had not succeeded in opening the front door and instead had rammed through the back door, which did not have a double lock.  The front door remains damaged.

168.    Upstairs, in Mario's bedroom, Mario observed that the wooden doorframe around his door had come loose from the pounding by the agents.  He repaired the doorframe himself.

## The ICE Raid at 165 Main Street, Mount Kisco, NY

169.    David Lazaro Perez rents a room on the third floor of a rooming house at 165 Main Street in Mount Kisco, Westchester County, New York.  The door to his room has a lock with a private key.

170.    On March 18, 2007, at about 4:00 in the morning, David was awakened to the sound of loud pounding and knocking outside his rooming house.  Bright lights were shining into the house.

171.    David then heard knocking at the door of his room, and three ICE agents, two men and a woman, burst into his room.  The agents, who were wearing jackets that read "ICE," did not identify themselves.

172.    The ICE agents did not say who they were looking for and did not show a warrant.  Nonetheless, they asked David for his identification and then ordered him to get

dressed. David heard other agents pounding on the doors of the rooms of other tenants and ordering them to open the doors.

173.    David and other tenants of the rooming house were led into the hallway where they were placed in handcuffs and taken out of their home to waiting vans and several additional agents.

174.    After a stop at the Mount Kisco police station, David and the others were transported to 26 Federal Plaza, in Manhattan, where David was detained for several hours.

175.    The ICE agents took David's belt and his wallet, which contained about seven hundred dollars in cash.

176.    David and some of the others were taken to another building and detained in a cell. After several hours, he and several others were transported to a detention center, where David was jailed overnight and released.

177.    Although his wallet was returned to him, his cash was not.

178.    He did not arrive home in Mount Kisco until about one o'clock in the morning, two days after the raid.

179.    The ICE agents had entered the rooming house and the individual rented rooms, including David's room, without exigent circumstances, consent or a valid warrant.

### The ICE Raid on the Doe Family

180.    The Doe Family represents two generations of a Latino family living together in one unit of a two-family house. While each unit has a separate, locked entrance door, both units share a common entryway and a front door that is kept locked.

26

181.    The Doe Family lives in the unit on the upper level of the home, located at the top of a stairwell that leads up from the entryway.

182.    On the night of the raid all members of the Doe Family were asleep in their home. At approximately 5:30 a.m. the Doe Family was awakened when ICE agents broke down and forcibly entered through the common entrance door of the house.

183.    After the ICE agents forcibly entered through the entryway, the adult members of the Doe Family heard them break down the door and forcibly enter the downstairs apartment.

184.    The children, JOHN DOE #2 and JOHN DOE #3, awakened by all of the noise, became terrified and began crying.

185.    After the ICE agents had detained people from the downstairs apartment and placed them in a van, including, upon information and belief, the person the ICE agents claimed they were looking for, the ICE agents climbed the stairs and attempted to enter the Doe Family's apartment.

186.    The adult family members, JOHN DOE #1, JANE DOE #1, JOHN DOE #4, and JOHN DOE #5 heard the agents shouting in English, "Immigration! Open the door" as they were coming up the stairs.

187.    The ICE agents attempted to break down the Doe Family's entrance door and forcibly enter the apartment.  The agents, however, were unable to enter the apartment.

188.    One of the ICE agents tried to convince the Doe Family to open the door.

189.    Both JOHN DOE #1 and JANE DOE #1 explained to the agents that they wanted to see a warrant and that the agents should place it under the door.  They insisted that they would not open the door until they saw something on paper.

190.    The same agent responded that they would go and get the necessary papers if the Doe Family did not voluntarily let them in, and so the Doe Family should open the door and let them in.

191.    The ICE agents then tried to convince the Doe Family that they were police and, therefore, the Doe Family should not be afraid of them and should open the door to them.

192.    JANE DOE #1 told the ICE agents that there were children in the apartment that were very frightened and that the ICE agents should leave.

193.    The agents ultimately became very angry and left the home.

194.    The Doe Family lives in daily terror that the ICE agents will return to the apartment, break down their door, and arrest the adults in the family, separating the Doe parents from their young children.

195.    Each ICE agent and Defendant Shanahan knew or should have known that ICE agents entering a home without a judicial warrant, voluntary consent, or any exigent circumstances or other lawful cause to justify the entrance is a violation of constitutional rights.

196.    Each ICE agent and Defendant Shanahan knew or should have known that ICE agents conducting a search of a home without a judicial warrant, voluntary consent, or any exigent circumstances or other lawful cause to justify the search is a violation of constitutional rights.

28

197.    Each ICE agent and Defendant Shanahan knew or should have known that ICE agents' detention of a person without a judicial warrant, voluntary consent or any exigent circumstances or other lawful cause to justify the detention is a violation of constitutional rights.

198.    Each ICE agent and Defendant Shanahan knew or should have known that the ICE agents' actions in gaining entry within the named Plaintiffs' homes violated the named Plaintiffs' constitutional rights.

199.    The actions of each ICE agent and Defendant Shanahan were unprivileged.

200.    Each Defendant performed all of the acts concerning the actions at the named Plaintiffs' homes under color of federal law.

201.    Each Defendant performed all of the acts concerning the complained-of actions at the named Plaintiffs' homes, in whole or in part, while acting in his or her capacity as an employee of an agency of the federal government.

### The Named Plaintiffs' Injuries

202.    As a direct and proximate result of the above conduct by Defendants, and each of them, the named Plaintiffs have been harmed, which harm includes, but is not limited to:

   a.    violations of their constitutional rights to be free from unreasonable searches and seizures;

   b.    having their homes and personal privacy invaded;

   c.    being intimidated, harassed, humiliated, and threatened with force;

   d.    experiencing severe emotional and mental distress;

   e.    being illegally and unreasonably detained;

29

f.      being subjected to an illegal and unreasonable interrogation;

g.      having their personal property damaged; and

h.      other harm according to proof.

203.    The acts described above by each Defendant were done intentionally, maliciously, and recklessly, and showed a callous disregard for, or indifference to, the named Plaintiffs' personal safety, security, freedom, and civil and constitutional rights, and/or with intent to injure, harass, and oppress Plaintiffs and other members of the Latino community in New York.

## CLASS ACTION ALLEGATIONS

204.    All claims set forth in the First Claim below are brought by the named Plaintiffs individually and on behalf of all other similarly situated persons pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

205.    The named Plaintiffs provisionally propose the First Claim be certified on behalf of the following class:

> Persons who, because they (1) are Latino, live in residences with Latinos or are or were associated with individuals otherwise sought by ICE pursuant to Operation Return to Sender and (2) reside in the jurisdiction of the New York City regional office of ICE, have been subjected to and/or are at imminent risk of home raids by the New York City regional office of ICE.

206.    The claims of the proposed class representatives and those of the proposed class members in the First Claim raise common questions of law and fact concerning, *inter alia*, whether Defendants have implemented, enforced, encouraged and/or sanctioned a policy, practice and/or custom of:

30

(a)     entering and searching homes without valid warrants or voluntary consent and in the absence of probable cause and exigent circumstances in violation of the Fourth Amendment to the United States Constitution; and

(b)     stopping, detaining, investigating, searching and effecting seizures in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause in violation of the Fourth Amendment to the United States Constitution.

207.    These questions are common to the named Plaintiffs and to the members of the proposed class because Defendants have acted and will continue to act on grounds generally applicable to both the named Plaintiffs and proposed class members.

208.    The claims of the named Plaintiffs are typical of the claims of the members of the proposed class.

209.    Members of the proposed class are so numerous that the joinder of all class members is impractical.

210.    The named Plaintiffs will fairly and adequately protect the interests of the members of the Plaintiff class.

211.    The named Plaintiffs are represented by counsel who are experienced in federal class action litigation, including those involving civil rights issues.

212.    As set forth above, the Defendants have acted on grounds generally applicable to the Plaintiff class, thereby making appropriate final injunctive and corresponding declaratory relief with respect to the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM: CLASS ACTION CLAIM OF FOURTH AMENDMENT VIOLATIONS
### (Against All Defendants)

213.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

214.    Plaintiffs bring this claim for injunctive and declaratory relief against Defendants to redress continuing and likely future violations of the Fourth Amendment to the United States Constitution.

215.    Upon information and belief, Defendants have, in violation of the Fourth Amendment to the United States Constitution, officially implemented, enforced, encouraged and/or sanctioned a policy, practice and/or custom of: (a) entering and searching homes without valid judicial warrants or voluntary consent and in the absence of probable cause and exigent circumstances; and (b) stopping, detaining, investigating, searching and effecting seizures in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause.

216.    As a result of Defendants' acts and/or omissions, the Fourth Amendment rights of the Plaintiffs and class to be free from unreasonable searches and seizures and unlawful entries into their homes have been violated.

217.    The Plaintiffs and class will suffer irreparable and repeated injury unless this Court orders equitable relief.  Such injury includes, *inter alia*, the deprivation of their constitutionally protected rights under the Fourth Amendment to the United States Constitution.

218.    As a result of Defendants' acts or omissions, at least some of the Plaintiffs and members of the class continue to suffer harm from Defendants' challenged conduct in the form of continuing judicial and administrative proceedings seeking their removal from this country.

219.    Damages cannot adequately address the injuries suffered by the Plaintiffs.

220.    Compelling the Defendants, their agents, employees and successors in office, and all persons acting in concert with them to comply with the dictates of the United States Constitution does not impose an improper or undue burden on the Defendants, their agents, employees and successors in office, and others, and, in fact, it serves the public interest by ensuring compliance with well-established Constitutional protections.

221.    Plaintiffs and the class are entitled to the issuance of a permanent injunction prohibiting Defendants from engaging in the unlawful and abusive practices alleged herein.

222.    For reasons including, but not limited to, those stated herein, an actual dispute exists between Plaintiffs and Defendants, in which the parties have genuine and opposing interests that are direct and substantial, and of which a judicial determination will be final and conclusive.

223.    This dispute entitles Plaintiffs to a declaratory judgment that in doing the acts complained of herein the Defendants denied Plaintiffs their Fourth Amendment rights and protections, including, but not limited to, the right to be free from unreasonable searches and seizures and the right to be free from unlawful entries into one's home, in violation of the U.S. Constitution.

224.    Plaintiffs are also entitled to such other and further relief as may follow from the entry of such a declaratory judgment.

## SECOND CLAIM: *BIVENS* CLAIM OF NAMED PLAINTIFFS
### (Against Defendants Christopher Shanahan and John Doe ICE Agents ## 1-30)

225.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

226.    In doing the acts complained of, Defendants Shanahan and John and Jane Doe ICE Agents ## 1-30 deprived Plaintiffs of certain constitutionally protected rights, including, but not limited to:

      a.    the right to be free from unlawful entries into and searches of Plaintiffs' homes without a valid warrant or voluntary consent and in the absence of probable cause and exigent circumstances; and

      b.    the right to be free from detentions without a lawful, reasonable and articulable suspicion of unlawful activity or probable cause.

227.    Because these Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, with regard to standards for home entry, search, seizure, questioning, and detention, they are not entitled to a good faith defense or official immunity defense.

228.    The actions of these Defendants were intentional, malicious, and reckless and showed a callous disregard for, or indifference to, the civil rights of the Plaintiffs.

34

229.    The actions of these Defendants give rise to a cause of action for damages against them in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

230.    As a direct and proximate result of the unlawful actions of these Defendants, Plaintiffs have suffered harm, in the form of, *inter alia*, outrage, humiliation, and emotional distress.  Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

1.    Issue a Declaratory Judgment on behalf of Plaintiffs with respect to the claims set forth in the First Claim declaring that the actions of Defendants vis-à-vis the Plaintiffs as complained of herein violated the Fourth Amendment to the United States Constitution;

2.    With respect to the claims set forth in the First Claim, issue an order permanently enjoining Defendants, their agents, employees, and successors in office and all others acting in concert with them from engaging in the unlawful, abusive and discriminatory actions as set forth above;

3.    Award the named Plaintiffs actual, compensatory, and punitive damages for violations of the Fourth Amendment to the United States Constitution;

4.    Award Plaintiffs costs of this action;

35

5.    Award Plaintiffs pre- and post-judgment interest, as permitted by law;

6.    Award Plaintiffs reasonable attorneys' fees with respect to their claims set

forth in the First and Second Claims;

7.    Grant Plaintiffs such other relief as the Court deems appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims and issues properly triable to a jury.

New York, New York
September 20, 2007

LeBOEUF, LAMB, GREENE &
MacRAE LLP

By: _____
    Patrick J. Gennardo
    Donna L. Gordon
    Richard J. Cairns
    Kelly H. Tsai
    Colin G. Stewart
125 W. 55th Street
New York, New York  10019
(212) 424-8000

PUERTO RICAN LEGAL DEFENSE
AND EDUCATION FUND

By: _____
    Foster Maer
    Jackson Chin
    Ghita Schwarz
90 Hudson Street, 14th Floor
New York, New York  10013
(212) 739-7507

Attorneys for Plaintiffs

36