UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADRIANA AGUILAR, ANDRES LEON,
ELENA LEON, ERIKA GABRIELA GARCIA-
LEON through her Next Friend Adriana Aguilar,
CARSON AGUILAR through his Next Friend
Adriana Aguilar, NELLY AMAYA, MARIO
PATZAN DeLEON, DAVID LAZARO PEREZ,
WILLIAM LAZARO, TARCIS SAPON-DIAZ,
SONIA BONILLA, BEATRIZ VELASQUEZ
through her Next Friend Sonia Bonilla, DALIA
VELASQUEZ through her Next Friend Sonia
Bonilla, ELDER BONILLA, DIANA
RODRIGUEZ, YONI REVOLORIO, JUAN
JOSE MIJANGOS, GONZALO ESCALANTE,
YANET MARTINEZ, RAUL AMAYA,
GLORIA VANESSA AMAYA, JOHN DOE #1,
JANE DOE #1, JOHN DOE #2 through his Next
Friend Jane Doe #1, JOHN DOE #3 through his
Next Friend Jane Doe #1, JOHN DOE #4, and
JOHN DOE #5 on behalf of themselves and all
others similarly situated,

      Plaintiffs,

    -against-

IMMIGRATION AND CUSTOMS
ENFORCEMENT DIVISION OF THE UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY, MICHAEL CHERTOFF, United
States Secretary of the Department of Homeland
Security, JULIE L. MYERS, Assistant Secretary
of Homeland Security for Immigration and
Customs Enforcement, JOHN P. TORRES,
Director of the Office of Detention and Removal
Operations, Immigration and Customs
Enforcement, CHRISTOPHER SHANAHAN,
New York Field Office Director for Detention
and Removal Operations, PETER J. SMITH,
JOSEPH A. PALMESE, JOHN and JANE DOE
ICE AGENTS, and JOHN ROE and JANE ROE
ICE SUPERVISORS,

      Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.
07 CIV 8224 (JGK) (FM)

**AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

OCT 0 4 2007
U.S....... ..., N.Y.
CASHIERS

Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, Gonzalo Escalante, Juan Jose Mijangos, David Lazaro Perez, William Lazaro, Tarcis Sapon-Diaz, Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez, Elder Bonilla, Diana Rodriguez, Yoni Revolorio, Yanet Martinez, Raul Amaya, Gloria Vanessa Amaya, and John Does ##1-5 and Jane Doe #1, on behalf of themselves and all others similarly situated, through their undersigned attorneys allege as follows:

## INTRODUCTION

1.    This class action seeks declaratory, injunctive and other relief to redress Defendants' deprivation of Plaintiffs' rights arising under the laws and Constitution of the United States.  This action arises out of a pattern and practice of unlawful entry, search and seizure by Defendants of Latino persons in New York City and surrounding suburban areas.  As described in detail below, Defendants' wrongful actions include, *inter alia,* unreasonable and unlawful entries into the homes of Plaintiffs and other Latinos in New York City and the surrounding area in violation of the Fourth Amendment to the U.S. Constitution, unlawful detainment, psychological and physical abuse, and the destruction of private, personal property.

2.    In 2006, the Immigration and Customs Enforcement Division of the Department of Homeland Security (commonly known as "ICE") initiated several programs to identify and arrest fugitive aliens, including one known as "Operation Return to Sender." (As used in this Amended Complaint, the term "Operation Return to Sender" refers to all similar national or local initiatives or operations.)  Under this program, Defendants have conducted, continue to conduct, and plan to conduct in the immediate future unconstitutional and abusive raids of homes occupied by Latino persons in New York City and the surrounding area, including the homes of the named Plaintiffs.

2

3.      The raids are ostensibly performed to arrest and remove fugitive aliens, *i.e.*, immigrants who have been previously ordered to leave this country.  However, the raids are performed in a manner that tramples on Fourth Amendment rights of persons residing in the United States and leaves a trail of harm affecting innocent members of our society.

4.      The *modus operandi* of "Operation Return to Sender" is to have teams of six to ten armed ICE agents raid homes of Latinos without court-issued search warrants and to do so in a manner that will obtain entry to the targeted homes without providing the occupants an opportunity to consent or refuse entry.  In these raids agents were armed with submachine guns known as MP-5s and shotguns.

5.      The raids are conducted in the pre-dawn and early morning hours.  Though the agents know the occupants are likely to be Spanish-speaking, ICE does not ensure that Spanish-speaking agents are present.  Acting in a manner that terrifies sleeping residents, ICE agents pound on and/or break down doors and windows while screaming as loudly as possible, often representing themselves as "police," which of course they are not.  When the unsuspecting residents have the opportunity to open the door to inquire about what is going on, the agents then burst into the homes without first obtaining the occupants' consent to entry.

6.      Without explanation or lawful justification, the agents immediately sweep through the home, searching the premises as if an armed fugitive were present, even though they have no reasonable basis for such belief.  All of these actions are conducted without good cause in a manner highly abusive and psychologically harmful to both the adults and children present.

7.      Moreover, despite the inherently intrusive nature of these raids, the agents do not conduct an investigation prior to the raid to ensure that the fugitive alien they are purportedly seeking is in fact inside the target home.  As a result, the agents regularly raid homes where the fugitive is not present and could not reasonably have been believed to be present.  Instead, the

unstated goal of these raids is to gain access to constitutionally protected areas in the hope of seizing as many undocumented persons as possible. In this manner, the agents try to meet ICE's recently-imposed 800 percent increase in arrest quotas.

8.     While ICE has been aggressively increasing the number of raids performed, ICE has not kept pace in providing adequate training to its agents to protect the constitutional rights of persons affected by ICE's actions.

9.     ICE has similarly failed to promulgate adequate rules and procedures for conducting these raids within permissible constitutional limits.

10.     ICE's failures have been repeatedly identified by such entities as the Department of Homeland Security Office of Inspector General (the "Inspector General"), which have cited ICE's lapses in training and information gathering that have contributed to the constitutional violations raised herein.

11.     Such failures have also been confirmed and criticized by Lawrence W. Mulvey, Commissioner of Police for Nassau County. In a public letter dated September 27, 2007, to Joseph A. Palmese, resident Agent-in-Charge of ICE investigations in Bohemia, New York, Commissioner Mulvey complained that when conducting raids in Nassau County that week, ICE agents lacked current intelligence, had incorrect addresses for targeted homes and displayed a "cowboy mentality." In one instance, Commissioner Mulvey noted that ICE agents were looking for a 28-year-old suspect using a photograph of the suspect from when he was seven years old. Commissioner Mulvey also confirmed that ICE misled the Nassau County Police about the nature of the raids and that by and large most people arrested in the raids were not targets of the raids but instead were undocumented immigrants. (*See* Exhibit 1 hereto for a complete copy of Commissioner Mulvey's letter.)

12.     Equally troubling is that Commissioner Mulvey's letter confirms that ICE plans to conduct future raids in Nassau County. *See* page 2 of Exhibit 1 in which Commissioner Mulvey states that the Nassau County Police will no longer lend support for these raids, but redacts the intended targets of future raids for confidentiality reasons.

13.     Nassau County Executive Thomas R. Suozzi has also complained to Defendant Chertoff about the actions and behavior of ICE agents conducting raids in Nassau County last week. In his public letter dated October 2, 2007, to Defendant Chertoff, County Executive Suozzi strongly suggests that ICE agents engaged in "misconduct" and "malfeasance" and utilized tactics that crossed "the lines of legality and law enforcement best practices" when conducting the raids. He also demanded an investigation by Defendant Chertoff. Some of the victims of last week's raids have been joined as named Plaintiffs in this matter. (*See* Exhibit 2 hereto for a complete copy of County Executive Suozzi's letter.)

14.     Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, and Carson Aguilar are members of the Leon/Aguilar family. Each is either a U.S. citizen or lawful permanent resident of the United States and each is a Latino who has been victimized by ICE's constitutional violations.

15.     On or about February 20, 2007, armed ICE agents pounded on the door of the Leon/Aguilar home located at 30 Copeces Lane, East Hampton, New York between 4:30 and 5:00 a.m. The ICE agents entered the Leon/Aguilar family home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search and illegally detained the Leon and Aguilar families. The agents never explained the family members' rights, prevented them from contacting a lawyer or the police, and failed to allow them to review what the ICE agents said was a warrant. Having once been victimized by ICE, the Aguilar and Leon families live in constant fear that ICE agents will return and again try to unlawfully enter their home.

5

Indeed, upon leaving the Leon/Aguilar family home, the ICE agents threatened that they would, in fact, be back.

16.     Plaintiff Nelly Amaya is Latino. She too is a victim of ICE's constitutional violations.

17.     On or about February 20, 2007, armed ICE agents kicked in the door of her home located at 20 Boatsteerer's Court, East Hampton, New York between 4:00 and 5:00 a.m. The ICE agents forcibly entered her home without a search warrant, consent, or any exigent circumstances. The ICE agents entered her home, physically abused her, and arrested her in retaliation for Nelly's demand to see a warrant. Nelly was never shown a warrant by ICE and lives in constant fear that ICE agents will again try to unlawfully enter her home.

18.     Plaintiffs Mario Patzan DeLeon, Gonzalo Escalante, Yoni Revolorio, and Juan Jose Mijangos are Latinos. They too are victims of ICE's constitutional violations.

19.     On or about April 18, 2007, armed ICE agents pounded on the door of their home located at 417 East Avenue, Riverhead, New York at about 4:30 a.m. The ICE agents forcibly entered the home without a judicial warrant, consent, or any exigent circumstances, by ramming through the back door of their home. The ICE agents arrested Mario, Gonzalo, Yoni and Juan Jose, handcuffing them and placing Mario in chains. The four men were then transported to Manhattan, where they were detained in a room, questioned, and released later that evening. The agents never explained their rights and failed to produce a warrant of any kind. Having once been victimized by ICE, Mario, Gonzalo, Yoni, and Juan Jose live in constant fear that ICE agents will return and again try to unlawfully enter their homes.

20.     Plaintiff David Lazaro Perez, William Lazaro, and Tarcis Sapon-Diaz are Latinos. They too are all victims of ICE's constitutional violations.

21.    On or about March 19, 2007, armed ICE agents forcibly entered their home located at 165 Main Street, Mount Kisco, New York at about 4:00 a.m. without a judicial warrant, consent, or any exigent circumstances. The ICE agents arrested David, William and Tarcis, placed them in handcuffs, and transported them to Manhattan, where they were detained for several hours. The men were later transported to a New Jersey detention center, from which they were released two days later. The agents never explained their rights and failed to produce a warrant of any kind. Having once been victimized by ICE, David, William and Tarcis live in constant fear that ICE agents will return and again try to unlawfully enter their home.

22.    Plaintiffs John Does ## 1-5 and Jane Doe #1 (collectively the "Doe Family") are Latinos and are members of two generations of the Doe Family. John Does ## 1, 4 and 5 and Jane Doe #1 are adults without immigration status. John Doe #2, age three, and John Doe #3, age one, are U.S. citizens. The members of the Doe Family are also victims of ICE's constitutional violations.

23.    In early 2007, armed ICE agents pounded on the door of the Doe Family home located in Suffolk County, New York at about 5:30 a.m. The agents had first entered the home of another family downstairs and, upon information and belief, had detained the person the ICE agents claimed they were looking for. Then, without a warrant or any exigent circumstances, the ICE agents attempted to break down the Doe Family apartment door and forcibly enter their apartment, but the locks held. The ICE agents then tried to cajole the Doe Family into opening the door, but the Doe family refused. The agents ultimately left without explaining the Doe Family's rights or producing a warrant. Having once been targeted by ICE for an unlawful entry, the Doe family lives in constant fear that ICE agents will return and attempt to unlawfully enter their apartment again.

24.    Plaintiffs Sonia Bonilla and her daughters Beatriz Velasquez and Dalia Velasquez are residents of Westbury, New York. Sonia is a lawful permanent resident, and her little girls are U.S. citizens. Each is a Latino person who has been victimized by ICE's constitutional violations.

25.    On September 24, 2007, armed ICE agents pounded on the door of the Bonilla/Velasquez home located at 710 Jefferson Street, Westbury, New York between 5:30 and 6:00 a.m. The ICE agents entered the home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search and illegally detained residents of the home. Four occupants of the home were arrested and no warrant of any kind was ever produced. The agents intimidated the twelve-year-old girl who opened the door while her parents were briefly out, conducted a full raid and a search. Having once been victimized by ICE, the Bonilla/Velasquez family lives in constant fear that ICE agents will return and again try to unlawfully enter their home.

26.    Plaintiffs Elder Bonilla and Diana Rodriguez are residents of Westbury, New York. Elder is a lawful permanent resident, and his fiancée Diana, who is also the mother of his two U.S. citizen children, has status as an asylee. Each is a Latino person who has been victimized by ICE's constitutional violations.

27.    On September 24, 2007, armed ICE agents pounded on the door of the Bonilla/Rodriguez home located at 22 Dogwood Lane in Westbury, New York between 5:30 and 6:00 a.m. When Elder opened the front door, ICE agents pointed a gun at his chest, immediately handcuffed him, and threw him toward the sofa. The ICE agents entered the home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search, damaged doors and walls, and illegally detained residents of the home, arresting six of them, including a sixteen-year-old boy, without ever showing a warrant.

8

28.    Plaintiff Yanet Martinez is a resident of 20 Chase Court, a home owned by her parents in Hempstead, New York. She is a Latino and an U.S. citizen who has been victimized by ICE's constitutional violations.

29.    On September 26, 2007, ICE agents burst into the front door of Yanet's home, kicking and pounding on the individual, locked doors of tenants in the home, forcibly entering a bathroom where a woman was showering, and damaging doors and walls throughout the first floor and basement of the home. The ICE agents entered without a judicial warrant, consent, or exigent circumstances, conducted an unlawful search, and detained six residents of the house.

30.    Plaintiff Raul Amaya and his wife, Plaintiff Gloria Vanessa Amaya, are residents of 58 East 6th Street, Huntington Station, New York. Raul is a U.S. citizen of Latino origin and Gloria Vanessa is a lawful conditional resident of Latino origin. They were both victimized by ICE's constitutional violations.

31.    Ten to fifteen ICE agents arrived at the Amaya home on September 27, 2007 at approximately 7:30 a.m. Raul was outside the home getting ready for work. The agents used profanities, and accused Raul of being "in trouble with the IRS," "under arrest," having no status, and holding a suspended or invalid driver's license. After refusing to look at Raul's documentation, and without a judicial warrant or exigent circumstances, ICE agents proceeded to enter Raul's house without consent. When Gloria Vanessa came out to investigate the loud commotion, she was interrogated by ICE agents. The ICE agents then entered and searched the home, including attempting to use a kitchen knife to pry open a locked door and attempting to kick open the basement unit. ICE agents searched the home for over an hour-and-a-half. As they were leaving, some ICE agents threatened to return later that day or in the following week.

32.    As a result of the raids on their homes, Plaintiffs have been profoundly traumatized, and remain extremely fearful that the ICE agents will return to inflict further harm.

Indeed, in several instances, the ICE agents have made specific threats that they would in fact return and Commissioner Mulvey has confirmed that ICE has plans to conduct future raids in at least Nassau County.

33.    Without judicial intervention there will be no end to ICE's unlawful and unconstitutional activities, and there is a credible threat of recurrent injuries to Plaintiffs and the class. By all appearances, ICE is continuing its aggressive, Latino-targeted program and increasing its unconstitutional enforcement activities without regard to the constitutional rights of those affected. The named Plaintiffs, like the other members of the class, are at real risk of further Fourth Amendment violations at the hands of ICE because they are Latino and/or associate with Latino individuals.

34.    ICE agents have conducted, and continue to conduct, similar raids against innocent and unsuspecting Latinos throughout ICE's New York City Region. To put an end to these unlawful activities, Plaintiffs seek on behalf of themselves and all others similarly situated a permanent injunction restraining agents within the jurisdiction of ICE's New York City Region from conducting home raids until they have established appropriate procedures and standards governing the conduct of ICE agents in performing home raids so as to assure that Plaintiffs and the class will not be subjected to the unlawful practices complained of herein.

35.    Plaintiffs also seek compensation for their own damages suffered as a result of the raids on their homes.

### JURISDICTION AND VENUE

36.    Jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331.

37.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, *inter alia*, (1) at least one of the defendants resides in this judicial district and (2) at least one of the Plaintiffs resides in this district and no real property is involved in this action.

10

## PARTIES

38.    Plaintiff ADRIANA AGUILAR is a citizen of the United States.  At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York. She appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for (a) her five-year-old son, Plaintiff CARSON AGUILAR and (b) her thirteen-year-old daughter, Plaintiff ERIKA GABRIELA GARCIA-LEON.

39.    Plaintiff CARSON AGUILAR is a citizen of the United States.  At all times relevant to this action, he was and is a resident of East Hampton, Suffolk County, New York, living with his mother, Plaintiff Adriana Aguilar.

40.    Plaintiff ERIKA GABRIELA GARCIA-LEON ("Gabriela") is a lawful permanent resident of the United States, whose citizenship application is currently pending.  At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York, living with her mother, Plaintiff Adriana Aguilar.

41.    Plaintiff ANDRES LEON is a citizen of the United States.  At all times relevant to this action, he was and is a resident of East Hampton, Suffolk County, New York.

42.    Plaintiff ELENA LEON is a citizen of the United States.  At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York.

43.    Plaintiff NELLY AMAYA is Latino.  At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York.

44.    Plaintiff MARIO PATZAN DeLEON is Latino.  At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

45.    Plaintiff GONZALO ESCALANTE is Latino.  At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

11

46.    Plaintiff YONI REVOLORIO is Latino.  At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

47.    Plaintiff JUAN JOSE MIJANGOS is Latino.  At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

48.    Plaintiff DAVID LAZARO PEREZ is Latino.  At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

49.    Plaintiff WILLIAM LAZARO is Latino.  At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

50.    Plaintiff TARCIS SAPON-DIAZ is Latino.  At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

51.    Plaintiff RAUL AMAYA is a citizen of the United States.  He is Latino.  At all times relevant to this action, he was and is a resident of Huntington Station, Suffolk County, New York.

52.    Plaintiff GLORIA VANESSA AMAYA is a lawful conditional resident of the United States. She is Latino.  She is married to Plaintiff RAUL AMAYA.  At all times relevant to this action, she was and is a resident of Huntington Station, Suffolk County, New York.

53.    Plaintiff JOHN DOE #1 is Latino.  At all times relevant to this action, he was and is a resident of Suffolk County, New York.  Plaintiff JOHN DOE #1 is married to Plaintiff JANE DOE #1.

54.    Plaintiff JANE DOE #1 is Latino.  At all times relevant to this action, she was and is a resident of Suffolk County, New York.  Plaintiff JANE DOE #1 is married to Plaintiff JOHN DOE #1.  Plaintiff JANE DOE #1 appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for (a) her three-year-old son, Plaintiff JOHN DOE #2 and (b) her one-year-old son, Plaintiff JOHN DOE #3.

12

55.    Plaintiff JOHN DOE #2 is a citizen of the United States. At all times relevant to this action, he was and is a resident of Suffolk County, New York, living with his parents, Plaintiffs JOHN DOE #1 and JANE DOE #1.

56.    Plaintiff JOHN DOE #3 is a citizen of the United States. At all times relevant to this action, he was and is a resident of Suffolk County, New York, living with his parents, Plaintiffs JOHN DOE #1 and JANE DOE #1.

57.    Plaintiff JOHN DOE #4 is Latino. At all times relevant to this action, he was and is a resident of Suffolk County, New York. Plaintiff JOHN DOE # 4 is Plaintiff JANE DOE #1's brother.

58.    Plaintiff JOHN DOE #5 is Latino. At all times relevant to this action, he was and is a resident of Suffolk County, New York. Plaintiff JOHN DOE # 5 is Plaintiff JANE DOE #1's brother.

59.    Plaintiff SONIA BONILLA is a lawful permanent resident of the United States. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York. She appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for (a) her twelve-year-old daughter, Plaintiff BEATRIZ VELASQUEZ and (b) her nine-year-old daughter, Plaintiff DALIA VELASQUEZ.

60.    Plaintiff BEATRIZ VELASQUEZ is a citizen of the United States. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York, living with her parents, SONIA BONILLA and NOE VELASQUEZ.

61.    Plaintiff DALIA VELASQUEZ is a citizen of the United States. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York, living with her parents, SONIA BONILLA and NOE VELASQUEZ.

62.    Plaintiff ELDER BONILLA is a lawful permanent resident of the United States. At all times relevant to this action, he was and is a resident of Westbury, Nassau County, New York.

63.    Plaintiff DIANA RODRIGUEZ is Latino. She has asylee status. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York.

64.    Plaintiff YANET MARTINEZ is a citizen of the United States. At all times relevant to this action, she was and is a resident of Hempstead, Nassau County, New York.

65.    Defendant IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY ("Defendant ICE") is headquartered in Washington, D.C., with an Office of Detention and Removal Operations Field Office located in New York, New York.

66.    The Special Agent-in-Charge Offices of Defendant ICE OFFICE OF INVESTIGATIONS are responsible for the administration and management of enforcement activities within the geographic boundaries of the office. Upon information and belief, the Bohemia, New York office of Defendant ICE Office of Investigations was involved in the home raids conducted in Nassau County on September 24 and 26, 2007.

67.    Defendant MICHAEL CHERTOFF ("Defendant Chertoff") is the United States Secretary of the Department of Homeland Security in Washington, D.C. Defendant Chertoff is, among other things, charged with constitutional and lawful implementation of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, and with the administration of the division of Immigration and Customs Enforcement. Defendant Chertoff is sued in his official capacity.

68.    Defendant JULIE L. MYERS ("Defendant Myers") is the Assistant Secretary of Homeland Security for Immigration and Customs Enforcement in Washington, D.C. Defendant Myers is, among other things, charged with the constitutional and lawful implementation of the

14

Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, and with the administration of the division of Immigration and Customs Enforcement. Defendant Myers is sued in her official capacity.

69.    Defendant JOHN P. TORRES ("Defendant Torres") is the Director of the Office of Detention and Removal Operations for ICE in Washington, D.C. Defendant Torres is responsible for the apprehension, detention and removal of foreign nationals charged with violation of immigration law and the supervision of sworn law enforcement officers assigned to the Detention and Removal field offices, including the field office based in New York County, New York. Defendant Torres is sued in his official capacity.

70.    Defendant CHRISTOPHER SHANAHAN is the Field Office Director for the Detention and Removal Operations Field Office based in New York County, New York. Defendant Shanahan is responsible for managing enforcement activities of ICE in the downstate New York area, including Suffolk and Westchester Counties.

71.    Upon information and belief, Defendant Shanahan was personally involved in and/or personally ordered or authorized the conduct of ICE agents at the homes of the named Plaintiffs as complained of herein. At a minimum, Defendant Shanahan was grossly negligent in managing the training and activities of the ICE agents under his supervision. Defendant Shanahan is sued individually.

72.    Defendant PETER J. SMITH ("Defendant Smith") is a special agent with ICE. Upon information and belief, Defendant Smith was in charge of ICE home raids conducted in Nassau County on September 24 and 26, 2007. Defendant Smith is sued individually.

73.    Upon information and belief, Defendant JOSEPH A. PALMESE ("Defendant Palmese") is the resident agent in charge of the Bohemia, New York office of Defendant ICE Office of Investigations. Upon information and belief, Defendant Palmese was personally

15

involved in and/or personally ordered and authorized the conduct of ICE agents in the Nassau County home raids on September 24 and 26, 2007. Defendant Palmese is sued individually.

74.    At all times relevant to the incidents complained of in this action, Defendants JOHN and JANE DOE ICE AGENTS were federal law enforcement agents employed by Defendant ICE.

75.    Defendants John and Jane Doe ICE Agents are sued individually.

76.    The true names and total number of Defendants John and Jane Doe ICE Agents are unknown to Plaintiffs, and therefore, Plaintiffs sue these Defendants by such fictitious names.

77.    Upon information and belief, each John and Jane Doe ICE Agent Defendant is responsible for the injuries and damages suffered by Plaintiffs caused by the acts alleged in this complaint.

78.    Plaintiffs will amend their complaint to state the true names of Defendants John and Jane Doe ICE Agents after those names have been identified.

79.    At all times relevant to the incidents complained of in this action, Defendants JOHN and JANE ROE ICE SUPERVISORS were federal law enforcement officials employed by Defendant ICE.

80.    The true names and total number of Defendants John and Jane Roe ICE Supervisors are unknown to Plaintiffs, and therefore, Plaintiffs sue these Defendants by such fictitious names.

81.    Upon information and belief, each John and Jane Roe ICE Supervisor Defendant is responsible for the injuries and damages suffered by Plaintiffs caused by the acts alleged in this complaint. Defendants John and Jane Roe are sued in their individual capacities.

82.    Plaintiffs will amend their complaint to state the true names of Defendants John and Jane Roe ICE Supervisors after those names have been identified.

83. In committing the acts alleged in this complaint, Defendants John and Jane Doe ICE Agents and John and Jane Roe ICE Supervisors were acting on behalf of Defendant ICE.

84. Further, upon information and belief, Defendants John and Jane Doe ICE Agents were acting under the immediate supervision of Defendants Torres, Shanahan, and John Roe and Jane Roe ICE Supervisors and pursuant to their authorization.

85. Defendants Shanahan, Smith, Palmese, John and Jane Doe ICE Agents, and John and Jane Roe Supervisors knew or should have known that committing the acts alleged in this complaint violated Plaintiffs' clearly established constitutional rights.

## FACTS

### Background on ICE

86. ICE is a division of the Department of Homeland Security and was formed in March 2003. ICE is comprised of four divisions, one of which is the Office of Detention and Removal Operations ("DRO").

87. The DRO has been running the National Fugitive Operations Program since February 2002. The goal of the National Fugitive Operations Program is to eliminate the backlog of fugitive aliens.

88. In August 2003, the DRO announced that it would step up its activities in locating and deporting fugitive aliens.

89. Since announcing its plan in 2003, ICE's DRO has pursued its goal to increase the number of persons removed from this country.

90. As of January 2006, each Fugitive Operations Team was expected to arrest 1,000 fugitive aliens per year. By comparison, in 2003, each team was expected to make only 125 arrests.

17

91.     However, ICE's DRO has implemented neither a corresponding increase in training nor procedures sufficient to protect the rights of persons affected by their activities. Moreover, members of the Fugitive Operations Teams are permitted to take part in home raids without first completing whatever little training ICE provides on how to lawfully conduct such raids.

92.     Furthermore, the DRO and Fugitive Operations Teams rely on a database that purports to contain relevant information concerning, among other things, the location of fugitive aliens.

93.     Much of the information in this database, however, is outdated, inaccurate and incomplete.

94.     Upon information and belief, the DRO has procedural manuals that are used to provide guidance to the Fugitive Operations Teams in conducting apprehension operations.

95.     Upon information and belief, these procedural manuals are inadequate and incomplete in that, among other things, they do not contain adequate specific instructions for determining how to obtain consent to enter a private home or how ICE agents are to conduct themselves within a private home.

96.     The Inspector General has criticized ICE for its incomplete and inaccurate background information, understaffing, and incomplete and inadequate training. Specifically, in its report of March 2007, the Inspector General noted that:

(a)     the DRO immigration database contained inaccurate and incomplete information on fugitive aliens;

(b)     data exchanged between the DRO and its federal partners have not been reconciled on a regular basis to ensure the identity and background information on the fugitive alien is valid;

(c)      Fugitive Operations Teams are not fully staffed;

(d)      headquarters and other locations that support Fugitive Operations Teams are not fully staffed;

(e)      not all Fugitive Operations Team members have completed the Fugitive Operations Training Program; and

(f)      there is no national refresher course for those Fugitive Operations Team members who have attended the program.

(A true and correct copy of the Inspector General's March 2007 report is attached hereto as Exhibit 3.)

### The ICE Raid on the Leon/Aguilar Family Home

97.      The Leon and Aguilar Plaintiffs are members of three generations of a Latino family.  With one exception, all are United States citizens.  The one exception is a young girl who is a lawful permanent resident of the United States and whose citizenship application is pending.

98.      On the morning of February 20, 2007, the Leon and Aguilar Plaintiffs were all asleep in the Leon/Aguilar family home.

99.      Between about 4:30 and 5:00 a.m., several ICE agents pulled their unmarked cars onto the road outside the family home, blocking the driveway.

100.      They parked their cars in such a way as to prevent any of the cars already in the driveway from exiting the driveway.

101.      The ICE agents then repeatedly rang the doorbell and pounded on the front door of the Leon/Aguilar family home.

102.      Elena Leon had been asleep and was startled awake by the noise of pounding and doorbell-ringing, and went to the door.

103.   When she opened the door, Elena witnessed several uniformed men standing outside the door.

104.   The men were wearing sidearms, which were clearly visible.

105.   Elena was stunned and terrified.

106.   The armed, uniformed men were ICE agents.

107.   As soon as Elena opened the door, two of the ICE agents crossed the threshold of the front door and entered the Leon/Aguilar family home.

108.   The others quickly followed.

109.   The ICE agents entered the Leon/Aguilar home without permission or voluntary consent.

110.   None of the ICE agents told Elena that she had the right to refuse them permission to enter her home.

111.   At no time did any of the ICE agents show Elena a warrant that granted permission for them to enter the Leon/Aguilar family home.

112.   There were no exigent circumstances that may have permitted the ICE agents to enter the Leon/Aguilar family home without a valid judicial warrant or voluntary consent.

113.   The ICE agents proceeded into the lower floor of the home, pounding on and opening bedroom doors.

114.   When she heard the noise, Erika Gabriela Garcia-Leon ("Gabriela") opened her bedroom door to see what was happening. Still in her nightclothes, and seeing men storming through the hallway, she slammed the door and leapt back into bed. The ICE agents opened the door. Gabriela was twelve years old at the time.

115.   Andres Leon was also awakened and opened his door. He saw two agents entering the hallway from the basement door. It was apparent that the agents had been in the basement without permission.

116.   At the same time, some of the agents entered the bedroom of Adriana Aguilar, where she was asleep with her son, Carson, who was four years old.

117.   The ICE agents pulled the covers off of her bed and shone flashlights into her face and the face of her son, who began to cry.

118.   The ICE agents searched the Aguilar/Leon family home without the consent of the Leon or Aguilar families.

119.   Startled awake, frightened and confused, Adriana repeatedly asked the ICE agents who they were and what they were doing.

120.   The ICE agents gathered Adriana, Andres and Gabriela in the office space on the ground floor of the house.

121.   The ICE agents positioned themselves so that the exits leading out of the office area were blocked.

122.   Adriana and Andres were not free to leave the office area.

123.   The agents would not say who they were despite being asked to identify themselves.

124.   The ICE agents would not permit Adriana to call the police or a lawyer.

125.   When Adriana attempted to open a drawer to get the telephone number of a lawyer, the agents put their hands on their weapons.

126.   One agent ordered her not to move.

127.    Only after the ICE agents had Adriana in the office area did they indicate that they were looking for someone specific.  They listed the names of several men whom they were looking for, including a man named "Wilson Garcia."

128.    Adriana thought they might have been referring to her first husband, whose name is Wilson Patricio Garcia, but who went by his middle name, "Patricio."

129.    Adriana had divorced him five years earlier in 2002.

130.    Adriana's divorce from Wilson Patricio Garcia, her subsequent marriage to her current husband Norman Aguilar, and her purchase of the Aguilar/Leon family home together with Norman are all matters of public record easily available to ICE had they checked.

131.    It was entirely unreasonable for the ICE agents to believe that they would find Wilson Patricio Garcia in the Leon/Aguilar family home at the time of the raid.

132.    In the office area, the ICE agents questioned Andres, Adriana and Gabriela about Wilson Garcia.

133.    While in the office area, Adriana asked the ICE agents to see a warrant.

134.    One of the agents told her that they would show her the warrant.

135.    However, the agents did not show her any warrant.

136.    Andres also asked the ICE agents to see a warrant.

137.    The ICE agents did not permit Andres to read a warrant.

138.    Instead, one of the ICE agents opened and then quickly closed a manila folder containing papers that the ICE agents claimed was a warrant.

139.    The quick display of the contents of the folder did not allow Andres to confirm the existence of a warrant or the opportunity to read any of the contents.

140.    Upon information and belief, the ICE agents did not have a warrant that permitted them to enter or search the Leon/Aguilar family home or to detain the Leon/Aguilar family without voluntary consent or exigent circumstances.

141.    A Freedom of Information Act request seeking a copy of any such warrant was made to ICE and has been outstanding since early July 2007.

142.    To date, ICE has yet to produce a copy of any such warrant.

143.    As the ICE agents were leaving the office area, Adriana asked one of the agents in Spanish where the warrant was. In English, he indicated to one of his colleagues that she was asking for the warrant.

144.    The ICE agents never provided any member of the Leon or Aguilar families with a copy of a warrant.

145.    On the way out of the office area, one of the ICE agents, turned to twelve-year-old Gabriela and said that they would be back. Adriana Aguilar and Andres Leon heard the agent say this clearly, in English.

### The ICE Raid on the Amaya Household

146.    Nelly Amaya rents a basement apartment at 20 Boatsteerer's Court in East Hampton, Suffolk County, New York. The apartment has three bedrooms. She has lived in this apartment since July 2006.

147.    At the time of the raid (described herein), Nelly shared this apartment with her ex-husband, Giovany Vicuña, her father, Antonio Amaya, and her brother-in-law, Marlon Vicuña.

148.    On the morning of February 20, 2007, the residents of the Amaya household were all asleep.

149.    Between about 4:00 and 5:00 a.m., several ICE agents forcibly entered the Amaya household by kicking the entry door open.

150.   The ICE agents entered Nelly's home without permission or voluntary consent from her or any other member of the household.

151.   The ICE agents did not explain to any member of the family that they had the right to refuse them permission to enter her home.

152.   Nelly was sleeping and was awakened by the agents screaming the name of her brother-in-law, Marlon Vicuña as they entered her apartment.

153.   Nelly saw several uniformed men blocking her bedroom door.

154.   The men were wearing sidearms, which were clearly visible.

155.   The men shone a flashlight in Nelly's eyes while at the bedroom door.

156.   The ICE agents then entered her bedroom.

157.   Nelly was wearing only a t-shirt and underwear when the men entered her bedroom.

158.   Immediately after crossing the threshold of Nelly's bedroom, the two ICE agents began questioning her and repeatedly asked for Marlon Vicuña.  Nelly asked who they were but they did not identify themselves.

159.   Nelly was ordered to go to the living room.

160.   Nelly threw on pajama pants and a sweatshirt before being pulled by her arm into the living room. After being pulled into the living room, she asked permission to use the bathroom and was not allowed to do so privately.

161.   When Nelly attempted to go to the bathroom to use the toilet, the ICE agents refused to let her close the door.

162.   Nelly asked the agents for a warrant, but the agents refused to show her any warrant.

163.   After she requested to see a warrant, one of the ICE agents asked Nelly her name.

24

164.    Nelly responded, "Nelly Amaya."

165.    The ICE agent started laughing and said, "Nelly Amaya, this is your arrest order. You are under arrest."

166.    At no time did any of the ICE agents show Nelly a warrant that granted permission for them to enter or search her home or to arrest her.

167.    There were no exigent circumstances that may have permitted the ICE agents to enter Nelly's home without a valid warrant or voluntary consent.

168.    The ICE agents searched the Amaya family home without permission or consent from the Amaya family.

169.    The ICE agents did not say who they were.

170.    One of the ICE agents put Nelly against the wall to frisk her.

171.    The ICE agent twisted Nelly's arm behind her.

172.    Nelly's arm was already injured before the raid.  During her waking hours, Nelly wore a sling, which was next to her bed when the ICE agents stormed into her bedroom.

173.    The agent's actions exacerbated Nelly's injuries.

174.    The ICE agents arrested, handcuffed and detained Nelly.

175.    The handcuffs caused Nelly's arm to swell and turn purple.

176.    Nelly was then transported to the Wainscott police station where the ICE agents changed their clothes.

177.    During the car ride, Nelly suffered an asthma attack.

178.    The ICE agents called an ambulance while at the Wainscott police station.  An emergency medical services worker took Nelly's pulse but did not give her any treatment, and did not even look at her swollen arm.

179.    Nelly was then transported from the Wainscott police station to 26 Federal Plaza in Manhattan.

180.    At 26 Federal Plaza, Nelly was fingerprinted and questioned by a female officer.

181.    The female officer asked, "Why did they take you in? You have a clean record."

182.    During the course of questioning the female officer also said, "You shouldn't have asked for a warrant."

183.    While under detention, Nelly was having difficulty breathing because of her asthma.  She was also still in pain from the damage to her arm.

184.    She told the ICE agents on duty that she felt congested because of her asthma.

185.    Approximately 10 hours after initially detaining Nelly and without providing her any medical treatment for her asthma or her injured arm, the ICE agents released her.

186.    Nelly was left to find transportation home on her own. She was dressed in her nightclothes and had no money or even a coat to keep her warm as she tried to hail a cab in the February cold.  After more than an hour without success, Nelly finally was able to convince a cabdriver to take her to Queens, where a friend of hers paid the fare.

187.    Nelly suffered a great deal of physical and psychological pain and discomfort and humiliation as a result of the raid, arrest and detention.

### The ICE Raid at 417 East Avenue, Riverhead, NY

188.    Mario Patzan DeLeon rents a room on the second floor of a rooming house at 417 East Avenue in Riverhead, Suffolk County, New York.  The door to his room has a lock and a private key.

189.    Gonzalo Escalante rents a room on the first floor at 417 East Avenue.  At the time of the raid, he shared it with another tenant.  The room had and has a private lock and key.  Juan

Jose Mijangos also rents a room with its own lock and key on the first floor of the rooming house.

190.    Yoni Revolorio also rents a private room at 417 East Avenue with a private lock and key.

191.    On April 18, 2007, at about 4:30 in the morning, Mario was awakened to the sound of shouts and loud banging. He ran into the hallway and looked out the window, where he saw several cars outside. Large lights were shining into the rooming house.

192.    Mario went back into his bedroom and locked the door.

193.    Gonzalo and Juan Jose were also awakened by the pounding and shouting at the front door. Soon he heard noise coming from the kitchen on the first floor. Men were ordering them to come out of their rooms, which they did. They went into the kitchen, where several agents had gathered. It appeared that agents had forced themselves through the back door, which had a less secure lock than the front door.

194.    In the kitchen, an agent grabbed Juan Jose by the neck, pushed him, and handcuffed him. Gonzalo was also handcuffed, as were others who were taken out of their rooms.

195.    Agents knocked on the second-floor bedroom of Yoni. They said they were police and asked him to come out of the room to talk in the kitchen. When Yoni obeyed and went downstairs, he too was handcuffed.

196.    From his bedroom on the second floor, Mario could hear the shouting and loud banging and ramming against the outside doors. After some time, Mario heard and felt men screaming and pounding against his bedroom door.

197.   Two men with uniforms who indicated that they were ICE burst into his room. They took Mario's wallet. Then they told him to go down to the kitchen because they just wanted to speak with him.

198.   In the kitchen, the men were placed in handcuffs. At no point were they shown a warrant or court order permitting the ICE agents to enter the house without consent. They were led outside to waiting vehicles.

199.   The group of cars continued to four more houses to conduct additional raids. From the vans, Mario and Gonzalo could hear similar banging and shouting at one or more of these houses.

200.   After the raids, the ICE agents stopped in a parking lot. While the men they had picked up waited in the car, the ICE agents had some coffee and some breakfast.

201.   Mario asked an officer if he could use the bathroom. He was placed in chains and told to relieve himself outdoors, while the agents observed. Mario remained in chains for the rest of the journey.

202.   After about 90 minutes, the cars arrived at 26 Federal Plaza in Manhattan. The men were taken inside the building to be interrogated. About 25 men were placed in a locked room to wait while each individual was questioned, one by one.

203.   Mario, Yoni, Juan Jose and Gonzalo were released several hours later, in the evening. Most of the men had no money to return home. Some of the men had managed to keep some cash with them, and they lent the others money to take the train home to Riverhead. They did not reach their home until about one o'clock in the morning of April 19, 2007.

204.   Once home, the men observed that the front door of the house was dented and damaged from the ramming by the agents, and that one of the double locks on the front door had been pounded so hard that it left a large hole in the plaster of the doorframe. It seemed that the

agents had not succeeded in opening the front door and instead had rammed through the back door, which did not have a double lock. The front door remains damaged.

205.    Upstairs, in Mario's bedroom, Mario observed that the wooden doorframe around his door had come loose from the pounding by the agents. He repaired the doorframe himself.

206.    Mario, Gonzalo, Juan Jose and Yoni remain frightened and traumatized by the raid. They fear that agents will return at any time to terrorize them again.

### The ICE Raid at 165 Main Street, Mount Kisco, NY

207.    David Lazaro Perez and William Lazaro rent a room on the third floor of a rooming house at 165 Main Street in Mount Kisco, Westchester County, New York. The door to the room has a lock with a private key. At the time of the raid, they shared this room with William's father.

208.    Tarcis Sapon-Diaz also rents a room at 165 Main Street. He shares the room, which is on the third floor, with his brother. The room has a private lock and key.

209.    On March 19, 2007, at about 4:00 a.m., David, William, and Tarcis were awakened to the sound of loud pounding and knocking outside his rooming house. Bright lights were shining into the house.

210.    Tarcis looked out of the window of his room and saw seven or eight cars outside the house.

211.    David and William heard knocking at the door of their room. They did not open the door. Three law enforcement agents, two men and one woman, forced open the door and burst into the room. The agents, a couple of whom were wearing jackets that read "ICE," did not identify themselves.

212.    The ICE agents did not say who they were looking for and did not show a warrant. Nonetheless, they asked the young men for their identification and then ordered them to

29

get dressed. David and William heard other agents pounding on the doors of the rooms of other tenants and ordering them to open the doors.

213.    Tarcis heard loud pounding and knocking on his door. He and his brother did not open the door, but the pounding continued. Fearing that the door would be broken down, he at last opened the door. Men who he believed to be ICE agents and Mt. Kisco police officers burst into his room. They demanded identification and handcuffed him and his brother.

214.    David, William, Tarcis and other tenants of the rooming house were led into the hallway. Those not already in handcuffs were handcuffed. William's waist and legs were chained. The men were taken out of their home to waiting vans. They could see that several additional agents surrounded the house.

215.    After a stop at the Mount Kisco police station, David, William, Tarcis and the others were transported to 26 Federal Plaza, in Manhattan, where they were detained for several hours.

216.    The ICE agents took the detainees' belts and wallets. David's wallet contained about seven hundred dollars in cash, and William's contained about four hundred dollars in cash.

217.    The men were taken to another building and detained in a room. After several hours, they were transported to a detention center in New Jersey, where they were jailed for two nights. On the afternoon of March 21, David, William, Tarcis and others were transported back to 26 Federal Plaza and released at about 11:00 at night. ICE did not return the men's cash until several weeks after the raid. As a result, they were released from Department of Homeland Security custody without any cash to return home. David was lucky enough to have an ATM card, and he took out enough cash to get himself and the other released detainees home.

218.    The men did not arrive home in Mount Kisco until about one o'clock in the morning of March 22, 2007.

219.    The men have remained fearful since the night of the raid.

220.    The ICE agents had entered the rooming house and the individual rented rooms without exigent circumstances, consent or a judicial warrant.

### The ICE Raid on the Doe Family

221.    The Doe Family represents two generations of a Latino family living together in one unit of a two-family house. While each unit has a separate, locked entrance door, both units share a common entryway and a front door that is kept locked.

222.    The Doe Family lives in the unit on the upper level of the home, located at the top of a stairwell that leads up from the entryway.

223.    On the night of the raid all members of the Doe Family were asleep in their home. At approximately 5:30 a.m. the Doe Family was awakened when ICE agents broke down and forcibly entered through the common entrance door of the house.

224.    After the ICE agents forcibly entered through the entryway, the adult members of the Doe Family heard them break down the door and forcibly enter the downstairs apartment.

225.    The children, JOHN DOE #2 and JOHN DOE #3, awakened by all of the noise, became terrified and began crying.

226.    After the ICE agents had detained people from the downstairs apartment and placed them in a van, including, upon information and belief, the person the ICE agents claimed they were looking for, the ICE agents climbed the stairs and attempted to enter the Doe Family's apartment.

227.    The adult family members, JOHN DOE #1, JANE DOE #1, JOHN DOE #4, and JOHN DOE #5 heard the agents shouting in English, "Immigration! Open the door" as they were coming up the stairs.

31

228.    The ICE agents attempted to break down the Doe Family's entrance door and forcibly enter the apartment. The agents, however, were unable to enter the apartment.

229.    One of the ICE agents tried to convince the Doe Family to open the door.

230.    Both JOHN DOE #1 and JANE DOE #1 explained to the agents that they wanted to see a warrant and that the agents should place it under the door. They insisted that they would not open the door until they saw something on paper.

231.    The same agent responded that they would go and get the necessary papers if the Doe Family did not voluntarily let them in, and so the Doe Family should open the door and let them in.

232.    The ICE agents then tried to convince the Doe Family that they were police and, therefore, the Doe Family should not be afraid of them and should open the door to them.

233.    JANE DOE #1 told the ICE agents that there were children in the apartment that were very frightened and that the ICE agents should leave.

234.    The agents ultimately became very angry and left the home.

235.    The Doe Family lives in daily terror that the ICE agents will return to the apartment, break down their door, and arrest the adults in the family, separating the Doe parents from their young children.

### The ICE Raid at the Bonilla/Velasquez Home in Westbury, New York

236.    Sonia Bonilla has been a resident of Westbury, New York, since 1992. Sonia lives at 710 Jefferson Street, in a house which she shares with her husband, Noe Velasquez, and her two daughters, Beatriz, who is twelve, and Dalia, who nine years old. Sonia Bonilla and Noe Velasquez rent extra rooms in their house to tenants.

237.    Sonia was born in El Salvador on March 3, 1976 and became a lawful permanent resident of the United States in 1992. Her children are U.S.-born citizens.

238.    On Monday, September 24, 2007, Sonia awoke to drive her husband to work at the Westbury sanitation department. She and her husband left the house at about 5:45 a.m. Beatriz, who is twelve-years-old, and Dalia, who is nine-years-old, were asleep when Sonia left the house.

239.    A few moments later, Beatriz was awakened by her sister Dalia. Dalia told Beatriz that police were at the house. Beatriz left her room in her pajamas to see who was at the door. Beatriz heard loud, violent knocking at the door.

240.    ICE agents outside the door were shouting, "Police! Police!" Beatriz believes she heard them say, "Someone is dying upstairs." She opened the door and saw three men and one woman standing outside the door. They did not tell her who they were. One was wearing a vest that said "police" in the front.

241.    The agents asked the little girl where her parents were, and then proceeded to enter the house and interrogate her about who lived in the house.

242.    The family dog began to bark, and the agents ordered Beatriz and her sister to take the dog into their bedroom and stay there.

243.    The girls could hear the agents storming through the house and bedrooms, shouting and knocking on doors of the family's tenants. From their bedroom window, the girls could see more agents outside the house.

244.    The infant of one of the tenants upstairs began to cry, and Beatriz overheard the tenant asking if he could leave the baby, who was four months old, with Beatriz and her sister. Instead agents detained the tenant and left the baby alone in the bedroom, crying.

245.    At about five minutes after six, Sonia drove onto her street and saw several unmarked cars parked in front of her house and became alarmed. Sonia drove into the driveway and parked.

33

246.    The girls could hear her mother's van drive into the driveway. Beatriz and her sister started to scream, "Mommy! Mommy!"

247.    Two men approached Sonia's van and ordered her out. They refused to explain what was happening, instead taking her wallet and searching for her identification. One agent shone a light into her van and searched inside. They would not permit her to go inside her own home. Sonia could see that other agents were inside the house, and she was terrified for her children.

248.    After a few minutes Sonia saw more agents coming out of the basement with two of her tenants. One was in handcuffs. Other tenants were in the living room, and four agents guarded the living room and hallway.

249.    Once finally inside her house, Sonia checked on her children. One of the agents, who had been attempting to open a locked closet in Sonia's room, demanded a key to the closet. About four agents escorted her into her bedroom. Agents had already opened dresser drawers, and once inside the closet, searched through clothing and shoes.

250.    The agents left at about 45 minutes later at about 6:30 .a.m.

251.    At no point during the entire raid did any of the agents show Sonia or Beatriz a warrant of any kind or tell them who or what they were looking for. There was no search warrant, exigent circumstance, or valid, competent consent to enter the home.

252.    Sonia Bonilla, her husband and her daughters live in daily fear that the ICE agents will return to the apartment, forcibly enter, and terrorize the family.

### The ICE Raid at the Bonilla/Rodriguez Home in Westbury, New York

253.    Elder Bonilla is a lawful permanent resident who lives at 22 Dogwood Lane in Westbury, New York. He lives with his fiancée, Diana Rodriguez, and their two U.S. Citizen

children, who are 15 months old and three months old. They share their home with several members of Diana's family and a friend.

254.    On Monday, September 24, 2007, the family was awakened by loud pounding and shouting outside the house. Elder went to the front door and saw through the window on the door that law enforcement agents were outside. They began to scream, in English, "Open the door!"

255.    Elder opened the door. Immediately, three agents burst in, and one of the agents pointed a gun at Elder's chest. Elder was handcuffed and pushed toward the sofa in his living room. Men stormed into the house and began pounding and searching through bedrooms.

256.    Upstairs, the agents handcuffed Diana and led her downstairs, leaving the children crying upstairs in their bedroom. They began handcuffing and detaining other adults in the living room, as well as Diana's sixteen-year-old cousin. While agents kept watch in the living room, others searched upstairs, pounding on walls and breaking down the door of a storage closet.

257.    Upstairs, the children continued to scream and cry. Downstairs, the men were being asked for identification.

258.    Elder said he had his papers upstairs, and was escorted by agents upstairs. Once upstairs, neither he nor Diana were permitted to leave their bedroom.

259.    ICE agents detained and took from the house five men and one sixteen-year-old boy, Carlos Flores. They took Carlos with them into their custody despite the fact that his mother, Diana's aunt, was in the home.

260.    At no point did any agent show a warrant of any kind or even explain who or what they were looking for. There were no exigent circumstances that could have justified their entry, and they did not even attempt to obtain consent to enter or search.

35

261.    Elder has not been able to sleep well or eat well since the raid.  He and Diana live in constant fear that ICE agents will return to humiliate and brutalize their family.

### The ICE Raid at 20 Chase Court in Hempstead, New York

262.    Yanet Martinez is a U.S.-born citizen, age 21, who lives at 20 Chase Court in Hempstead New York.  She lives in a three-story home owned by her parents, sharing a second-floor bedroom with her boyfriend.  At the time of the raid, several tenants were renting other private, locked rooms in the home.

263.    At about 5:00 a.m. on the morning of Wednesday, September 26, 2007, Yanet awoke to the sound of loud pounding and shouting at the bathroom door on the first floor of the house.  Her first thought was that someone had broken into the house and that police had come to help.

264.    She opened her bedroom door and looked into the stairway.  Law enforcement agents ordered her to come downstairs.  Yanet and her boyfriend came downstairs, her boyfriend dressed only in shorts and an undershirt.

265.    Three men were at the door, and they directed Yanet and her boyfriend outside, where three additional agents stood guard.  One agent grabbed Yanet and pulled her into the driveway, and another handcuffed her boyfriend.  Yanet asked in English for an explanation, but was ignored.  From outside she could see that several tenants in the house were being detained in the living room.

266.    Some of the men, as well as one woman, wore jackets that said "ICE," and Yanet realized that they were from immigration.  They asked for her boyfriend's papers, and when he responded that he was a lawful permanent resident, ordered Yanet to go upstairs to find it.

36

267.   Shaken, Yanet went upstairs to find her boyfriend's papers. Upstairs, one of the female tenants told her that she had been showering when male agents burst into the bathroom door.

268.   Yanet went downstairs to hand over her boyfriend's documents. She asked for permission to bring him some clothes, because he was shaking with cold, and was allowed to go into the house. She could hear banging and pounding throughout the house, which she later realized was from agents breaking down doors in the basement.

269.   Yanet and several other women were ordered into the bedroom of one of the detained men, whose two-year-old had been left in the bedroom. An agent guarded the door.

270.   Several tenants were taken from the home in waiting cars.

271.   At no point during the course of the raid did agents show any kind of warrant. There were no exigent circumstances to justify entry, and no consent from the occupants of 20 Chase Court.

272.   The residents who remained in the house after the raid were crying and shaking. Yanet, who is in the first trimester of pregnancy, began to be worried for the health of the baby she is carrying.

273.   After the raid, Yanet examined the house for damage. Several walls and doors had been damaged, and there were kick marks on several other doors, including the bathroom door.

274.   Several tenants are so traumatized by the raid that they have refused to sleep in their beds, and several others have moved out.

### The ICE Raid on the Amaya Home in Huntington Station, New York

275.   Raul Amaya is a naturalized United States citizen. His wife, Gloria Vanessa, is a lawful conditional resident. They are both originally from El Salvador. They have resided in

their ranch-style house at 58 East 6th Street, Huntington Station, Suffolk County since it was purchased in 2004. They have a two-year-old United States-born son.

276.    On September 27, 2007, at about 7:30 a.m., about 10 to 15 ICE agents and local law officers surrounded Raul who was outside the house preparing his pick-up truck for work. The Amayas were each preparing to go to work.

277.    At the time of the raid, the family lived in the first floor unit. The second floor had four tenants, each of whom had already left for work. The basement unit had one teenage occupant who was asleep.

278.    The ICE agents yelled, made allegations and used profanities to intimidate the Amayas. ICE agents accused Raul of being "in trouble with the IRS," "under arrest," having no status, and, holding a suspended or invalid driver's license.

279.    Although Raul tried to show his identification, ICE agents put aside his wallet and refused to look at his documents.

280.    ICE agents asked if he knew the where abouts of a person named "Oscar." Raul said he did not.

281.    Without a judicial warrant or exigent circumstances, ICE agents proceeded to make entry into the house.

282.    None of the agents identified themselves to Raul or Gloria Vanessa.

283.    Gloria Vanessa came out of the house to investigate the loud commotion. As she stood outside the front door, she was interrogated by several ICE agents.

284.    An ICE agent showed Gloria Vanessa a paper with a photograph of the person they were seeking. She said she knew who he was. He was never a resident in the house.

285.    One ICE agent slipped past her to enter the house. Other agents entered the house and she followed.

38

286.    During the following ten to fifteen minutes inside the house, Gloria Vanessa was interrogated and observed ICE agents searching some of the rooms and closets and opening doors.

287.    She saw ICE agents take one of her kitchen knives to attempt prying open a locked door.

288.    She was ordered out of the house's rear door into the backyard.

289.    She witnessed ICE agents knocking and then attempting to kick open the basement unit which was occupied by a sleeping teenager. The teenager was questioned and released.

290.    For over an hour and a half, ICE agents conducted a full search of the house, its rooms, beds, closets, and contents.

291.    Raul and Gloria Vanessa were kept outside of the house while their son was left inside the bedroom.

292.    As they were leaving, some ICE agents threatened to return later that day or in the following week. They said that Raul would be "in trouble" if he had lied to them. The Amayas were stricken with fear and anxiety.

293.    Later, Raul decided to salvage his work day as a landscaper and drove his pick-up truck from his house.

294.    While driving through nearby streets, he saw some ICE agents and parked vans. They were the same agents who had been at his home.

295.    He saw ICE agents chasing down a half dozen or more Latino men on foot near a local food store that served mainly Latino customers. The Latino men were running like crazy in all directions.

296.    Each of Defendants Shanahan, Smith, Palmese, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that ICE agents entering a home without a judicial warrant, voluntary consent, or any exigent circumstances or other lawful cause to justify the entrance is a violation of constitutional rights.

297.    Each of Defendants Shanahan, Smith, Palmese, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that ICE agents conducting a search of a home without a judicial warrant, voluntary consent, or any exigent circumstances or other lawful cause to justify the search is a violation of constitutional rights.

298.    Each of Defendants Shanahan, Smith, Palmese, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that ICE agents' detention of a person without a judicial warrant, voluntary consent or any exigent circumstances or other lawful cause to justify the detention is a violation of constitutional rights.

299.    Each of Defendants Shanahan, Smith, Palmese, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that the ICE agents' actions in gaining entry within the named Plaintiffs' homes violated the named Plaintiffs' constitutional rights.

300.    The actions of each of Defendants Shanahan, Smith, Palmese, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors were unprivileged.

301.    Each Defendant performed all of the acts concerning the actions at the named Plaintiffs' homes under color of federal law.

302.    Each Defendant performed all of the acts concerning the complained-of actions at the named Plaintiffs' homes, in whole or in part, while acting in his or her capacity as an employee of an agency of the federal government.

**ICE's Pattern and Practice, if not Policy, of Performing Illegal and
Unconstitutional Home Raids**

303.    The above described illegal conduct by Defendants is part of a broad pattern and

practice, if not official policy of ICE.  Allegations of similar tactics have been reported on

numerous occasions all across the country.  The frequency of the raids and the similarity of the

allegations strongly suggest that the conduct of ICE agents during home raids is a deliberate

practice if not policy of ICE.

304.    For example, an October 3, 2007 N.Y. TIMES article written by Nina Bernstein,

entitled "Raids Were a Shambles, Nassau Complains to U.S.," describes the raids conducted in

Nassau County on September 24 and 26, 2007 (which included raids on some of the named

Plaintiffs, as described above).  The article states that ICE agents brandished shotguns and

automatic weapons during the raids, while some wore cowboy hats.  ICE asked the Nassau

County police department to assist in the raids, which purportedly targeted suspected gang

members.  According to the Nassau County police commissioner, however, his department was

"misled" into participating in these raids.  He stated that ICE did not seem to have reason to

believe gang members were present in the homes, refused offers to check their list of purported

gang members against a police database that is updated daily, and all except 6 of 96

administrative warrants had incorrect or outdated addresses.  In one case, ICE sought a 28-year-

old man with a photograph taken when he was seven years old.  According to the police

commissioner, most of the individuals arrested were purported illegal immigrant workers with no

criminal records.  ICE admitted that it arrested at least one person who was a U.S. citizen.  The

cavalier attitude of ICE and total disregard for the rights of the occupants of the homes being

raided are reflected in a comment attributed to Defendant Smith, the special agent in charge of

the raids. He stated, "We didn't have warrants. We don't need warrants to make arrests. These are illegal immigrants." (A true and correct copy of this article is attached hereto as Exhibit 4.)

305.   A July 23, 2007 N.Y. TIMES article written by Nina Bernstein, entitled "Promise of ID Cards Is Followed by Peril of Arrest for Illegal Immigrants," describes ICE practices of pushing past New Haven, Connecticut residents who opened the door to agents and arbitrarily knocking at homes near to the residence listed in a deportation order after finding the target residence empty. (A true and correct copy of this article is attached hereto as Exhibit 5.)

306.   A September 21, 2007 Associated Press article published in THE OREGONIAN, entitled "Groups Question Immigration Raid in Central Idaho," describes a raid where armed ICE agents pounded on the door and pushed their way into the home of U.S. citizens and a legal permanent resident ostensibly in search of a sexual predator with a Hispanic surname who was unfamiliar to the homeowner. (A true and correct copy of this article is attached hereto as Exhibit 6.)

307.   A September 19, 2007 IDAHO MOUNTAIN EXPRESS article written by Terry Smith, entitled "Immigration Agents Seize 20 Suspected Illegal Aliens: ACLU Investigating to See if Civil Rights Were Violated," describes a pre-dawn raid where ICE agents pounded on the door and pushed their way into the home without informing the occupants who they were or showing a warrant. (A true and correct copy of this article is attached hereto as Exhibit 7.)

308.   An April 28, 2007 THE DAILY REVIEW article written by Mark Prado, entitled "ACLU Sues for Boy in Immigration Raid," describes early-morning raids in the San Francisco, California area and reports that ICE admitted to conducting home raids with only arrest warrants. ICE failed to address the charge that a search warrant was required for the home entry at issue. (A true and correct copy of this article is attached hereto as Exhibit 8.)

309.    An April 27, 2007 SAN FRANCISCO CHRONICLE article written by Tyche Hendricks, entitled "The Human Face of Immigration Raids in the Bay Area: Arrests of Parents Can Deeply Traumatize Children Caught in the Fray, Experts Argue," describes the arrests made in a fugitive alien's former residence and the ICE practice of allowing agents to identify themselves as "Police" to gain entry into homes and questioning individuals solely because of an association with the target of a warrant. (A true and correct copy of this article is attached hereto as Exhibit 9.)

310.    A February 3, 2007 ALAMEDA TIMES-STAR article written by David DeBolt, entitled "Immigrants in Richmond Live in Fear of Deportation," describes an incident where ICE agents broke down the door to a private residence without knocking and without a warrant and proceeded to force occupants to lie on the floor. The 6:00 a.m. entry by ICE agents into the dwelling resulted in the arrests of persons other than the purported intended target. (A true and correct copy of this article is attached hereto as Exhibit 10.)

### The Named Plaintiffs' Injuries

311.    As a direct and proximate result of the above conduct by Defendants, and each of them, the named Plaintiffs have been harmed, which harm includes, but is not limited to:

    a.    violations of their constitutional rights to be free from unreasonable searches and seizures;

    b.    having their homes and personal privacy invaded;

    c.    being intimidated, harassed, humiliated, and threatened with force;

    d.    experiencing severe emotional and mental distress;

    e.    being illegally and unreasonably detained;

    f.    being subjected to an illegal and unreasonable interrogation;

    g.    having their personal property damaged; and

h. other harm according to proof.

312. The acts described above by each Defendant were done intentionally, maliciously, and recklessly, and showed a callous disregard for, or indifference to, the named Plaintiffs' personal safety, security, freedom, and civil and constitutional rights, and/or with intent to injure, harass, and oppress Plaintiffs and other members of the Latino community in New York.

313. Each of the named Plaintiffs intend to continue to live in residences with Latinos and/or associate with Latinos, including possibly wittingly or unwittingly associating with individuals sought by ICE pursuant to Operation Return to Sender.

## CLASS ACTION ALLEGATIONS

314. All claims set forth in the First Claim below are brought by the named Plaintiffs individually and on behalf of all other similarly situated persons pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

315. The named Plaintiffs provisionally propose the First Claim be certified on behalf of the following class:

> Persons who, because they (1) are Latino, live in residences with Latinos or are or were associated with individuals otherwise sought by ICE and (2) reside in the jurisdiction of the New York City regional office (or field office) of ICE, have been subjected to and/or are at imminent risk of home raids by the New York City regional office (or field office) of ICE.

316. The claims of the proposed class representatives and those of the proposed class members in the First Claim raise common questions of law and fact concerning, *inter alia*, whether Defendants have implemented, enforced, encouraged and/or sanctioned a policy, practice and/or custom of:

(a)    entering and searching homes without judicial warrants or voluntary consent and in the absence of probable cause and exigent circumstances in violation of the Fourth Amendment to the United States Constitution; and

(b)    stopping, detaining, investigating, searching and effecting seizures in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause in violation of the Fourth Amendment to the United States Constitution.

317.    These questions are common to the named Plaintiffs and to the members of the proposed class because Defendants have acted and will continue to act on grounds generally applicable to both the named Plaintiffs and proposed class members.

318.    The claims of the named Plaintiffs are typical of the claims of the members of the proposed class.

319.    Members of the proposed class are so numerous that the joinder of all class members is impractical.

320.    The named Plaintiffs will fairly and adequately protect the interests of the members of the proposed class.

321.    The named Plaintiffs are represented by counsel who are experienced in federal class action litigation, including those involving civil rights issues.

322.    As set forth above, the Defendants have acted on grounds generally applicable to the members of the proposed class, thereby making appropriate final injunctive and corresponding declaratory relief with respect to the class as a whole.

## CLAIMS FOR RELIEF

### FIRST CLAIM: CLASS ACTION CLAIM OF FOURTH AMENDMENT VIOLATIONS
(Against All Defendants)

323.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

324.   Plaintiffs bring this claim for injunctive and declaratory relief against Defendants to redress continuing and likely future violations of the Fourth Amendment to the United States Constitution.

325.   Upon information and belief, Defendants have, in violation of the Fourth Amendment to the United States Constitution, officially implemented, enforced, encouraged and/or sanctioned a policy, practice and/or custom of: (a) entering and searching homes without valid judicial warrants or voluntary consent and in the absence of probable cause and exigent circumstances; and (b) stopping, detaining, investigating, searching and effecting seizures in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause.

326.   As a result of Defendants' acts and/or omissions, the Fourth Amendment rights of the Plaintiffs and class to be free from unreasonable searches and seizures and unlawful entries into their homes have been violated.

327.   As previously noted ICE has engaged in a pattern and practice of conducting home raids in New York City and the surrounding area, as well as across the country. The raids described in this matter occurred throughout 2007, with the latest raids occurring just last week. Moreover, Nassau County Police Commissioner Mulvey's September 2007 letter, confirms that future raids are planned by ICE in New York City and the surrounding area. *See* Exhibit 1, page 2.

328.   Such raids have consistently targeted Latinos and individuals who know or have associated with Latinos.

329.   The named Plaintiffs and class members are at risk of prospective constitutional deprivations at the hands of ICE because ICE intends to conduct future raids in New York City and the surrounding area where Plaintiffs live and because they are Latinos, associate or live with Latinos and may unwittingly associate or have associated with individuals sought by ICE.

46

330.    The named Plaintiffs intend to continue to associate with other Latinos and to continue living in New York City and the surrounding area.

331.    The Plaintiffs and proposed class will suffer irreparable and repeated injury unless this Court orders equitable relief. Such injury includes, *inter alia*, the deprivation of their constitutionally protected rights under the Fourth Amendment to the United States Constitution.

332.    As a result of Defendants' acts or omissions, at least some of the Plaintiffs and members of the class continue to suffer harm from Defendants' challenged conduct in the form of continuing judicial and administrative proceedings seeking their removal from this country.

333.    Damages cannot adequately address the injuries suffered by the Plaintiffs.

334.    Compelling the Defendants, their agents, employees and successors in office, and all persons acting in concert with them to comply with the dictates of the United States Constitution does not impose an improper or undue burden on the Defendants, their agents, employees and successors in office, and others, and, in fact, it serves the public interest by ensuring compliance with well-established Constitutional protections.

335.    Plaintiffs and the proposed class are entitled to the issuance of a permanent injunction prohibiting Defendants from engaging in the unlawful and abusive practices alleged herein.

336.    For reasons including, but not limited to, those stated herein, an actual dispute exists between Plaintiffs and Defendants, in which the parties have genuine and opposing interests that are direct and substantial, and of which a judicial determination will be final and conclusive.

337.    This dispute entitles Plaintiffs to a declaratory judgment that in doing the acts complained of herein the Defendants denied Plaintiffs their Fourth Amendment rights and protections, including, but not limited to, the right to be free from unreasonable searches and

seizures and the right to be free from unlawful entries into one's home, in violation of the United States Constitution.

338.    Plaintiffs are also entitled to such other and further relief as may follow from the entry of such a declaratory judgment.

## SECOND CLAIM: *BIVENS* CLAIM OF NAMED PLAINTIFFS
### (Against Defendants Shanahan, Smith, Palmese
### John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors)

339.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

340.    In doing the acts complained of, Defendants Shanahan, Smith, Palmese, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors deprived Plaintiffs of certain constitutionally protected rights, including, but not limited to:

    a.    The right to be free from unlawful entries into and searches of Plaintiffs' homes without a judicial warrant or voluntary consent and in the absence of probable cause and exigent circumstances; and

    b.    the right to be free from detentions without a lawful, reasonable and articulable suspicion of unlawful activity or probable cause.

341.    Because these Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, with regard to standards for home entry, search, seizure, questioning, and detention, they are not entitled to a good faith defense or official immunity defense.

342.    The actions of these Defendants were intentional, malicious, and reckless and showed a callous disregard for, or indifference to, the civil rights of the Plaintiffs.

48

343.    The actions of these Defendants give rise to a cause of action for damages against them in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

344.    As a direct and proximate result of the unlawful actions of these Defendants, Plaintiffs have suffered harm, in the form of, *inter alia*, outrage, humiliation, and emotional distress. Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

1.    Issue a Declaratory Judgment on behalf of Plaintiffs with respect to the claims set forth in the First Claim declaring that the actions of Defendants vis-à-vis the Plaintiffs as complained of herein violated the Fourth Amendment to the United States Constitution;

2.    With respect to the claims set forth in the First Claim, issue an order permanently enjoining Defendants, their agents, employees, and successors in office and all others acting in concert with them from engaging in the unlawful, abusive and discriminatory actions as set forth above;

3.    Award the named Plaintiffs actual, compensatory, and punitive damages for violations of the Fourth Amendment to the United States Constitution;

4.    Award Plaintiffs costs of this action;

5.    Award Plaintiffs pre- and post-judgment interest, as permitted by law;

6.    Award Plaintiffs reasonable attorneys' fees with respect to their claims set forth in the First and Second Claims;

7.    Grant Plaintiffs such other relief as the Court deems appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims and issues properly triable to a jury.

New York, New York
October 4, 2007

DEWEY & LEBOEUF LLP

By: _____
     Patrick J. Gennardo
     Donna L. Gordon
     Richard J. Cairns
     Kelly H. Tsai
     Colin G. Stewart
125 W. 55th Street
New York, New York 10019
(212) 424-8000

PUERTO RICAN LEGAL DEFENSE
AND EDUCATION FUND

By: _____
     Foster Maer
     Jackson Chin
     Ghita Schwarz
90 Hudson Street, 14th Floor
New York, New York 10013
(212) 739-7507

Attorneys for Plaintiffs