# Removal Proceedings Process

The Executive Office for Immigration Review, an agency of the Department of Justice, oversees three components that adjudicate matters involving immigration law at both the trial and appellate level. The Executive Office for Immigration Review immigration judges hold evidentiary removal hearings to determine whether certain aliens are removable from the United States.

When a Department of Homeland Security (DHS) enforcement official determines that a person is in the United States illegally and the alleged illegal alien denies that allegation, the official serves the alleged illegal alien with a Notice to Appear. The Notice to Appear is a "charging document" that initiates formal removal proceedings and can be served either in person or through the mail. Once this document has been issued, DHS is not permitted to remove the alleged illegal alien from the United States. Generally, a Notice to Appear includes the date, time, and place of the removal hearing, although sometimes it will indicate that a future document will provide the date, time, and place of the hearing. DHS also files these notices with the Executive Office for Immigration Review. At the hearings, attorneys from United States Immigration and Customs Enforcement's Office of Principal Legal Advisor present evidence that the alleged illegal alien, or "respondent," is removable.

The immigration judge makes two determinations:

1.  Whether the alleged illegal alien is removable. For example, when an immigration judge determines that the respondent is a United States citizen, he or she would not be removable.

2.  When the respondent is deemed to be removable, then the immigration judge determines whether the alien is entitled to any relief from removal. The most common forms of relief are adjustment of status to that of a lawful permanent resident, asylum, and cancellation of removal.

The immigration judge makes the decision during a recorded proceeding. When the judge finds against the respondent, he or she is issued a final order of removal. When the respondent fails to appear at the hearing, the DHS attorney presents evidence to the immigration judge that the respondent is removable. Based on the evidence, the immigration judges issues an *in absentia* order. The result of the *in absentia* hearing is mailed to the respondent. When an immigration judge's decision is against the respondent, the respondent can appeal to the Board of Immigration Appeals. Likewise, when the immigration judge's decision is in favor of the respondent, the government may appeal to the Board of Immigration Appeals. The Board's

Appendix A
Removal Proceedings Process

decisions are subject to review by the federal courts. Aliens who have been issued a final order of removal are required to leave the country.

# Fugitive Operations Support Units

Two support units, the Fugitive Case Management Unit in Laguna Niguel, California, and the Fugitive Operations Support Center in Burlington, Vermont, assist United States Immigration and Customs Enforcement's (ICE) Fugitive Operations Teams.

## Fugitive Case Management Unit

In March 2004, ICE's Office of Detention and Removal Operations established the Fugitive Case Management Unit to coordinate all fugitive case leads for the National Fugitive Operations Program. The unit receives information from various sources, primarily from the United States Citizenship and Immigration Services, other agencies such as the Departments of State and Labor, and the Department of Homeland Security's Transportation Security Administration. The Fugitive Case Management Unit also receives leads generated by the Office of Detention and Removal Operations' headquarters.

The unit's staff consolidates the information and each week provides a list of fugitive alien leads to appropriate field offices. Also, the Fugitive Case Management Unit might send "hot leads" on fugitive aliens to field offices. Either the Office of Detention and Removal Operations' headquarters or the Transportation Security Administration makes the determination as to what constitutes "hot leads," which appear to be credible information that would lead to immediate apprehensions and require the Fugitive Operations Team's immediate attention. A response must be received within seven days by the unit on the action taken to pursue these type leads. Data in the Fugitive Case Management Unit system are regularly compared to Deportable Alien Control System data to determine if fugitives have criminal convictions. Leads on fugitive aliens with criminal convictions require the Fugitive Operations Team to respond to the Fugitive Case Management Unit with the results of the inquiry within 30 days, and non-criminal leads require a response in 180 days.

## Fugitive Operations Support Center

In October 2005, the Office of Detention and Removal Operations established the Fugitive Operations Support Center to support the teams' efforts and "enhance the efficiency and effectiveness of the [National Fugitive Operations Program]."[30] The center's operational plan, which was approved in June 2006, proposes three goals for the center: (1) improving the integrity of data in

---

[30] Office of Detention and Removal Operations, *Fugitive Operations Support Center Operational Plan*, June 2006.

Appendix B
Fugitive Operations Support Units

the Deportable Alien Control System; (2) developing leads on fugitives for the field; and (3) supporting national ICE and the Office of Detention and Removal Operations' initiatives, including Operation Community Shield and Operation Predator. Community Shield is designed to disrupt, dismantle, and prosecute violent gang organizations by employing the authorities and investigative tools available to ICE. Operation Predator identifies child predators and removes them from the United States, subject to deportation.

As of September 2006, the chief of the Fugitive Operations Support Center said that the staffing plan for the center has not yet been approved. Currently, the center has a staff of ten, including one supervisor, five officers, and four support personnel. Four additional staff members have been authorized but have not come on board as of September 2006.

# Purpose, Scope, and Methodology

The purpose of our review was to determine: (1) the adequacy of the performance measures used to assess the effectiveness of Fugitive Operations Teams in completing their mission; (2) the teams' progress in reducing the backlog of fugitive alien cases; (3) the adequacy of teams staffing levels resulting from additional funding and the Office of Detention and Removal Operations' recruitment efforts; and (4) what factors affect the teams' operations, such as coordination activities with internal and external entities and the Office of Detention and Removal Operations' training policies.

We performed fieldwork from February 2006 through June 2006. We interviewed numerous Office of Detention and Removal Operations' managers and analysts at headquarters in Washington, DC. We traveled to Baltimore, Chicago, Detroit, and Los Angeles; interviewed field office directors and Fugitive Operations Team members in those cities; and accompanied officers on fugitive apprehensions. We conducted telephone interviews of field office directors and team supervisors in Atlanta; Boston; Buffalo; Cherry Hill, New Jersey; Denver; Fairfax, Virginia; Houston; Miami; Newark; New York City; Richmond, Virginia; Salt Lake City; San Francisco; and Seattle.

We visited the Fugitive Case Management Unit and United States Customs and Border Protection service center in Laguna Niguel, California, and interviewed staff from both offices. Additionally, we conducted a telephone interview with the chief of the Fugitive Operations Support Center in Burlington, Vermont. We interviewed, by telephone, a detective from the Boston Police Department and two sheriffs from Plymouth City, Massachusetts, Sheriff's Departments. Also, we obtained information on the Fugitive Operations Training Program conducted at the Federal Law Enforcement Training Center in Glynco, Georgia.

During our fieldwork, we reviewed Fugitive Operations Teams' documents, such as alien files, target folders, fugitive operations worksheets, weekly fugitive apprehension reports, performance work plans, and fugitive operations plans. We also reviewed fugitive operations documents, the Office of Detention and Removal Operations' financial management reports, and information on team staffing levels from headquarters. Additionally, we collected and analyzed data from the Deportable Alien Control System and the Fugitive Case Management System and documentation from the Fugitive Case Management Unit, the Fugitive Operations Support Center, and the Federal Law Enforcement Training Center.

Appendix C
Purpose, Scope, and Methodology

This review was scheduled as part of our annual work plan. Our work was conducted under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspections* issued by the President's Council on Integrity and Efficiency.

Appendix D
Recommendations

## Recommendations

We recommended that the Assistant Secretary for United States Immigration and Customs Enforcement:

**Recommendation 1:** Establish a Fugitive Operations Team reporting system that enables Office of Detention and Removal Operations managers to classify all categories of apprehensions.

**Recommendation 2:** Conduct an assessment of the working space presently available to all Fugitive Operations Team members and develop a detailed plan to ensure that current and future officers are provided an adequate working environment that meets applicable federal standards.

**Recommendation 3:** Provide the resources needed by the Office of Detention and Removal Operations to detain, process, and remove all fugitive aliens apprehended by the Fugitive Operations Teams.

**Recommendation 4:** Assign Fugitive Operations Team members in a manner consistent with its Detention and Deportation Officer's Manual or amend the manual to reflect current assignment practices.

**Recommendation 5:** Train and certify deportation officers who are not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

**Recommendation 6:** Negotiate information sharing agreements with federal, state, or local agencies that can provide access to information pertaining to fugitive aliens and provide the resources needed by the Office of Detention and Removal Operations to reconcile data from those agencies.

**Recommendation 7:** Assess the training requirements and needs of the Fugitive Operations Teams and consider establishing a fugitive operations refresher course.

Appendix E
Management Response to Draft Report

# Management Response to Draft Report

Office of the Assistant Secretary
U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536



**U.S. Immigration
and Customs
Enforcement**

DEC 2 2 2006

| | |
|---|---|
| MEMORANDUM FOR: | Richard L. Skinner<br>Inspector General<br>Department of Homeland Security |
| FROM: | Julie L. Myers<br>Assistant Secretary |
| SUBJECT: | Response to OIG Draft Report: An Assessment of<br>United States Immigration and Customs Enforcement's<br>Fugitive Operations Teams |

The following response is provided to the subject report

**Recommendation 1:**

Establish a Fugitive Operations Team reporting system that enables Office of Detention and Removal Operations managers to classify all categories of apprehensions.

**Response:**

ICE concurs with this recommendation. U.S. Immigration and Customs Enforcement (ICE) Detention and Removal Operations (DRO) has satisfied this recommendation and requests that it be considered closed. ICE/DRO initiated the planning and development of the Fugitive Case Management System (FCMS) in April 2005. On March 3, 2006, the ICE Office of the Chief Information Officer (OCIO) certified and accredited the system for use. From June 27 through June 28, 2006, supervisors met in St. Louis, Missouri for FCMS training. The system was ultimately made available to all field offices on August 28, 2006 for Fugitive Operations Team (FOT) activity reporting.

ICE/DRO utilizes FCMS to track statistics in support of its overall mission. FCMS is also used to create reports and measure FOT weekly activity. Data entered by the field into FCMS populates statistical reports regarding fugitive team activity generated by Headquarters DRO (HQDRO).

FCMS extracts data from the Deportable Alien Control System (DACS) to reconcile FCMS data and increase the quality of information used to populate reports.

When officers enter activity into FCMS, they differentiate between various "Actions" by choosing the appropriate action for each case from a "drop-down" menu. Furthermore, the system is capable of identifying the officer who conducted the action, thereby differentiating between FOT and non-FOT personnel. Using data entered into FCMS, HQDRO now can track field activity by actual arrests, case closures, category changes, and detainers placed. This function was not previously available.

www.ice.gov

An Assessment of United States Immigration and Customs Enforcement's Fugitive Operations Teams

Appendix E
Management Response to Draft Report

Subject: Response to OIG Draft Report: An Assessment of United States
         Immigration and Customs Enforcement's Fugitive Operations Teams
Page 2

The following are definitions used by the field to determine which "Actions" to select when entering data into FCMS:

Apprehension: FOT personnel took an individual into custody as a result of an arrest.

Located/Detainer (I-247 Lodged): FOT personnel located and placed a detainer on an individual detained by another agency, including the Federal Bureau of Prisons, and state, county, or local law enforcement agencies or Departments of Corrections.

Case Category Changed: The individual's category has changed from a fugitive status to another category in DACS. This section may relate to a change in legal proceedings; for instance, if an immigration judge granted a motion to reopen.

Case Closure: FOT personnel determine that the alien is no longer a fugitive and that the DACS case has been closed for one of these reasons (i.e., self-removal, death, or receipt of an immigration benefit).

The continuation and development of FCMS is essential to accurate reporting. Using FCMS as the reporting tool for all fugitive team enforcement activity will allow HQDRO to clearly distinguish and prospectively report the different types of activity the field conducts, such as actual arrests (fugitive as well as non-fugitive), the number of case closures, category changes, and detainers placed.

**Recommendation 2**.

Conduct an assessment of the working space presently available to all Fugitive Operations Team members and develop a detailed plan to ensure that current and future officers are provided an adequate working environment that meets applicable federal standards.

**Response**:

ICE concurs with this recommendation. This recommendation has been satisfied in part. A Space Allocation Survey (SAS) is incorporated into the systematic process for identifying the need for additional workspace and then assessing available resources to accommodate such requests. The space acquisition must be coordinated with several entities, including ICE Facilities, the General Services Administration (GSA) and U.S. Customs and Border Protection (CBP) Facilities. DRO continues to work with these entities to acquire the space necessary to fulfill the ICE mission.

In October 2006, in an effort to facilitate the deployment of new fiscal year (FY) 2007 FOTs, the affected field offices were asked to determine their facility needs. This request was made in addition to the regular SAS, and specifically asked whether the new sites or pre-existing sites needed additional storage space, additional parking space, gyms, and holding facilities.

By conducting this additional survey, ICE assessed the current FOT workspace and assisted the efficient allocation of future resources to the most appropriate venues. Field offices are now in various stages of the procurement process. The survey produced the following results:

- Facility issues have been settled and no action is required for the deployment of five of the additional 23 fugitive teams for FY 2007.

Appendix E
Management Response to Draft Report

Subject: Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams
Page 3

- Three teams require temporary space while their new field/suboffices are being constructed/relocated. The new facilities will have adequate space to accommodate the fugitive teams.

- For seven of the teams, DRO is aggressively pursuing the acquisition of space and is currently working with ICE Facilities and GSA.

- Five teams have identified existing space at ICE facilities that can accommodate the teams' requirements. Two of the five only require additional parking spaces. The National Fugitive Operations Program (NFOP) believes that the parking issues will be settled in the second quarter of this fiscal year.

- Three field offices are working to identify areas within their existing space to be utilized as accommodations for their new team.

GSA and ICE/CBP Facilities were provided the results of the supplemental survey in order to ensure that space acquisition is completed in a timely manner. Within the second quarter of FY 2007, DRO will propose and develop a coordinated space acquisition plan with all entities involved in the process.

**Recommendation 3**:

Provide the resources needed by the Office of Detention and Removal Operations to detain, process, and remove all fugitive aliens apprehended by the Fugitive Operations Teams.

**Response:**

ICE concurs in part with this recommendation, as not all of the issues contained therein are within ICE/DRO's purview. ICE/DRO has satisfied this recommendation within the areas directly under its control, and therefore requests that it be closed. It should be noted that at the time of the OIG assessment and audit of the NFOP, the ICE Detention Operations Coordination Center (DOCC) was not yet fully operational. However, since the assessment, Congress allotted additional funds to DRO, which were earmarked specifically to address detention bed space.

The DOCC coordinates the movement and placement of detained aliens throughout the United States in order to effectively allocate detention space and accommodate the numerous enforcement actions that ICE conducts on a daily basis. The DOCC acts as a clearinghouse by providing information in a timely manner to the field and headquarters so that space, which remains at a premium and can directly and adversely impact field operations, is managed effectively.

Various units within ICE/DRO are currently engaged in an ongoing effort to develop a cohesive, comprehensive infrastructure that would improve coordinated removal efforts and the management of detention space through immediate information sharing between the DOCC, Justice Prisoner and Alien Transportation System (JPATS), and Air Transportation Unit (ATU). This effort is developing an integrated detention and air and ground transportation program to maintain the equilibrium between apprehension and detention throughout the ICE/DRO field offices, in order to sustain the "catch and remove" policy. This requires that field offices articulate their detention space and transportation needs based on coordination with non-Department of Homeland Security (DHS) partners and with those within DHS such as the ICE Office of Investigations, ICE/DRO Criminal Alien Program, ICE/DRO FOTs, the 287(g)

Subject: Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams
Page 4

program, and CBP  These detention space and transportation requirements are then articulated to the DOCC, which coordinates with ATU and JPATS.  The DOCC identifies available bed space and coordinates the air and ground transportation resources to effect the movement of detainees.

ICE/DRO is also identifying "air hubs" at strategic locations in the United States, with supporting detention space and ground transportation contracts, to maximize transportation efficiencies while maintaining the detention equilibrium of its field offices.  JPATS flights would serve these hubs through regularly established air schedules.  ICE/DRO also authorized the acquisition of two additional aircraft, which will increase the JPATS fleet to six medium-sized aircraft dedicated to facilitating ICE movements and one smaller aircraft to be based in Puerto Rico.  Modified flight schedules, "air hubs", and supporting detention and ground transportation will expedite transportation for field offices and increase operational flexibility.

It should be noted that the immigration process is affected by many factors beyond the control of ICE/DRO.  Foreign embassies and consulates can delay or refuse the issuance of travel documents for their nationals, while the Executive Office for Immigration Review and federal courts can directly impact the removal process through grants of relief, motions to reopen, issuance of stays, and other legal decisions.

Furthermore, ICE/DRO must adhere to standing legal requirements for detention.  The Supreme Court of the United States has ordered that after 180 days, an alien in ICE custody who possesses a final order of removal and is not subject to mandatory custody must be released if it appears that removal is not reasonably foreseeable.  Under the Immigration and Nationality Act (INA), § 241, DHS has 90 days to remove a detained alien after a final order of removal is issued.  After 90 days, the alien receives a custody review.  ICE/DRO releases certain aliens when there is not sufficient evidence to believe they pose a risk of flight or danger to the community, or that their removal is imminent.  For certain classes of aliens, INA § 241 allows for continued detention even after the removal period.  However, all aliens are subject to the Supreme Court's decisions in Zadvydas v. Davis and Clark v. Martinez, which interpret authority to detain beyond 90 days as reasonably necessary to effect that alien's removal from the United States.  The Supreme Court held that six months is a reasonable period of time.  Under the regulations promulgated post-Zadvydas, an alien must be released after 180 days if there is no significant likelihood of removal in the reasonably foreseeable future.  Exceptions occur when the alien fails to cooperate, is granted a stay of removal, or is designated as a special circumstances case under the regulations of 8 CFR 241.14.  This six-month analysis is based largely on whether ICE can obtain a travel document for the alien.  Many countries unreasonably delay issuing travel documents to their nationals or refuse to issue travel documents altogether.  In FY 2005, 1,007 aliens were released under Zadvydas, and in FY 2006, 431 aliens were released.

These external conditions impede the ability of ICE to execute removal operations.

**Recommendation 4**:

Use Fugitive Operations Team members solely for apprehending fugitive aliens with unexecuted final orders of removal or closing fugitive alien cases.

**Response**:

ICE does not concur with this recommendation.  The identification and arrest of fugitive aliens is an obligatory enforcement action on the part of all ICE enforcement divisions and components including the FOTs.  The FOTs, although primarily called upon to administratively arrest

Subject: Response to OIG Draft Report: An Assessment of United States
        Immigration and Customs Enforcement's Fugitive Operations Teams
Page 5

fugitive aliens, are also required to assist in ensuring the overall effective implementation of ICE compliance measures. ICE must ensure that the primary mission of protecting the borders and preventing future terrorist attacks is accomplished; therefore, ICE must effectively utilize and allocate all of its resources. The OIG report references Chapter 19 Section 4.1 of the Detention and Deportation Officer's Field Manual (DDFM) (*sic*), which indicates that a permanent Fugitive Operations Team's (FOT) mission is the elimination of fugitive cases in their assigned office and as such would abide by the following guidelines:

1) Shall only be assigned to fugitive cases with an emphasis on backlog cases.

2) Shall not be assigned to any duties that will deter them from conducting fugitive operations, including but not limited to, case management of the general detained or non-detained dockets, escorts, and collateral duties normally accomplished by general assignment deportation officers.

The intent of these strictures was to ensure that the funded positions for fugitive operations would be utilized as such and the primary focus for the fugitive units should be to aggressively pursue the reduction of the extant fugitive alien population. ICE/DRO established a unit to identify, locate, arrest, and remove fugitive aliens as well as reduce the fugitive case backlog. ICE/DRO did not intend for the guidelines to exclude all other collateral assignments or prohibit the Field Office Directors' ability to allocate needed resources in order to accommodate an evolving national agenda or to meet existing circumstances.

ICE has also established measurable fiscal-year goals for the FOTs located throughout the field offices. One thousand administrative arrests are expected from each field office based on the number of teams located within the area of operational responsibility (AOR). Furthermore, the implementation and use of FCMS, in addition to the production and dissemination of weekly and monthly reports from Headquarters to the field offices, will assist in the effective management of FOTs. Such a system facilitates frequent feedback between operations in the field and Headquarters, which in turn allows Field Office Directors to receive data that will assist them in assessing their progress toward specific fiscal year goals. If the data indicates that goals are not currently being met, the information will serve as an effective management tool to determine the causes for the performance or lack thereof.

ICE/DRO will develop a plan of action to assess these DDFM guidelines within 90 days and determine if revisions to the manual are necessary. If ICE/DRO revises the manual, all alterations will be implemented by the close of the second quarter of FY 2007.

**Recommendation 5:**

Train and certify deportation officers who are not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

**Response:**

ICE concurs in part. ICE regularly trains and certifies deportation officers not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators. Yet, in order effectively implement ICE compliance measures and accomplish ICE's overall mission of protecting the borders and preventing future terrorist attacks, ICE/DRO must have the flexibility to utilize and

Subject: Response to OIG Draft Report. An Assessment of United States
            Immigration and Customs Enforcement's Fugitive Operations Teams
Page 6

allocate all of its resources, including personnel not assigned to FOTs, to meet constantly
evolving conditions and national mandates.

Any overarching plans that limit the Field Office Directors' ability or discretion to assign duties
would also limit the their flexibility to allocate resources for existing circumstances, such as
responding to ICE and DHS national priorities.

Furthermore, collective bargaining issues will require union negotiations if there is an attempt to
limit or categorize an officer to a specific job responsibility that could adversely impact their
career growth. ICE requires a multi-disciplined, dynamic workforce that can provide
comprehensive support to ICE's multi-faceted mission. Permitting officers to participate in a
variety of assignments allows them to enhance their careers by gaining valuable field experience
in several enforcement and non-enforcement venues.

ICE believes the current level of training and certification for deportation officers not assigned to
FOTs is adequate to meet the collateral needs of the FOTs and support the broader mission of the
agency.

**Recommendation 6**:

Negotiate information-sharing agreements with federal, state, or local agencies that can provide
access to information pertaining to fugitive aliens and provide the resources needed by the
Office of Detention and Removal Operations to reconcile the data from those agencies.

**Response:**

ICE concurs with this recommendation and has satisfied its requirements. ICE respectfully
requests that this recommendation be closed. ICE DRO has continually pursued and maintained
information-sharing agreements with numerous federal, state, and local agencies.

ICE Program Offices enter into a variety of information-sharing agreements with outside
agencies to include federal, state and local law enforcement agencies. All information-sharing
agreements are developed under and abide by the appropriate DHS and ICE governing legal
authorities and Information Technology security standards and may be subject to Privacy Impact
Assessments. All agreements are subject to Third Party Agency rules and are coordinated
between the respective Program Office, Office of Principal Legal Advisor (OPLA) and, OCIO,
and are executed by the appropriate information owner or Designated Accredited Authority. All
ICE information-sharing initiatives such as Enterprise Agreements, which includes Memoranda
of Understanding and Interconnection Security Agreements, are designed to support and advance
a specific mission need.

Currently, ICE/DRO has approximately 330 Enterprise Agreements in place with a variety of
federal agencies, such as the United States Marshals Service and the Federal Bureau of Prisons,
as well as state and local municipalities, such as the New York State Police and the Riverside
County Sheriff's Office. Although ICE aggressively pursues information sharing with outside
agencies in order to provide ICE personnel the most accurate information possible, it does not
have the legal authority to legislate and require that every federal, state, and local agency must
provide information to ICE or enter into Memoranda of Understanding. Enterprise Agreements
are freely entered into between ICE and the respective agencies and there is no legal mechanism
to enforce compliance.

Appendix E
Management Response to Draft Report

---

Subject: Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams
Page 7

Moreover, through the prior establishment of the Fugitive Operations Support Center (FOSC), ICE provides resources to assist DRO in processing data from outside agencies and sources. The FOSC reconciles data from both external government and private sources. After collation, vetting, and compilation, actionable information is disseminated to support fugitive operations in the field.

Furthermore, ICE has enhanced the DRO infrastructure through the development and maintenance of the FOSC, which assists in reconciling and vetting data received from those agencies with whom ICE has information-sharing agreements. DRO developed the FOSC in 2005 in an effort to enhance the efficiency and effectiveness of the NFOP. By close of calendar year 2005, a Director for the FOSC was selected. In March 2006, the FOSC hired some staff and provided some support to individual field exercises. In June 2006, the FOSC began limited operations and by July of the same year the FOSC became fully operational.

The FOSC, through the use of technology and partnerships with law enforcement agencies, will serve as a force multiplier for the NFOP. The FOSC is located in Burlington, Vermont, and reports to the Compliance Enforcement Division in Washington, D.C. The FOSC reviews and updates absconder cases in DACS, develops leads for and provides assistance to FOTs, develops National Fugitive Field Operations, and manages the absconder numbers. The FOSC is currently seeking contractor assistance to conduct analysis, screening, background checks, and related support activities for the vetting of fugitive/absconder aliens. During October 2006, the FOSC resolved 2,488 absconder cases in DACS due to an appropriate case category change, and/or by locating the absconder while incarcerated and placing a detainer on the absconder. During the same month, the FOSC compared all of the absconder case data to the data located within the Central Index System and is currently conducting an analysis to determine the appropriate case categories.

The FOSC remains committed to pursuing information-sharing resources to aid in their function with the FOTs as the ultimate beneficiaries.

## Recommendation 7:

Assess the training requirements and needs of the Fugitive Operations Teams and consider establishing a fugitive operations refresher course.

## Response:

ICE concurs and has partially satisfied the recommendation. In August 2006, the HQ Fugitive Operations Unit consulted with the DRO training division at the Federal Law Enforcement Training Center (FLETC) to review the existing fugitive operations curriculum and to determine the relevance of current training manuals and subject matter.

Based on these discussions, ICE revised the current lesson plans and incorporated a larger selection of contemporaneous material, such as the identification of methamphetamine laboratories.

This endeavor provides fugitive operations officers in the field with real world scenarios so that daily operational tactics may be better assessed. Because the curriculum has not been finalized, ICE has decided to postpone the currently scheduled basic Fugitive Operations course. It is anticipated that courses will recommence during the second quarter of FY 2007. Measures have been taken to ensure that this delay does not adversely impact the rigorous training schedule.

Appendix E
Management Response to Draft Report

Subject: Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams
Page 8

Furthermore, it is estimated that every officer previously scheduled to attend the basic Fugitive Operations course will be accommodated, and the Fugitive Operations Unit will not be remiss by failing to provide an enhanced training module.

Currently, there is an insufficient number of permanent instructors for the Fugitive Operations training program at FLETC, however, it is anticipated that this will be remedied within the FY 2007. Upon the Human Capital Training Unit receiving additional staff, ICE anticipates the creation of a supplemental/refresher course which will be developed for implementation during FY 2007. A refresher course proposal will be developed and forthcoming in 90 days.

Should you or your staff have any questions, please contact Clinett Short at (202) 616-7629.

cc    Steven Pecinosvsky, DHS Audit Liaison
Clinett Short, ICE OIG Audit Portfolio Manager

Appendix E
Management Response to Draft Report



Office of the Assistant Secretary
U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536

U.S. Immigration
and Customs
Enforcement

February 13, 2007

Memorandum for:        Richard L. Skinner
                       Inspector General
                       Department of Homeland Security

From:                  Julie L. Myers
                       Assistant Secretary

Subject:               Modification to Response to OIG Draft Report: **An Assessment**
                       of United States Immigration and Customs Enforcement's
                       Fugitive Operations Teams.

ICE submits the following modified response to the recommendations of the subject report, per
the OIG's e-mail memorandum of February 13, 2007.

In its e-mail memorandum, OIG proposed the following change:

(OLD) Recommendation 4: Use Fugitive Operations Team members solely for apprehending
fugitive aliens with unexecuted final orders of removal or closing fugitive alien cases.

(PROPOSED NEW) Recommendation 4: Assign Fugitive Operations Team members in a
manner consistent with its Detention and Deportation Officer's Manual or amend the manual to
reflect current assignment practices

ICE submits the following for the proposed new recommendation:

1) Change the start of the ICE response to "ICE concurs with this recommendation."

2) Strike the following sentence from the end of Paragraph 2- "ICE/DRO did not intend for the
guidelines to exclude all other collateral assignments or prohibit the Field Office Directors'
ability to allocate needed resources in order to accommodate an evolving national agenda or
meet existing circumstances."

www.ice.gov

An Assessment of Immigration and Customs Enforcement's Fugitive Operations Teams

Appendix E
Management Response to Draft Report

3) Insert the following sentence in its place- "ICE/DRO intended for the guidelines to enhance Field Office Director ability to allocate resources as needed, including through collateral assignments as necessary, to accommodate evolving national enforcement efforts or meet existing circumstances."

If you have any questions concerning this response, please contact Clinett Short, the ICE OIG audit portfolio manager, at (202) 616-7629.

Appendix E
Management Response to Draft Report



*Office of Detention and Removal Operations*

**U.S. Department of Homeland Security**
425 I Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

**DEC – 1 2006**

MEMORANDUM FOR:     Traci Lembke
                    Acting Director
                    Office of Professional Responsibility

FROM:                John P. Torres
                    Director

SUBJECT:             Comments on the Office of Inspector General's
                    Draft Report Entitled *"An Assessment of United
                    States Immigration and Customs Enforcement's
                    Fugitive Operations Teams"*

Attached are technical comments prepared by the Office of Detention and Removal
Operations (DRO) related to the Office of Inspector General's draft Report entitled, "An
Assessment of the United States Immigration and Customs Enforcement's Fugitive
Operations Teams." Following a careful review of the report, DRO has concluded that
the draft Report fails to acknowledge many of the positive steps already independently
taken by DRO to address issues identified therein. The attached technical comments
explain these positive steps and identify other apparent misperceptions in the draft
Report. DRO would request that these technical comments be published with the Report
when it is finalized, if not adopted in their entirety.

Attachment

### Office of Detention and Removal Operations Review of the Report

The U.S. Immigration and Customs Enforcement (ICE) Office of Detention and Removal Operations (DRO) has reviewed the Inspector General's draft Report. The following discussion represents a page-by-page analysis of that document, including areas where DRO believes that the report either lacks adequate updated information or has incorrectly described the program.

### General Recommendations for Draft Report Clarification

ICE refers to the act of taking an alien into ICE custody as an arrest, and no longer uses the term "apprehension(s)." Throughout the draft report, where OIG has used the term "apprehension" to refer to the act of taking a subject into ICE custody please replace the word "apprehension" with the word "arrest."

ICE refers to "fugitive aliens" rather than the much broader term of "fugitives." A "fugitive" is any absconder from justice, and is a much broader category than "fugitive alien."

In March 2006, DRO changed the name of the *Detention and Deportation Officer's Field Manual (DDFM)* to the Detention and Removal Operations Policy and Procedure Manual (DROPPM). References to the DDFM should be changed to DROPPM throughout the report.

### Executive Summary

Page 1, second paragraph: We suggest deleting the following sentences: *"A fugitive alien is an individual who has been issued an unexecuted final order of removal from the Executive Office for Immigration Review. The order requires the alien to be removed from this country."*

> It seems incorrect to describe 'issuance" of an unexecuted final order, as the Executive Office for Immigration Review could not issue an "executed" final order. Issuance and execution of a removal order are distinct events. Once an "issued" order becomes administrative final, DRO may lawfully "execute" the order.

Page 1, second paragraph reads, *"Since 2003, the office allocated more than $204 million to deploy 52 Fugitive Operations Teams and, as of August 2006, 45 teams are apprehending fugitives in various cities nationwide."*

> The sentence should read as follows: "Since 2003, the office allocated more than $204 million to deploy 52 Fugitive Operations Teams and, as of **October** 2006, **50** teams are **arresting** fugitives in various cities nationwide."

2

Appendix E
Management Response to Draft Report

## Background

Pages 2, third paragraph: The following sentence should be deleted: *"Fugitive aliens are non-United States citizens who have been placed into formal removal proceedings, have been issued a final order of removal by an immigration judge from the Executive Office for Immigration Review (EOIR), and whose whereabouts are unknown."*

> The sentence above should be replaced with the following: "Fugitive aliens are non-United States citizens not currently in the custody or control of ICE who have failed to depart the United States pursuant to a final order of removal, deportation or exclusion or have failed to report to a DRO officer after receiving notice to do so."

Page 3, second paragraph: *"an effort to stop the increase of fugitives in this country"* would be more accurately phrased as "an effort to stop the increase of fugitive aliens in this country."

## Results of Review

### Fugitive Apprehension Reports Should Accurately Reflect the Teams' Activities

Page 7, first paragraph: The weekly field office "apprehension reports" were renamed weekly field office "enforcement activity" reports in September 2006 to more accurately reflect the statistics measured by the reports.

Please change all references to "apprehension reports" in this Draft Report to "enforcement activity reports".

> For example, the sentence in the draft Report which reads, *"To measure the FOTs' performance, DRO uses weekly field office apprehension reports provided to DRO headquarters."* should now read as follows: "To measure the FOTs' performance, DRO uses weekly field office enforcement activity reports provided to DRO headquarters."

Page 7, first paragraph, sentence states: *"The reports also included case closures, in which the FOT verified that a fugitive alien died, voluntarily left the country, or changed their immigration status by, for example, becoming a United States citizen or legal permanent resident."*

> Fugitive aliens do not *"voluntarily leave the country"* (i.e., a phrase which evokes such legal concepts as "voluntary departure" and "voluntary return"); instead, they self-execute their outstanding orders of removal.

Page 7, first paragraph, sentence states: *"The reported apprehensions involved varying levels of FOT effort from taking custody of and processing aliens already arrested by*

3

*other law enforcement agencies to receiving leads, searching databases, talking to informants, and making apprehensions."*

As stated in the comment above, please change the language to read as follows: "**The reported enforcement activities** involved varying levels of FOT effort...."

Page 7, second paragraph: Please add the following information to the draft report:

In August 2006, DRO implemented the Fugitive Case Management System (FCMS) at all its field offices nationwide to track FOT statistics. The use of FCMS has improved DRO FOT metrics, allowing enhanced tracking of FOTs' progress toward annual arrest target goals. Notably, FCMS has the ability to record the name of the officer responsible for conducting the enforcement activity. Recording the name of the officer associated with the enforcement action allows DRO to audit all activities and determine whether a FOT officer was responsible for the activity, thereby providing a means by which managers can assess FOT performance.

The ultimate goal of DRO and the FOTs is to reduce the fugitive alien population in the U.S. Although the primary responsibility of reducing the fugitive alien population in the United States resides with the FOTs, all DRO officers are responsible for the arrest and closure of fugitive alien cases that they encounter during the course of their duties. FCMS enforcement activity reports track the total number of fugitive aliens deducted from the fugitive alien population, regardless of whether the enforcement activity was conducted by FOTs or other DRO officers.

Page 8, fourth paragraph: Please add a footnote indicating that Acting Director Torres was appointed to the position of Director of DRO in October 2006.

Page 8, fourth paragraph: Please update footnote 18. The FOSC became operational in July 2006.

Page 9, Table 2: Title for Table 2 should be changed from *"Fugitive Apprehension Reported by Field Offices with Authorized Teams"* to "Fugitive **Enforcement Activity** Reported by Field Offices with Authorized Teams"

Change column name *"Total Fugitive Apprehensions"* to "**Total Fugitive Enforcement Activities**". This change would also apply to Page 13, Table 4.

Change *"Source: DRO fugitive apprehensions report"* to Source: DRO fugitive **enforcement activity** report."

Page 10, first and second paragraphs: Change all references to *"apprehension"* or *"apprehensions"* to "**enforcement activity**" and "**enforcement activities**," respectively.

Page 11, first paragraph: change reference to *"apprehension"* to "**enforcement activity**".

4

Appendix E
Management Response to Draft Report

---

*Fugitive Alien Backlog Is Increasing Despite the Teams' Efforts*

Page 13 – <u>Bed Space Constraints</u> - Please add the following paragraphs:

ICE implemented a number of significant mission enhancing efficiencies, such as shortened removal cycle times; increased use of the Justice Prisoner and Alien Transportation System (JPATS) and other air assets; and rapid activation of detention facilities. These efficiencies have created additional detention capacity at various locations around the country and provided Immigration and Customs Enforcement (ICE) and other Federal, State and local law enforcement agencies opportunities to dramatically increase the apprehension and removal of illegal aliens.

In July 2006, ICE established the Detention Operations Coordination Center (DOCC). The DOCC was established to ensure that all ICE field offices have adequate detention space for routine apprehensions, coordinating special operations that require large numbers of detention beds, and bed space management on a national scale, thus ensuring no alien amenable to removal proceedings will be released from Detention and Removal Operations (DRO) custody due to a lack of detention space.

Through capacity planning and bed space management, the average number of aliens detained in FY06 has increased from 20,683 on October 1, 2005 to 27,390 on September 30, 2006. This results in a total increase of 6,707 detained aliens per day. In particular, since November 2005, a total of 6,300 beds have been added to support the President's Secure Border Initiative. Initially, 2,300 SBI beds were provided along the SW Border. For fiscal year 2007, Congress earmarked an enhancement of 6,700 beds to ICE/DRO. As part of Operation Jumpstart, the first 4,000 of the FY07 enhancement beds were provided during the fourth quarter of fiscal year 2006.

Page 15, second paragraph: Please note that although DACS does not have zip code search capabilities; the FOSC utilizes DACS data in conjunction with information from outside vendors to provide a central source of zip code information to FOTs, thereby eliminating the need for *ad hoc* databases within each field office.

*Removal Rate of Teams' Fugitive Alien Apprehensions Cannot Be Determined*

Pages 17-18: This entire section should be removed; DRO does in fact track the removal rate of fugitive aliens.

Our FCMS-generated enforcement activity reports are reconciled with DACS data to determine the total number of fugitive aliens removed as a result of FOT enforcement activities. From March 2003 to September 30, 2006, NFOP enforcement activities have resulted in the removal of more than 30,470 fugitive aliens from the United States.

*Effective Partnerships with Federal, State, and Local Agencies Exist*

Pages 25-26: Please note that the Fugitive Operation Support Center (FOSC) is in the process of advertising a support contract solicitation to identify a vendor with existing

5

Appendix E
Management Response to Draft Report

data-sharing agreements in place with federal, state, and local law enforcement agencies. The FOSC will utilize the contractor's law enforcement data, and the contractor will be responsible for maintaining its data sharing agreements with these agencies. When completed, the contract will allow the FOSC to make use of a single data system, which is continually updated and consistently formatted, to collect other law enforcement agency information relevant to fugitive alien enforcement activity.

In addition, the FOSC has begun an extensive electronic review of fugitive cases, which will last for several months. The FOSC will close appropriate cases and provide comprehensive leads to the Field Offices on many others, facilitating efforts to meet the per-team goal of 1,000 arrests.

### Appendix A:  Removal Proceedings Process

Page 33:  The report references a form of immigration relief called "change of immigration status."  This term is not entirely clear.  Perhaps the writer intended to indicate "adjustment of status to that of a lawful permanent resident" (such as under sections 209 or 245 of the Immigration and Nationality Act).

6

Appendix F
Major Contributors to this Report

## Major Contributors to this Report

Jacqueline Simms, Senior Inspector, Department of Homeland Security, Office of Inspections

Kristine Odiña, Inspector, Department of Homeland Security, Office of Inspections

Michael Zeitler, Inspector, Department of Homeland Security, Office of Inspections

Appendix G
Report Distribution

## Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy of Staff
General Counsel
Executive Secretary
Assistant Secretary for Immigration and Customs Enforcement
Assistant Secretary for Policy
Assistant Secretary for Public Affairs
Assistant Secretary for Legislative Affairs and Intergovernmental Affairs
DHS OIG Audit Liaison
ICE Audit Liaison
Chief Privacy Officer

### Office of Management and Budget

Chief, Homeland Security Branch
DHS Program Examiner

### Congress

Congressional Oversight and Appropriations Committees, as appropriate

**Additional Information and Copies**

To obtain additional copies of this report, call the Office of Inspector General (OIG) at (202) 254-4100, fax your request to (202) 254-4285, or visit the OIG web site at www.dhs.gov.

**OIG Hotline**

To report alleged fraud, waste, abuse or mismanagement, or any other kind of criminal or noncriminal misconduct relative to department programs or operations, call the OIG Hotline at 1-800-323-8603; write to Department of Homeland Security, Washington, DC 20528, Attn: Office of Inspector General, Investigations Division – Hotline. The OIG seeks to protect the identity of each writer and caller.