UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIANA AGUILAR, ANDRES LEON, ELENA LEON, ERIKA GABRIELA GARCIA-LEON through her Next Friend Adriana Aguilar, CARSON AGUILAR through his Next Friend Adriana Aguilar, NELLY AMAYA, MARIO PATZAN DeLEON, DAVID LAZARO PEREZ, WILLIAM LAZARO, TARCIS SAPON-DIAZ, SONIA BONILLA, BEATRIZ VELASQUEZ through her Next Friend Sonia Bonilla, DALIA VELASQUEZ through her Next Friend Sonia Bonilla, ELDER BONILLA, DIANA RODRIGUEZ, YONI REVOLORIO, JUAN JOSE MIJANGOS, GONZALO ESCALANTE, YANET MARTINEZ, RAUL AMAYA, GLORIA VANESSA AMAYA, JOHN DOE #1, JANE DOE #1, JOHN DOE #2 through his Next Friend Jane Doe #1, John Doe #3 through his Next Friend Jane Doe #1, JOHN DOE #4, and JOHN DOE #5 on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, MICHAEL CHERTOFF, United States Secretary of the Department of Homeland Security, JULIE L. MYERS, Assistant Secretary of Homeland Security for Immigration and Customs Enforcement, JOHN P. TORRES, Director of the Office of Detention and Removal Operations, Immigration and Customs Enforcement, CHRISTOPHER SHANAHAN, New York Field Office Director for Detention and Removal Operations, PETER J. SMITH, JOSEPH A. PALMESE, JOHN and JANE DOE ICE AGENTS, and JOHN ROE and JANE ROE ICE SUPERVISORS,<br><br>Defendants. | **ECF Case**<br>**07 Civ. 8224 (JGK) (FM)**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**DECLARATION OF**<br>**JEFFREY KNOPF** |

Pursuant to 28 U.S.C. § 1746, I, Jeffrey Knopf, declare as follows:

1.   I am a Group Supervisor in the New York Special Agent-in-Charge (SAC) Office of the Office of Investigations, a division of the Bureau of Immigration and Customs Enforcement (ICE), Department of Homeland Security (DHS). The New York SAC Office is located at 601 West 26th Street, New York, New York 10001. I work out of the Resident Agent-

in-Charge's Office (RAC) in Long Island located at 3900 Veterans Memorial Highway, Bohemia, New York 11716. The RAC Long Island is a division of the New York SAC Office.

2.  I have been a Group Supervisor with ICE since 2003. My geographic area of responsibility is Nassau and Suffolk Counties on Long Island. My responsibilities include supervising agents conducting investigations in ICE's investigative program areas of human trafficking, alien smuggling, drug and contraband smuggling, alien sex and gang offenses, criminal alien offenses, internet child pornography, child exploitation, import/export violations, commercial fraud, benefit fraud, visa fraud, and administrative violations under the Immigration and Nationality Act (INA). I have supervised agents conducting gang-related investigations on Long Island since before ICE began Operation Community Shield in February 2005. From 2000 to 2003, I was a Supervisory Special Agent with the legacy Immigration and Naturalization Service (INS) in New York City. Prior to 2000, I was a Special Agent with the INS in New York City. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my official capacity.

3.  ICE consists of four law enforcement divisions -- including Office of Investigations (OI) and Detention and Removal Operations (DRO) -- and several non-law enforcement service components. OI, the criminal investigative division within ICE, investigates a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and out of the United States. OI investigations cover national security threats, financial and smuggling violations, financial crimes, commercial fraud, human trafficking, narcotics smuggling, child pornography and exploitation, immigration fraud, and other immigration violations.

**Operation Community Shield and Operation Surge**

4.    I am generally familiar with the allegations contained in plaintiffs' amended complaint dated October 4, 2007. The September 2007 home entries referred to in the amended complaint were carried out by OI agents under a national enforcement initiative known as Operation Community Shield.

5.    In February 2005, ICE began Operation Community Shield, a national enforcement initiative that targets gang members for criminal prosecution or removal from the United States. Under Operation Community Shield, ICE partners with federal, state, and local law enforcement agencies to investigate targets and carry out enforcement operations.

6.    Operation Surge was the name given to the 2007 local implementation of Operation Community Shield in Long Island, New York. The RAC Long Island executed Operation Surge from September 24 through September 29, 2007, in Nassau and Suffolk counties on Long Island. The objective of the operation was to locate and arrest gang members who were amenable to removal from the United States. The operation targeted the residences of these gang members, among other locations. The RAC Long Island office obtained administrative warrants of removal for the targeted gang members who were subject to final orders of removal. Those targets who were not under final orders of removal were to be arrested without a warrant under the authority of section 287(a)(2) of the Immigration and Nationality Act (INA).

7.    MS-13 and other gangs whose members consist primarily of foreign nationals from Central and South America are responsible for much of the gang-related criminal activity on Long Island.[1] OI special agents worked with state and local police, probation, and corrections

---

[1] MS-13 began as an El Salvadoran gang but its members now include people from a number of other Central and South American countries.

departments to identify potential targets for Operation Surge. Gang members who know they are removable from the United States, as all of the targets were, typically attempt to evade arrest by hiding out or moving from place to place, sometimes on a weekly basis. The gang members on the list were targeted based on their criminal histories and immigration status that made them amenable to removal.

8. Approximately 160 special agents (SA) from OI took part in the operation. Eight teams of ten special agents were to approach targeted residences and conduct consensual entries and interviews, otherwise known as "knock-and-talks." Two law enforcement officials from either Nassau or Suffolk County (depending on the location of the targeted residence) were to accompany each team. Because of the large scope of the operation and small size of the New York SAC Office, ICE agents from other parts of the country were detailed to New York to participate in the operation. The operational plan for Operation Surge was developed by the RAC Long Island office and approved by the SAC New York.

9. Consistent with OI policies and procedures, the knock-and-talk was to be conducted as follows. OI special agents were to knock on the door of a targeted residence and seek consent to enter the home to ask questions and conduct interviews. If consent was given, the agents were to enter and ask questions regarding the location of the target(s). If the agents considered it appropriate under the circumstances, they could request consent to search the premises or a portion thereof. The special agents were not permitted to search portions of the premises other than those for which consent to search had been given. OI agents have been instructed that consent to remain in the house and to search can be revoked at any time. Under OI policy, agents were permitted to conduct a protective sweep while on the premises if they had a reasonable suspicion that the premises harbored a person or persons who posed a danger to the

agents. Agents have been instructed that any protective sweep could extend only to areas in which the potentially dangerous person(s) could be hiding.

10. If, in the course of searching for the targeted gang members, the special agents encountered other aliens, the agents were permitted to seek the aliens' consent to ask questions regarding their immigration status. If the agents developed reason to believe that these aliens they encountered were in the United States illegally, they could arrest them without a warrant under the authority of section 287(a)(2) of the Immigration and Nationality Act. Anyone arrested was to be transported to 26 Federal Plaza for processing. The fugitive aliens, those subject to a final order of removal, were to be processed for removal from the United States. The non-fugitive illegal aliens were to be placed in removal proceedings.

11. A total of 195 aliens were arrested as a result of the New York SAC Office's September 2007 implementation of Operation Surge. The countries of origin for those arrested were: El Salvador, Columbia, Guatemala, Honduras, Mexico, Ecuador, China, Haiti, and Dominican Republic.

**ICE Policies Governing the Home Searches Conducted During Operation Surge**

12. As noted, Operation Surge was to be carried out using consensual home entries, interviews, and searches. OI agents did not plan to obtain judicial search warrants to enter particular residences. The conduct of consensual home interviews and searches by OI Special Agents is governed by policies and procedures contained in two manuals: (i) Chapter 42 of the Special Agent's Handbook, entitled Search and Seizure, and (ii) the Law of Arrest, Search and Seizure Manual, commonly referred to as the M-69. Chapter 42 sets forth mandatory guidelines for searches, and seizures related to searches, that OI special agents are required to follow in implementing enforcement operations. The M-69 provides mandatory guidance for OI special

agents, concerning, among other things, the statutory and constitutional boundaries of an officer's authority during arrests, searches, and seizures.

13. Although both Chapter 42 and the M-69 refer to their contents as "guidelines," both manuals are mandatory. OI agents must abide by them in implementing enforcement operations, and they are not free to develop informal alternative practices that conflict with the dictates of either manual. Since before 2007, Chapter 42 of the Special Agent's Handbook and the M-69 have been available on demand, on ICE's intranet, to OI special agents with appropriate security clearances. The M-69 is available on the intranet to all ICE employees through secured access.

14. Both Chapter 42 of the Special Agent's Handbook and the M-69 require that agents obtain consent to enter a residence in the absence of a search warrant. Chapter 42 states:

> Voluntary and effective consent to search obviates the need for a warrant or probable cause. To justify a search without a warrant on this ground, there must be a violitional [sic], duress-free permission to enter and make the kind of search agreed to.

A true copy of the provision on consent searches in Chapter 42 of the Special Agent's Handbook is attached as Exhibit 1 to this declaration.

15. Chapter 42 explains that "[e]ffective consent to a warrantless search may be given either by the suspect or by any third party who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected." See page US000819 of Exhibit 1 to this declaration.

16. Chapter III of the M-69, entitled "Searches and Seizures," likewise informs agents that they may search a residence without a warrant or probable cause only if they obtain the voluntary consent of "the person in control of the premises." A true copy of the M-69's provision on consent searches is attached as Exhibit 2 to this declaration.

17. The provision further explains that whether consent is voluntary depends on the totality of the circumstances, and it provides examples from the case law that illustrate factors bearing on whether a consent is voluntary. See Exhibit 2 to this declaration, at pages US000747-748.

18. The M-69 instructs agents that consent may only be effectively given "by the person with the primary right to occupy the premises or a third party who possesses common authority over, or other sufficient relationship to, the premises . . . ." Thus, the manual explains, "a landlord or hotel owner may not give valid consent to search the rented premises." The manual also notes that a "person may revoke his or her consent to search at any time." See Exhibit 2 to this declaration, at page US000748.

19. The M-69 authorizes agents making an arrest inside a residence to conduct a limited protective sweep of the area if they have "a reasonable suspicion based upon specific articulable facts that a dwelling where the arrest occurred harbors an individual who presents a danger to those on the scene." A true copy of the M-69's provision on protective sweeps appears on page US000748 included in Exhibit 2 to this declaration.

Pursuant to 28 U.S.C. § 1746, I declare the foregoing to be true and correct.

Executed this 7 day of December 2007.

_____
Jeffrey Knopf
Group Supervisor