UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIANA AGUILAR, ANDRES LEON, ELENA LEON, ERIKA GABRIELA GARCIA-LEON through her Next Friend Adriana Aguilar, CARSON AGUILAR through his Next Friend Adriana Aguilar, NELLY AMAYA, MARIO PATZAN DeLEON, DAVID LAZARO PEREZ, WILLIAM LAZARO, TARCIS SAPON-DIAZ, SONIA BONILLA, BEATRIZ VELASQUEZ through her Next Friend Sonia Bonilla, DALIA VELASQUEZ through her Next Friend Sonia Bonilla, ELDER BONILLA, DIANA RODRIGUEZ, YONI REVOLORIO, JUAN JOSE MIJANGOS, GONZALO ESCALANTE, YANET MARTINEZ, RAUL AMAYA, GLORIA VANESSA AMAYA, JOHN DOE #1, JANE DOE #1, JOHN DOE #2 through his Next Friend Jane Doe #1, John Doe #3 through his Next Friend Jane Doe #1, JOHN DOE #4, and JOHN DOE #5 on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, MICHAEL CHERTOFF, United States Secretary of the Department of Homeland Security, JULIE L. MYERS, Assistant Secretary of Homeland Security for Immigration and Customs Enforcement, JOHN P. TORRES, Director of the Office of Detention and Removal Operations, Immigration and Customs Enforcement, CHRISTOPHER SHANAHAN, New York Field Office Director for Detention and Removal Operations, PETER J. SMITH, JOSEPH A. PALMESE, JOHN and JANE DOE ICE AGENTS, and JOHN ROE and JANE ROE ICE SUPERVISORS,<br><br>Defendants. | **ECF Case**<br>**07 Civ. 8224 (JGK) (FM)**<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**DECLARATION OF**<br>**DARREN WILLIAMS** |

Pursuant to 28 U.S.C. § 1746, I, Darren Williams, declare as follows:

1.  I am a Supervisory Detention and Deportation Officer with the New York City Fugitive Operations Team, in the New York Field Office of the Office of Detention and Removal Operations (DRO), a position I have held since July 2006. DRO is a division of the Bureau of Immigration and Customs Enforcement (ICE), an agency within the Department of Homeland

Security (DHS). The New York Field office is located at 26 Federal Plaza, New York, New York 10278.

2. As a Supervisory Detention and Deportation Officer (SDDO) with the New York Fugitive Operations Team, I plan, coordinate, and supervise the work of Deportation Officers, Immigration Enforcement Agents, and support staff. I make assignments, review subordinates' reports on planned and completed operations, provide guidance to subordinates concerning operations and investigations, and take steps to ensure that the officers and agents under my supervision are kept informed of judicial and administrative decisions relating to fugitive operations, investigations, and interrogations. Prior to becoming an SDDO, I spent four years as a Deportation Officer assigned to the Fugitive Operations Team. In that capacity, my responsibilities included developing and conducting operations aimed at apprehending fugitive aliens and carrying out their removal from the United States. The statements contained in this declaration are based upon my personal knowledge or upon information provided to me in my official capacity.

3. ICE is the largest investigative bureau in DHS and the second largest investigative agency in the federal government. ICE's mission is to protect the United States by targeting the people, money, and materials that support terrorist and criminal activities and by enforcing federal immigration law. Following enactment of the Homeland Security Act of 2002, which created DHS, ICE was created from elements of several legacy agencies, including the former U.S. Customs Service and the former Immigration and Naturalization Service (INS). ICE has more than 15,000 employees located in the United States and around the world.

4. ICE consists of four law enforcement divisions and several support divisions. The four law enforcement divisions are the Office of Investigations (OI), the Office of Detention

and Removal Operations (DRO), the Federal Protective Service, and the Office of Professional Responsibility. DRO is responsible for promoting public safety and national security by seeking to ensure, through enforcement of the immigration laws, that all removable aliens depart the United States. DRO carries out this mission through the apprehension, detention, and removal of illegal aliens.

**The Enforcement Operations Alleged in the Complaint**

5.      I am generally familiar with the allegations contained in plaintiffs' amended complaint dated October 4, 2007. The February, March, and April 2007 home entries referred to in the amended complaint were carried out by DRO agents under national enforcement operations known as Operation Return to Sender and Operation Cross Check.

**Operation Return to Sender**

6.      Operation Return to Sender is a national initiative aimed at apprehending criminal and non-criminal fugitive aliens. Fugitive aliens are aliens who have been ordered removed from the United States in immigration proceedings but have failed to depart. Operation Return to Sender had its genesis in the USA PATRIOT Act, passed in October 2001 in response to the September 11, 2001 terrorist attacks. Using funding provided by Congress in that statute, the INS created eight dedicated fugitive operations teams, and designated seven cities for the initial operations. Newark, Detroit, Chicago, Miami, Los Angeles, and San Francisco each received one team. New York received two teams.

7.      In 2002, the INS established the National Fugitive Operations Program, an enforcement initiative the purpose of which was to identify, locate, apprehend, and remove fugitive aliens from the United States. When the INS was abolished, DRO was transferred to ICE and maintained responsibility for implementing the National Fugitive Operations Program.

8. DRO's New York Field Office developed a local operational plan pursuant to Operation Return to Sender, which was sent to DRO Headquarters for approval. From February 12 through March 9, 2007, and from March 19 through April 13, 2007, Operation Return to Sender was implemented within the five boroughs of New York City, Nassau and Suffolk Counties on Long Island, and the five northern counties in the New York Field Office's area of responsibility, Putnam, Dutchess, Westchester, Orange, and Rockland. The operation targeted criminal fugitive aliens. The national operation for Return to Sender is ongoing.

9. Fugitive aliens can be difficult to locate because they typically try to avoid detection and because identifying documents, such as driver's licenses, utility bills, credit card statements, phone bills, and voter registration rolls, may not exist for fugitive aliens. Many fugitives have simply vanished since being ordered to leave the country.

10. DRO's New York Field Office maintains files on fugitive aliens. For Operation Return to Sender and Operation Cross Check, DRO officers developed a list of targets, and chose the residences they would approach based on where the officers believed they were most likely to locate the targets. Once the targeted residences were identified, teams of deportation officers, along with support personnel, were to approach the residences and conduct a "knock-and-talk," a conversation in which the officers would ask for consent to enter the residence.

11. Under DRO practice, a knock-and-talk is typically conducted in the following manner. Officers are to knock on the door and, if someone answers, identify themselves as police or ICE agents. One of the officers then asks the person who answers the door for consent to enter the premises. If a child answers the door, the officer must ask to speak to his or her mother or father and must obtain consent to enter from a parent or an adult who has the legal ability to give the consent. Once consent to enter is given, officers inquire concerning the

whereabouts of the target. If they wish to search any part of the premises, the officers are required to obtain consent to search, and must abide by the scope of the consent. DRO officers have been instructed that consent to remain in the house can be revoked at any time, for any reason. If in the course of searching for the targeted fugitives officers encounter other aliens whom they have reason to believe are in the United States illegally, they can arrest those aliens without a warrant under the authority of section 287(a)(2) of the Immigration and Nationality Act (INA).

12. Any alien arrested during a home entry was to be transported to 26 Federal Plaza in Manhattan for processing. The fugitive aliens were to be processed for removal from the United States. The non-fugitives were to be placed in removal proceedings.

13. A total of 213 aliens from 16 countries were arrested in the February-March operation. Those arrested were from Bangladesh, Belize, China, Colombia, Dominican Republic, Ecuador, El Salvador, Guatemala, Malaysia, Mexico, Peru, Russia, Turkey, Trinidad, Ukraine, and Yugoslavia. A total of 170 aliens from 25 countries were arrested during the March-April operation. Those arrested were from China, Colombia, Dominican Republic, Ecuador, El Salvador, Estonia, Gambia, Guatemala, Guinea, Guyana, Haiti, Honduras, India, Indonesia, Jamaica, Lebanon, Mauritania, Mali, Mexico, Pakistan, Panama, St. Vincent, Senegal, Serbia-Montenegro, and Trinidad. Not all of those arrested were fugitive aliens. The non-fugitive aliens who were arrested included criminal and non-criminal illegal aliens who had not been placed in removal proceedings, but had no lawful basis for remaining in the United States. In this context, the term criminal alien refers to (i) an alien who is not lawfully admitted to the United States and has committed any criminal offense in the United States, and (ii) an alien who is lawfully admitted to the United States and has committed a criminal offense in the United

States, the commission of which makes the alien subject to removal. The term illegal alien generally refers to an alien who is not lawfully present in the United States.

**Operation Cross Check**

14. Operation Cross Check is a national operational umbrella encompassing enforcement efforts that target specific alien populations, such as aliens from certain countries or aliens working in certain industries. The DRO New York Field Office conducted Operation Cross Check locally from April 16 through April 27, 2007. The objective of the local operation was to locate and arrest criminal aliens, whether or not they were fugitives, residing within the New York Field Office's area of responsibility. Specifically targeted were criminal aliens who had been convicted of violent crimes rendering them subject to removal.

15. Like Operation Return to Sender, Operation Cross Check was designed to be carried out through knock-and-talks conducted by teams of deportation officers in the manner described in paragraphs 10-11 above. Anyone arrested was to be taken to 26 Federal Plaza for processing. The fugitives were to be processed for removal. The non-fugitives were to be placed in removal proceedings.

16. A total of 131 aliens were arrested during the New York Field Office's local implementation of Operation Cross Check in April 2007. Those arrested were from China, Colombia, Cuba, Dominican Republic, Ecuador, Egypt, El Salvador, Guatemala, Guinea, Guyana, Haiti, Honduras, India, Israel, Italy, Jamaica, Jordan, Mexico, Morocco, Nigeria, Panama, Poland, Russia, South Korea, Sierra Leone, St. Lucia, Trinidad, and Venezuela. Not all of those arrested were non-fugitive criminal aliens; some were fugitives (criminal and non-criminal), and others were non-criminal illegal aliens whom agents encountered while searching for the targeted aliens.

### ICE Policies Governing the Home Searches Conducted
### During Operation Return to Sender and Operation Cross Check

17.     As noted, Operation Return to Sender and Operation Cross Check were to be carried out using consensual home entries and searches. Although they possessed administrative warrants of removal for the targeted fugitives, DRO officers did not plan to obtain judicial search warrants for particular residences. DRO officers' conduct of consensual home searches is governed by the Detention and Removal Operations Policy and Procedure Manual (the "DROPPM") (formerly known as the Detention and Deportation Officer's Field Manual), a manual setting forth policies and procedures addressed to all aspects of DRO's area of responsibility. Chapter 19 of the DROPPM sets forth policies and standard operating procedures governing DRO's Fugitive Operations Program, including Operation Return to Sender and Operation Cross Check, and governs the conduct of deportation officers and other DRO personnel during the execution of an Operation Return to Sender and an Operation Cross Check.

18.     The policies in Chapter 19 impose mandatory obligations on DRO officers. Participants in Operation Return to Sender and Operation Cross Check were not permitted to deviate from those policies or develop informal rules for the operations inconsistent with the dictates of Chapter 19. All ICE DRO law enforcement personnel have access the DROPPM, which has been posted on ICE's intranet since before 2007.

19.     Chapter 19 of the DROPPM requires DRO officers to obtain informed consent before entering a residence to execute a warrant of removal. The manual states:

> Warrants of Deportation or Removal are administrative rather than criminal, and do[ ] not grant the authority to breach doors. Thus informed consent must be obtained from the occupant of the residence prior to entering.

20. A true copy of this excerpt from Chapter 19 is included in Exhibit A to this declaration. This provision appears again in an undated revision to Chapter 19, a true copy of which is included in Exhibit A.

21. The manual emphasizes that, if officers do not have a search warrant, they may enter a residence only if they obtain authorized consent to do so. In a provision addressing "arrest locations," the manual dictates:

> Officers can knock on a door and request to speak with the occupants of the house without first obtaining a search warrant. However, in order to enter a residence, someone who has authority to do so must grant informed consent, unless a court-approved search warrant is obtained in advance.

22. A true copy of this excerpt from Chapter 19 is included in Exhibit B attached to this declaration. This provision appears again in an undated revision to Chapter 19, a true copy of which is included in Exhibit B.

Pursuant to 28 U.S.C. § 1746, I declare the foregoing to be true and correct.
Executed this ___ day of December 2007.

_____
Darren Williams
Supervisory Detention and Deportation Officer