UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADRIANA AGUILAR, ANDRES LEON,
ELENA LEON, ERIKA GABRIELA GARCIA-
LEON through her Next Friend Adriana Aguilar,
CARSON AGUILAR through his Next Friend
Adriana Aguilar, NELLY AMAYA, MARIO
PATZAN DeLEON, DAVID LAZARO PEREZ,
WILLIAM LAZARO, TARCIS SAPON-DIAZ,
SONIA BONILLA, BEATRIZ VELASQUEZ
through her Next Friend Sonia Bonilla, DALIA
VELASQUEZ through her Next Friend Sonia
Bonilla, ELDER BONILLA, DIANA
RODRIGUEZ, YONI REVOLORIO, JUAN
JOSE MIJANGOS, GONZALO ESCALANTE,
YANET MARTINEZ, RAUL AMAYA,
GLORIA VANESSA AMAYA, JOHN DOE #1,
JANE DOE #1, JOHN DOE #2 through his Next
Friend Jane Doe #1, JOHN DOE #3 through his
Next Friend Jane Doe #1, JOHN DOE #4, and
JOHN DOE #5 on behalf of themselves and all
others similarly situated,

                   Plaintiffs,

              -against-

IMMIGRATION AND CUSTOMS
ENFORCEMENT DIVISION OF THE UNITED
STATES DEPARTMENT OF HOMELAND
SECURITY, MICHAEL CHERTOFF, United
States Secretary of the Department of Homeland
Security, JULIE L. MYERS, Assistant Secretary
of Homeland Security for Immigration and
Customs Enforcement, JOHN P. TORRES,
Director of the Office of Detention and Removal
Operations, Immigration and Customs
Enforcement, CHRISTOPHER SHANAHAN,
New York Field Office Director for Detention
and Removal Operations, PETER J. SMITH,
JOSEPH A. PALMESE, JOHN and JANE DOE
ICE AGENTS, and JOHN ROE and JANE ROE
ICE SUPERVISORS,

                   Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.
07 CIV 8224 (JGK) (FM)

**AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, Gonzalo Escalante, Juan Jose Mijangos, David Lazaro Perez, William Lazaro, Tarcis Sapon-Diaz, Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez, Elder Bonilla, Diana Rodriguez, Yoni Revolorio, Yanet Martinez, Raul Amaya, Gloria Vanessa Amaya, and John Does ##1-5 and Jane Doe #1, on behalf of themselves and all others similarly situated, through their undersigned attorneys allege as follows:

## INTRODUCTION

1.      This class action seeks declaratory, injunctive and other relief to redress Defendants' deprivation of Plaintiffs' rights arising under the laws and Constitution of the United States.  This action arises out of a pattern and practice of unlawful entry, search and seizure by Defendants of Latino persons in New York City and surrounding suburban areas.  As described in detail below, Defendants' wrongful actions include, *inter alia,* unreasonable and unlawful entries into the homes of Plaintiffs and other Latinos in New York City and the surrounding area in violation of the Fourth Amendment to the U.S. Constitution, unlawful detainment, psychological and physical abuse, and the destruction of private, personal property.

2.      In 2006, the Immigration and Customs Enforcement Division of the Department of Homeland Security (commonly known as "ICE") initiated several programs to identify and arrest fugitive aliens, including one known as "Operation Return to Sender."  (As used in this Amended Complaint, the term "Operation Return to Sender" refers to all similar national or local initiatives or operations.)  Under this program, Defendants have conducted, continue to conduct, and plan to conduct in the immediate future unconstitutional and abusive raids of homes occupied by Latino persons in New York City and the surrounding area, including the homes of the named Plaintiffs.

3.      The raids are ostensibly performed to arrest and remove fugitive aliens, *i.e.*, immigrants who have been previously ordered to leave this country. However, the raids are performed in a manner that tramples on Fourth Amendment rights of persons residing in the United States and leaves a trail of harm affecting innocent members of our society.

4.      The *modus operandi* of "Operation Return to Sender" is to have teams of six to ten armed ICE agents raid homes of Latinos without court-issued search warrants and to do so in a manner that will obtain entry to the targeted homes without providing the occupants an opportunity to consent or refuse entry. In these raids agents were armed with submachine guns known as MP-5s and shotguns.

5.      The raids are conducted in the pre-dawn and early morning hours. Though the agents know the occupants are likely to be Spanish-speaking, ICE does not ensure that Spanish-speaking agents are present. Acting in a manner that terrifies sleeping residents, ICE agents pound on and/or break down doors and windows while screaming as loudly as possible, often representing themselves as "police," which of course they are not. When the unsuspecting residents have the opportunity to open the door to inquire about what is going on, the agents then burst into the homes without first obtaining the occupants' consent to entry.

6.      Without explanation or lawful justification, the agents immediately sweep through the home, searching the premises as if an armed fugitive were present, even though they have no reasonable basis for such belief. All of these actions are conducted without good cause in a manner highly abusive and psychologically harmful to both the adults and children present.

7.      Moreover, despite the inherently intrusive nature of these raids, the agents do not conduct an investigation prior to the raid to ensure that the fugitive alien they are purportedly seeking is in fact inside the target home. As a result, the agents regularly raid homes where the fugitive is not present and could not reasonably have been believed to be present. Instead, the

unstated goal of these raids is to gain access to constitutionally protected areas in the hope of seizing as many undocumented persons as possible. In this manner, the agents try to meet ICE's recently-imposed 800 percent increase in arrest quotas.

8.      While ICE has been aggressively increasing the number of raids performed, ICE has not kept pace in providing adequate training to its agents to protect the constitutional rights of persons affected by ICE's actions.

9.      ICE has similarly failed to promulgate adequate rules and procedures for conducting these raids within permissible constitutional limits.

10.     ICE's failures have been repeatedly identified by such entities as the Department of Homeland Security Office of Inspector General (the "Inspector General"), which have cited ICE's lapses in training and information gathering that have contributed to the constitutional violations raised herein.

11.     Such failures have also been confirmed and criticized by Lawrence W. Mulvey, Commissioner of Police for Nassau County. In a public letter dated September 27, 2007, to Joseph A. Palmese, resident Agent-in-Charge of ICE investigations in Bohemia, New York, Commissioner Mulvey complained that when conducting raids in Nassau County that week, ICE agents lacked current intelligence, had incorrect addresses for targeted homes and displayed a "cowboy mentality." In one instance, Commissioner Mulvey noted that ICE agents were looking for a 28-year-old suspect using a photograph of the suspect from when he was seven years old. Commissioner Mulvey also confirmed that ICE misled the Nassau County Police about the nature of the raids and that by and large most people arrested in the raids were not targets of the raids but instead were undocumented immigrants. (*See* Exhibit 1 hereto for a complete copy of Commissioner Mulvey's letter.)

12.    Equally troubling is that Commissioner Mulvey's letter confirms that ICE plans to conduct future raids in Nassau County. *See* page 2 of Exhibit 1 in which Commissioner Mulvey states that the Nassau County Police will no longer lend support for these raids, but redacts the intended targets of future raids for confidentiality reasons.

13.    Nassau County Executive Thomas R. Suozzi has also complained to Defendant Chertoff about the actions and behavior of ICE agents conducting raids in Nassau County last week. In his public letter dated October 2, 2007, to Defendant Chertoff, County Executive Suozzi strongly suggests that ICE agents engaged in "misconduct" and "malfeasance" and utilized tactics that crossed "the lines of legality and law enforcement best practices" when conducting the raids. He also demanded an investigation by Defendant Chertoff. Some of the victims of last week's raids have been joined as named Plaintiffs in this matter. (*See* Exhibit 2 hereto for a complete copy of County Executive Suozzi's letter.)

14.    Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, and Carson Aguilar are members of the Leon/Aguilar family. Each is either a U.S. citizen or lawful permanent resident of the United States and each is a Latino who has been victimized by ICE's constitutional violations.

15.    On or about February 20, 2007, armed ICE agents pounded on the door of the Leon/Aguilar home located at 30 Copeces Lane, East Hampton, New York between 4:30 and 5:00 a.m. The ICE agents entered the Leon/Aguilar family home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search and illegally detained the Leon and Aguilar families. The agents never explained the family members' rights, prevented them from contacting a lawyer or the police, and failed to allow them to review what the ICE agents said was a warrant. Having once been victimized by ICE, the Aguilar and Leon families live in constant fear that ICE agents will return and again try to unlawfully enter their home.

5

Indeed, upon leaving the Leon/Aguilar family home, the ICE agents threatened that they would, in fact, be back.

16.    Plaintiff Nelly Amaya is Latino. She too is a victim of ICE's constitutional violations.

17.    On or about February 20, 2007, armed ICE agents kicked in the door of her home located at 20 Boatsteerer's Court, East Hampton, New York between 4:00 and 5:00 a.m. The ICE agents forcibly entered her home without a search warrant, consent, or any exigent circumstances. The ICE agents entered her home, physically abused her, and arrested her in retaliation for Nelly's demand to see a warrant. Nelly was never shown a warrant by ICE and lives in constant fear that ICE agents will again try to unlawfully enter her home.

18.    Plaintiffs Mario Patzan DeLeon, Gonzalo Escalante, Yoni Revolorio, and Juan Jose Mijangos are Latinos. They too are victims of ICE's constitutional violations.

19.    On or about April 18, 2007, armed ICE agents pounded on the door of their home located at 417 East Avenue, Riverhead, New York at about 4:30 a.m. The ICE agents forcibly entered the home without a judicial warrant, consent, or any exigent circumstances, by ramming through the back door of their home. The ICE agents arrested Mario, Gonzalo, Yoni and Juan Jose, handcuffing them and placing Mario in chains. The four men were then transported to Manhattan, where they were detained in a room, questioned, and released later that evening. The agents never explained their rights and failed to produce a warrant of any kind. Having once been victimized by ICE, Mario, Gonzalo, Yoni, and Juan Jose live in constant fear that ICE agents will return and again try to unlawfully enter their homes.

20.    Plaintiff David Lazaro Perez, William Lazaro, and Tarcis Sapon-Diaz are Latinos. They too are all victims of ICE's constitutional violations.

6

21.    On or about March 19, 2007, armed ICE agents forcibly entered their home located at 165 Main Street, Mount Kisco, New York at about 4:00 a.m. without a judicial warrant, consent, or any exigent circumstances. The ICE agents arrested David, William and Tarcis, placed them in handcuffs, and transported them to Manhattan, where they were detained for several hours. The men were later transported to a New Jersey detention center, from which they were released two days later. The agents never explained their rights and failed to produce a warrant of any kind. Having once been victimized by ICE, David, William and Tarcis live in constant fear that ICE agents will return and again try to unlawfully enter their home.

22.    Plaintiffs John Does ## 1-5 and Jane Doe #1 (collectively the "Doe Family") are Latinos and are members of two generations of the Doe Family. John Does ## 1, 4 and 5 and Jane Doe #1 are adults without immigration status. John Doe #2, age three, and John Doe #3, age one, are U.S. citizens. The members of the Doe Family are also victims of ICE's constitutional violations.

23.    In early 2007, armed ICE agents pounded on the door of the Doe Family home located in Suffolk County, New York at about 5:30 a.m. The agents had first entered the home of another family downstairs and, upon information and belief, had detained the person the ICE agents claimed they were looking for. Then, without a warrant or any exigent circumstances, the ICE agents attempted to break down the Doe Family apartment door and forcibly enter their apartment, but the locks held. The ICE agents then tried to cajole the Doe Family into opening the door, but the Doe family refused. The agents ultimately left without explaining the Doe Family's rights or producing a warrant. Having once been targeted by ICE for an unlawful entry, the Doe family lives in constant fear that ICE agents will return and attempt to unlawfully enter their apartment again.

24.     Plaintiffs Sonia Bonilla and her daughters Beatriz Velasquez and Dalia Velasquez are residents of Westbury, New York. Sonia is a lawful permanent resident, and her little girls are U.S. citizens. Each is a Latino person who has been victimized by ICE's constitutional violations.

25.     On September 24, 2007, armed ICE agents pounded on the door of the Bonilla/Velasquez home located at 710 Jefferson Street, Westbury, New York between 5:30 and 6:00 a.m. The ICE agents entered the home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search and illegally detained residents of the home. Four occupants of the home were arrested and no warrant of any kind was ever produced. The agents intimidated the twelve-year-old girl who opened the door while her parents were briefly out, conducted a full raid and a search. Having once been victimized by ICE, the Bonilla/Velasquez family lives in constant fear that ICE agents will return and again try to unlawfully enter their home.

26.     Plaintiffs Elder Bonilla and Diana Rodriguez are residents of Westbury, New York. Elder is a lawful permanent resident, and his fiancée Diana, who is also the mother of his two U.S. citizen children, has temporary protected status. Each is a Latino person who has been victimized by ICE's constitutional violations.

27.     On September 24, 2007, armed ICE agents pounded on the door of the Bonilla/Rodriguez home located at 22 Dogwood Lane in Westbury, New York between 5:30 and 6:00 a.m. When Elder opened the front door, ICE agents pointed a gun at his chest, immediately handcuffed him, and threw him toward the sofa. The ICE agents entered the home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search, damaged doors and walls, and illegally detained residents of the home, arresting six of them, including a sixteen-year-old boy, without ever showing a warrant.

8

28.     Plaintiff Yanet Martinez is a resident of 20 Chase Court, a home owned by her parents in Hempstead, New York. She is a Latino and an U.S. citizen who has been victimized by ICE's constitutional violations.

29.     On September 26, 2007, ICE agents burst into the front door of Yanet's home, kicking and pounding on the individual, locked doors of tenants in the home, forcibly entering a bathroom where a woman was showering, and damaging doors and walls throughout the first floor and basement of the home. The ICE agents entered without a judicial warrant, consent, or exigent circumstances, conducted an unlawful search, and detained six residents of the house.

30.     Plaintiff Raul Amaya and his wife, Plaintiff Gloria Vanessa Amaya, are residents of 58 East 6th Street, Huntington Station, New York. Raul is a U.S. citizen of Latino origin and Gloria Vanessa is a lawful conditional resident of Latino origin. They were both victimized by ICE's constitutional violations.

31.     Ten to fifteen ICE agents arrived at the Amaya home on September 27, 2007 at approximately 7:30 a.m. Raul was outside the home getting ready for work. The agents used profanities, and accused Raul of being "in trouble with the IRS," "under arrest," having no status, and holding a suspended or invalid driver's license. After refusing to look at Raul's documentation, and without a judicial warrant or exigent circumstances, ICE agents proceeded to enter Raul's house without consent. When Gloria Vanessa came out to investigate the loud commotion, she was interrogated by ICE agents. The ICE agents then entered and searched the home, including attempting to use a kitchen knife to pry open a locked door and attempting to kick open the basement unit. ICE agents searched the home for over an hour-and-a-half. As they were leaving, some ICE agents threatened to return later that day or in the following week.

32.     As a result of the raids on their homes, Plaintiffs have been profoundly traumatized, and remain extremely fearful that the ICE agents will return to inflict further harm.

Indeed, in several instances, the ICE agents have made specific threats that they would in fact return and Commissioner Mulvey has confirmed that ICE has plans to conduct future raids in at least Nassau County.

33.    Without judicial intervention there will be no end to ICE's unlawful and unconstitutional activities, and there is a credible threat of recurrent injuries to Plaintiffs and the class. By all appearances, ICE is continuing its aggressive, Latino-targeted program and increasing its unconstitutional enforcement activities without regard to the constitutional rights of those affected. The named Plaintiffs, like the other members of the class, are at real risk of further Fourth Amendment violations at the hands of ICE because they are Latino and/or associate with Latino individuals.

34.    ICE agents have conducted, and continue to conduct, similar raids against innocent and unsuspecting Latinos throughout ICE's New York City Region. To put an end to these unlawful activities, Plaintiffs seek on behalf of themselves and all others similarly situated a permanent injunction restraining agents within the jurisdiction of ICE's New York City Region from conducting home raids until they have established appropriate procedures and standards governing the conduct of ICE agents in performing home raids so as to assure that Plaintiffs and the class will not be subjected to the unlawful practices complained of herein.

35.    Plaintiffs also seek compensation for their own damages suffered as a result of the raids on their homes.

## JURISDICTION AND VENUE

36.    Jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331.

37.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, *inter alia*, (1) at least one of the defendants resides in this judicial district and (2) at least one of the Plaintiffs resides in this district and no real property is involved in this action.

## PARTIES

38.    Plaintiff ADRIANA AGUILAR is a citizen of the United States. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York. She appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for (a) her five-year-old son, Plaintiff CARSON AGUILAR and (b) her thirteen-year-old daughter, Plaintiff ERIKA GABRIELA GARCIA-LEON.

39.    Plaintiff CARSON AGUILAR is a citizen of the United States. At all times relevant to this action, he was and is a resident of East Hampton, Suffolk County, New York, living with his mother, Plaintiff Adriana Aguilar.

40.    Plaintiff ERIKA GABRIELA GARCIA-LEON ("Gabriela") is a lawful permanent resident of the United States, whose citizenship application is currently pending. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York, living with her mother, Plaintiff Adriana Aguilar.

41.    Plaintiff ANDRES LEON is a citizen of the United States. At all times relevant to this action, he was and is a resident of East Hampton, Suffolk County, New York.

42.    Plaintiff ELENA LEON is a citizen of the United States. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York.

43.    Plaintiff NELLY AMAYA is Latino. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York.

44.    Plaintiff MARIO PATZAN DeLEON is Latino. At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

45.    Plaintiff GONZALO ESCALANTE is Latino. At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

46.    Plaintiff YONI REVOLORIO is Latino.  At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

47.    Plaintiff JUAN JOSE MIJANGOS is Latino.  At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

48.    Plaintiff DAVID LAZARO PEREZ is Latino.  At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

49.    Plaintiff WILLIAM LAZARO is Latino.   At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

50.    Plaintiff TARCIS SAPON-DIAZ is Latino.   At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

51.    Plaintiff RAUL AMAYA is a citizen of the United States.  He is Latino.  At all times relevant to this action, he was and is a resident of Huntington Station, Suffolk County, New York.

52.    Plaintiff GLORIA VANESSA AMAYA is a lawful conditional resident of the United States.  She is Latino.  She is married to Plaintiff RAUL AMAYA.  At all times relevant to this action, she was and is a resident of Huntington Station, Suffolk County, New York.

53.    Plaintiff JOHN DOE #1 is Latino.  At all times relevant to this action, he was and is a resident of Suffolk County, New York.  Plaintiff JOHN DOE #1 is married to Plaintiff JANE DOE #1.

54.    Plaintiff JANE DOE #1 is Latino.  At all times relevant to this action, she was and is a resident of Suffolk County, New York.  Plaintiff JANE DOE #1 is married to Plaintiff JOHN DOE #1.  Plaintiff JANE DOE #1 appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for (a) her three-year-old son, Plaintiff JOHN DOE #2 and (b) her one-year-old son, Plaintiff JOHN DOE #3.

55.     Plaintiff JOHN DOE #2 is a citizen of the United States. At all times relevant to this action, he was and is a resident of Suffolk County, New York, living with his parents, Plaintiffs JOHN DOE #1 and JANE DOE #1.

56.     Plaintiff JOHN DOE #3 is a citizen of the United States. At all times relevant to this action, he was and is a resident of Suffolk County, New York, living with his parents, Plaintiffs JOHN DOE #1 and JANE DOE #1.

57.     Plaintiff JOHN DOE #4 is Latino. At all times relevant to this action, he was and is a resident of Suffolk County, New York. Plaintiff JOHN DOE # 4 is Plaintiff JANE DOE #1's brother.

58.     Plaintiff JOHN DOE #5 is Latino. At all times relevant to this action, he was and is a resident of Suffolk County, New York. Plaintiff JOHN DOE # 5 is Plaintiff JANE DOE #1's brother.

59.     Plaintiff SONIA BONILLA is a lawful permanent resident of the United States. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York. She appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for (a) her twelve-year-old daughter, Plaintiff BEATRIZ VELASQUEZ and (b) her nine-year-old daughter, Plaintiff DALIA VELASQUEZ.

60.     Plaintiff BEATRIZ VELASQUEZ is a citizen of the United States. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York, living with her parents, SONIA BONILLA and NOE VELASQUEZ.

61.     Plaintiff DALIA VELASQUEZ is a citizen of the United States. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York, living with her parents, SONIA BONILLA and NOE VELASQUEZ.

62.     Plaintiff ELDER BONILLA is a lawful permanent resident of the United States. At all times relevant to this action, he was and is a resident of Westbury, Nassau County, New York.

63.     Plaintiff DIANA RODRIGUEZ is Latino. She has asylee status. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York.

64.     Plaintiff YANET MARTINEZ is a citizen of the United States. At all times relevant to this action, she was and is a resident of Hempstead, Nassau County, New York.

65.     Defendant IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY ("Defendant ICE") is headquartered in Washington, D.C., with an Office of Detention and Removal Operations Field Office located in New York, New York.

66.     The Special Agent-in-Charge Offices of Defendant ICE OFFICE OF INVESTIGATIONS are responsible for the administration and management of enforcement activities within the geographic boundaries of the office. Upon information and belief, the Bohemia, New York office of Defendant ICE Office of Investigations was involved in the home raids conducted in Nassau County on September 24 and 26, 2007.

67.     Defendant MICHAEL CHERTOFF ("Defendant Chertoff") is the United States Secretary of the Department of Homeland Security in Washington, D.C. Defendant Chertoff is, among other things, charged with constitutional and lawful implementation of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, and with the administration of the division of Immigration and Customs Enforcement. Defendant Chertoff is sued in his official capacity.

68.     Defendant JULIE L. MYERS ("Defendant Myers") is the Assistant Secretary of Homeland Security for Immigration and Customs Enforcement in Washington, D.C. Defendant Myers is, among other things, charged with the constitutional and lawful implementation of the

Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, and with the administration of the division of Immigration and Customs Enforcement. Defendant Myers is sued in her official capacity.

69.    Defendant JOHN P. TORRES ("Defendant Torres") is the Director of the Office of Detention and Removal Operations for ICE in Washington, D.C. Defendant Torres is responsible for the apprehension, detention and removal of foreign nationals charged with violation of immigration law and the supervision of sworn law enforcement officers assigned to the Detention and Removal field offices, including the field office based in New York County, New York. Defendant Torres is sued in his official capacity.

70.    Defendant CHRISTOPHER SHANAHAN is the Field Office Director for the Detention and Removal Operations Field Office based in New York County, New York. Defendant Shanahan is responsible for managing enforcement activities of ICE in the downstate New York area, including Suffolk and Westchester Counties.

71.    Upon information and belief, Defendant Shanahan was personally involved in and/or personally ordered or authorized the conduct of ICE agents at the homes of the named Plaintiffs as complained of herein. At a minimum, Defendant Shanahan was grossly negligent in managing the training and activities of the ICE agents under his supervision. Defendant Shanahan is sued individually.

72.    Defendant PETER J. SMITH ("Defendant Smith") is a special agent with ICE. Upon information and belief, Defendant Smith was in charge of ICE home raids conducted in Nassau County on September 24 and 26, 2007. Defendant Smith is sued individually.

73.    Upon information and belief, Defendant JOSEPH A. PALMESE ("Defendant Palmese") is the resident agent in charge of the Bohemia, New York office of Defendant ICE Office of Investigations. Upon information and belief, Defendant Palmese was personally

involved in and/or personally ordered and authorized the conduct of ICE agents in the Nassau County home raids on September 24 and 26, 2007. Defendant Palmese is sued individually.

74. At all times relevant to the incidents complained of in this action, Defendants JOHN and JANE DOE ICE AGENTS were federal law enforcement agents employed by Defendant ICE.

75. Defendants John and Jane Doe ICE Agents are sued individually.

76. The true names and total number of Defendants John and Jane Doe ICE Agents are unknown to Plaintiffs, and therefore, Plaintiffs sue these Defendants by such fictitious names.

77. Upon information and belief, each John and Jane Doe ICE Agent Defendant is responsible for the injuries and damages suffered by Plaintiffs caused by the acts alleged in this complaint.

78. Plaintiffs will amend their complaint to state the true names of Defendants John and Jane Doe ICE Agents after those names have been identified.

79. At all times relevant to the incidents complained of in this action, Defendants JOHN and JANE ROE ICE SUPERVISORS were federal law enforcement officials employed by Defendant ICE.

80. The true names and total number of Defendants John and Jane Roe ICE Supervisors are unknown to Plaintiffs, and therefore, Plaintiffs sue these Defendants by such fictitious names.

81. Upon information and belief, each John and Jane Roe ICE Supervisor Defendant is responsible for the injuries and damages suffered by Plaintiffs caused by the acts alleged in this complaint. Defendants John and Jane Roe are sued in their individual capacities.

82. Plaintiffs will amend their complaint to state the true names of Defendants John and Jane Roe ICE Supervisors after those names have been identified.

83.     In committing the acts alleged in this complaint, Defendants John and Jane Doe ICE Agents and John and Jane Roe ICE Supervisors were acting on behalf of Defendant ICE.

84.     Further, upon information and belief, Defendants John and Jane Doe ICE Agents were acting under the immediate supervision of Defendants Torres, Shanahan, and John Roe and Jane Roe ICE Supervisors and pursuant to their authorization.

85.     Defendants Shanahan, Smith, Palmese, John and Jane Doe ICE Agents, and John and Jane Roe Supervisors knew or should have known that committing the acts alleged in this complaint violated Plaintiffs' clearly established constitutional rights.

## FACTS

### Background on ICE

86.     ICE is a division of the Department of Homeland Security and was formed in March 2003. ICE is comprised of four divisions, one of which is the Office of Detention and Removal Operations ("DRO").

87.     The DRO has been running the National Fugitive Operations Program since February 2002. The goal of the National Fugitive Operations Program is to eliminate the backlog of fugitive aliens.

88.     In August 2003, the DRO announced that it would step up its activities in locating and deporting fugitive aliens.

89.     Since announcing its plan in 2003, ICE's DRO has pursued its goal to increase the number of persons removed from this country.

90.     As of January 2006, each Fugitive Operations Team was expected to arrest 1,000 fugitive aliens per year. By comparison, in 2003, each team was expected to make only 125 arrests.

91.    However, ICE's DRO has implemented neither a corresponding increase in training nor procedures sufficient to protect the rights of persons affected by their activities. Moreover, members of the Fugitive Operations Teams are permitted to take part in home raids without first completing whatever little training ICE provides on how to lawfully conduct such raids.

92.    Furthermore, the DRO and Fugitive Operations Teams rely on a database that purports to contain relevant information concerning, among other things, the location of fugitive aliens.

93.    Much of the information in this database, however, is outdated, inaccurate and incomplete.

94.    Upon information and belief, the DRO has procedural manuals that are used to provide guidance to the Fugitive Operations Teams in conducting apprehension operations.

95.    Upon information and belief, these procedural manuals are inadequate and incomplete in that, among other things, they do not contain adequate specific instructions for determining how to obtain consent to enter a private home or how ICE agents are to conduct themselves within a private home.

96.    The Inspector General has criticized ICE for its incomplete and inaccurate background information, understaffing, and incomplete and inadequate training. Specifically, in its report of March 2007, the Inspector General noted that:

(a)    the DRO immigration database contained inaccurate and incomplete information on fugitive aliens;

(b)    data exchanged between the DRO and its federal partners have not been reconciled on a regular basis to ensure the identity and background information on the fugitive alien is valid;

18

(c)    Fugitive Operations Teams are not fully staffed;

(d)    headquarters and other locations that support Fugitive Operations Teams are not fully staffed;

(e)    not all Fugitive Operations Team members have completed the Fugitive Operations Training Program; and

(f)    there is no national refresher course for those Fugitive Operations Team members who have attended the program.

(A true and correct copy of the Inspector General's March 2007 report is attached hereto as Exhibit 3.)

### The ICE Raid on the Leon/Aguilar Family Home

97.    The Leon and Aguilar Plaintiffs are members of three generations of a Latino family. With one exception, all are United States citizens. The one exception is a young girl who is a lawful permanent resident of the United States and whose citizenship application is pending.

98.    On the morning of February 20, 2007, the Leon and Aguilar Plaintiffs were all asleep in the Leon/Aguilar family home.

99.    Between about 4:30 and 5:00 a.m., several ICE agents pulled their unmarked cars onto the road outside the family home, blocking the driveway.

100.    They parked their cars in such a way as to prevent any of the cars already in the driveway from exiting the driveway.

101.    The ICE agents then repeatedly rang the doorbell and pounded on the front door of the Leon/Aguilar family home.

102.    Elena Leon had been asleep and was startled awake by the noise of pounding and doorbell-ringing, and went to the door.

103.    When she opened the door, Elena witnessed several uniformed men standing outside the door.

104.    The men were wearing sidearms, which were clearly visible.

105.    Elena was stunned and terrified.

106.    The armed, uniformed men were ICE agents.

107.    As soon as Elena opened the door, two of the ICE agents crossed the threshold of the front door and entered the Leon/Aguilar family home.

108.    The others quickly followed.

109.    The ICE agents entered the Leon/Aguilar home without permission or voluntary consent.

110.    None of the ICE agents told Elena that she had the right to refuse them permission to enter her home.

111.    At no time did any of the ICE agents show Elena a warrant that granted permission for them to enter the Leon/Aguilar family home.

112.    There were no exigent circumstances that may have permitted the ICE agents to enter the Leon/Aguilar family home without a valid judicial warrant or voluntary consent.

113.    The ICE agents proceeded into the lower floor of the home, pounding on and opening bedroom doors.

114.    When she heard the noise, Erika Gabriela Garcia-Leon ("Gabriela") opened her bedroom door to see what was happening. Still in her nightclothes, and seeing men storming through the hallway, she slammed the door and leapt back into bed. The ICE agents opened the door. Gabriela was twelve years old at the time.

115.    Andres Leon was also awakened and opened his door.  He saw two agents entering the hallway from the basement door.  It was apparent that the agents had been in the basement without permission.

116.    At the same time, some of the agents entered the bedroom of Adriana Aguilar, where she was asleep with her son, Carson, who was four years old.

117.    The ICE agents pulled the covers off of her bed and shone flashlights into her face and the face of her son, who began to cry.

118.    The ICE agents searched the Aguilar/Leon family home without the consent of the Leon or Aguilar families.

119.    Startled awake, frightened and confused, Adriana repeatedly asked the ICE agents who they were and what they were doing.

120.    The ICE agents gathered Adriana, Andres and Gabriela in the office space on the ground floor of the house.

121.    The ICE agents positioned themselves so that the exits leading out of the office area were blocked.

122.    Adriana and Andres were not free to leave the office area.

123.    The agents would not say who they were despite being asked to identify themselves.

124.    The ICE agents would not permit Adriana to call the police or a lawyer.

125.    When Adriana attempted to open a drawer to get the telephone number of a lawyer, the agents put their hands on their weapons.

126.    One agent ordered her not to move.

127.    Only after the ICE agents had Adriana in the office area did they indicate that they were looking for someone specific.  They listed the names of several men whom they were looking for, including a man named "Wilson Garcia."

128.    Adriana thought they might have been referring to her first husband, whose name is Wilson Patricio Garcia, but who went by his middle name, "Patricio."

129.    Adriana had divorced him five years earlier in 2002.

130.    Adriana's divorce from Wilson Patricio Garcia, her subsequent marriage to her current husband Norman Aguilar, and her purchase of the Aguilar/Leon family home together with Norman are all matters of public record easily available to ICE had they checked.

131.    It was entirely unreasonable for the ICE agents to believe that they would find Wilson Patricio Garcia in the Leon/Aguilar family home at the time of the raid.

132.    In the office area, the ICE agents questioned Andres, Adriana and Gabriela about Wilson Garcia.

133.    While in the office area, Adriana asked the ICE agents to see a warrant.

134.    One of the agents told her that they would show her the warrant.

135.    However, the agents did not show her any warrant.

136.    Andres also asked the ICE agents to see a warrant.

137.    The ICE agents did not permit Andres to read a warrant.

138.    Instead, one of the ICE agents opened and then quickly closed a manila folder containing papers that the ICE agents claimed was a warrant.

139.    The quick display of the contents of the folder did not allow Andres to confirm the existence of a warrant or the opportunity to read any of the contents.

22

140.    Upon information and belief, the ICE agents did not have a warrant that permitted them to enter or search the Leon/Aguilar family home or to detain the Leon/Aguilar family without voluntary consent or exigent circumstances.

141.    A Freedom of Information Act request seeking a copy of any such warrant was made to ICE and has been outstanding since early July 2007.

142.    To date, ICE has yet to produce a copy of any such warrant.

143.    As the ICE agents were leaving the office area, Adriana asked one of the agents in Spanish where the warrant was.  In English, he indicated to one of his colleagues that she was asking for the warrant.

144.    The ICE agents never provided any member of the Leon or Aguilar families with a copy of a warrant.

145.    On the way out of the office area, one of the ICE agents, turned to twelve-year-old Gabriela and said that they would be back.  Adriana Aguilar and Andres Leon heard the agent say this clearly, in English.

### The ICE Raid on the Amaya Household

146.    Nelly Amaya rents a basement apartment at 20 Boatsteerer's Court in East Hampton, Suffolk County, New York.  The apartment has three bedrooms.  She has lived in this apartment since July 2006.

147.    At the time of the raid (described herein), Nelly shared this apartment with her ex-husband, Giovany Vicuña, her father, Antonio Amaya, and her brother-in-law, Marlon Vicuña.

148.    On the morning of February 20, 2007, the residents of the Amaya household were all asleep.

149.    Between about 4:00 and 5:00 a.m., several ICE agents forcibly entered the Amaya household by kicking the entry door open.

150.    The ICE agents entered Nelly's home without permission or voluntary consent from her or any other member of the household.

151.    The ICE agents did not explain to any member of the family that they had the right to refuse them permission to enter her home.

152.    Nelly was sleeping and was awakened by the agents screaming the name of her brother-in-law, Marlon Vicuña as they entered her apartment.

153.    Nelly saw several uniformed men blocking her bedroom door.

154.    The men were wearing sidearms, which were clearly visible.

155.    The men shone a flashlight in Nelly's eyes while at the bedroom door.

156.    The ICE agents then entered her bedroom.

157.    Nelly was wearing only a t-shirt and underwear when the men entered her bedroom.

158.    Immediately after crossing the threshold of Nelly's bedroom, the two ICE agents began questioning her and repeatedly asked for Marlon Vicuña. Nelly asked who they were but they did not identify themselves.

159.    Nelly was ordered to go to the living room.

160.    Nelly threw on pajama pants and a sweatshirt before being pulled by her arm into the living room. After being pulled into the living room, she asked permission to use the bathroom and was not allowed to do so privately.

161.    When Nelly attempted to go to the bathroom to use the toilet, the ICE agents refused to let her close the door.

162.    Nelly asked the agents for a warrant, but the agents refused to show her any warrant.

163.    After she requested to see a warrant, one of the ICE agents asked Nelly her name.