7a9nagun                           Argument

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ADRIANA AGUILAR, et al,

4                     Plaintiffs,

5              v.                              07 CV 8224 (JGK)

6    BUREAU OF IMMIGRATION AND
     CUSTOMS ENFORCEMENT,
7
                     Defendant.
8
     ------------------------------x
9                                             New York, N.Y.
                                              October 9, 2007
10                                            4:30 p.m.

11   Before:

12                       HON. JOHN G. KOELTL,

13                                            District Judge

14                          APPEARANCES

15   DEWEY & LeBOEUF
          Attorneys for Plaintiff
16   PATRICK J. GENNARDO
     DONNA L. GORDON
17
     PUERTO RICAN LEGAL DEFENSE AND EDUCATION FUND
18        Attorneys for Plaintiff
     FOSTER MAER
19   GHITA SCHWARZ
     JACKSON CHIN
20
     UNITED STATES DEPARTMENT OF JUSTICE
21        Attorneys for Defendant
     ELIZABETH WOLSTEIN
22   SHANE CARGO
     PATRICIA BUCHANAN
23

24

25

7a9nagun                                    Argument

1

2              (Case called)

3              MR. GENNARDO:  Good afternoon, your Honor.  My name is

4    Patrick Gennardo.  I'm a member of the firm of Dewey & LeBoeuf.

5    I have with me my partner and cocounsel Donna Gordon, my

6    cocounsel, Foster Maer, and Ghita Schwarz and Jackson Chin from

7    the Puerto Rican Legal Defense and Education Fund.

8              THE COURT:  Good afternoon.

9              MS. WOLSTEIN:  Elizabeth Wolstein from the U.S.

10   Attorney's Office on behalf of the defendants, and with me my

11   colleagues Shane Cargo and Patricia Buchanan from the U.S.

12   Attorney's Office.

13             THE COURT:  All right.  Good afternoon.

14             I should point out -- I may have done this at the last

15   conference -- I am sure I know people at Dewey & LeBoeuf.  My

16   deputy knows at least someone at LeBoeuf.  I know people at the

17   U.S. Attorney's Office.  There's nothing about any of that that

18   affects anything I do in the case.

19             I don't believe that I know any of the individual

20   lawyers who are appearing here.

21             This is an application for a TRO.  I should point out

22   I received the government's letter by fax.  I received the

23   plaintiffs' brief, also by fax, and a copy of the brief was

24   delivered to chambers.

25             There's a reference to a reply declaration by Gordon.

7a9nagun                          Argument

1    I don't have that reply declaration.  So if you want to pass up

2    a copy of the reply declaration --

3              MR. GENNARDO:  I believe I have one, your Honor.  I'm

4    sorry about that confusion.  You were actually supposed to get

5    a copy of the reply declaration by hand, not a copy of the

6    brief.

7              THE COURT:  I think I got two copies of the brief, one

8    by fax and one delivered.

9              MR. GENNARDO:  OK.

10             THE COURT:  I take it that the Gordon declaration has

11   also been given to the government.

12             MS. WOLSTEIN:  No, your Honor.  We have not been

13   served with that declaration or with the exhibits.

14             MR. GENNARDO:  Your Honor, we sent out a courier this

15   morning with a copy of the declaration to both yourself and to

16   Ms. Wolstein, understanding that we would not be able to send

17   such a long document by fax.

18             THE COURT:  Something must have happened.

19             MR. GENNARDO:  Something happened along the way.

20             THE COURT:  The same thing must have happened to the

21   government's copy as happened to our copy, I assume.

22             MR. GENNARDO:  May I?

23             THE COURT:  It is always possible that things get

24   lost.

25             MR. GENNARDO:  Your Honor, we will have a copy brought

7a9nagun                          Argument

1    up right away.

2              THE COURT:  OK.

3              MR. GENNARDO:  I can tell you, your Honor, what was

4    attached to the declarations.

5              THE COURT:  Sure.

6              MR. GENNARDO:  It is primarily two things.  It's

7    affirmations from each of the adult plaintiffs serving as named

8    plaintiffs in this matter as well as some photographs of the

9    plaintiffs' homes which we believe show that the entry and

10   searches conducted of the plaintiffs' homes was not consensual

11   in any sense:  Pictures of broken doorframes, kicked-in doors,

12   boot marks on doors, things of that nature.  We will get that

13   to you expeditiously.  I do apologize for the confusion and to

14   the government, of course.

15             THE COURT:  OK.

16             MR. GENNARDO:  I'm sorry.  One other item, your Honor,

17   I forgot.

18             We also included a declaration from Mrs. Peggy De La

19   Rosa.  She was a victim of a nonconsensual ICE raid just last

20   week.  She lives in Huntington Station, New York.  This was the

21   second time that ICE returned to her home purportedly in

22   pursuit of a fugitive alien named Miguel.  Miguel has never

23   resided with Ms. De La Rosa.  The government was there about 13

24   months ago, did a nonconsensual entry and search of her home

25   and then returned to do it again just this past week.  So we've

7a9nagun                         Argument

1      included a declaration from her as well.

2              THE COURT:  OK.  She's the only plaintiff who has been

3      revisited?

4              MR. GENNARDO:  She's actually not a named plaintiff

5      yet, your Honor.

6              THE COURT:  OK.

7              MR. GENNARDO:  May I?

8              THE COURT:  It is your application.

9              MR. GENNARDO:  First of all, your Honor, thank you

10     very much for hearing us on an expedited basis.  We appreciate

11     your hearing us both on Friday and again this afternoon.

12              Your Honor, our clients desperately need your help.

13     They have no place else to turn.  I don't know how to say that

14     in any other way.  Fourth Amendment rights of a Latino

15     community in the lower New York State area are systematically

16     being violated by the Immigration and Customs Enforcement

17     Division of the Department of Homeland Security, more commonly

18     known as ICE.  The fact that these violations are occurring is

19     beyond any real dispute.

20              In our complaint we have 27 plaintiffs from nine

21     separate incidents ranging in three separate counties in lower

22     New York State.  All of the complaints alleged by these

23     plaintiffs are very similar in the tactics that ICE has used to

24     gain entry to their homes, unlawfully search their homes, and

25     detain the plaintiffs.

7a9nagun                              Argument

1      We also have declarations from each of the adult

2   plaintiffs in our complaint verifying the allegations in the

3   complaint.  We obtained those, your Honor, based on some of

4   your comments at our last hearing and concerns that the

5   complaint was not verified.

6      We now have pictures attached as Exhibit G to the

7   Gordon declaration which we will have for you shortly, which

8   show that the entries to plaintiffs' homes were far from

9   consensual.

10      As I noted earlier, the pictures show broken door

11   frames; they show kicked-in doorways; they show boot marks on

12   doors.

13      These are not the hallmarks of a consensual entry or

14   search.  These are hallmarks of forcible entries and searches.

15   As the government conceded last time we were here at a hearing

16   on Friday, the government does was operating under judicially

17   ordered search warrants or judicially order arrest warrants;

18   that the program under which the government is operating is

19   purely a consensual program.

20      We have also brought to your attention, your Honor,

21   that there are numerous other complaints pending around the

22   country making very similar allegations about ICE's misconduct

23   as raised in plaintiffs' complaint in this matter.  We have

24   also provided your Honor with numerous articles, again,

25   recounting stories from all over the country --

7a9nagun                              Argument

1          THE COURT:  Is there any case law from any other court

2    granting or denying motions for a TRO or preliminary

3    injunction?

4          MR. GENNARDO:  I believe there was one matter in which

5    the Court denied a TRO.  That was in Minnesota, your Honor.

6    The allegations of that complaint were a little different than

7    the allegations in our complaint.  In that case the plaintiffs

8    actually sought to intervene into the workings of the

9    Department of Homeland Security and effectuate stays of the

10   prosecution of some of the named plaintiffs who were detained

11   by ICE.  We have not sought to do that in this matter.

12         As I was saying, the articles, again, if you read

13   them, you will see that the allegations made by other victims

14   of ICE's nonconsensual searches very much parrot the types of

15   allegations that we raised in our complaint.

16         Perhaps most tellingly, we've provided your Honor with

17   copies of letters that were written by the Nassau County Police

18   Commissioner and the Nassau County Executive publicly

19   complaining to ICE officials about the manner in which ICE

20   conducted home raids just last week or ten days ago in Nassau

21   County.  In those letters Executive Suozzi very pointedly said

22   to the Department of Homeland Security that the raids that were

23   conducted were characterized by malfeasance.

24         THE COURT:  Those raids appear to be from the letter

25   somewhat different from the allegations in the complaint,

7a9nagun                    Argument

1   because the letters from Nassau indicate that there were arrest

2   warrants and also indicated that there were persons who were

3   detained who were in fact eligible for detention because they

4   were here illegally, unlike the plaintiffs in this case.

5           MR. GENNARDO:  May I address that, your Honor?

6           THE COURT:  Sure.

7           MR. GENNARDO:  Actually, some of the victims of that

8   raid are plaintiffs in our case.  In fact, when the agents came

9   to some of our plaintiffs' homes, they were seeking specific

10  individuals.  Those individuals did not live in the homes of

11  the various named plaintiffs.

12          In Nassau County, if you read the letters, actually

13  the allegations are very similar to the allegations in our

14  complaint.  In those letters, the police commissioner makes

15  very clear that very few of the people detained by the

16  government in those raids had arrest warrants issued for them.

17  The overwhelming majority of the individuals arrested in those

18  raids were undocumented aliens.

19          So it's very much in line with the allegations of our

20  complaint in which we allege that the government is using

21  administratively issued arrest warrants, not judicially issued

22  arrest warrants, and with those warrants and with poor due

23  diligence and poor background information, they are approaching

24  plaintiffs' homes.

25          THE COURT:  But none of the plaintiffs in this case

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7a9nagun                         Argument

1   are undocumented aliens.

2           MR. GENNARDO:  That's not correct.

3           Some of them are.

4           Getting back to the Nassau County letters, in those

5   letters, the police commissioner and Executive Suozzi make very

6   clear that the raids that are being conducted by ICE are being

7   conducted with a cowboy mentality and I quote Commissioner

8   Mulvey's letter that the raid that they witnessed, independent

9   third-party governmental entities, were characterized by

10  malfeasance and illegality.

11          The confluence of all these facts shows a clear

12  pattern and practice on the part of ICE to engage in unlawful

13  and illegal entries, searches and seizures, not only here in

14  lower New York State, but all over the country.

15          There's no other way to explain the frequency and the

16  similarity of the allegations that are coming up not only here

17  in lower New York State but all over the country.

18          The fact that the violations are continuing and that

19  plaintiffs are at daily risk of violation is also beyond any

20  real dispute.  ICE conducted raids in Queens only four days

21  ago.  They conducted raids in Nassau County ten days ago.  The

22  Nassau County police chief letter, the very last paragraph of

23  that letter unequivocally attests to the fact that future raids

24  are planned in Nassau County by ICE.

25          ICE agents have threatened our plaintiffs that they

7a9nagun                          Argument

1    are in fact going to return.  The De La Rosa declaration shows

2    that ICE agents do return.  In fact, having been raided by ICE

3    once puts you at even greater risk of a second ICE unlawful

4    entry because ICE's database and information gathering is so

5    poor that, once you end up on that database, you are at greater

6    risk of once again being identified by ICE as a potential

7    target for home raid.

8         That's clearly what happened to Mrs. De La Rosa.  If

9    you take a look at the independent inspector general's report,

10   ICE's own inspector general, you will see that the inspector

11   general criticizes ICE's own investigative techniques, ICE's

12   own information gathering and ICE's maintenance of an

13   up-to-date database.

14        The Nassau County letters also show that ICE was very

15   poorly prepared for the raids that they engaged in, that their

16   Intel was not up to date, and that something like 8 of the 98

17   arrest warrants that ICE had that evening or in the course of

18   those two days had incorrect addresses on them.

19        The other set of our plaintiffs who have a continuing

20   harm here are what we call our Deshawn plaintiffs.  These are

21   plaintiffs who were arrested as undocumented aliens.  They are

22   now currently subject to immigration proceedings by DHS, and

23   the only reason that they are in these proceedings and subject

24   to the future damages is because of ICE's illegal activities in

25   entering their homes and illegally seizing them once inside

7a9nagun                          Argument

1    their homes.

2         Before we dig into the substance -- yes, your Honor.

3         THE COURT:  Deshawn was a case where the Court was

4    talking about evidence that was allegedly illegally obtained

5    and was then used in a proceeding.  If in fact the initial

6    detention was unlawful, does that mean any further detention

7    cannot be accomplished?

8         MR. GENNARDO:  Your Honor, with all due respect, I

9    think that gets a little bit beyond the allegations that we're

10   comfortable making in this matter.  I think in each of the

11   individual plaintiffs' deportation proceedings they do have the

12   right to raise that they were seized illegally and their homes

13   were searched in violation of the Fourth Amendment.

14        Our case is postured a little bit differently.  What

15   we're purely challenging here is the unconstitutional conduct

16   by ICE in entering the homes.  We're seeking an injunction to

17   stop ICE from violating Latinos' constitutional rights.

18        THE COURT:  In Deshawn, the basis for standing was in

19   fact the threat of the continuing use of the evidence allegedly

20   illegally seized.  You say that's not what we're arguing about

21   here.

22        MR. GENNARDO:  No.

23        THE COURT:  So --

24        MR. GENNARDO:  We read Deshawn along with your Honor,

25   but also a little bit differently.

7a9nagun                        Argument

1       What we read <u>Deshawn</u> to say is that when the

2  government improperly obtains some fruit that it can use later

3  on to cause future harm to the plaintiffs, that <u>Deshawn</u> kicks

4  in to provide standing to enjoin the government from acting.

5       But <u>Deshawn</u> also very clearly says that when the

6  government is acting under an illegal pattern or practice or

7  policy or something akin thereto, and the group to which that

8  illegal activity is targeted can be identified, that in fact

9  there is injunctive relief standing.

10      There are numerous cases that stand for that position,

11  including <u>Shane</u>.  Before we dive into the substantive

12  allegations, I wanted to address some of the your Honor's

13  comments from last week about the perhaps unusual posture of

14  our motion.  When we filed our complaint in September, we were

15  not aware of any raids postdating the spring of 2007.

16      Being ever vigilant of the legal standards involved

17  for an exigent motion and respectful of the Court's and the

18  government's time, we determined at that point not to seek a

19  TRO.  Instead we determined that what we would do is seek

20  expedited discovery and promptly bring on a motion for a

21  preliminary injunction.

22      Literally on the eve of making our motion for

23  expedited discovery, two intervening factors occurred:

24      First, the raids started again, except this time they

25  were much more brutal and aggressive than the raids we had been

7a9nagun                          Argument

1   told about before.  We felt we had no choice, but at that

2   moment in time, particularly knowing that future raids were

3   being scheduled by ICE in Nassau County, that we had to move

4   for expedited relief before your Honor.

5          The second thing that happened is my son was born and

6   I had to travel out of state to California to get him.  So we

7   were in the process of trying to amend our complaint, bring on

8   the motion for a TRO, prepare our declarations and get

9   information, and doing all of that from about 2500 miles away.

10         This is just a short way of trying to assure your

11  Honor that, while the posture of the motion might be somewhat

12  unusual and not typical of the TRO motion that your Honor has

13  seen before, that we have moved very cautiously and carefully

14  in bringing the instant motions and that we are certainly

15  prepared to bring our preliminary injunction motion promptly,

16  certainly within the 10 to 20 days provided by Rule 65,

17  provided the government is able to provide us with the

18  discovery that we believe we deserve and need to bring that

19  motion on.

20         I would like to address the standing issues if your

21  Honor would like to hear us on those.

22         THE COURT:  Sure.

23         MR. GENNARDO:  Then Ms. Gordon and Mr. Foster will

24  address some of the other issues raised by the government in

25  their opposition brief.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7a9nagun                              Argument

1          Under Lyons and Shane it's clear that where a policy

2    or the equivalent of a policy of unconstitutional conduct by

3    the government is aimed at a particular group and the threat of

4    harm is imminent to that particular group, that injunctive

5    relief standing exists.

6          I believe that we've alleged certainly as best as we

7    can under the haste of bringing a TRO motion that, one, in

8    fact, there must be some sort of practice if not a policy on

9    the part of the government targeting Latinos in lower New York

10   State.

11         As I noted earlier, there's simply no other

12   explanation for the confluence of all of the information that

13   we've been able to gather not only from within lower New York

14   State but also across the country.

15         There's no way plaintiffs can be suffering the same

16   kind of constitutional deprivations, the stories can be the

17   same over and over again, unless ICE is consciously engaging in

18   these activities.

19         The fact that there's been a threat I think is also

20   abundantly clear both from the fact that the raids are

21   occurring, that raids are planned in the future, that there

22   have been threats against our plaintiffs for future raids, and,

23   then, of course we have the Deshawn plaintiffs against whom the

24   government's continuing to bring claims and continuing to

25   prosecute based on the government's illegal conduct in entering

7a9nagun                          Argument

1    their homes and seizing the plaintiffs.

2          The allegations in our complaint are found in

3    paragraphs 321 through 328 and 332.

4          Another factor that the government argued I believe

5    last week and argued in their papers is that we're somehow

6    seeking a mandatory injunction, and therefore, the standard for

7    receiving an injunction should be viewed at a higher level.

8          That's simply a mischaracterization of the relief we

9    sought here, your Honor.  The fact that we have provided the

10   government or sought to provide the government with an out or

11   release from the prohibition on conducting warrantless home

12   raids does not rise to the level of changing government policy

13   or affirmatively requiring the government to get judicial

14   warrants when it conducts raids.

15         Our requested relief in the TRO is purely seeking to

16   maintain the status quo, to prevent further irreparable injury

17   to our clients, and to preserve the integrity of this process

18   so that we are able to continue to access our witnesses and not

19   have our named plaintiffs removed from the jurisdiction.

20         THE COURT:  But the request for a TRO does request

21   that ICE be prohibited from entering or searching any home

22   without first obtaining a judicially ordered search warrant.

23   That would change the law, which allows a consent search.

24         MR. GENNARDO:  But it does not mandate a change in the

25   sense that it mandates ICE to go and get search warrants.  ICE

7a9nagun                          Argument

1    does not have to conduct home raids.

2         THE COURT:  So it would change the availability of a

3    constitutionally authorized search on consent.  ICE would be

4    told, you cannot conduct a constitutionally authorized search

5    on consent.

6         MR. GENNARDO:  That's correct, your Honor.

7         THE COURT:  It changes the law.

8         MR. GENNARDO:  But there's no other way to protect our

9    clients' constitutional rights.  ICE has demonstrated time and

10   time again, not only against our 27 plaintiffs, but all across

11   the country, that whatever rules, whatever policies, whatever

12   procedures they're operating under are not correctly geared to

13   abide by the constitutional rights of the homes and the

14   individuals in the homes to which they're targeting.

15        That is the only way that our clients can be assured

16   that they are not going to continue to suffer the irreparable

17   harm that is being handed to them now by ICE.  It is not

18   unusual in the sense when a governmental entity is engaging in

19   an illegal practice of conduct geared to a particular community

20   for a court to enter a TRO or permanent injunction enjoining

21   the government to abide by the Constitution.

22        THE COURT:  This goes further than that, because it

23   would prohibit the government even from conducting otherwise

24   constitutional searches.

25        MR. GENNARDO:  But it would not prevent the government

7a9nagun                          Argument

1    from doing those searches at all.  It certainly provides the

2    opportunity, with due deference to the important mission that

3    ICE has, it provides ICE with the opportunity to do home

4    searches when they can justify that the home searches are

5    warranted by the facts of the individual case.

6           We did not try to draw that prohibition in a way to

7    hamstring ICE or prevent ICE from conducting what would

8    otherwise be valid home searches and valid home entries, but

9    ICE has shown that it does not have the ability to make

10   judgments about what a valid and invalid home search is at this

11   point.

12          I don't know.  I can't think of any other way to

13   protect our clients from the recurring irreparable harm that

14   they are now being faced with by ICE every day as these raids

15   continue, as plans for raids continue, as ICE continues in its

16   conduct in the face of our complaint, painstakingly setting out

17   the allegations of misconduct in the face of the other

18   complaints around the country, in the face of the letters from

19   the Nassau County Executive and the Nassau County police

20   commissioner.

21          The two raids that occurred most recently happened

22   after the filing of our complaint, and certainly the second

23   raid occurred after the public letters by Nassau County to

24   high-ranking ICE officials.

25          I don't know how else, your Honor, we protect the

7a9nagun                          Argument

1    constitutional rights of our clients, the irreparably damaged

2    rights, once ICE does continue to conduct these raids.

3              THE COURT:  The issue for purposes of a temporary

4    restraining order would be -- and you can correct me if I'm

5    wrong -- whether there is a likelihood of immediate and

6    irreparable injury to the plaintiffs in the ten days for which

7    the temporary restraining order by rule could continue to

8    exist.

9              MR. GENNARDO:  I do not disagree with that, your

10   Honor.

11             THE COURT:  What would the showing be that it is

12   likely that the plaintiffs who are before me will have an

13   illegal raid conducted against them in the next ten days?

14             MR. GENNARDO:  Again, your Honor, the fact that ICE is

15   continuing with its raids unabated in lower New York State,

16   that it is targeting Latinos for these raids -- all of our

17   clients are Latinos.

18             THE COURT:  Yes.

19             Even those plaintiffs who were subject to search going

20   back to February through April of 2007, no plaintiff has been

21   revisited in the months and months since then, and you ask me

22   to find that it is likely that they will suffer another search,

23   even though they haven't suffered another search for months and

24   months, that these plaintiffs will have another search which

25   would be Elavil in the next ten days.

7a9nagun                          Argument

1          MR. GENNARDO:  Yes, your Honor.

2          We need to be a bit careful.  Because <u>Lyons</u> certainly

3     does not require, and it's certainly not the case law that I've

4     read, that plaintiffs actually have suffered two deprivations

5     of their constitutional rights before they can make a showing

6     that they're likely to suffer an additional deprivation at the

7     hands of the government.

8          What we have alleged here is that our clients are

9     members of a targeted community in an identifiable area, that

10    ICE is conducting raids as recently as four days ago and that

11    there are plans to conduct additional raids.  Our plaintiffs

12    are certainly within the group of individuals that ICE is

13    targeting for unconstitutional home entries, seizures and

14    detention.

15         There is a strong likelihood that any of our named

16    plaintiffs, including any member of the putative class, could

17    have a home entry by ICE.  It could be happening right now as

18    we're sitting here.  There's no way that any of us can say that

19    any of our named plaintiffs is unlikely to suffer that harm.

20    They are within the group that ICE is targeting for home raids.

21         THE COURT:  But the showing is really not whether it

22    can be said to be unlikely, but whether there is a showing of

23    likelihood of irreparable injury that is not hypothetical or

24    speculative, but a sufficient showing of immediate and

25    irreparable injury to warrant a temporary restraining order.

7a9nagun                              Argument

1          The temporary restraining order is itself somewhat --

2     well, it's different from either a preliminary injunction or a

3     permanent injunction because it exists for ten days, and it is

4     extraordinary relief.

5          MR. GENNARDO:  Yes, it is, your Honor.  The harms that

6     are occurring are extraordinary here, not only extraordinary in

7     the fact that they're deprivations of very basic constitutional

8     rights, but the manner in which these raids are being executed

9     is brutal.

10         We have clients who have had guns pulled on them,

11    completely innocent people asleep in their home having their

12    doors kicked in and guns put in their chest in the middle of

13    the night.

14         If you read the Nassau county police commissioner's

15    letter, in there he notes that what ICE is doing is of grave

16    danger to not only his officers but to all of the parties

17    involved.

18         This is a very grave issue.  This is not a light

19    issue.  Certainly it rises to the level of the type of

20    important and special relief that we are seeking here.  If I

21    can just get back to the standards that your Honor raised about

22    the TRO, certainly, I don't think there can be any doubt that

23    irreparable injury is being suffered, has been suffered, and

24    that our clients are at risk of suffering irreparable injury.

25         It's pretty clear under the case law that violations

7a9nagun                                    Argument

1    of Fourth Amendment rights are irreparable injuries.    Our

2    clients have a right to be secure that in the next ten days,

3    the next 20 days, the next 20 years, that the government is not

4    going to kick in their door, seize their families in the middle

5    of the night, particularly when they have absolutely no

6    relationship to anything that ICE is doing or any person that

7    ICE is pursuing.

8          Those are important rights.    Those are important

9    security rights given to each of us by the Constitution.    The

10   fact that our plaintiffs are likely to be within the ambit of

11   individuals who might have that happen to them I think is

12   pretty clear from the fact that ICE is continuing to do the

13   raids, that ICE has plans to do more raids, and they have

14   threatened to come back to some of our plaintiffs' homes, and

15   in fact they have come back to some plaintiffs -- not

16   plaintiffs but to some of their victims' homes.    We have the

17   affidavit from Mrs. De La Rosa to prove that.

18         I think, your Honor, the facts here are very different

19   from Lyons and Shane, where the court there properly found that

20   the distance between the harm that had been suffered by Shane

21   and by Mr. Lyons was very remote.

22         Those individuals were not within a targeted class of

23   individuals or illegal government activity.    They were not

24   within the group targeted.    It was not in Lyons, for example,

25   in a policy of the Los Angeles police to conduct chokeholds.

7a9nagun                              Argument

1   In this situation it's very different.

2           We have a group that is being targeted.  We have a

3   pattern and practice, if not policy, of violating that targeted

4   group's rights, and we have evidence that that type of activity

5   and those types of raids are planned for the future and our

6   clients have been threatened with that type of activity in the

7   future.

8           This is not like Lyons, where the individual would

9   have to just happen to have to be stopped by the police and

10  that the police officer who stopped them might just use his

11  discretion to use a chokehold that was not sanctioned by the

12  government.

13          This is a case where our clients are within the group

14  being targeted by the government for constitutional

15  deprivations.  That group is identifiable both by race and by

16  location.  There's no doubt, the police chief's letter makes

17  clear there will be more raids.  Unless the government is

18  stopped, there will be more irreparable injury suffered by our

19  clients and members of the putative class.

20          That is very different from Lyons.  That is very

21  different from Shane.

22          The notion that Shane, a lawyer, might be arrested

23  again in the future and strip searched when he had no prior

24  record, when the proceedings the underlying marital proceedings

25  which gave rise to his initial arrest had been resolved, sure I

7a9nagun                    Argument

1    think we can all sit here and say that it's not likely that

2    Shane is going to be arrested and strip searched again.

3          I think it is fair to say that Lyons was not likely to

4    be one of the millions of people traveling on the California

5    roads and arrested again and put in a chokehold.  I don't think

6    we can say the same thing about the plaintiffs in this matter.

7    It is very different.

8          THE COURT:  All right.

9          MR. GENNARDO:  OK.  Diane, would you like to address

10   some of the other contentions by the government?

11         MS. GORDON:  Good afternoon, your Honor.

12         THE COURT:  Good afternoon.

13         MS. GORDON:  I would like to address defendants

14   allegations that plaintiffs' TRO application is prohibited by

15   the Real ID Act by 8 U.S.C.A. 1252(g) and by 8 U.S.C.A.

16   1252(f).

17         Defendants use the Real ID Act to challenge the second

18   prong of plaintiff's TRO.  Defendants mischaracterized the

19   nature of this action and the relief sought in this application

20   for a restraining order to argue that the Real ID Act divests

21   this court of jurisdiction.  8 U.S.C.A. 1252(b)(9) sets forth

22   or allows judicial review of all questions of law and fact

23   arising from any action taken or proceeding brought to remove

24   an alien.  Let me just clarify, your Honor.  It prohibits

25   judicial review.

7a9nagun                        Argument

1          In conjunction with (b)(9), we also have 8 U.S.C.A.

2     1252(g).  The two statutes are very similar in that they are

3     mint to prevent an alien from challenging the removal

4     proceedings that have been decided.

5          In this case, the plaintiffs' case does not involve

6     removal proceedings.  The plaintiffs do not challenge any

7     deportability charges or seek to review any actions or

8     proceedings to remove an alien.  Our case does not arise out of

9     removal proceedings, which is the aim of the Real ID Act.

10         Plaintiffs do not seek to interfere in the removal

11    process or to stay removal orders with an intention to prolong

12    any defendant's presence in the United States.

13         What we want is to maintain the integrity of the

14    judicial process by having the Court temporarily restrain

15    defendants from tampering with individuals that are integral to

16    the prosecution of this action.

17         All of the cases cited by the defendant in support of

18    its arguments relating to the Real ID Act or 8 U.S.C.A. 1252(g)

19    deal with someone who is trying to stay in the country and get

20    around deportation.  That is not the target of the instant

21    case.

22         8 U.S.C.A. 1252(g) is a statute that states that no

23    court shall have jurisdiction to hear any cause or claim by or

24    on behalf of any alien arising from the decision or action by

25    the attorney general to commence proceedings, adjudicate cases,

7a9nagun                          Argument

1    or execute removal orders against the aliens.

2              Those are the three actions at 1252(g) is aimed at.

3              The instant case does not deal with the attorney

4    general's decision to commence proceedings, adjudicate cases,

5    or execute removal orders.  Therefore, it is inapplicable to

6    the instant matter.

7              THE COURT:  Wouldn't the second part of the TRO in

8    fact prevent the removal of a person otherwise subject to an

9    order of removal?

10             MS. GORDON:  You're referring to the reference to

11   deporting?

12             THE COURT:  Right.

13             MS. GORDON:  We do recognize that, your Honor, but we

14   believe that what the statute is meant to prohibit is people

15   who are trying to get around their deportation findings.

16             In this case, we're simply trying to ensure the

17   integrity of the judicial process so that we will have

18   availability to our witnesses.  We are simply talking about

19   something, some sort of temporary restraint --

20             THE COURT:  Wouldn't it on its face prevent the

21   execution of an order of removal against a person otherwise

22   subject to an order of removal?

23             MS. GORDON:  It could, your Honor.  If that proved to

24   be a problem, we would be willing to strike that from the

25   paragraph of the temporary restraint.

7a9nagun                          Argument

1          THE COURT:  Go ahead.

2          MS. GORDON:  The claims at issue here arise out of a

3     pattern and practice, if not a policy, of ICE to conduct

4     unconstitutional home raids.

5          Home raids do not qualify as a proceeding, an

6     adjudication, or an execution of removal in any form under the

7     statutory language.  The unconstitutional violations are wholly

8     independent of any immigration proceeding the plaintiffs or

9     class members may be subject to now or in the future.

10         The relief requested to address this common grievance

11    would not alter the course of proceedings against an alien in

12    any individual immigration case.

13         The two cases that I would cite to your Honor are 490

14    F.3d 143 Iqbal v. Hasty, and Arar v. Ashcroft, 414 F.Supp.2d

15    250.  In both of these cases, plaintiffs claims were separate

16    from any underlying removal action, although they could be

17    considered to be closely related to the removal proceedings.

18         Our case differs because those cases relied on by the

19    defendant sought a stay of removal in order to facilitate an

20    ultimate goal of reversing the removal or obtaining alternative

21    relief.  That is not the case in the instant matter.

22         With regard to the last provision of the TRO, the

23    defendants seek to prohibit that provision based on 8 U.S.C.

24    1252(f).  This provision of the TRO simply is a notice

25    provision, your Honor.  All we are asking is that the

7a9nagun                          Argument

1    defendants notify the plaintiffs when they seek to transfer an

2    alien who has been detained and who may be a witness in our

3    case prior to transferring them or prior to transferring them

4    to outside of the New York State area.

5           We believe that all of the TRO provisions are not

6    prohibited by the statute set forth by the defendant and ask

7    that the Court grant the TRO in our favor.

8           THE COURT:  Thank you.

9           MR. GENNARDO:  Foster, did you want to address

10   expedited relief, expedited discovery?

11          MR. MAER:  Good afternoon, your Honor.

12          THE COURT:  Good afternoon.

13          MR. MAER:  You asked the question before about legal

14   challenges and had there been preliminary injunctions issued.

15          We cite to two cases in our memo of law where

16   preliminary injunctions were issued, one of which is Illinois

17   Migrant Council V. Pillioid.  That is 540 F.2d 1062.  Then also

18   Leduc v. Nelson, 562 F.2d 1318.

19          Typically a lot of these cases that are brought about

20   raids are for damages.  Few have sought --

21          THE COURT:  Were those cases involving preliminary

22   injunctions against ICE?

23          MR. MAER:  As I recall, yes.

24          THE COURT:  Where were they issued?  What were the

25   circumstances?

7a9nagun                          Argument

1          MR. MAER:   The <u>Illinois Migrant Council</u> case, it's the

2     Seventh Circuit 1976 if I recall correctly, there was sort of

3     an all-encompassing raid of a migrant community connected with

4     some sort of employment or the nature of the employment,

5     agricultural area, and a number of homes were invaded in that

6     instance.  <u>Leduc v. Nelson</u> -- let me check on that, your Honor.

7     I am not certain.  That was a 1985 case, Ninth Circuit.

8          THE COURT:  All right.

9          MR. MAER:  Again, a lot of these cases where these

10    actions do occur --

11          <u>LeDuc</u> is Washington state.  I think I have the cite

12    there.

13          -- seek damages and very few have sought preliminary

14    injunctive relief.  So that's one reason there's not a lot of

15    these cases.

16          In the instant situation in the last year or two, as

17    our papers make clear, this practice of home raids, there has

18    been a tremendous increase in the use of these raids.  Prior to

19    2006, there just weren't many home raids.  It's really part of

20    this Operation Return to Sender that home raids have been

21    utilized and hence produced this large number of home raids and

22    the actions that we're complaining of.

23          Lastly, there is a tremendous amount of fear in the

24    Latino community to stand up and publicly challenge these

25    raids.  People, their family members, friends, people they live

7a9nagun                         Argument

1      with, may have issues that involve their immigration status, so

2      there's a huge reluctance to step forward and bring these

3      challenges.

4            THE COURT:  But that argument was raised last time,

5      and it's obviously an important issue.  I asked for the

6      government's representation about the plaintiffs in this case

7      so that the government would give assurances that there would

8      be no retaliation against the plaintiffs in this case, and the

9      government gave those assurances with respect to the named

10     plaintiffs in this case, though they could make no assurance

11     with respect to John Doe plaintiffs.

12           MR. MAER:  Correct.

13           THE COURT:  That would be in keeping plainly with the

14     government's prior representations with respect to people who

15     are in litigation, representations that they make to the Court

16     of Appeals with respect to not removing people who are subject

17     to the litigation process because the government would not want

18     to tell the Court of Appeals that it was attempting to moot the

19     process.

20           The government gave those assurances with respect to

21     the named plaintiffs in this case, which would also tend to

22     undercut whether a temporary restraining order is necessary to

23     give such assurance for the plaintiffs in this case that their

24     case will be litigated without retaliation.

25           Wouldn't it also be unusual if you have named