1   plaintiffs in the case subject to the scrutiny of litigation to

2   expect that those named plaintiffs would then be subject to

3   another search while the case was going on, much less during

4   the ten-day period that a temporary restraining order would be

5   in effect?

6        MR. MAER:  Let me start with sort of the initial

7   premise that you set out there.  The reason I mention this is

8   that, why these practices have gone unchallenged, the

9   reluctance.

10       Certainly we have told our clients that we would

11  expect that such commitments would be made.  I have no reason

12  to present any evidence that they won't be respected in this

13  case.  That still doesn't stop our clients from being fearful

14  of stepping forward here, either the ones we've talked to or

15  what we believe are hundreds of other families who haven't

16  stepped forward because of that fear.  That was my point.

17       As Mr. Gennardo said, our clients are part of this

18  class that they will conduct raids against in the future, be it

19  this week or next week.  They have to meet the quota of 1,000

20  arrests per year, so these arrests are ongoing.

21       So will it be our plaintiffs?  We can't say with any

22  certainty.

23       But will it be someone in our class, in the group

24  we're seeking here to stop these raids and stop these

25  unconstitutional activities?  Certainly.

7a9nagun                              Argument

1        We don't know even how many raids there were the week

2   before last, but to meet this quota -- and maybe this can be

3   addressed by the U.S. Attorney.  How many raids they have had

4   in the last month, how many they have had this year.

5        So the number is substantial.  That's what we're

6   seeking relief from, both for our plaintiffs as well as for the

7   larger group of Latino households that we're seeking to

8   represent here.

9        It is under that umbrella that our plaintiffs need the

10  relief just like everybody else.

11       THE COURT:  Go ahead.

12       MR. MAER:  You also had raised the question about

13  under Deshawn whether this evidence could be used against them.

14       Yes, it can be.  Eight of our plaintiffs were put into

15  proceedings after these raids.  That evidence and their seizure

16  is a result obviously from our perspective of these unlawful

17  Fourth Amendment violations.  So, yes, this evidence --

18       THE COURT:  But the papers aren't clear that the

19  searches resulted in any evidence as opposed to a seizure of

20  persons.  I thought that your colleague said that you really

21  were not attempting to litigate in this action the removal

22  proceedings, which are a separate issue.

23       MR. MAER:  Yes, your Honor.

24       But again, be it their testimony -- we don't know

25  whether any sort of documentary proof, evidence, was obtained

1    in these raids.  In one of the raids I think described it's

2    clear they went through people's drawers, I believe, and so it

3    is likely, but we don't know that documentary evidence was

4    obtained in these raids that would be used in these hearings.

5            So we believe that's the type of continuing ongoing

6    harm or prospect of harm that Deshawn was designed, that the

7    Court intended to make protected and something that can be

8    challenged in standing under the Lyons test.

9            THE COURT:  Go ahead.

10           MR. MAER:  The last point is, you also raised the

11   perspective that we're asking that the agency change its

12   behavior, the way it does its normal course of business,

13   something that it's constitutionally entitled to do.

14           There's a case -- I apologize, we did not cite it --

15   that deals with this very constellation of facts.  I wish I

16   could pronounce it better Mastrovincenzo v. City of New York,

17   435 F.3d 78, that deals with the New York City Police

18   Department and its actions towards unlicensed street vendors.

19           There the defendants made the same argument that they

20   did on Friday and that your Honor is concerned about, and I

21   quote here, "If, as defendants suggest, the action prohibited

22   in the instant case is so regular and consistent that the

23   injunction must be designated as de facto mandatory, and then

24   it goes on to say that that isn't the way the court viewed it,

25   that just because the government agency regularly undertakes

33

7a9nagun                    Argument

1    this activity that it does not somehow convert what you might

2    normally think of as simply a prohibitory injunction to become

3    mandatory, that still you just look at the nature of the

4    injunction itself.  It prohibits the government from doing

5    something, even something they do all of the time.

6              That is on page 90 of that decision.

7              As for expedited discovery, there are two tests that

8    have been articulated and that are still at work here in the

9    Second Circuit.

10             One is called, it comes from the case Notaro v. Koch,

11   and that is outlined in our papers, where in essence it's only

12   like a preliminary injunction standard that is applied to

13   justify a request for expedited discovery.

14             Of late, in the last 10, 15 years, a second test has

15   evolved, recognizing that, particularly when plaintiffs are

16   seeking a preliminary injunction, evidence to pursue one, that

17   it doesn't make sense to hold them to that same standard.

18             That was best articulated in Ayyash v. Bank Al-Madina,

19   233 F.R.D. 325  (S.D.N.Y. 2005).  That's just a good cause

20   standard.  They just look at all the circumstances in a

21   situation.

22             The Court did articulate three categories of how to

23   approach this issue under this good cause test:  First, whether

24   there's good cause to order expedited discovery; second,

25   whether the request is reasonable in light of all the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    surrounding circumstances; and third, whether the need for

2    expedited discovery outweighs the prejudice to the responding

3    party.

4          I don't think that there can be much argument that the

5    need for expedited discovery here is compelling.  The concerns

6    that would be addressed by obtaining the preliminary injunction

7    are as high as could be imagined in terms of giving priority to

8    getting expedited discovery.

9          The next question is whether the request is reasonable

10   in light of all the surrounding circumstances.  Let me address

11   specifically the different categories of discovery that we're

12   seeking.  The first category is outlined in our memo of law --

13          THE COURT:  Let me stop you for a moment on expedited

14   discovery.  I raised an issue with respect to the unusual

15   nature of the papers last time.

16          MR. MAER:  Yes.

17          THE COURT:  And we discussed that some.

18          The only place where the items of expedited discovery

19   are listed is the memorandum of law.  The way in which a

20   request for expedited discovery would normally come up is

21   there's a motion for a preliminary injunction; there is a

22   request at the same time for expedited discovery which attaches

23   discovery requests.  Discovery requests give the other side an

24   opportunity to interpose objections, make claims that the

25   discovery request is insufficiently precise, unlimited with

7a9nagun                          Argument

1    respect to time, or otherwise subject to any one of a number of

2    objections that might be posed from privacy interests, to

3    privilege interests and the like.

4         There are no discovery requests that are included in

5    the papers.  The only request for expedited discovery comes in

6    the memorandum of law that sets out general categories that the

7    plaintiffs are interested in obtaining.

8         So it's somewhat difficult to say, OK, produce that,

9    when there's no request for documents under Rule 34.  There are

10   none of the kinds of discovery requests that normally arise,

11   and thus, no opportunity to file specific objections or resolve

12   them.

13        MR. GENNARDO:  Your Honor, we will have those to you

14   and to the government by the morning.

15        THE COURT:  Go ahead.

16        MR. MAER:  I apologize.

17        THE COURT:  It is all right.  It is OK.  I'm just

18   pointing it out because I raised it last time.

19        MR. MAER:  Yes.

20        I can only assure you we have been very busy, but we

21   just did not produce that for this afternoon's hearing, but

22   we'll do so.

23        THE COURT:  It's all right.  I was just attempting to

24   raise a concern with respect to a request that just asks me to

25   say, OK, take expedited discovery.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7a9nagun                          Argument

1              MR. MAER:  Yes.

2          I think there is a utility in discussing the three

3     categories of information that we are seeking and that will

4     give guidance to the actual request itself.

5              The first one is the policies, the documentations

6     concerning ICE's policies, practices, procedures, training,

7     concerning the conduct of these home raids and how they're

8     identified.

9              It is a self-evident set of documents.  Obviously, it

10    is critical to understand the government's liability and

11    actions here, what do their policies say or what do they not

12    say.

13             We don't know if these actions are the result of

14    inadequate supervision, if they are the result of directly the

15    result of policies or protocols or whether it's the result of a

16    failure to supervise.  We just don't know.  That request I

17    think is pretty self-evident as to its relevancy and its ease

18    of production.

19             I believe Ms. Buchanan here is the head of the

20    immigration unit.  I am not sure how it's referred to in the

21    Southern District here.  I assume that she would know where

22    these policies are.

23             The second category is the information as to the home

24    raids themselves.  What we seek there is, since January, when

25    our plaintiffs began to suffer these raids, we want to get a

7a9nagun                          Argument

1    sense of both the scope of the raids, how many people were

2    arrested, how many homes, as well as sort of a minimal set of

3    information as to the warrants used, the reports that were

4    generated by those raids, the address of those raids and

5    whether the arrests were in fact of the person targeted by that

6    raid or whether they were collateral arrests as we have

7    described them in our papers.

8            Third is the names of the agents involved in the

9    raids.  We would seek that information both to obtain all

10   possible witnesses that we would be able to call for a

11   preliminary injunction hearing to get a sense of which agents

12   might be most useful to depose or to present at trial and also

13   to understand how these raids were staffed, how many people

14   were involved in each of these raids.  We think that would be

15   very helpful for the Court in addressing the preliminary

16   injunction motion.

17           THE COURT:  All right.

18           MR. MAER:  Thank you, your Honor.

19           MR. GENNARDO:  Your Honor, if I could just wrap up

20   with a few comments and then turn it over.

21           Your Honor had asked earlier why would the government

22   revisit a plaintiff who's brought suit against the government.

23   I would ask why would the government go back to Mrs. De La

24   Rosa's house after they had already been there once and been

25   told that the Miguel the government was looking for wasn't

7a9nagun                              Argument

1    there?

2           Why would they return 13 months later seeking the same

3    person?  Why would the government engage in --

4           THE COURT:  But she wasn't a plaintiff in the case, so

5    that the focus on the importance of assuring that there be no

6    retaliation against a plaintiff in a case that was proceeding

7    in court had not been given to her.  Indeed, she has not been a

8    plaintiff in this action, and no retaliation has occurred so

9    far as the plaintiffs have told me with respect to any of the

10   plaintiffs in this action.  Not only no retaliation, but even

11   prior to the time that the action was brought, no repeat

12   visits, no repeat search.

13          MR. GENNARDO:  Your Honor, I think you had raised the

14   point to try to make a point that in fact no competent,

15   intelligent agency of the government would actually go out and

16   raid the named plaintiffs who are accusing them of misconduct.

17          THE COURT:  It is not only the agency, but presumably

18   the agency advised by counsel handling litigation on behalf of

19   the agency in court.  When the immigration service or the

20   attorney general is required to defend specific cases in court,

21   the immigration service doesn't go out there on its own.  It's

22   being represented by lawyers who advise the agency and who in

23   turn make representations to the Court.

24          MR. GENNARDO:  Those same lawyers, your Honor, are

25   representing the government in the face of Nassau County

7a9nagun                        Argument

1   writing public letters to senior ICE officials saying your

2   agents are acting like cowboys.  They're engaging in illegal

3   conduct, and what do they do?  Three or four days later they do

4   it all over again.

5           The point is this is not a competent agency.  This is

6   an agency that is violating constitutional rights day in and

7   day out, the agency that's own inspector general has criticized

8   for being incompetent, being disorganized, being understaffed

9   and acting without proper direction.

10          That's why our plaintiffs are at risk.  This is not an

11  agency that is organized and acting in an organized way, but in

12  a way that you and I would normally hope and expect that a

13  governmental agency would be acting.

14          Your Honor was kind enough last time to get assurances

15  from the government that they would not retaliate against our

16  clients.  It would be even more helpful to us if the government

17  would give assurances that the Latino community is not going to

18  suffer unconstitutional, nonconsensual searches and seizures of

19  their homes and that the government hasn't done.

20          Our clients, that community, as Mr. Maer has pointed

21  out previously, lives in daily fear of those types of raids.

22  Those are real and immediate fears on part of that community,

23  given the plans for future raids and the fact that raids are

24  ongoing and the fact that ICE has not stopped those raids even

25  in the face of very pointed and strong criticism by independent

7a9nagun                          Argument

1    third-party government officials.

2           Earlier you had asked me whether any of our clients

3    were undocumented immigrants.  I misspoke slightly.  I should

4    have said that they are being charged as undocumented aliens

5    and not that in fact they were.  They are being charged that

6    way.  There are proceedings against them for being undocumented

7    aliens, but certainly nothing in our complaint makes that fact.

8    So, thank you very much, your Honor.

9           THE COURT:  OK.  Thank you.

10           All right.  Ms. Wolstein.

11           MS. WOLSTEIN:  Thank you, your Honor.  I am going

12    address a few points in the reply brief as well as briefly the

13    standing and then Mr. Cargo --

14           THE COURT:  Please keep your voice up.

15           MS. WOLSTEIN:  Yes, your Honor.  I apologize.

16           I will address briefly the standing issue because I

17    don't think there's a huge amount to add, as well as a few

18    points in the reply brief, and Mr. Cargo will address the

19    jurisdictional provisions of the Immigration and Nationality

20    Act.

21           As to standing, your Honor, you heard Mr. Maer concede

22    that they cannot say with certainty that it will be their

23    plaintiffs who will be again subject allegedly to

24    unconstitutional entries into the house.  Rather, what they are

25    saying is that it will be someone within the class that they're

7a9nagun                            Argument

1    claiming to seek to certify.

2           Your Honor, the Supreme Court has said, and it's quite

3    clear that they cannot bootstrap class action allegations on to

4    obtaining standing.  That's the O'Shea v. Littleton case, which

5    is discussed extensively in the Lyons case.  That's 414 U.S.488

6    at 495: "If none of the named plaintiffs purporting to

7    represent a class establishes the requisite of a case or

8    controversy with the defendants, none may seek relief on behalf

9    of himself or any other member of the class."

10          I also direct the Court to a case from this district,

11   Miller v. Silverman, 951 F.Supp. 485.  I don't have a point

12   cite, I apologize, but: "The fact that plaintiffs purport to

13   represent a broader class adds nothing to the question of

14   standing, for even named plaintiffs who represent a class must

15   allege and show that they personally have been injured, not

16   that the injury has been suffered by other unidentified members

17   of the class to which they belong."

18          As far as further on standing, I think your Honor has

19   framed the question accurately.  The question for the TRO is

20   whether these plaintiffs will suffer imminent, concrete

21   irreparable harm in the next ten days.

22          Nothing that has been said today or that is in the

23   reply brief alters the legal analysis that prevails here, and

24   that is the fact that a past violation of the Fourth Amendment,

25   even if true, which we strongly dispute the plaintiffs' version

7a9nagun                          Argument

1    of the facts, but even assuming the truth for purposes of this

2    motion, nothing about these alleged past violations reflects or

3    gives rise to any immediate, irreparable, concrete,

4    nonspeculative injury of the kind that is required to establish

5    standing, as well as, of course, to establish the entitlement

6    to injunctive relief.

7            As to the Delgado affidavit, which we haven't seen, as

8    I mentioned, the Court is quite right that she is not a

9    plaintiff.  So the fact that they returned 13 months later,

10   which is far more than ten days later, says nothing about

11   whether these plaintiffs are at risk of immediate irreparable

12   harm.

13           In fact, even the allegations of a policy or practice

14   add nothing to the likelihood of immediate, irreparable injury.

15   In Lyons there was in fact a police department policy of

16   chokehold.  You can find that at page 899, among others, of the

17   Court's opinion.

18           In fact, the people who died from the chokehold were

19   members of a protected class, they were black.  I would add

20   that the future raids are planned generally, or entries are

21   planned as part of ICE's enforcement program also says nothing

22   as to these plaintiffs that ICE will return and commit

23   allegedly unconstitutional acts.

24           Just a few specific points in response to the reply

25   brief:  Page 3, the claim is "ICE agents either broke down the

7a9nagun                          Argument

1    entry door to plaintiffs' home or pushed their way past whoever

2    opened the door without consent.  These accounts are echoed and

3    independently confirmed by the letters attached to the

4    complaint."

5            That is absolutely not correct.  The letters say

6    nothing of whether unconstitutional actions occurred.  The

7    letter of the police commissioner addresses three things.  They

8    say you didn't e-mail us the list of targets like you said you

9    would.  You used an outdated picture in one case, and we have

10   tactical concerns, that the agents don't train together and

11   weren't wearing consistent uniforms.

12           As to the mandatory versus prohibitory injunction, I

13   think the Court was correct in the analysis.  The plaintiffs

14   are not claiming that the injunction is merely an injunction

15   prohibiting the government from violating the Fourth Amendment.

16   The government is already under a duty not to violate the

17   Fourth Amendment.

18           What they are seeking is to alter the basic structure

19   of this particular law enforcement operation by requiring that

20   agents obtain a warrant rather than proceeding on consent.  In

21   fact, they actually even want to prohibit the seeking of

22   consent, so that would mean effectively shutting down the

23   entire program.

24           THE COURT:  Wouldn't that be a prohibitory rather than

25   mandatory injunction, prohibit them from relying on consent?

7a9nagun                          Argument

1    They are not required to get court-ordered warrants.  They can

2    simply choose not to search.

3         MS. WOLSTEIN:  The status quo here is not hard to

4    discern.  The status quo is that an operation that proceeds on

5    consent, which is very much in dispute -- an injunction that

6    would prohibit law enforcement officials from seeking consent

7    would certainly alter the status quo and would basically shut

8    down the operation if they were in fact prohibited from seeking

9    consent.

10        The use of the word "prohibit" doesn't tell us very

11   much.  The question is what the operation is, what the status

12   quo is, and how does the injunction attempt to change that.

13   Here it's a very dramatic proposed alteration that would either

14   require the use of warrants or prohibit, as the Court said, an

15   otherwise perfectly constitutional entry based on consent.

16        I can turn it over to Mr. Cargo now to address the INA

17   and the expedited discovery issues, unless the Court has

18   questions.

19        THE COURT:  No.  Go ahead, Mr. Cargo.

20        MR. CARGO:  Good afternoon, your Honor, Shane Cargo

21   for the government.

22        Just very briefly on the two jurisdictional provisions

23   that the government relies upon here, I think it is helpful to

24   take one big step back and understand how these two provisions

25   work with one another.

7a9nagun                          Argument

1          The Real ID Act, as the Supreme Court said, effected a

2    sea change in the way immigration challenges are handled in

3    federal courts.  In effect, it funnels all challenges to

4    removal orders into the circuit courts of appeal.  There's no

5    longer such a thing as a habeas corpus proceeding in district

6    court.  There is no longer such a thing as an All Writs Act

7    proceeding in district court.

8          However a plaintiff chooses to denominate his action,

9    if it seeks to challenge a removal order, it must be brought in

10   the circuit within 30 days of him receiving a final

11   administrative order.

12         1252(g), on the other hand, is only triggered when the

13   alien seeks a standalone stay of removal, that is, they are

14   seeking a stay from the district court that is not connected

15   with a challenge to the removal order.  I believe I heard

16   plaintiffs concede that they are not challenging their removal

17   orders in this case, so clearly that implicates 1252(g).

18         Now, it's drafted very broadly.  It prohibits,

19   withdraws jurisdiction to review any decision or action by the

20   attorney general to commence proceedings, adjudicate cases, or

21   execute removal orders against any alien under this chapter.

22         If you look at the scope of the second order that

23   they're seeking in the TRO, they seek an order from this court

24   prohibiting the defendants from contacting, retaliating

25   against, arresting, prosecuting, or deporting the named

1    plaintiffs in this action.

2           They are seeking a stay from this court, your Honor,

3    to stay the deportation of any aliens who are now in

4    proceedings.  The status of the plaintiffs has been a little

5    unclear up to this point, but their latest papers make it be

6    known that several of the plaintiffs are in removal

7    proceedings.  That's a decision by the attorney general to

8    place the alien in proceedings, and when the alien is subject

9    to a final removal order it will be up to the attorney

10   general's discretion to execute that removal order.

11          So that's clearly covered by 1252(g), and plaintiffs

12   have tied themselves in knots trying to avoid those two very

13   clear jurisdictional provisions.

14          But that's exactly what Congress was intending.

15   Congress did not want aliens to forestall removal by bringing

16   district court actions seeking a stay.

17          If the Court has no questions, I'll move on briefly to

18   the discovery requests.

19          As your Honor mentioned, these are not made pursuant

20   to a proper motion.  If they had been, the government would

21   have an opportunity to interpose objections concerning the

22   scope and the sweep and privilege and all of those types of

23   things.

24          Let me address the first two.

25          They seek documents concerning ICE's policies,

1   practices, procedures, and training related to home searches.

2   They also seek facts relating to home raids conducted in the

3   past ten months.

4           The problem with these two requests, your Honor, is

5   that they go to the ultimate relief that the plaintiffs are

6   seeking in this case.  Allowing discovery at this point would

7   in effect permit the plaintiffs to circumvent the very

8   substantial standing objections that the government has raised

9   and will raise by formal motion later in this litigation.

10          Mr. Maer said to the Court that those documents will

11  be very helpful to the Court.  But the plaintiffs have never

12  articulated why they will be irreparably harmed if those

13  documents are not produced at this point.  That's the standard

14  to get expedited rediscovery.

15          The third and fourth are the names of the agents

16  involved in the raids and the names and locations of all the

17  individuals detained since September of 2007.

18          Again, the problem with these two requests is that

19  they have nothing to do with the preliminary injunction motion.

20  The plaintiffs haven't articled how these requests will help

21  them establish irreparable harm.

22          I should mention that these are unbelievably

23  burdensome.  They go back the past ten months.  They want facts

24  relating to home raids conducted the past 10 months.  These

25  officers head out every morning, so you are talking about

7a9nagun                          Argument

1    literally hundreds and hundreds of searches at this point.  So

2    a document request like that is extremely burdensome at this

3    preliminary stage.

4            If your Honor has no further questions, the government

5    is prepared to rest on its papers.

6            THE COURT:  OK.

7            MR. GENNARDO:  Your Honor, you have been very

8    indulgent of us.  Would you allow me just a few more minutes?

9            THE COURT:  Sure.  Did you have the affidavit to pass

10   up to me and to the government?  No?

11           MR. GENNARDO:  Not as of yet, your Honor.

12           THE COURT:  I'll accept your representations for is

13   contained in the affidavit.  I've read obviously all the papers

14   submitted to me, including the reply memo that describes what's

15   in the supporting affirmation.

16           Go ahead.

17           MR. GENNARDO:  Thank you very much for that.  I

18   appreciate that.  Your Honor I just wanted to correct a few

19   things that were just said and to point out a few things that

20   were just said.

21           First of all, it is true that Mr. Maer conceded that

22   there was no certainty that any of the named plaintiffs would

23   be amongst those who suffered a constitutionally improper

24   search and seizure.  He certainly did not concede that there

25   was not a likelihood that they would not be a victim of an

1   unconstitutional search and seizure.  In fact, we've argued and

2   we've pled in our papers that our clients are within an

3   identifiable class and that there is a practice and a policy

4   and procedure of targeting that class for unconstitutional

5   raids.

6        The case law supports very much our position that

7   where the government has that type of practice and policy and

8   procedure that standing exists.  I will note to you that in

9   Deshawn the Second Circuit noted that in Lyons, in

10  distinguishing Lyons, "There was no proof of a pattern of

11  illegality.  In contrast, the challenged methods in this case

12  are officially endorsed policies."

13       From that sentence the Court went on to grant the

14  preliminary -- or at least find that there was standing to move

15  for the preliminary injunction.

16       In Leduc, again distinguishing Lyons, the Court in the

17  Ninth Circuit noted that the Supreme Court has repeatedly

18  upheld the appropriateness of federal injunctive relief to

19  combat a pattern of illicit law enforcement behavior.  That is

20  exactly what we alleged here.

21       THE COURT:  All that Deshawn did, though, was to say

22  that there was standing in Deshawn.

23       MR. GENNARDO:  Correct.

24       THE COURT:  And then proceeded to affirm the denial of

25  the preliminary injunction and the grant of summary judgment

7a9nagun                         Argument

1    dismissing the case.

2          MR. GENNARDO:  Because the plaintiffs had failed to

3    state a claim.  That is very different here.  The government

4    has not said that we have failed to state a claim here.

5          If the Court dismissed the complaint before it could

6    reach the preliminary injunction motion, for obvious reasons it

7    wouldn't then reach the preliminary injunction motion.  Again,

8    we have alleged here that our plaintiffs are subject to and

9    likely to be victims of imminent constitutional harms simply

10   for being who they are and where they live.

11         The courts again have numerous times found that in

12   those situations there is standing to seek injunctive relief.

13   I refer your Honor to Leduc again.  I won't quote from there.

14         The fact that Ms. Delgado is not a plaintiff here as

15   of yet misses the point.  The purpose of that affidavit is to

16   show that in fact, having been victimized by ICE once does not

17   mean you will not be victimized again.

18         As I stated earlier, the fact that you are on the

19   government's radar, the fact that the government believes you

20   are a potential target and the fact that the government is not

21   coordinated and competent enough to keep its information

22   straight puts you at a heightened risk of intrusion by the

23   government.  It does not lower the risk of intrusion.

24         Ms. Wolstein said that Lyons had a policy of giving

25   chokeholds.  That's not correct.  The policy was discretionary.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

7a9nagun                         Argument

1    The Court in that case found that it was for too attenuated to

2    say that Mr. Lyons would suffer a chokehold in the future.  He

3    would have to be first stopped and then the officer would have

4    to use his or her individual discretion to decide whether to

5    give a chokehold or not.

6         I'll just wrap up, your Honor, by noting the very

7    concerning concession just made by the government.  There are

8    daily raids going on; hundreds and hundreds of raids going on.

9    Those are the words from the government.

10        THE COURT:  But how does that help you?

11        In the papers before me there are approximately nine

12   incidents involving approximately 23 plaintiffs.  Out of

13   hundreds and hundreds of raids, searches, we have nine

14   incidents of alleged abuses on the basis of which the

15   plaintiffs ask that I enjoin all further searches, even

16   searches which would be constitutional on consent, on the basis

17   of nine incidents which are in the papers before me.

18        MR. GENNARDO:  Your Honor, it can't be the standard

19   that we have to join hundreds of plaintiffs to make out our

20   case.

21        THE COURT:  No.

22        But my question was how does the fact that hundreds of

23   searches occur help an argument that searches which are

24   otherwise constitutional on consent should be prohibited?

25        Why isn't that the equivalent of an argument that

1  because there are incidents of abuses that occur in any given

2  police department which are then subject to litigation in terms

3  of motions to suppress at criminal trial and actions for

4  damages, whether it be under a _Bivens_ standard or under a 1983

5  standard, that if you gather together nine searches by similar

6  agents of a department that warrants relief to prevent searches

7  that are even constitutional.

8         I ask that question solely for purposes of a temporary

9  restraining order, because there is no motion for a preliminary

10 injunction before me, and there is no motion for obviously a

11 permanent injunction, which could only be decided after a trial

12 on the merits.

13        But you are asking me to stop what would otherwise be

14 constitutional searches based on nine incidents.

15        MR. GENNARDO:  Your Honor, we are not asking you to

16 stop constitutional searches by any means.  What we are asking

17 is to stop the unconstitutional searches by the government.

18        THE COURT:  But the temporary restraining order that's

19 being asked for would say that searches cannot occur unless

20 based upon a judicially authorized warrant, which would exclude

21 all other even constitutional bases for a search, including a

22 consent search.

23        MR. GENNARDO:  Your Honor, we are not talking about

24 constitutional searches here.  That provision is purely meant

25 to protect our clients from irreparable harm.

7a9nagun                          Argument

1          ICE has demonstrated not just in nine plaintiffs --

2    those are just the nine that we have had the opportunity to

3    bring to your Honor in this very short time frame.  On the

4    night of September 24 and 26 there were hundreds of people

5    victimized by the raids that the Nassau County Executive

6    characterized -- and again Ms. Wolstein was not correct on

7    this:  "I bring to your attention serious allegations of

8    misconduct and malfeasance.  I condemn any tactical actions

9    which crossed the lines of legality and law enforcement just

10   practices."

11         We are not talking about nine plaintiffs here.  We are

12   talking about hundreds of plaintiffs across lower New York

13   State and across the country.  We have brought articles ranging

14   from Oregon to Idaho; complaints lodged in Georgia; articles

15   about what's happening in lower New York State.

16         These nine plaintiffs are just purely representative

17   of what's happening in the hundreds of raids that are happening

18   daily, that have happened in the last ten months, are

19   continuing to happen.

20         The relevance of that concession is that our clients

21   are very much at risk of having another unconstitutional home

22   raid inflicted upon them.  That's the basis on which I raise

23   that point.

24         Thank you very much, your Honor.  I appreciate all the

25   time.

7a9nagun                    Argument

1          THE COURT:  No problem.

2          I have a limited application before me at the moment.

3    It is for a temporary restraining order which seeks temporary

4    relief, including enjoining the defendants from entering or

5    searching any home or seeking consent to enter or search any

6    home within the jurisdiction of the New York City regional

7    office and/or field office of ICE without first obtaining a

8    judicially ordered search warrant.

9          A temporary restraining order is an extraordinary form

10   of relief that provides relief for a period of ten days,

11   although it can be renewed for another period of ten days.

12         In general, to establish a justification for a

13   temporary restraining order, the plaintiff must establish

14   immediate and irreparable injury and a likelihood of success on

15   the merits.

16         Although there are arguments why in the case of

17   injunctions against actions in the public interest, there is a

18   higher standard, there is also some case law that establishes a

19   somewhat lesser standard involving not a likelihood of success

20   on the merits but serious questions going to the merits and a

21   balance of hardships tipping decidedly in favor of the movant.

22         Even if a lesser standard were applied in this case,

23   there is no showing that a temporary restraining order is

24   warranted.  Under any standard the plaintiffs would be required

25   to show immediate and irreparable injury which is real and not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    speculative, which is not conjectural or hypothetical.

2         The alleged injury in this case to be prevented is the

3    recurrence of an allegedly unconstitutional search involving

4    the plaintiffs.  There is no reasonable showing of immediate

5    and irreparable injury to these plaintiffs.

6         There are numerous plaintiffs, some of whom had

7    searches conducted in February and April of 2007.  In no case

8    of any plaintiff has there been a subsequent search.  The

9    plaintiffs proffer that they have one individual who had a

10   recurrent search 13 months after the first search, but that

11   person is not a plaintiff in this action, and a search that was

12   a recurrent search that occurred 13 months after the first

13   search would not establish the prospect of immediate and

14   irreparable injury for these plaintiffs for the term of the

15   temporary restraining order.  The plaintiffs have not shown

16   that they will be the subject of an unconstitutional search in

17   the period of time to be covered by the temporary restraining

18   order.

19        Similarly, the plaintiffs have not shown a likelihood

20   of success on the merits or serious questions going to the

21   merits.  In City of Los Angeles v. Lyons, 461 U.S. 95 (1983),

22   the Supreme Court drew a distinction between requests for an

23   injunction and claims for damages and made it clear that in

24   assessing the likelihood of success on the merits for purposes

25   of an injunction the Court would have to assess similar issues

7a9nagun                              Argument

1   of future substantial and irreparable injury which cannot be

2   remedied at law.

3           The Court made it clear that this inquiry with respect

4   to the merits is similar to the issue of standing for a claim

5   of equitable relief.  In this case, for purposes of the very

6   preliminary temporary restraining order, the plaintiffs have

7   failed to make a sufficient showing of likelihood of success on

8   the merits of their claim for equitable relief.

9           This case is different from Deshawn E. v. Safir, 156

10  F.3d 340 (2d Cir. 1998), on which the plaintiffs rely.  There

11  the plaintiff class was allegedly in delinquency proceedings

12  where the alleged fruits of the allegedly unconstitutional

13  conduct were being used.

14          In this case, the thrust of the arguments are that the

15  ongoing searches should be stopped without any evidence that

16  the searches will be directed against these plaintiffs, and the

17  plaintiffs have attempted to, in fact, draw a distinction

18  between the issue of the searches and the ongoing removal

19  proceedings with respect to some of the plaintiffs.

20          A final note with respect to the request for a

21  temporary restraining order, and that is that the relief sought

22  here is extraordinary in that it would require that the

23  authorities forego what is otherwise a constitutional search

24  based on consent.

25          The decision to deny the temporary restraining order

7a9nagun                          Argument

1    is strengthened by the fact that the plaintiffs conceded at the

2    last hearing and appeared to concede today that they had

3    insufficient evidence at this time to make a case for a

4    preliminary injunction.  If there is insufficient evidence to

5    establish the requirements for a preliminary injunction, it

6    also supports the denial of a temporary restraining order.

7            For the reasons that I've explained the application

8    for a temporary restraining order is denied.

9            There is an application for expedited discovery, but

10   as I indicated, the request is premature because there are no

11   specific requests for discovery as to which expedition is

12   sought and as to which objections could be raised.

13           If there are discovery requests and an application to

14   have the discovery requests responded to in an expedited

15   fashion more quickly than the Federal Rules of Civil Procedure

16   would otherwise provide, the Court will consider that

17   application and also consider whether the Court should

18   supervise that discovery or assign it to the magistrate judge

19   for the supervision of discovery.

20           So the request for a temporary restraining order is

21   denied.  To the extent that there is a specific request for

22   expedited discovery it's denied without prejudice to renewal on

23   the filing of specific discovery requests.

24           Obviously, when I deny a temporary restraining order,

25   it doesn't preclude the plaintiffs from returning with another

58

7a9nagun                          Argument

1    request for a temporary restraining order.

2            So, on the papers before me, the request for a

3    temporary restraining order is denied.

4            OK.  Thank you, all.

5            MR. GENNARDO:  Thank you, your Honor.

6            MS. WOLSTEIN:  Thank you, your Honor.

7            (Adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25