7a5QaguC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

ADRIANA AGUILAR, et al,

               Plaintiffs,

        v.                        07 CV 8224 (JGK)

BUREAU OF IMMIGRATION AND
CUSTOMS ENFORCEMENT,

               Defendant.

------------------------------x
                        New York, N.Y.
                        October 5, 2007
                        3:25 p.m.

Before:

               HON. JOHN G. KOELTL,

                             District Judge

                 APPEARANCES

DEWEY & LEBOUF
     Attorneys for Plaintiff
DONNA L. GORDON

PUERTO RICAN LEGAL DEFENSE AND EDUCATIO FUND
     Attorneys for Plaintiff
FOSTER MAER

UNITED STATES DEPARTMENT OF JUSTICE
     Attorneys for Defendant
ELIZABETH WOLFSTEIN
SHANE CARGO
PATRICIA BUCHANAN

7a5QaguC

1          (In open court; case called)

2          MS. GORDON:  Donna Gordon of Dewey & Leboeuf for

3    plaintiffs.

4          MR. MAER:  Foster Maer of the Puerto Rican Legal

5    Defense and Education Fund for plaintiffs.

6          MS. SCHWARTZ:  Ghita Schwartz of the Puerto Rican

7    Legal Defense and Education Fund for plaintiffs.

8          MS. WOLFSTEIN:  Elizabeth Wolfstein from the U.S.

9    Attorney's office for the defendants.

10         MR. CARGO:  Shane Cargo also from the U.S. Attorney's

11   office for the defendants.

12         MS. BUCHANAN:  Patricia Buchanan, also from the U.S.

13   Attorney's office for defendants.

14         THE COURT:  Good afternoon, all.  I expect that I know

15   people at Dewey & Leboeuf.  There's nothing about anything that

16   affects anything that I do.  I know people at the U.S.

17   Attorney's Office, and there's nothing about that that affects

18   anything that I do.  This is a order to show cause for a

19   temporary restraining order and expedited discovery.  It's an

20   unusual temporary restraining order because it doesn't ask me

21   to set down a date for a preliminary injunction, and, of

22   course, on its face a temporary restraining order is only good

23   for ten days and usually comes with a request for a hearing on

24   the preliminary injunction, but I will listen to the parties.

25         MR. MAER:  Thank you, your Honor.  If I may go to the

7a5QaguC

1    podium.

2                THE COURT:  Sure.

3                MR. MAER:  My name is Foster Maer of the Puerto Rican

4    Legal Defense and Education Fund speaking for plaintiffs.  To

5    address your point, typically a request for a preliminary

6    injunction is attached to the temporary restraining order.  We

7    talked about going that way or this way, which we thought was a

8    little more appropriate since we know so little about the facts

9    behind defendant's actions here.  So we thought it a bit more

10   judicious, but obviously we would make any timely motion for

11   the preliminary injunction to make sure that our clients are

12   protected and that the normal procedures are followed.

13           So, if your Honor believes that we should amend that

14   or in a sense file the preliminary injunction sooner rather

15   than later, we will do so.  We filed this complaint two weeks

16   ago alleging that under the pretension of seeking certain

17   fugitive aliens that the defendants have engaged in a pattern

18   and practice of entering and searching the homes of Latino

19   households in the Downstate New York area without either a

20   search warrant, valid consent or exigent circumstances.

21           Two examples make this clear.  The Aguilar Norman

22   family.  On February 20, armed ICE agents pounded on the door

23   of their home in East Hampton, New York between 4:30 and

24   5:00 a.m. in the morning.  After a Spanish-speaking grandmother

25   opened the door, they pushed passed her, raced down the stairs,

7a5QaguC

1    opened all the bedroom doors, pulled off all the bed covers,

2    shined flashlights in everybody's eyes who was asleep there,

3    including a nine-year-old and a four-year-old, I believe --

4    12-year-old and four-year-old children who were completely

5    terrified by everything that went on there.  They proceeded to

6    search the premises.  They detained the people there in the

7    house and interrogated them.  What is particularly striking

8    about this case is they were looking for Ms. Aguilar's

9    ex-husband who had been divorced -- they had divorced five

10   years ago.  He had never lived in this house.  How they came to

11   believe he did, we don't know, but obviously any simple sort of

12   investigative technique would have revealed that he did not

13   live there.  Last point, they said they might return.  Since

14   then, the Aguilar Norman family, particularly the children, are

15   terrified that the ICE agents will return.

16          The other example is the Doe family.  In the winter of

17   2007, again armed ICE agents pound on the door around 5:00 in

18   the morning.  The Does heard what sounded like them breaking

19   down the entrance door to this two-family home and then

20   breaking down the door to the first floor unit, taking away

21   somebody.  They saw somebody being taken away into a van who

22   they believed, from what was being said, was the person that

23   was being looked for.  Then after they'd done that, they come

24   upstairs and pound on the door, try to get their way in, even

25   though, again, they found the person they were looking for.

7a5QaguC

1    Fortunately, the locks held, they did not get in, but, again,

2    this family is left terrified that ICE will return.

3         After filing our complaint, was happens next?  The

4    local regional office conducts another series of raids, this

5    time much more extensive and much more brutal; but, again, the

6    same pattern.  If someone opens the door, the ICE agents push

7    their way in without obtaining consent.  If no one opens the

8    door, they try to break it down.  Once inside, the ICE agents

9    proceed to act in ways that result in the residents being

10    terrified.

11         Two examples, the Elder Bonilla and Dana Rodriguez

12    family in Westbury, an extended family, September 24 last week,

13    they were awakened by armed ICE agents pounding on the door,

14    shouting outside their door.  Elder went to the front door, saw

15    through the window the law enforcement agents outside.  The

16    agents screaming "open the door, open the door".  So when he

17    did, three agents burst into the home.  One of them pointed a

18    gun to his chest.  He was handcuffed and pushed onto the sofa

19    in the living room.  They then stormed through the home and

20    began searching throughout the bedrooms throughout the house.

21         Upstairs they handcuffed Diana Rodriguez, Elder's

22    fiance, and forced her downstairs leaving their 15-month-old

23    child upstairs crying in the bedroom.  The other examples,

24    Sonia Bonilla and her 12-year-old daughter, Beatriz Velasquez,

25    and 9-year-old Dalia Velasquez, all plaintiffs, that same day

7a5QaguC

```
 1    the 12-year-old, Beatriz, opened the door after she had been
 2    startled awake from the ICE agents who again were pounding
 3    violently on the door yelling "police, police".  Her parents
 4    weren't home because the wife was dropping the father off at
 5    work.  Beatriz opened the door, was confronted by four ICE
 6    agents who forced their way past her into the home.  They
 7    proceeded to interrogate Beatriz, again, a 12-year-old and
 8    eventually ordered her and her younger daughter into the
 9    bedroom.  There they could hear the agents storming through the
10    rest of the house shouting, banging on bedroom doors, entering
11    the rooms of the family tenants and separating a father from
12    his four-month-old infant.  When the infant began to cry, they
13    could hear the agents -- when the father asked the agents if he
14    could leave the infant with the two sisters downstairs, the
15    agents refused, abandoning the infant alone in the bedroom.
16    This family was in terror that ICE will return.
17          All of these families have lawful status.  None of
18    them are gang members.  As far as we know, except for the
19    ex-husband of Ms. Aguilar, there is no reason that they know of
20    why their homes were raided, and they'd never heard of the
21    alleged target of these raids.  Of course, they were not shown
22    a warrant, a single warrant for any of these entries.
23          These are terrifying stories.  Could they be a bit
24    enhanced because, gee, these are early morning, scary raids?
25    Unfortunately, no, as verified by Nassau County Police, the
```

7a5QaguC

1    police chief and the county executive.  Attached to our motion

2    papers, exhibit 1, are the letters issued just three days ago

3    about these raids.  In that letter they set out that they are

4    making "serious" allegations of misconduct, malfeasance and

5    they made two general complaints.  First, that these raids

6    lacked current intell; that ICE did not have adequate

7    information where these alleged gang members were, which was

8    allegedly what the reason for these raids was.  Only 9 of the

9    82 arrests made last week in Nassau County were of gang

10   members.  Everyone else had no association with a gang.  The

11   intell was so bad that they were relying on a picture of a

12   29-year-old from when he was seven when they were trying to

13   identify him.  In short, they were busting down the wrong

14   houses.

15        Second, and I don't know which is more disturbing,

16   they asserted that "tactically" the operations was poorly

17   structured and that they used border patrol personnel from

18   across the country who had not trained together for this

19   complex mission.  Most disturbing, it goes on to say ICE

20   members wore cowboy hats and in the view of some members

21   displayed a cowboy mentality.  Again, this is from the county

22   executive, in my view posed unnecessary danger to all parties,

23   including my members who in fact were drawn upon by some of the

24   ICE agents.

25        So even the police accompanying the ICE agents were

7a5QaguC

1    terrified of what was going on, felt in danger, and had guns

2    pulled on them.

3         Tragically, these raids have continued.  Yesterday -

4    we have not been able to speak to the family - we heard of

5    another raid in Queens.  This time where it was a three-bedroom

6    apartment where they entered the building without consent, the

7    different apartments without consent, looking for someone who

8    had lived in the building seven years ago; again, making

9    numerous arrests but not of the person they were looking for.

10         So, why is this going on now?  2003 defendant ICE

11    announced its intention to step up its activities in locating

12    and deporting what are called fugitive aliens, immigrants who

13    do not have lawful status against whom there is an order of

14    deportation.  Initially ICE focused only on those fugitive

15    aliens against whom there was a criminal conviction.

16         In 2006 that changed, and that's what we think has

17    changed the dynamic of what's going on here.  They expanded the

18    focus to target any fugitive alien.  It didn't matter whether

19    they had any criminal contact.  Simultaneously, they increased

20    the arrest quota for each team within ICE, these fugitive

21    operation teams, from 125 arrests per year to 1,000, an

22    800 percent increase.  To satisfy this heavy quota set by ICE

23    management, these teams had responded to obviously, (1)

24    increasing the number of raids, which, again, very much could

25    lead to the likelihood of knocking on the wrong door; and (2)

7a5QaguC

1   by focusing on arresting people or counting on arresting people

2   who were not the fugitive alien but were in these residence

3   when they made these raids.

4          In that context, it would make sense, since this is

5   really a new initiative of entering homes at night, maybe to

6   develop some protocol, some rules for how these raids are to be

7   conducted.  They have them for work place raids, but they don't

8   have them, as far as we know, for these home raids.  So you

9   have this massive pressure for arrest quotas and no rules

10  governing how these raids are to be conducted.

11         Given that combination, it's hardly surprising that

12  ICE agents have failed to comply with the Fourth Amendment

13  guarantees against unreasonable searches.  So we come to court

14  today with this order to show cause seeking three forms of

15  relief:  (1) a stay of any further home raids, unless there's a

16  judicial warrant to search the home; (2) that plaintiffs will

17  step forward here, and they do so with great fear.  This is one

18  of the problems why we think these practices have gone on for

19  as long as they have, is that the immigrant community, these

20  families that are raided are terrified of stepping forward and

21  publicly challenging ICE's activities because typically they

22  have relatives and family who are dependent on ICE and are

23  trying to get lawful status here.  So we ask they be protected

24  from any type of retailiation, deportation, arrest, visiting

25  the home, etc.; (3) to preserve the ability of counsel to

7a5QaguC

1    interview the victims of this raid, we ask that all -- to

2    identify all the people who have been arrested since

3    September 20 the day we filed the complaint, that if they're

4    currently in New York State or the New York region, that they

5    stay here, so that we do have the opportunity to interview them

6    and potentially use them as witnesses.

7         We also ask that, as indicated before, that we get

8    discovery on an expedited basis so that we can learn what, from

9    ICE's point of view, is going on here.  In particular, we would

10   like to see these alleged administrative arrest warrants, who

11   they are for, and why they chose these homes.  We obviously

12   want the basic information of how many raids have been

13   conducted.  Very simple, straightforward information.

14        And, last, do they have rules, and what do these rules

15   say?  All we are aware of is a couple of paragraphs in one

16   manual that describes or that essentially concludes that it's

17   the totality of the circumstances.  And how is a -- not that

18   law school necessarily teaches you everything, but an agent,

19   how are they to know really what the totality of circumstances

20   are?  They need to know what it takes to get consent to go into

21   a home.  If you knock on the door and someone opens it, can you

22   just push on by?  Can you step in?  If they invite you in, can

23   you go and take over the whole house or do you have to stay in

24   that room?  These rules are established by case law, but they

25   are not communicated to these agents.

7a5QaguC

1          In sum, I point back again to the letters from Nassau

2    County that have determined that not only are their police

3    agents, but our clients, the people who live in these homes,

4    are in danger, physical danger from these raids.  We ask that

5    the residents of these homes be given the same protection

6    that's being given to the police force members; that these

7    raids be stopped unless there's a judicial warrant.  The

8    government will be able to continue to get home raids.  They

9    just have to do their homework like every other police agency,

10   and they can still arrest individuals on the street or what

11   have you.  They just can't go into somebody's home.  So we

12   think that this is appropriately crafted relief.  ICE can still

13   do its job, but our clients are protected from this clear

14   danger.  Thank you, your Honor

15          THE COURT:  All right.  The government?

16          MS. WOLFSTEIN:  Thank you, your Honor.  We are here on

17   a temporary restraining order, of course.  I will address some

18   of the factual background and the irreparable harm issue, and

19   my colleague, Shane Cargo, will address the success of

20   likelihood on the merits.  I would just note that we have not,

21   in fact, received a copy of the amended complaint.  We looked

22   on the Court's website earlier today and couldn't find it there

23   either.  So our comments are addressed to the motion rather

24   than the complaint.

25          THE COURT:  The amended complaint was not served with

7a5QaguC

1    the papers given to the court either.

2            MS. GORDON:  Excuse me, your Honor.  The amended

3    complaint was filed yesterday with the clerk.

4            THE COURT:  OK.  I wasn't given it with the papers on

5    the order to show cause.

6            MS. GORDON:  We can get you a copy.

7            THE COURT:  Thank you.

8            MS. WOLFSTEIN:  Your Honor, the enforcement program

9    being challenged in the complaint targets fugitive aliens who

10   have been ordered to leave the country under final orders of

11   removal but who have not done so.  What it means for an alien

12   to be under a final order of removal is that he's had a hearing

13   before an immigration judge, he's had the opportunity to appeal

14   an adverse decision to the board of immigration appeals, and

15   he's had an opportunity to appeal an adverse decision of the

16   BIA to the Court of Appeals.  In all of these proceedings from

17   the IJ on up to the Court of Appeals, the alien has the

18   opportunity to raise any and all claims he may have that

19   challenges the government's charges that he is subject to

20   removal.  That includes constitutional claims as well as any

21   other basis the alien has for seeking relief from the removal

22   order.

23            So, the fact that someone is under a final order of

24   removal means that the person has gone through all of that

25   process, but three tribunals:  The IJ, the BIA, and the Court

7a5QaguC

1    of Appeals have found that the alien is not entitled to relief

2    from removal.

3            Once a final order of removal is issued, ICE, the

4    Immigration and Customs Enforcement, is entitled to execute it

5    by deporting the alien without further process.  What this

6    operation sought to do -- I'm talking about the operation

7    that's detailed in the original complaint.  The operation

8    regarding gang members is a different operation.  But what this

9    operation that's discussed in the original complaint sought to

10   do is seek out these aliens under final orders of removal, and

11   to do that by using the best available investigative

12   information; and if the information led to a house, the agents

13   would go to the house and knock on the door of the house and

14   seek consent to enter and look for the alien.

15           So this is a program that rests entirely on consent.

16   The government is not claiming that we have probable cause to

17   search.  What there is is an absolute entitlement to execute

18   the order of removal.  Just to give an example of the Aguilar

19   family, the person sought, the ex-husband, had been under a

20   final order of removal since 1998, so nine years, and was also

21   a criminal alien who had committed a crime.

22           Turning to the TRO, of course a TRO is an

23   extraordinary remedy that is meant to preserve the status quo

24   and prevent irreparable harm until an underlying motion for

25   injunctive relief can be resolved.  If we look beneath some of

7a5QaguC

1    the heated rhetoric here, we can see this is simply not a case

2    that merits this kind of extraordinary relief.

3          The required showing of irreparable harm and the

4    likelihood of success on the merits is effectively a standard

5    that applies in cases of preliminary injunction.  Now, as an

6    initial matter, a standard for preliminary injunction that

7    applies here is a heightened one for two reasons.

8          One is because we're talking about a program challenge

9    that is government action taken in the public interest pursuant

10   to a statutory or regulatory scheme.  When that is the case,

11   the standard is likelihood of success on the merits, that's

12   what the plaintiff has to show; not fair ground for litigation,

13   the lesser standard.

14         Second, we're also talking about a mandatory

15   injunction as opposed to a prohibitory injunction.  It's a

16   mandatory injunction because it would alter the status quo by

17   dramatically changing the government's operation from one that

18   proceeds on consent to one in which the government would be

19   required to obtain a warrant based on a showing of probable

20   cause.

21         Now, for a mandatory injunction, the moving party is

22   required to meet still more heightened showing on the merits;

23   that is, a clear or substantial showing of a likelihood of

24   success on the merits.

25         Now, as Mr. Cargo will explain in further detail, the

7a5QaguC

1    plaintiffs cannot meet this standard, first, because they lack

2    standing under the case of *City of Los Angeles v. Lyons* which

3    is a case from the Supreme Court that addresses standing in the

4    exact scenario we have here, ie., a past constitutional

5    violation and a request for an injunction against an ongoing

6    law enforcement program.  We have copies of that case for the

7    Court and for counsel.

8           But for similar reasons, they also cannot show an

9    entitlement to equitable relief because they do have an

10    adequate damages remedy in the form of a Bivens claim which

11    they're certainly availing themselves of here.

12           On to irreparable harm in the absence of injunction,

13    the plaintiffs have not shown that there's any likelihood of a

14    concrete, nonspeculative harm much less one that is

15    irreparable.  Now, the claimed harm, you heard counsel say it,

16    is that the plaintiffs are terrified that ICE will return.

17    Having been legitimately the victims of an unconstitutional

18    victim in the past, they're afraid that it will happen to them

19    again.  And, again, the sole basis for thinking so is that

20    there has been allegedly unconstitutional entry into the house

21    in the past.

22           Your Honor, the fact that there has been a past

23    violation, even assuming that that's true, says nothing about

24    whether ICE agents will return to these plaintiffs' homes and

25    commit unconstitutional acts.  That is what the Supreme Court

7a5QaguC

said in City of Los Angeles; namely, that just because your
rights have been violated in the past does not mean that there
is any likelihood that the experience will be repeated in the
future.

The plaintiffs cite several cases in their brief
alleging a constitutional violation in the context of a
preliminary injunction satisfies the irreparable harm standard.
We need to look at those cases because those claimed violations
are quite different.  They are in fact ongoing violations or
they're violations that it's apparent the plaintiff would
likely or conceivably or possibly be subjected to.  In the
Jolly case, that's the case where the inmate refused a TB test
on religious grounds and was placed in administrative
detention.  That violation was ongoing.  He remained in
administrative detention.  So that's an example of the ongoing
violation.

In the other two cases, *Mitchell v. Cuomo* that was the
case where the state wanted to close a certain prison which
undeniably would have resulted in the transfer of the
plaintiffs to another overcrowded prison.  And absent an
injunction forbidding the closing of the prison, their Eighth
Amendment rights would have been violated because they would
have been transferred to a prison that the state had previously
said was overcrowded.  Covino, the third case cited, that
involved a policy of random strip searches of pretrial

7a5QaguC

1    detainees, and there was no question but that the plaintiff was

2    a pretrial detainee subject to random strip search.

3              Now, here by contrast, there is simply absolutely no

4    way of knowing whether ICE agents will return to these

5    plaintiffs' households, and if they do, whether they will

6    commit allegedly unconstitutional acts.  Obviously, not every

7    ICE agent who participates in this program acts

8    unconstitutionally.  There have been far more raids than those

9    alleged in the complaint and yet only a handful of  people are

10   complaining their rights were violated.

11             If anything, for that matter, the agents have no

12   reason to return to these households.  Having been there once

13   and found a resident unhelpful in locating the fugitive,

14   there's no reason to return absent some potentially new

15   information, and we just don't know if that's ever going to

16   come into their possession.  So, in sum, there's really no

17   nonspeculative basis to conclude that these plaintiffs will be

18   harmed, much less irreparably harmed.

19             As to the irreparable part, of course, the usual

20   remedy for these kinds of violations is a Bivens claim and

21   they've made those claims.  So the harm, if there was any, is

22   certainly reparable, and I would just also point out that

23   belying the supposedly emergency nature of this application is

24   the fact that these raids took place eight months ago in

25   February.  The plaintiff saw no need to bring a supposedly

7a5QaguC

1    emergency application until eight months after the fact, and

2    there is certainly no claim that the agents have returned in

3    the interim.  Of course, what this underscores is that the

4    proper remedy is the usual remedy, and that is a Bivens claim

5    for damages.

6            Unless the Court has any questions, I'll turn it over

7    to my colleague, Mr. Cargo.

8            THE COURT:  The plaintiffs allege that there have been

9    new raids and that there are, therefore, additional plaintiffs,

10   right?

11           MS. WOLFSTEIN:  Yes, that's my understanding.

12           THE COURT:  There's no allegation that there's

13   anything that has occurred with the original plaintiffs.

14           MS. WOLFSTEIN:  No, there isn't.

15           THE COURT:  What's the government's representations

16   with respect to the plaintiffs in this action?  For example,

17   none of the plaintiffs in this action, I take it, are subject

18   to any final orders of removal.  If an alien were subject to a

19   final order of removal and the immigration status were at issue

20   in the court, the government's traditional position is, of

21   course, we won't deport this person or remove this person until

22   the case is decided; that's our position, and we used to be --

23   we'd say it to the District Court, and now you say it to the

24   Court of Appeals.  I assume that the government's position with

25   respect to the individually named plaintiffs would be, first,

7a5QaguC

1    they won't be removed because if they're not alleged to be

2    fugitives, they're not alleged to be removable aliens, and I

3    take it the government's representation would also be that

4    their finding would be no retaliation taken against the

5    plaintiffs in this case because that would be wrong and

6    certainly counterproductive.

7         MS. WOLFSTEIN:  Right, your Honor, of course, a

8    citizen is not subject to being removed.  So if they are

9    citizens, they are not subject to being removed at all.  As I

10   said, there is another program that is -- it appears to be at

11   issue in the amended complaint, the target gang members, not

12   all of whom are -- or perhaps most of whom -- many are of whom

13   are not under final orders of removal but are here illegally.

14   And, again, I don't want to say too much because we've had very

15   limited time to delve into the facts, but in the situation of

16   an illegal alien who is subject to an order of removal like a

17   gang member, I think the enforcement action I understand is

18   meant to put them into proceedings where they will proceed

19   before an immigration judge, the BIA, the Court of Appeals.

20        But as to your specific questions, if they are not

21   fugitives under a final order of removal, my understanding is

22   they will not be targeted for removal, and certainly I cannot

23   imagine that there would be any -- as you say, I can't imagine

24   there would be any program of retaliation or any informal

25   notion of retaliating against plaintiffs for bringing a

7a5QaguC

1    lawsuit.  So I think those are not in dispute.

2            THE COURT:  And you would communicate that to your

3    client?

4            MS. WOLFSTEIN:  Yes, your Honor.

5            THE COURT:  All right.

6            MR. CARGO:  Good afternoon, your Honor.  Shane Cargo

7    also for the government.  I'd like to speak briefly about the

8    standing issue, and then move to the scope of the order that

9    they are seeking.  As Ms. Wolfstein touched upon, Lyons is a

10   case that's notably absent from their papers, but it's the

11   Supreme Court case that governs this Court's jurisdiction to

12   issue prospective injunctive relief.

13           A quick background of the facts of Lyons.  The

14   plaintiff in that case was severely injured when a police

15   officer administered this chokehold against him.  In addition

16   to damages, he sought an injunction prohibiting the Los Angeles

17   Police Department from ever using that technique in connection

18   with their law enforcement activities.  The Supreme Court in

19   that case said that in order to attain standing to request

20   prospective injunctive relief, the threat of injury must be

21   real and immediate, not conjectural and hypothetical.  In that

22   case, notably, ten people had already died from the chokehold.

23   The court nonetheless found that the threat of future harm was

24   conjectural and hypothetical.  That case has been followed by

25   the Second Circuit in a couple of recent decisions including

7a5QaguC

1   the Shane case from 2004.

2           In this case the threat of harm is far more

3   conjectural than it was in the Lyon's case.  Plaintiff's

4   hypothesize that ICE is going to go back to Mrs. Aguilar's

5   house even though they haven't been there for seven months.

6   They hypothesize that if those agents go to her house, they

7   will enter without consent in violation of the Fourth

8   Amendment.  They're also hypothesizing that she won't have an

9   adequate remedy.

10          She's already brought the Bivens suit, and she's

11  seeking through money damages to address any harm she's

12  suffered.  That's a very different issue than the forward

13  analysis that a court has to go through when considering

14  whether a plaintiff has standing to seek prospective injunctive

15  relief.

16          I'd like to actually turn to this order because it is

17  not at all narrowly tailored to the harm that's complained of.

18  Reading from Subsection A, it seeks an order enjoining and

19  restraining defendants, their agents, employees, assignees, all

20  persons acting on their behalf.  The defendants, of course, are

21  ICE, but there are more than 500 ICE agents in New York, and

22  they are engaged in a whole panoply of law enforcement

23  activities:  Narcotics, national security, terrorism, child

24  pornography, human trafficking.  So this injunction would

25  prohibit all of those officers from entering or searching any

7a5QaguC

1    home or seeking consent to enter any home within the

2    jurisdiction of New York without first obtaining a judicially

3    ordered search warrant.

4          It makes no allowance if an officer is in hot pursuit

5    of a fugitive.  It makes no allowance if somebody has probable

6    cause to enter a home.  The scope of this injunction would

7    really bring ICE -- and as I say that's more than 500 officers

8    -- their activities to a halt until the court can rule on the

9    preliminary injunction itself.

10         As far as the third clause, contacting, retaliating

11   against, arresting, prosecuting, deporting the named plaintiffs

12   in this action, their family members, and any witnesses in

13   raids.  That clause is actually prohibited by 8 USC 1252(g),

14   and I will give your Honor a copy of that, but that broadly

15   prohibits any court from interfering with the Attorney

16   General's discretion to execute removal orders.

17         If any of these plaintiffs are under removal orders,

18   and, as my colleague said, it's too early to determine

19   immigration status of all the plaintiffs.  Many of them

20   apparently are citizens.  There's a few where they say they're

21   of Latino origin.  The complaint doesn't specify whether

22   they're lawful, permanent residents or citizens, but if any of

23   those are subject to removal orders, this second clause would

24   clearly run afoul of 1252(g) which prevents a court from

25   interfering with the Attorney General's discretion to execute

7a5QaguC

1    removal orders.

2              The third clause transferring any individual detained

3    by ICE, that's also precluded by a separate subsection of 8 USC

4    1252(f) which states that it's in the Attorney General's

5    discretion where he chooses to detain aliens and, of course, he

6    can transfer aliens to wherever there happens to be space to

7    hold those aliens.

8              Finally, with respect to B, plaintiff's motion for

9    expedited discovery.  As my colleague mentioned, this is at

10   heart a Bivens case, and we expect the discovery will progress

11   along those lines and expedited discovery pursuant to Rule

12   26(d) is clearly beyond the scope of this lawsuit.  So we

13   respectfully request that the Court deny that request as well.

14             THE COURT:  What do you mean by beyond the scope of

15   this lawsuit?

16             MR. CARGO:  Well, this lawsuit really seeks to do two

17   things:  Claim one, I'm talking about the initial complaint

18   because we haven't yet seen the amended complaint, seeks

19   prospective relief in the form of some kind of order for the

20   Court requiring ICE to follow certain policies and procedures.

21   Again, the allegation here is that they have a policy and

22   practice of, in effect, violating the constitution when they're

23   trying to execute removal orders.  We take issue, as I

24   mentioned, with their standing and their ability to assert a

25   claim like that in federal court.

7a5QaguC

1          Claim two is a plain old Bivens case seeking damages

2     for the alleged constitutional violation that happened back in

3     February of this year.

4          THE COURT:  I don't follow you again as to why you say

5     expedited discovery pursuant to 26(d) is beyond the scope of

6     the lawsuit.

7          MR. CARGO:  Well, part of the problem I'm having is

8     that in the papers I read it's not clear what kind of discovery

9     they are seeking.  I think I heard the plaintiff's lawyer say

10    that they wanted to see any manuals that ICE follows when it's

11    executing its removal orders.  I know that those exist, and

12    those actually really go to the first claim in the lawsuit.

13         THE COURT:  I may be wrong, but the only -- the place

14    I saw the request for expedited discovery is in the memo of law

15    in support of the application at page 20 where it says "the

16    plaintiffs request only information relating to (1) ICE's

17    policy, practices, procedures, and training relating to the

18    conduct of home raids by ICE.  (2) The facts relating to the

19    home raids actually conducted by ICE's New York City regional

20    office for the past ten months.  (3) The names of the agents

21    involved in the raids in the complaint and amended complaint.

22    And (4) the names of current locations of all individuals

23    detained by ICE in any raid conducted within the jurisdiction

24    of the New York City regional office since September 20, 2007.

25         I'm correct, aren't I, that's the place where the --

7a5QaguC

1    addressing the plaintiff?

2        MR. MAER:  Yes, your Honor.  We obviously don't know

3    exactly what records they keep.  If there's a conversation,

4    we'd obviously be happy to clarify what types of records would

5    satisfy us, and we could prepare a document for Tuesday.

6        MR. CARGO:  As I said, your Honor, we've indicated the

7    defendants will be moving against this action for lack of

8    standing in at least the first claim, and I don't think we

9    should engage in discovery until the Court has ruled on a

10   motion that will be dispositive, at least with respect to half

11   of the case, frankly, the larger half of the case.

12       THE COURT:  When do you expect to make a motion to

13   dismiss for lack of standing at least the first claim?

14       MR. CARGO:  I think it will come in the form of a

15   cross motion and opposition to their injunction papers.

16       THE COURT:  They say they don't have enough

17   information at the moment to make their motion for preliminary

18   injunction.

19       MR. CARGO:  Well, we had contemplated making a

20   preanswer motion.  We haven't seen the second -- the amended

21   complaint in this case.  We would have made a preanswer motion

22   in approximately seven weeks when our answer was due.

23       THE COURT:  When was the original complaint filed?

24   You had 60 days after the summons was served.

25       MR. CARGO:  Yes.

7a5QaguC

1          THE COURT:  And the original complaint was served.

2          MR. CARGO:  It was served on the 24th, filed on the

3     20th.  At least one of the individual defendants has net yet

4     been served.

5          MR. MAER:  Your Honor, if I can respond?

6          THE COURT:  Let me just finish.  Anything further?

7          MR. CARGO:  Unless the Court has any questions or my

8     colleague wants to fill in, thank you.

9          THE COURT:  OK.  Plaintiffs?

10          MR. MAER:  Thank you, your Honor.  If I can speak from

11     the table, your Honor.

12          THE COURT:  Sure.

13          MR. MAER:  Thank you.  I don't know why -- the amended

14     complaint was served, and I believe we have a receipt from it

15     having been filed yesterday.  It's obviously the critical

16     document here because it sets forth the facts that we are

17     primarily relying on.

18          THE COURT:  Is it a verified complaint?

19          MR. MAER:  Yes.  And attached to our order to show

20     cause are declarations.

21          THE COURT:  I read the declarations attached to your

22     order to show cause.

23          MR. MAER:  I do have copies of these letters from the

24     government from Nassau County, and I would like to hand them to

25     the Court and to opposing counsel.  They are attached to the

7a5QaguC

1  complaint because in a sense he said/she said is always a

2  difficult type of situation to be in.  Here we have the police

3  chief of Nassau County who had a large number of agents

4  accompanying ICE on these raids in which 190 people were

5  arrested, again, a very small handful of what are these

6  fugitive aliens and the police chef said, "I'm not going to

7  allow my police officers to go out on these raids because

8  they're in physical danger and they're completely ineffective."

9       If I could, I would like to give this to the Court and

10  to opposing counsel, and I'm wondering maybe we should come

11  back on Tuesday or something when the amended complaint has

12  been properly served and have been delivered to the parties

13  because seven of our plaintiffs were told that ICE would be

14  coming back, the ICE agents would be coming back.  These raids

15  seemed to being targeted on the Latino community.  That's why

16  we fashioned our class definition of people living in Latino

17  households.  This is, I think, the basis for addressing the

18  Lyons question, are these people just like everybody else

19  subject to future harm?  No.  These people, many of them have

20  been told that ICE is coming back.  They're in a very narrow

21  subset of households that will potentially have this happen.

22  And there is a news article from yesterday.

23       THE COURT:  I cannot rely on a news article.

24       MR. MAER:  I understand, where a woman testified that

25  a return raid was made on her home even though the first time

7a5QaguC

1     there was no problem.  So, the likelihood of these raids

2     occurring again to our plaintiffs, we think, is serious and

3     addresses the concerns set out in Lyons.

4              THE COURT:  When were the raids conducted with respect

5     to the original plaintiffs?

6              MR. MAER:  Starting in the winter of this year.

7              THE COURT:  Winter of '06?

8              MR. MAER:  7.

9              THE COURT:  Early 2007.

10             MR. MAER:  I'm sorry, yes, early 2007.

11             THE COURT:  Did the ICE agents return to any of the

12     plaintiffs?

13             MR. MAER:  No, they have not.

14             THE COURT:  I understand your argument, and I'm

15     perfectly happy to come back -- to have you pass up the

16     documents, give them to the government, and have you come back

17     on Tuesday.  Meanwhile, of course, you heard my colloquy with

18     the government with respect to the issue of whether there would

19     be retaliation against the plaintiffs in this action, and you

20     can certainly communicate that colloquy to the plaintiffs in

21     this action.  I take seriously the government's representations

22     and also how unproductive it would be to attempt to retaliate

23     against plaintiffs in the case.  Of course, as you said, there

24     has been no action taken against the plaintiffs where the raids

25     were conducted many months ago.

7a5QaguC

1          But, in any event, I'll certainly have you back on

2    Tuesday, read the amended complaint, as well as the other

3    documents you've given me, and the government can do the same,

4    and let me give you a time on Tuesday

5          MR. MAER:  Thank you, your Honor.

6          THE COURT:  Give me just a moment.  Tuesday October 9

7    at 3:00 p.m.

8          MR. MAER:  That's good.  Thank you, your Honor.

9          THE COURT:  I will look forward to seeing you all

10   then.

11         MS. WOLFSTEIN:  Your Honor, just one point from the

12   government.  It just bears noting that some of the plaintiffs

13   are Jane Doe and John Doe.  So we, of course, have no idea who

14   they are, hard -- can't make --

15         THE COURT:  That's true.

16         MS. WOLFSTEIN:  We can't not enforce the order.

17         THE COURT:  That's absolutely right.  Your

18   representation is only with respect to the people who you know

19   about as being plaintiffs in this case.

20         MR. MAER:  We understand, your Honor.

21         THE COURT:  If the plaintiffs wanted to come forward,

22   and I'm certainly not requiring the plaintiffs to do that, and

23   say, look, we're John Doe number one, and we want to make sure

24   that there's no action taken against us, but I certainly didn't

25   read your representation to mean that ICE cannot take any

7a5QaguC

1    actions against any persons because they might be John Doe, and

2    the plaintiffs understand that, right?

3            MR. MAER:  Yes, we do, your Honor.

4            MS. WOLFSTEIN:  One more question.  Is there anything

5    the Court would like from the government for Tuesday's

6    appearance?

7            THE COURT:  Well, that's a very kind offer -- no. I

8    have a memo in support of the TRO, and so I called you all in

9    promptly, and I realize that there's been no opportunity to

10   file a memo in response.  I would appreciate a memo in response

11   that sets forth the opposing position and cites the cases on

12   which you are relying, and it would be most helpful to me if it

13   were submitted by, obviously, the end of the day on Monday,

14   late on Monday -- sometime prior to dinner on Monday, and you

15   should assure that one way of filing it to assure that I get it

16   is to fax it to my chambers at the fax number which you can get

17   from my deputy and of course serve it, and you can serve it by

18   faxing it to counsel for the plaintiffs.  I'm not requiring any

19   further papers, but I know that lawyers never want to give up

20   an opportunity, so if the plaintiffs wanted to file reply

21   papers, they could do it in the morning by faxing a reply to me

22   in the same way.  Mr. Fletcher will provide both sides with a

23   fax number.

24           MS. GORDON:  Thank you very much, your Honor.

25           MR. MAER:  May I, your Honor?  I think one production

7a5QaguC

1    by the government would be useful.  We've stated that as far as

2    we know, they do not have any clear protocols telling ICE

3    agents what they should and should not do and how they should

4    approach these home raids other than sort of a two paragraph

5    summary of the totality of the circumstances, and I believe I

6    heard reference to the fact that they may in fact have

7    protocols governing these home raids.  If they could produce

8    those for Monday, that would obviously be very helpful so we

9    can understand what types of directions the agents are or are

10   not informed of.

11            THE COURT:  Mr. Cargo?

12            MR. CARGO:  Monday is a holiday.  As of 30 minutes

13   from now we really won't be able to get in touch with our

14   clients until Tuesday.  So I can't see any way that we will be

15   able to pull together the policies and review them.  This is an

16   extremely complex operation, and that's one reason we object to

17   discovery at this early stage, especially since there is a big

18   standing issue, and we intend to move against the complaint on

19   that basis.

20            I'm also not clear whether your Honor is interested in

21   receiving an opposition to the TRO for an injunction itself,

22   and I'm not clear whether the plaintiffs are planning on filing

23   an application for a TRO with an actual set of papers in

24   support of a PI.

25            THE COURT:  The only thing that's before me now is the

7a5QaguC

1    temporary restraining order which seeks the relief that you

2    correctly identified in the order and a request for expedited

3    discovery, the substance of which is referred to in the

4    memorandum, although there's no request for documents that's

5    out there.

6         MR. CARGO:  Clearly, standing is a threshold issue of

7    the Court's jurisdiction--

8         THE COURT:  Right, I understand.

9         MR. CARGO:  And does your Honor expect a brief on the

10   standing issue?  That has to be part and parcel of the

11   opposition we filed, but, again, we --

12        THE COURT:  Yes, sure.  I mean, anything you would

13   like to tell me in response to the temporary restraining order,

14   the request for temporary restraining order and request for

15   expedited discovery, I would like to hear in papers.  You've

16   certainly raise the standing issue.  You've raised some

17   statutory restrictions on some of the requests for relief.  So,

18   I realize that there is little time to put together the

19   responsibilities on a temporary restraining order.  I'm not

20   asking for a Supreme Court brief or anything like that.  Both

21   of you have already indicated the standards that should be set

22   out for a temporary restraining order with respect to

23   government action.  You can tell me whatever you would like to

24   tell me in as brief a form as you wish so that I'm in a

25   position to decide solely the temporary restraining order.

7a5QaguC

```
1        As I indicated earlier to the parties, I do not have
2   even a motion for a preliminary injunction, so you're not
3   putting in a response to a motion for preliminary injunction.
4   I said that this relief is somewhat unusual because usually a
5   temporary -- well, under the rules, a temporary restraining
6   order exists only for ten days unless extended for another ten
7   days, and it's usually preliminary to a preliminary injunction,
8   and I have no motion for preliminary injunction, and the
9   plaintiff says we don't have enough information and haven't had
10  enough information to ask yet for a preliminary injunction.
11       So, there is no motion for a preliminary injunction.
12  You're not responding to a motion for preliminary injunction.
13  You're responding solely to the request before me for a TRO.
14       MR. CARGO:  I guess part of the problem I was having
15  was understanding the nature of the follow-up conference at
16  3:00.
17       THE COURT:  Ah, as I understand it, the plaintiff says
18  no one has read our amended complain.  We don't know why it
19  didn't get to the government.  We don't know why it didn't get
20  to the Court.  The amended complaint is a verified complaint.
21  It contains sworn statements which we rely upon in support of
22  our request for a TRO.  Part of what your colleague told me is
23  we can't really address the amended complaint.  We haven't seen
24  it.  So one of the things you'll want to add -- and so the
25  plaintiff says we would rather have a decision made on the TRO
```

1    after everyone has looked at the amended complaint and the

2    additional letters from Nassau County, and so I assume that --

3    and come back.  Let us come back on Tuesday.  We'll argue for

4    the TRO at that time.  That's why we're having a conference on

5    Tuesday.

6         Why are you submitting a brief?  Because your

7    colleague asked me whether that would be appropriate, and I

8    never turn down help.  Even if it's help that's offered over a

9    holiday weekend from both sides.  Again, I'm not asking for a

10   Supreme Court brief, and you can be as short or as long as you

11   want.  You say why is this dispositive.  You say there are a

12   couple of statutes you want me to look at.  Whatever it is you

13   want me to look at in terms of the standards, etc., the kind of

14   brief you would have given me had you gotten notice that the

15   decision would finally be made on the TRO today after one day's

16   notice, that's all.  And I will not under the circumstances

17   require that discovery be made at this point between now and

18   the time I see you all on Tuesday.  Any other questions?

19        MS. WOLFSTEIN:  Understood.  Thank you.

20        MR. MAER:  I just want to correct a misstatement of

21   mine.  The amended complaint is not verified.

22        THE COURT:  Ah.

23        MR. MAER:  I think I represented that.

24        THE COURT:  OK.  Do you still want to come back on

25   Tuesday?  OK.

7a5QaguC

1          MR. MAER:  Yes.

2          MS. WOLFSTEIN:  Thank you, your Honor.

3          (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25