7amraguo

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

2    ------------------------------x

3    ADRIANA AGUILAR, et al.,

4                    Plaintiffs,

5              v.                          07 Civ. 8224 (JGK)

6    BUREAU OF IMMIGRATION AND
     CUSTOMS ENFORCEMENT DIVISION

7    OF THE UNITED STATES OF
     AMERICA DEPARTMENT OF

8    HOMELAND SECURITY, et al.,
                                          Order to Show Cause

9                    Defendants.

10   ------------------------------x

11                                        New York, N.Y.
                                          October 22, 2007

12                                        4:55 p.m.

     Before:

13
              HON. JOHN G. KOELTL

14
                                          District Judge

15

16         APPEARANCES

17

     DEWEY & LeBOEUF LLP

18   Attorneys for Plaintiffs
          125 West 55th Street

19        New York, New York  10019
          (212) 424-8000

20   BY:  DONNA L. GORDON, ESQ.
          PATRICK J. GENNARDO, ESQ.

21

22   PUERTO RICAN LEGAL DEFENSE AND EDUCATION FUND
     Attorneys for Plaintiffs

23        99 Hudson Street
          New York, New York  10013

24        (212) 219-3360
     BY:  FOSTER S. MAER, ESQ.

25        GHITA SCHWARTZ, ESQ.

7amraguo

```
                    APPEARANCES


MILBANK, TWEED, HADLEY & McCLOY, LLP
Attorneys for Plaintiffs
     One Chase Manhattan Plaza
     New York, New Yrok  10005
     (212) 530-5000
BY: SEAN FARRELL, ESQ.


JOSEPH LANZA, ESQ.
Attorney for Plaintiff Luis Pagan


MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendants
     86 Chambers Street
     New York, New York  10007
     (212) 637-2743
SHANE CARGO
ELIZABETH WOLSTEIN
PATRICIA L. BUCHANAN
     Assistant United States Attorneys
```

7amraguo

```
 1              (Case called)

 2              THE COURT:  Good afternoon all.  Please be seated.

 3              THE CLERK:  Aguilar v. Bureau of Immigration and

 4   Customs Enforcement.

 5              THE COURT:  This is an order to show cause for

 6   expedited discovery.  I don't sign orders to show cause without

 7   calling the parties in.  So it is really a scheduling issue

 8   with respect to when the government will be responding to the

 9   order to show cause or expedited discovery.  I believe I memo

10   endorsed the government's letter which says let us respond to

11   the order to show cause for expedited discovery at the same

12   time we move to dismiss.  What's that date?

13              MR. CARGO:  November 16th, your Honor.

14              THE COURT:  So the issue is one really of scheduling.

15   But I'm perfectly happy to listen to the parties.  I have some

16   views, but I'm perfectly happy to listen to the parties.

17   Someone on behalf of the plaintiffs?

18              MS. GORDON:  Good afternoon, your Honor.  Donna Gordon

19   of Dewey & LeBoeuf.

20              Your Honor, we are here today on plaintiff's order to

21   show cause for expedited discovery.  Really what we see is two

22   issues before the Court.  One is what standard should be

23   applied, and the second is whether or not plaintiffs meet that

24   standard on their motion for expedited discovery.

25              As your Honor is possibly well aware, previous courts
```

7amraguo

1   in this district have applied the four-part test similar to the

2   preliminary injunction analysis set forth in Notaro v. Koch.

3   More recently courts have moved away from this standard and

4   applied a good cause standard or a reasonableness standard,

5   particularly in cases where the expedited discovery is related

6   to a preliminary injunction motion.  I'd cite the Court to

7   IOSH, 233 F.R.D. --

8          THE COURT:  Do those cases deal with expedited

9   discovery in connection with a motion for a preliminary

10   injunction that has been filed and in preparation for a hearing

11   on the preliminary injunction or with efforts to obtain

12   expedited discovery prior to filing the motion for a

13   preliminary injunction?

14          MS. GORDON:  It is the second, your Honor.  Both the

15   IOSH case and the Standard Investors Charters case both deal

16   with instances where plaintiffs are seeking expedited discovery

17   in aid of their forthcoming preliminary injunction motions.

18          THE COURT:  Motion or hearing?

19          MS. GORDON:  I believe it's both, the motion and the

20   anticipated hearing.

21          THE COURT:  Before they filed any motion for a

22   preliminary injunction?

23          MS. GORDON:  I do believe that's the case, your Honor.

24          THE COURT:  OK.

25          MS. GORDON:  Based on the decisions made by the courts

1    in this district, plaintiffs believe that the good cause test

2    applies.  My plan is to address the IOSH standard as the proper

3    standard for reviewing plaintiffs' instant requests for

4    expedited discovery.  If your Honor thinks it would be helpful,

5    I am also prepared to address the Notaro standard.

6         THE COURT:  You could address both, but I've indicated

7    where we are is an issue of scheduling.  Unless the parties

8    convince me otherwise, I would tend to get a response to the

9    order to show cause and then set it down for an argument

10   perhaps on the order to show cause for expedited discovery.

11   That's why I always, even on orders to show cause without

12   restraint, call the parties in.  If things can be resolved at

13   the conference, they are resolved.  If they are not, the other

14   side has an opportunity to respond.  It's a motion.

15        But I'm always happy to listen.

16        MS. GORDON:  In that vein, your Honor, I think what we

17   want to bring your Honor's attention to is the fact that on the

18   third prong of the good cause standard, which is whether the

19   need for expedited discovery outweighs the prejudice to a

20   responding party, we believe that the expedited discovery

21   motion should be granted and that we should not have to wait in

22   order for plaintiffs to get an extension of 30 days and/or to

23   submit their cross-motions for a stay or a motion to dismiss.

24        THE COURT:  They want to move to dismiss.  I'll listen

25   to what they have to say.  But they say that the case ought to

1    be dismissed, in which case there would be no basis for

2    discovery.

3              MS. GORDON:  Right, your Honor, but that's a

4    hypothetical motion to dismiss.  There is no motion currently

5    before the Court to dismiss.  There is no motion to stay.

6    There is no way for the Court to evaluate the merits of those

7    motions.

8              Right now we have real harm before your Honor.  We

9    have constitutional deprivations that are taking place every

10   day.  We would submit that those are greatly in favor of

11   granting expedited discovery to commence immediately as opposed

12   to engaging in a briefing schedule.

13             THE COURT:  Go ahead.

14             MS. GORDON:  Instead of going through each of the

15   interrogatories and how they are reasonable and narrowly

16   tailored, think what I want to say --

17             THE COURT:  The interrogatories appear to go beyond

18   what are permitted under the local rules with respect to

19   interrogatories.  They ask, for example, for a narrative

20   description from every person with knowledge of the arrest to

21   describe what that person's knowledge is.

22             MS. GORDON:  Yes, your Honor.

23             THE COURT:  That's way beyond what the permissible

24   limits of interrogatories are.  I raise that only because you

25   said that each of the interrogatories is narrowly drafted.

1          MS. GORDON:  Your Honor, when we drafted both the

2     document requests and the interrogatories, as well as the

3     individuals whom we thought we would subject to deposition, we

4     felt that we did narrowly tailor then and did so in the

5     confines of the Federal Rules of Civil Procedure.

6          THE COURT:  The local rules with respect to

7     interrogatories limit interrogatories at the beginning of the

8     case to essentially identification of witnesses, documents,

9     scope of damages, if memory serves me right.  This asks to list

10    every person with knowledge of the arrest and then to describe

11    what that person's knowledge is.

12         MS. GORDON:  I guess we viewed that in the scope of

13    identifying the individuals.

14         THE COURT:  OK.  Could I also ask another question.

15    Both the interrogatories and the document requests seek

16    information with respect to every person who was arrested.  Are

17    there any privacy issues with respect to detailed information

18    with respect to the arrest of persons other than the named

19    plaintiffs in the case whom you are representing and to consent

20    to disclosure of personal information about them?

21         MS. GORDON:  Could I consult with my colleague for one

22    second, your Honor?

23         THE COURT:  Sure.

24         MS. GORDON:  Your Honor, we were simply looking to

25    obtain the names of witnesses who could give us details about

1    the accounts of the various raids.  If there is a privacy issue

2    involved, we were simply looking for names, but we could also

3    conduct the discovery under seal.

4         THE COURT:  There are always questions with respect to

5    sealing.  The initial questions would be the disclosure of

6    private information with respect to others who are not their

7    lawyers. I just raise it.  As I said, there has been no

8    response yet to the motion for expedited discovery.  You say

9    that there is a continuing, ongoing constitutional violation

10   that's occurring every day.

11        MS. GORDON:  Correct, your Honor.

12        THE COURT:  The last incident that is described in the

13   papers was September 24th, I think.

14        MS. GORDON:  Yes, your Honor.  But that doesn't mean

15   that the raids have stopped.  Every day we notice from things

16   in the public press or from reports across the country that

17   these raids are occurring and they occur in the same manner.

18        THE COURT:  We are dealing here with the New York

19   area, right?

20        MS. GORDON:  Yes, your Honor.

21        THE COURT:  With the New York region and what's

22   happened since September 24th.  Presumably you're not

23   contending that any arrest or detention that's occurred since

24   September 24th is unconstitutional.

25        MS. GORDON:  Yes, your Honor, I think that we would

1  contend that.  What we are contending, your Honor, is that

2  there is a pattern and practice here, if not a policy, in the

3  way that ICE conducts its home raids such that they are

4  violative of the constitutional rights of the individuals.  The

5  government last time we were here conceded that raids are

6  happening every day.

7      THE COURT:  But they certainly didn't concede, and

8  I'll listen to the government, that there were unconstitutional

9  raids that are going on every day.  There were two separate

10 incidents, apparently, or two separate groups.  One was a group

11 where the alleged violation was a failure to obtain informed

12 consent.  A separate set where there were apparently

13 administrative arrest warrants which was separate from efforts

14 to obtain informed consent.

15     MS. GORDON:  Your Honor, what we would contend is that

16 the raids that are occurring, maybe in all cases, we don't

17 know -- this is why we need expedited discovery -- we believe

18 that the pattern and practice amounts to a policy of ICE to

19 conduct unconstitutional home raids.

20     If that pattern and practice can be confirmed by the

21 procedures and the policies and training documents of ICE, then

22 that would essentially raise it to the level where there would

23 be no discretion, because they would have to follow these

24 policies and practices and patterns, and every raid they would

25 be conducting could almost be deemed to be violative of

7amraguo

 1   someone's constitutional home rights.

 2        MR. GENNARDO:  Your Honor, it is a little bit more

 3   than that.  What we have, and we read this from the complaint,

 4   first of all, an agency that has increased the quotas for

 5   arrests by their agents by almost 800 percent.  We have the

 6   inspector general of ICE saying that ICE has not conducted

 7   proper training for its agents, that it works off of old and

 8   outdated information, that it has uncoordinated and sloppy

 9   policies.

10        We have 27 plaintiffs, all of whom said that their

11   homes have been unconstitutionally raided.  We have articles

12   from all over the country with very similar types of

13   allegations about the types of home raids that have occurred

14   all around the country at the hands of ICE.

15        When you start to pull all of that information

16   together and look at it, there is certainly a lot of smoke

17   about the policies of ICE and the way that they conduct home

18   raids.  When you have the government conceding that home raids

19   are happening every day in the lower New York area, you have

20   some very real issues and some very real concerns that justify

21   expedited discovery, especially when you compare that to a

22   hypothetical motion to dismiss that may or may not be made,

23   that may or may not have merits.

24        We don't know what those arguments are going to be,

25   yet we have here today very real constitutional harms happening

1    as recently -- we can document as recently as September 27th.

2    We have the government saying that the raids are happening

3    every day.

4              I can't tell you that a raid happened today or

5    yesterday.  We don't hear about every single raid.  As Mr. Maer

6    has told your Honor before, our clients and members of the

7    putative class are very, very reticent, very afraid to come

8    forward and seek help.  They are afraid of the government.  The

9    customs and the background where they come from, it is not

10   typical for them to come forward and challenge the government

11   openly.

12             So while we can't tell you that raids happened

13   yesterday or today or are going to definitively happen

14   tomorrow, we do have statements by the government that raids

15   happen every day.  We have a lot of information suggesting that

16   the policy and practice is to conduct those raids in an

17   unconstitutional manner.

18             THE COURT:  It doesn't necessarily follow that because

19   there is a search, the search is unconstitutional.

20             MR. GENNARDO:  That's correct.

21             THE COURT:  The fact that there is a statement that

22   there are searches and that they do occur is different from a

23   statement that there is a policy, practice, custom of

24   unconstitutional searches.

25             MR. GENNARDO:  But if the policy is to conduct raids

7amraguo

1  in a particular way and that agency is sending its agents out

2  to conduct raids -- you're right, your Honor, it could be that

3  they say, go do the unconstitutional raids here on Monday and

4  do the constitutional ones here on Tuesday.  That's a

5  possibility.

6        But the if the pattern and practice of the government

7  is to conduct raids in a particular way and we know that they

8  are conducting raids every day, we know that the raids they

9  have conducted in the past are unconstitutional, and we know

10  from the Nassau police commissioner's letter that other raids

11  are planned for Nassau County sometime in the future, when you

12  put all that together, you're right, it's possible that they

13  pick out certain types of raids for unconstitutional behavior

14  versus other, but we don't know that.  It's not a huge leap to

15  say that if ICE's policy is to act in a certain way and they

16  conduct raids every day, that they are using their own

17  policies.  That's all we are saying.

18        THE COURT:  All right.  Defendants?

19        MR. CARGO:  Good afternoon, your Honor.  Shane Cargo.

20  I'd like to loop back and discuss briefly the letter request

21  and then briefly cover the timing basis for the motion, and

22  Elizabeth Wolstein is going to cover the scope of some of the

23  actual requests.

24        First, the scheduling matter.  The defendants have

25  made a very reasonable request to consolidate briefing with

7amraguo

 1    their anticipated motion to dismiss.  The date that we have

 2    proposed, November 16th, is one week before our response to the

 3    complaint would be due.  So we would be filing one week earlier

 4    than we are actually required.

 5         More importantly, this Court has already recognized

 6    that standing is an important and substantial threshold issue

 7    in this case.  In the October 9 decision the Court stated that,

 8    "Plaintiffs have failed to make a sufficient showing of

 9    likelihood of success on the merits of their claim for

10    equitable relief."  Therefore, in the interests of judicial

11    economy and efficiency and fairness, the Court should

12    adjudicate the defendants' anticipated motion to dismiss before

13    permitting expedited discovery.

14         THE COURT:  Don't the questions of whether there is a

15    policy go to the issue of standing?  And irrespective of

16    whether there is standing for equitable relief, the plaintiffs'

17    case goes forward based on alleged individual constitutional

18    violations with respect to the individual plaintiffs, right?

19         MR. CARGO:  Correct.

20         THE COURT:  And the motion to dismiss would not be

21    directed to that, right?

22         MR. CARGO:  Correct.  We have no plan to move against

23    the Bivins aspect.

24         THE COURT:  So what would the motion to dismiss be

25    directed toward?

1          MR. CARGO:  The motion to dismiss would seek to

2     dismiss claim 1 of the amended complaint, which is the claim

3     that seeks prospective injunctive relief against ICE.  It seeks

4     two things:  A declaration that ICE had violated the

5     plaintiffs' rights in the past.  It also seeks some kind of

6     injunction broadly prohibiting them from violating their

7     constitutional rights in the future.

8          This motion to dismiss would move against the first

9     claim.  And as we mentioned in the letter, we would also plan

10    to file a motion to stay discovery with respect to prospective

11    injunctive relief.  The question of whether discovery could

12    proceed on the Bivins claims I don't believe we have thought

13    through, but I don't see much of a basis for moving to stay

14    discovery on the Bivins cases.

15         THE COURT:  On the Bivins there will be a lot of

16    individual discovery as to what all of the circumstances were

17    for all of the individual searches that occurred with respect

18    to all of these individual plaintiffs.

19         MR. CARGO:  Correct.  But the policy and practice is

20    really irrelevant to that.  It will be a fact-specific inquiry

21    of whether a given named plaintiff gave proper consent to

22    having the home searched, and that will turn on the facts of

23    each encounter.  It necessarily has to.

24         THE COURT:  There are going to be individual

25    defendants, there are John Doe defendants, now, right?

1   Wouldn't it make a difference to the individual defendants

2   whether the individual defendants were acting pursuant to any

3   policies of ICE that were either reasonable or not reasonable?

4       MR. CARGO:  Yes, I imagine that that issue will come

5   up in connection with qualified immunity defenses.

6       THE COURT:  Sure.  So all of that discovery is coming

7   down the road in any event, right?  It's sort of hard to

8   separate out that discovery.

9       MR. CARGO:  I don't agree with that.  What they are

10  seeking is information -- documents, testimony -- going far

11  beyond what happened to each individual plaintiff in the past.

12  They are casting a very wide net here seeking disclosure of

13  policies and practices and statistics and all kinds of things.

14  Ms. Wolstein will speak more about the scope of the request in

15  a moment.  But I think it goes far beyond the type of

16  discovery --

17      THE COURT:  There is an argument that that is true.  I

18  pointed out some issues with respect to some of the discovery

19  already.  But won't some elements of the motion to dismiss

20  raise questions with respect to whether there was a policy or

21  practice and what the policy or practice was in terms of

22  attempting to determine whether the plaintiffs have standing to

23  attempt to obtain equitable relief?

24      MR. CARGO:  The answer to that question, your Honor,

25  is not necessarily.  In the Lyons case the Supreme Court said

1    that the plaintiffs would have to make the remarkable assertion

2    that the police officers violated the constitutional rights of

3    every person they encountered.  Here I don't believe that they

4    have made that remarkable assertion.

5          THE COURT:  But in Lyons the plaintiffs would have to

6    say that they were going to place themselves in the position to

7    be arrested again, and here the plaintiffs say because of our

8    nationality we are in the position of being subjected again to

9    a search.

10         One of the issues that is at least in my mind as I

11    deal with this is whether there are policies, practices, or

12    customs that apply to the searches at issue for these

13    plaintiffs that provide them with standing, and, if so,

14    standing for what?

15         A motion to dismiss asks me to accept as true the

16    allegations in the complaint and then asks me to dismiss it

17    based on the broad allegations in the complaint.  I'm raising a

18    question whether that makes sense, particularly when it's

19    discovery that's going to come along fairly soon down the road

20    in connection with the Bivins action.  And some of this

21    material one would think would be available under the Freedom

22    of Information Act.

23         Going beyond that, I had thought that you told me last

24    time or at least left me with the impression that one of the

25    problems with gathering together policies, practices, or

1   customs was that it was a Thursday or a Friday and it would be

2   difficult to get these policies or practices in a day and a

3   half.  We are now weeks down the road.

4        You know, if the parties are not at loggerheads, the

5   way in which some of this sometimes gets worked out is parties

6   sit down and they agree.  Plainly, there are some issues on the

7   face of the requests for discovery.  I can read discovery

8   requests myself.

9        There is the possibility of various privileges that

10  are out there, whether it be privacy or whether there is a law

11  enforcement privilege with respect to some information, but

12  with respect to having sufficient information to litigate

13  whether there is a policy, practice, or custom, what that

14  policy, practice, or custom is, whether it is constitutional or

15  not constitutional.

16       Otherwise, a motion to dismiss is directed against the

17  complaint which says there is an unconstitutional policy that

18  we have been subjected to which coerces consent.  Is there in

19  fact such a policy?  Do I have to accept an allegation in the

20  complaint that there is such a policy?  Were these searches

21  conducted according to any sort of general policy, practice,

22  principle?  Are there guidelines?  Were there policy

23  statements?  All of that presumably is going to come out not

24  too long in the future.  Then you say, wait until we file our

25  motion to dismiss, then we are going to move to stay discovery

7amraguo                                                                    18

1   and we are going to respond to the request for expedited

2   discovery.

3           One would have thought that a more reasonable general

4   approach to this would be here are the general policies,

5   practices, here are the manuals, directives, policy statements

6   with respect to this set of searches, here are the policy

7   statements with respect to this set of searches, we believe

8   that other discovery goes far beyond what you are entitled to

9   at this point.

10          I can't decide a motion to dismiss, obviously, that

11  hasn't even been briefed.  But these are the issues that I see

12  going forward.  They raise questions in my mind as to what the

13  timing of discovery should be, particularly in a case which the

14  defendants acknowledge is going forward with respect to these

15  plaintiffs, with respect to these searches, with respect to

16  their Bivins claims, their arguments with respect to the

17  alleged unconstitutional searches of these plaintiffs against

18  people who will be identified defendants as well as the agency

19  defendants.

20          Those are a couple of the observations just in terms

21  of what the timing is for this.  Let me try to respond to those

22  concerns.  First of all, I wasn't trying to hide the ball with

23  respect to the documents and the declarations that we will be

24  submitting with the motion to dismiss.  I simply did not want

25  to concede that a policy and practice was the end of the

7amraguo

```
 1    inquiry --

 2            THE COURT:   I'm sorry?

 3            MR. CARGO:   -- that a policy and practice is not the

 4    end of the inquiry under Lyons, because I don't think the case

 5    reads that way.

 6            However, as the Court is aware, on a jurisdictional

 7    motion we can submit other evidence without converting it to a

 8    motion for summary judgment.  We intend to submit declarations

 9    that say there is a policy and practice -- the practice is to

10    not violate the Fourth Amendment, the policy is to be careful

11    not to violate the Fourth Amendment -- and that these officers

12    followed that policy.  I agree with you, that is important to

13    the issue of standing.

14            Now, if the Court desires some extra discovery with

15    respect to that, I've seen cases where a district court has

16    permitted limited discovery for the purpose of adjudicating a

17    motion to dismiss for lack of standing, and the government

18    would probably not object to that.

19            I can tell you that what we will try to do is put in

20    declarations from people in supervisory positions at ICE that

21    say there is a policy that these searches are on consent and

22    that the officers are instructed to follow those policies.

23            THE COURT:   Doesn't that suggest that there would have

24    to be some production of a policy statement's directives that

25    are given to the officers when they conduct the search as well
```

7amraguo

 1   as any policy statements that applied on a more general basis

 2   to this group of searches, not just we tell our officers not to

 3   violate the Fourth Amendment?  Doesn't it provoke discovery

 4   with respect to what were the general guidelines and standards

 5   for this particular group of searches that went on at the two

 6   times that are identified in the amended complaint?

 7         MR. CARGO:  That may well be the case.  It is a little

 8   bit difficult to answer that question in the abstract.  Again,

 9   we plan to submit declarations and, where appropriate, sections

10   of the policies and procedures that describe that they are

11   supposed to conduct these home searches on consent.

12         THE COURT:  Ms. Wolstein told me, I thought, last time

13   that there were two separate groups of searches at issue.  The

14   first group was explicitly searches conducted where there was

15   an effort to obtain consent.  So it was a group of searches

16   that had some standards out there that the officer attempted to

17   get consent.

18         The second group of searches were, I think Ms.

19   Wolstein told me, allege d gang-related searches which were

20   conducted pursuant to administrative arrest warrants, a

21   different group of standards or operating procedures that would

22   have governed the two sets.  One would have thought that there

23   would be sort of general operating procedures with respect to

24   the two separate searches.

25         MR. CARGO:  I don't know the answer to that, to be

1   quite honest.  One problem is we don't have authority to

2   represent the individual defendants yet, so we are precluded

3   from having conversations with them.

4         We understand the broad outlines of the program.  We

5   know more about the first program that your Honor mentioned

6   than the second, but we'll certainly be investigating that

7   after we have authority to represent the individual defendants,

8   some of which were recently named in the amended complaint.

9   It's new defendants.  So we simply haven't had time to really

10  consider that.

11        Moving to some of the substantive aspects of the

12  motion itself, I think there are several problems with

13  permitting discovery at this point.  First, the discovery

14  motion is premature, as your Honor indicated, because the

15  plaintiffs have not yet moved for a preliminary injunction.

16  And all of the cases that the plaintiffs rely on, including the

17  Elsworth case from the district court in the District of

18  Columbia, involve discovery sought in preparation for a

19  preliminary injunction hearing, not a preliminary injunction

20  motion itself.

21        The IOSH case is sort of in a different category,

22  because in that case the plaintiffs were seeking discovery from

23  nonparty banks.  They sought an ex parte motion.  Presumably

24  the defendants didn't oppose that.  And the plaintiffs did not

25  make a preliminary injunction motion in that case.

1        That distinction, I submit, matters here because the

2    government cannot divine what relief the plaintiffs will be

3    seeking in their preliminary injunction motion.  As I

4    mentioned, in the amended the complaint the plaintiffs pray for

5    two forms of equitable relief:  A declaration that the

6    defendants had violated their constitutional rights and an

7    order estopping them from engaging in unlawful conduct in the

8    future.

9        But in the TRO papers they sought a much broader

10    order, one that, in the words of this Court, would require that

11    the authorities forgo what is otherwise a constitutional search

12    based on consent.  In a recent decision from the district

13    court, one that post-dates the Elsworth case in the District of

14    Columbia, the court denied a motion for expedited discovery as

15    overbroad because the plaintiffs were trying to radically

16    transform the status quo, which is what plaintiffs may be

17    trying to do in this case.  As we say, without having a

18    preliminary injunction motion itself it's difficult to tell

19    what ultimate relief the plaintiffs are actually asking for.

20        The second point is the plaintiffs have not

21    demonstrated here that they will be irreparably harmed by

22    having to make their discovery motion in the ordinary course.

23    They have not alleged that any evidence will be lost or

24    destroyed.  They haven't alleged that any of the testimony they

25    seek will become unavailable.

1          Most importantly, the only exigent circumstance in

2   this case that they have identified is the alleged irreparable

3   harm of ICE returning to the homes of the plaintiffs.  Ms.

4   Gordon has said that the constitutional deprivations are

5   occurring every day.  Mr. Gennardo made many of the same

6   arguments that we heard at the TRO hearing.  But this Court has

7   already determined that "there is no reasonable showing of

8   immediate and irreparable injury to these plaintiffs."

9          In their papers the plaintiffs repeatedly state that

10  they face irreparable harm notwithstanding this Court's finding

11  to the contrary.  So the Court should not permit plaintiffs to

12  circumvent that finding and indeed circumvent the normal

13  discovery process in this case.

14          Unless the Court has any questions about these points,

15  Ms. Wolstein is prepared to talk about the scope of some of the

16  requests themselves.

17          THE COURT:  What about my implied suggestion, or maybe

18  it's more appropriately directed to Ms. Wolstein, about

19  producing discovery with respect to any policies, customs, or

20  practices that apply to the searches at issue in the complaint?

21          MR. CARGO:  In connection with a motion for standing

22  or for lack of standing or in connection with a motion for

23  expedited discovery to support a future motion for preliminary

24  injunction?

25          THE COURT:  All of the above plus the fact that all of

1    that discovery would eventually be discoverable with respect to

2    these plaintiffs, these searches, these defendants.  And the

3    only thing that we are talking about is providing the Court and

4    the other parties with the information that goes to the issues

5    that we are talking about:  The motion to dismiss, eventually a

6    class action motion.

7              MR. CARGO:  I think we should confer on that.  I'm not

8    trying to be difficult.  Again, the policy says --

9              THE COURT:  You're not being difficult.  All I would

10   have to do is to set a shorter time for the response to the

11   motion for expedited discovery.

12             MR. CARGO:  The big picture is I think some of that

13   information is relevant to the issue of standing, but the

14   documents and the categories of information they seek in their

15   discovery goes far beyond the scope of the narrow issue of

16   standing.  Again, Ms. Wolstein can discuss the scope of those

17   document requests, but they are extremely broad.

18             THE COURT:  Not the one that I suggested.

19             MR. CARGO:  No.  Conceivably that's just a handbook

20   that sets forth --

21             THE COURT:  I would imagine it's more than a handbook.

22   If in fact the searches were part of a program, part of an

23   initiative, part of a however it is described, task force, one

24   would think that there would be guidelines, policies,

25   procedures that would go beyond a regular manual.

1          MR. CARGO:  Yes.

2          THE COURT:  Which would be identifiable and not

3   burdensome.  But perhaps Ms. Wolstein will deal with that.

4          MR. CARGO:  The answer is I think it depends.  If they

5   are under a standing obligation not to violate the Fourth

6   Amendment and that's articulated in some handbook, then I query

7   why the addition of more specific protocols would have to

8   reassert that.

9          THE COURT:  Oh, please.  You can have more than one

10  set of instructions.  You can have more than one set of

11  manuals.  You can have more specific instructions.  And maybe

12  those exist and maybe they don't.  The details with respect to

13  what the operating procedures were with respect to the specific

14  searches at issue are matters that will be subject to discovery

15  in the course of the case, one would think.

16         MR. CARGO:  Yes.

17         THE COURT:  I always caution that I use argument as an

18  effort to obtain what the parties' positions are.  I don't

19  decide anything until I have actually decided it on the facts

20  and the law.  But I do attempt to understand what the parties'

21  positions are.

22         MR. CARGO:  It's the very early days of this case, and

23  I can tell you that the government doesn't have anything to

24  hide with respect to its policies and procedures.  Now, I don't

25  have how much information is out there.  That's why I'm having

7amraguo

1    a difficult time answering your questions in the hypothetical.

2         THE COURT:  The request for expedited discovery was

3    out there even though it wasn't articulated in the original

4    papers.  There were several categories of documents that were

5    referred to in the memo even though the plaintiffs had not

6    gotten around to drafting document requests, interrogatories,

7    and 30(b)(6) deposition requests.

8         And there was a discussion with respect to this issue

9    at the last conference.  At that conference you said it would

10   take more than a couple of days because your client didn't work

11   on the weekend.  Now we're several weeks down the road and

12   presumably, particularly because you're in the process of

13   working with the client on the motion to dismiss, which will

14   have to go into what the circumstances of these searches were,

15   presumably there is some inquiry into what the policies and

16   practices were that govern these searches and it goes beyond

17   simply to instructions to people that they are to comply with

18   the Fourth Amendment.  True?

19         MR. CARGO:  That's true.  Again, you're talking about

20   an enormous agency here, and we are just starting to pull all

21   this information together.  Keep in mind that we didn't receive

22   the motion for expedited discovery until last week and had no

23   reason to believe that that was on the horizon.  So we are

24   doing everything as quickly as we can, but we do not understand

25   the universe of documents.

1          THE COURT:  Come again?

2          MR. CARGO:  I say we don't yet fully understand the

3    universe of documents out there.

4          THE COURT:  OK.  Ms. Wolstein.

5          MS. WOLSTEIN:  Your Honor, it would be one thing if

6    the plaintiffs had made a proper, narrowly tailored motion for

7    policies and practices.  I think we recognize that that is at

8    least relevant to the injunctive claim, although without a

9    motion for a preliminary injunction we are somewhat hampered in

10   knowing exactly what injunctive relief they are seeking.

11         The fact is the Court is doing the plaintiffs a great

12   service in pointing out that what is really relevant and the

13   discovery that is arguably relevant is the policies and

14   practices.  But that's not what they sought.  They made

15   enormously wide-ranging, comprehensive requests.  I think it is

16   important for the Court to see what those requests are, but

17   I'll defer that to pick up on what is obviously the Court's

18   interest in the policies and practices.

19         We can agree to confer among ourselves and to confer

20   with our client to see whether there is some narrow universe of

21   written documents that would speak to policies that are at

22   issue here, again subject to any privilege that might apply.  I

23   know from experience in other cases that often policy manuals

24   are produced with redactions for law enforcement privilege, and

25   I would imagine that that might be the case here.  So if that

1    would assist the Court, we could agree to confer about that.

2         Again, the plaintiffs have not merely sought policies

3    and practices.  They have submitted requests that go to every

4    aspect of their requests for relief, both claims, the

5    injunctive claim, the Bivins claim, some requests that are not

6    relevant to either claim.

7         I would direct the Court that document requests number

8    11 through 14 are all addressed to enforcement activities

9    undertaken in the past.  Numbers 12 and 13 seek comprehensive

10   information about eight of the nine home searches alleged in

11   the complaint, including the names of ICE officers present

12   during the raids, the names of aliens sought at each location,

13   the documents agents relied on in selecting the location for a

14   search, the reasons for entering each residence, how the

15   officers identifies themselves, and the name of everyone

16   arrested.

17        This information certainly may bear on the Bivins

18   claims and would help the plaintiffs identify the John Doe

19   defendants, but really has nothing to do with their --

20        THE COURT:  Don't you have an obligation to identify

21   the John Doe defendants in any event?

22        MS. WOLSTEIN:  Maybe, but not in a request for

23   expedited discovery.

24        THE COURT:  I know that.

25        MS. WOLSTEIN:  I don't even know.  If we are asked, we

1    may have an obligation, I would agree with that.

2          Request number 14 actually seeks comprehensive

3    documents relating to home searches that occurred during

4    certain weeks in February, March, and September that are not

5    even at issue in the case.

6          Number 11 astonishingly seeks all summary enforcement

7    activity reports generated by any ICE office.  It's not limited

8    to the enforcement activities at issue in the case, it's not

9    limited by date, it's not limited to the conduct of the New

10   York office, it's not limited to the New York operations at

11   issue.

12         So these are requests that are vastly overbroad and

13   would certainly be objectionable on the grounds of overbreadth

14   in the course of normal discovery.

15         I could go on.  Requests 9 and 10 are similar.

16   Request number 7 asks for an OIG report that plaintiffs have in

17   their possession and attached to their amended complaint.

18         THE COURT:  Is a list of fugitive alien leads,

19   including hot leads, a matter that is discoverable?

20         MS. WOLSTEIN:  I would find it hard to imagine that

21   that is subject to discovery but rather would be privileged

22   under the law enforcement privilege.  To give up a list of your

23   targets and your leads would be quite an interference with

24   enforcement operations.

25         Even the requests for policies, even those requests

1    ask for policies and guidelines that cover the entirety of

2    ICE's enforcement efforts, if you look at request number 1, not

3    just the home searches.  Request number 2 calls for policies,

4    including policies that are not even in effect.

5              The interrogatories, as the Court pointed out, three

6    of them on their face fail to comply with Local Rule 33.3.  Of

7    the remaining six, four of them go against the Bivins claims,

8    the names of the officers who participated in the past.

9              The remaining two, I guess numbers 3 and 4, go to the

10   policies.  But again, as Mr. Cargo pointed out, the policies

11   alone are not enough under Lyons to show what they need to show

12   to obtain preliminary relief.  They have to show that they are

13   likely to be subject to future unconstitutional conduct also.

14             THE COURT:  But they say in response to that that they

15   are, some of them, currently undergoing the effects of the

16   alleged unconstitutional search because they are undocumented

17   aliens who have been identified in the course of the search.

18             MS. WOLSTEIN:  That is not an ongoing constitutional

19   violation.  There is no right to not be put in proceedings when

20   ICE believes there is a basis to believe you are an alien.

21   That's not an ongoing constitutional effect.  It's an ongoing

22   effect; it's in no way unconstitutional.  In that way the case

23   is quite different from Deshawn, as the Court has previously

24   recognized.

25             I just would point out on the depositions, there were

1    four deposition notices attached.  The 30(b)(6) notice is

2    improper on its face in failing to specify the topics for the

3    deposition, much less doing so with reasonable particularity,

4    as the rule requires.

5           Then there are deposition notices as to the three

6    Bivins defendants which presumably, if they served a proper

7    30(b)(6) notice, they would ask for someone who could speak to

8    the policies and practices.  In that case the Bivins

9    defendants' depositions would be entirely cumulative, as the

10   only arguably relevant things to be covered would be the

11   policies and practices.

12          I go through all this because the vast overbreadth of

13   these requests really shows that the requests for expedited

14   discovery is not a good-faith attempt to obtain a narrow field

15   of information to support a contemplated unspecified

16   preliminary injunction motion but is an effort to obtain early

17   discovery, which of course every plaintiff would like to do, in

18   the face of two realities.

19          One is the fact that they have no irreparable harm, as

20   the Court has concluded, and they cannot show any irreparable

21   harm, which is why they haven't sought a preliminary

22   injunction.  The second reality is that the government's motion

23   to dismiss, if it were successful, would do away with the need

24   for any discovery on the injunction claim because it would

25   knock out that claim.

7amraguo

 1          THE COURT:  The discovery would be quite similar with

 2    respect to these plaintiffs on the Bivins claims.

 3          MS. WOLSTEIN:  Yes, some of the discovery would.  But

 4    they can get their Bivins discovery in the course --

 5          THE COURT:  It wouldn't knock out the need for all of

 6    this discovery.  It may defer the discovery.  And

 7    realistically, the way in which people deal, as you all know,

 8    with document requests and interrogatories is people sit down

 9    and negotiate the scope.  Sometimes they file objections first,

10    then they negotiate the scope, and only after they have

11    finished their negotiations, if they are unsuccessful, do they

12    come to the court.

13          So it is plainly right that simply filing all of these

14    discovery requests is not the end of the road.  It's the

15    beginning of the road as to what discovery should be allowed

16    and when it should be allowed.

17          MS. WOLSTEIN:  Understood, your Honor.  I think

18    perhaps if we had been faced with a request, even an oral

19    request, saying listen, this is what we need, we need the

20    policies, it might have unfolded quite differently.  But

21    instead we are hit with an incredibly wide-ranging request on

22    an order to show cause.

23          THE COURT:  But you haven't responded to the order to

24    show cause yet.  I've put over the response.  I said I try and

25    call the parties in and set the schedule.  Sometimes an order

1   to show cause is able to be resolved by calling the parties in

2   and it saves the parties time, effort, expense.

3           One way of resolving the order to show cause for

4   expedited discovery, which may not be satisfactory to either

5   side, is the government would agree to provide any policies,

6   practices, procedures, guidelines that apply to the searches at

7   issue in the complaint by a reasonably soon deadline.  The

8   parties can negotiate out what the precise terms of those

9   documents would be, presumably in good faith.

10          If it resolves the whole motion for expedited

11  discovery, the order to show cause for expedited discovery,

12  that's fine, and discovery will proceed in the normal course

13  because there is no motion to dismiss and won't be a motion to

14  dismiss, at the very least, the individual claims by these

15  plaintiffs, the Bivins claims with respect to the allegations

16  that the searches against them were unconstitutional, and

17  leaves open the fact that the defendants intend to make a

18  partial motion to dismiss with respect to equitable relief.  If

19  the plaintiffs want to press requests for further discovery,

20  they can ask for further discovery, and they can do that in due

21  course.

22          As I say, I don't know if that is agreeable to either

23  side.

24          MS. WOLSTEIN:  I think we'd need to confer about it,

25  and we could do so in short order.  So if we could have a short

1    time to confer, including with the client.

2            One of the issues with requests like this is that the

3    privilege review is not de minimis.  I think there are a couple

4    of layers within the agency of review.  I don't know the

5    precise scope, but I know it is not de minimis.  It is not just

6    us reviewing those documents for privilege.  Often the way

7    these agencies work is that they send to it the people that

8    review FOIA requests, FOIA requests for production.

9            THE COURT:  Has there been any FOIA request here?

10   Yes?

11           MR. GENNARDO:  Yes, there is, your Honor.  We made

12   FOIA requests way back when to obtain whatever warrants were

13   used when approaching the Aguilar-Leon home.  We did that back

14   in July.  We have gotten nothing but the run-around on that

15   FOIA request for the last three and a half, four months.  So we

16   have not viewed FOIA as a particularly effective way of getting

17   information in this case out of the government.  It gets sent

18   from one group to another group to another group to another

19   group.

20           THE COURT:  The Aguilar search was in the first series

21   of searches?

22           MR. GENNARDO:  Yes.

23           THE COURT:  There was no warrant for them on the first

24   series of searches?

25           MR. MAER:  That's correct.  Let me finish that and

1    address that, because that has to do with what the U.S.

2    attorney has represented.  It's truly a catch-22.  We got a

3    response back to the FOIA request saying we needed permission

4    from the presumed target of this raid, which we don't know for

5    sure but we think it is the ex-husband of our client.  Now, we

6    can't get that permission from him.  Yet that's the only way we

7    can get the warrant that was used to raid our client's home.

8              THE COURT:  I thought with respect to the first set of

9    searches --

10             MR. MAER:  That's the second thing that has not been

11   correct.  No.  They have to get consent for every single one of

12   these raids, every single one.

13             THE COURT:  I know that.

14             MR. MAER:  Even the gang-related ones.  The

15   administrative warrant gives them no entry, no special

16   privilege, to enter the home.  So all of these raids have to be

17   on consent.  There's no two categories here.

18             THE COURT:  I thought that the two sets of searches

19   were according to two separate protocols, if you will.

20             MR. MAER:  No.  There is just one, as far as we know.

21             THE COURT:  I thought that the second set was dealing

22   with alleged gang-related enforcement activities.

23             MR. MAER:  As far as we know, the administrative

24   warrant, which is the only thing that ICE has to operate, is

25   merely to arrest somebody.  It doesn't have any address

1    attached to it, does not give them authority to enter a home.

2        We do have counsel, I believe she is chief counsel,

3    for the U.S. Attorney's office and ICE here.  She may be able

4    to shed light on several of these matters, because we don't

5    know for sure.

6        MS. WOLSTEIN:  Your Honor, I did want to correct that.

7    Evidently, I was not clear.  I think our understanding at this

8    point is that they are all consent searches, but there are two

9    types of enforcement operations.  One targets fugitive aliens,

10   i.e., those under a final order of removal, and one targets

11   gang members who may not be in proceedings yet.

12       THE COURT:  OK.

13       MS. WOLSTEIN:  The FOIA point, exemption 6 of FOIA is

14   the personal privacy exemption.  Without getting too far into

15   it, but it does relate to one of your Honor's questions, of

16   course the agency under FOIA exemption 6 is not permitted to

17   release information that would intrude on personal privacy.

18   It's a balancing test, the privacy interests versus the

19   public's interests.  That is certainly a legitimate response.

20   If they don't like the response, they can bring a FOIA suit and

21   the agency can argue exemption 6, that's why they were

22   withheld.

23       As far as the Court's privacy question, I don't think,

24   obviously, the FOIA exemption would apply here, exemption 6, as

25   an authority to protect the privacy of the witnesses or the

7amraguo

1    people arrested.  The privacy act covers only citizens and

2    lawful permanent residents.  I cannot point to any particular

3    authority that would require the government to withhold that

4    kind of information.

5         I also want to add an important thing that I left out,

6    which is that there are regulations known as Tuohy regulations,

7    which I'm sure the Court has encountered.  ICE and DHS have

8    Tuohy regulations, which govern the responses to requests for

9    information, including information sought in discovery in which

10   the government is the party and that require authorization by a

11   person with authority to permit the requested discovery.  That

12   is not something that I can waive, certainly not without

13   consulting with the client.

14        We would be willing certainly to confer and consult

15   with the client to see if that is something they are willing to

16   do, to identify a narrow field of the policies and guidelines

17   and procedures governing the searches at issue to see if there

18   are portions that are not privileged that can be produced, but

19   we would have to get back to the Court on that.

20        THE COURT:  OK.  Do the plaintiffs have any sort of

21   response to my thoughts with respect to the requests at issue?

22        MR. GENNARDO:  Yes, your Honor.  We would welcome the

23   opportunity to speak with the government.  Certainly the

24   policies and procedures are very important to us.  Also, we

25   would need to be able to depose some of the agents involved,

1    because of course the written policy and the actual in force

2    active policy may differ.   There may be directions given to

3    agents in the field about how they should act that supplement

4    what's in the policy.   In fact, they may be told not to follow

5    that policy but to follow a different policy.

6           We certainly would want to get information about how

7    they actually acted in conducting the raids.   But I think your

8    Honor's suggestion is as eminently reasonable and practical and

9    smart an approach to this, and we would certainly be willing to

10   take that tack at this point.

11          THE COURT:   There is an issue with respect to

12   depositions prior to the motion to dismiss of the individual

13   agents, some of whom are not even named and the government

14   doesn't necessarily have authority to represent them.   You want

15   their depositions taken, and they are going to be defendants in

16   the case.

17          They are not subject to the motion to dismiss.   The

18   government doesn't yet represent them, so they are

19   unrepresented.   You want this done quickly because it's going

20   to relate to the motion to dismiss and the existence of

21   policies or practices.   It is not clear to me that that is

22   something that can easily be done.

23          Also, it is useful to remember what standards the

24   Court has to apply on a motion to dismiss.   To the extent that

25   there is discovery that's necessary, another way is to focus on

1   what's at issue on the motion to dismiss after a motion to

2   dismiss is filed, presumably, as I'm told, supported by

3   affidavits to see who the affiants are and determine whether

4   there is discovery necessary from those.

5          Again, I don't decide anything until it is briefed on

6   the facts and the law.  There are practical problems in timing

7   and questions of whether that is necessary for the decisions on

8   the motion to dismiss or for any prospective application for

9   preliminary injunction.

10         By making these suggestions, I don't mean to ask

11  either side to compromise their position or give up what they

12  think they are entitled to.

13         MR. GENNARDO:  Thank you.

14         THE COURT:  So you're going to get back to me on

15  whether the parties have reached any agreement with respect to

16  scope of immediate discovery and how you're going to accomplish

17  that.  If you don't reach an agreement, then I'll set a

18  response time for the motion for expedited discovery.  The

19  government in any event is going to be making a motion to

20  dismiss by November 16th.

21         MR. GENNARDO:  Thank you, your Honor.  Could I make

22  one quick correction?

23         THE COURT:  Sure.

24         MR. GENNARDO:  It may be because of something I said

25  last time.  We haven't conceded here that any of our clients

1  are undocumented.   They are being accused of being

2  undocumented.

3         THE COURT:  I think you made that point to me last

4  time also.

5         MR. GENNARDO:  I just wanted to be sure.  Maybe I

6  misunderstood something your Honor said a little earlier.  I

7  wanted to be sure we are operating under the same understanding

8  there.

9         THE COURT:  Accused of being undocumented.  I

10  understand that you haven't conceded that they are in fact

11  undocumented.

12         MR. GENNARDO:  Thank you, your Honor.

13         THE COURT:  Anything else?

14         MS. WOLSTEIN:  Could we have just a minute to confer,

15  your Honor, as to whether there is anything else?

16         THE COURT:  Sure.  You can confer with each other,

17  too.

18         MS. WOLSTEIN:  Nothing further from us.  Thank you,

19  your Honor.

20         THE COURT:  I'll wait to hear from you all.

21         (Adjourned)

22

23

24

25