UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ADRIANA AGUILAR, ANDRES LEON, ELENA LEON, ERIKA
GABRIELA GARCIA-LEON through her Next Friend Adriana Aguilar,
CARSON AGUILAR through his Next Friend Adriana Aguilar,
NELLY AMAYA, MARIO PATZAN DeLEON, DAVID LAZARO
PEREZ, WILLIAM LAZARO, TARCIS SAPON-DIAZ, SONIA
BONILLA, BEATRIZ VELASQUEZ through her Next Friend Sonia
Bonilla, DALIA VELASQUEZ through her Next Friend Sonia Bonilla,
ELDER BONILLA, DIANA RODRIGUEZ, YONI REVOLORIO,
JUAN JOSE MIJANGOS, GONZALO ESCALANTE, YANET
MARTINEZ, RAUL AMAYA, GLORIA VANESSA AMAYA, JOHN
DOE #1, JANE DOE #1, JOHN DOE #2 through his Next Friend Jane
Doe #1, John Doe #3 through his Next Friend Jane Doe #1, JOHN DOE
#4, and JOHN DOE #5 on behalf of themselves and all others similarly
situated,

Plaintiffs,

- against -

IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION
OF THE UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, MICHAEL CHERTOFF, United States Secretary of
the Department of Homeland Security, JULIE L. MYERS,
Assistant Secretary of Homeland Security for Immigration and
Customs Enforcement, JOHN P. TORRES, Director of the Office
of Detention and Removal Operations, Immigration and Customs
Enforcement, CHRISTOPHER SHANAHAN, New York Field
Office Director for Detention and Removal Operations, PETER J.
SMITH, JOSEPH A. PALMESE, JOHN and JANE DOE ICE
AGENTS, and JOHN ROE and JANE ROE ICE SUPERVISORS,

Defendants.

---

ECF Case
07 Civ. 8224 (JGK) (FM)

**MEMORANDUM OF LAW
IN SUPPORT OF
THE GOVERNMENT'S
MOTION TO DISMISS
THE FIRST CLAIM OF THE
AMENDED COMPLAINT
AND FOR A LIMITED
STAY OF DISCOVERY**

MICHAEL J. GARCIA
United States Attorney for the
Southern District of New York
Attorney for Defendants
86 Chambers Street
New York, New York 10007

SHANE CARGO
ELIZABETH WOLSTEIN
Assistant United States Attorneys

– Of Counsel –

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND...............................................4

    A.    ICE Organization and Responsibilities....................................................4

    B.    Statutory Powers of ICE Agents .............................................................5

        1.    Powers to Arrest Without a Warrant................................................5

        2.    Powers to Execute Administrative Warrants ..................................6

    C.    The Enforcement Operations Alleged in the Complaint...........................6

        1.    Operation Return to Sender .............................................................6

        2.    Operation Cross Check .....................................................................9

        3.    Operation Community Shield and Operation Surge ......................10

    D.    ICE Policies Governing Home Searches ................................................12

        1.    Policies Applicable to Operation Return to Sender
            and Operation Cross Check .........................................................12

        2.    Policies Applicable to Operation Surge.........................................13

    E.    The Allegations of the Complaint and Plaintiffs' Claims for Relief ......15

        1.    Factual Allegations ........................................................................15

            (a)    The February, March, and April 2007 Operations.........................15

            (b)    The September 2007 Operations....................................................17

        2.    Claims for Relief...........................................................................19

    F.    Procedural History ................................................................................20

ARGUMENT ......................................................................................................22

    POINT I.  PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF SHOULD BE
    DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION ..........................22

        A.     The Standard for Dismissal Under Federal Rule of
               Civil Procedure 12(b)(1) ........................................................................22

        B.     The Constitutional Requirement of Standing ........................................23

               1.     General Requirements.................................................................23

               2.     The Supreme Court's *Lyons* Decision
                      and its Second Circuit Progeny.................................................25

               3.     Under *Lyons* and its Second Circuit Progeny, Plaintiffs Lack
                      Standing to Obtain Prospective Injunctive Relief......................32

    POINT II.  PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF
    SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM ..............................36

        A.     Applicable Legal Standards ....................................................................36

               1.     Motion to Dismiss.....................................................................36

                2.     Permanent Injunction ...............................................................37

        B.     The Complaint Fails to Allege Irreparable Harm and Plaintiffs
               Will Be Unable to Succeed on the Merits Because They Lack
                Standing to Seek Injunctive Relief .......................................................39

    POINT III.  THIS COURT SHOULD GRANT A LIMITED STAY OF
    DISCOVERY PENDING RESOLUTION OF THE GOVERNMENT'S
    PARTIAL MOTION TO DISMISS...............................................................................44

        A.     Applicable Legal Standards ....................................................................44

        B.     There is Good Cause for Granting a Limited
               Stay of Discovery...................................................................................45

CONCLUSION...................................................................................................47

# TABLE OF AUTHORITIES

**Cases:**                                                                                                page

*Allen v. Wright*, 468 U.S. 737 (1984) ....................................................................24

*Am. Booksellers Ass'n v. Houghton Mifflin Co.*, No. 94 Civ. 8566 (JFK),
    1995 WL 72376 (S.D.N.Y. Feb. 22, 1995)................................................45

*Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531 (1987).................................44

*Batista v. City of New York*, No. 05 Civ. 8444 (KMK),
    2007 WL 2822211 (S.D.N.Y. Sept. 25, 2007) ........................................42

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .............................. 36-37, 39

*Bell v. Hood*, 327 U.S. 678 (1946)..........................................................................23

*Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*,
    403 U.S. 388 (1971)............................................................................ *passim*

*Chesney v. Valley Stream Union Free Sch. Dist.*, 236 F.R.D. 113 (E.D.N.Y. 2006) ...................45

*Chrysler Capital Corp. v. Century Power Corp.*, 137 F.R.D. 209 (S.D.N.Y. 1991)...................46

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ................................................ *passim*

*Conley v. Gibson*, 355 U.S. 41 (1957) ....................................................................36

*Covino v. Patrissi*, 967 F.2d 73 (2d Cir. 1992)........................................................40

*In re Currency Conversion Fee Antitrust Litig.*, No. MDL 1409,
    2002 WL 88278 (S.D.N.Y. Jan. 22, 2002) ............................................46

*Curtis v. City of New Haven*, 726 F.2d 65 (2d Cir. 1984) ....................................27, 34

*De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65 (2d Cir. 1996)....................................37

*DeShawn E. v. Safir*, 156 F.3d 340 (2d Cir. 1998) ............................................. *passim*

*Doe v. Blum*, 729 F.2d 186 (2d Cir. 1984)..............................................................25

*Doe v. Bridgeport Police Dep't*, 198 F.R.D. 325 (D. Conn. 2001) ........................ 40-41

*Dolori Fabrics, Inc. v. The Limited, Inc.*, 662 F. Supp. 1347 (S.D.N.Y. 1987) ...........38

*First Capital Asset Mgmt, Inc. v. Brickellbush, Inc.*,
    218 F. Supp. 2d 369 (S.D.N.Y. 2002) ...............................................................32

*Gamble v. City of New York*, No. 06 Civ. 4849 (JSR),
    2007 WL 2847221 (S.D.N.Y. Sept. 28, 2007) ..................................................37

*General Ins. Co. of America v. Mezzacappa Bros., Inc.*,
    No. 01-CV-7394, 2003 WL 22244964 (E.D.N.Y. Oct. 1, 2003) ..........................41

*Helios & Matheson North Am., Inc. v. Vegasoft Oy*, No. 07 Civ. 3600 (PAC),
    2007 WL 1541204 (S.D.N.Y. May 24, 2007) ....................................................43

*Iouri v. Ashcroft*, 487 F.3d 76 (2d Cir. 2007) ................................................................6

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) ........................................................37, 42

*JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75 (2d Cir. 1990) ......................38, 40

*Johnson v. New York Univ. Sch. of Educ.*, 205 F.R.D. 433 (S.D.N.Y. 2002)..............45

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ........................................................39, 40

*Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006 (2d Cir. 1986) .....................................23

*Luckett v. Bure*, 290 F.3d 493 (2d Cir. 2002) ......................................................22, 23

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .......................................23, 24, 31

*Makarova v. United States*, 201 F.3d 110 (2d Cir. 2000)......................................22, 23

*Malik v. Meissner*, 82 F.3d 560 (2d Cir. 1996)............................................................23

*Mansfield, C. & L.M.R. Co. v. Swan*, 111 U.S. 379 (1884)..........................................23

*Melnitzky v. HSBC*, No. 06 Civ. 13526 (JGK),
    2007 WL 195239 (S.D.N.Y. Jan. 24, 2007) ....................................................37

*Miller v. Silbermann*, 951 F. Supp. 485 (S.D.N.Y. 1997) ...........................................25

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984)........................................................40

*Nash v. City Univ. of New York*, No. 02 Civ. 8323 (GBD),
    2003 WL 21135720 (S.D.N.Y. May 16, 2003) ................................................32

*Nicacio v. INS*, 768 F.2d 1133 (9th Cir. 1985), *amended*, 797 F.2d 700 (9th Cir. 1985)..............29

*O'Shea v. Littleton*, 414 U.S. 488 (1974) .............................................................................25, 38

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
      -- F.3d --, 2007 WL 3071637 (2d Cir. Oct. 23, 2007) ......................................37, 42

*Rizzo v. Goode*, 423 U.S. 362 (1976).......................................................................................38

*Roach v. Morse*, 440 F.3d 53 (2d Cir. 2006) ...........................................................................37

*Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999) ..............................................................38

*Shain v. Ellison*, 356 F.3d 211 (2d Cir. 2004) .................................................................. *passim*

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)..............................................25

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).......................................................................43

*Spencer Trask Software v. Rpost Int'l Ltd.*, 206 F.R.D. 367 (S.D.N.Y. 2002) ...................44-45

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)....................................................23

*Tom Doherty Assocs., Inc. v. Saban Entmt.*, 60 F.3d 27 (2d Cir. 1995)...................................37

*United States Trust Co. v. Shapiro*, 835 F.2d 1007 (2d Cir. 1987)...........................................41

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................................24-25

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ...............................................................22, 23, 31

*Wilkie v. Robbins*, 127 S. Ct. 2588 (2007)...............................................................................43

## Federal Statutes, Rules, and Regulations:

8 U.S.C. § 1357.................................................................................................... *passim*

8 C.F.R. § 239.1 ..........................................................................................................6

8 C.F.R. § 241.2(a).......................................................................................................6

8 C.F.R. § 287.3 ..........................................................................................................6

8 C.F.R. § 287.5(c)(1) ..............................................................................................5-6

8 C.F.R. § 287.8 ..........................................................................................................5

8 C.F.R. § 287.9(b) ......................................................................................................5

8 C.F.R. § 1003.14 .................................................................................................................6

8 C.F.R. § 1003.15 .................................................................................................................6

68 Fed. Reg. 35273, 2003 WL 21358855 (June 13, 2003) ....................................................5

Fed. R. Civ. P. 12(b)(1) ...................................................................................................1, 2, 4

Fed. R. Civ. P. 12(b)(6) ................................................................................................. passim

Fed. R. Civ. P. 26(c) .............................................................................................................44

The Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002) ......................4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIANA AGUILAR, ANDRES LEON, ELENA LEON, ERIKA GABRIELA GARCIA-LEON through her Next Friend Adriana Aguilar, CARSON AGUILAR through his Next Friend Adriana Aguilar, NELLY AMAYA, MARIO PATZAN DeLEON, DAVID LAZARO PEREZ, WILLIAM LAZARO, TARCIS SAPON-DIAZ, SONIA BONILLA, BEATRIZ VELASQUEZ through her Next Friend Sonia Bonilla, DALIA VELASQUEZ through her Next Friend Sonia Bonilla, ELDER BONILLA, DIANA RODRIGUEZ, YONI REVOLORIO, JUAN JOSE MIJANGOS, GONZALO ESCALANTE, YANET MARTINEZ, RAUL AMAYA, GLORIA VANESSA AMAYA, JOHN DOE #1, JANE DOE #1, JOHN DOE #2 through his Next Friend Jane Doe #1, John Doe #3 through his Next Friend Jane Doe #1, JOHN DOE #4, and JOHN DOE #5 on behalf of themselves and all others similarly situated, | **ECF Case**<br>**07 Civ. 8224 (JGK) (FM)** |
| Plaintiffs, | |
| - against - | |
| IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, MICHAEL CHERTOFF, United States Secretary of the Department of Homeland Security, JULIE L. MYERS, Assistant Secretary of Homeland Security for Immigration and Customs Enforcement, JOHN P. TORRES, Director of the Office of Detention and Removal Operations, Immigration and Customs Enforcement, CHRISTOPHER SHANAHAN, New York Field Office Director for Detention and Removal Operations, PETER J. SMITH, JOSEPH A. PALMESE, JOHN and JANE DOE ICE AGENTS, and JOHN ROE and JANE ROE ICE SUPERVISORS, | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT
## OF THE GOVERNMENT'S MOTION TO
## DISMISS THE FIRST CLAIM OF THE AMENDED
## COMPLAINT AND FOR A LIMITED STAY OF DISCOVERY

### Preliminary Statement

This action arises from the efforts of defendant Immigration and Customs Enforcement

("ICE") to remove illegal aliens from the United States — in particular, aliens who have

committed crimes and those who have disregarded orders of removal.  Under national

enforcement initiatives developed by ICE headquarters, two of ICE's New York regional offices

1

planned and executed operations to apprehend targeted aliens by obtaining consent to enter

residences where agents believed the aliens would be found.  Under the Immigration and

Nationality Act (the "INA"), ICE agents may arrest without a warrant any person whom they

have reason to believe is in the country illegally, be it the target of an enforcement operation or

someone they encounter while searching for the target.

Plaintiffs contend that in nine incidents arising from these enforcement initiatives, ICE

agents entered their residences without consent or other legal justification in violation of the

Fourth Amendment.  On behalf of the named plaintiffs and a proposed class, the complaint seeks

a declaration that ICE has engaged in unconstitutional conduct and an injunction prohibiting it

"from engaging in the unlawful and abusive practices alleged herein."  Amended Complaint,

dated October 4, 2007 (the "complaint" or "Cmplt.") ¶ 335.  The complaint also seeks, on behalf

of the named plaintiffs only, damages against three individual-capacity ICE agents, Doe ICE

agents, and Roe ICE supervisors.

For two reasons, this Court should dismiss plaintiffs' claim for injunctive relief.  First,

because plaintiffs lack standing to obtain prospective injunctive relief, this Court is without

subject matter jurisdiction, and the injunction claim should be dismissed under Fed. R. Civ.

P. 12(b)(1).  In City of Los Angeles v. Lyons, 461 U.S. 95 (1983), the Supreme Court stated that

"[a]bstract injury is not enough" to obtain injunctive relief, and that even where a constitutional

violation has occurred in the past, for a plaintiff to have standing, the threat of a recurrence must

be "real and immediate," not "conjectural or hypothetical."  Id. at 101-02 (citations and internal

quotations marks omitted).  A plaintiff's fear that unconstitutional conduct will be repeated is on

its own insufficient to establish the requisite likelihood of future injury.  In applying Lyons, the

Second Circuit has recognized that to establish standing to enjoin law enforcement practices, a

plaintiff must satisfy a dual burden:  he "must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent."  Shain v. Ellison, 356 F.3d 211, 216 (2d Cir. 2004) (emphasis in original).

Plaintiffs cannot meet either requirement.  Plaintiffs admit that ICE agents have not returned to any of their homes since the incidents alleged in the complaint.  Nor have they made any factual allegations suggesting that agents are likely to return.  Thus, plaintiffs' alleged fear of a future unconstitutional encounter is no less speculative than the plaintiff's claim in Lyons.  Moreover, ICE's official policy requires agents to obtain consent to enter homes in the absence of a search warrant.  In light of ICE's declarations accompanying this motion — which explain that agents must obtain consent to enter through consensual "knock-and-talk" conversations — plaintiffs cannot plausibly assert that ICE has an official policy of authorizing or requiring its agents to act in violation of the Fourth Amendment.

Second, for largely the same reasons plaintiffs lack standing, they cannot state a claim for injunctive relief.  As in Lyons, plaintiffs have not demonstrated that the threat of injury is likely, rather than merely speculative.  Furthermore, given that a Bivens claim for damages is available to remedy any future Fourth Amendment violation by ICE agents, plaintiffs cannot demonstrate that they will be irreparably harmed absent a permanent injunction.

Finally, this Court should grant a limited stay of discovery pending resolution of the partial motion to dismiss.  The requested stay — which is limited to certain depositions and interrogatories — would not hinder plaintiffs' ability to proceed with discovery on their Bivens claims, and it would relieve ICE and the official-capacity defendants of the burden of submitting to non-document discovery relating to a claim that may not survive.

## FACTUAL AND PROCEDURAL BACKGROUND

**A.    ICE Organization and Responsibilities**

ICE is the largest investigative bureau in the United States Department of Homeland Security ("DHS") and the second largest investigative agency in the federal government.  See Declaration of Darren Williams, dated December 5, 2007 ("Williams Decl.") ¶ 3.  ICE's mission is to protect the United States by targeting the people, money, and materials that support terrorist and criminal activities and by enforcing federal immigration law.  Id.  Following enactment of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), which created DHS, ICE was created from elements of several legacy agencies, including the former U.S. Customs Service ("USCS") and the former Immigration and Naturalization Service ("INS").  Id.  ICE has more than 15,000 employees located in the United States and around the world.  Id.

ICE consists of four law enforcement divisions, including, as relevant here, the Office of Investigations ("OI") and the Office of Detention and Removal Operations ("DRO").  Id. ¶ 4.  DRO promotes public safety and national security by seeking to apprehend and remove all aliens who are unlawfully present in the United States.  Id.

OI, the criminal investigative division within ICE, investigates a wide range of domestic and international activities arising from the illegal movement of people and goods into, within, and out of the United States.  See Declaration of Jeffrey Knopf, dated December 7, 2007 ("Knopf Decl.") ¶ 3.  OI investigations cover national security threats, financial and smuggling violations, financial crimes, commercial fraud, human trafficking, narcotics smuggling, child pornography and exploitation, immigration fraud, and other immigration violations.  Id.

4

**B.    Statutory Powers of ICE Agents**

**1.    Powers to Arrest Without a Warrant**

Section 287 of the INA, 8 U.S.C. § 1357, authorizes certain categories of ICE employees

to undertake specified enforcement-related actions without a warrant.  Section 1357(a)(2)

empowers any authorized agent, without a warrant, "to arrest any alien in the United States[] if

he believes that the alien so arrested is in the United States in violation of any such law or

regulation [relating to the admission, exclusion, expulsion, or removal of aliens] and is likely to

escape before a warrant can be obtained for his arrest."  8 U.S.C. § 1357(a)(2).

Regulations prescribed by the Attorney General permit certain employees, including

deportation officers, special agents, and immigration enforcement agents to make the warrantless

arrests authorized in section 1357(a)(2), provided that they have successfully completed basic

immigration law enforcement training.  <u>See</u> 8 C.F.R. § 287.5(c)(1).[1]  These employees are also

authorized by statute and regulation to carry firearms and to employ deadly and non-deadly force

in conducting enforcement activities.  <u>See</u> 8 C.F.R. §§ 287.8(a)(1), (a)(2); 8 U.S.C. § 1357(a)

(authorizing DHS officers to carry firearms pursuant to regulations issued by the Attorney

General); 8 C.F.R. § 287.9(b) (permitting immigration officers, as defined in 8 C.F.R. § 103.1(b)

to carry firearms approved by DHS).

An alien arrested without a warrant under section 1357(a)(2) must be examined by an

immigration officer to determine whether "there is prima facie evidence that the arrested alien

was entering, attempting to enter, or is present in the United States in violation of the

-----

[1] The Homeland Security Act provided that references "relating to" the INS in "statutes, regulations, directives, or delegations of authority shall be deemed to refer to the appropriate official" of DHS.  68 Fed. Reg. 35273, 2003 WL 21358855 (June 13, 2003) (final rule conforming text of Title 8 of Code of Federal Regulations to governmental structures established in Homeland Security Act and DHS reorganization plan).

immigration laws."  8 C.F.R. §§ 287.3(a), (b).  If such evidence exists, the examining officer

refers the case to an immigration judge by issuing a "Notice to Appear," which charges the alien

with being in the United States in violation of the INA.  See 8 C.F.R. §§ 239.1, 1003.15.  The

filing of a Notice to Appear (or other charging document) with the Immigration Court vests that

Court with jurisdiction and initiates removal proceedings against the alien.  See 8 C.F.R.

§ 1003.14.

### 2.    Powers to Execute Administrative Warrants

Once an alien is subject to a final removal order, certain ICE officials authorized by

regulation may issue a warrant of removal.  See 8 C.F.R. § 241.2(a); Iouri v. Ashcroft, 487 F.3d

76, 85 (2d Cir. 2007) ("When an alien is ordered deported, a warrant by the INS District Director

is issued authorizing the officer to take the alien into custody and deport him or her.").  A

warrant of removal may be executed by certain employees, including special agents and

deportation officers, provided that they have successfully completed basic immigration law

enforcement training.  See 8 C.F.R. § 287.5(c)(1).

### C.    The Enforcement Operations Alleged in the Complaint

Plaintiffs complain that ICE agents violated their Fourth Amendment rights during nine

home "raids" in February, March, April, and September 2007.  See Cmplt. ¶¶ 97-302.  The

February, March, and April 2007 incidents involved DRO agents carrying out national

enforcement operations known as Operation Return to Sender and Operation Cross Check.  See

Williams Decl. ¶ 5.  The September 2007 home entries involved OI agents executing a national

enforcement initiative known as Operation Community Shield.  See Knopf Decl. ¶ 4.

### 1.    Operation Return to Sender

Operation Return to Sender is a national initiative aimed at apprehending criminal and

non-criminal fugitive aliens.  See Williams Decl. ¶ 6.  Fugitive aliens are aliens who have been

ordered removed from the United States in immigration proceedings but have failed to depart.
Id.  Operation Return to Sender had its genesis in the USA PATRIOT Act, passed in October
2001 in response to the September 11, 2001 terrorist attacks.  Id.  Using funding provided by
Congress in that statute, the INS created eight dedicated fugitive operations teams and designated
seven cities for the initial operations.  Id.  Newark, Detroit, Chicago, Miami, Los Angeles, and
San Francisco each received one team.  Id.  New York received two teams.  Id.

      In 2002, the INS established the National Fugitive Operations Program, an enforcement
initiative the purpose of which was to identify, locate, apprehend, and remove fugitive aliens
from the United States.  Id. ¶ 7.  When the INS was abolished, DRO was transferred to ICE, and
it maintains responsibility for implementing the National Fugitive Operations Program.  Id.

      DRO's New York Field Office, with the approval of DRO Headquarters, developed local
operational plans, targeting criminal fugitive aliens, to implement Operation Return to Sender.
Id. ¶ 8.  From February 12 through March 9, 2007, and from March 19 through April 13, 2007,
Operation Return to Sender was implemented within the five boroughs of New York City,
Nassau and Suffolk Counties on Long Island, and the five northern counties in the New York
Field Office's area of responsibility, Putnam, Dutchess, Westchester, Orange, and Rockland.
Id. ¶ 8.  The national operation for Return to Sender is ongoing.  Id.

      Fugitive aliens can be difficult to locate because they typically try to avoid detection and
because identifying documents, such as drivers' licenses, utility bills, credit card statements,
phone bills, and voter registration rolls, may not exist for them.  Id. ¶ 9.  Many fugitives have
simply vanished since being ordered to leave the country.  Id.

      DRO's New York Field Office maintains files on fugitive aliens.  Id. ¶ 10.  For Operation
Return to Sender and Operation Cross Check, DRO officers developed a list of targets, and chose

the residences they would approach based on where the officers believed they were most likely

to locate the targets.  Id.  Once the targeted residences were identified, teams of deportation

officers, along with support personnel, were to approach the residences and conduct a "knock-

and-talk," a conversation in which the officers would ask for consent to enter the residence.  Id.

   Under DRO practice, a knock-and-talk is typically conducted in the following manner.

Officers are to knock on the door and, if someone answers, identify themselves as police or ICE

agents.  Id. ¶ 11.  One of the officers then asks the person who answers the door for consent to

enter.  Id.  If a child answers the door, the officer must ask to speak to his or her mother or father

and must obtain consent to enter from a parent or an adult who has the legal ability to give

consent to enter.  Id.  Once consent is given, officers inquire concerning the whereabouts of the

target.  Id.  If they wish to search any part of the premises, the officers are required to obtain

consent to search, and they must abide by the scope of the consent.  Id.  DRO officers have been

instructed that consent to remain in the house can be revoked at any time, for any reason.  Id.  If,

in the course of searching for the targeted fugitives, officers encounter other aliens whom they

have reason to believe are in the United States illegally, they can arrest those aliens without a

warrant and transport them to an examining immigration officer under the authority of

section 287(a)(2) of the INA.  Id.

   Any alien arrested during a home entry was to be transported to 26 Federal Plaza in

Manhattan for processing.  Id. at ¶ 12.  Any fugitive aliens were to be processed for removal

from the United States.  Id.  The non-fugitives were to be placed in removal proceedings.  Id.

   DRO arrested 213 aliens from 16 countries in the February-March operation and 170

aliens from 25 countries in the March-April operation.  Id. at ¶ 13 (listing countries).  Not all of

those arrested were fugitive aliens.  Id.  The non-fugitive aliens who were arrested included

criminal and non-criminal illegal aliens who had not been placed in removal proceedings, but had no lawful basis for remaining in the United States.[2] Id.

### 2. Operation Cross Check

Operation Cross Check is a national operational umbrella encompassing enforcement efforts that target specific alien populations, such as aliens from certain countries or aliens working in certain industries. Id. ¶ 14. The DRO New York Field Office conducted Operation Cross Check locally from April 16 through April 27, 2007. Id. The objective of the local operation was to locate and arrest criminal aliens, whether or not they were fugitives, residing within the New York Field Office's area of responsibility. Id. Specifically targeted were criminal aliens who had been convicted of violent crimes rendering them subject to removal. Id.

Like Operation Return to Sender, Operation Cross Check was designed to be carried out through knock-and-talk conversations conducted by teams of deportation officers in the manner described above. Id. ¶ 15; see also supra at 8. Anyone arrested was to be taken to 26 Federal Plaza for processing. See Williams Decl. ¶ 15. The fugitives were to be processed for removal, and the non-fugitives were to be placed in removal proceedings. Id. DRO arrested 131 aliens from 28 countries during the New York Field Office's local implementation of Operation Cross Check. Id. ¶ 16 (listing countries). Not all of those arrested were non-fugitive criminal aliens; some were fugitives (criminal and non-criminal), and others were non-criminal illegal aliens whom agents encountered while searching for the targeted aliens. Id.

---

[2] In this context, "criminal alien" refers to (i) an alien who is not lawfully admitted to the United States and has committed any criminal offense in the United States, and (ii) an alien who is lawfully admitted to the United States and has committed a criminal offense in the United States, the commission of which makes the alien subject to removal. Id. ¶ 13.

### 3.     Operation Community Shield and Operation Surge

In February 2005, ICE began Operation Community Shield, a national enforcement initiative that targets gang members for criminal prosecution or removal from the United States. See Knopf Decl. ¶ 5.  Under Operation Community Shield, ICE partners with federal, state, and local law enforcement agencies to investigate targets and carry out enforcement operations.  Id.

Operation Surge was the name given to the 2007 local implementation of Operation Community Shield in Long Island, New York.  Id. at ¶ 6.  The Resident Agent-in-Charge ("RAC") Long Island, a division of the New York SAC Office, executed Operation Surge from September 24 through September 29, 2007, in Nassau and Suffolk counties on Long Island.  Id. ¶¶ 1, 6.  The objective of the operation was to locate and arrest gang members who were subject to removal from the United States.  Id. ¶ 6.  The operation targeted, among other locations, the residences of these gang members.  Id.  The RAC Long Island office obtained administrative warrants of removal for the targeted gang members who were subject to final orders of removal. Id.  Those targets who were not under final orders of removal were to be arrested without a warrant under the authority of section 287(a)(2) of the INA.  Id.

OI special agents worked with state and local police, probation, and corrections departments to identify potential targets for Operation Surge, including members of MS-13 and other gangs.[3] Id. ¶ 7.  Gang members who know they are removable from the United States, as all of the targets were, typically attempt to evade arrest by hiding out or by moving from place to place.  Id.  The gang members on the list were targeted because their criminal histories and immigration status made them subject to removal.  Id.

---

[3] MS-13 began as an El Salvadoran gang but its members now include people from a number of other Central and South American countries.  Id. ¶ 7.

Approximately 160 special agents ("SA") from OI took part in the operation. Id. ¶ 8. Eight teams of ten special agents were to approach targeted residences and conduct "knock-and-talk" conversations. Id. Two law enforcement officials from either Nassau or Suffolk County (depending on the location of the targeted residence) were to accompany each team. Id. Because of the large scope of the operation and small size of the New York SAC Office, ICE agents from other parts of the country were detailed to New York to participate. Id. The operational plan for Surge was developed by the RAC Long Island office and approved by the SAC New York. Id.

Consistent with OI policies and procedures, the knock-and-talk was to be conducted as follows. OI special agents were to knock on the door of a targeted residence and seek consent to enter the home to ask questions and conduct interviews. Id. ¶ 9. If consent was given, the agents were to enter and ask questions regarding the location of the targets. Id. If the agents considered it appropriate under the circumstances, they could request consent to search the premises or a portion thereof. Id. The special agents were not permitted to search portions of the premises other than those for which consent to search had been given. Id. OI agents have been instructed that consent to remain in the house and to search can be revoked at any time. Id. Under OI policy, agents were permitted to conduct a protective sweep while on the premises if they had a reasonable suspicion that the premises harbored a person or persons who posed a danger to the agents. Id. Agents have been instructed that any protective sweep could extend only to areas in which the potentially dangerous persons could be hiding. Id.

If, in the course of searching for the targeted gang members, the special agents encountered other aliens, the agents were permitted to seek the aliens' consent to ask questions regarding their immigration status. Id. ¶ 10. If the agents developed reason to believe that the

aliens they encountered were in the United States illegally, they could arrest them without a

warrant under the authority of section 287(a)(2) of the INA.  Id.  Anyone arrested was to be

transported to 26 Federal Plaza for processing.  Id.  The fugitive aliens, those subject to a final

order of removal, were to be processed for removal from the United States.  Id.  The non-fugitive

illegal aliens were to be placed in removal proceedings.  Id.

OI arrested 195 aliens from nine countries during the New York SAC Office's September

2007 implementation of Operation Surge.  Id. ¶ 11 (listing countries).

**D.    ICE Policies Governing Home Searches**

As explained above, Operation Return to Sender, Operation Cross Check, and Operation

Surge were to be carried out using consensual home entries and searches.  See Williams Decl.

¶¶ 10-11, 15; Knopf Decl. ¶¶ 8-9.  Although they possessed administrative warrants of removal

for the fugitive aliens, DRO officers and OI special agents did not plan to obtain judicial search

warrants for particular residences.  See Williams Decl. ¶ 17; Knopf Decl. ¶ 12.  Several ICE

manuals set forth the policies, procedures, and legal requirements that deportation officers and

special agents were required to follow in seeking consent to enter and search the targeted

residences in each of the three operations.  See Williams Decl. ¶ 17-21; Knopf Decl. ¶ 12-19.

**1.    Policies Applicable to Operation Return to Sender
        and Operation Cross Check**

DRO officers' conduct of consensual home searches is governed by the Detention and

Removal Operations Policy and Procedure Manual (the "DROPPM") (formerly known as the

Detention and Deportation Officer's Field Manual), a manual setting forth policies and

procedures addressed to all aspects of DRO's area of responsibility.  See Williams Decl. ¶ 17.

Chapter 19 of the DROPPM sets forth policies and standard operating procedures governing

DRO's Fugitive Operations Program, including Operation Return to Sender and Operation Cross

Check, and it governs the conduct of deportation officers and other DRO personnel during the execution of these operations. Id.

Chapter 19 of the DROPPM requires DRO officers to obtain informed consent before entering a residence to execute a warrant of removal. Id. ¶ 19. The manual states:

> Warrants of Deportation or Removal are administrative rather than criminal, and do[ ] not grant the authority to breach doors. Thus informed consent must be obtained from the occupant of the residence prior to entering.

See Williams Decl. ¶ 19; see also DROPPM (Williams Decl., Exh. A) at US 000016 and US 000044 (same) (undated addition to manual). The manual emphasizes that, if officers do not have a search warrant, they may enter a residence only after obtaining authorized consent. See Williams Decl. ¶ 21. In a provision addressing "arrest locations," the manual dictates:

> Officers can knock on a door and request to speak with the occupants of the house without first obtaining a search warrant. However, in order to enter a residence, ***someone who has authority to do so must grant informed consent, unless a court-approved search warrant is obtained in advance.***

Id.; see also DROPPM (Williams Decl., Exh. B) at US 000018 (emphasis in original) and US 000047 (same) (undated addition to manual).

### 2.   Policies Applicable to Operation Surge

The policies and procedures set forth in the DROPPM do not apply to OI special agents. Knopf Decl. ¶ 12. Their conduct, as relevant here, was governed by two manuals addressing the law of search and seizure: (i) Chapter 42 of the Special Agent's Handbook, entitled Search and Seizure, and (ii) the Law of Arrest, Search and Seizure Manual, commonly referred to as the M-69. Id. Chapter 42 sets forth mandatory guidelines for searches, and seizures related to searches, that OI special agents must follow in carrying out enforcement operations. Id. The M-69 provides mandatory guidance for certain ICE officers, including OI special agents, concerning

13

the statutory and constitutional boundaries of an officer's authority during arrests, searches, and seizures.  Id.

Although both Chapter 42 and the M-69 refer to their contents as "guidelines," both manuals are mandatory.  Id. ¶ 13.  OI agents must abide by them in implementing enforcement operations, and they are not free to develop informal alternative practices that conflict with the dictates of either manual.  Id.  Since before 2007, Chapter 42 of the Special Agent's Handbook has been available on demand, on ICE's intranet, to OI special agents with appropriate security clearances.  Id.  The M-69 is available on the intranet to all ICE employees through secured access.  Id.

Both Chapter 42 of the Special Agent's Handbook and the M-69 require that agents obtain consent to enter a residence in the absence of a search warrant.  Id. ¶ 14.  Chapter 42 states:

> Voluntary and effective consent to search obviates the need for a warrant or probable cause.  To justify a search without a warrant on this ground, there must be a violitional [*sic*], duress-free permission to enter and make the kind of search agreed to.

Id.; see also SA Handbook (Knopf Decl., Exh. 1) at US 000818.  The chapter explains that "[e]ffective consent to a warrantless search may be given either by the suspect or by any third party who possesses common authority or other sufficient relationship to the premises or effects sought to be inspected."  Knopf Decl. ¶ 15; see also SA Handbook (Knopf Decl., Exh. 1) at US 000819.

Chapter III of the M-69, entitled "Searches and Seizures," likewise informs agents that they may search a residence without a warrant or probable cause only if they obtain the voluntary consent of "the person in control of the premises."  Knopf Decl. ¶ 16; see also M-69 (Knopf Decl., Exh. 2) at US 000747.  The provision further explains that whether consent is voluntary

depends on the totality of the circumstances, and it provides examples from the case law that illustrate factors bearing on whether consent is voluntary.  <u>See</u> Knopf Decl. ¶ 17; <u>see also</u> M-69 (Knopf Decl., Exh. 2) at US 000747-48.  The M-69 instructs agents that consent may only be effectively given "by the person with the primary right to occupy the premises or a third party who possesses common authority over, or other sufficient relationship to, the premises."  <u>See</u> Knopf Decl. ¶ 18; <u>see also</u> M-69 (Knopf Decl., Exh. 2) at US 000748.  Thus, the manual explains, "a landlord or hotel owner may not give valid consent to search the rented premises." <u>Id.</u>  The manual also notes that a "person may revoke his or her consent to search at any time." <u>Id.</u>  The M-69 also states that agents may conduct a protective sweep only if they have "a reasonable suspicion based on specific articulable facts" that the residence "harbors an individual who presents a danger to those on the scene."  Knopf Decl. ¶ 19; <u>see also</u> M-69 (Knopf Decl., Exh. 2) at US 000747.

**E.      The Allegations of the Complaint and Plaintiffs' Claims for Relief**

**1.      Factual Allegations**

The named plaintiffs are Latinos who live in the New York metropolitan area, some of whom are United States citizens, lawful permanent residents or conditional permanent residents of the United States.  <u>See generally</u> Cmplt. ¶¶ 14-30.  The complaint alleges that during nine incidents that occurred between February and September 2007, ICE agents violated plaintiffs' Fourth Amendment rights by entering their residences without warrants or other legal justification.  Plaintiffs claim that the allegedly illegal entries are "part of a broad pattern and practice, if not official policy of ICE."  <u>Id.</u> ¶ 303.

**(a)      The February, March, and April 2007 Operations**

The complaint alleges that on the morning of February 20, 2007, ICE agents arrived at the home of plaintiff Adriana Aguilar and began ringing the doorbell and pounding on the door.

Id. ¶¶ 15, 98, 101.  Plaintiff Elena Leon opened the door, and several agents entered.  Id. ¶¶ 102, 103, 107.  The agents began searching the home, and they later told Adriana Aguilar that they were looking for Wilson Garcia, whom Adriana had divorced in 2002.  Id. ¶¶ 118, 127-29.  The agents did not arrest anyone, but, the complaint alleges, one of the ICE agents told Adriana Aguilar's daughter Gabriela that they would return.  Id. ¶ 145.

The complaint alleges that on the same morning, ICE agents stopped at the home of plaintiff Nelly Amaya in East Hampton, New York.  Id. ¶¶ 16-17, 146.  The complaint alleges that, without a warrant, the agents kicked open the door of the house in search of non-party Marlon Vicuna, Nelly Amaya's brother-in-law.  Id. ¶¶ 147-49.  The complaint alleges that ICE agents arrested Nelly Amaya and took her to the Wainscott police station, then to ICE offices at 26 Federal Plaza, where she was questioned then released at 2:00 p.m.  Id. ¶¶ 176, 179, 185.

The complaint alleges that approximately one month later, on April 18, 2007, ICE agents went to a rooming house in Riverhead, New York, where plaintiffs Mario Patzan DeLeon, Gonzalo Escalante, Juan Jose Mijangos, and Yoni Revolorio rent rooms.  Id. ¶¶ 18-19, 188-191.  The agents allegedly forced themselves through the back door, and also "burst into" plaintiff Mario Patzan DeLeon's room, then ordered the men to gather in the kitchen.  Id. ¶¶ 193-95, 197.  The men were arrested, taken to awaiting vehicles, transported to 26 Federal Plaza for questioning, and released several hours later.  Id. ¶¶ 198, 202, 203.

The complaint alleges that on March 19, 2007, plaintiffs David Lazaro Perez, William Lazaro, and Tarcis Sapon-Diaz, who rent rooms on the third floor of a rooming house in Mount Kisco, New York, were awakened to the sounds of loud knocking.  Id. ¶¶ 207-09.  The complaint alleges that the agents "burst into" the room of David Perez and William Lazaro, asked them for identification, and ordered them to get dressed.  Id. ¶¶ 211-12.  The complaint alleges that Tarcis

Sapon-Diaz and his brother (not a party) opened the door to their room because they feared it "would be broken down."  Id. ¶ 213.  After asking for identification, the ICE agents arrested the brothers and transported them, along with other tenants, to 26 Federal Plaza, then to a detention center in New Jersey, where they were allegedly detained for two nights, then released.  Id. ¶¶ 214, 215, 217.

The complaint alleges that in the early morning of an unspecified date, ICE agents awakened the Doe Family, which lives on the second floor of a two-family house, by breaking down the common entrance door.  Id. ¶¶ 23, 223.  The complaint alleges that after the agents apprehended people from the downstairs apartment, they "attempted to break down the Doe Family's entrance door and forcibly enter the apartment," and that "[o]ne of the ICE agents tried to convince the Doe Family to open the door."  Id. ¶¶ 226, 228-29.  Jane and John Doe said they would not open the door unless the agents produced a warrant, and the agents departed.  Id. ¶¶ 230, 234.  According to the complaint, the Doe Family "lives in daily terror" that ICE agents will return and arrest them.  Id. ¶ 235.

### (b)     The September 2007 Operations

The complaint alleges that on the morning of September 24, 2007, plaintiff Sonia Bonilla left to take her husband, nonparty Noe Velasquez, to work.  Id. ¶ 238.  According to the complaint, ICE agents then arrived at the house in Westbury, New York, and awakened her two daughters, plaintiffs Beatriz and Dalia Velasquez.  Id. ¶ 239.  The complaint alleges that twelve-year-old Beatriz opened the door, and that agents entered the house and began knocking on doors of other tenants.  Id. ¶¶ 241, 243.  The complaint alleges that when Sonia Bonilla returned, agents ordered her out of her van and searched her wallet for identification.  Id. ¶ 247.  The complaint alleges that the agents neither displayed a warrant nor obtained "competent consent,"

and that Sonia Bonilla and her family "live in daily fear that the ICE agents will return to the apartment, forcibly enter, and terrorize the family." Id. ¶¶ 251, 252.

The complaint alleges that on the same morning, September 24, 2007, plaintiff Elder Bonilla, a lawful permanent resident, and his fiancé, plaintiff Diana Rodriguez awoke to the sound of shouting outside the Westbury, New York, home they share "with several members of Diana's family and a friend." Id. ¶ 253. The complaint alleges that when Elder Bonilla opened the door, three agents entered and one pointed a gun at his chest. Id. ¶ 255. The complaint alleges that they handcuffed Elder Bonilla and Diana Rodriguez, then began searching the house. Id. ¶¶ 255-56. The agents arrested and removed five men and Diana's sixteen-year-old cousin, who is not a plaintiff. Id. ¶ 256. The complaint alleges that the agents did not show a warrant or attempt to obtain consent, and that Elder Bonilla and his fiancé "live in constant fear that ICE agents will return to humiliate and brutalize their family." Id. ¶¶ 260-61.

The complaint alleges that on the morning of September 26, 2007, plaintiff Yanet Martinez, a United States citizen who lives with her boyfriend on the second floor of a rooming house in Hempstead, New York, awoke to the sound of loud pounding coming from the first floor of the house. Id. ¶¶ 262-63. When Yanet Martinez opened her bedroom door, the complaint alleges, agents ordered her and her boyfriend outside, where he was handcuffed. Id. ¶¶ 264-65. The complaint alleges that Yanet Martinez was told to reenter the house to find her boyfriend's papers, and that she could hear agents "breaking down doors in the basement." Id. ¶¶ 267-68.

The complaint alleges that ICE agents visited the home of plaintiff Raul Amaya, a United States citizen, and his wife, plaintiff Gloria Vanessa Amaya, who live with at least five other tenants in Huntington Station, New York. Id. ¶¶ 275, 277. The complaint alleges that at

approximately 7:30 a.m. on September 27, 2007, "10 to 15 ICE agents and local law officers" surrounded Raul Amaya as he was loading his work truck, id. ¶ 276, and they asked him if he knew the whereabouts of a person named "Oscar," id. ¶ 280.  Raul Amaya said that he did not, and the agents proceeded to the front of the house, where they encountered Gloria Amaya, who told the agents she knew who Oscar was.  Id. ¶¶ 280-84.  According to the complaint, one agent "slipped past her to enter the house," and others followed.  Id. ¶ 285.  Gloria Amaya claims that the agents interrogated her, then conducted a full search of the house.  Id. ¶¶ 286, 290.

### 2.    Claims for Relief

The complaint alleges two claims for relief.  The first claim is asserted on behalf of the named plaintiffs as well as a proposed class of plaintiffs composed of persons who are "at imminent risk of home raids by the New York City regional office (or field office) of ICE" because they "(1) are Latino, live in residences with Latinos or are or were associated with individuals otherwise sought by ICE and (2) reside in the jurisdiction of the New York City regional office (or field office) of ICE."  Id. ¶ 315.

The first claim seeks "injunctive and declaratory relief against the defendants to redress continuing and likely future violations of the Fourth Amendment to the United States Constitution."  Id. ¶ 324.  The complaint alleges that defendants have "officially implemented, enforced, encouraged and/or sanctioned a policy, practice and/or custom of: (a) entering and searching homes without valid judicial warrants or voluntary consent and in the absence of probable cause and exigent circumstances; and (b) stopping, detaining, investigating, searching and effecting seizures in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause."  Id. ¶ 325.  The complaint alleges that "[s]uch raids have consistently targeted Latinos and individuals who know or have associated with Latinos."  Id. ¶ 328.  The complaint alleges that "[t]he Plaintiffs and proposed class will suffer irreparable and repeated injury unless

this Court orders equitable relief," id. ¶ 331, and that "Plaintiffs and the proposed class are entitled to the issuance of a permanent injunction prohibiting Defendants from engaging in the unlawful and abusive practices alleged herein," id. ¶ 335.  The complaint also seeks a declaratory judgment "that in doing the acts complained of herein the Defendants denied Plaintiffs their Fourth Amendment rights and protections, including, but not limited to, the right to be free from unreasonable searches and seizures and the right to be free from unlawful entries into one's home, in violation of the United States Constitution."  Id. ¶ 337.

The second claim, asserted on behalf of only the named plaintiffs, seeks damages against three ICE agents in their individual capacities, as well as Doe ICE agents and Roe ICE supervisors.  See id. ¶¶ 339-344.

**F.     Procedural History**

On October 5, 2007, plaintiffs served an order to show cause seeking a temporary restraining order (the "TRO Motion") prohibiting ICE from entering or searching any home, or seeking consent to enter any home within the jurisdiction of ICE's New York regional office without a judicial search warrant.  See Order to Show Cause for Temporary Restraining Order and Expedited Discovery (Wolstein Decl., Exh. B) at 2.  The TRO Motion sought two additional far-reaching injunctions against ICE operations.  First, it sought to bar ICE from "contacting, retaliating against, arresting, prosecuting, or deporting" plaintiffs, "their family members and any witnesses to the raids" alleged in the complaint, and from "approaching, searching, entering or seeking a warrant to enter any of such persons' homes under any circumstances."  Id. at 2.  Second, it sought to enjoin ICE from "transferring any individuals detained by ICE within the jurisdiction of the New York City regional office . . . since September 20, 2007 to facilities outside the State of New York without prior notice to the Court and counsel for Plaintiffs."  Id.  Finally, the TRO Motion asked the Court to order expedited discovery, although the motion did

not include discovery requests.  Id.; see also Wolstein Decl. ¶ 2.  ICE served a letter-brief in opposition to the TRO Motion on October 8, 2007, and plaintiffs served a reply brief on October 9, 2007.

The Court held oral argument on the TRO Motion on October 5 and again on October 9, 2007.  The Court denied the motion in a decision issued from the bench following oral argument on October 9.  See Transcript of October 9, 2007 Argument ("Oct. 9 Tr.") (Wolstein Decl., Exh. C) at 54-58.  The Court noted that the alleged injury plaintiffs sought to prevent was "the recurrence of an allegedly unconstitutional search involving the plaintiffs," but concluded that there was "no reasonable showing of immediate and irreparable injury."  Id. at 55.  Relying on plaintiffs' concession that no plaintiff had been subjected to an allegedly unconstitutional home search subsequent to the incidents alleged in the complaint, see Transcript of October 5, 2007 Argument ("Oct. 5 Tr.") (Wolstein Decl., Exh. D) at 28, the Court concluded that "plaintiffs have not shown that they will be the subject of an unconstitutional search in the period of time to be covered by the temporary restraining order."  Oct. 9 Tr. (Wolstein Decl., Exh. C) at 55.  The Court also relied on plaintiffs' concession that "they had insufficient evidence at this time to make a case for a preliminary injunction," reasoning that the absence of such evidence "also support[ed] the denial of a temporary restraining order."  Id. at 57.

The Court further determined that plaintiffs had not shown a likelihood of success on the merits, or even made the lesser showing of "serious questions going to the merits."  Id. at 55.  The Court reasoned that under City of Los Angeles v. Lyons, 461 U.S. 95 (1983), the same question that governs a plaintiff's entitlement to injunctive relief — whether he or she can establish "future substantial and irreparable injury which cannot be remedied at law" also governs the plaintiff's standing to sue for such relief.  Oct. 9 Tr. (Wolstein Decl., Exh. C) at 55.

Because there was no evidence that the complained-of home entries will again "be directed against these plaintiffs," plaintiffs failed to show a likelihood of success on the merits. Id. The Court distinguished DeShawn E. v. Safir, 156 F.3d 340 (2d Cir. 1998), on the ground that there, unlike in this case, the fruits of the police department's allegedly unconstitutional interrogations were being used in (criminal) delinquency proceedings in violation of plaintiffs' constitutional rights. See id. at 56. Finally, the court noted that the relief sought in the TRO Motion was extraordinary because it sought to bar ICE from conducting "what is otherwise a constitutional search based on consent." Id.

The next week, on October 17, 2007, plaintiffs served an order to show cause seeking expedited discovery, which this time included document requests, interrogatories, and deposition notices. At a conference on October 22, 2007, the Court suggested that the parties attempt to settle the order to show cause by ICE providing plaintiffs with "any policies, practices, procedures, [and] guidelines that apply to the searches at issue in the complaint." Transcript of October 22, 2007 (Wolstein Decl., Exh. E) at 33. Since then, ICE has produced more than 800 pages of policy and training materials relating to warrantless searches and administrative arrests. See Wolstein Decl. ¶ 4.

## ARGUMENT

## POINT I

### PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION

**A.    The Standard for Dismissal Under Federal Rule of Civil Procedure 12(b)(1)**

"'A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it.'" Luckett v. Bure, 290 F.3d 493, 496 (2d Cir. 2002) (quoting Makarova v. United States, 201 F.3d 110, 113

(2d Cir. 2000)).  "The requirement that jurisdiction be established as a threshold matter 'spring[s] from the nature and limits of the judicial power of the United States' and is 'inflexible and without exception.'"  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998) (quoting Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)).  Because the issue of the Court's jurisdiction is "the first and fundamental question," id. at 94, a motion questioning the court's subject matter jurisdiction must be considered before all other challenges.  See Bell v. Hood, 327 U.S. 678, 682 (1946).  If a litigant "lacks standing" to assert a claim, then the court "lack[s] subject matter jurisdiction to entertain a request for such relief."  Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004) (citing Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990)).

The plaintiff bears the burden of establishing, by a preponderance of the evidence, that the Court has subject matter jurisdiction over his claims.  See Makarova, 201 F.3d at 113 (citing Malik v. Meissner, 82 F.3d 560, 562 (2d Cir. 1996)).  In considering a motion to dismiss for lack of subject matter jurisdiction, the Court may consider evidence outside of the pleadings without converting the motion to one for summary judgment.  See id.; see also Luckett, 290 F.3d at 496-97; Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986).  Also, the court "is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing."  Whitmore, 495 U.S. at 155-56.

## B.    The Constitutional Requirement of Standing

### 1.    General Requirements

Article III of the constitution limits federal court jurisdiction to "cases" and "controversies."  U.S. CONST. art. III, § 2.  James Madison wrote that the judicial sphere is "described by landmarks" that are "less uncertain" than those limiting executive and legislative power, see THE FEDERALIST NO. 48, at 384 (James Madison) (John Hamilton ed., 1998), and the Supreme Court has stated that "[o]ne of those landmarks . . . is the doctrine of standing."  Lujan

v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  According to Lujan, "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."  Id. (citing Allen v. Wright, 468 U.S. 737, 751 (1984)).  Standing poses the question of "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues."  Warth v. Seldin, 422 U.S. 490, 498 (1975).

The Supreme Court has established three "irreducible constitutional" elements of standing.  See Lujan, 504 U.S. at 560.  First, the plaintiff must have suffered a concrete and particularized "injury in fact"; that is, an injury that is actual or imminent, not conjectural or hypothetical.  See id. (internal citations and quotation marks omitted).  Second, the plaintiff's injury must be fairly traceable to the defendant's action, not caused by some third party not before the court.  See id. (citation and quotation marks omitted).  Third, it must be likely — not merely speculative — that the injury will be redressed by a favorable decision.  See id. at 561 (citation and quotations marks omitted).

The Supreme Court has stated that "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," and the elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case."  Id. (citations omitted).  Therefore, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."  Id. (citations omitted).

While past injury creates standing to seek damages, a litigant seeking declaratory or prospective injunctive relief "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future."  Deshawn E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998) (citing City of Los Angeles v. Lyons, 461 U.S. 95, 105-06 (1983)); see

also <u>Lujan</u>, 504 U.S. at 564 ("Past exposure to illegal conduct does not in itself show a present

case or controversy regarding injunctive relief . . . .") (quotations omitted); <u>Shain</u>, 356 F.3d at

215 ("the fact that such practices had been used in the past did not translate into a real and

immediate threat of future injury").

  Finally, the standing inquiry must be addressed to the named plaintiffs, a requirement that

cannot be circumvented by alleging that a class as a whole faces a threat of imminent injury. <u>See</u>

<u>O'Shea v. Littleton</u>, 414 U.S. 488, 494 (1974) ("Moreover, if none of the named plaintiffs

purporting to represent a class establishes the requisite of a case or controversy with the

defendants, none may seek relief on behalf of himself or any other member of the class.")

(citations omitted); <u>Miller v. Silbermann</u>, 951 F. Supp. 485, 490 (S.D.N.Y. 1997) ("Moreover,

the fact that plaintiffs purport to represent a broader class 'adds nothing to the question of

standing, for even named plaintiffs who represent a class must allege and show that they

personally have been injured, not that injury has been suffered by other, unidentified members of

the class to which they belong . . . .'") (quoting <u>Simon v. Eastern Ky. Welfare Rights Org.</u>, 426

U.S. 26, 40 n.20 (1976) (quotation to <u>Warth</u>, 422 U.S. at 502, omitted)); <u>see also</u> <u>Doe v. Blum</u>,

729 F.2d 186, 190 n.4 (2d Cir. 1984) (satisfaction of standing's injury requirement must be

determined with respect to named plaintiffs).

  **2.**  **The Supreme Court's <u>Lyons</u> Decision and its Second Circuit Progeny**

  The seminal case treating standing to seek prospective injunctive relief is the Supreme

Court's decision in <u>Lyons</u>. <u>See</u> <u>Shain</u>, 356 F.3d at 215 ("<u>City of Los Angeles v. Lyons</u> occupies

much of this territory."). In <u>Lyons</u>, the plaintiff alleged that he had been stopped for a traffic

violation, and that without justification or provocation, Los Angeles police officers applied a

"chokehold," injuring him and rendering him unconscious. <u>See</u> <u>Lyons</u>, 461 U.S. at 97-98. In

addition to damages, Lyons sought a preliminary and permanent injunction barring the police

department's use of control chokeholds, which had killed 16 people in Los Angeles between 1975 and 1982. See id. at 115 (Marshall, J., dissenting).

The Court began its analysis by noting that "[i]t goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshhold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." Id. at 101 (citations omitted). "Abstract injury is not enough," the Court stated, and the plaintiff "must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as a result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" Id. at 101-02 (citations omitted).

The fact that Lyons may have been illegally choked in the past, the Court concluded, "while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." Id. at 105. Rather, to establish an actual controversy, and therefore standing, Lyons would not only have to allege that he would have a future encounter with the police, but he would also have to make the "incredible assertion either, (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning, or (2) that the City ordered or authorized police officers to act in such a manner." Id. at 106 (emphasis in original).

Observing that five months had passed without incident between Lyons' injury and the filing of the complaint, the Court rejected the notion that the "odds" that Lyons would be subjected to another chokehold "are sufficient to make out a federal case for equitable relief."

Id. at 108.  The Court noted that "[n]othing in [the Police Department's] policy . . . suggests that the chokeholds, or other kinds of force for that matter, are authorized absent some resistance or other provocation by the arrestee or other suspect."  Id. at 110.  As a result, the Court concluded, "Lyons is no more entitled to an injunction that any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional."  Id. at 111 (citations omitted).

The Second Circuit has applied Lyons to requests for prospective injunctive relief in three important cases:  Curtis v. City of New Haven, 726 F.2d 65 (2d Cir. 1984); Deshawn E., 156 F.3d 340; and Shain, 356 F.3d 211.  In Curtis, the plaintiffs sued the City of New Haven and named police officers for damages and injunctive relief arising from the officers' negligent use of mace.  Curtis, 726 F.2d at 65.  Following separate jury trials on the damages claims, the district court issued an injunction prohibiting the use of mace except under circumstances set forth in the International Association of Chiefs of Police guidelines.  See id. at 66.

The Supreme Court decided Lyons six days after the district court issued its decision, see id. at 67, and the Second Circuit held that under Lyons, "the district court erred in concluding that plaintiffs had standing to obtain injunctive relief."  Id. at 69.  First, the Court reasoned that "[p]laintiffs do not make, in the words of the [Supreme] Court, the 'incredible assertion' that *all* City police officers *always* assault people they encounter with mace, or that the City authorizes its police officers to act in such a manner."  Id. at 68 (quoting Lyons) (emphasis in original).  In fact, because the police department's policy did not authorize officers to use mace offensively, the officers "appear to have violated" the policy.  Id.

Second, the Court noted that under Lyons, "the critical inquiry is the likelihood that these plaintiffs will again be illegally assaulted with mace."  Id.  The Court observed that the plaintiffs

had not alleged that they would be assaulted with mace without provocation and that there was "no evidence that this has happened since plaintiffs were assaulted in 1977." Id.

In 1998, the Second Circuit concluded in Deshawn E., 156 F.3d at 344-45, that Lyons did not preclude the plaintiffs from seeking equitable relief against the New York Police Department. Under New York law, after a juvenile is arrested, he may be released and issued an "appearance ticket," which directs the juvenile to return to family court for a preliminary conference with probation services to determine whether or not delinquency proceedings should be filed. Id. at 342-43. In 1995, the NYPD's Family Court Detective Squad began interrogating juveniles when they returned for these conferences. Id. at 343. The two named plaintiffs claimed that the Squad unconstitutionally coerced involuntary statements, elicited involuntary waivers of Miranda rights, and questioned juveniles without counsel present. Id. at 342. In addition to seeking declarative and injunctive relief, the plaintiffs moved for class certification, which the district court granted upon the defendants' consent.[4] See id. at 344.

After reviewing Lyons, the Second Circuit distinguished the case for three reasons. See id. at 344-45. First, "unlike Lyons, the plaintiffs in this case allegedly continue to suffer harm from the challenged conduct because the information secured by the Squad is used to enhance their cases and to obtain plea bargains." Id. at 344 (citation omitted). Second, the court stated:

---

[4] The class was composed of "all children arrested on possible delinquency charges who are summoned to appear at the probation service in a Family Court building and are interrogated by members of the New York City Police Department's Detective Squad." Id. at 342.

> [T]his case is distinguishable from <u>Lyons</u> because, in <u>Lyons</u>, there was no proof of a pattern of illegality as the police had discretion to decide if they were going to apply a choke hold and there was no formal policy which sanctioned the application of the choke hold.  In contrast, the challenged interrogation methods in this case are officially endorsed policies; there is a likelihood of recurring injury because the Squad's activities are authorized by a written memorandum of understanding between the Corporation Counsel and the Police Commissioner.  In addition, plaintiffs' complaint alleges that the New York Police Department "has plans to and is in the process of instituting Detective Squads in the Family Court buildings in the Bronx, Brooklyn, and Queens."  Thus, unlike <u>Lyons</u>, "the City ordered or authorized [the Squad] to act in such manner," and plaintiffs have standing to seek injunctive relief.

<u>Id.</u> at 344-45 (citations omitted) (alterations in <u>Deshawn</u>).[5]

Finally, the Second Circuit applied <u>Lyons</u> to deny a claim for prospective injunctive relief in <u>Shain</u>, 356 F.3d 211.  Shain challenged a policy of the Nassau County Correctional Center that "required all admittees to be stripped and searched regardless of the severity of the charge or whether the admittee was suspected of concealing a weapon or contraband."  <u>Id.</u> at 213.  After twice being subjected to a cavity search at the Nassau facility, Shain sued Nassau County alleging that its search policy violated the Fourth Amendment.  <u>See id.</u>  In addition to damages, Shain sought an order enjoining cavity searches, <u>see id.</u>, and the district court issued an injunction prohibiting cavity searches "absent a reasonable suspicion that such individual is concealing weapons or other contraband."  <u>Id.</u> at 214.

On appeal, the Second Circuit acknowledged that Shain "had standing to seek appropriate monetary and declaratory relief" because he "suffered an unconstitutional strip search."  <u>Id.</u> at

---

[5] The court also found that "[u]nlike <u>Lyons</u>, the plaintiffs in this case allege that they, as a certified class, are likely to suffer future interrogations by the Squad," <u>id.</u> at 344, citing <u>Nicacio v. INS</u>, 768 F.2d 1133, 1136-37 (9th Cir. 1985), <u>amended</u>, 797 F.2d 700, 702 (9th Cir. 1985).  In that case, the Ninth Circuit concluded that "[t]he possibility of recurring injury ceases to be speculative when actual repeated incidents are documented," and relied on the district court's finding that "several of the plaintiff class members had actually experienced repeated stops which the court found to have been violative of their rights."  <u>Id.</u>

214-15.  "But," the court continued, "whether Shain has standing to seek injunctive relief is a different matter."  <u>Id.</u>  Applying <u>Lyons</u>, the court concluded that Shain lacked standing because he "failed to demonstrate a likelihood of future harm."  <u>Id.</u> at 216.

First, the court found that Shain did not establish "the likelihood of a future encounter with the Nassau County police likely to result in a subsequent unconstitutional strip search."  <u>Id.</u> at 215.  The court observed that Shain had not been rearrested "in the year between his arrest and his lawsuit," and that even if he were arrested again, "it is entirely conjectural that he would be detained overnight and remanded to the NCCC, as almost all misdemeanor arrestees are released on their own recognizance or on bail."  <u>Id.</u>  Thus, the "accumulation of inferences is simply too speculative and conjectural to supply a predicate for prospective injunctive relief."  <u>Id.</u> at 216 (citation omitted).

Second, the court stated that Shain's reliance on <u>Deshawn E.</u> was "misplaced" because <u>Deshawn E.</u> does not stand for the proposition that "the existence of an official policy, on its own, is sufficient to confer standing to sue on any individual who had previously been subjected to that policy."  <u>Id.</u>  Rather, "<u>Deshawn E.</u> thus suggests — and <u>Lyons</u> confirms — that a plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent."  <u>Id.</u> (citing <u>Lyons</u>, 461 U.S. at 105-06) (emphasis in original).  "Here, Shain has failed to demonstrate a likelihood of future harm and therefore, even if he was subjected to an official policy, he lacks standing to seek injunctive relief."  <u>Id.</u>

Although standing determinations necessarily turn on particular facts, several guiding principles have emerged from the case law.  First, the alleged future harm must arise from the defendant's continued application of its purportedly illegal policy or procedure, and not merely the future effect of a past violation.  Thus, whereas Lyons' "subjective apprehensions" of

being choked in the future did not confer standing because "[t]he emotional consequences of a prior act simply are not a sufficient basis for an injunction," Lyons, 461 U.S. at 107 n.8, one of the reasons the Second Circuit reached a different conclusion in Deshawn E. is that the plaintiffs "continue[d] to suffer harm from the challenged conduct because the information secured . . . is used to enhance their cases and to obtain plea bargains," Deshawn E., 156 F.3d at 344.

Second, the Second Circuit has instructed that the question of whether a claimed future injury is sufficiently real and immediate, or too speculative and conjectural, can in turn be divided into two concrete inquiries — likelihood of future harm and existence of an official policy or its equivalent. See Shain, 356 F.3d at 216. Plaintiffs must demonstrate both to establish standing. Id. (stating that plaintiffs "must demonstrate *both* a likelihood of future harm *and* the existence of an official policy or its equivalent") (emphasis in original). In Shain, for example, there was an official policy to conduct cavity searches, but Shain lacked standing because he could not demonstrate a likelihood of again being detained at the prison that followed the policy. See id. at 215.

Third, because standing is not merely a pleading requirement, see Lujan, 504 U.S. at 561, the Second Circuit has required plaintiffs to demonstrate — as opposed to merely allege — that they face ongoing unlawful conduct or an imminent threat of future harm. See Deshawn E., 156 F.3d at 344-45 (distinguishing Lyons on the basis that there was "no proof of a pattern of illegality," but "the challenged interrogation methods in this case are officially endorsed policies"); Shain, 356 F.3d at 216 (concluding that Shain lacked standing to seek injunctive relief because he "has failed to demonstrate a likelihood of future harm"); see also Whitmore, 495 U.S. at 158 ("Allegations of possible future injury do not satisfy the requirements of Art. III."). Thus, once a plaintiff's standing is challenged on the basis of facts outside the complaint, the plaintiff

must prove by a preponderance of the evidence that standing exists.  See, e.g, Nash v. City Univ. of New York, No. 02 Civ. 8323 (GBD), 2003 WL 21135720, at *1 (S.D.N.Y. May 16, 2003); First Capital Asset Mgmt, Inc. v. Brickellbush, Inc., 218 F. Supp. 2d 369, 378 (S.D.N.Y. 2002) ("plaintiff has the ultimate burden of establishing subject matter jurisdiction . . . by a preponderance of the evidence when the defendant makes a 'factual challenge' on a Rule 12(b)(1) motion") (citations omitted).

### 3. Under Lyons and its Second Circuit Progeny, Plaintiffs Lack Standing to Obtain Prospective Injunctive Relief

In this case, plaintiffs seek "the issuance of a permanent injunction prohibiting Defendants from engaging in the unlawful and abusive practices alleged herein."  See Cmplt. ¶ 335.  But no matter how plaintiffs cast the relief they seek, they have demonstrated neither a likelihood of future harm nor the existence of an official policy or its equivalent to violate their constitutional rights.  Thus, plaintiffs lack standing to obtain prospective injunctive relief.

First, plaintiffs have not demonstrated a likely threat of future harm.  At most, some plaintiffs claim that they fear ICE agents will return to their homes and commit constitutional violations.  See Cmplt. ¶¶ 252, 261.  Yet plaintiffs' counsel conceded at oral argument that ICE agents have not returned to any of the plaintiffs' homes.  See Oct. 5 Tr. (Wolstein Decl., Exh D) at 28; see also Lyons, 461 U.S. at 108 ("We note that five months elapsed between [the date Lyons was choked] and the filing of the complaint, yet there was no allegation of further unfortunate encounters between Lyons and the police.").  In fact, in denying the plaintiffs' motion for a TRO, this Court found that there was no evidence that the complained-of searches will again "be directed against these plaintiffs."  See Oct. 9 Tr. (Wolstein Decl., Exh. C) at 56. At bottom, then, plaintiffs' claim of future injury is no less speculative than Lyons' claim that he

would again be choked by the police.  See Lyons, 461 U.S. at 107 n.8 ("It is the *reality* of the threat of repeated injury . . . not the plaintiff's subjective apprehensions.") (emphasis in original).

Second, plaintiffs have not demonstrated "the existence of an official policy or its equivalent," Shain, 356 F.3d at 216 (citing Lyons, 461 U.S. at 105-06), requiring or even permitting ICE agents to conduct unconstitutional searches.  To the contrary, ICE's official policy mandates that agents obtain consent to enter and search a home in the absence of a search warrant.  See Williams Decl. ¶¶ 10-11, 15, 17-21; Knopf Decl. ¶¶ 8-9, 12-19.  Chapter 19 of the DROPPM, which governed the DRO officers' conduct of Operation Return to Sender and Operation Cross Check, explains that warrants of removal are "administrative rather than criminal," and do "not grant the authority to breach doors."  DROPPM (Williams Decl., Exh. A) at US 000016.  The manual instructs that "in order to enter a residence, ***someone who has authority to do so must grant informed consent, unless a court-approved search warrant is obtained in advance.***"  DROPPM (Williams Decl., Exh. B) at US 000018 (emphasis in original).

Moreover, as explained in the Williams and Knopf declarations, ICE's practice is to obtain consent to enter homes through "knock-and-talk" conversations.  See Williams Decl. ¶¶ 10-11, 15; Knopf Decl. ¶¶ 8-9.  As the Williams Declaration explains, if someone answers the door where an alien targeted by DRO is believed to reside, officers identify themselves as police or ICE agents and ask for consent to enter.  See Williams Decl. ¶ 11.  If the officers wish to search any part of the premises, they are required to obtain consent to search, and the officers have been instructed that consent to remain in the house can be revoked at any time.  Id.

The manuals that govern the conduct of OI special agents, Chapter 42 of the Special Agent's Handbook and the M-69, are equally plain in stating that consent must be obtained in the absence of a search warrant.  See Knopf Decl. ¶¶ 12-19.  The Special Agent's Handbook states

that "[v]oluntary and effective consent to search premises obviates the need for a warrant or probable cause," and "[t]o justify a search without a warrant on this ground, there must be a violitional [*sic*], duress-free permission to enter and make the kind of search agreed to." SA Handbook (Knopf Decl., Exh. 1) at US 000818.  Chapter III of the M-69 informs agents that they may search a residence without a warrant or probable cause only if they obtain consent of the person "in control of the premises."  M-69 (Knopf Decl., Exh. 2) at US 000747.  The manual explains that whether consent is voluntary depends on the totality of the circumstances, and that a "person may revoke his or her consent to search at any time."  Id. at US 000748.  In addition, the "knock-and-talk" practices of OI are consistent with those of DRO, in that an officer seeks consent to enter and that agents may not search other any part of the home without first obtaining additional consent.  See Knopf Decl. ¶ 9.

        In light of these policies and practices, plaintiffs cannot establish a likelihood of future injury based on their allegation that ICE policy authorizes agents to conduct warrantless home entries without obtaining consent.  In the absence of such a policy, it is no more than speculation to suppose that, even if agents were to return to plaintiffs' homes — which is itself purely speculative — they would violate plaintiffs' Fourth Amendment rights.  See Lyons, 461 U.S. at 106 (noting that the complaint "did not indicate why Lyons might be realistically threatened by police officers who acted within the strictures of the City's policy"), 108 ("it is untenable to assert . . that strangleholds are applied by the Los Angeles police to every citizen who is stopped or arrested regardless of the conduct of the person stopped"); Curtis, 726 F.2d at 68 (noting that although "plaintiffs here have actually suffered past injury," plaintiffs could not demonstrate a likelihood that they would "again be illegally assaulted with mace" because the police department's policy did "not authorize the use of mace in the manner it was used in this case");

cf. Deshawn E., 156 F.3d at 345 (distinguishing Lyons because, *inter alia*, "the challenged interrogation methods in this case are officially endorsed policies").  Thus, plaintiffs have established neither a likelihood of harm nor the existence of an official policy to conduct unconstitutional home searches.

The Second Circuit's decision in Deshawn E. does not compel a different conclusion because the reasons the court distinguished it from Lyons do not apply in this case.  First, Deshawn E. explicitly distinguished Lyons on the basis that "the challenged interrogation methods in this case are officially endorsed policies."  Deshawn E., 156 F.3d at 345.  As discussed above, ICE's "officially endorsed" policies concerning the operations at issue provide that warrantless home entries and searches may only be conducted based on authorized consent.  Thus, plaintiffs cannot claim that the allegedly unconstitutional conduct resulted from an official policy of ICE.

Second, in Deshawn E., the plaintiffs continued "to suffer harm from the challenged conduct" because the unconstitutionally obtained information was "used to enhance their cases and to obtain plea bargains."  Id. at 344.  Here, the past injury plaintiffs have alleged — and for which they seek damages — is the purportedly unconstitutional entry into their homes.  And it is a future unconstitutional entry into their homes that they seek to prevent through an injunction.  See Cmplt. ¶ 334 (requesting an injunction "prohibiting Defendants from engaging in the unlawful and abusive practices alleged herein.").

At oral argument, plaintiffs stated that "[w]hat we're purely challenging here is the unconstitutional conduct by ICE in entering the homes," and "[w]e're seeking an injunction to stop ICE from violating Latinos' constitutional rights."  Oct. 9 Tr. (Wolstein Decl., Exh. C) at 11.  The Court stated that "[i]n Deshawn, the basis for standing was in fact the threat of the

continuing use of the evidence allegedly illegally seized.  You say that's not what we're arguing about here." Id.  Counsel answered "No." Id.  And in denying the plaintiffs' TRO motion, the Court noted that "[t]his case is different from Deshawn" because "[t]here the plaintiff class was allegedly in delinquency proceedings where the alleged fruits of the allegedly unconstitutional conduct were being used." Id. at 56.

## POINT II

### PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

For largely the same reasons that plaintiffs cannot establish standing to sue for injunctive relief, they cannot state a claim for injunctive relief, even assuming the truth of the allegations in the complaint.[6]

### A.      Applicable Legal Standards

### 1.      Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) should be granted if the complaint fails "to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1974 (2007).  While a complaint need not contain "detailed factual allegations," the factual allegations asserted "must be enough to raise a right to relief above the speculative level." Id. at 1964-65.  In Twombly, the Supreme Court expressly repudiated the "no set of facts" standard that originated in Conley v. Gibson, 355 U.S. 41, 45-46 (1957), and that courts have long applied as the standard of pleading required to survive a motion to dismiss.[7] See Twombly, 127 S. Ct. at

---

[6] If the Court determines that plaintiffs lack standing, it need not reach the Government's argument that plaintiffs' claim for injunctive relief also fails to state a claim under Rule 12(b)(6).

[7] Conley stated that it was an "accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46.

1969 ("Conley's 'no set of facts' language has been questioned, criticized, and explained away

long enough. . . . [A]fter puzzling the profession for 50 years, this famous observation has earned

its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted

pleading standard: once a claim has been stated adequately, it may be supported by showing any

set of facts consistent with the allegations in the complaint.").

 The Second Circuit has interpreted <u>Twombly</u> to require a "flexible 'plausibility standard,'

which obliges a pleader to amplify a claim with some factual allegations in those contexts where

such amplification is needed to render the claim <u>plausible</u>." <u>Iqbal v. Hasty</u>, 490 F.3d 143, 157-

58 (2d Cir. 2007) (emphasis in original); <u>see also</u> <u>Gamble v. City of New York</u>, No. 06 Civ. 4849

(JSR), 2007 WL 2847221, at *3 (S.D.N.Y. Sept. 28, 2007) (same). Thus, "a complaint must

allege facts that are not merely consistent with the conclusion that the defendant violated the law,

but which actively and plausibly suggest that conclusion." <u>Port Dock & Stone Corp. v. Oldcastle</u>

<u>Northeast, Inc.</u>, -- F.3d --, 2007 WL 3071637, at *2 (2d Cir. Oct. 23, 2007). When deciding a

motion to dismiss under Rule 12(b)(6), courts must accept all factual allegations in the complaint

as true and draw all reasonable inferences in the plaintiff's favor. <u>See</u> <u>De Jesus v. Sears,</u>

<u>Roebuck & Co.</u>, 87 F.3d 65, 70 (2d Cir. 1996).

  **2.** **Permanent Injunction**

 "'To obtain a permanent injunction, a plaintiff must succeed on the merits and show the

absence of an adequate remedy at law and irreparable harm if the relief is not granted."

<u>Melnitzky v. HSBC</u>, No. 06 Civ. 13526 (JGK), 2007 WL 195239, at *2 (S.D.N.Y. Jan. 24, 2007)

(quoting <u>Roach v. Morse</u>, 440 F.3d 53, 56 (2d Cir. 2006)). "Irreparable harm is an injury that is

not remote or speculative but actual and imminent, and for which a monetary award cannot be

adequate compensation." <u>Tom Doherty Assocs., Inc. v. Saban Entertainment</u>, 60 F.3d 27, 37 (2d

Cir. 1995) (internal quotation marks omitted). The Second Circuit has emphasized that a

plaintiff "must show that it is <u>likely</u> to suffer irreparable harm if equitable relief is denied," not merely that such harm is a "possibility." <u>JSG Trading Corp. v. Tray-Wrap, Inc.</u>, 917 F.2d 75, 79 (2d Cir. 1990) (vacating preliminary injunction where district court relied on standard that movant must show only "'the possibility' of irreparable harm") (emphasis in original); <u>see also</u> <u>O'Shea v. Littleton</u>, 414 U.S. 488, 502 (1974) ("basic requisites" of issuance of equitable relief is "<u>likelihood</u> of substantial and immediate irreparable injury, and the inadequacy of remedies at law") (emphasis added).[8]

"[A]n injunction is an extraordinary remedy, which ordinarily should not be granted where a plaintiff has not proven a probability or threat of continuing or additional" unlawful conduct. <u>Dolori Fabrics, Inc. v. The Limited, Inc.</u>, 662 F. Supp. 1347, 1358 (S.D.N.Y. 1987) (Lumbard, J., sitting by designation); <u>see also</u> <u>Rizzo v. Goode</u>, 423 U.S. 362 (1976) at 379 ("[P]rinciples of equity . . . militate heavily against the grant of an injunction except in the most extraordinary circumstances."), <u>see</u> <u>id.</u> at 372 (reversing grant of injunction directing police department to develop program for dealing with civilian complaints of alleged misconduct where injunction was based on "what one of a small, unnamed minority of policemen might do to [plaintiffs] in the future because of that unknown policeman's perception of departmental disciplinary procedures").

---

[8] The Second Circuit has noted that "[a]lthough a showing of irreparable harm is required for the imposition of any injunctive relief, preliminary or permanent, . . . the 'imminent' aspect of the [irreparable] harm [requirement] is not crucial to granting a permanent injunction." <u>Rodriguez v. DeBuono</u>, 175 F.3d 227, 235 n.9 (2d Cir. 1999). That is because for a preliminary injunction to issue, "the harm must be so imminent as to be irreparable if a court waits until the end of trial to resolve the harm." <u>Id.</u> at 235. A permanent injunction, by contrast, is not limited in its coverage to a defined time period in the immediate future but is granted only after the plaintiff has proven his case at a trial on the merits.

**B.    The Complaint Fails to Allege Irreparable Harm and Plaintiffs Will Be Unable to Succeed on the Merits Because They Lack Standing to Seek Injunctive Relief**

In <u>Lyons</u>, the Supreme Court held that Lyons' fear of once again being subjected to an allegedly unconstitutional chokehold did not establish an irreparable injury necessary to obtain an injunction against the police department's use of chokeholds.  <u>See</u> 461 U.S. at 98.  The Court stated that, in addition to failing to establish a case or controversy sufficient to support federal court jurisdiction, <u>see</u> <u>supra</u> at 26-27, Lyons made no showing that "he is realistically threatened by a repetition of his experience" with the police and thus "has not met the requirements for seeking an injunction in a federal court."  <u>Lyons</u>, 461 U.S. at 109.  The Court stressed that even where a plaintiff has been allegedly wronged in the past, the irreparable injury requirement "cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again"  <u>Id.</u> at 111.  In Lyons' case, the "speculative nature" of his "claim of future injury" — that the police would choke him again during a future encounter — "require[d] a finding that [the irreparable harm] prerequisite of equitable relief has not been fulfilled."  <u>Id.</u> at 111.

Thus, <u>Lyons</u> teaches that a plaintiff's alleged fear that a past constitutional violation will be repeated does not establish irreparable injury absent a realistic threat that the violation will recur.  At the pleading stage, <u>Twombly</u> requires that the alleged threat be supported by plausible and non-speculative allegations.  <u>See</u> <u>supra</u> at 36-37.

Where an alleged future constitutional violation has been held to constitute irreparable harm, the future violation was likely, if not certain to occur.  In <u>Jolly v. Coughlin</u>, 76 F.3d 468 (2d Cir. 1996), for example, the alleged Eighth Amendment violation was ongoing when the complaint was filed.  Jolly, a prison inmate, refused to submit to an invasive tuberculosis (TB) screening test on the ground that it would violate his Rastafarian religious beliefs.  <u>See</u> <u>id.</u> at 472.

In response, prison officials placed him in indefinite administrative confinement, requiring him to remain in his cell at all times except to take one ten-minute shower per week and to confer with his lawyer.  See id.  In the three-and a half years between Jolly's refusal to submit to the TB test and the district court's grant of a preliminary injunction requiring prison officials to release him — thus, at the time he filed his complaint — Jolly remained in administrative detention.  See id.  It was this ongoing confinement, which would have continued indefinitely absent an injunction, that triggered a finding of irreparable harm.  See id. at 482.

The alleged future harm in Mitchell v. Cuomo, 748 F.2d 804 (2d Cir. 1984), while not ongoing as in Jolly, was also certain to occur absent an injunction.  In that case, inmates of the Long Island Correctional Facility ("LICF") sought injunctive relief to prevent New York State from closing the LICF and transferring them to overcrowded prisons, which they contended would violate their Eighth Amendment rights.  See id. at 806.  The State had already decided to close the prison by the time the inmates brought suit.  See id. at 805.  The irreparable harm lay in the alleged (and admittedly unproven) Eighth Amendment violations that were certain to occur absent an injunction preventing the closing of the prison.  See id. at 806.

These cases demonstrate that although the constitutional deprivation may be alleged rather than proven, the alleged deprivation must be likely rather than merely speculative.  Consequently, the statement by some courts that an allegation of Fourth Amendment violations constitutes irreparable harm does not relieve a plaintiff of the obligation to demonstrate "the usual requirements for injunctive relief," including irreparable harm that is "likely" rather than a mere "possibility," JSG Trading Corp., 917 F.2d at 79.  See Covino v. Patrissi, 967 F.2d 73, 77 (2d Cir. 1992) (stating that pretrial detainee showed irreparable harm where he alleged that he was subject to prison policy authorizing random visual body cavity searches that could

"possibl[y]" deprive him of Fourth Amendment rights); Doe v. Bridgeport Police Dep't, 198

F.R.D. 325, 335 (D. Conn. 2001) (stating that allegation of Fourth Amendment violation

establishes irreparable harm, while finding that plaintiffs would be irreparably harmed absent an

injunction because they were subject to "systemic or ongoing constitutional violations," having

already been detained and criminally charged; consequently, threat to plaintiffs' "fourth

amendment rights is actual and imminent and not remote or speculative").

   Plaintiffs will be unable to demonstrate irreparable harm because the complaint contains

only speculative factual allegations that ICE agents are likely to return to their homes and again

(allegedly) violate their Fourth Amendment rights.  At most, the complaint alleges (i) that some

plaintiffs fear that agents will return to their homes and commit additional constitutional

violations, see Cmplt. ¶¶ 206, 235, 252, 261, and (ii) that agents stated during two of the nine

incidents alleged in the complaint that, in one case, they would "be back," id. ¶ 145, and in the

other, that they would "return later that day or in the following week."  Id. ¶ 292.  But plaintiffs'

fear of a future unconstitutional encounter is exactly the kind of speculation that Lyons rejected

as insufficient.  See Lyons, 461 U.S. at 111; supra at 26-27.  Nor does the complaint allege any

facts to cast as a "real or immediate threat," Lyons, 461 U.S. at 111, some agents' statements that

they would return to the homes they had visited, and, more importantly, that if the agents did

return they would likely violate plaintiffs' rights.  Indeed, plaintiffs acknowledged at oral

argument that no ICE agents have returned to any of the plaintiffs' homes — including the

agents who allegedly threatened to reappear within the day or the week — since the incidents

alleged in complaint, many of which occurred between seven and nine months ago.  See Oct. 5

Tr. (Wolstein Decl., Exh. D) at 28; see also United States Trust Co. v. Shapiro, 835 F.2d 1007,

1008-09 (2d Cir. 1987) (holding that concession by plaintiff's counsel during oral argument was

binding); <u>General Ins. Co. of America v. Mezzacappa Bros., Inc.</u>, No. 01-CV-7394, 2003 WL 22244964, at *5 (E.D.N.Y. Oct. 1, 2003) ("Statements made by an attorney during oral argument . . . constitute binding judicial admissions.") (collecting cases).

Plaintiffs' claim to irreparable harm is not saved by their unsupported allegations that ICE has officially authorized and enforced a "policy, practice and/or custom" of allowing agents to enter homes without a search warrant or consent. Cmplt. ¶ 325; <u>see also</u> <u>id.</u> ¶ 303. This is merely plaintiffs' "incredible assertion" that it is official ICE policy to allow, even require, agents to conduct unconstitutional, warrantless entries into private homes in carrying out its obligations to remove illegal aliens from the United States. <u>Lyons</u>, 461 U.S. at 106 (noting that it would be an "incredible assertion" for plaintiff to allege that City of Los Angeles "ordered or authorized" police officers to always apply a chokehold to any person with whom they have an encounter). The complaint contains no factual allegations to support this conclusory claim, much less factual allegations that "actively and plausibly suggest" the conclusion. <u>Port Dock & Stone Corp</u>, 2007 WL 3071637, at *2. As a result, plaintiffs fail to meet their obligation to "amplify [their] claim with some factual allegations" that would "render the claim plausible." <u>Iqbal v. Hasty</u>, 490 F.3d at 157-58 (emphasis omitted).[9]

---

[9] In fact, the Williams and Knopf declarations refute plaintiffs' allegation that ICE had a policy of allowing agents to conduct warrantless home entries and searches without the appropriate consent. <u>See</u> Williams Decl. ¶¶ 10-11, 15, 17-21; Knopf Decl. ¶¶ 8-10; 12-19. However, the Court may not rely on those declarations without converting that portion of the Government's motion seeking dismissal of plaintiffs' claim for injunctive relief for failure to state a claim to a motion for summary judgment. <u>See, e.g.</u>, <u>Batista v. City of New York</u>, No. 05 Civ. 8444 (KMK), 2007 WL 2822211, at *3 (S.D.N.Y. Sept. 25, 2007). ("[W]hen a court ruling on a motion to dismiss considers matters outside the pleadings, it is required to convert the motion from a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment."). Because the complaint is deficient on its face in failing to plead even minimal factual allegations necessary to make plausible plaintiffs' allegation that ICE policy authorizes agents to conduct warrantless home entries without consent, the Court need not rely on the declarations to grant dismissal of plaintiffs' claim for injunctive relief.

Finally, there is no basis to conclude that plaintiffs' alleged constitutional injuries cannot be adequately remedied through an award of money damages. To the contrary, the Supreme Court created the Bivens remedy precisely to compensate individuals for violations of their Fourth Amendment rights by federal agents. See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 395, 397 (1971); Wilkie v. Robbins, 127 S. Ct. 2588, 2611-12 (2007); (Bivens holds that "a victim of a Fourth Amendment violation by federal officers has a claim for relief in the form of money damages"); see also Sosa v. Alvarez-Machain, 542 U.S. 692, 736-37 (2004) (noting that Bivens provides damages remedies for any unauthorized arrest of an alien and "for any seizure of an alien in violation of the Fourth Amendment"). Indeed, in creating that remedy the Court relied on the fact that "[h]istorically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty" such as the federal agents' unlawful entry, arrest, and search at issue in the case. Bivens, 403 U.S. at 395. In Lyons, the Supreme Court held that the plaintiff had "an adequate remedy at law" in his pending suit for damages against the offending officers and the City. 461 U.S. at 111.

The same is true here. Plaintiffs have asserted Bivens claims against three ICE officials, and other Jane and John Doe defendants, based on the same nine incidents that allegedly support their claim for injunctive relief. See Cmplt. ¶¶ 339-44. Given that plaintiffs have a well-established remedy for any future Fourth Amendment violations by ICE agents, plaintiffs will be unable, as a matter of law, to demonstrate irreparable harm in the absence of a permanent injunction. See, e.g., Helios & Matheson North Am., Inc. v. Vegasoft Oy, No. 07 Civ. 3600 (PAC), 2007 WL 1541204, at *2 (S.D.N.Y. May 24, 2007) ("An essential component of an

'irreparable' injury is that it is 'incapable of being fully remedied by money damages.") (internal quotation marks omitted).[10]

**POINT III**

**THIS COURT SHOULD GRANT A LIMITED STAY OF DISCOVERY PENDING RESOLUTION OF THE GOVERNMENT'S PARTIAL MOTION TO DISMISS**

Because a grant of the Government's motion would dismiss plaintiffs' claim for injunctive relief and obviate the need for discovery on that claim, the Court should grant a limited stay of discovery pending resolution of the motion.  Specifically, the Government moves to stay (i) all depositions other than those of the individual-capacity defendants, and (ii) all interrogatories other than those that seek to identify persons with knowledge concerning the nine home entries alleged in the complaint.  The requested stay would not hinder plaintiffs' ability to proceed with discovery on their <u>Bivens</u> claim, and would relieve ICE and the official-capacity defendants of the burdens of non-document discovery on a claim that may not survive.

**A.      Applicable Legal Standards**

"Pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, a court has discretion to stay discovery 'for good cause shown.'"  <u>Spencer Trask Software v. Rpost Int'l Ltd.</u>, 206 F.R.D. 367, 368 (S.D.N.Y. 2002) (quoting Rule).  "Courts in this district have held that a stay of discovery is appropriate pending resolution of a potentially dispositive motion where the motion appears to have substantial grounds or, stated another way, do[es] not appear to be without

---

[10] Plaintiffs also will be unable to show actual success on the merits because, as demonstrated above, <u>see supra</u> at 32-36, they lack standing to assert their claim for injunctive relief.  <u>See</u> <u>Amoco Prod. Co. v. Village of Gambell</u>, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").  Thus, while the absence of irreparable injury is, standing alone, fatal to their claim for injunctive relief, plaintiffs' inability as a matter of law to meet the actual-success-on-the-merits requirement also means that they will be unable to show their entitlement to an injunction.

foundation in law." <u>Johnson v. New York Univ. Sch. of Educ.</u>, 205 F.R.D. 433, 434 (S.D.N.Y. 2002) (internal quotation marks and citations omitted) (alteration in original).  Other factors that courts consider in determining whether to stay discovery are the breadth of the requested discovery and burden in responding to it, and whether the opposing party will be prejudiced by a stay.  <u>See</u> <u>Spencer Trask Software</u>, 206 F.R.D. at 368; <u>Johnson</u>, 205 F.R.D. at 434; <u>see also</u> <u>Chesney v. Valley Stream Union Free Sch. Dist.</u>, 236 F.R.D. 113, 115 (E.D.N.Y. 2006) ("Factors that courts have considered when determining whether or not a stay is appropriate include: (1) whether the defendant has made a strong showing that the plaintiff's claim is unmeritorious; (2) the breadth of discovery and the burden of responding to it; and (3) the risk of unfair prejudice to the party opposing the stay.").  The moving party bears the burden of establishing good cause for the stay.  <u>See, e.g.</u>, <u>Am. Booksellers Ass'n v. Houghton Mifflin Co.</u>, No. 94 Civ. 8566 (JFK), 1995 WL 72376, at *1 (S.D.N.Y. Feb. 22, 1995).

## B.     There is Good Cause for Granting a Limited Stay of Discovery

All three factors weigh in favor of granting the limited stay requested here.

First, the Government has "substantial arguments for dismissal" of plaintiffs' claim for injunctive relief.  <u>Spencer Trask Software</u>, 206 F.R.D. at 368.  As demonstrated above, plaintiffs cannot establish standing to bring this claim because their alleged future injury — the repetition of allegedly unconstitutional home entries and searches conducted between two and nine months ago — is indistinguishable from that which the Supreme Court in <u>Lyons</u> rejected as too speculative to confer standing to seek equitable relief.  <u>See</u> <u>supra</u> at 26-27.  The speculative nature of plaintiffs' fears that ICE agents will return to their homes and commit additional Fourth Amendment violations is likewise insufficient to establish the irreparable injury necessary to prevail on their injunction claim on the merits.  <u>See</u> <u>supra</u> at 32-36.

Second, depositions of high-ranking ICE officials on matters relating to plaintiffs' injunctive claim are burdensome given the strong challenge the Government has made to plaintiffs' standing to bring that claim.  See In re Currency Conversion Fee Antitrust Litig., No. MDL 1409, 2002 WL 88278, at *3 (S.D.N.Y. Jan. 22, 2002) ("[I]t would be wasteful to subject defendants' principals to wide-ranging depositions in the absence of a pleading that has withstood scrutiny under Rule 12(b)(6).") (citation omitted).  Sworn interrogatories are likewise burdensome when they relate to a claim that may not survive.  Moreover, the Government has already produced to plaintiffs, earlier than in the ordinary course of discovery, more than 800 pages of policy and training materials relating to warrantless searches and administrative arrests.  See Wolstein Decl. ¶ 4.  See also Chrysler Capital Corp. v. Century Power Corp., 137 F.R.D. 209, 211 (S.D.N.Y. 1991) (granting stay of discovery where "[p]laintiffs already have access to extensive discovery material" as a result of related administrative proceedings; discovery requests were "extensive"; "defendants' motions for dismissal do appear to have substantial grounds"; and plaintiffs would not be harmed by stay).  Thus, plaintiffs have already received the bulk of the documents relevant to their injunction claim.

Third, plaintiffs will not be prejudiced by the limited stay requested.  If the Court denies the Government's motion, plaintiffs will have every opportunity to take depositions relevant to their claim for injunctive relief; the only effect of a stay would be to defer those depositions until a later date in the event the Court determines that plaintiffs' injunction claim should not be dismissed.  In the meantime, plaintiffs may conduct discovery on their Bivens claims, so they will not be prejudiced in their ability to develop their case.

## CONCLUSION

For the foregoing reasons, the Court should (i) dismiss the first claim for relief in plaintiffs' amended complaint for lack of subject matter jurisdiction and failure to state a claim, and (ii) grant a limited stay of discovery pending resolution of the Government's motion.

Dated:    New York, New York
          December 7, 2007

                                  MICHAEL J. GARCIA
                                  United States Attorney for the
                                  Southern District of New York,
                                  Attorney for Defendants


          By:      /s/
                 _____
                 SHANE CARGO
                 ELIZABETH WOLSTEIN
                 Assistant United States Attorneys
                 86 Chambers Street
                 New York, New York 10007
                 Tel.    (212) 637-2711/2743
                 Fax     (212) 637-2786
                 shane.cargo@usdoj.gov
                 elizabeth.wolstein@usdoj.gov