# EXHIBIT 3

# DEPARTMENT OF HOMELAND SECURITY
## Office of Inspector General

An Assessment of United States
Immigration and Customs Enforcement's
Fugitive Operations Teams



**OIG-07-34**                    **March 2007**

*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528

 **Homeland Security**

March 5, 2007

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*. This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibility to promote economy, effectiveness, and efficiency within the department.

This report addresses the effectiveness of United States Immigration and Customs Enforcement's Fugitive Operations Teams. It is based on interviews with employees and officials of relevant agencies and institutions, direct observations, statistical analyses, and a review of applicable documents.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. It is our hope that this report will result in more effective, efficient, and economical operations. We express our appreciation to all of those who contributed to the preparation of this report.

*Richard L. Skinner*

Richard L. Skinner
Inspector General

# Table of Contents

**Executive Summary** ............................................................................................1

**Background** ..........................................................................................................2

**Results of Review** ...............................................................................................7

    Fugitive Apprehension Reports Should Accurately Reflect the Teams' Activities ..............7
    Fugitive Alien Backlog Is Increasing Despite the Teams' Efforts ........................12
    Removal Rate of Teams' Fugitive Alien Apprehensions Cannot be Determined...............17
    Team Members Performed Non-Fugitive Operations Duties..............................................19
    Progress Has Been Made in Staffing the Teams...............................................................21
    Partnerships with Federal, State, and Local Agencies are Effective ......................24
    Team Members Have Basic Law Enforcement Training ...................................29

**Management Comments and OIG Analysis** ...........................................................32

## Tables

Table 1:    Funds Allocated to Fugitive Operations ........................................................6
Table 2:    Fugitive Apprehensions Reported by Field Offices with Authorized Teams................9
Table 3:    Estimated Fugitive Alien Backlog................................................................12
Table 4:    Fugitive Alien Apprehensions Reported by All Field Offices..................................13

## Figures

Figure 1:    United States Immigration and Customs Enforcement Organization Chart.................2
Figure 2:    Fugitive Operations Team...............................................................................6

## Appendices

Appendix A:    Removal Proceedings Process.................................................................39
Appendix B:    Fugitive Operations Support Units...........................................................41
Appendix C:    Purpose, Scope, and Methodology .........................................................43
Appendix D:    Recommendations ...................................................................................45
Appendix E:    Management Response to Draft Report .....................................................46
Appendix F:    Major Contributors to this Report .............................................................62
Appendix G:    Report Distribution..................................................................................63

**Abbreviations**

| | |
|---|---|
| CBP | United States Customs and Border Protection |
| DHS | Department of Homeland Security |
| ICE | United States Immigration and Customs Enforcement |
| INS | Immigration and Naturalization Service |
| OIG | Office of Inspector General |
| PL | Public Law |
| USC | United States Code |



*Department of Homeland Security*
*Office of Inspector General*

## Executive Summary

To bring integrity to the immigration process, in February 2002, the legacy Immigration and Naturalization Service established the National Fugitive Operations Program under the auspices of the Office of Detention and Removal Operations. When the Department of Homeland Security was formed in March 2003, the office became a part of United States Immigration and Customs Enforcement.

The purpose of the National Fugitive Operations Program is to identify, locate, apprehend, and remove fugitive aliens from the United States. Fugitive aliens are individuals who have unexecuted final orders of removal from the Executive Office for Immigration Review. The orders require the aliens to be removed from this country. The ultimate goal of the program is to eliminate the backlog of fugitive aliens. As of August 2006, the Office of Detention and Removal Operations estimated there were 623,292 fugitive aliens in the United States. Since 2003, the office allocated more than $204 million to deploy 52 Fugitive Operations Teams. As of October 2006, 50 teams are operational and apprehending fugitive aliens in various cities nationwide. Following are the results of our review:

- Fugitive alien apprehensions reported by the Office of Detention and Removal Operations did not accurately reflect the teams' activities;
- The fugitive alien backlog increased despite the teams' efforts;
- The teams' effectiveness was hampered by insufficient detention capacity, limitations of an immigration database, and inadequate working space;
- The removal rate of fugitive aliens apprehended by the teams could not be determined;
- The teams performed duties unrelated to fugitive operations, contrary to Office of Detention and Removal Operations policy;
- Despite hiring obstacles, progress has been made in staffing the teams;
- The teams have effective partnerships with federal, state, and local agencies; and
- The teams have basic law enforcement training.

We are making seven recommendations to the Assistant Secretary for United States Immigration and Customs Enforcement to address our concerns. The Office of Detention and Removal Operations concurs with all seven recommendations and has taken steps to address them.

# Background

United States Immigration and Customs Enforcement (ICE) is the largest investigative branch within the Department of Homeland Security (DHS). ICE's mission is to protect America and uphold public safety by targeting the people, money, and materials that support terrorist and criminal activities. Sections 236 and 287 of the Immigration and Nationality Act provide authority to ICE officers to arrest, detain, and remove certain aliens from the United States.[1] ICE has more than 15,000 employees working in offices nationally and around the world, and its fiscal year (FY) 2006 budget was $3.1 billion. ICE is comprised of four divisions:

**Figure 1:    ICE Organization Chart**



The Office of Detention and Removal Operations is responsible for promoting public safety and national security by making certain, through the enforcement of national immigration laws, that all removable aliens depart the United States. This task is accomplished through the apprehension, detention, and removal of illegal aliens. This office manages illegal aliens in its custody, known as the "detained docket," and tracks illegal aliens who are not in custody, known as the "non-detained docket." As of June 2006, there were 4,170 full-time staff members working in 23 field offices throughout the country. For FY 2006, the Office of Detention and Removal Operations' budget was $1.0 billion.

Fugitive Aliens

Fugitive aliens are non-United States citizens not currently in the custody or control of ICE who have failed to depart the United States pursuant to a final order of removal, deportation or exclusion, or have failed to report to a DRO officer after receiving notice to do so.[2] The most common reasons a fugitive alien's whereabouts are unknown include:

---

[1] 8 USC §§ 1226 and 1357.
[2] In this report, the terms "fugitive alien" and "absconder" are used interchangeably.

- The alien did not appear for deportation as ordered by the Executive Office for Immigration Review immigration judge's final order of removal;

- The fugitive left the United States by his or her own choice without the knowledge of the Office of Detention and Removal Operations; or

- The Office of Detention and Removal Operations is unaware that the fugitive changed his or her immigration status or has died.

As of March 2006, there were an estimated 11.5 to 12 million illegal aliens living in the United States.[3] As of August 2006, the Office of Detention and Removal Operations estimated there was a backlog of 623,292 fugitive aliens. Therefore, fugitive aliens constitute about 5.4 percent of the estimated illegal alien population.

<u>Early Efforts to Apprehend Fugitives</u>

The Office of Detention and Removal Operations deportation officers have always apprehended fugitive aliens on an ad hoc basis, but teams were not exclusively devoted to this task. In an attempt to establish teams dedicated to this mission, in June 1995, the Commissioner of the legacy Immigration and Naturalization Service (INS) and the Attorney General signed *The National Detention, Transportation and Removal Plan*, an effort to stop the increase of fugitive aliens in this country. The plan called for the creation of "abscondee removal teams," and the 1996 Appropriation Bill provided funding for these new positions. According to one Office of Detention and Removal Operations document, although the positions were earmarked for the teams, the appropriation bill did not mandate that the positions be used for the teams. Consequently, the positions were absorbed into day-to-day INS detention and deportation operations.

In August 1998, INS instituted another effort to apprehend fugitive aliens. The INS Executive Associate Commissioner for Field Operations signed the *Fugitive Apprehension Operations, Detention & Deportation Operations Unit Planning Initiative*. This initiative called for the creation of Fugitive Operations Teams and specific training necessary to apprehend fugitives. According to an Office of Detention and Removal Operations document, the training was initially provided, but no teams were ever established.

---

[3] Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.*, March 7, 2006, page i

Absconder Apprehension Initiative

The terrorist attacks of September 2001 brought new attention to the fugitive alien backlog. The Deputy Attorney General's Absconder Apprehension Initiative made fugitive apprehension a priority for legacy INS, the Federal Bureau of Investigation, and the United States Marshals Service.[4]  At that time, INS determined there were approximately 314,000 fugitive aliens in the United States. The objective of the initiative was to "locate, apprehend, interview, and deport" those fugitive aliens. In support of the USA PATRIOT Act, ICE authorized 40 positions to be used exclusively for dedicated teams to apprehend fugitives.[5]  Subsequently, the Office of Detention and Removal Operations' headquarters deployed eight five-person teams in seven cities.

An additional objective of the Absconder Apprehension Initiative was the use of the National Crime Information Center to enhance federal authorities' ability to locate fugitives. This center is a nationwide law enforcement consortium and computerized index of criminal justice information. The Absconder Apprehension Initiative called for the information on 300,000 fugitive aliens to be placed into the National Crime Information Center database. Through its Law Enforcement Support Center, part of ICE's Office of Investigations, ICE administers and controls information on immigration violators in the database. The Law Enforcement Support Center provides immigration identity and status information to federal, state, and local law enforcement agencies on criminal aliens.

National Fugitive Operations Program

To enforce unexecuted final orders of removal and bring integrity to the immigration process, in February 2002, legacy INS established the National Fugitive Operations Program under the auspices of the Office of Detention and Removal Operations. When DHS was created in March 2003, ICE absorbed the National Fugitive Operations Program. According to an ICE fact sheet:

> The primary mission of [the National Fugitive Operations Program] is to identify, locate, apprehend, process, and remove fugitive aliens from the United States with the highest priority placed on those fugitives who have been convicted of crimes. Further, [the National Fugitive Operations Program's] goal is to eliminate the backlog of fugitives and ensure that the

---

[4] Department of Justice Memorandum, "Guidance for Absconder Apprehension Initiative," January 25, 2002.
[5] Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001. PL.-107-56.

number of aliens deported equals the number of final orders of removal issued by the immigration courts in any given year.

In its Strategic Plan, *Endgame,* dated June 2003, the Office of Detention and Removal Operations indicated that the National Fugitive Operations Program's goal was to eliminate the backlog of fugitive aliens by the end of 2012 and acknowledged that the initial allocation of 40 positions to fugitive operations would not be enough to reach that goal.

> The [National Fugitive Operations Program] will target this backlog by facilitating the apprehension and subsequent removal of those fugitives. The goal over the next ten years [2003 – 2012] will be to eliminate this backlog and to ensure that our efforts in terms of apprehension and removal of fugitive cases equal the number of new cases falling into this category. While woefully inadequate to achieve the goal, the creation of 40 positions dedicated to the [National Fugitive Operations Program] is a promising start.

However, in its Detention and Deportation Officer's Field Manual, dated August 2003, the Office of Detention and Removal Operations stated a more aggressive goal for the program: "The intended goal of this manual is the elimination of backlog fugitive ... cases by the conclusion of fiscal year 2009."

Whether by 2009 or 2012, apprehending and removing fugitive aliens and ensuring that final orders of removal are executed are clearly priorities for the Office of Detention and Removal Operations.

Funding for Fugitive Operations

Since FY 2003, Congress has provided the Office of Detention and Removal Operations funding to support fugitive operations. According to our analysis of ICE financial reports, since FY 2003, this office has allocated more than $204 million for the apprehension, detention, and removal of fugitive aliens.

**Table 1:  Funds Allocated to Fugitive Operations**

| Fiscal Year | Total Funds Allocated |
|---|---|
| FY 2003 | $9,333,519 |
| FY 2004 | $12,683,962 |
| FY 2005 | $72,186,192 |
| FY 2006 | $110,638,837 |
| Total | $204,842,510 |

Source: ICE Federal Financial Management System reports

<u>Fugitive Operations Team Structure</u>

Under the National Fugitive Operations Program, each team consists of seven members, as depicted in the figure below.  The four deportation officers, who report to the supervisory deportation officer, are responsible for identifying, locating, and apprehending fugitive aliens.[6]  The immigration enforcement agent assists in apprehending fugitives and transporting them from the place of arrest to an Office of Detention and Removal Operations detention facility or processing center.  The deportation assistant is a clerical employee who performs administrative tasks.

**Figure 2:  Fugitive Operations Team**



Typically, a team has seven members.  However, there are instances in which this does not apply.  For example, when one city has two teams, only one supervisory deportation officer is assigned to supervise both teams.  Additionally, one field office assigned two immigration enforcement agents, instead of one, to a team.

---

[6] Supervisory deportation officers and supervisory detention and deportation officers have the same responsibilities and both are GS-13 supervisory officers.  In this report, we use both titles to refer to Fugitive Operations Teams' supervisors.

Originally, only experienced GS-12 or "journeyman level" deportation officers were hired for the teams. However, the Office of Detention and Removal Operations recently decided to hire Fugitive Operations Teams' deportation officers at the GS-11 level as well. A United States Customs and Border Protection (CBP) human resources manager speculated that hiring at the GS-11 level was due to the depletion of the available GS-12 level applicant pool.

## Results of Review

### Fugitive Apprehension Reports Should Accurately Reflect the Teams' Activities

To measure the Fugitive Operations Teams' performance, the Office of Detention and Removal Operations used weekly field office apprehension reports provided to headquarters. However, these reports did not accurately reflect the teams' productivity. The Office of Detention and Removal Operations' statistical reports for the teams included apprehensions they made, as well as deportation officers within field offices who are not team members, and other federal, state, and local law enforcement agencies. The reports also included case closures, in which the Fugitive Operations Team verified that a fugitive alien died, voluntarily left the country, or changed their immigration status by, for example, becoming a United States citizen or legal permanent resident. The reported apprehensions involved varying levels of Fugitive Operations Teams' effort, from taking custody of and processing aliens already arrested by other law enforcement agencies to receiving leads, searching databases, talking to informants, and making apprehensions.

While it is not a requirement that the Fugitive Operations Teams and non-Fugitive Operations Teams apprehensions be recorded separately, the current reporting system does not provide a means by which managers can assess teams' performance. There is also no requirement that the level of the teams' involvement be a determining factor when receiving credit for apprehensions made by other sources, such as National Crime Information Center matches and arrests by other law enforcement agencies.

The fugitive apprehensions, as reported by the Office of Detention and Removal Operations, do not represent the productivity of the Fugitive Operations Teams but those of all field offices. In order to assess the true performance of the teams, it is essential that their activities be documented separately from other activities in the field offices. For this reason, the apprehension numbers used in this section of our report are presented as field office apprehensions rather than those of the teams.

<u>Fugitive Operations Teams' Goals and Reported Apprehensions in Fiscal
Years 2003 – 2006</u>

Varying apprehension priorities have been established since the formation of
Fugitive Operations Teams in FY 2003. Statistical information compiled by
the Office of Detention and Removal Operations shows all apprehensions
made in each field office from FY 2003 to FY 2006, making it virtually
impossible to determine the actual number of apprehensions made by the
teams. Consequently, the productivity of Fugitive Operations Teams is
uncertain as well as whether the teams met their annual apprehension goals.

In FY 2003, eight teams were created and distributed to field offices within
the Office of Detention and Removal Operations, then a part of legacy INS. A
headquarters manager said statistics for the first teams were compiled as of
March 2003. He said there was no funding specifically for Fugitive
Operations Teams in FY 2002, but fugitive apprehensions had been a duty for
deportation officers before the inception of the National Fugitive Operations
Program.

The goal of each team in FY 2003 was to apprehend 125 fugitive aliens, with
priority given to backlog fugitive alien cases and aliens released on orders of
supervision, a form of relief from detention that is similar to a parole. The
Office of Detention and Removal Operations sets conditions of release on
orders of supervision. Five of the seven field offices apprehended more than
125 fugitive aliens. Two field offices did not attain the goal.

In June 2004, the fugitive apprehension goal was changed and required that at
least 75% of each team's apprehensions be criminal aliens.[7] This requirement
remained in effect until January 2006. Field office reports indicated that the
fugitive apprehension goal was not met during this period of time.

In late January 2006, the fugitive apprehension goal was changed again. This
goal required the apprehension of 1,000 fugitive aliens per team each year.
The apprehensions were prioritized as follows: (1) fugitives posing a threat to
the nation; (2) fugitives posing a threat to the community; (3) fugitives with a
violent criminal history; (4) criminal fugitives; and (5) non-criminal
fugitives.[8] We were unable to determine whether this goal was achieved since
it changed four months into the fiscal year.

---

[7] Office of Detention and Removal Operations Memorandum, "Case Load Priority with Fugitive Operations," January
22, 2004. A "criminal fugitive" is a fugitive alien who has a criminal conviction identified in their Deportable Alien
Control System record.
[8] Office of Detention and Removal Operations Memorandum, "Fugitive Operations Case Priority and Annual Goals,"
January 31, 2006.

The office's then-acting director cited two reasons why the goal changed to 1,000 apprehensions. First, the creation of the Fugitive Operations Support Center would give teams more time to focus on apprehensions by vetting leads and performing database checks on fugitive aliens.[9] Purportedly, this would reduce the burden on Fugitive Operations Teams in performing these tasks. Secondly, because teams would no longer be required to apprehend 75% criminal aliens, the teams would be able to apprehend more fugitives aliens overall. He said the previous 75% goal predisposed the teams to focus on capturing criminal fugitives aliens, which was more time-consuming and neglected the arrests of non-criminal fugitives aliens. A second manager said apprehending criminal fugitives required more time due to tasks such as following up on leads and surveillance activities.

The table below shows the fiscal years in which Fugitive Operations Teams were authorized and the apprehensions reported by the field offices assigned those teams. These figures include all apprehensions made within field offices, whether by team members or not. The Office of Detention and Removal Operations official responsible for compiling statistical reports said this reporting method did not allow him to distinguish fugitive aliens apprehended by teams from those apprehended by others. Therefore, the table is not an accurate portrayal of the Fugitive Operations Teams' productivity, but it is our best effort to reconcile the figures given the manner in which the office reported fugitive apprehensions. Furthermore, because it reported apprehensions made by team and non-team members, the statistics presented below overestimate the teams' productivity.

**Table 2: Fugitive Apprehensions Reported by Field Offices with Authorized Teams**

| Fiscal Year[10] | Authorized Teams | Fugitive (Criminals) | Fugitive (Non-Criminals) | Total Fugitive Apprehensions |
|---|---|---|---|---|
| 2003 | 8 | 474 | 749 | 1,223 |
| 2004 | 18 | 4,378 | 3,956 | 8,334 |
| 2005 | 44 | 4,651 | 4,304 | 8,955 |
| 2006 | 52 | 4,158 | 7,706 | 11,864 |
| Total | 52 | 13,661 | 16,712 | 30,376 |

Source: Office of Detention and Removal Operations fugitive apprehensions reports

---

[9] The Fugitive Operations Support Center is described in greater detail in Appendix B.
[10] The statistics for FY 2003 only reflect apprehensions reported during the second half of FY 2003, March 2003 through September 2003, and the statistics for FY 2006 only reflect apprehensions reported during the first three quarters of FY 2006, October 2005 through June 2006.

<u>Additional Statistics Included in Fugitive Apprehension Reports</u>

The Office of Detention and Removal Operations reported fugitive alien
apprehensions from its field offices and satellite offices that do not have
dedicated Fugitive Operations Teams. The apprehensions made by
deportation officers in those offices are combined with apprehensions made
by teams and other officers assigned to field offices where teams are
deployed. For example, a supervisor explained that a satellite office under his
field office's supervision has two officers assigned to the non-detained docket
who also participated in fugitive operations. Fugitive arrests made by those
deportation officers are included in the field office weekly apprehension
report even though these officers are not assigned to the team.

In addition, reported fugitive apprehension statistics included arrests of
fugitive aliens by other law enforcement agencies using information extracted
from the National Crime Information Center. For example, a local police
officer might encounter a suspected illegal alien and check the person's
identity with the Law Enforcement Support Center. When the person is
identified as a fugitive alien in National Crime Information Center, the officer
contacts the Office of Detention and Removal Operations. A manager
explained that if local or state authorities intend to prosecute the fugitive alien
on local charges, the affected authority will take custody of the individual, and
the Fugitive Operations Team members place a detainer on the fugitive alien.
When no charges are filed, team members arrange to pick up the fugitive alien
for processing.

A detainer is an agreement that state or local prison or jail officials will notify
the Office of Detention and Removal Operations that illegal aliens are about
to be released. Officers from the Office of Detention and Removal
Operations' can then take the aliens into custody. Detainers placed on
fugitive aliens were reported as apprehensions, even though the alien was not
in the office's custody. However, as another officer noted and an Office of
Detention and Removal Operations headquarters manager confirmed,
headquarters told Fugitive Operations Teams to cease counting detainers as
apprehensions. One officer said that state and local authorities sometimes fail
to honor detainers and release the fugitive without notifying the office.

Case closures are another means by which field offices are given credit for
apprehensions. A case closure represents a fugitive alien who is determined
by the Office of Detention and Removal Operations to have (1) changed
immigration status, for example, the fugitive became a naturalized United
States citizen or a legal permanent resident; (2) died; or (3) left the country
voluntarily. Once a deportation officer verifies that the fugitive alien meets
one of the above conditions, the case may be closed. A majority of managers

and supervisors said they advised the teams to include case closures as apprehensions based on the amount of time deportation officers spend following leads and identifying aliens as fugitives.

Accurate Reporting Needed to Assess Progress of Fugitive Operations Teams

The Fugitive Case Management System, a database that became operational in June 2006, has replaced apprehension reports. This replacement provides the Office of Detention and Removal Operations with a computerized system to manage fugitive alien leads and track fugitive arrests or case closures. The database allows apprehension information to be entered by field office personnel and sent directly to headquarters for preparation of statistical apprehension reports. Since the database became operational after the conclusion of our fieldwork, we were unable to assess its effectiveness or accuracy.

Due to the various ways the office characterizes and reports apprehensions, it was difficult to determine with certainty whether the agency met the target goals from FY 2003 to FY 2005. Also, we were unable to predict whether the FY 2006 target goal of 1,000 apprehensions per team might be achieved since the goal changed four months into the fiscal year. Each Fugitive Operations Team must now arrest 1,000 fugitives a year, yet it cannot be determined whether the teams have ever met any performance threshold based on the past reporting of apprehensions per field office.

Performance measures should be valid representations of the progress toward achieving program goals and objectives. Without accurate tracking of program performance, the office's managers cannot make sound judgments about the program. Also, program managers cannot effectively estimate the benefit of additional Fugitive Operations Teams. Since the reporting process was a cumulative accounting of all apprehensions made within the field office, it was not representative of apprehensions made by the teams. Consequently, the Office of Detention and Removal Operations' fugitive operations apprehension reports did not properly reflect team performance.

**Recommendation**

We recommend that the Assistant Secretary for United States Immigration and Customs Enforcement:

**Recommendation 1:** Establish a Fugitive Operations Team reporting system that enables Office of Detention and Removal Operations managers to classify all categories of apprehensions.

### Fugitive Alien Backlog Is Increasing Despite the Teams' Efforts

The Office of Detention and Removal Operations' officers and managers cited several factors that limited the effectiveness of Fugitive Operations Teams in decreasing the fugitive alien backlog. These factors include the inaccuracy and functionality of the Office of Detention and Removal Operations' immigration database, unavailability of adequate bed space to detain fugitive alien apprehensions, and inadequate working space for additional staff hired to serve on the teams.

The office established the National Fugitive Operations Program to aid in identifying, locating, apprehending, processing, and removing fugitive aliens by deploying teams nationwide. According to the Detention and Deportation Officer's Field Manual, the Fugitive Operations Team's "immediate mission is the elimination of fugitive cases in their assigned office." However, despite the efforts of the teams, the backlog of fugitive alien cases has increased each fiscal year since the program was established in February 2002. The fugitive alien population is growing at a rate that exceeds the teams' ability to apprehend. The factors mentioned earlier contributed to the inability of Fugitive Operations Team apprehensions to keep pace with the increase in the backlog of fugitive aliens, not to mention reduce it.

**Table 3:  Estimated Fugitive Alien Backlog**

| Date | Total Number of Fugitives | Change From Previous Year | Percent Change |
|------|---------------------------|---------------------------|----------------|
| September 2001 | 331,734 | | |
| September 2002 | 376,003 | 44,269 | 13.3 % |
| September 2003 | 418,753 | 42,750 | 11.4 % |
| September 2004 | 465,353 | 46,600 | 11.1 % |
| September 2005 | 536,644 | 71,291 | 15.3 % |
| August 2006 | 623,292 | 86,648 | 16.1 % |

Sources: DHS OIG, *An Assessment of the Proposal to Merge Customs and Border Protection with Immigration and Customs Enforcement*, OIG-06-04, November 2005, page 90 and the Office of Detention and Removal Operations.

The backlog of fugitive alien cases has increased, on average, 51,228 each year over the four-year period ending September 2005. Also, the increase for the period from October 2005 to August 2006 was 86,648 fugitive alien cases. As of August 2006, the Office of Detention and Removal Operations estimated there were 623,292 fugitive aliens.

**Table 4:  Fugitive Alien Apprehensions Reported by All Field Offices**

| Time Period | Fugitive (Criminal) | Fugitive (Non-Crim.) | Total Fugitive Apprehensions |
|---|---|---|---|
| March 2003 – September 2003 | 1,302 | 2,088 | 3,390 |
| October 2003 – February 2004 | 1,631 | 2,176 | 3,807 |
| March 2004 – September 2004 | 3,917 | 3,261 | 7,178 |
| October 2004 – February 2005 | 2,152 | 2,833 | 4,985 |
| March 2005 – September 2005 | 2,550 | 3,669 | 6,219 |
| October 2005 – February 2006 | 2,104 | 2,557 | 4,661 |
| March 2006 – June 2006 | 2,054 | 5,149 | 7,203 |
| **Total** | **15,710** | **21,733** | **37,443** |

Source: Office of Detention and Removal Operations fugitive apprehension reports.

According to our analysis presented in Table 2, the field offices with authorized Fugitive Operations Teams reported apprehending 30,376 fugitives since FY 2003.  In our review of all apprehensions reported from March 2003 through June 2006 by all field offices, the Office of Detention and Removal Operations apprehended 37,443 fugitives.  With a backlog of 623,292 fugitives that is growing at a rate of more than 50,000 fugitives per year, the National Fugitive Operations Program's progress in addressing the backlog has been limited.  It is highly improbable that it will be eliminated in the near future.

Inadequate detention bed space, the overall capabilities of the Deportable Alien Control System and insufficient or nonexistent workspace are factors that limit the effectiveness of the Fugitive Operations Teams.  Other factors that limit the teams' effectiveness are members performing non-fugitive operations duties and insufficient staffing, both discussed in more detail later in this report.

Bed Space Constraints

Some of the Office of Detention and Removal Operations' officers noted that the lack of adequate detention space limits the effectiveness of the Fugitive Operations Teams.  A field office director reported ceasing fugitive operations for six weeks because of insufficient bed space and another manager reported slowing team operations for the same reason.  Other managers indicated that as more officers are hired to serve on the teams, managing the increased fugitive apprehensions with their current bed space capacity would become more difficult.

Aliens in the Office of Detention and Removal Operations' custody are held in three types of detention facilities. These include Service Processing Centers, which are government-owned and operated, Contract Detention Facilities, which are contractor-owned, and local or county jails. A headquarters official estimated that about half of the office's detained population is in local or county jails. Additionally, the office has bed space allocated by the Federal Bureau of Prisons, which can only be used for aliens who have been convicted of crimes.

A supervisory deportation officer from a field office, which was authorized 400 beds per day, said his office's three teams stopped apprehending fugitive aliens for approximately six weeks because no facilities were available to house the aliens. Additionally, the Office of Detention and Removal Operations' field offices often share bed space with other field offices. According to a field office director in a neighboring city, which was authorized 707 bed spaces per day, he had to slow down fugitive operations because all the office's beds in the region were full. The director told us he did not think the team would achieve its goal because of a lack of adequate bed space. By June 2006, the three teams in the nearby city had apprehended approximately 800 fugitives. The field office director foresaw apprehending 1,500 to 2,000 fugitives by the end of the year, depending on bed space availability.

Another supervisor indicated that a lack of adequate detention space is the team's biggest limitation. The field office director said that even if a team could apprehend 1,000 fugitives, they would have no place to put them. For FY 2006, this field office was funded for 246 bed spaces to hold not only Fugitive Operations Team's fugitive alien apprehensions, but also aliens apprehended by the other office's officers, the ICE Office of Investigations, and CBP Inspections at airports. The field office director stated that he is attempting to convince the office's headquarters managers to increase funding for this field office to 270 or 280 bed spaces. He reported that his detained population for that day was about 280.

Deportable Alien Control System Limitations

The Office of Detention and Removal Operations manages cases in the Deportable Alien Control System, a database that is the office's system of records. Legacy INS implemented this database, which provides ICE with data concerning the detention and deportation of aliens in accordance with immigration and nationality laws. The database also serves as a docket and control system by providing the Office of Detention and Removal Operations management with information concerning the status or disposition of deportable aliens.

The database contains four types of information: (1) "biographical records," including name, alias(es), nationality, date of birth, etc.; (2) "detention records," including whether the alien is in the Office of Detention and Removal Operations' custody and where; (3) "case records," which include deportation or removal case information; and (4) "jail records," which include information on aliens serving sentences. According to an analyst, there were approximately 4 million records in the database and 1.3 million open cases, of which almost half were fugitive aliens.

Fugitive Operations Team officers said that the database limits the capability of the teams. Specifically, they said the information in the Deportable Alien Control System was inaccurate or incomplete. One supervisor stated that the database has "been neglected for the past 25 years." An analyst, who has worked the Deportable Alien Control System help desk for ten years, estimated that approximately 50% of the data in the database is accurate, and there is more incomplete than inaccurate information. Having a large number of aliens to manage and few staff members to handle them made maintaining information difficult. For example, New York City had 200,000 aliens on its non-detained docket and at one point only 10 deportation officers to manage both detained and non-detained cases in the Deportable Alien Control System. Because of the ratio of cases to deportation officers, timely updating of the database was nearly impossible.

Recognizing the problems associated with the database's data integrity, the Office of Detention and Removal Operations issued a directive mandating that all personnel "completely enter all data fields in [Deportable Alien Control System]" and ensure the information is accurate and accessible to both the field and headquarters.[11] In addition, some field offices were directed to update the fugitive data in their area of responsibility to reflect actual cases of fugitives that are removable and to update past due call-up dates, which is a case call-up function in the database that allows officers to review cases periodically.

Some officers and managers mentioned a proposed replacement for the Deportable Alien Control System, called the ENFORCE Removals Module, which is an automated law enforcement information system. According to the Office of Detention and Removal Operations, the purpose of the program is to deploy a service-wide, information-based system that uses automation to reduce the amount of time agents spend on manual administrative work. However, as of August 2006, the replacement has not been implemented.

---

[11] Office of Detention and Removal Operations Memorandum, "Reiteration of Data Entry Policy for the Deportable Alien Control System," January 12, 2006.

<u>Insufficient or Nonexistent Work Space</u>

Many members said they are working in cramped and overly crowded work areas. It is not clear whether the availability of adequate working space was taken into account as new positions were generated for the deployment of the teams. Additionally, as of July 2006, a Rock Island team that was authorized in FY 2004 has not been established because there is no available facility from which team members can work. An officer explained that the team was designated, but the building to house them has not been completed. A supervisor noted that officers were selected for the Rock Island team, but they have since taken other jobs because the team was never formed.

In FY 2005, the Office of Detention and Removal Operations established a team that would be housed at a later date in a satellite office 60 miles from the team's field office. This team began operations in October 2005 and was staffed with four deportation officers and one supervisory deportation officer. Because no office space was available in the satellite office at the time, the team operated out of the field office from October 2005 to March 2006. The team performed their duties in the field office, such as database checks and other tasks associated with locating fugitives, while apprehending fugitives in the area of the satellite office. During this time, the officers were on "per diem" as the location of their office was not their official duty station, although they were apprehending fugitives in the area of the official duty location.

In March 2006, the team was given limited office space in their satellite office. Two deportation officers and one immigration enforcement agent assigned to the team work in a small room that was previously a detention cell and was later converted to an interview room. One officer measured the room and said that it was 12 feet by 15 feet, or 180 square feet. Another deportation officer sits at a table that holds the team's fax machine. The supervisory deportation officer has an office that was previously an interview room, and the deportation assistant sits at the desk of the satellite office receptionist.

Other teams have working conditions that are less than ideal. Because the Office of Detention and Removal Operations' building in one Midwest city was already overcrowded when the Fugitive Operations Team was established in FY 2003, team members worked in office space loaned to them from CBP in a terminal at the local airport. In another example, five members of a Northeast team work in a "chopped up office" that was originally designed for two people.

Without sufficient office space, accurate and up-to-date databases, and detention space commensurate with apprehensions made by Fugitive

Operations Teams, the teams' effectiveness is limited, making it difficult to work at maximum capacity.

**Recommendation**

We recommend that the Assistant Secretary for United States Immigration and Customs Enforcement:

**Recommendation 2:** Conduct an assessment of the working space presently available to all Fugitive Operations Team members and develop a detailed plan to ensure that current and future officers are provided an adequate working environment that meets applicable federal standards.

## Removal Rate of Teams' Fugitive Alien Apprehensions Cannot Be Determined

We were unable to determine the removal rate of fugitive aliens apprehended by Fugitive Operations Teams. If fugitives captured by teams are not removed, the ultimate objective of final orders of removal has not been achieved, and the efforts of the teams are undermined. As the Office of Detention and Removal Operations noted in its Strategic Plan, *Endgame*:

> Moving toward a 100% rate of removal for all removable aliens is critical to allow the ICE to provide the level of immigration enforcement necessary to keep America secure. Without this final step in the process, apprehensions made by other DHS programs cannot truly contribute to national security.

Also, according to an ICE fact sheet, the "[National Fugitive Operations Program's] goal is to eliminate the backlog of fugitive aliens and ensure that the number of aliens deported equals the number of final orders of removal issued by the immigration courts in any given year."

We could not determine the percentage of team-apprehended fugitive aliens removed from the United States by the Office of Detention and Removal Operations. In its National Fugitive Operations Program weekly statistical report, the office recorded, in separate columns, the total number of apprehended fugitive and non-fugitive aliens. According to the Detention and Deportation Officer's Field Manual, these non-fugitive alien apprehensions, also referred to as "collateral apprehensions" or "incidental arrests," are the "apprehensions of persons other than fugitive aliens," which have not been issued final orders of removal. Fugitive Operations Team members are charged with taking these individuals into custody and placing them into

removal proceedings. However, the numbers of apprehended fugitives and non-fugitive aliens were combined to account for the total number of apprehensions.

The report also contained a column showing the total number of aliens removed from the country. However, the report does not specify whether the removed aliens were fugitive or non-fugitive aliens or whether a Fugitive Operations Team or non-Fugitive Operations Team member made the apprehensions. Accordingly, we were unable to determine the percentage of fugitive alien apprehensions removed.

As of June 2006, according to reports from the Office of Detention and Removal Operations, 49,473 illegal aliens were apprehended, of which 37,443 were fugitives. Also according to data extracted from the Deportable Alien Control System as of July 2006, the office reported removing 32,206 of those illegal aliens, or 65% of the total apprehended. Since the office does not distinguish between fugitives and non-fugitives in its removal figures, we could not determine the percentage of fugitive aliens removed from the country. More specifically, it is unknown how many of the fugitive aliens apprehended by the teams were removed. When fugitive aliens have not been removed, they are likely released into the United States on their own recognizance or an order of supervision.

The United States Supreme Court has determined that aliens could not be held indefinitely if there was no likelihood they would be removed from the country in the foreseeable future.[12] In these situations, aliens who cannot be removed are released from custody. The release of fugitive aliens undercuts the productivity of Fugitive Operations Teams and counteracts the deterrence posed by effective apprehension.

**Recommendation**

We recommend that the Assistant Secretary for United States Immigration and Customs Enforcement:

**Recommendation 3:** Provide the resources needed by the Office of Detention and Removal Operations to detain, process, and remove all fugitive aliens apprehended by the Fugitive Operations Teams.

---

[12] Zadvydas v Davis, 533 U.S. 678 (2001); Clark v Martinez, 543 U.S. 371 (2005). (The Office of Detention and Removal Operations may detain an alien for a presumptively reasonable six-month period. If after six months it is determined that the alien's removal is not significantly likely in the reasonable foreseeable future, then the alien must be released, unless the alien meets stringent criteria for continued detention.)

## Team Members Performed Non-Fugitive Operations Duties

Although Fugitive Operations Teams are prohibited from performing duties not associated with fugitive operations, almost all team members reported performing collateral duties while assigned as team members. Collateral duties include firearms instructor, juvenile coordinator, and jail inspector.

According to an Office of Detention and Removal Operations document, "non-fugitive operations duties" include, but are not limited to, docket management, bond management, Institutional Removal Program operations, travel document issues, domestic and foreign alien escorts, and jail inspection. "Fugitive operations duties" are identified as case preparation, field investigation, surveillance, apprehension operations, criminal prosecutions, court time, and task force participation.

Team members also reported that, while serving as a member of the team, they were involved in escorting aliens returning to their country of origin or from local jails to an Office of Detention and Removal Operations facility, taking bonds, escorting special interest aliens to court appearances, and managing the detained and non-detained dockets.

While team members are performing non-fugitive operations duties, they are unable to identify, locate, or apprehend fugitives. However, many officers we interviewed indicated that in January 2006, management began to enforce its policy restricting team members from performing non-fugitive operations duties. The exception to this policy was assigning them to serve as firearms instructors for mandatory quarterly firearms qualifications. Certified firearms instructors oversee the qualifications and assist remedial officers who have difficulty meeting the qualification standards.

The Office of Detention and Removal Operations' policy prohibits team members from performing non-fugitive operations duties. According to the Detention and Deportation Officer's Field Manual, Fugitive Operations Team members:

- Shall only be assigned to fugitive cases with an emphasis on backlog cases.

- Shall not be assigned to any duties that will deter them from conducting fugitive operations, including but not limited to, case management of the general detained or non-detained dockets, escorts and collateral duties normally accomplished by general assignment deportation officers.

Also, according to an ICE fact sheet, "The designated [Fugitive Operations Teams], strategically deployed around the country, work *solely* on those cases identified as fugitives and attempt to locate and apprehend those persons who will ultimately be removed from the United States." (Emphasis added.)

Additionally, a previous Office of Detention and Removal Operation's director sent a memorandum to all field office directors in December 2003 reiterating that team members are only to conduct fugitive operations duties.[13] The memorandum cited examples of prohibited tasks, such as escorts, taking bonds, court details, and consular liaison.

For example, one team member was a juvenile coordinator for the field office and, as such, had to attend to the special needs of juveniles in the Office of Detention and Removal Operations' custody. Although he could not estimate the time he devoted to juvenile coordinator duties, he recalled escorting at least seven juveniles since being assigned to the team in October 2005. The director for this field office indicated there had not been a juvenile coordinator training course offered in some time. Therefore, he could not assign this duty to another officer in the field office. Without available training, non-Fugitive Operations Team members cannot be certified to perform juvenile coordinator duties to supplant the officers assigned to the teams.

Another team member reported that the team provided transportation for special interest aliens suspected of terrorist activity. This involves picking up illegal aliens in local jails and transporting them to the Office of Detention and Removal Operations' detention facilities or to criminal court appearances. This officer indicated that the team normally spent approximately two days per week transporting aliens. The director for this office said he assigned Fugitive Operations Teams to jail transport activities because of their training and proficiency in handling rifles and assault-type weapons.

Several team members were also certified firearms instructors. Most reported overseeing the quarterly firearms qualifications for all officers in their field office. One officer reported spending about five weeks during the year performing this collateral duty. Another supervisory officer estimated that a firearms instructor spends two hours per day for four or five days each quarter on firearms instruction. That estimate equates to 40 hours per year. Even after management began enforcing its policy restricting Fugitive Operations Teams from performing non-fugitive operations duties, officers continued to perform firearms instructor duties.

[13] Office of Detention and Removal Operations Memorandum, "Utilization of Fugitive Operations Team Members," December 3, 2003.

Also, many Fugitive Operations Team officers explained that they were required to continue performing the duties for which they were assigned before joining the teams. These assignments primarily involved managing non-detained docket cases until another officer was hired to backfill the vacancy created when the deportation officer was reassigned to the team.

**Recommendations**

We recommend that the Assistant Secretary for the United States Immigration and Customs Enforcement:

**Recommendation 4:** Assign Fugitive Operations Team members in a manner consistent with its Detention and Deportation Officer's Manual or amend the manual to reflect current assignment practices.

**Recommendation 5:** Train and certify deportation officers who are not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

## Progress Has Been Made in Staffing the Teams

Despite operating under hiring restrictions that hindered staffing for more than two years, ICE has made progress in establishing additional teams. In October 2006, the Office of Detention and Removal Operations announced there were 50 Fugitive Operations Teams nationwide.[14] This is a significant achievement considering the 16 teams apprehending fugitive aliens in June 2005.[15] According to the office's acting director at the time, the Office of Detention and Removal Operations planned to have all 52 authorized teams in place by the end of FY 2006.

Although progress has been made to establish Fugitive Operations Teams, all teams are not fully staffed. Only 225, or 76%, of the 297 positions authorized for 44 teams through FY 2005 have been filled.

In May 2006, the Office of Detention and Removal Operations provided a staffing list that outlined 352 authorized field positions for 52 Fugitive Operations Teams. Our analysis of filled positions does not include an additional 55 personnel authorized for eight teams in FY 2006. We were

---

[14] ICE news release, "ICE Adds Seven New Fugitive Operations Teams to its Nationwide Arsenal: 496 Fugitives Arrested by San Antonio Team," August 10, 2006.
[15] ICE news release, "187 Arrested in Major ICE Criminal Alien Fugitive Operation: ICE and New England Law Enforcement Partners Arrest Criminals with Convictions for Violent Crimes," June 16, 2005.

provided an updated staffing list in August 2006, which did not provide sufficient information to be analyzed and, therefore, was not included.

<u>Obstacles to Hiring Team Members on a Timely Basis</u>

The most significant obstacle to resolving the staffing shortfall was the ICE hiring restrictions imposed from March 2004 to July 2006. During this period, ICE was subject to three phases of hiring restrictions: (1) an initial hiring freeze through September 2004; (2) a period of severely restrictive hiring of crucial positions pending approval from a waiver board that was established to review all requests and justifications for hiring lasting through May 2005; and (3) 14 months of minor hiring restrictions, during which waivers were only required before a date could be set for a selected individual to enter on duty and actions involving permanent change of stations requiring moving funds. The waiver board and all hiring restrictions were finally dissolved in July 2006.

A large volume of applicants seeking positions within the Office of Detention and Removal Operations also affected hiring. When hiring restrictions were lifted, many general vacancies, including Fugitive Operations Team positions, had to be filled. A human resources manager stated there was a minimum of 120 vacant positions announced at that time that resulted in the office receiving thousands of applications. The manager also said the applicant pool for Fugitive Operations Team positions had been very large, with the office receiving nearly 500 applications from deportation officers, immigration enforcement agents, CBP inspectors, and Border Patrol agents for one vacancy. Processing substantial numbers of applications contributed to hiring delays for team positions.

The Office of Detention and Removal Operations' dependence on a human resources service center managed by CBP in Laguna Niguel, California, which itself is understaffed, is another factor that affects filling positions. The service center is responsible for non-entry level hiring of the Office of Detention and Removal Operations' employees and provides support to the office for staffing, personnel actions, payroll, promotions, and benefits.

In FY 2005, the service center announced 379 vacancies, reviewed 26,764 applications, issued 1,196 selection lists, and processed 455 selections.[16] The service center's staffing unit is authorized 15 staff members. As of July 2006, it had nine staffing specialists and four human resources assistants. Five of the specialists service the Office of Detention and Removal Operations' programs full time. In addition, the office recently agreed to provide the staffing unit with four contractors, who will assist them in performing human

---

[16] The Laguna Niguel Service Center provided statistics in a report dated October 18, 2005.

resource assistant work. The shortage of manpower to process large volumes of applications was a contributing factor to delays in hiring team members.

Another factor inhibiting the timely staffing of Fugitive Operations Teams was DHS' Secure Border Initiative, which was announced in November 2005. As a result of the initiative, new detention facilities were to be opened in various locations, which also required supervisory deportation officers, deportation officers, supervisory immigration enforcement agents, immigration enforcement agents, and support staff. A CBP human resources manager noted the initiative created a "volume and urgency" to hire for that program alone, adding to the already heavy workload of the staffing unit.

The security clearance process has also been an impediment to hiring. Under legacy INS, verifying whether applicants had security clearances involved only checking current employees' social security numbers. After this cursory check, the individual would be cleared since no background investigation was needed. However, under DHS, the security clearance verification process changed. When the individual was an ICE employee, the process described above was followed. When, however, the applicant came from CBP or another entity, a background investigation had to be conducted even when the applicant already had a valid security clearance. The security clearance required submission of the necessary paperwork, conduct of the background investigation, and adjudication of the results of the investigation before the security clearance could be granted.

In January 2006, the requirements changed again, allowing for quicker security checks for both ICE and CBP employees. Now, they only have to fill out forms when a five or ten-year reinvestigation is necessary. This policy change expedited the hiring process.

Progress in Hiring Made But Teams Not Fully Staffed

Despite the obstacles to hiring, progress has been made as demonstrated by the increase of teams from 16 to 45 since June 2005.[17] As of May 2006, 76% of the positions authorized for 44 teams through FY 2005 were filled, while only four were fully staffed. At the time of our fieldwork, twenty teams had five or six members on board, and the remaining teams had four or less members. The Rock Island team remained vacant.

Eight Fugitive Operations Teams were authorized for FY 2006, five of which were deployed to locations that did not have teams in prior years. Of the 35 authorized personnel for these five teams, only five members, or 14%, were

---

[17] ICE news release, "ICE Adds Seven New Fugitive Operations Teams to its Nationwide Arsenal: 496 Fugitives Arrested by San Antonio Team," August 10, 2006.

on board. We did not include the three remaining teams authorized for FY 2006 because they were deployed to locations that previously had Fugitive Operations Teams.

Headquarters and other locations that support Fugitive Operations Teams are also not fully staffed. In addition to the field staff, the National Fugitive Operations Program has additional positions to support the teams that are assigned to the Office of Detention and Removal Operations' headquarters, the Federal Law Enforcement Training Center in Glynco, Georgia, and the Fugitive Operations Support Center in Burlington, Vermont. In February 2006, only 20 of the 40 authorized support staff, or 50%, were on-board. The staffing list provided on May 26, 2006 did not include figures for Fugitive Operations Teams' support staff. Therefore, our analysis does not include the authorized staff for the Fugitive Case Management Unit because these numbers were not provided in the February 2006 staffing list. In addition, these figures do not include authorized positions that have not been assigned.

The hiring restrictions imposed from March 2004 to July 2006 and the delays associated with the CBP service center inhibited the timely hiring of the teams. Lifting the waiver requirements, conducting faster security checks, and employing additional personnel to the human resources unit will expedite the hiring process. Many teams have been established nationwide, but numerous vacancies remain. As a consequence, the teams' effectiveness is reduced.

## Partnerships with Federal, State, and Local Agencies are Effective

The teams are successfully liaising and coordinating with other entities to locate and apprehend fugitive aliens through partnerships in obtaining information on fugitive aliens and enlisting other entities' participation in Fugitive Operations Team-led apprehensions.

Networking Important to Obtain Fugitive Leads

With 623,292 fugitive aliens to locate and apprehend, all teams obtain information on fugitives and generate leads as to their locations by enlisting the aid of federal, state, and local partners, including the following:
- Department of Labor
- Social Security Administration
- United States Marshals Service
- Federal Bureau of Prisons
- State departments of corrections, parole, and probation
- Local law enforcement and jails

The Detention and Deportation Officer's Field Manual directs the Fugitive Operations Teams to establish relationships with external agencies to share information on fugitive aliens that may lead to successful apprehensions.[18] The teams' reliance on these agencies for intelligence gathering provides added resources that might not have been available otherwise.

Although such contacts are useful to maintain the networking capacity between the agencies, access to the agencies' databases can be more effective than coordinating information requests. Having the ability to search a number of databases allows access to a larger pool of information.

<u>Information Sharing and Data Reconciliation Important in Providing Valid Fugitive Leads</u>

The Fugitive Operations Teams have successfully partnered with individual federal, state, and local departments and agencies on an ad hoc basis to acquire information about fugitive aliens. At the national level, data collection can be expanded through the use of information sharing agreements with various federal agencies. The Office of Detention and Removal Operations has negotiated three agreements to access data from the databases of other federal agencies and obtain information on the identification and location of potential fugitive aliens.

In pursuit of information sharing practices encouraged in the USA PATRIOT Act and the Immigration and Nationality Act, which directs any government agency to provide information as to the identity and location of aliens in the United States "to the Service upon request made by the Attorney General to the head of any such department or agency,"[19] ICE signed three memoranda of understanding with the Departments of State, Labor, and Housing and Urban Development.[20] Under those agreements, ICE provides data on fugitive aliens from the Deportable Alien Control System to those agencies. The agencies then reconcile the data provided with information in their respective databases and any matches found are shared with ICE. A fourth agreement with the United States Marshals Service gives the Marshals direct access to the Deportable Alien Control System to obtain selected aliens' status, history, and other information. This agreement does not give ICE access to the Marshals' databases.

---

[18] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 4, "Case Assignment, Preparation and Management," and Chapter 19, Section 19, "ICE Most Wanted Poster."
[19] PL 82-414, Section 290(b). Codified at 8 USC, Section 1360(b).
[20] Memorandum of Understanding between ICE's Office of Detention and Removal Operations and the Department of State, Bureau of Consular Affairs, November 2003; the Department of Labor OIG, April 2004; and the Department of Housing and Urban Development OIG, November 2004. Interconnection Security Agreement between ICE's Office of Detention and Removal Operations and the United States Marshals Service, August 5, 2004.

According to a headquarters manager, the Office of Detention and Removal Operations has been in the process of negotiating two additional memoranda for the past year with the Social Security Administration and the Chicago Police Department. However, those agreements had not been finalized as of July 2006.

After the data are exchanged between the Office of Detention and Removal Operations and its federal partners, the data must be reconciled. A headquarters manager explained that although the data exchange might have identified matches between the databases, further data resolution must occur before leads are sent to the field. This ensures that the fugitive's identity and background information are valid.

The exchange and reconciliation of data at the headquarters level would provide access to larger amounts of data that the individual teams might not have access to at the local level. The reconciliation of fugitive alien data and the preparation of viable leads for the teams originating at headquarters would permit the teams to focus on apprehensions and spend less time performing searches in various databases. Although information-sharing agreements exist, they have not been fully utilized because the exchange of data and its reconciliation have not been occurring on a regular basis.

Currently, deportation officers search for fugitives in various federal, state, and local databases. A formal information-sharing agreement or approved access to external databases would expand the scope of searches compared to the officers' individual queries.

Fugitive Operations Conducted with Federal, State, and Local Law Enforcement Agencies

Coordination exists between the Fugitive Operations Teams and federal, state, and local law enforcement agencies in conducting multi-jurisdictional fugitive operations. Specifically, the teams contact law enforcement officers to inform them of their anticipated activities in the area prior to conducting an operation. This coordination allows teams to tailor their operations to avoid conflicts with any ongoing investigations concerning the targeted fugitive or the jurisdiction in which the operation would take place.

In addition, many teams have solicited the assistance of local law enforcement officers to participate in fugitive alien apprehensions. In such instances, the local police typically only provide support through their uniformed presence and do not participate in apprehensions or the interview process.

According to a local law enforcement officer who participated in Fugitive Operations Team-led operations, most people are afraid of the officers in plainclothes and a uniformed police officer often eases their concerns. Therefore, Fugitive Operations Teams frequently seek uniformed officers' presence during apprehensions when possible. In one fugitive apprehension we observed, the team called the local police department and requested uniformed assistance. Upon the two uniformed police officers' arrival, the team provided them with information on the targets, such as their identity, photographs, and criminal history. At the fugitive's residence, we observed the team and police officers secure the exterior and interior of the house.

Although the police officers were present, the Fugitive Operations Team was responsible for watching the target and others in the residence to ensure they did not present a threat. Team members conducted the interview and obtained the fugitive's passport, which identified the fugitive's country of origin. Once the apprehension was made, the team took custody of the fugitive and the police officers departed the scene.

The process is largely the same in major operations planned by the Fugitive Operations Teams. Since June 2005, the teams have conducted major operations throughout the nation, including:

- Operation Return to Sender, a nationwide initiative,
- Operation City Lights in Las Vegas,
- Operation Phoenix in Florida,
- Operation Deep Freeze in Chicago, and
- Operation FLASH in New England.

These major operations were coordinated efforts to identify, locate, and apprehend a large number of fugitive aliens in a short period of time. Combinations of Fugitive Operations Teams from various areas, investigators from ICE's Office of Investigations, the United States Marshals Service, various state departments of corrections and motor vehicles, and other federal, state, and local departments and law enforcement agencies participated. For example, according to a county sheriff whose deputies participated in Operation FLASH, the Fugitive Operations Team contacted his office and requested deputies to assist in an operation. He explained that the participating deputies received direction from the Office of Detention and Removal Operations' field commander.

In addition, the teams participate in operations and task forces led by other agencies, such as ICE's Office of Investigations' Operation Predator and the United States Marshals Service's Operation Falcon. The Fugitive Operations Teams strengthen and reinforce their networks with other agencies by offering their resources and manpower to these initiatives.

To enhance their effectiveness further, one field office has sought the aid of three local law enforcement agencies by formalizing cooperative agreements to establish a joint fugitive task force. The agreements specify that additional law enforcement officers will be provided at the expense of the partnering agencies to assist the team in locating, apprehending, and locally transporting fugitive aliens. According to one non-Fugitive Operations Team task force member, his responsibilities are the same as the Fugitive Operations Team members but the teams are more knowledgeable of the administrative aspects of immigration procedures.

These agreements were negotiated under legacy INS. The Office of Detention and Removal Operations' field office is currently drafting cooperative agreements with the same agencies outlining identical roles and responsibilities under ICE authority. As of August 2006, the agreements had not been finalized.

Although the degree of coordination with federal, state, and local law enforcement agencies differs among Fugitive Operations Teams, the teams are networking effectively with the wider law enforcement community. This coordination of activities has proven beneficial in increasing the teams' effectiveness.

<u>Certain Cities Prohibit Local Law Enforcement Authorities from Assisting with Immigration Enforcement</u>

A few Fugitive Operations Team members explained that some cities have policies prohibiting local law enforcement agencies from assisting teams to locate fugitive aliens. Specifically, a few major cities have policies that prohibit local law enforcement officers from questioning immigrants, contacting federal authorities, or providing the identity and location of illegal immigrants in the communities.

The Denver Police Department, for example, has a policy stating that officers should not initiate any action to determine a person's immigration status. Furthermore, officers will generally "not detain, arrest, or take enforcement action" against an individual on suspicion of being illegal.[21] One Office of Detention and Removal Operations officer said San Francisco is considered a "sanctuary city" and local police departments are prohibited from assisting team members. Specifically, a San Francisco ordinance limits the

---

[21] This policy is not applicable when the individual is arrested for other charges. Denver Police Department, Denver Police Department Operations Manual, "Arrests," 104.52(3), Revised July 2005

circumstances under which city and county officers assist in enforcing federal immigration law or gathering or disseminating information on residents' immigration status.[22]

According to the Office of Detention and Removal Operations officer, the San Francisco Fugitive Operations Teams coordinate with only a few non-federal agencies in the region. Although the teams reach out to other agencies, there are cities with policies that limit the teams from effectively partnering with local law enforcement agencies.

The Fugitive Operations Teams need the resources and manpower that local law enforcement agencies possess. Partnerships with local officers, who are more connected to the communities they serve, are a major tool team members can use to locate and apprehend fugitive aliens.

**Recommendations**

We recommend that the Assistant Secretary for the United States Immigration and Customs Enforcement:

**Recommendation 6:** Negotiate information sharing agreements with federal, state, or local agencies that can provide access to information pertaining to fugitive aliens and provide the resources needed by the Office of Detention and Removal Operations to reconcile data from those agencies.

## Team Members Have Basic Law Enforcement Training

The Fugitive Operations Training Program offered at the Federal Law Enforcement Training Center provides team members basic tools to locate and apprehend fugitive aliens and introduces participants to standard procedures involving fugitive operations. Since many teams have been recently staffed, not all team members have attended the training program, which they are required to attend within two years of their assignment to the team.[23] According to the Detention and Deportation Officer's Field Manual, though, before a field office director can authorize an officer's participation in fugitive operations, the officer must have completed some basic law enforcement training.[24] Although not all team members have attended the Fugitive

---

[22] City of San Francisco, San Francisco Administrative Code, Ordinance Code Chapter 12H, 1989.

[23] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 16, "Fugitive Operations Training Requirements," December 10, 2004.

[24] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 1, "Introduction to Fugitive Operations Policy and Procedure Manual and Historical Perspective," August 21, 2003, page 5.

Operations Training Program, at a minimum, they all have completed some basic law enforcement training.

## Fugitive Operations Training Program

The three-week Fugitive Operations Training Program offers basic training in fugitive operations to all officers performing fugitive operations. This includes fugitive case file preparation and review, database queries useful for locating fugitives, networking options, use of confidential informants, surveillance, and planning and conducting apprehension operations.[25]

There have been 21 courses and 469 Office of Detention and Removal Operations personnel have attended the course from FY 2004 to FY 2006. The Federal Law Enforcement Training Center provided the training program's student rosters as of May 1, 2006. The FY 2003 rosters were not included. Other Office of Detention and Removal Operations officers not serving on the Fugitive Operations Teams attended the training program as well.

Many team supervisors noted that most of their deportation officers have completed the requisite training to conduct fugitive operations but not all team members have attended the Fugitive Operations Training Program. The supervisors said those members would be scheduled to attend. Some team members completed the training more than once and others attended the course before joining the team.

In addition, while teams are encouraged to seek refresher training at the local level, there is no national refresher course for the Fugitive Operations Teams. Although the Fugitive Operations Training Program course may be updated to reflect changes in immigration law or procedures, the new or updated information would be presented only to those attending subsequent course sessions.

## Experience in Law Enforcement and Fugitive Operations

With the exception of the deportation assistants, all team members must have successfully completed the Immigration Officer Basic Training Course or the United States Border Patrol Academy prior to being assigned to a Fugitive Operations Team.[26] Vacancy announcements for officer positions indicate applicants must have completed either of these entry-level courses or other equivalent ICE training programs. These training courses offer instruction on

---

[25] DHS, ICE, *Fugitive Operations Training Course: Participant Workbook*, July 8, 2003.
[26] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 1, "Introduction to Fugitive Operations Policy and Procedure Manual and Historical Perspective," August 21, 2003, page 5.

laws pertaining to immigration and nationality, criminal statutes and statutory authorities, agency operations and procedures, defensive tactics, use of firearms, and drivers training.[27]

Fugitive operations require team members to review and update the Deportable Alien Control System and documentation in alien files to determine whether an alien is illegal, subject to removal, and whether actions, such as a petition to change their immigration status or an appeal with the immigration courts, are pending.[28] The Fugitive Operations Teams are to verify whether a fugitive has filed a petition for a change in immigration status or has an appeal pending before the Executive Office for Immigration Review's Board of Immigration Appeals or the federal courts because this will affect the ability to remove the fugitive.

Such determinations call for a comprehensive understanding of immigration laws and regulations, as well as knowledge of the immigration court process involving the Executive Office for Immigration Review. Once this determination is made, the fugitive must be located and apprehended without endangering the officers. Training assists in equipping team members to successfully perform their jobs. Therefore, it is crucial that all Fugitive Operations Team members complete their training requirements. Further, team members should receive periodic refresher instruction whenever there are legislative changes or information technology upgrades.

**Recommendation**

We recommend that the Assistant Secretary for the United States Immigration and Customs Enforcement:

**Recommendation 7:** Assess the training requirements and needs of the Fugitive Operations Teams and consider establishing a fugitive operations refresher course.

---

[27] DHS, *Federal Law Enforcement Training Center Catalog of Training Programs, 2005-2006*, March 2005, page 96 and CBP Border Patrol Academy courses at http://www.cbp.gov/xp/cgov/careers/customs_careers/border_careers/bp_academy/bp_acad_courses.xml.

[28] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 4, "Case Assignment, Preparation and Management," page 3.

## Management Comments and OIG Analysis

ICE provided specific responses on each of the seven recommendations and technical comments on particular statements and facts contained within the draft report. ICE requested that the technical comments be published with the final report if not adopted in their entirety. In addressing ICE's technical comments, we evaluated each comment on its merit and modified our report where appropriate. ICE requested language changes throughout the report, such as "apprehensions" to "arrests" and "apprehension reports" to "enforcement activity reports." We did not make the technical changes because use of those terms occurred after the completion of our fieldwork. However, the technical comments were included in their entirety in Appendix E of this report. We revised Recommendation 4 and ICE provided an amended response to that recommendation, which is also included in Appendix E. ICE concurred with all seven recommendations. One recommendation is closed and six remain open.

**Recommendation 1:** Establish a Fugitive Operations Team reporting system that enables Office of Detention and Removal Operations managers to classify all categories of apprehensions.

**ICE Response:** ICE concurred with this recommendation. ICE developed the Fugitive Case Management System in April 2005 but the system was not certified and accredited for use by the ICE Office of the Chief Information Officer until March 3, 2006. From June 27-28, 2006, ICE supervisors met in St. Louis, Missouri, for Fugitive Case Management System training. The system was made available to all field offices on August 28, 2006 to report fugitive operations activities, generate various management reports, and measure team performance.

As officers enter activities into the Fugitive Case Management System, they differentiate between various actions by choosing the appropriate classification for each case from a "drop-down" menu. Additionally, the system is capable of identifying the officer who performed the action, thereby differentiating between Fugitive Operations Team and non-Fugitive Operations Team personnel. Using data entered into the Fugitive Case Management System, the Office of Deportation and Removal Operations can now track field activity by actual arrests, case closures, category changes, and placement of detainers. This function was not previously available.

**OIG Analysis:** We consider the recommendation resolved and closed. ICE's actions meet the requirements of this recommendation. We reviewed reports from the Fugitive Case Management System and were satisfied that the system appropriately classified each category of apprehensions.

In addition to ICE's response to this recommendation, the Office of Deportation and Removal Operations submitted technical comments under separate cover, requesting that all comments be included in the draft report. The comments pertaining to this recommendation were a reiteration of the formation and capability of the Fugitive Case Management System, which was described in detail in ICE's response and incorporated into our report. To avoid repetition, we did not include these comments because comparable language had been used in ICE's response to the draft report.

**Recommendation 1 – Resolved – Closed**

**Recommendation 2:** Conduct an assessment of the working space presently available to all Fugitive Operations Team members and develop a detailed plan to ensure that current and future officers are provided an adequate working environment that meets applicable federal standards.

**ICE Response:** ICE concurred with this recommendation and is taking steps toward its implementation. In its response, ICE said that a Space Allocation Survey is incorporated into the systematic process for identifying the needs of additional workspace and then assessing the available resources to accommodate such requests. In addition to the Space Allocation Survey, in October 2006, ICE asked affected field offices to identify their facility needs for the deployment of new Fugitive Operations Teams for FY 2007.

ICE said that space acquisition must be coordinated with the General Services Administration and CBP. In the second quarter of FY 2007, the Office of Detention and Removal Operations will propose and develop a coordinated space acquisition plan with all entities involved in the process.

**OIG Analysis:** ICE is taking steps to implement this recommendation, therefore it is resolved. However, the recommendation will remain open until ICE provides us with copies of the space acquisition plan and the Space Allocation Survey. We will determine at that time whether they have complied with the recommendation.

**Recommendation 2 – Resolved – Open**

**Recommendation 3:** Provide the resources needed by the Office of Detention and Removal Operations to detain, process, and remove all fugitive aliens apprehended by the Fugitive Operations Teams.

**ICE Response:** ICE concurred in part with this recommendation. In its response, ICE reported that not all the issues contained in the recommendation

were within the purview of the Office of Detention and Removal Operations. ICE described steps it had taken to improve its ability to detain, process, and remove aliens and reported that Congress had earmarked additional funds to address detention bed space. ICE said the Office of Detention and Removal Operations had satisfied the recommendation within the areas directly under its control.

With the creation of the Detention Operations Coordination Center, ICE now coordinates the movement and placement of detained aliens in order to effectively allocate detention space. Various Office of Detention and Removal Operations units are engaged in activities to develop a comprehensive infrastructure that would improve coordinated removal efforts and management of detention space. According to ICE, this coordination will occur through expeditious information sharing between the Detention Operations Coordination Center, the Justice Prisoner and Alien Transportation System, and the Office of Detention and Removal Operations' Air Transportation Unit.

In addition, the Office of Detention and Removal Operations is identifying air hubs throughout the United States, with supporting detention space and ground transportation contracts, to maximize efficiencies. Justice Prisoner and Alien Transportation System flights would serve these hubs through regularly established air schedules.

ICE reported that through capacity planning and bed space management, the average number of detained aliens has increased from 20,683 on October 1, 2005, to 27,390 on September 30, 2006. ICE added that, since November 2005, 6,300 bed spaces have been added in support of the Secure Border Initiative.

ICE reported that many factors outside the Office of Detention and Removal Operations' control impede its ability to execute removal operations. For example, foreign embassies and consulates could refuse or delay the issuance of travel documents for their nationals. ICE also said that the Executive Office for Immigration Review and the federal courts could directly impact the removal process through grants of relief, motions to reopen, issuances of stays, and other legal decisions. Additionally, the United States Supreme Court has ordered that after 180 days, an alien in ICE custody who possesses a final order of removal and is not subject to mandatory custody must be released if it appears that removal is not reasonably foreseeable.

**OIG Analysis:** ICE's response described steps taken to implement this recommendation, including efforts to improve efficiencies in the detention and removal system and increase its detention capacity. ICE described factors outside its control that impeded its ability to execute removal operations and

explained that it must comply with the decisions of the United States Supreme Court. ICE's response addresses difficulties associated with all aliens subject to removal. However, ICE has not quantified the extent to which these factors have impeded the removal of fugitive aliens apprehended by Fugitive Operations Teams.

Moreover, while ICE is correct that the Executive Office for Immigration Review and federal courts can directly affect the removal process through grants of relief, motions to reopen, issuances of stays, and other legal decisions, once these decisions are made the alien is no longer a fugitive alien. Assuming this change in status is appropriately made in the Deportable Alien Control System, this would result in a fugitive alien case closure in the Fugitive Case Management System. As such, the alien would not constitute a fugitive alien apprehended by a Fugitive Operations Team member that the Office of Detention and Removal Operations did not remove.

This recommendation is resolved since ICE is taking steps to implement it within the areas directly under its control. In order to understand the extent of the effect of factors outside ICE's control, we request that ICE provide the number of fugitive aliens apprehended by the teams who were released from custody during FYs 2003-2006 due to (1) consulates or embassies delaying the issuance of, or refusing to issue, travel documents; and (2) decisions made by the Executive Office for Immigration Review or the federal courts, such as grants of relief, motions to reopen, or issuances of stays. Additionally, we request that ICE identify the total number of fugitive aliens apprehended by Fugitive Operations Teams during FYs 2003-2006, and, of that number, the total number removed by the Office of Detention and Removal Operations. We will evaluate this information to determine whether ICE has complied with this recommendation within the areas directly under its control.

**Recommendation 3 – Resolved – Open**

**Recommendation 4:** Assign Fugitive Operations Team members in a manner consistent with its Detention and Deportation Officer's Manual or amend the manual to reflect current assignment practices.

**ICE Response:** ICE concurred with this recommendation. ICE reported that although Fugitive Operations Teams are primarily called upon to perform administrative arrests of fugitive aliens, they are also required to assist in the overall implementation of ICE compliance measures.

In its response, ICE said that the Office of Detention and Removal Operations policy that restricts team members from performing non-fugitive operations duties was not intended to exclude all other collateral assignments. Also, the

policy was not intended to prohibit the ability of field office directors to redirect resources to accommodate an evolving national agenda or to meet existing circumstances. ICE said it would evaluate these policies within 90 days to determine if revisions are necessary.

**OIG Analysis:** This recommendation is resolved and open. ICE's policy prohibits Fugitive Operations Team members from performing any duties that will deter them from conducting fugitive operations, including collateral duties. A previous Office of Detention and Removal Operations' director sent a memorandum to all field office directors in December 2003 reiterating that Fugitive Operations Team members were only to conduct fugitive operations duties.[29]

This recommendation will remain resolved and open until ICE implements the recommendation, persuades us that this recommendation is not beneficial or not readily achievable, or proposes an acceptable alternative solution.

**Recommendation 4 – Resolved – Open**

**Recommendation 5:** Train and certify deportation officers who are not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

**ICE Response:** ICE concurred in part with this recommendation. In its response, ICE reported that it regularly trains and certifies deportation officers not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

However, ICE said that any overarching plan that limits the field office directors' ability or discretion to assign duties would also limit their flexibility to allocate resources for existing circumstances, such as responding to ICE and DHS national priorities.

ICE explained that it believes the current level of training and certification for deportation officers not assigned to Fugitive Operations Teams is adequate to meet the collateral needs of the teams and support the broader mission of the agency.

---

[29] Office of Detention and Removal Operations Memorandum, "Utilization of Fugitive Operations Team Members," December 3, 2003.

**OIG Analysis:** ICE reported that it regularly trains and certifies deportation officers not assigned to a Fugitive Operations Team to perform collateral duties. However, ICE's discussion of an overarching plan that limits the field office directors' ability or discretion to assign duties to their staff seems to address Recommendation 4.

Because ICE said it regularly trains and certifies deportation officers not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators, this recommendation is resolved.

ICE reported that the current level of training and certification of non-team members was adequate to meet the collateral needs of the teams and support the broader mission of the agency. However, ICE did not provide supportive information concerning its current level of trained and certified non-team members.

This recommendation will remain open until ICE identifies the number of officers not assigned to a Fugitive Operation Team who have been trained and certified to perform specific collateral duties in each field office with a Fugitive Operations Team. We will evaluate this information and determine whether the level of training and certification complies with the recommendation.

**Recommendation 5 – Resolved – Open**

**Recommendation 6:** Negotiate information sharing agreements with federal, state, or local agencies that can provide access to information pertaining to fugitive aliens and provide the resources needed by the Office of Detention and Removal Operations to reconcile data from those agencies.

**ICE Response:** ICE concurred with this recommendation and said that it continually pursues and maintains information-sharing agreements with numerous federal, state, and local agencies. Specifically, ICE said it has approximately 330 agreements that support specific ICE needs.

In addition, ICE is pursuing contractor assistance for the Fugitive Operations Support Center. The center, which became fully operational in July 2006, will assist the Office of Detention and Removal Operations process data received through negotiated information-sharing agreements in several ways. It will review and update absconder cases in the Deportable Alien Control System, develop leads for and provide assistance to the Fugitive Operations Teams, and develop major operations that the teams will conduct. In its response,

ICE said that since it has been in operation the center has resolved 2,488 absconder cases in the Deportable Alien Control System.

**OIG Analysis:** We recognize that ICE has negotiated a number of agreements with various federal, state, and local agencies that are designed to support and advance specific mission needs. We encourage them to continue this effort. Furthermore, ICE established the Fugitive Operations Support Center, which will provide assistance in processing data from outside agencies and sources. The center will also reconcile the data received and send viable leads to support fugitive operations in the field.

Because of these initiatives, this recommendation is resolved. During our review, we learned of four negotiated agreements that provide the Office of Detention and Removal Operations access to fugitive alien information. Although ICE has other agreements in place, it did not specify in its comments how many of those agreements pertain to fugitive aliens. This recommendation will remain open until ICE identifies those relevant agreements that provide information specifically on fugitive aliens.

**Recommendation 6 - Resolved - Open**

**Recommendation 7:** Assess the training requirements and needs of Fugitive Operations Teams and consider establishing a fugitive operations refresher course.

**ICE Response:** ICE concurred with this recommendation and initiated a review of the existing fugitive operations curriculum in August 2006 to determine whether current training manuals and subject matter are relevant. In addition, ICE intends to develop a supplemental or refresher course during FY 2007 and foresees the development of a refresher course proposal in 90 days.

**OIG Analysis:** ICE's plan to develop a refresher course proposal during FY 2007 is responsive to this recommendation. However, the recommendation will remain open until ICE provides an update on the status of the refresher course proposal.

**Recommendation 7 – Resolved – Open**