UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ADRIANA AGUILAR, ANDRES LEON, ELENA LEON, ERIKA
GABRIELA GARCIA-LEON through her Next Friend Adriana
Aguilar, CARSON AGUILAR through his Next Friend Adriana
Aguilar, NELLY AMAYA, MARIO PATZAN DeLEON, DAVID
LAZARO PEREZ, WILLIAM LAZARO, TARCIS SAPON-DIAZ,
SONIA BONILLA, BEATRIZ VELASQUEZ through her Next
Friend Sonia Bonilla, DALIA VELASQUEZ through her Next Friend
Sonia Bonilla, ELDER BONILLA, DIANA RODRIGUEZ, YONI
REVOLORIO, JUAN JOSE MIJANGOS, GONZALO ESCALANTE,
VICTOR PINEDA MORALES, RAUL AMAYA, GLORIA
VANESSA AMAYA, PELAGIA DE LA ROSA-DELGADO,
ANTHONY JIMENEZ, CHRISTOPHER JIMENEZ, and BRYAN
JIMENEZ, through his Next Friend Pelagia De La Rosa-Delgado, on
behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF
THE UNITED STATES DEPARTMENT OF HOMELAND
SECURITY, MICHAEL CHERTOFF, Former United States Secretary
of the Department of Homeland Security, JANET NAPOLITANO,
United States Secretary of the Department of Homeland Security,
JULIE L. MYERS, Former Assistant Secretary of Homeland Security
for Immigration and Customs Enforcement, JOHN MORTON,
Assistant Secretary of Homeland Security for Immigrations and
Customs Enforcement, JOHN P. TORRES, Former Director of the
Office of Detention and Removal Operations, Immigration and
Customs Enforcement, DAVID J. VENTURELLA, Acting Director of
the Office of Detention and Removal Operations, Immigration and
Customs Enforcement, MARCY FORMAN, Former Director of the
Office of Investigations, Immigration and Customs Enforcement,
KUMAR KIBBLE, Acting Director of the Office of Investigations,
Immigration and Customs Enforcement, CHRISTOPHER
SHANAHAN, New York Field Office Director for Detention and
Removal Operations, PETER J. SMITH, JOSEPH A. PALMESE,
DARREN WILLIAMS, JEFFREY KNOPF, JANE AND JOHN DOE
DEFENDANTS #1-59, a/k/a ICE 1-59, sued in their individual
capacities and in their official capacities as agents and/or supervisors
of ICE, JOHN and JANE DOE ICE AGENTS, JOHN ROE and JANE
ROE ICE SUPERVISORS, and THE UNITED STATES OF
AMERICA,

Defendants.

---

x

ECF Case
Civil Action No.
07 CIV 8224 (JGK)
(FM)

**FOURTH
AMENDED
CLASS ACTION
COMPLAINT**

**JURY TRIAL
DEMANDED**


RECEIVED
DEC 21 2009
U.S.D.C. S.D. N.Y.
CASHIERS

x

Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Juan Jose Mijangos, David Lazaro Perez, William Lazaro, Tarcis Sapon-Diaz, Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez, Elder Bonilla, Diana Rodriguez, Yoni Revolorio, Raul Amaya, Gloria Vanessa Amaya, Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez, and Bryan Jimenez, on behalf of themselves and all others similarly situated, through their undersigned attorneys allege as follows:

## **INTRODUCTION**

1.      This class action seeks declaratory, injunctive and other relief to redress Defendants' deprivation of Plaintiffs' rights arising under the laws and Constitution of the United States.  This action arises out of a pattern and practice of unlawful entry, search and seizure by Defendants of Latino persons within the jurisdiction of the New York City field office of ICE.  As described in detail below, Defendants' wrongful actions include, *inter alia,* unreasonable and unlawful entries into and searches and seizures of the homes of Plaintiffs and other Latinos within the jurisdiction of the New York City field office of ICE, unlawful detainment and seizure of Plaintiffs and other Latinos, psychological and physical abuse, and the destruction of private, personal property in violation of the Fourth and Fifth Amendments to the U.S. Constitution.

2.      In 2006, the Immigration and Customs Enforcement Division of the Department of Homeland Security (commonly known as "ICE") initiated several programs to identify and arrest aliens, including operations known as "Operation Cross Check," "Operation Return to Sender," and "Operation Community Shield" (collectively and together with all similar national or local initiatives or operations, the "Operations").  Under these programs, Defendants have conducted, continue to conduct, and plan to conduct in the immediate future unconstitutional and

abusive raids of homes occupied by Latino persons within the jurisdiction of the New York City field office of ICE, including the homes of the named Plaintiffs.

3.      The raids are ostensibly performed to arrest and remove specifically identified targets (e.g., fugitive aliens (immigrants who have been previously ordered to leave this country), criminal non-fugitive aliens, gang members, and gang member associates). However, the raids are performed in a manner that tramples on the Fourth and Fifth Amendment rights of persons residing in the United States and leaves a trail of harm affecting innocent members of our society. According to a report published by the Migration Policy Institute, since 2004 these raids have led to a nearly sevenfold increase in detentions without any appreciable increase in the number of arrests of the intended targets. (*See* Migration Policy Institute, *Collateral Damage: An Examination of ICE's Fugitive Operations Program* (Feb. 2009), attached hereto as Exhibit 1, at 13-17.)

4.      The *modus operandi* of the Operations is to have teams of six to ten armed ICE agents raid homes of Latinos without court-issued search warrants and to do so in a manner that will obtain entry to the targeted homes without providing the occupants a meaningful opportunity to consent or refuse entry. In these raids agents were armed with submachine guns known as MP-5s and shotguns. Furthermore, as a foreseeable result of high-level administrative policies and pressure to increase apprehensions without providing a corresponding increase in training, ICE agents specifically target homes occupied by residents of Latino origin, regardless of immigration status.

5.      The raids are conducted in the pre-dawn and early morning hours. High-level supervisors, including the Assistant District Director of ICE, approve operational plans. Such supervisors are required to approve and provide justification for operations conducted outside of daylight hours, but frequently fail to do so, despite the fact that such raids clearly take place.

Though the agents often know that the occupants of a targeted residence are likely to be Spanish-speaking, ICE does not ensure that Spanish-speaking agents are present. Acting in a manner that terrifies sleeping residents, ICE agents pound on and/or break down doors and windows while screaming as loudly as possible, often representing themselves as "police," which of course they are not. When the unsuspecting residents have the opportunity to open the door to inquire about what is going on, the agents then burst into the homes without first obtaining the occupants' consent to entry.

6.      Without explanation or lawful justification, the agents immediately sweep through the home, searching the premises as if an armed fugitive were present, even though they have no reasonable basis for such belief, and have not sought or obtained consent to search the premises of the residents. Latino persons are then brought to a central location within the home to be detained and interrogated by ICE agents regarding their immigration status. All of these actions are conducted without good cause in a manner highly abusive and psychologically harmful to both the adults and children present.

7.      Moreover, despite the inherently intrusive nature of these raids, the agents do not conduct an adequate investigation prior to the raid to ensure that the alien they are purportedly seeking is actually inside the targeted home at the time of the raid. As a result, the agents regularly raid homes where the target is not present and could not reasonably have been believed to be present. Indeed, ICE has refused offers of assistance from local law enforcement agencies that could have provided more accurate information about the whereabouts of targets, thus increasing the likelihood that agents will raid Latino homes where no target resides. The poor quality of this intelligence was known to ICE before the raids: a 2007 investigation by the Department of Homeland Security ("DHS") Office of the Inspector General observed that of 96

administrative warrants issued for October, 2007 raids in Nassau County, only nine contained up-to-date intelligence. (*See* Exhibit 1 at 6.)

8.     The goal of these raids is to gain access to constitutionally protected areas in the hope of seizing as many undocumented persons as possible. In 2006, Defendant Torres, the Director of the Office of Detention and Removal Operations for ICE, disseminated memoranda that imposed an 800-percent increase in arrest quotas for each Fugitive Operations Team, and that permitted agents to meet these quotas through the arrests of non-target immigrants, or "collaterals." This 800-percent increase was created and implemented by individuals at the highest levels of the Department of Homeland Security. The detention goals were defined in terms of the number of people to be detained, not the number of criminal fugitives, the purported targets of Fugitive Operations Teams. Thus, the Defendants clearly demonstrated an intent and purpose to target Latino individuals, irrespective of whether or not they were criminals or fugitives. The facts show that the Defendants achieved their stated intent: In the first fiscal year after the detention goals were adjusted, detentions of non-criminal aliens doubled, while detention of criminal alien fugitives remained static. In February 2007, coinciding with the beginning of Operation Return to Sender, Defendant Torres boasted that ICE had the highest weekly total of arrests since the inception of the program.

9.     Upon information and belief, as an intentional and foreseeable result of ICE's campaign to increase each team's detentions eight-fold without providing a corresponding increase in training or resources, ICE has resorted to unconstitutional targeting of the local Latino population. Local businesses such as restaurants, bars, convenience stores and laundromats with known concentrations of Latino patrons have also been targeted, and Latino patrons present within these businesses have been targeted for unconstitutional stops and detentions based solely on the individual's perceived race, ethnicity, or national origin.

10.     These raids demonstrate a pattern and practice of conduct that deliberately targets the Latino population within the jurisdiction of the New York City field office of ICE, reflecting the pressure on ICE teams to increase arrests without receiving additional training or agents. The intent to target Latinos is demonstrated by the agents' actions during the raids. For example, although ICE agents purportedly go to homes only when seeking a specific person or persons, (i.e., a target) ICE agents have raided Latino homes even when advised (or after they should reasonably have determined) that their target was not present, while immediately departing from homes occupied by Caucasian individuals without even asking for the target. Similarly, agents have surrounded Latino homes, detained and seized Latinos within the homes, and handcuffed Latinos prior to eliciting or reviewing any evidence of unlawful status, even when the individuals could not reasonably have been mistaken for the purported target of the raid. Often, ICE agents never even ask the Latinos encountered if the purported target lives at the home. This conduct has resulted in a disproportionately high rate of "collateral" arrests of Latinos when compared to the number of "targets" who are Latino. Further, when agents make collateral arrests of Latinos, they rarely note the basis for seizing and questioning the individual arrested. A report issued by the Immigration Justice Clinic at the Cardozo School of Law reports that in Long Island between 2006 and 2008, ICE failed to note the basis for seizing and questioning Latino collaterals in 94% of arrests. The report states that "[t]his data lends empirical support to the community complaints that during home raids ICE agents seize Latino residents based simply on their ethnic appearance or limited English proficiency." (*See* "Constitution on ICE: A Report on Immigration Home Raid Operations," Cardozo Immigration Justice Clinic, July 22, 2009, attached hereto as Exhibit 2, at 12.)

11.     Despite accounts that ICE has erroneously targeted numerous Latino homes, including complaints that they have raided the same home more than once without making any

arrests and reports that clearly show ICE has used stale intelligence, ICE has never required agents to document or input information into their records or databases noting incidents of failed attempts to find targets. As a foreseeable result of these lapses at the highest levels of ICE, Latinos face the risk of being wrongly and repeatedly targeted for raids. An investigation by the DHS Office of the Inspector General into intelligence supporting raids in Nassau County in October 2007 found that less than 10% of administrative warrants issued contained accurate intelligence.

12. ICE agents working under the jurisdiction of the New York field office have noted internally that raids have been characterized by racial profiling as well as by nonconsensual entries and searches. Defendants Chertoff, Myers, Forman, and Torres were aware of such complaints before such raids took place. These defendants condoned such unconstitutional conduct by dismissing the internal accusations without conducting proper investigations. Indeed, upon information and belief, the internal investigations into such allegations have been woefully inadequate and have not resulted in discipline for agents and supervisors or any change in ICE practice. These internal allegations of racial profiling have been corroborated by deposition testimony from a local law enforcement agency indicating that during jointly conducted raids, ICE agents on multiple occasions used derogatory and racist terms such as "wetback" to refer to the Latinos whose homes were being raided and who were being detained for questioning or arrested. Moreover, this same deposition testimony revealed that of the four bars or clubs chosen for raids on one night during the same operation, only two were known gang hangouts -- the other two were merely establishments frequented by Latinos. Such racial, ethnic, and/or national origin profiling, overt racism, selective enforcement of the federal immigration laws and regulations, and non-consensual, warrantless entry of homes are fundamentally at odds with the basic values

upon which this country was founded and violate the Fourth Amendment and the Equal Protection Clause of the Fifth Amendment.

13.     While ICE has been aggressively increasing the number of raids performed, ICE has not kept pace in providing adequate training to its agents to protect the constitutional rights of persons affected by ICE's actions.

14.     ICE has similarly failed to promulgate adequate rules and procedures for conducting these raids within permissible constitutional limits.

15.     ICE's failures have been repeatedly identified by such entities as the Department of Homeland Security Office of Inspector General (the "Inspector General"), which have cited ICE's lapses in training and information gathering that have contributed to the constitutional violations raised herein.  Senior officials at ICE, including Defendants Chertoff, Myers, Forman and Torres, knew of and reviewed these reports, yet continued to allow these inadequately trained agents to participate in ICE operations.  Some agents involved in raids never received the three-week training course for Fugitive Operations Team members, and ICE offers no "refresher training" program.

16.     The training and intelligence failures of ICE have also been confirmed and criticized by Lawrence W. Mulvey, Commissioner of Police for Nassau County.  In a public letter dated September 27, 2007, to Joseph A. Palmese, resident Agent-in-Charge of ICE investigations in Bohemia, New York, Commissioner Mulvey complained that when conducting raids in Nassau County that week, ICE agents lacked current intelligence, had incorrect addresses for targeted homes and displayed a "cowboy mentality."  In one instance, Commissioner Mulvey noted that ICE agents were looking for a 28-year-old suspect using a photograph of the suspect from when he was seven years old.  Commissioner Mulvey also confirmed that ICE misled the Nassau County Police about the nature of the raids and that most people arrested in the raids were not

targets of the raids but instead were undocumented immigrants. (*See* September 27, 2007 Letter from Commissioner Mulvey to Defendant Palmese, attached hereto as Exhibit 3.)

17. Equally troubling is that Commissioner Mulvey's letter confirms that as of September 27, 2007, ICE plans to conduct future raids in Nassau County. (*See* page 2 of Exhibit 3 in which Commissioner Mulvey states that the Nassau County Police will no longer lend support for these raids, but redacts the intended targets of future raids for confidentiality reasons.) In fact, Operation Community Shield, Operation Return to Sender, and other similar operations are still ongoing.

18. Nassau County Executive Thomas R. Suozzi also complained to Defendant Chertoff about the actions and behavior of ICE agents conducting raids in Nassau County in September 2007. In his public letter dated October 2, 2007, to Defendant Chertoff, County Executive Suozzi strongly suggests that ICE agents engaged in "misconduct" and "malfeasance" and utilized tactics that crossed "the lines of legality and law enforcement best practices" when conducting the raids. He also demanded an investigation by Defendant Chertoff. Some of the victims of the raids addressed in this letter have been joined as named Plaintiffs in this matter. (*See* October 2, 2007 Letter from County Executive Suozzi to Defendant Chertoff, attached hereto as Exhibit 4.)

19. Rather than implementing changes as a result of these constitutional violations, senior policymakers have actively defended ICE agents' misconduct. Defendants Chertoff and Myers received letters from Nassau County Police Commissioner Lawrence Mulvey and Nassau County Executive Thomas Suozzi. These letters stated the numerous concerns the Nassau County officials had with the conduct of the raids. Defendant Chertoff drafted a reply letter to Mr. Suozzi, but never sent it. Instead, on October 19, 2007, Defendant Myers sent a revised letter to Mr. Suozzi on Defendant Chertoff's behalf, dismissing the claims as unsubstantiated. The

"thorough investigation" that Defendant Myers touts in her letter was conducted without interviewing a single member of the Nassau County Police Department. In blindly defending ICE from these allegations of misconduct, Defendants Chertoff and Myers have continued to affirmatively support a policy of unconstitutional entries into homes.

20.     Senior policymakers at ICE have also actively defended ICE's unconstitutional conduct to elected officials. On October 7, 2007, at the behest of Defendant Myers, Defendants Smith and Palmese met with New York State Congressman Peter King in an attempt to assuage his concerns over the allegations of misconduct by the Nassau County officials. Defendants Smith and Palmese did this without conducting an adequate internal investigation into the allegations. Defendants Smith and Palmese's defense of ICE's activities effectively condoned ICE's custom or policy of unconstitutional conduct.

21.     Defendants Chertoff, Myers, Forman and Torres played active and extensive roles in formulating and implementing ICE's strategy for alien apprehension. According to the Migration Policy Institute report, Defendant Chertoff identified expansion of alien apprehension programs as one of his "overarching goals" while at DHS. Thus, rather than simply being aware of such programs, Defendant Chertoff made them one of his primary objectives. Moreover, after such programs were implemented, despite receiving consistent and widespread complaints about a pattern and practice of constitutional violations, Defendants ICE, Chertoff, Myers, Forman, and Torres took little or no action to conduct adequate investigations of misconduct, correct violations, improve training, or otherwise address systemic failures, thus allowing the continuation of the policies they set in motion.

22.     Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, and Carson Aguilar are members of the Leon/Aguilar family. Each is a U.S. citizen of the United States and is a Latino who has been victimized by ICE's constitutional violations.

23.     On or about February 20, 2007, armed ICE agents pounded on the door of the Leon/Aguilar home located at 30 Copeces Lane, East Hampton, New York between 4:30 and 5:00 a.m.  The ICE agents, including Defendant Williams, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, and ICE 8 entered the Leon/Aguilar family home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search and illegally detained the Leon and Aguilar families.  The agents never explained the family members' rights, prevented them from contacting a lawyer or the police, and failed to allow them to review what the ICE agents said was a warrant.  Having once been victimized by ICE, the Aguilar and Leon families live in constant fear that ICE agents will return and again try to unlawfully enter their home. Indeed, upon leaving the Leon/Aguilar family home, the ICE agents threatened that they would, in fact, be back.

24.     Plaintiff Nelly Amaya is Latina.  She too is a victim of ICE's constitutional violations.

25.     On or about February 20, 2007, armed ICE agents kicked in the door of her home located at 20 Boatsteerers Court, East Hampton, New York between 4:00 and 5:00 a.m.  The ICE agents, including Defendant Williams, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7 and ICE 8, forcibly entered her home without a search warrant, consent, or any exigent circumstances. The ICE agents entered her home, physically abused her, and arrested her in retaliation for Nelly's demand to see a warrant.  Nelly was never shown a warrant by ICE and lives in constant fear that ICE agents will again try to unlawfully enter her home.

26.     Plaintiffs Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio, and Juan Jose Mijangos are Latinos.  They too are victims of ICE's constitutional violations.

27.     On or about April 18, 2007, armed ICE agents pounded on the door of their home located at 417 East Avenue, Riverhead, New York at about 4:30 a.m. The ICE agents, including ICE 1, ICE 3, ICE 4, ICE 7, ICE 8, ICE 9, ICE 10 and ICE 11, forcibly entered the home without a judicial warrant, consent, or any exigent circumstances, by ramming through the back door of their home. The ICE agents arrested Mario, Gonzalo, Victor, Yoni and Juan Jose, handcuffing them and placing Mario in chains. The four men were then transported to Manhattan, where they were detained in a room, questioned, and released later that evening. The agents never explained their rights and failed to produce a warrant of any kind. Having once been victimized by ICE, Mario, Gonzalo, Victor, Yoni, and Juan Jose live in constant fear that ICE agents will return and again try to unlawfully enter their homes.

28.     Plaintiff David Lazaro Perez, William Lazaro, and Tarcis Sapon-Diaz are Latinos. They too are all victims of ICE's constitutional violations.

29.     On or about March 19, 2007, armed ICE agents, including ICE 1, ICE 6, ICE 8, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16 and ICE 17, forcibly entered their home located at 165 Main Street, Mount Kisco, New York at about 4:00 a.m. without a judicial warrant, consent, or any exigent circumstances. The ICE agents arrested David, William and Tarcis, placed them in handcuffs, and transported them to Manhattan, where they were detained for several hours. The men were later transported to a New Jersey detention center, from which they were released two days later. The agents never explained their rights and failed to produce a warrant of any kind. Having once been victimized by ICE, David, William and Tarcis live in constant fear that ICE agents will return and again try to unlawfully enter their homes.

30.     Plaintiffs Sonia Bonilla and her daughters Beatriz Velasquez and Dalia Velasquez are residents of Westbury, New York. Sonia is a lawful permanent resident, and her little girls are U.S. citizens. Each is a Latina person who has been victimized by ICE's constitutional violations.

31.     On September 24, 2007, armed ICE agents pounded on the door of the Bonilla/Velasquez home located at 710 Jefferson Street, Westbury, New York between 5:30 and 6:00 a.m.  The ICE agents, including ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26 and ICE 42, entered the home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search and illegally detained residents of the home.  Four occupants of the home were arrested and no warrant of any kind was ever produced.  The agents intimidated the twelve-year-old girl who opened the door while her parents were briefly out, conducted a full raid and a search.  Having once been victimized by ICE, the Bonilla/Velasquez family lives in constant fear that ICE agents will return and again try to unlawfully enter their home.

32.     Plaintiffs Elder Bonilla and Diana Rodriguez are residents of Westbury, New York.  Elder is a lawful permanent resident, and his girlfriend Diana, who is also the mother of his two U.S. citizen children, has status as an asylee.  Each is a Latino person who has been victimized by ICE's constitutional violations.

33.     On September 24, 2007, armed ICE agents pounded on the door of the Bonilla/Rodriguez home located at 22 Dogwood Lane in Westbury, New York between 5:30 and 6:00 a.m.  When Elder opened the front door, ICE agents pointed a gun at his chest, immediately handcuffed him, and threw him toward the sofa.  The ICE agents, including ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 43, ICE 53, ICE 54, and ICE 55, entered the home without a judicial warrant, consent, or any exigent circumstances, conducted an unlawful search, damaged doors and walls, and illegally detained residents of the home, arresting six of them, including a sixteen-year-old boy, without ever showing a warrant.

34.     Plaintiff Raul Amaya and his wife, Plaintiff Gloria Vanessa Amaya, are residents of Huntington Station, New York.  Raul is a U.S. citizen of Latino origin and Gloria Vanessa is a

lawful conditional resident of Latino origin. They were both victimized by ICE's constitutional violations.

35. Ten to fifteen ICE agents arrived at the Amaya home on September 27, 2007 at approximately 7:30 a.m. Raul was outside the home getting ready for work. The agents used profanities, and accused Raul of being "in trouble with the IRS," "under arrest," having no status, and holding a suspended or invalid driver's license. After refusing to look at Raul's documentation, and without a judicial warrant or exigent circumstances, ICE agents proceeded to enter Raul's house without consent. When Gloria Vanessa came out to investigate the loud commotion, she was interrogated by ICE agents. The ICE agents, including ICE 27, ICE 28, ICE 29, ICE 31, ICE 32, ICE 33, ICE 36, ICE 37, ICE 54, and ICE 55 then entered and searched the home, including attempting to use a kitchen knife to pry open a locked door and attempting to kick open the basement unit. ICE agents searched the home for over an hour-and-a-half. As they were leaving, some ICE agents threatened to return later that day or in the following week.

36. Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez, and Bryan Jimenez are residents of Huntington Station, New York and are all United States citizens. Each is a Latino person who has been victimized by ICE's constitutional violations.

37. In approximately mid- to late-August 2006, ICE agents pounded on the door of the De La Rosa-Delgado/Jimenez home at 15 West 18th Street in Huntington Station, New York in the pre-dawn hours. The ICE agents entered the home without a judicial warrant, consent, or any exigent circumstances, and conducted an unlawful search without ever showing a warrant. The ICE agents claimed they were looking for a man named "Miguel," and were told that no one by that name had lived at the home since Pelagia bought it in 2003.

38. Despite being told that the man they were seeking had never lived at the De La Rosa-Delgado/Jimenez home, ICE agents, including ICE 39, ICE 40, ICE 41, ICE 45, ICE 46,

14

ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 56, and ICE 57 returned to the De La Rosa-Delgado/Jimenez home a little before 6:00 a.m. on September 27, 2007. Once again, ICE agents pounded on the front door of the De La Rosa-Delgado/Jimenez home, entered the home without a judicial warrant, consent, or any exigent circumstances, and conducted an unlawful search without ever showing a warrant. The ICE agents also pounded on the back door of the home. The ICE agents claimed they were looking for "Miguel," the same person that they were seeking in 2006 and whom they were told had not lived at the home since at least 2003, if ever. The De La Rosa-Delgado/Jimenez family lives in constant fear that ICE agents will return and attempt to unlawfully enter their home for a third time.

39.    As a result of the raids on their homes, Plaintiffs have been profoundly traumatized, and remain extremely fearful that the ICE agents will return to inflict further harm. Indeed, the ICE agents did return to the De La Rosa-Delgado/Jimenez home and, in several other instances, the ICE agents have made specific threats that they would return. Indeed, reports and testimony confirm that the Operations are ongoing.

40.    Without judicial intervention there will be no end to ICE's unlawful and unconstitutional activities, and there is a credible threat of recurrent injuries to Plaintiffs and the class. By all appearances, ICE is continuing its aggressive, Latino-targeted program and increasing its unconstitutional enforcement activities without regard to the constitutional rights of those affected. The named Plaintiffs, like the other members of the class, are at real risk of further Fourth and Fifth Amendment violations at the hands of ICE because they are Latino and/or live in residences with Latino individuals.

41.    ICE agents have conducted, and continue to conduct, similar raids against innocent and unsuspecting Latinos throughout the area within the jurisdiction of the New York City field office of ICE. To put an end to these unlawful activities, Plaintiffs seek on behalf of

themselves and all others similarly situated a permanent injunction restraining agents within the jurisdiction of the New York City field office of ICE from conducting home raids until they have established appropriate procedures and standards governing the conduct of ICE agents in performing home raids, selecting sites for said raids, and documenting activities during raids so as to assure that Plaintiffs and the class will not be subjected to the unlawful practices complained of herein.

42. Plaintiffs also seek compensation for their own damages suffered as a result of the raids on their homes.

## JURISDICTION AND VENUE

43. Jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331 and 1346.

44. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because, *inter alia*, (1) at least one of the defendants resides in this judicial district and (2) at least one of the Plaintiffs resides in this district and no real property is involved in this action.

## PARTIES AND OTHER RELEVANT PERSONS

45. Plaintiff ADRIANA AGUILAR is a citizen of the United States and is Latina. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York. She appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for (a) her five-year-old son, Plaintiff CARSON AGUILAR and (b) her thirteen-year-old daughter, Plaintiff ERIKA GABRIELA GARCIA-LEON.

46. Plaintiff CARSON AGUILAR is a citizen of the United States and is Latino. At all times relevant to this action, he was and is a resident of East Hampton, Suffolk County, New York, living with his mother, Plaintiff Adriana Aguilar.

47. Plaintiff ERIKA GABRIELA GARCIA-LEON ("Gabriela") is a citizen of the United States and is Latina. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York, living with her mother, Plaintiff Adriana Aguilar.

48. Plaintiff ANDRES LEON is a citizen of the United States and is Latino. At all times relevant to this action, he was and is a resident of East Hampton, Suffolk County, New York.

49. Plaintiff ELENA LEON is a citizen of the United States and is Latina. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York.

50. Plaintiff NELLY AMAYA is Latina. At all times relevant to this action, she was and is a resident of East Hampton, Suffolk County, New York.

51. Plaintiff MARIO PATZAN DeLEON is Latino. At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

52. Plaintiff GONZALO ESCALANTE is Latino. At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

53. Plaintiff VICTOR PINEDA MORALES is Latino. At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

54. Plaintiff YONI REVOLORIO is Latino. At all times relevant to this action, he was and is a resident of Riverhead, Suffolk County, New York.

55. Plaintiff JUAN JOSE MIJANGOS is Latino. At all times relevant to this action, he was a resident of Riverhead, Suffolk County, New York.

56. Plaintiff DAVID LAZARO PEREZ is Latino. At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

57. Plaintiff WILLIAM LAZARO is Latino. At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

58. Plaintiff TARCIS SAPON-DIAZ is Latino. At all times relevant to this action, he was and is a resident of Mount Kisco, Westchester County, New York.

59. Plaintiff RAUL AMAYA is a citizen of the United States and is Latino. At all times relevant to this action, he was and is a resident of Huntington Station, Suffolk County, New York.

60. Plaintiff GLORIA VANESSA AMAYA is a lawful conditional resident of the United States and is Latina. She is married to Plaintiff RAUL AMAYA. At all times relevant to this action, she was and is a resident of Huntington Station, Suffolk County, New York.

61. Plaintiff SONIA BONILLA is a lawful permanent resident of the United States and is Latina. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York. She appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for (a) her twelve-year-old daughter, Plaintiff BEATRIZ VELASQUEZ and (b) her nine-year-old daughter, Plaintiff DALIA VELASQUEZ.

62. Plaintiff BEATRIZ VELASQUEZ is a citizen of the United States and is Latina. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York, living with her parents, SONIA BONILLA and NOE VELASQUEZ.

63. Plaintiff DALIA VELASQUEZ is a citizen of the United States and is Latina. At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York, living with her parents, SONIA BONILLA and NOE VELASQUEZ.

64.     Plaintiff ELDER BONILLA is a lawful permanent resident of the United States and is Latino.  At all times relevant to this action, he was and is a resident of Westbury, Nassau County, New York.

65.     Plaintiff DIANA RODRIGUEZ is Latina.  She has asylee status.  At all times relevant to this action, she was and is a resident of Westbury, Nassau County, New York.

66.     Plaintiff PELAGIA DE LA ROSA-DELGADO is a citizen of the United States and is Latina.  At all times relevant to this action, she was and is a resident of Huntington Station, Suffolk County, New York.  She appears in this action both as a Plaintiff in her individual and representative capacities and, pursuant to FRCP Rule 17(c), as Next Friend for her sixteen-year-old son, Plaintiff BRYAN JIMENEZ.

67.     Plaintiff ANTHONY JIMENEZ is a citizen of the United States and is Latino.  At all times relevant to this action, he was and is a resident of Huntington Station, Suffolk County, New York

68.     Plaintiff CHRISTOPHER JIMENEZ is a citizen of the United States and is Latino.  At all times relevant to this action, he was and is a resident of Huntington Station, Suffolk County, New York, living with his mother, Plaintiff Pelagia De La Rosa-Delgado.

69.     Plaintiff BRYAN JIMENEZ is a citizen of the United States and is Latino.  At all times relevant to this action, he was and is a resident of Huntington Station, Suffolk County, New York, living with his mother, Plaintiff Pelagia De La Rosa-Delgado.

70.     Defendant IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY ("Defendant ICE") is headquartered in Washington, D.C., with an Office of Detention and Removal Operations field office located in New York, New York.

71.     The Special Agent-in-Charge Offices of Defendant ICE OFFICE OF INVESTIGATIONS ("OI") are responsible for the administration and management of enforcement activities within the geographic boundaries of the office. Upon information and belief, the Bohemia, New York office of Defendant ICE OI was involved in the home raids conducted in Nassau County on September 24 and 26, 2007.

72.     Defendant MICHAEL CHERTOFF ("Defendant Chertoff") was, during at least part of the relevant time, the United States Secretary of the Department of Homeland Security in Washington, D.C. Defendant Chertoff was, among other things, charged with constitutional and lawful implementation of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, and with the administration of the division of Immigration and Customs Enforcement. Defendant Chertoff was the highest ranking official for the Department of Homeland Security, and was charged with supervising Assistant Secretary Julie Myers, Director of ICE's Office of Detention and Removal Operations John Torres, and Director of ICE's Office of Investigations Marcy Forman. Defendant Chertoff is sued individually.

73.     Defendant Chertoff, pursuant to 8 U.S.C. §1103, was the ultimate decision maker for the Department of Homeland Security and all divisions of the Department of Homeland Security, including ICE. Defendant Chertoff created, approved, and implemented official policies and strategies. In late 2005 and early 2006, Defendants Chertoff and Myers conceived and announced the Secure Border Initiative ("SBI"), which was a comprehensive and aggressive immigration enforcement strategy for the United States. Operations Cross Check, Return to Sender and Community Shield were conducted under the SBI. Defendant Chertoff intended to violate constitutional rights by, *inter alia*, implementing these policies. Furthermore, Defendant Chertoff, as a result of being the Secretary of DHS, was involved in the planning and/or investigation of ICE agents' conduct during raids.

74.     Defendant Chertoff identified expansion of alien apprehension programs as one of his "overarching goals" while at DHS.  In order to achieve his goal, Defendant Chertoff approved an 800 percent increase in the goal for arrests per team, which led to ICE customs and policies that regularly ran afoul of constitutional rights.  Defendant Chertoff held and led a publicly reported operational briefing on February 9, 2006.  On behalf of Defendant Chertoff, Defendant Torres provided further detail about the impossible goal of 1,000 arrests per fugitive operations team.

75.     Defendant Chertoff encouraged, endorsed, and thus intended the unconstitutional conduct by ICE during home raids.  This is demonstrated, among other things, by Defendant Chertoff's response (or lack thereof) to numerous high profile newspaper articles and letters identifying ICE's unconstitutional conduct.

(a)     From February 12, 2007 through March 9, 2007, from March 19, 2007 through April 13, 2007, and from April 16, 2007 through April 27, 2007, ICE's Department of Removal Operations New York City field office conducted Operations Return to Sender and Cross Check.  ICE raids on Plaintiffs' homes located at 30 Copeces Lane, East Hampton, New York, 20 Boatsteerers Court, East Hampton, New York, 417 East Avenue, Riverhead, New York, and 165 Main Street, Mt. Kisco, New York, took place during this time.  As early as March 1, 2007, and in publications as prominent as the New York Times, newspapers publicized the widespread unconstitutional practices of ICE.  These high-profile articles detailed the unconstitutional customs and practices of ICE, and also contained quotes from various high-level ICE officials.  For example, on April 10, 2007, the New York Times reported that ICE agents had entered 30 Copeces Lane, East Hampton, New York, at 5 a.m., purportedly looking for a target who had not lived in the house since 2003.  After failing to find the target, the agents threatened to return.  On May 23, 2007, Defendant Chertoff received a letter from counsel for

Reinaldo Gonzales, detailing the ICE Agents' warrantless, nonconsensual entry into 165 Main Street, Mt. Kisco, New York. This letter expressly told Defendant Chertoff that Mr. Gonzalez was restrained and "herded into a van" without the ICE agents identifying themselves, asking Mr. Gonzalez if he was undocumented, or asking him for identification. Only after much pleading was Mr. Gonzalez allowed to produce his Alien Registration Card, proving his legal status.

(b)     In June 2007, ICE conducted home raids in New Haven, Connecticut. United States Senators Christopher Dodd and Joseph Lieberman, among others, sent a joint letter to Defendant Chertoff "requesting an explanation for the repeated accounts of ICE agents illegally entering homes." (*See* June 11, 2007 Letter from Senators Dodd and Lieberman to Defendant Chertoff, attached hereto as Exhibit 5.) Specifically, the Senators told Defendant Chertoff that only four of the thirty-one apprehended individuals had outstanding deportation orders, that eyewitnesses saw ICE agents push their way into homes without consent, and that the operation appeared to be in retaliation for a new initiative to issue identification cards to the undocumented community. *Id*. Defendant Chertoff, without adequate investigation or basis, gave a blanket denial of all allegations. Defendant Chertoff staunchly defended the conduct of ICE during those raids and despite evidence to the contrary, boldly claimed "[a]t no time did any ICE FOTs enter a dwelling without consent." (*See* June 14, 2007 Letter from Defendant Chertoff to Senator Dodd, attached hereto as Exhibit 6.) This claim was made either with actual knowledge of falsity or with reckless disregard as to truth or falsity, and was refuted by the findings of an immigration judge, who determined that ICE's conduct during at least some of those home raids "worked an egregious violation" of the individuals' Fourth Amendment rights. (*See* "Judge Rules Raids Violated Illegal Immigrants' Rights," CBS News, June 8, 2009,

attached hereto as Exhibit 7.  *See also* three of the decisions and orders discussed in Exhibit 7, attached hereto as Exhibit 8, 9, and 10.)

(c)     From September 24, 2007, through September 29, 2007, ICE's Office of Investigations Conducted Operation Community Shield.  ICE raids on Plaintiffs' homes located at 710 Jefferson Street, Westbury, New York, 22 Dogwood Lane, Westbury, New York, 58 East 6th Street, Huntington Station, New York, and 15 West 18th Street, Huntington Station, New York, took place during this time. On October 2, 2007, Nassau County Executive Thomas Suozzi told Defendant Chertoff of the numerous deficiencies with the ICE raids in Nassau County during Operation Community Shield.  Specifically, County Executive Suozzi reiterated Commissioner Mulvey's concerns over outdated intelligence used by ICE, the poor structure of the raid, and the "cowboy mentality" of the ICE agents.  By October 4, 2007, a mere two days after receipt of the letter, Defendant Chertoff drafted a response to County Executive Suozzi.  This response was yet another blanket denial of all allegations of ICE misconduct, despite the fact that it was impossible for Defendant Chertoff to have conducted an adequate investigation into the allegations in only two days.  Instead of sending this draft letter, however, Defendant Chertoff instead elected to have Defendant Myers reply on his behalf.  On October 19, 2007, a full seventeen days after receipt of County Executive Suozzi's letter, Defendant Myers replied to County Executive Suozzi.  However this letter was substantially the same as Defendant Chertoff's initial draft.  It is clear that, at the outset, Defendant Chertoff and Myers did not plan to conduct an investigation into the matter, and instead planned on blindly defending ICE from all allegations of misconduct. (*See also* "Raids Were a Shambles, Nassau Complains to U.S.," New York Times, October 3, 2007, attached hereto as Exhibit 11.)

(d)     Defendant Chertoff continued to receive complaints about ICE's unconstitutional conduct in 2008.  For example, on February 11, 2008, Congressman Jose E.

Serrano of the 16th Congressional District of New York wrote a letter to Defendant Chertoff noting the flaws in the tactics the ICE agents use during the raids, including the use of excessive force and intimidation. Congressman Serrano also noted the perceived racial profiling on the part of some ICE officers. (*See* Congressman Serrano Letter to Defendant Chertoff, attached hereto as Exhibit 12.) On May 16, 2008, United States Senator Edward M. Kennedy sent a letter to Defendant Chertoff condemning the ICE custom of attempting to apprehend suspected aliens by targeting child care programs. (*See* Senator Kennedy Letter to Defendant Chertoff, attached hereto as Exhibit 13.) On June 12, 2008, The Commission on Security and Cooperation in Europe alerted Defendant Chertoff that detainees were being forced to take psychiatric drugs without medical reason and without consent. (*See* Commission Letter to Defendant Chertoff, attached hereto as Exhibit 14.)

76.     As the ultimate decision-maker and final policy-maker for ICE, Defendant Chertoff had a duty to fully investigate the above allegations and immediately take corrective measures. Instead, Defendant Chertoff, having been informed of ICE's misconduct multiple times, allowed, condoned, and actively defended and encouraged ICE's custom or practice of violating constitutional rights during home raids. Indeed, these constitutional violations were conducted pursuant to the SBI that Defendant Chertoff created and in furtherance of his expressly stated overarching goal of expanding the alien apprehension programs.

77.     Defendant JANET NAPOLITANO ("Defendant Napolitano") is the United States Secretary of the Department of Homeland Security in Washington, D.C. She replaced Defendant Chertoff as Secretary of the Department of Homeland Security on or about January 21, 2009. Defendant Napolitano is, among other things, charged with constitutional and lawful implementation of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, et seq., and with the administration of the division of Immigration and Customs Enforcement. While Defendant

Napolitano was not the Secretary of DHS during the time of the raids at issue in the complaint, operations such as Return to Sender and Community Shield are ongoing. Indeed, Defendant Napolitano has stated that she will continue the programs that were started under President George W. Bush. (*See* "Napolitano Focuses on Immigration Enforcement," New York Times, August 12, 2009, attached hereto as Exhibit 15.) Since Defendant Napolitano became Secretary of DHS, arrests and deportations have doubled when compared with the same period two years ago. *Id.* While Defendant Napolitano claims to have shifted the focus of these raids to criminal targets, there is no indication that the disturbing proportion of collateral arrests to target arrests has changed, that ICE agents are now conducting adequate investigations of the purported targets prior to raiding a home, or that the unconstitutional conduct complained of herein has stopped. Thus, Defendant Napolitano is not only continuing the policies that fostered the unconstitutional practices that are the subject of this complaint, but is multiplying their negative effects. Defendant Napolitano is sued for injunctive relief in her official capacity.

78.    Defendant JULIE L. MYERS ("Defendant Myers") was, during at least part of the relevant time, the Assistant Secretary of Homeland Security for Immigration and Customs Enforcement in Washington, D.C. Defendant Myers was, among other things, charged with the constitutional and lawful implementation of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, and with the administration of the division of Immigration and Customs Enforcement. Defendant Myers, working hand-in-hand with Defendant Chertoff, directly supervised all aspects of ICE, including Director of ICE's Office of Detention and Removal Operations John Torres and Director of ICE's Office of Investigations Marcy Forman. Defendant Myers is sued individually.

79.    Defendant Myers was closely involved in numerous aspects of the raids at issue. In conjunction with Defendant Chertoff, Defendant Myers was responsible for creating and

implementing ICE's overall comprehensive immigration enforcement strategy. In late 2005 and early 2006, Defendants Chertoff and Myers conceived and promulgated the SBI, which was a comprehensive and aggressive immigration enforcement strategy for the United States. Operations Return to Sender, Cross Check, and Community Shield were conducted under the SBI.

80. Defendant Myers coordinated ICE's response to the Nassau County allegations, and also oversaw a grossly inadequate investigation into internal allegations of racial profiling. Upon information and belief, Defendant Myers approved Defendant Torres's astounding 800% goal increase of target apprehensions for each fugitive operations team, as well as his policy guidance that allowed each team to count "collateral" arrests for purposes of achieving that goal. Defendant Myers intended to violate constitutional rights by, *inter alia*, implementing these policies, and then vigorously defended ICE in spite of mounting evidence of repeated and systematic unconstitutional conduct.

81. Upon information and belief, Defendant Myers received regular briefings on newspaper articles concerning ICE's unconstitutional conduct and was therefore fully aware of the contents of all articles discussed above. Despite her duty to take corrective measures when faced with this knowledge, Defendant Myers actively condoned and endorsed this unconstitutional conduct.

82. Defendant JOHN MORTON ("Defendant Morton") is the Assistant Secretary of Homeland Security for Immigration and Customs Enforcement in Washington, D.C. He replaced Defendant Myers as Assistant Secretary of Homeland Security for ICE on or about May 14, 2009. Defendant Morton is, among other things, charged with the constitutional and lawful implementation of the Immigration and Nationality Act, 8 U.S.C. §§ 1101, *et seq.*, and with the administration of the division of Immigration and Customs Enforcement. While Defendant

Morton was not the Assistant Secretary of ICE during the time of the raids at issue in the complaint, operations such as Return to Sender are ongoing. There is no evidence of material changes since 2007 in ICE policy or implementation of policies regarding these types of Operations. (*See* Exhibit 15.) Defendant Morton is sued for injunctive relief in his official capacity.

83. Defendant JOHN P. TORRES ("Defendant Torres") is the Special Advisor on Enforcement and Private Sector Issues to the Assistant Secretary of ICE. From June 2005 until March of 2008, he was the Director of the Office of Detention and Removal Operations ("DRO") for ICE in Washington, D.C., and from November 2008 to May of 2009, he was the Acting Assistant Secretary of ICE in Washington, D.C. As Director of DRO, Defendant Torres worked closely with his supervisors, Defendants Chertoff and Myers, in setting ICE DRO policies and practices. In that position Defendant Torres was responsible for the apprehension, detention and removal of foreign nationals charged with violation of immigration law and the supervision of sworn law enforcement officers assigned to the Detention and Removal field offices, including the field office based in New York County, New York. Defendant Torres is sued individually.

84. In conjunction with Defendants Chertoff and Myers, Defendant Torres created a new goal of 1,000 arrests per year for fugitive operations teams. This was an 800% increase over the previous goal. ICE agents viewed this goal as "not doable." Defendant Torres explicitly stated that any collateral arrests made as a part of a headquarters sponsored operation would count towards that goal, knowing and intending that this would lead ICE to design operations to maximize the number of collateral arrests. At a publicly reported operational briefing held and led by Defendant Chertoff on February 9, 2006, Defendant Torres provided further detail on the impossible goal of 1,000 arrests per year for fugitive operations teams. Defendant Torres intended to violate constitutional rights by, *inter alia*, implementing these policies.

85. At Defendant Torres's direction, DRO and OI closely collaborated their efforts, essentially functioning as one unit. Defendant Torres issued memoranda creating numerous protocols regarding the coordination of raids, case management, procedures for keeping records, and dispute resolution between DRO and OI employees. Defendant Torres explicitly stated that the traditional roles of DRO and OI will overlap, and that responsibilities normally undertaken by one may be undertaken by the other, as neither area is exclusive to a particular program. Defendant Torres also issued memoranda stressing the importance of using ruses in operations. These policies advocated the use of deception by ICE agents to gain entry into the homes of unsuspecting individuals.

86. Having authority delegated by and approvals from Defendants Chertoff and Defendant Myers, Defendant Torres was the approving official for the operational plans for Return to Sender and Cross Check. These plans detailed targets, operational planning and execution, tasks for each group or office involved, coordinating instructions, and logistics. In addition, Defendant Torres authored and disseminated a specific memorandum that provided objectives, target priorities, and reporting requirements for Operation Cross Check. Defendant Torres also participated in a discussion regarding the DRO New York field office's problems with "difficult to remove" nationalities, such as African or Chinese aliens.

87. Defendant Torres also was involved in all aspects of ICE's response to the highly critical Inspector General's report "An Assessment of United States Immigration and Customs Enforcement's Fugitive Operations Teams." By coordinating, editing, and ultimately approving a response designed to dismiss or minimize the effects of the numerous deficiencies found by the Inspector General's report, Defendant Torres actively defended ICE's custom or policy of unconstitutional conduct.

88.     Defendant DAVID J. VENTURELLA ("Defendant Venturella") is the Acting

Director of the Office of DRO for ICE in Washington, D.C., the position previously held by

Defendant Torres.  He is responsible for the apprehension, detention and removal of foreign

nationals charged with violation of immigration law and the supervision of sworn law

enforcement officers assigned to the DRO field offices, including the field office based in

New York County, New York.  While Defendant Venturella was not the Acting Director of DRO

during the time of the raids at issue in the complaint, operations such as Return to Sender are

ongoing.  There is no evidence of material changes since 2007 in ICE policy or implementation of

policies regarding these types of operations.  (*See* Exhibit 15.)  Defendant Venturella is sued for

injunctive relief in his official capacity.

89.     Defendant MARCY FORMAN ("Defendant Forman") was the Director of the

Office of Investigations for ICE in Washington, D.C. in 2006 and 2007, during the time of the

raids described in this complaint.  Upon information and belief, Defendant Forman continued to

serve as the Director of OI until at least January 2009.  As the Director of OI, Defendant Forman

worked closely with her supervisors, Defendants Chertoff and Myers, in setting ICE OI policies

and customs.  She was responsible for overseeing the investigative arm of ICE and the

supervision of sworn law enforcement officers assigned to the OI, including Special Agent-in-

Charge ("SAC") officers based in New York County, New York and operating in the downstate

New York area, including Suffolk, Nassau and Westchester Counties.  Defendant Forman is sued

individually.

90.     Having authority delegated by and approvals from Defendants Chertoff and

Defendant Myers, Defendant Forman played a significant role in the planning of the ICE raids in

Nassau County in September 2007.  Upon information and belief, Defendant Forman was in

charge of overseeing training and setting policy regarding ICE agent conduct during home raids.

Defendant Forman intended to violate constitutional rights by, *inter alia*, implementing these policies.

91.　　At Defendant Forman's direction, DRO and OI closely collaborated their efforts, essentially functioning as one unit. Defendant Forman issued memoranda creating numerous protocols regarding the coordination of raids, case management, procedures for keeping records, and dispute resolution between DRO and OI employees. Defendant Forman explicitly stated that the traditional roles of DRO and OI will overlap, and that responsibilities normally undertaken by one may be undertaken by the other, as neither area is exclusive to a particular program. Defendant Forman also issued memoranda stressing the importance of using ruses in operations. These policies advocated the use of deception by ICE agents to gain entry into the homes of unsuspecting individuals.

92.　　Upon information and belief, Defendant Forman continued to authorize similar raids after becoming aware of concerns about the constitutionality of ICE agents' conduct through press reports and internal investigations. Upon information and belief, Defendant Forman did not address lapses in training or otherwise change the instructions that agents under her supervision were expected to obey.

93.　　Defendant KUMAR KIBBLE ("Defendant Kibble") is the Acting Director of the Office of Investigations for ICE in Washington, D.C., replacing Defendant Forman. He is responsible for overseeing the investigative arm of ICE and the supervision of sworn law enforcement officers assigned to the OI, including Special Agent-in-Charge ("SAC") officers based in New York County, New York and operating in the downstate New York area, including Suffolk, Nassau and Westchester Counties. While Defendant Kibble was not the Acting Director of OI during the time of the raids at issue in the complaint, operations such as Community Shield are ongoing. There is no evidence of material changes since 2007 in ICE policy or

implementation of policies regarding these types of operations. (*See* Exhibit 15.) Defendant Kibble is sued for injunctive relief in his official capacity.

94.     Defendant CHRISTOPHER SHANAHAN ("Defendant Shanahan") is the Field Office Director for the DRO field office based in New York County, New York. As noted above, this DRO field office had numerous problems regarding an overabundance of "difficult to remove" nationalities, such as African or Chinese aliens. Defendant Shanahan is responsible for managing enforcement activities of ICE in the downstate New York area, including Suffolk, Nassau and Westchester Counties, and implementing ICE policies throughout the New York area. Defendant Shanahan is sued individually and in his official capacity.

95.     Upon information and belief, Defendant Shanahan was personally involved in and/or personally ordered, encouraged or authorized the conduct of ICE agents at the homes of the named Plaintiffs as complained of herein by enforcing increased quotas for apprehension without providing adequate resources. Defendant Shanahan intended to violate constitutional rights by, *inter alia*, implementing these ICE policies. Additionally, on March 8, 2007, Defendant Shanahan specifically requested, and later received a memorandum in preparation for a response to a New York Times article authored by Nina Bernstein that mentioned three raids conducted by the NYC Fugitive Operations Unit. Upon information and belief, Defendant Shanahan continued to authorize similar raids after becoming aware of concerns about the constitutionality of ICE agents' conduct through press reports and internal investigations. Upon information and belief, Defendant Shanahan has not addressed lapses in training or otherwise changed the instructions that agents under his supervision are expected to obey.

96.     Defendant PETER J. SMITH ("Defendant Smith") is the Special Agent in Charge of the New York SAC office of Defendant ICE OI. SAC offices utilize various subordinate offices within their geographic region, including Resident Agent in Charge Offices ("RAC"), to

enforce ICE policies. Defendant Smith implemented ICE policies throughout the New York area, and intended to violate constitutional rights by, *inter alia*, implementing ICE policies during raids on homes of one or more of the named Plaintiffs. The RAC office that conducted these raids did so with the approval and at the behest of Defendant Smith. Defendant Smith was in charge of ICE home raids conducted in Nassau County the week of September 24, 2007, and publicly espoused the view that warrants were not necessary because the targets of the raids were immigrants. Defendant Smith is sued individually and in his official capacity.

97.     Defendant Smith was personally involved in the planning of Operation Surge during the week of September 24, 2007. Defendant Smith determined resources to be allocated by the SAC New York office, collaborated with DRO to enlist assistance for the raids, and attended and spoke at the briefing prior to the operation. Defendant Smith, working in conjunction with his subordinates, was also closely involved in crafting ICE's response to the Nassau County allegations of ICE misconduct during Operation Surge. Defendant Smith personally met with New York State Congressman Peter King to defend ICE from the Nassau County officials' accusations, despite not having conducted an adequate investigation into the matter.

98.     Defendant JOSEPH A. PALMESE ("Defendant Palmese") is the Resident Agent in Charge of the Bohemia, New York RAC office of Defendant ICE OI. Defendant Palmese implemented ICE policies throughout the New York area. Upon information and belief, Defendant Palmese was personally involved in and/or personally encouraged, ordered, authorized, or supervised the conduct of ICE agents in the Nassau County home raids the week of September 24, 2007. Defendant Palmese intended to violate constitutional rights by, *inter alia*, implementing ICE policies during these raids. As evidenced by the widespread abuses by agents under his immediate direction, Defendant Palmese provided inadequate training and/or nurtured

an environment of impunity in which agents were expected to increase apprehensions through "collateral" arrests designed to boost apprehension statistics. Defendant Palmese is sued individually and in his official capacity.

99. Defendant Palmese had managerial oversight of the planning and execution of ICE home raids in Nassau County during the week of September 24, 2007. Defendant Palmese drafted and disseminated a tentative plan for the raids, coordinated the agents who would take part in the raids, and conducted the pre-operation briefing. At that briefing, Defendant Palmese led a general discussion regarding warrantless arrests, consent, and collateral arrests. Given the widespread nature of the Constitutional violations that occurred during these raids, Defendant Palmese failed to train adequately the ICE agents who participated in the raids. Defendant Palmese also met with New York State Congressman Peter King to defend ICE from the Nassau County officials' accusations, despite not having conducted an adequate investigation into the matter.

100. DARREN WILLIAMS ("Defendant Williams") is a Supervisory Detention and Deportation Officer with the New York City Fugitive Operations Team of ICE, in the New York City DRO field office. In that role, Defendant Williams delegated assignments, reviewed reports on planned and completed operations, and provided guidance to agents regarding numerous operational and investigative procedures. Defendant Williams implemented ICE policies throughout the New York area. Upon information and belief, Defendant Williams was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar and Nelly Amaya. Defendant Williams intended to violate constitutional rights by, *inter alia*, implementing ICE policies during these raids. Defendant Williams is sued individually and in his official capacity.

101.     Defendant Williams was involved in numerous aspects of the planning of the ICE raids on homes of one or more of the named Plaintiffs, including the selection of agents for each raid.  As noted in the operational plans, Defendant Williams was an operational supervisor and member of the command center for raids conducted by the New York City DRO field office pursuant to Operation Return to Sender and Operation Cross Check.  Defendant Williams also coordinated with the RAC NY office to provide Fugitive Operations team members to assist in the raids during the week of September 24, 2007.  Defendant Williams has not addressed lapses in training or otherwise changed the instructions that agents under his supervision are expected to obey.

102.     Defendant JEFFREY KNOPF ("Defendant Knopf") is a Group Supervisor in the New York SAC Office of ICE Office of Investigations, but worked out of the RAC office in Bohemia, New York.  Defendant Knopf implemented ICE policies throughout Nassau and Suffolk Counties on Long Island, New York.  Defendant Knopf is sued individually and in his official capacity.

103.     Defendant Knopf was involved in multiple aspects of the ICE raids on the homes of one or more of the named Plaintiffs, and is listed as the "ICE Supervisor" on the Enforcement Operation Plan for the ICE Operations that took place in Nassau and Suffolk County during the week of September 24, 2007.  Defendant Knopf intended to violate constitutional rights by, *inter alia*, implementing ICE policies during these raids.  Defendant Knopf also attended and spoke at a briefing prior to these ICE operations, where he directed the ICE agents on issues relating to the warrantless apprehension of undocumented aliens and home entries.  Given the widespread nature of the constitutional violations that occurred during these raids, Defendant Knopf failed to adequately train the ICE agents who participated in the raids.

104.    Upon information and belief, Defendant ICE 1 ("Defendant ICE 1") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 1 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio, Juan Mijangos, David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz.  Through his/her actions, as set forth herein, ICE 1 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 1 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  ICE 1, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations.  Upon information and belief, ICE 1 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  ICE 1 was an operational supervisor and member of the command center for raids conducted by the New York City DRO field office pursuant to Operation Return to Sender and Operation Cross Check, and was an ICE point of contact with local police departments. Defendant ICE 1 is sued individually and in his/her official capacity.

105.    Upon information and belief, Defendant ICE 2 ("Defendant ICE 2") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 2 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika

Gabriela Garcia-Leon, Carson Aguilar and Nelly Amaya. Through his/her actions, as set forth herein, ICE 2 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 2 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 2, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 2 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. ICE 2 also played a critical role in the process of operational plans being approved by DRO headquarters. Defendant ICE 2 is sued individually and in his/her official capacity.

106. Upon information and belief, Defendant ICE 3 ("Defendant ICE 3") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 3 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio and Juan Jose Mijangos. Through his/her actions, as set forth herein, ICE 3 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 3 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. As a team leader, ICE 3 was responsible for leading his/her team at all times during each raid. Upon information and belief, ICE 3's

responsibilities as a team leader included, *inter alia*: assigning team members tasks for each raid, providing team members with background information regarding each residence prior to the raid, ensuring that consent to enter each residence was obtained, and making any necessary decisions on behalf of his/her team. ICE 3, as a team leader and coordinator of other ICE agents, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 3 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Through coordination with other law enforcement agencies, ICE 3 selected raid targets and locations based in part on the number of expected collateral arrests. Defendant ICE 3 is sued individually and in his/her official capacity.

107. Upon information and belief, Defendant ICE 4 ("Defendant ICE 4") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 4 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio and Juan Jose Mijangos. Through his/her actions, as set forth herein, ICE 4 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 4 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 4, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and

unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 4 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 4 is sued individually and in his/her official capacity.

108. Upon information and belief, Defendant ICE 5 ("Defendant ICE 5") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 5 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar and Nelly Amaya. Through his/her actions, as set forth herein, ICE 5 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 5 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 5, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 5 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 5 is sued individually and in his/her official capacity.

109. Upon information and belief, Defendant ICE 6 ("Defendant ICE 6") is a federal law enforcement agent and/or deportation officer employed by Defendant ICE. Upon information

and belief, Defendant ICE 6 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 6 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 6 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 6, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 6 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 6 is sued individually and in his/her official capacity.

110. Upon information and belief, Defendant ICE 7 ("Defendant ICE 7") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 7 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Moralez, Yoni Revolorio and Juan Jose Mijangos. Through his/her actions, as set forth herein, ICE 7 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 7 attended a pre-raid briefing where policies and procedures

were outlined regarding the raids on Plaintiffs' homes. ICE 7, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 7 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 7 is sued individually and in his/her official capacity.

111. Upon information and belief, Defendant ICE 8 ("Defendant ICE 8") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 8 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, Carson Aguilar, Nelly Amaya, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio, Juan Jose Mijangos, David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 8 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 8 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 8, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 8 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the

homes. ICE 8 provided information on raid targets and also coordinated the logistics of operations he/she was involved in. Defendant ICE 8 is sued individually and in his/her official capacity.

112.     Upon information and belief, Defendant ICE 9 ("Defendant ICE 9") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 9 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio and Juan Jose Mijangos. Through his/her actions, as set forth herein, ICE 9 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 9 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 9, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 9 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 9 is sued individually and in his/her official capacity.

113.     Upon information and belief, Defendant ICE 10 ("Defendant ICE 10") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 10 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio and Juan Jose Mijangos. Through his/her actions, as set forth

herein, ICE 10 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 10 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 10, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 10 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 10 is sued individually and in his/her official capacity.

114. Upon information and belief, Defendant ICE 11 ("Defendant ICE 11") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 11 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio, Juan Jose Mijangos, David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 11 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 11 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 11, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and

belief, ICE 11 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 11 is sued individually and in his/her official capacity.

115. Upon information and belief, Defendant ICE 12 ("Defendant ICE 12") is a federal law enforcement agent and/or examining officer employed by Defendant ICE. Upon information and belief, Defendant ICE 12 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 12 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 12 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 12, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 12 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. ICE 12 was an operational supervisor and member of the command center for raids conducted by the New York City DRO field office pursuant to Operation Return to Sender. ICE 12 also coordinated the DRO response to accusations of misconduct at 165 Main Street, Mt. Kisco, New York. Defendant ICE 12 is sued individually and in his/her official capacity.

116. Upon information and belief, Defendant ICE 13 ("Defendant ICE 13") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant

ICE 13 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 13 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 13 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 13, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 13 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 13 is sued individually and in his/her official capacity.

117.    Upon information and belief, Defendant ICE 14 ("Defendant ICE 14") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 14 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 14 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 14 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 14, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited

proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 14 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 14 is sued individually and in his/her official capacity.

118. Upon information and belief, Defendant ICE 15 ("Defendant ICE 15") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 15 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 15 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 15 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. As a team leader, ICE 15 was responsible for leading his/her team at all times during each raid. Upon information and belief, ICE 15's responsibilities as a team leader included, *inter alia*: assigning team members tasks for each raid, providing team members with background information regarding each residence prior to the raid, ensuring that consent to enter each residence was obtained, and making any necessary decisions on behalf of his/her team. ICE 15, as a team leader and coordinator of other ICE agents, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 15 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. ICE 15 also led pre-raid briefings attended by both ICE and local law enforcement.

Through coordination with other law enforcement agencies, ICE 15 selected raid targets and locations based in part on the number of expected collateral arrests. Defendant ICE 15 is sued individually and in his/her official capacity.

119. Upon information and belief, Defendant ICE 16 ("Defendant ICE 16") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 16 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs David Lazaro Perez, William Lazaro and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 16 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 16 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 16, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 16 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 16 is sued individually and in his/her official capacity.

120. Upon information and belief, Defendant ICE 17 ("Defendant ICE 17") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 17 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs David Lazaro Perez, William Lazaro, and Tarcis Sapon-Diaz. Through his/her actions, as set forth herein, ICE 17 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the

46

constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 17 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 17, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 17 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 17 is sued individually and in his/her official capacity.

121. Upon information and belief, Defendant ICE 18 ("Defendant ICE 18") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 18 was personally involved in the ICE raids on the homes of Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez and Yanet Martinez. Through his/her actions, as set forth herein, ICE 18 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 18 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. As a team leader, ICE 18 was responsible for leading his/her team at all times during each raid. Upon information and belief, ICE 18's responsibilities as a team leader included, *inter alia*: assigning team members tasks for each raid, providing team members with background information regarding each residence prior to the raid, ensuring that consent to enter each residence was obtained, and making any necessary decisions on behalf of his/her team. ICE 18, as a team leader and coordinator of other ICE agents, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their

Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 18 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. ICE 18 was informed of the outdated nature of target addresses, yet elected to still lead his/her team of agents on these raids despite this failure of intelligence. ICE 18 is sued individually and in his/her official capacity.

122. Upon information and belief, Defendant ICE 19 ("Defendant ICE 19") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 19 was personally involved in the ICE raids on the homes of Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez and Yanet Martinez. Through his/her actions, as set forth herein, ICE 19 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 19 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 19, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 19 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 19 is sued individually and in his/her official capacity.

123. Upon information and belief, Defendant ICE 20 ("Defendant ICE 20") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 20 was personally involved in the ICE raids on the homes of one or more of the named

Plaintiffs, including the homes of Plaintiffs Sonia Bonilla, Beatriz Velasquez, and Dalia Velasquez. Through his/her actions, as set forth herein, ICE 20 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 20 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 20, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 20 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 20 is sued individually and in his/her official capacity.

124. Upon information and belief, Defendant ICE 21 ("Defendant ICE 21") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 21 was personally involved in the ICE raids on the homes of Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez and Yanet Martinez. Through his/her actions, as set forth herein, ICE 21 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 21 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 21, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 21 and the other Defendants

selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 21 is sued individually and in his/her official capacity.

125. Upon information and belief, Defendant ICE 22 ("Defendant ICE 22") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 22 was personally involved in the ICE raids on the homes of Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez and Yanet Martinez. Through his/her actions, as set forth herein, ICE 22 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 22 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 22, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 22 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 22 is sued individually and in his/her official capacity.

126. Upon information and belief, Defendant ICE 23 ("Defendant ICE 23") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 23 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Sonia Bonilla, Beatriz Velasquez and Dalia Velasquez. Through his/her actions, as set forth herein, ICE 23 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights

of Latino persons in New York City and the surrounding suburban area. ICE 23 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 23, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 23 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 23 is sued individually and in his/her official capacity.

127. Upon information and belief, Defendant ICE 24 ("Defendant ICE 24") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 24 was personally involved in the ICE raids on the homes of Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez and Yanet Martinez. Through his/her actions, as set forth herein, ICE 24 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 24 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 24, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 24 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 24 is sued individually and in his/her official capacity.

128. Upon information and belief, Defendant ICE 25 ("Defendant ICE 25") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 25 was personally involved in the ICE raids on the homes of Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez and Yanet Martinez. Through his/her actions, as set forth herein, ICE 25 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 25 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 25, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 25 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 25 is sued individually and in his/her official capacity.

129. Upon information and belief, Defendant ICE 26 ("Defendant ICE 26") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 26 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Sonia Bonilla, Beatriz Velasquez and Dalia Velasquez. Through his/her actions, as set forth herein, ICE 26 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 26 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 26, in conjunction with others, unlawfully entered, searched, and seized the homes of

Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 26 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 26 is sued individually and in his/her official capacity.

130. Upon information and belief, Defendant ICE 27 ("Defendant ICE 27") is a federal law enforcement agent employed by Defendant ICE. ICE 27 is listed as the "Case Agent" on the Enforcement Operation Plan for the ICE Operations that took place in Nassau and Suffolk Counties during the week of September 24, 2007 and was intimately involved in the planning and organization of those operations. As the Case Agent, ICE 27 was responsible for implementing ICE policies during these operations throughout the Long Island, NY area. Defendant ICE 27 intended to violate constitutional rights by, *inter alia*, implementing ICE policies during these raids.

131. In his/her capacity as Case Agent, ICE 27 helped conduct the briefing of the team leaders and others that was held just prior to beginning the operations. Also, prior to the operations, ICE 27 participated in a series of meetings with Defendants Palmese, Knopf, ICE 58, and ICE 59, during which those Defendants engaged in planning of the operations. As demonstrated by the widespread nature of the Constitutional violations that occurred during these raids, as the Case Agent, ICE 27 failed to adequately train agents scheduled to participate in the raids. ICE 27 also failed to properly share information, including target lists, with local law enforcement agencies. In preparation for the raids, ICE 27 was involved in selecting the team leaders and in the organization of ICE agents into teams and, upon information and belief, in the preparation of the outdated and inaccurate address lists used during the raids. Upon information

and belief, ICE 27 and the other Defendants selected the residences and individuals targeted for immigration raids because Latinos were believed to reside at the homes.

132.     Upon information and belief, Defendant ICE 27 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Elder Bonilla, Diana Rodriguez, Raul Amaya and Gloria Vanessa Amaya.  Through his/her actions, as set forth herein, ICE 27 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  As a team leader, ICE 27 was responsible for leading his/her team at all times during each raid.  Upon information and belief, ICE 27's responsibilities as a team leader included, *inter alia*: assigning team members tasks for each raid, providing team members with background information regarding each residence prior to the raid, ensuring that consent to enter each residence was obtained, and making any necessary decisions on behalf of his/her team.  ICE 27, as a team leader and coordinator of other ICE agents, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations.  Defendant ICE 27 is sued individually and in his/her official capacity.

133.     Upon information and belief, Defendant ICE 28 ("Defendant ICE 28") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 28 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Elder Bonilla, Diana Rodriguez, Raul Amaya and Gloria Vanessa Amaya.  Through his/her actions, as set forth herein, ICE 28 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the

constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 28 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 28, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 28 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 28 is sued individually and in his/her official capacity.

134. Upon information and belief, Defendant ICE 29 ("Defendant ICE 29") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 29 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Elder Bonilla, Diana Rodriguez, Raul Amaya and Gloria Vanessa Amaya. Through his/her actions, as set forth herein, ICE 29 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 29 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 29, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 29 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 29 is sued individually and in his/her official capacity.

135. Upon information and belief, Defendant ICE 30 ("Defendant ICE 30") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 30 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Elder Bonilla and Diana Rodriguez. Through his/her actions, as set forth herein, ICE 30 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 30 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 30, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 30 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 30 is sued individually and in his/her official capacity.

136. Upon information and belief, Defendant ICE 31 ("Defendant ICE 31") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 31 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Elder Bonilla, Diana Rodriguez, Raul Amaya and Gloria Vanessa Amaya. Through his/her actions, as set forth herein, ICE 31 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 31 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 31, in conjunction with others, unlawfully entered, searched, and seized

the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 31 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 31 is sued individually and in his/her official capacity.

137. Upon information and belief, Defendant ICE 32 ("Defendant ICE 32") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 32 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Elder Bonilla, Diana Rodriguez, Raul Amaya and Gloria Vanessa Amaya. Through his/her actions, as set forth herein, ICE 32 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 32 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 32, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 32 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 32 is sued individually and in his/her official capacity.

138. Upon information and belief, Defendant ICE 33 ("Defendant ICE 33") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 33 was personally involved in the ICE raids on the homes of one or more of the named

Plaintiffs, including the homes of Plaintiffs Elder Bonilla, Diana Rodriguez, Raul Amaya and Gloria Vanessa Amaya. Through his/her actions, as set forth herein, ICE 33 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 33 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 33, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 33 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 33 is sued individually and in his/her official capacity.

139. Upon information and belief, Defendant ICE 34 ("Defendant ICE 34") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 34 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Elder Bonilla and Diana Rodriguez. Through his/her actions, as set forth herein, ICE 34 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 34 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 34, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 34 and the other

58

Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 34 is sued individually and in his/her official capacity.

140. Upon information and belief, Defendant ICE 35 ("Defendant ICE 35") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 35 was personally involved in the ICE raids on the home of Yanet Martinez. Through his/her actions, as set forth herein, ICE 35 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 35 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 35, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 35 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 35 is sued individually and in his/her official capacity.

141. Upon information and belief, Defendant ICE 36 ("Defendant ICE 36") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 36 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Raul Amaya and Gloria Vanessa Amaya. Through his/her actions, as set forth herein, ICE 36 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 36 attended a pre-raid briefing where

policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 36, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 36] and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 36 is sued individually and in his/her official capacity.

142.     Upon information and belief, Defendant ICE 37 ("Defendant ICE 37") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 37 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Raul Amaya and Gloria Vanessa Amaya. Through his/her actions, as set forth herein, ICE 37 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 37 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 37, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 37 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 37 is sued individually and in his/her official capacity.

143.    Upon information and belief, Defendant ICE 38 ("Defendant ICE 38") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 38 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs.  Through his/her actions, as set forth herein, ICE 38 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 38 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  ICE 38, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations.  Upon information and belief, ICE 38 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 38 is sued individually and in his/her official capacity.

144.    Upon information and belief, Defendant ICE 39 ("Defendant ICE 39") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 39 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez.  Through his/her actions, as set forth herein, ICE 39 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 39 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  As a team leader, ICE 39 was responsible for leading his/her team at all times during each raid.  Upon information and belief, ICE 39's responsibilities

as a team leader included, *inter alia*: assigning team members tasks for each raid, providing team members with background information regarding each residence prior to the raid, ensuring that consent to enter each residence was obtained, and making any necessary decisions on behalf of his/her team. ICE 39, as a team leader and coordinator of other ICE agents, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 39 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 39 is sued individually and in his/her official capacity.

145. Upon information and belief, Defendant ICE 40 ("Defendant ICE 40") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 40 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez. Through his/her actions, as set forth herein, ICE 40 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 40 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 40, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 40 and the other Defendants selected the residences and

individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 40 is sued individually and in his/her official capacity.

146. Upon information and belief, Defendant ICE 41 ("Defendant ICE 41") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 41 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez. Through his/her actions, as set forth herein, ICE 41 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 41 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 41, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 41 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 41 is sued individually and in his/her official capacity.

147. Upon information and belief, Defendant ICE 42 ("Defendant ICE 42") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 42 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Sonia Bonilla, Beatriz Velasquez and Dalia Velasquez. Through his/her actions, as set forth herein, ICE 42 engaged in a pattern and practice of

conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 42 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 42, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 42 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 42 is sued individually and in his/her official capacity.

148. Upon information and belief, Defendant ICE 43 ("Defendant ICE 43") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 43 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Elder Bonilla and Diana Rodriguez. Through his/her actions, as set forth herein, ICE 43 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 43 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 43, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 43 and the other Defendants selected the residences and individuals targeted in these home raids for immigration

enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 43 is sued individually and in his/her official capacity.

149.    Upon information and belief, Defendant ICE 44 ("Defendant ICE 44") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 44 was personally involved in the ICE raids on the homes of Yanet Martinez.  Through his/her actions, as set forth herein, ICE 44 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 44 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  ICE 44, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations.  Upon information and belief, ICE 44 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 44 is sued individually and in his/her official capacity.

150.    Upon information and belief, Defendant ICE 45 ("Defendant ICE 45") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 45 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez.  Through his/her actions, as set forth herein, ICE 45 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 45 attended a pre-raid briefing where policies and procedures were outlined

65

regarding the raids on Plaintiffs' homes. ICE 45, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 45 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 45 is sued individually and in his/her official capacity.

151. Upon information and belief, Defendant ICE 46 ("Defendant ICE 46") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 46 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez. Through his/her actions, as set forth herein, ICE 46 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 46 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 46, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 46 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 46 is sued individually and in his/her official capacity.

152. Upon information and belief, Defendant ICE 47 ("Defendant ICE 47") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 47 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez. Through his/her actions, as set forth herein, ICE 47 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 47 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 47, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 47 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 47 is sued individually and in his/her official capacity.

153. Upon information and belief, Defendant ICE 48 ("Defendant ICE 48") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 48 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez. Through his/her actions, as set forth herein, ICE 48 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 48 attended a pre-raid briefing where policies and procedures were outlined

regarding the raids on Plaintiffs' homes.  ICE 48, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 48 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 48 is sued individually and in his/her official capacity.

154.     Upon information and belief, Defendant ICE 49 ("Defendant ICE 49") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 49 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez.  Through his/her actions, as set forth herein, ICE 49 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 49 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  ICE 49, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 49 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 49 is sued individually and in his/her official capacity.

155.     Upon information and belief, Defendant ICE 50 ("Defendant ICE 50") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 50 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez.  Through his/her actions, as set forth herein, ICE 50 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 50 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  ICE 50, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations.  Upon information and belief, ICE 50 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 50 is sued individually and in his/her official capacity.

156.     Upon information and belief, Defendant ICE 51 ("Defendant ICE 51") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 51 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez.  Through his/her actions, as set forth herein, ICE 51 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 51 attended a pre-raid briefing where policies and procedures were outlined

regarding the raids on Plaintiffs' homes. ICE 51, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 51 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 51 is sued individually and in his/her official capacity.

157.    Upon information and belief, Defendant ICE 52 ("Defendant ICE 52") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 52 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez. Through his/her actions, as set forth herein, ICE 52 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 52 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 52, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 52 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 52 is sued individually and in his/her official capacity.

158.     Upon information and belief, Defendant ICE 53 ("Defendant ICE 53") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 53 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Elder Bonilla and Diana Rodriguez.  Through his/her actions, as set forth herein, ICE 53 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 53 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  ICE 53, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations.  Upon information and belief, ICE 53 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 53 is sued individually and in his/her official capacity.

159.     Upon information and belief, Defendant ICE 54 ("Defendant ICE 54") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 54 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Elder Bonilla, Diana Rodriguez, Raul Amaya and Gloria Vanessa Amaya.  Through his/her actions, as set forth herein, ICE 54 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 54 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  ICE 54, in conjunction with others, unlawfully entered, searched, and seized

the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations.  Upon information and belief, ICE 54 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 54 is sued individually and in his/her official capacity.

160.    Upon information and belief, Defendant ICE 55 ("Defendant ICE 55") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 55 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the homes of Plaintiffs Elder Bonilla, Diana Rodriguez, Raul Amaya and Gloria Vanessa Amaya.  Through his/her actions, as set forth herein, ICE 55 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area.  ICE 55 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes.  ICE 55, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations.  Upon information and belief, ICE 55 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes.  Defendant ICE 55 is sued individually and in his/her official capacity.

161.    Upon information and belief, Defendant ICE 56 ("Defendant ICE 56") is a federal law enforcement agent employed by Defendant ICE.  Upon information and belief, Defendant ICE 56 was personally involved in the ICE raids on the homes of one or more of the named

Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez. Through his/her actions, as set forth herein, ICE 56 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 56 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 56, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 56 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 56 is sued individually and in his/her official capacity.

162. Upon information and belief, Defendant ICE 57 ("Defendant ICE 57") is a federal law enforcement agent employed by Defendant ICE. Upon information and belief, Defendant ICE 57 was personally involved in the ICE raids on the homes of one or more of the named Plaintiffs, including the home of Plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez and Bryan Jimenez. Through his/her actions, as set forth herein, ICE 57 engaged in a pattern and practice of conducting home raids in a manner that did, and was intended to, violate the constitutional rights of Latino persons in New York City and the surrounding suburban area. ICE 57 attended a pre-raid briefing where policies and procedures were outlined regarding the raids on Plaintiffs' homes. ICE 57, in conjunction with others, unlawfully entered, searched, and seized the homes of Plaintiffs and other Latino persons and unlawfully seized and detained them within their homes based upon nothing more than their Latino appearance, inability

to speak, or limited proficiency in, English, accent, and/or other impermissible considerations. Upon information and belief, ICE 57 and the other Defendants selected the residences and individuals targeted in these home raids for immigration enforcement actions because Latinos were believed to reside at the homes. Defendant ICE 57 is sued individually and in his/her official capacity.

163. Upon information and belief, Defendant ICE 58 ("Defendant ICE 58") is a federal law enforcement agent employed by Defendant ICE. Defendant ICE 58 implemented ICE policies throughout Nassau and Suffolk Counties on Long Island, New York. ICE 58 was personally involved in the planning and organization of the ICE operations conducted in Nassau and Suffolk Counties during the week of September 24, 2007. ICE 58 was in contact with local law enforcement agencies during the preparations for the operations and personally met with representatives of the Nassau County Police Department the week before the operations were scheduled to begin. ICE 58 participated in several planning meetings with Defendants Palmese, Knopf, ICE 27, and ICE 58. ICE 58 was also involved in the process of compiling and providing the information necessary for the operations to receive approval from senior ICE officials. Further, ICE 58 was personally involved in the selection of the purported targets for the operations. In addition to his/her involvement in the planning of the operations, ICE 58 participated directly in the operations as the team leader of a raid team. As a team leader, ICE 58 was responsible for leading his/her team at all times during each raid. Upon information and belief, ICE 58's responsibilities as a team leader included, *inter alia*: assigning team members tasks for each raid, providing team members with background information regarding each residence prior to the raid, ensuring that consent to enter each residence was obtained, and making any necessary decisions on behalf of his/her team. ICE 58 intended to violate constitutional rights

by, *inter alia*, implementing ICE policies during these raids. Defendant ICE 58 is sued individually and in his/her official capacity.

164. Upon information and belief, ICE 59 ("Defendant ICE 59") is a Group Supervisor in the Bohemia, NY RAC office of Defendant ICE OI. Defendant ICE 59 implemented ICE policies throughout Nassau and Suffolk Counties on Long Island, New York. Upon information and belief, ICE 59 supervised several of the agents involved in the planning and organization of the ICE Operations conducted in Nassau and Suffolk Counties during the week of September 24, 2007. ICE 59 intended to violate constitutional rights by, *inter alia*, implementing ICE policies during these raids. ICE 59 was also personally involved in the planning of these operations. ICE 59 was present during a series of meetings with Defendants Palmese, Knopf, ICE 27, and ICE 58 during which these operations were planned. Further, ICE 59 was kept aware of the planning process for these operations at all times by communications from Defendants Palmese, Knopf, ICE 27, and ICE 58. Upon information and belief, ICE 59 was also involved in the generation and/or review of internal ICE reports tracking the arrests made during the September 2007 raids.

165. ICE 59 was also personally involved in the operations beginning on September 24, 2007. ICE 59 specifically was responsible for coordinating transportation and logistical details, ensuring the completion of necessary paperwork, and approving reports created in connection with the operations. In this capacity, ICE 59 spoke at the pre-operational briefing regarding logistical issues and the paperwork that would need to be completed in connection with the operations. As demonstrated by the widespread nature of the Constitutional violations that occurred during these raids, ICE 59 failed to adequately train the ICE agents who participated in the raids. Defendant ICE 59 is sued individually and in his/her official capacity.

166. Defendant UNITED STATES OF AMERICA is a sovereign nation and exists under the Constitution of the United States of America and the laws enacted by the United States

Congress. ICE is, and at all times relevant to this lawsuit was, an agency of the Department of Homeland Security, which in turn is an agency organized and existing under the laws of the United States. Defendant United States of America was at all times relevant to this lawsuit the employer of all Defendants named in this action.

167. At all times relevant to the incidents complained of in this action, Defendants JOHN and JANE DOE ICE AGENTS were federal law enforcement agents employed by Defendant ICE.

168. Defendants John and Jane Doe ICE Agents are sued individually and in their official capacity.

169. The true names and total number of Defendants John and Jane Doe ICE Agents are unknown to Plaintiffs, and therefore, Plaintiffs sue these Defendants by such fictitious names.

170. Upon information and belief, each John and Jane Doe ICE Agent Defendant is responsible for the injuries and damages suffered by Plaintiffs caused by the acts alleged in this complaint.

171. Plaintiffs will amend their complaint to state the true names of Defendants John and Jane Doe ICE Agents after those names have been identified.

172. At all times relevant to the incidents complained of in this action, Defendants JOHN and JANE ROE ICE SUPERVISORS were federal law enforcement officials employed by Defendant ICE.

173. The true names and total number of Defendants John and Jane Roe ICE Supervisors are unknown to Plaintiffs, and therefore, Plaintiffs sue these Defendants by such fictitious names.

174.     Upon information and belief, each John and Jane Roe ICE Supervisor Defendant is responsible for the injuries and damages suffered by Plaintiffs caused by the acts alleged in this complaint.  Defendants John and Jane Roe ICE Supervisors are sued in their individual capacities.

175.     Plaintiffs will amend their complaint to state the true names of Defendants John and Jane Roe ICE Supervisors after those names have been identified.

176.     In committing the acts alleged in this complaint, Defendants John and Jane Doe ICE Agents and John and Jane Roe ICE Supervisors were acting on behalf of Defendant ICE.

177.     Further, upon information and belief, Defendants ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, and Defendants John and Jane Doe ICE Agents, were acting under the immediate supervision of Defendants Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 12, ICE 18, ICE 27, ICE 59, and John Roe and Jane Roe ICE Supervisors and pursuant to their authorization.

178.     Defendants Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that committing the acts alleged in this complaint violated Plaintiffs' clearly established constitutional rights.

# FACTS

## Background on ICE

179.     ICE is a division of the Department of Homeland Security and was formed in March 2003.  ICE is comprised of four divisions.  One of these divisions is the DRO, and another is the OI.  The DRO has been running the National Fugitive Operations Program since February 2002.  The goal of the National Fugitive Operations Program is to eliminate the backlog of fugitive aliens.

180.     In August 2003, the DRO announced that it would step up its activities in locating and deporting fugitive aliens.

181.     Since announcing its plan in 2003, ICE's DRO has pursued its goal to increase the number of persons removed from this country.

182.     As of January 2006, each Fugitive Operations Team was expected to arrest 1,000 fugitive aliens per year.  By comparison, in 2003, each team was expected to make only 125 arrests.

183.     However, ICE's DRO has implemented neither a corresponding increase in training nor procedures sufficient to protect the rights of persons affected by their activities.  Moreover, members of the Fugitive Operations Teams are permitted to take part in home raids without first completing whatever little training ICE provides on how to lawfully conduct such raids.

184.     Furthermore, the DRO and Fugitive Operations Teams rely on a database that purports to contain relevant information concerning, among other things, the location of fugitive aliens.

185.     Much of the information in this database, however, is outdated, inaccurate and incomplete.

186.     The OI is responsible for investigating issues related to national security.  Agents and supervisors who work under the direction of the DRO have also participated in operations directed by the OI.  Upon information and belief, OI operations also make use of some of the same databases and intelligence available to the DRO.  Indeed, as outlined in a joint memorandum from the directors of DRO and OI, the two programs' responsibilities routinely overlap, as neither area of responsibility is exclusive to either program.

187.     Upon information and belief, ICE has procedural manuals that are used to provide guidance to the Fugitive Operations Teams and other agents in conducting apprehension operations, including but not limited to those conducted by the DRO and by OI.

188.     Upon information and belief, these procedural manuals are inadequate and incomplete in that, among other things, they do not contain adequate specific instructions for determining how to obtain consent to enter a private home or how ICE agents are to conduct themselves within a private home.

189.     The Inspector General has criticized ICE for its incomplete and inaccurate background information, understaffing, and incomplete and inadequate training.  Specifically, in its report of March 2007, the Inspector General noted that:

(a)     the DRO immigration database contained inaccurate and incomplete information on fugitive aliens;

(b)     data exchanged between the DRO and its federal partners have not been reconciled on a regular basis to ensure the identity and background information on the fugitive alien is valid;

(c)     Fugitive Operations Teams are not fully staffed;

(d)     headquarters and other locations that support Fugitive Operations Teams are not fully staffed;

(e)     not all Fugitive Operations Team members have completed the Fugitive Operations Training Program; and

(f)     there is no national refresher course for those Fugitive Operations Team members who have attended the program.  (*See* March 2007 Report of the Inspector General, attached hereto as Exhibit 16.)

### The ICE Raid on the Leon/Aguilar Family Home

190.     The Leon and Aguilar Plaintiffs are members of three generations of a Latino family.  All are United States citizens.

191.     On the morning of February 20, 2007, the Leon and Aguilar Plaintiffs were all asleep in the Leon/Aguilar family home.

192.     Between about 4:30 and 5:00 a.m., several ICE agents pulled their unmarked cars onto the road outside the family home, blocking the driveway.

193.     They parked their cars in such a way as to prevent any of the cars already in the driveway from exiting the driveway.

194.     The ICE agents then repeatedly rang the doorbell and pounded on the front door of the Leon/Aguilar family home.

195.     Elena Leon had been asleep and was startled awake by the noise of pounding and doorbell-ringing, and went to the door.

196.     When she opened the door, Elena witnessed several uniformed men standing outside the door.

197.     The men were wearing sidearms, which were clearly visible.

198.     Elena was stunned and terrified.

199.     The armed, uniformed men were ICE agents.

200.     As soon Elena opened the door, two of the ICE agents crossed the threshold of the front door and entered the Leon/Aguilar family home.

201.     The others quickly followed.

202.     The ICE agents entered the Leon/Aguilar home without permission or voluntary consent.

203.     None of the ICE agents told Elena that she had the right to refuse them permission to enter her home.

204.     At no time did any of the ICE agents show Elena a warrant that granted permission for them to enter the Leon/Aguilar family home.

205.     There were no exigent circumstances that may have permitted the ICE agents to enter the Leon/Aguilar family home without a valid judicial warrant or voluntary consent.

206.     The ICE agents proceeded into the lower floor of the home, pounding on and opening bedroom doors.

207.     When she heard the noise, Erika Gabriela Garcia-Leon ("Gabriela") opened her bedroom door to see what was happening. Still in her nightclothes, and seeing men storming through the hallway, she slammed the door and leapt back into bed. The ICE agents opened the door. Gabriela was twelve years old at the time.

208.     Andres Leon was also awakened and opened his door. He saw two agents entering the hallway from the basement door. It was apparent that the agents had been in the basement without permission.

209.     At the same time, some of the agents entered the bedroom of Adriana Aguilar, where she was asleep with her son, Carson, who was four years old.

210.     The ICE agents pulled the covers off of her bed and shone flashlights into her face and the face of her son, who began to cry.

211.     The ICE agents searched the Aguilar/Leon family home without the consent of the Leon or Aguilar families.

212.     Startled awake, frightened and confused, Adriana repeatedly asked the ICE agents who they were and what they were doing.  An ICE agent responded that only ICE was permitted to ask questions, and Adriana must answer them.

213.     The ICE agents gathered Adriana, Andres and Gabriela in the office space on the ground floor of the house.

214.     The ICE agents positioned themselves so that the exits leading out of the office area were blocked.

215.     Adriana and Andres were not free to leave the office area.

216.     The agents would not say who they were despite being asked to identify themselves.

217.     The ICE agents would not permit Adriana to call the police or a lawyer.

218.     When Adriana attempted to open a drawer to get the telephone number of a lawyer, the agents put their hands on their weapons.

219.     One agent ordered her not to move.

220.     Only after the ICE agents had Adriana in the office area did they indicate that they were looking for someone specific.  They listed the names of several men for whom they were looking, including a man named "Wilson Garcia."

221.     Adriana thought they might have been referring to her first husband, whose name is Wilson Patricio Garcia, but who went by his middle name, "Patricio."

222.     Adriana had divorced him five years earlier in 2002.

223.     Adriana's divorce from Wilson Patricio Garcia, her subsequent marriage to her current husband Norman Aguilar, and her purchase of the Aguilar/Leon family home together with Norman are all matters of public record easily available to ICE had they checked.

224.     It was entirely unreasonable for the ICE agents to believe that they would find Wilson Patricio Garcia in the Leon/Aguilar family home at the time of the raid.

225.     In the office area, the ICE agents questioned Andres, Adriana and Gabriela about Wilson Garcia.

226.     While in the office area, Adriana asked the ICE agents to see a warrant.

227.     One of the agents told her that they would show her the warrant.

228.     However, the agents did not show her any warrant.

229.     Andres also asked the ICE agents to see a warrant.

230.     The ICE agents did not permit Andres to read a warrant.

231.     Instead, one of the ICE agents opened and then quickly closed a manila folder containing papers that the ICE agents claimed was a warrant.

232.     The quick display of the contents of the folder did not allow Andres to confirm the existence of a warrant or the opportunity to read any of the contents.

233.     Upon information and belief, the ICE agents did not have a warrant that permitted them to enter or search the Leon/Aguilar family home or to detain the Leon/Aguilar family without voluntary consent or exigent circumstances.

234.     A Freedom of Information Act request seeking a copy of any such warrant was made to ICE in early July 2007.

235.     To date, ICE has not produced a copy of any such warrant.

236.     As the ICE agents were leaving the office area, Adriana asked one of the agents in Spanish where the warrant was.  In English, he indicated to one of his colleagues that she was asking for the warrant.

237.     The ICE agents never provided any member of the Leon or Aguilar families with a copy of a warrant.

238.     On the way out of the office area, one of the ICE agents, turned to twelve-year-old Gabriela and said that they would be back.  Adriana Aguilar and Andres Leon heard the agent say this clearly, in English.

239.     Adriana Aguilar, Andres Leon, Elena Leon, Erika Gabriela Garcia-Leon, and Carson Aguilar were not the targets of the raid.

240.     The only occupant asked for identification was Andres.

241.     Upon information and belief, the ICE agents involved in this raid included Defendants Williams, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7 and ICE 8.

### The ICE Raid on the Amaya Household

242.     At the time of the raid, Nelly Amaya rented a basement apartment at 20 Boatsteerers Court in East Hampton, Suffolk County, New York.  The apartment has three bedrooms.  She had been living in this apartment since 2006.

243.     At the time of the raid (described herein), Nelly shared this apartment with her ex-husband, Giovany Vicuña, her father, Antonio Amaya, and her brother-in-law, Marlon Vicuña.

244.     On the morning of February 20, 2007, the residents of the Amaya household were all asleep.

245.     Between about 4:00 and 5:00 a.m., several ICE agents forcibly entered the Amaya household by pushing the entry door open and kicking open the bedroom doors.

246.     The ICE agents entered Nelly's home without permission or voluntary consent from her or any other member of her household.

247.     The ICE agents did not explain to any member of the family that they had the right to refuse them permission to enter her home.

248.     Nelly was sleeping and was awakened by the agents screaming the name of her brother-in-law, Marlon Vicuña as they entered her apartment.

249.     Nelly saw several uniformed men blocking her bedroom door.

250.     The men were wearing sidearms, which were clearly visible.  One agent had bullets strapped across his chest.

251.     The men shone a flashlight in Nelly's eyes while at the bedroom door.

252.     The ICE agents then entered her bedroom.

253.     Nelly was wearing only a t-shirt and underwear when the men entered her bedroom.

254.     Immediately after crossing the threshold of Nelly's bedroom, the two ICE agents began questioning her and repeatedly asked for Marlon Vicuña.  Nelly asked who they were but they did not identify themselves.

255.     Nelly was ordered to go to the living room.

256.     Nelly threw on pajama pants and a sweatshirt before being pulled by her arm into the living room.  After being pulled into the living room, she asked permission to use the bathroom and was not allowed to do so privately.

257.     When Nelly attempted to go to the bathroom to use the toilet, the ICE agents refused to let her close the door.

258.     Nelly asked the agents for a warrant, but the agents refused to show her any warrant.

259.    After she requested to see a warrant, one of the ICE agents asked Nelly her name.

260.    Nelly responded, "Nelly Amaya."

261.    The ICE agent started laughing and said, "Nelly Amaya, this is your arrest order. You are under arrest."

262.    At no time did any of the ICE agents show Nelly a warrant that granted permission for them to enter or search her home or to arrest her.

263.    There were no exigent circumstances that may have permitted the ICE agents to enter Nelly's home without a valid warrant or voluntary consent.

264.    The ICE agents searched the Amaya family home without permission or consent from the Amaya family.

265.    The ICE agents did not say who they were.

266.    One of the ICE agents put Nelly against the wall to frisk her.

267.    The ICE agent twisted Nelly's arm behind her.

268.    Nelly's arm was already injured before the raid.  During her waking hours, Nelly wore a sling, which was next to her bed when the ICE agents stormed into her bedroom.

269.    The agent's actions exacerbated Nelly's injuries.

270.    The ICE agents arrested, handcuffed and detained Nelly.

271.    The handcuffs caused Nelly's arm to swell and turn purple.

272.    Nelly was then transported to the Wainscott police station where the ICE agents changed their clothes.

273.    During the car ride, Nelly suffered an asthma attack.

274.    The ICE agents called an ambulance while at the Wainscott police station.  An emergency medical services worker took Nelly's pulse but did not give her any treatment, and did not even look at her swollen arm.

275.     Nelly was then transported from the Wainscott police station to 26 Federal Plaza in Manhattan.

276.     At 26 Federal Plaza, Nelly was fingerprinted and questioned by an officer.

277.     A male officer, whom Nelly believed to be a supervisor, asked, "Why did they take you in? You have a clean record."

278.     During the course of questioning the female officer also said, "You shouldn't have asked for a warrant."

279.     While under detention, Nelly was having difficulty breathing because of her asthma.  She was also still in pain from the damage to her arm.

280.     She told the ICE agents on duty that she felt congested because of her asthma.

281.     Approximately 10 hours after initially detaining Nelly and without providing her any medical treatment for her asthma or her injured arm, the ICE agents released her.

282.     Nelly was left to find transportation home on her own.  She was dressed in her nightclothes and had no money or even a coat to keep her warm as she tried to hail a cab in the February cold.  After more than an hour without success, Nelly finally was able to convince a cabdriver to take her to Queens, where a friend of hers paid the fare.

283.     Nelly suffered a great deal of physical and psychological pain and discomfort and humiliation as a result of the raid, arrest and detention.

284.     Nelly Amaya was not the target of the raid.

285.     Upon information and belief, the ICE agents involved in this raid included Defendants Williams, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7 and ICE 8.

**The ICE Raid at 417 East Avenue, Riverhead, NY**

286.     At the time of the raid, Mario Patzan DeLeon rented a room on the second floor of a house at 417 East Avenue in Riverhead, Suffolk County, New York.  The door to his room had a lock and a private key.

287.     At the time of the raid, Gonzalo Escalante rented a room on the first floor at 417 East Avenue, which he shared with Victor Pineda Morales.  The room had a private lock and key.  At the time of the raid, Juan Jose Mijangos was also renting a room with its own lock and key on the first floor of the house.

288.     Yoni Revolorio also rents a private room at 417 East Avenue with a private lock and key.  At the time of the raid, he lived on the second floor of the house.

289.     On April 18, 2007, between about 3:00 and 4:30 in the morning, Mario was awakened to the sound of shouts and loud banging.  He ran into the hallway and looked out the window, where he saw several cars outside.  Large lights were shining into the house.

290.     Mario went back into his bedroom and locked the door.

291.     Gonzalo, Victor and Juan Jose were also awakened by the pounding and shouting at the front door.  Soon they heard noise coming from the kitchen on the first floor.  Men were ordering them to come out of their rooms, which they did.  They went into the kitchen, where several agents had gathered.  It appeared that agents had forced themselves through the back door, which had a less secure lock than the front door.

292.     In the kitchen, an agent grabbed Juan Jose by the neck, pushed him, and handcuffed him.  Gonzalo and Victor were also handcuffed, as were others who were taken out of their rooms.

293.     Agents knocked on the door of the second-floor bedroom of Yoni.  They said they were police and grabbed the door.  An agent put his foot in front of the door and then entered

88

Yoni's room. Once inside Yoni's room, the agent grabbed Yoni by his upper arm and told him to get dressed, come downstairs and talk in the kitchen. Yoni was handcuffed and then led downstairs.

294. From his bedroom on the second floor, Mario could hear the shouting and loud banging and ramming against the outside doors. After some time, Mario heard and felt men screaming and pounding against his bedroom door.

295. Two men with uniforms who indicated that they were ICE burst into his room and ordered Mario against the wall to search him. They took Mario's wallet. Then they told him to go down to the kitchen because they wanted to speak with him.

296. In the kitchen, the residents of the house who were not already placed in handcuffs were handcuffed. At no point were they shown a warrant or court order permitting the ICE agents to enter the house without consent. The men were led outside to waiting vehicles.

297. The group of cars continued to four or five more houses to conduct additional raids. From the vans, all of the men could hear similar banging and shouting at one or more of these houses.

298. After the raids, the ICE agents stopped in a parking lot. While the men they had picked up remained in the car, the ICE agents had some coffee and some breakfast.

299. Mario asked an officer if he could use the bathroom. He was placed in chains and told to relieve himself outdoors, while the agents observed. Mario remained in chains for the rest of the journey.

300. After several hours, the cars arrived at 26 Federal Plaza in Manhattan. The men were taken inside the building to be interrogated. About 25 men were placed in a locked room to wait while each individual was questioned, one by one.

301. Mario, Yoni, Juan Jose, Victor and Gonzalo were released several hours later, in the evening. Most of the men had no money to return home. Some of the men had managed to keep some cash with them, and they lent the others money to take the train home to Riverhead. They did not reach their home until about one o'clock in the morning of April 19, 2007.

302. Once home, the men observed that the front door of the house was dented and damaged from the ramming by the agents, and that one of the double locks on the front door had been pounded so hard that it left a large hole in the plaster of the doorframe. It seemed that the agents had not succeeded in opening the front door and instead had rammed through the back door, which did not have a double lock. The front door remains damaged.

303. Upstairs, in Mario's bedroom, Mario observed that the wooden doorframe around his door had come loose from the pounding by the agents. He repaired the doorframe himself.

304. Mario, Gonzalo, Victor, Juan Jose and Yoni remain frightened and traumatized by the raid. They fear that agents will return at any time to terrorize them again.

305. Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio, and Juan Jose Mijangos were not the targets of the raid.

306. Upon information and belief, the ICE agents involved in this raid included Defendants ICE 1, ICE 3, ICE 4, ICE 7, ICE 8, ICE 9, ICE 10 and ICE 11.

### The ICE Raid at 165 Main Street, Mount Kisco, NY

307. At the time of the raid (described below), David Lazaro Perez and William Lazaro rented a room in an apartment on the third floor of a building at 165 Main Street in Mount Kisco, Westchester County, New York. The door to the room has a lock with a private key. At the time of the raid, they shared this room with William's father.

308.     Tarcis Sapon-Diaz also rents a room in an apartment at 165 Main Street.  He shares the room, which is on the third floor, with his brother.  The room has a private lock and key.

309.     On March 19, 2007, at about 4:00 a.m., David, William, and Tarcis were awakened to the sound of loud pounding and knocking outside their building.  Bright lights were shining into the building.

310.     Tarcis looked out of the window of his room and saw seven or eight cars outside their building.

311.     David and William heard knocking at the door of their room.  They did not open their locked door.  Three law enforcement agents, two men and one woman, forced open the door and burst into the room.  The agents, a couple of whom were wearing jackets that read "ICE," did not identify themselves.

312.     The ICE agents did not say who they were looking for and did not show a warrant.  Nonetheless, they asked the young men for their identification and then ordered them to get dressed.  David and William heard other agents pounding on the doors elsewhere in the apartment and the building, and ordering the tenants to open the doors.

313.     Tarcis heard loud pounding and knocking on his door.  He and his brother did not open the door, but the pounding continued.  Fearing that the door would be broken down, he at last opened the door.  Men who he believed to be ICE agents and Mt. Kisco police officers burst into his room.  They demanded identification and handcuffed him and his brother.

314.     David, William, Tarcis and other tenants of the apartment building were led into the hallway.  Those not already in handcuffs were handcuffed.  William's waist and legs were chained.  The men were taken out of their home to waiting vans.  They could see that several additional agents surrounded the building.

315. While David, William, and Tarcis were in the hallway, an agent asked Mr. Gilberto Soto for identification. Mr. Soto gave a New York State identification card to the agent. The agent then asked Mr. Soto where he bought it.

316. After a stop at the Mount Kisco police station, David, William, Tarcis and the others were transported to 26 Federal Plaza, in Manhattan, where they were detained for several hours.

317. The ICE agents took the detainees' belts and wallets. David's wallet contained about seven hundred dollars in cash, and William's contained about four hundred dollars in cash.

318. The men were taken to another building and detained in a room. After several hours, they were transported to a detention center in New Jersey, where they were jailed for two nights and David and William were injected with an unknown substance by federal employees. As noted above in paragraph 75, as late as June 12, 2008, ICE policies regarding the forced medication of detainees were continuing, and Defendant Chertoff was aware of these practices. On the afternoon of March 21, David, William, Tarcis and others were transported back to a building in Manhattan and released at about 11:00 at night. ICE did not return the men's cash until several weeks after the raid. As a result, they were released from Department of Homeland Security custody without any cash to return home. David was lucky enough to have an ATM card, and he took out enough cash to get himself and the other released detainees home.

319. The men did not arrive home in Mount Kisco until about one o'clock in the morning of March 22, 2007. Walls and doors inside the building had been marked with signs of attempts at forcible entry and damaged in the course of the raid.

320. The men have remained fearful since the night of the raid.

321. The ICE agents had entered the apartment building and individual apartments and rooms without exigent circumstances, consent or a judicial warrant.

322.     David Lazaro Perez, William Lazaro, and Tarcis Sapon-Diaz were not the targets of the raid.

323.     Upon information and belief, the ICE agents involved in this raid included Defendants ICE 1, ICE 6, ICE 8, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16 and ICE 17.

**The ICE Raid at the Bonilla/Velasquez Home in Westbury, New York**

324.     Sonia Bonilla has been a resident of Westbury, New York, since 1992. Sonia lives at 710 Jefferson Street, in a house which she shares with her husband, Noe Velasquez, and her two daughters, Beatriz, who was twelve years old at the time of the raid, and Dalia, who was nine years old at the time of the raid. Sonia Bonilla and Noe Velasquez rent extra rooms in their house to tenants.

325.     Sonia was born in El Salvador on March 3, 1976 and became a lawful permanent resident of the United States in 1992. Her children are U.S.-born citizens.

326.     On Monday, September 24, 2007, Sonia awoke to drive her husband to work at the Westbury sanitation department. She and her husband left the house at about 5:45 a.m. Beatriz, who was twelve years old, and Dalia, who was nine years old, were asleep when Sonia left the house.

327.     A few moments later, Beatriz was awakened by her sister Dalia. Dalia told Beatriz that police were at the house. Beatriz left her room in her pajamas to see who was at the door. Beatriz heard loud, violent knocking at the door.

328.     ICE agents outside the door were shouting, "Police! Police!" Beatriz believes she heard them say, "Someone is dying upstairs." She opened the door and saw three men and one woman standing outside the door. They did not tell her who they were. One was wearing a vest that said "police" in the front.

93

329.     The agents asked the little girl where her parents were. Beatriz told the agents her parents were away. ICE agents then maneuvered past Beatriz and entered the house without any invitation or consent to enter.

330.     The family dog began to bark, and the agents ordered Beatriz and her sister to take the dog into their bedroom and stay there.

331.     The girls could hear the agents storming through the house and bedrooms, shouting and knocking on doors of the family's tenants. From their bedroom window, the girls could see more agents outside the house.

332.     The infant of one of the tenants upstairs began to cry, and Beatriz overheard the tenant asking if he could leave the baby, who was four months old, with Beatriz and her sister. Instead agents detained the tenant and left the baby alone in the bedroom, crying.

333.     At about five minutes after six, Sonia drove onto her street and saw several unmarked cars parked in front of her house and became alarmed. Sonia drove into the driveway and parked.

334.     The girls could hear her mother's van drive into the driveway. Beatriz and her sister started to scream, "Mommy! Mommy!"

335.     Two men approached Sonia's van and ordered her out. They refused to explain what was happening, instead taking her wallet and searching for her identification. One agent shone a light into her van and searched inside. They would not permit her to go inside her own home. Sonia could see that other agents were inside the house, and she was terrified for her children.

336.     After a few minutes Sonia saw more agents coming out of the basement with two of her tenants. One was in handcuffs. When she entered her house, she saw that other tenants were in the living room, and four agents guarded the living room and hallway.

337.     Once finally inside her house, Sonia checked on her children.  One of the agents, who had been attempting to open a locked closet in Sonia's room, demanded a key to the closet.  About four agents escorted her into her bedroom.  Agents had already opened dresser drawers, and once inside the closet, searched through clothing and shoes.

338.     The agents left at about 45 minutes later at about 6:30 .a.m.

339.     At no point during the entire raid did any of the agents show Sonia or Beatriz a warrant of any kind or tell them who or what they were looking for.  There was no search warrant, exigent circumstances, or valid, competent consent to enter the home.

340.     Sonia Bonilla, her husband and her daughters live in daily fear that the ICE agents will return to the house, forcibly enter, and terrorize their family and tenants.

341.     Sonia Bonilla, Beatriz Velasquez, and Dalia Velasquez were not the targets of the raid.

342.     Upon information and belief, the ICE agents involved in this raid included Defendants ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26 and ICE 42.

### The ICE Raid at the Bonilla/Rodriguez Home in Westbury, New York

343.     Elder Bonilla is a lawful permanent resident of the United States who lived at 22 Dogwood Lane in Westbury, New York at the time of the raid.  He lived with his girlfriend, Diana Rodriguez, and their two U.S. Citizen children, who were 15 months old and three months old at the time of the raid.  They shared their home with several members of Diana's family and a friend.

344.     On Monday, September 24, 2007, the family was awakened by loud pounding and shouting outside the house.  Elder went to the front door and saw through the window on the door that law enforcement agents were outside.  They began to scream, in English, "Open the door!"

345.     Elder opened the door.  Immediately, three agents burst in, and one of the agents pointed a gun at Elder's chest.  Elder was handcuffed and pushed toward the sofa in his living room.  Men stormed into the house and began pounding and searching through bedrooms.

346.     Upstairs, the agents handcuffed Diana and led her downstairs, leaving the children crying upstairs in their bedroom.  They began handcuffing and detaining other adults in the living room, as well as Diana's sixteen-year-old cousin.  While agents kept watch in the living room, others searched upstairs, pounding on walls and breaking down the door of a storage closet.

347.     Upstairs, the children continued to scream and cry.  Downstairs, the men were being asked for identification.

348.     Elder said he had his papers upstairs, and was escorted by agents upstairs.  Once upstairs, neither he nor Diana were permitted to leave their bedroom.

349.     ICE agents detained and took from the house four men, including a sixteen-year-old boy, Cesar Flores.  They took Cesar with them into their custody despite the fact that his mother, Diana's aunt, was in the home.

350.     At no point did any agent show a warrant of any kind or even explain who or what they were looking for.  There were no exigent circumstances that could have justified their entry, and they did not even attempt to obtain consent to enter or search.

351.     Elder has not been able to sleep well or eat well since the raid.  He and Diana live in constant fear that ICE agents will return to humiliate and brutalize their family.

352.     Elder Bonilla and Diana Rodriguez were not the targets of the raid.

353.     Upon information and belief, the ICE agents involved in this raid included Defendants ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 43, ICE 53, ICE 54, and ICE 55.

### The ICE Raid on the Amaya Home in Huntington Station, New York

354. Raul Amaya is a naturalized United States citizen. His wife, Gloria Vanessa, is a lawful conditional resident. They are both originally from El Salvador. They have resided in their ranch-style house at 58 East 6th Street, Huntington Station, Suffolk County since it was purchased in 2004. They have a two-year-old United States-born son.

355. On September 27, 2007, at about 7:30 a.m., about 10 to 15 ICE agents and local law enforcement officers surrounded Raul who was outside the house preparing his pick-up truck for work. The Amayas were each preparing to go to work.

356. At the time of the raid, the family lived in the first floor unit. The second floor had four tenants, each of whom had already left for work. The basement unit had one teenage occupant who was asleep.

357. The ICE agents yelled, made allegations and used profanities to intimidate the Amayas. ICE agents accused Raul of being "in trouble with the IRS," "under arrest," having no status, and, holding a suspended or invalid driver's license.

358. Although Raul tried to show his identification, ICE agents put aside his wallet and refused to look at his documents.

359. ICE agents asked if he knew the whereabouts of a person named "Oscar." Raul said he did not.

360. Without a judicial warrant or exigent circumstances, ICE agents proceeded to make entry into the house.

361. None of the agents identified themselves to Raul or Gloria Vanessa.

362. Gloria Vanessa came out of the house to investigate the loud commotion. As she stood outside the front door, she was interrogated by several ICE agents.

363.     An ICE agent showed Gloria Vanessa a paper with a photograph of the person they were seeking.  She said she knew who he was.  He was never a resident in the house.

364.     One ICE agent slipped past her to enter the house.  Other agents entered the house and she followed.

365.     During the following ten to fifteen minutes inside the house, Gloria Vanessa was interrogated and observed ICE agents searching some of the rooms and closets and opening doors.

366.     She saw ICE agents take one of her kitchen knives to attempt prying open a locked door.

367.     She was ordered out of the house's rear door into the backyard.

368.     She witnessed ICE agents knocking and then attempting to kick open the basement unit which was occupied by a sleeping teenager.  The teenager was questioned and released.

369.     For over an hour and a half, ICE agents conducted a full search of the house, its rooms, beds, closets, and contents.

370.     Raul and Gloria Vanessa were kept outside of the house while their son was left inside the bedroom.

371.     As they were leaving, some ICE agents threatened to return later that day or in the following week.  They said that Raul would be "in trouble" if he had lied to them.  The Amayas were stricken with fear and anxiety.

372.     Later, Raul decided to salvage his work day as a landscaper and drove his pick-up truck from his house.

373.     While driving through nearby streets, he saw some ICE agents and parked vans. They were the same agents who had been at his home.

374.     He saw ICE agents chasing down a half dozen or more Latino men on foot near a local food store that served mainly Latino customers.  The Latino men were running frantically in all directions.

375.     Raul Amaya and Gloria Vanessa Amaya were not the targets of the raid.

376.     Upon information and belief, the ICE agents involved in this raid included Defendants ICE 27, ICE 28, ICE 29, ICE 31, ICE 32, ICE 33, ICE 36, ICE 37, ICE 54, and ICE 55.

<u>**The Two ICE Raids on the De La Rosa-Delgado/Jimenez**</u>

<u>**Home in Huntington Station, New York**</u>

377.     Pelagia De La Rosa-Delgado is a naturalized United States citizen who was born in the Dominican Republic.  She has resided at her home at 15 West 18th Street in Huntington Station, New York, since she purchased it in May 2003.

378.     Pelagia lives with her husband, her three sons, Plaintiffs Anthony Jimenez, Christopher Jimenez, and Bryan Jimenez, and her aunt and uncle.  Pelagia also has a tenant, who lives downstairs.  Pelagia's sons are all United States-born citizens.  Anthony holds two jobs. Christopher is a recent high school graduate and Bryan is a high school student.

379.     ICE agents raided the family home twice within a thirteen-month period, both times in the early morning and without a judicial warrant or valid consent.  In both instances, ICE purported to be looking for the same individual, a man named "Miguel" who was unknown to the family and who had not lived at the home since the family purchased it, if ever.

380.     In approximately mid-to-late August, 2006, ICE agents pounded on the door of the De La Rosa-Delgado/Jimenez home before sunrise.

381.     Pelagia was awakened by loud banging and shouting at the front door.  She rushed downstairs from her bedroom, still in her nightgown, as the pounding and shouting continued.

382.     Pelagia had recently renovated her house and was afraid the agents would break down the door, so she opened the door.  She saw several armed agents, dressed in boots and heavy jackets.

383.     The ICE agents barged into Pelagia's home without asking for permission and without obtaining voluntary consent from her or any other member of the household.

384.     The ICE agents did not explain to Pelagia or any other member of the household that they had the right to refuse them permission to enter the home.

385.     At no time did the ICE agents show Pelagia or any other member of the household a warrant that granted them permission to enter the De La Rosa-Delgado/Jimenez home.

386.     There were no exigent circumstances that may have permitted the ICE agents to enter the De La Rosa-Delgado/Jimenez home without a valid judicial warrant or voluntary consent.

387.     ICE agents were stationed around the perimeter of the home during the raid.

388.     An ICE agent was stationed by the door to the home while the other ICE agents searched the residence.

389.     The ICE agents told Pelagia to sit on her couch, and went throughout the home. They showed her a piece of paper with a copy of a small photograph affixed to it.  The photograph was of a man she did not recognize.  The agents stated they were looking for a man named "Miguel."  Pelagia does not remember the last name of the man the ICE agents were seeking.

390.    Pelagia told the ICE agents that no one named "Miguel" or fitting his description had ever lived at the home.

391.    The ICE agents proceeded through the home, searching upstairs and downstairs. The agents woke up Bryan, who was thirteen years old at the time, and Pelagia's aunt and uncle. All three were ordered out of their bedrooms into the living room, while the ICE agents demanded to know who else lived in the home.

392.    Downstairs, Christopher, who was sixteen years old at the time, was doing laundry and unaware of what was happening on the ground floor. When he heard the ICE agents storming downstairs, he thought for a moment the family was being robbed. After the agents appeared, they questioned him and kept him in the laundry room during the raid, away from his mother.

393.    After searching the home, the ICE agents eventually left without explaining their mistake or apologizing to the family. The family was scared and humiliated.

394.    Thirteen months later, ICE agents returned to the De La Rosa-Delgado/Jimenez home, looking for the same man they had failed to find the previous year. Again, ICE agents had no judicial warrant and entered and searched the house without voluntary consent.

395.    A little before 6:00 a.m. on September 27, 2007, ICE agents began pounding on the front door of the De La Rosa-Delgado/Jimenez home.

396.    Pelagia's son, Christopher, was awake after a night with a fever for which he had been at the emergency room the day before, on September 26, 2007. He was on the phone with his girlfriend when the pounding began. He opened the front door, and several ICE agents, dressed in boots and jackets, pushed past him into the home.

397.    The ICE agents entered the home without asking for permission and without obtaining voluntary consent from Christopher or any other member of the household.

398. The ICE agents did not explain to Christopher or any other member of the household that they had the right to refuse them permission to enter the home.

399. At no time did the ICE agents show Christopher or any other member of the household a warrant that granted them permission to enter the De La Rosa-Delgado/Jimenez home.

400. There were no exigent circumstances that may have permitted the ICE agents to enter the De La Rosa-Delgado/Jimenez home without a valid judicial warrant or voluntary consent.

401. When Christopher asked why the ICE agents were there, they said they were looking for a man named "Miguel." Christopher remembered that "Miguel" was the same person that ICE was seeking the year before, and told the ICE agents that no one by that name lived at the home.

402. More ICE agents went around the yard to the back door of the home and began pounding on that door. The ICE agents who had barged into the home from the front door ordered Christopher to open the back glass door. Christopher could see that several agents were in the back yard, having surrounded the home. When Christopher slid open the back glass door, more agents entered the home without asking for permission or obtaining voluntary consent.

403. Christopher was terrified and upset. As he walked from the back glass door to the kitchen, he lifted his phone to tell his girlfriend what was happening, and an agent reached out as if to grab the phone from Christopher's hand. A law enforcement official wearing a Suffolk County uniform told Christopher to put the phone on the kitchen counter, and Christopher obeyed.

404. Anthony and Bryan, who was fourteen years old at the time, were also awakened by the noise and by lights flashing into their bedroom window. When Anthony opened his

bedroom door, he saw the ICE agents. Anthony attempted to return to his room to put on a shirt because he was wearing only boxer shorts. ICE agents ordered him and his brother to sit in the living room, preventing him from covering himself. Bryan was wearing shorts and a sleeveless undershirt.

405.     Anthony and Bryan were detained in the living room in a state of undress while ICE agents stood watch.

406.     Christopher attempted to leave the kitchen to go upstairs and wake his mother. An agent stood in front of the kitchen entranceway and put his arm across it, stopping Christopher from passing through and keeping him isolated from his mother and brothers. Another ICE agent put his hand on Anthony's chest, physically restraining him from going towards his mother's room.

407.     The ICE agents went throughout the home, and pounded on the bedroom door of Pelagia's aunt and uncle. The ICE agents demanded that Pelagia's aunt and uncle leave their bedroom, and they were also detained in the living room.

408.     The ICE agents asked the family members over and over again about "Miguel." None of the ICE agents spoke fluent Spanish, so when the agents were demanding answers from Pelagia's aunt and uncle, her sons had to translate several words.

409.     ICE agents also entered and searched the downstairs of the home, where they detained and interrogated Pelagia's husband and her tenant.

410.     Pelagia was upstairs at the home sleeping when the ICE agents arrived.

411.     Despite asking for their mother, the ICE agents would not allow Pelagia's children to go upstairs.

412.     The ICE went upstairs and knocked on Pelagia's door. When she did not answer, they entered the room anyway. Pelagia's sons could hear the agents walking around upstairs,

103

above the living room, where a large storage closet adjoined Pelagia's bedroom. When they asked again to join their mother, the ICE agents told them to stay where they were. Pelagia's sons believe the ICE agents were in their mother's sleeping quarters for between ten and twenty minutes.

413.    Pelagia had two jobs at the time of this second ICE raid, had been up late on the night of the raid checking on Christopher's fever, and had taken Christopher to the emergency room the previous day. She did not wake up when the ICE agents went through her bedroom and the adjoining storage area, and gave no consent to the search.

414.    The ICE agents went through the house for about an hour, including searching the upstairs area of the home. After they left, Pelagia's sons ran upstairs to see what had happened between the ICE agents and their mother. They learned that she had been asleep, and the ICE agents had searched the entire second floor without speaking to her.

415.    Pelagia's sons estimate that between ten to fifteen ICE agents were in their home. They could see many law enforcement cars and vans parked on their street.

416.    The family feels violated and humiliated for the second time in a little more than a year. Although the ICE agents were told in August 2006 that "Miguel" had never lived in their home, the ICE agents returned a year later looking for the same person. Pelagia and her sons are afraid that ICE agents will return to look for "Miguel" or someone else, and terrorize them again. After the second raid, Christopher began calling his mother more frequently, fearful that something would happen to her. The whole family worries that neighbors will think they are criminals.

417.    Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez, and Bryan Jimenez were not the targets of the raid.

418. Upon information and belief, the ICE agents involved in the September 27, 2007 raid included Defendants ICE 39, ICE 40, ICE 41, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 56, and ICE 57.

419. Each of Defendants Shanahan, Smith, Palmese, Williams, Knopf, ICE 1,  ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that ICE agents entering a home without a judicial warrant, voluntary consent, or any exigent circumstances or other lawful cause to justify the entrance is a violation of constitutional rights.

420. Each of Defendants Shanahan, Smith, Palmese, Williams, Knopf, ICE 1,  ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that ICE agents conducting a search of a home without a judicial warrant, voluntary consent, or any exigent circumstances or other lawful cause to justify the search is a violation of constitutional rights.

421. Each of Defendants Shanahan, Smith, Palmese, Williams, Knopf, ICE 1,  ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE

15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that ICE agents' detention of a person without a judicial warrant, voluntary consent or any exigent circumstances or other lawful cause to justify the detention is a violation of constitutional rights.

422. Each of Defendants Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors knew or should have known that the ICE agents' actions in gaining entry within the named Plaintiffs' homes violated the named Plaintiffs' constitutional rights.

423. The actions of each of Defendants Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors were unprivileged.

424.     Each Defendant performed all of the acts concerning the actions at the named Plaintiffs' homes under color of federal law.

425.     Each Defendant performed all of the acts concerning the complained-of actions at the named Plaintiffs' homes, in whole or in part, while acting in his or her capacity as an employee of an agency of the federal government.

### ICE's Pattern and Practice, if not Policy, of Performing Illegal and Unconstitutional Home Raids

426.     The above described illegal conduct by Defendants is part of a broad pattern and practice, if not official policy of ICE.  Allegations of similar tactics have been reported on numerous occasions all across the country.  (*See* Exhibit 2 at 16-22.)  The frequency of the raids and the similarity of the illegal conduct during home raids strongly suggest a deliberate practice if not policy of ICE.

427.     For example, an October 3, 2007 New York Times article written by Nina Bernstein, entitled "Raids Were a Shambles, Nassau Complains to U.S.," describes the raids conducted in Nassau County on September 24 and 26, 2007 (which included raids on some of the named Plaintiffs, as described above).  The article states that ICE agents brandished shotguns and automatic weapons during the raids, while some wore cowboy hats.  ICE asked the Nassau County police department to assist in the raids, which purportedly targeted suspected gang members.  According to the Nassau County police commissioner, however, his department was "misled" into participating in these raids.  He stated that ICE did not seem to have reason to believe gang members were present in the homes, refused offers to check their list of purported gang members against a police database that is updated daily, and all except 6 of 96 administrative warrants had incorrect or outdated addresses.  In one case, ICE sought a 28-year-old man with a photograph taken when he was seven years old.  According to the police

commissioner, most of the individuals arrested were purported illegal immigrant workers with no criminal records. ICE admitted that it arrested at least one person who was a U.S. citizen. The cavalier attitude of ICE and total disregard for the rights of the occupants of the homes being raided are reflected in a comment attributed to Defendant Smith, the special agent in charge of the raids. He stated, "We didn't have warrants. We don't need warrants to make arrests. These are illegal immigrants." (*See* Exhibit 11.)

428.    A July 23, 2007 New York Times article written by Nina Bernstein, entitled "Promise of ID Cards Is Followed by Peril of Arrest for Illegal Immigrants," describes ICE practices of pushing past New Haven, Connecticut residents who opened the door to agents and arbitrarily knocking at homes near to the residence listed in a deportation order after finding the target residence empty. (*See* "Promise of ID Cards Is Followed by Peril of Arrest for Illegal Immigrants," New York Times, July 23, 2007, attached hereto as Exhibit 17.)

429.    A September 21, 2007 Associated Press article published in THE OREGONIAN, entitled "Groups Question Immigration Raid in Central Idaho," describes raids in Ketchum, Hailey and Bellevue, Idaho, where armed ICE agents pounded on the door and pushed their way into the home of U.S. citizens and a legal permanent resident ostensibly in search of a sexual predator with a Hispanic surname who was unfamiliar to the homeowner. (*See* "Groups Question Immigration Raid in Central Idaho," The Oregonian, September 21, 2007, attached hereto as Exhibit 18.)

430.    A September 19, 2007 IDAHO MOUNTAIN EXPRESS article written by Terry Smith, entitled "Immigration Agents Seize 20 Suspected Illegal Aliens: ACLU Investigating to See if Civil Rights Were Violated," describes a pre-dawn raid in the Wood River Valley region of Idaho where ICE agents pounded on the door and pushed their way into the home without informing the occupants who they were or showing a warrant. (*See* "Immigration Agents Seize

20 Suspected Illegal Aliens: ACLU Investigating to See if Civil Rights Were Violated," Idaho Mountain Express, September 19, 2007, attached hereto as Exhibit 19.)

431. An April 28, 2007 THE DAILY REVIEW article written by Mark Prado, entitled "ACLU Sues for Boy in Immigration Raid," describes early-morning raids in the San Francisco, California area and reports that ICE admitted to conducting home raids with only arrest warrants. ICE failed to address the charge that a search warrant was required for the home entry at issue. (*See* "ACLU Sues for Boy in Immigration Raid," The Daily Review, April 28, 2007, attached hereto as Exhibit 20.)

432. An April 27, 2007 SAN FRANCISCO CHRONICLE article written by Tyche Hendricks, entitled "The Human Face of Immigration Raids in the Bay Area: Arrests of Parents Can Deeply Traumatize Children Caught in the Fray, Experts Argue," describes the San Francisco, California area arrests made in a fugitive alien's former residence and the ICE practice of allowing agents to identify themselves as "Police" to gain entry into homes and question individuals solely because of an association with the target of a warrant. (*See* "The Human Face of Immigration Raids in the Bay Area: Arrests of Parents Can Deeply Traumatize Children Caught in the Fray, Experts Argue," San Francisco Chronicle, April 27, 2007, attached hereto as Exhibit 21.)

433. A February 3, 2007 ALAMEDA TIMES-STAR article written by David DeBolt, entitled "Immigrants in Richmond Live in Fear of Deportation," describes an incident where ICE agents broke down the door to a Richmond, California private residence without knocking and without a warrant and proceeded to force occupants to lie on the floor. The 6:00 a.m. entry by ICE agents into the dwelling resulted in the arrests of persons other than the purported intended target. (*See* "Immigrants in Richmond Live in Fear of Deportation," Alameda Times Star, February 3, 2007, attached hereto as Exhibit 22.)

434.    A November 25, 2007 New York Times article written by Nina Bernstein, entitled "Immigrant Workers Caught in Net Cast for Gangs," describes early morning home raids conducted in Suffolk County on September 27, 2007, that were specifically targeted at local Latino residents.  According to the local police department, although the operation was ostensibly conducted to deport violent gang members, only one of the eleven men arrested during the raids was even suspected of gang affiliation (the other ten were neither gang associates nor did they have criminal records).  Greenport police Detective Sinning provided federal agents with names of potential gang member targets and six or seven home addresses "roughly associated" with the four targets he identified.  According to Detective Sinning, one of the homes on the target list was occupied by residents who did not appear to be Latino, and ICE agents immediately walked away after seeing them.  In fact, the article reports that another home swarmed by ICE agents was occupied by Greenport firefighter and U.S. citizen James Berry.  When he opened the door to prevent agents from kicking it in, they looked at him, stated "I think we have the wrong address," and walked away.  (*See* "Immigrant Workers Caught in Net Cast for Gangs," New York Times, November 25, 2007, attached hereto as Exhibit 23.)  In contrast, at residences occupied by Latinos, agents entered and searched the homes, detained and questioned every resident within the home, and arrested anyone who could not produce proper documentation.  Even when Latinos present valid identification, ICE agents question the document's validity without any basis for doing so.  The agents' conduct demonstrates their assumption that an individual of Latino descent is presumptively a suspect because it is not reasonable for that individual to present valid United States, government-issued documentation, as well as the agents' assumption that there is no need to question a person of Anglo descent.

435.    A June 4, 2008 NORTHJERSEY.COM article by Elizabeth Llorente entitled "Immigration Raids Net 491," describes ICE raids of private residences in the New York and

New Jersey area that took place in May 2008. According to ICE official Harold Ort, ICE has every intention of continuing to conduct such home raids. (*See* "Immigration Raids Net 491," NORTHJERSEY.COM, June 4, 2008, attached hereto as Exhibit 24.)

436.     An August 26, 2008 US ICE press release entitled "New York ICE Fugitive Operations Teams arrest 130 fugitives and immigration violators in 10-day operation: *600th criminal alien fugitive arrested by the New York Fugitive Operations Teams this fiscal year*," describes recent raids in the New York vicinity that resulted in the arrests of 120 aliens, less than a third of whom had any criminal record. (*See* "New York ICE Fugitive Operations Teams arrest 130 fugitives and immigration violators in 10-day operation: *600th criminal alien fugitive arrested by the New York Fugitive Operations Teams this fiscal year*," US ICE press release, August 26, 2008, attached hereto as Exhibit 25.)

437.     A February 18, 2009 WASHINGTON POST article by N.C. Aizenman entitled "Conflicting Accounts of an ICE Raid in Md.," details the pressure that ICE supervisors place on their agents, which inevitably leads to constitutional violations. According to an internal ICE investigation, a supervisor warned Baltimore office team members that they were well behind the 1,000 arrest per team quota, and "I don't care where you get more arrests, we need more numbers." He then told the agents to go to any street corner and find illegal immigrants, and that an experienced officer knew where potential illegal aliens gather, such as a Home Depot or Lowe's parking lots. The result was a nine-person team going to a nearby 7-Eleven and arresting 24 Latino men. While ICE agents claimed that the arrested individuals voluntarily approached the agents looking for day labor work, security camera footage directly contradicts these statements. The video confirms that at least eight individuals had no contact with the officers prior to being detained. A deportation officer on the team told ICE investigators that he did not believe the fugitive operations team was appropriately used. (*See* "Conflicting Accounts of an

111

ICE Raid in Md.," Washington Post, February 18, 2009, attached hereto as Exhibit 26.)  On information and belief, the same behavior was exhibited by ICE agents and approved by supervisors in the New York area.

438.    An August 4, 2009 New York Times article by Julia Preston entitled "Staying Tough in Crackdown on Immigrants," states that despite the pledges by President Obama that he would alter the Bush administration's policies on immigration enforcement, DHS is actually relying and expanding on the flawed programs that were started by the previous administration. Defendant Napolitano admitted that DHS is in fact expanding enforcement of these highly criticized initiatives.  The article also noted that despite strong indications that some DHS programs were being used to harass Hispanic residents, Defendant Napolitano has not responded to those allegations of ethnic profiling, and has not altered those programs at all.  (*See* "Staying Tough in Crackdown on Immigrants," New York Times, August 4, 2009, attached hereto as Exhibit 27.)

**The Named Plaintiffs' Injuries**

439.    As a direct and proximate result of the above conduct by Defendants, and each of them, the named Plaintiffs have been harmed, which harm includes, but is not limited to:

a.    violations of their constitutional rights to be free from unreasonable searches and seizures;

b.    violations of their constitutional rights to equal protection, including to be free from discriminatory application of the law;

c.    having their homes and personal privacy invaded;

d.    being intimidated, harassed, humiliated, and threatened with force;

e.    experiencing severe emotional and mental distress;

f.    being illegally and unreasonably detained;

112

g.     being subjected to an illegal and unreasonable interrogation;

h.     having their personal property damaged; and

i.     other harm according to proof.

440.    The acts described above by each Defendant were done intentionally, maliciously, and recklessly, and showed a callous disregard for, or indifference to, the named Plaintiffs' personal safety, security, freedom, and civil and constitutional rights, and/or with intent to injure, harass, and oppress Plaintiffs and other members of the Latino community in New York.

441.    Each of the named Plaintiffs is Latino and intends to continue living in residences with other Latinos.  By engaging in such routine, law-abiding activities as living in their homes, Plaintiffs face the potential threat of future violations to their personal safety, security, freedom, and civil and constitutional rights.

## CLASS ACTION ALLEGATIONS

442.    All claims set forth in the First and Second Claims below are brought by the named Plaintiffs individually and on behalf of all other similarly situated persons pursuant to Rule 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

443.    The named Plaintiffs provisionally propose the First and Second Claims be certified on behalf of the following class:

> Persons who, because they (1) are Latino, and (2) reside in the jurisdiction of the New York City regional office (or field office) of ICE, have been subjected to and/or are at imminent risk of home raids by the New York City regional office (or field office) of ICE.

444.    The claims of the proposed class representatives and those of the proposed class members in the First and Second Claims raise common questions of law and fact concerning, *inter alia*, whether Defendants have implemented, enforced, encouraged and/or sanctioned a policy, practice and/or custom of:

(a)     targeting locations with known concentrations of Latino residences and/or individual homes occupied by persons of Latino origin in violation of the Fifth Amendment to the United States Constitution;

(b)     entering and searching homes without judicial warrants or voluntary consent and in the absence of probable cause and exigent circumstances in violation of the Fourth Amendment to the United States Constitution; and

(c)     stopping, detaining, investigating, searching and effecting seizures in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause in violation of the Fourth Amendment to the United States Constitution.

445.     These questions are common to the named Plaintiffs and to the members of the proposed class because Defendants have acted and will continue to act on grounds generally applicable to both the named Plaintiffs and proposed class members.

446.     The claims of the named Plaintiffs are typical of the claims of the members of the proposed class.

447.     Members of the proposed class are so numerous that the joinder of all class members is impractical.

448.     The named Plaintiffs will fairly and adequately protect the interests of the members of the proposed class.

449.     The named Plaintiffs are represented by counsel who are experienced in federal class action litigation, including those involving civil rights issues.

450.     As set forth above, the Defendants have acted on grounds generally applicable to the members of the proposed class, thereby making appropriate final injunctive and corresponding declaratory relief with respect to the class as a whole.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

451.     Pursuant to 28 U.S.C. Section 2675(a), all Plaintiffs, with the exception of Raul and Gloria Amaya, have exhausted their administrative remedies regarding their claims herein pursuant to the Federal Tort Claims Act (referenced herein as the "FTCA Plaintiffs").  Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Carson Aguilar and Erika Gabriela Garcia-Leon presented Claims for Damage, Injury or Death on Standard Form 95 (hereinafter "Claim for Damage") to the United States Department of Homeland Security/ICE and to ICE ##1-59 on or about January 11, 2008.  Plaintiffs Mario Patzan DeLeon and Tarcis Sapon-Diaz presented Claims for Damage on or about January 14, 2008.  Plaintiffs Sonia Bonilla, Beatriz Velasquez and Dalia Velasquez presented Claims for Damage on or about February 4, 2008.  Plaintiffs Nelly Amaya, Elder Bonilla and Diana Rodriguez presented Claims for Damage on or about March 21, 2008.  Plaintiffs William Lazaro, David Lazaro-Perez, Pelagia De La Rosa-Delgado, Anthony Jimenez, Bryan Jimenez, and Christopher Jimenez presented Claims for Damage on or about June 9, 2008.

452.     FTCA Plaintiffs Adriana Aguilar, Andres Leon, Elena Leon, Carson Aguilar, Erika Gabriela Garcia-Leon, Mario Patzan DeLeon, Tarcis Sapon-Diaz, Sonia Bonilla, Beatriz Velasquez, Dalia Velasquez, Nelly Amaya, Elder Bonilla, Diana Rodriguez, William Lazaro, David Lazaro-Perez, Pelagia De La Rosa-Delgado, Anthony Jimenez, Bryan Jimenez, and Christopher Jimenez have exhausted their administrative remedies because none of them have received, in writing, a final disposition of their Claims for Damage and six months or more have elapsed since they filed their Claims for Damage.

453.     Plaintiffs Gonzalo Escalante, Victor Pineda Morales, and Yoni Revolrio presented Claims for Damage on or about December 8, 2008.  The Department of Homeland Security denied their claims on July 2, 2009.

## CLAIMS FOR RELIEF

### FIRST CLAIM: CLASS ACTION CLAIM OF FOURTH AMENDMENT VIOLATIONS
### (Against All Defendants)

454.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

455.     Plaintiffs bring this claim for injunctive and declaratory relief against Defendants to redress continuing and likely future violations of the Fourth Amendment to the United States Constitution.

456.     Upon information and belief, Defendants have, in violation of the Fourth Amendment to the United States Constitution, officially implemented, enforced, encouraged and/or sanctioned a policy, practice and/or custom of:  (a) entering and searching homes without valid judicial warrants or voluntary consent and in the absence of probable cause and exigent circumstances; and (b) stopping, detaining, investigating, searching and effecting seizures in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause.

457.     As a result of Defendants' acts and/or omissions, the Fourth Amendment rights of the Plaintiffs and class to be free from unreasonable searches and seizures and unlawful entries into their homes have been violated.

458.     As previously noted, ICE has engaged in a pattern and practice of conducting home raids in New York City and the surrounding area, as well as across the country.  The raids described in this matter occurred throughout 2007 and, in one instance, in 2006.  Moreover, Nassau County Police Commissioner Mulvey's September 2007 letter, confirms that future raids are planned by ICE in at least Nassau County.  (*See* Exhibit 3, page 2.)

459.     Such raids have consistently targeted Latinos and individuals who live in residences with Latinos, such as the named Plaintiffs.

460. The named Plaintiffs and class members are at risk of prospective constitutional deprivations at the hands of ICE because (i) ICE intends to conduct future raids in New York City and the surrounding area where Plaintiffs live, and (ii) because they are Latino and intend to continue living in New York City and the surrounding area. Indeed, ICE returned to the De La Rosa-Delgado/Jimenez home, and threatened to return to the homes of other named Plaintiffs. The risk of prospective constitutional deprivations is increased by ICE's systemic deficiencies, including its failure to keep or update properly databases containing information about aliens, perform adequate investigations prior to conducting home raids, and train its agents adequately. The named Plaintiffs and class members are further placed at greater risk in light of the fact that Latinos are "significantly overrepresented in collateral arrests by ICE agents during home raids." (*See* Exhibit 2 at 12.) Accordingly, there is a credible threat that the named Plaintiffs and class members will be subjected to illegal raids in the future.

461. The Plaintiffs and proposed class will suffer irreparable and repeated injury unless this Court orders equitable relief. Such injury includes, *inter alia*, the deprivation of their constitutionally protected rights under the Fourth Amendment to the United States Constitution.

462. As a result of Defendants' acts or omissions, at least some of the Plaintiffs and members of the class continue to suffer harm from Defendants' challenged conduct in the form of continuing judicial and administrative proceedings seeking their removal from this country. In addition, ICE is using evidence seized during the illegal raids against these Plaintiffs and members of the class in the judicial and administrative proceedings, including statements made and documents obtained during the home raids.

463. Upon information and belief, and based upon currently available information, only a small percentage of the individuals arrested pursuant to the Operations were actually targets of the raids. The large majority of those arrested were other individuals swept up in raids

like those experienced by Plaintiffs. Indeed, not a single named Plaintiff was a target of any of the Operations. Rather some of them, like many other Latinos in the New York area, were arrested as "collaterals." As described herein, ICE agents routinely raid homes where the purported target is not present and could not reasonably have been believed to have been present. According to the 2007 Inspector General's Report, agents rely on outdated, inaccurate, and incomplete data in approximately 50% of their cases.

464.    Damages cannot adequately address the injuries suffered by the Plaintiffs.

465.    Compelling the Defendants, their agents, employees and successors in office, and all persons acting in concert with them to comply with the dictates of the United States Constitution does not impose an improper or undue burden on the Defendants, their agents, employees and successors in office, and others, and, in fact, it serves the public interest by ensuring compliance with well-established Constitutional protections.

466.    Plaintiffs and the proposed class are entitled to the issuance of a permanent injunction prohibiting Defendants from engaging in the unlawful and abusive practices alleged herein.

467.    For reasons including, but not limited to, those stated herein, an actual dispute exists between Plaintiffs and Defendants, in which the parties have genuine and opposing interests that are direct and substantial, and of which a judicial determination will be final and conclusive.

468.    This dispute entitles Plaintiffs to a declaratory judgment that in doing the acts complained of herein the Defendants denied Plaintiffs their Fourth Amendment rights and protections, including, but not limited to, the right to be free from unreasonable searches and seizures and the right to be free from unlawful entries into one's home, in violation of the United States Constitution.

469.    Plaintiffs are also entitled to such other and further relief as may follow from the entry of such a declaratory judgment.

## SECOND CLAIM: CLASS ACTION CLAIM OF FIFTH AMENDMENT EQUAL PROTECTION VIOLATIONS
### (Against All Defendants)

470.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

471.    Plaintiffs bring this claim for injunctive and declaratory relief against Defendants to redress continuing and likely future violations of the Equal Protection Clause of the Fifth Amendment to the United States Constitution.

472.    Upon information and belief, Defendants have, in violation of the Fifth Amendment to the United States Constitution, officially implemented, enforced, encouraged and/or sanctioned a policy, practice and/or custom of identifying and targeting locations with known concentrations of Latino residents, conducting unconstitutional entries into and searches and seizures of residences in which Latinos reside or are believed to reside, and conducting unconstitutional detentions, interrogations, and seizures of Latinos within these residences. Upon information and belief, the residences and individuals targeted in these home raids were selected for such purported immigration enforcement actions because Latinos were believed to reside at the homes.

473.    As a result of Defendants' acts and/or omissions, the rights of the Plaintiffs and class to be free from discriminatory treatment as provided by the Equal Protection Clause of the Fifth Amendment have been violated. Defendants' acts and/or omissions were based upon impermissible considerations, such as race, ethnicity, or national origin, in violation of the Equal Protection Clause of the Fifth Amendment.

474.    Upon information and belief, and based upon currently available information, only a small percentage of the individuals arrested under the Operations were actually targets of the raids.  The large majority of those arrested were other individuals swept up in raids like those experienced by Plaintiffs.  Indeed, not a single named Plaintiff was a target of any of the Operations.  Rather some of them, like many other Latinos in the New York area, were arrested as "collaterals."  As described herein, ICE agents routinely raid homes where the purported target is not present and could not reasonably have been believed to have been present.  According to the 2007 Inspector General's Report, agents rely on outdated, inaccurate, and incomplete data in approximately 50% of their cases.

475.    The named Plaintiffs and class members are at risk of prospective constitutional deprivations at the hands of ICE because (i) ICE intends to conduct future raids in New York City and the surrounding area where Plaintiffs live, and (ii) because they are Latino and intend to continue living in New York City and the surrounding area.  Indeed, ICE returned to the De La Rosa-Delgado/Jimenez home, and threatened to return to the homes of other named Plaintiffs.  The risk of prospective constitutional deprivations is increased by ICE's systemic deficiencies, including its failure to keep or update properly databases containing information about aliens, perform adequate investigations prior to conducting home raids, and train its agents adequately.  The named Plaintiffs and class members are further placed at greater risk in light of the fact that Latinos are "significantly overrepresented in collateral arrests by ICE agents during home raids."  (*See* Exhibit 2 at 12.)  Accordingly, there is a credible threat that the named Plaintiffs and class members will be subjected to illegal raids in the future.

476.    The Plaintiffs and proposed class will suffer irreparable and repeated injury unless this Court orders equitable relief.  Such injury includes, *inter alia*, the deprivation of their constitutionally protected rights under the Fifth Amendment to the United States Constitution.

477.     As a result of Defendants' acts or omissions, at least some of the Plaintiffs and members of the class continue to suffer harm from Defendants' challenged conduct in the form of continuing judicial and administrative proceedings seeking their removal from this country.  In addition, ICE is using evidence seized during the illegal raids against these Plaintiffs and members of the class in the judicial and administrative proceedings, including statements made and documents obtained during the home raids.

478.     Damages cannot adequately address the injuries suffered by the Plaintiffs.

479.     Compelling the Defendants, their agents, employees and successors in office, and all persons acting in concert with them to comply with the dictates of the United States Constitution does not impose an improper or undue burden on the Defendants, their agents, employees and successors in office, and others, and, in fact, it serves the public interest by ensuring compliance with well-established Constitutional protections.

480.     Plaintiffs and the proposed class are entitled to the issuance of a permanent injunction prohibiting Defendants from engaging in the unlawful and abusive practices alleged herein.

481.     For reasons including, but not limited to, those stated herein, an actual dispute exists between Plaintiffs and Defendants, in which the parties have genuine and opposing interests that are direct and substantial, and of which a judicial determination will be final and conclusive.

482.     This dispute entitles Plaintiffs to a declaratory judgment that in doing the acts complained of herein the Defendants denied Plaintiffs their Fifth Amendment rights to equal protection under the law and their right to be free from discriminatory application of the laws.

483.     Plaintiffs are also entitled to such other and further relief as may follow from the entry of such a declaratory judgment.

**THIRD CLAIM: *BIVENS* CLAIM OF NAMED PLAINTIFFS**
**(Against Defendants Chertoff, Myers, Torres, Forman, Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors)**

484.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

485.     In doing the acts complained of, Defendants Chertoff, Myers, Torres, Forman, Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 35, ICE 36, ICE 37, ICE 38, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 44, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors failed to intervene to protect Plaintiffs' constitutional rights from infringement, were grossly negligent in supervising subordinates who committed the wrongful acts, and/or aided and abetted and/or conspired to deprive, participated in depriving, and/or did deprive Plaintiffs of certain constitutionally protected rights, including, but not limited to:

a.     the right not to be subject to unlawful home raids;

b.     the right to be free from unlawful entries into and searches and seizures of Plaintiffs' homes without a judicial warrant or voluntary consent and in the absence of probable cause and exigent circumstances;

c. the right to be free from detentions without a lawful, reasonable and articulable suspicion of unlawful activity or probable cause, including, but not limited to, the right not to have defendants surround their homes or detain their persons in connection with an otherwise unlawful home raid; and

d. the right to be free from discriminatory application of the law and the right to equal protection under the law.

486. Because these Defendants acted in clear violation of well-settled law, of which a reasonable person should have been aware, with regard to standards for home entry, search, seizure, questioning, and detention, they are not entitled to a good faith defense or official immunity defense.

487. The actions of these Defendants were intentional, malicious, and reckless and showed a callous disregard for, or indifference to, the civil rights of the Plaintiffs.

488. The actions of these Defendants give rise to a claim for damages against them in their individual capacities pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

489. As a direct and proximate result of the unlawful actions of these Defendants, Plaintiffs have incurred harm, including pain and suffering, outrage, humiliation, or emotional distress. Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial.

## FOURTH CLAIM: FALSE IMPRISONMENT CLAIM OF THE FTCA PLAINTIFFS
### (Against Defendant United States of America)

490.   Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

491.   At all times relevant to this action, agents, officials and other personnel were acting in their official capacity under the authority of DHS and ICE and, therefore, under the authority of the United States of America.

492.   In surrounding homes, entering homes without consent, warrants, or exigent circumstances, and detaining named Plaintiffs inside their homes, Defendant United States of America, by its employees Defendants Chertoff, Myers, Torres, Forman, Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 36, ICE 37, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors falsely imprisoned the FTCA Plaintiffs and deprived them of their personal liberty.  Defendant intended to detain the FTCA Plaintiffs and accomplished that detention through intimidation and the threat of force. The FTCA Plaintiffs and/or their minor children were aware of their detention inside their homes, did not consent to the detentions, and the detentions were not otherwise lawful.

493.   Defendant's acts, through its employees, give rise to a claim for damages for the tort of false imprisonment pursuant to New York law and the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq.*

494.     Defendant United States of America is not entitled to any defense, statutory or otherwise.

495.     As a direct and proximate result of the unlawful actions of Defendant, the FTCA Plaintiffs have incurred harm, including pain and suffering, outrage, humiliation, or emotional distress.  The FTCA Plaintiffs are entitled to damages in an amount to be determined at trial.

### FIFTH CLAIM: RECKLESS OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM OF THE FTCA PLAINTIFFS
### (Against Defendant United States of America)

496.     Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

497.     At all times relevant to this action, agents, officials and other personnel were acting in their official capacity under the authority of DHS and ICE, and, therefore, under the authority of the United States of America.

498.     Defendant United States of America had a duty to the FTCA Plaintiffs to act with due care.  Defendant United States of America, by its employees Defendants Chertoff, Myers, Torres, Forman, Shanahan, Smith, Palmese, Williams, Knopf, ICE 1,  ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 36, ICE 37, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors engaged in extreme and outrageous conduct that proximately caused the FTCA Plaintiffs severe emotional distress.  As a result of the warrantless and non-consensual surrounding of, entry into and search of the FTCA Plaintiffs' homes, and the other unreasonable,

unlawful, callous and intrusive conduct alleged herein, Defendant United States of America, through its employees, acted with the intent of causing, or with reckless disregard of a substantial probability of causing, severe emotional distress to named Plaintiffs.

499. Defendant's acts, through its employees, give rise to a claim for damages for the tort of intentional infliction of emotional distress pursuant to New York law and the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq.*

500. Defendant United States of America is not entitled to any defense, statutory or otherwise.

501. As a direct and proximate result of the unlawful actions of Defendant, the FTCA Plaintiffs have suffered harm, in the form of, *inter alia*, mental anguish, outrage, humiliation, severe emotional distress, physical harm and/or psychological injuries. The FTCA Plaintiffs are entitled to damages in an amount to be determined at trial.

## SIXTH CLAIM: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM OF THE FTCA PLAINTIFFS
### (Against Defendant United States of America)

502. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

503. At all times relevant to this action, agents, officials and other personnel were acting in their official capacity under the authority of DHS and ICE, and, therefore, under the authority of the United States of America.

504. Defendant United States of America had a duty to the FTCA Plaintiffs to act with due care. As a result of the warrantless, non-consensual and unlawful surrounding of, and entry into search of the FTCA Plaintiffs' homes, and the other unreasonable, unlawful, callous and intrusive conduct alleged herein, Defendant United States of America, by its employees

Defendants Chertoff, Myers, Torres, Forman, Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 36, ICE 37, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors caused the FTCA Plaintiffs severe emotional distress. Defendant United States of America reasonably should have known that such unlawful conduct would cause the named Plaintiffs severe emotional distress.

505. Defendant's acts, through its employees, give rise to a claim for damages for the tort of negligent infliction of emotional distress pursuant to New York law and the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq.*

506. Defendant United States of America is not entitled to any defense, statutory or otherwise.

507. As a direct and proximate result of the unlawful actions of Defendant, the FTCA Plaintiffs have suffered harm, in the form of, *inter alia*, mental anguish, outrage, humiliation, severe emotional distress, physical harm and/or psychological injuries. Plaintiffs are entitled to damages in an amount to be determined at trial.

### SEVENTH CLAIM: NEGLIGENCE AND GROSS NEGLIGENCE CLAIM OF THE FTCA PLAINTIFFS
### (Against Defendant United States of America)

508. Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

509. At all times relevant to this action, agents, officials and other personnel were acting in their official capacity under the authority of DHS and ICE, and, therefore, under the authority of the United States of America.

510. Defendant United States of America had a duty to the FTCA Plaintiffs to act with due care and in conformance with mandatory ICE regulations and the United States Constitution. By reason of the above-described actions, including (i) failing to train and supervise its employees in proper, constitutionally valid procedures, and (ii) failing to ensure the use of accurate and reasonable information in investigations, Defendant United States of America, by its employees Defendants Chertoff, Myers, Torres, Forman, Shanahan, Smith, Palmese, Williams, Knopf, ICE 1, ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 36, ICE 37, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors breached that duty. As a direct and proximate result of Defendant United States of America's negligence and gross negligence, named Plaintiffs suffered severe emotional distress and other substantial harms.

511. Defendant's acts, through its employees, give rise to a claim for damages for the torts of negligence and gross negligence pursuant to New York law and the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq*.

512. Defendant United States of America is not entitled to any defense, statutory or otherwise.

513.    As a direct and proximate result of the unlawful actions of Defendant, the FTCA Plaintiffs have incurred harm, including pain and suffering, outrage, humiliation, or emotional distress.  The FTCA Plaintiffs are entitled to damages in an amount to be determined at trial.

### EIGHTH CLAIM: TRESPASS CLAIM OF THE FTCA PLAINTIFFS
### (Against Defendant United States of America)

514.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

515.    At all times relevant to this action, agents, officials and other personnel were acting in their official capacity under the authority of DHS and ICE, and, therefore, under the authority of the United States of America.

516.    Defendant United States of America, by its employees Defendants Chertoff, Myers, Torres, Forman, Shanahan, Smith, Palmese, Williams, Knopf, ICE 1,  ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 36, ICE 37, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE Supervisors interfered with the FTCA Plaintiffs' rights of possession of their homes through the warrantless, non-consensual and otherwise unlawful surrounding of, entry into and search of the FTCA Plaintiffs' homes alleged herein.

517.    Defendant's acts give rise to a claim for damages for the tort of trespass pursuant to New York law and the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq.*

518.    Defendant United States of America is not entitled to any defense, statutory or otherwise.

519.    As a direct and proximate result of the unlawful actions of Defendant, the FTCA Plaintiffs have incurred harm, including pain and suffering, outrage, humiliation, or emotional distress.  The FTCA Plaintiffs are entitled to damages in an amount to be determined at trial.

## NINTH CLAIM: ASSAULT CLAIM OF THE FTCA PLAINTIFFS
### (Against Defendant United States of America)

520.    Plaintiffs incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

521.    At all times relevant to this action, agents, officials and other personnel were acting in their official capacity under the authority of DHS and ICE, and, therefore, under the authority of the United States of America.

522.    By the actions described above, including forcibly entering the FTCA Plaintiffs' homes, kicking down doors, brandishing their weapons, and behaving in a threatening and aggressive manner, and, in the case of Elder Bonilla, pointing a gun at his chest, Defendant United States of America, by its employees Defendants Chertoff, Myers, Torres, Forman, Shanahan, Smith, Palmese, Williams, Knopf, ICE 1,  ICE 2, ICE 3, ICE 4, ICE 5, ICE 6, ICE 7, ICE 8, ICE 9, ICE 10, ICE 11, ICE 12, ICE 13, ICE 14, ICE 15, ICE 16, ICE 17, ICE 18, ICE 19, ICE 20, ICE 21, ICE 22, ICE 23, ICE 24, ICE 25, ICE 26, ICE 27, ICE 28, ICE 29, ICE 30, ICE 31, ICE 32, ICE 33, ICE 34, ICE 36, ICE 37, ICE 39, ICE 40, ICE 41, ICE 42, ICE 43, ICE 45, ICE 46, ICE 47, ICE 48, ICE 49, ICE 50, ICE 51, ICE 52, ICE 53, ICE 54, ICE 55, ICE 56, ICE 57, ICE 58, ICE 59, John and Jane Doe ICE Agents, and John and Jane Roe ICE

Supervisors intentionally and unreasonably caused the FTCA Plaintiffs to apprehend imminent and grievous bodily harm.

523.    Defendant's acts, by its employees, give rise to a claim for damages for the tort of assault pursuant to New York law and the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq.*

524.    Defendant United States of America is not entitled to any defense, statutory or otherwise.

525.    As a direct and proximate result of the unlawful actions of Defendant, the FTCA Plaintiffs have incurred harm, including pain and suffering, outrage, humiliation, or emotional distress.  The FTCA Plaintiffs are entitled to damages in an amount to be determined at trial.

**TENTH CLAIM: BATTERY CLAIMS OF NELLY AMAYA, WILLIAM LAZARO, DAVID LAZARO PEREZ, TARCIS SAPON-DIAZ, JUAN JOSE MIJANGOS, MARIO PATZAN DELEON, GONZALO ESCALANTE, VICTOR PINEDA MORALES, YONI REVOLORIO, AND ELDER BONILLA**
**(Against Defendant United States of America)**

526.    Plaintiffs Nelly Amaya, William Lazaro, David Lazaro Perez, Tarcis Sapon-Diaz, Juan Jose Mijangos, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio, and Elder Bonilla incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

527.    At all times relevant to this action, agents, officials and other personnel were acting in their official capacity under the authority of DHS and ICE, and, therefore, under the authority of the United States of America.

528.    Defendant United States of America's employees, including Defendant Williams, and/or ICE ##1-8, in forcibly detaining Plaintiff Nelly Amaya, pushing her against the wall, and twisting her arm, intentionally and unreasonably made bodily contact with Ms. Amaya that was offensive in nature without lawful justification.

529.     Defendant United States of America's employees, including ICE ##1, 6, 8, and/or 11-17, in forcibly detaining, grabbing, pushing, and/or handcuffing (in at least some cases, prior to asking any questions at all) Plaintiffs William Lazaro, David Lazaro Perez, and Tarcis Sapon-Diaz, intentionally and unreasonably made bodily contact with these Plaintiffs that was offensive in nature and without lawful justification.  ICE ##1, 6, 8, and/or 11-17 also transported Plaintiffs William Lazaro and David Lazaro Perez to a detention center in New Jersey, where they were injected with an unknown substance by federal officials and/or officials acting at the behest of the United States.  As late as June 12, 2008, these ICE policies regarding the forced medication of detainees were continuing, and Defendant Chertoff was aware of these practices.

530.     Defendant United States of America's employees, including ICE ##1, 3, 4, and/or 7-11, in forcibly detaining, grabbing, pushing, and/or handcuffing (in at least some cases, prior to asking any questions at all) Plaintiffs Juan Jose Mijangos, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, and Yoni Revolorio, intentionally and unreasonably made bodily contact with these Plaintiffs that was offensive in nature and without lawful justification.

531.     Defendant United States of America's employees, including ICE ## 27-34, 43, 53, 54, and/or 55, burst through the front door of Plaintiff Elder Bonilla's home, pointed a gun at his chest, handcuffed him, and threw him toward the sofa.  In doing so, ICE ## 27-34, 43, 53, 54, and/or 55 intentionally and unreasonably made bodily contact with Mr. Bonilla that was offensive in nature and without lawful justification.

532.     Defendant's acts, by its employees, give rise to a claim for damages for the tort of battery pursuant to New York law and the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq.*

533.     Defendant United States of America is not entitled to any defense, statutory or otherwise.

534.    As a direct and proximate result of the unlawful actions of Defendant, Ms. Amaya, Mr. Lazaro, Mr. Perez, Mr. Sapon-Diaz, Mr. Mijangos, Mr. Escalante, Mr. Pineda Morales, Mr. Revolorio, Mr. Patzan DeLeon, and Mr. Bonilla have incurred harm, including pain and suffering, outrage, humiliation, or emotional distress.  Ms. Amaya, Mr. Lazaro, Mr. Perez, Mr. Sapon-Diaz, Mr. Mijangos, Mr. Patzan DeLeon, Mr. Escalante, Mr. Pineda Morales, Mr. Revolorio, and Mr. Bonilla are entitled to damages in an amount to be determined at trial.

**ELEVENTH CLAIM: EXCESSIVE FORCE CLAIMS OF NELLY AMAYA, WILLIAM LAZARO, DAVID LAZARO PEREZ, TARCIS SAPON-DIAZ, JUAN JOSE MIJANGOS, MARIO PATZAN DELEON, GONZALO ESCALANTE, VICTOR PINEDA MORALES, YONI REVOLORIO, AND ELDER BONILLA**
**(Against Defendant United States of America)**

535.    Plaintiffs Nelly Amaya, William Lazaro, David Lazaro Perez, Tarcis Sapon-Diaz, Juan Jose Mijangos, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio, and Elder Bonilla incorporate by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein, excluding only Plaintiffs' class action allegations.

536.    At all times relevant to this action, agents, officials and other personnel were acting in their official capacity under the authority of DHS and ICE, and, therefore, under the authority of the United States of America.

537.    Defendant United States of America's employees, Defendant Williams, and/or ICE ##1-8, in forcibly detaining Plaintiff Nelly Amaya, pushed her against the wall and twisted her clearly injured arm behind her back.  The officers did this despite the fact that Ms. Amaya was not committing a crime, was not a threat to officers or others, and was not attempting to evade or resist arrest.  Thus, the officers intentionally and unreasonably used an amount of force against Ms. Amaya that a prudent law enforcement officer would not have used.

538.    Defendant United States of America's employees, including ICE ##1, 6, 8, and/or 11-17, forcibly detained, grabbed, pushed, and/or handcuffed (in at least some cases, prior to asking any questions at all) Plaintiffs William Lazaro, David Lazaro Perez, and Tarcis Sapon-Diaz.  The officers did this despite the fact that the Plaintiffs were not committing a crime, were not a threat to officers or others, and were not attempting to evade or resist arrest.  Thus, the officers intentionally and unreasonably used an amount of force against the Plaintiffs that a prudent law enforcement officer would not have used.

539.    Defendant United States of America's employees, including ICE ##1, 3, 4, and/or 7-11, forcibly detained, grabbed, pushed, and/or handcuffed (in at least some cases, prior to asking any questions at all) Plaintiffs Juan Jose Mijangos, Mario Patzan DeLeon, Gonzalo Escalante, Victor Pineda Morales, and Yoni Revolorio. The officers did this despite the fact that the Plaintiffs were not committing a crime, were not a threat to officers or others, and were not attempting to evade or resist arrest.  Thus, the officers intentionally and unreasonably used an amount of force against the Plaintiffs that a prudent law enforcement officer would not have used.

540.    Defendant United States of America's employees, including ICE ## 27-34, 43, 53, 54, and/or 55, burst through the front door of Plaintiff Elder Bonilla's home, pointed a gun at his chest, handcuffed him, and threw him toward the sofa.  The officers did this despite the fact that Mr. Bonilla was not committing a crime, was not a threat to officers or others, and was not attempting to evade or resist arrest.  The ICE agents' actions intentionally and unreasonably used an amount of force against Mr. Bonilla that a prudent law enforcement officer would not have used.

541.     Defendant's acts, by its employees, give rise to a claim for damages for the tort of excessive force pursuant to New York law and the Federal Tort Claims Act, 28 U.S.C. §§2671 *et seq.*

542.     Defendant United States of America is not entitled to any defense, statutory or otherwise.

543.     As a direct and proximate result of the unlawful actions of Defendant, Ms. Amaya, Mr. Lazaro, Mr. Perez, Mr. Sapon-Diaz, Mr. Mijangos, Mr. Patzan DeLeon, Mr. Escalante, Mr. Pineda Morales, Mr. Revolorio, and Mr. Bonilla have incurred harm, including pain and suffering, outrage, humiliation, or emotional distress.  Ms. Amaya, Mr. Lazaro, Mr. Perez, Mr. Sapon-Diaz, Mr. Mijangos, Mr. Escalante, Mr. Pineda Morales, Mr. Revolorio, Mr. Patzan DeLeon, and Mr. Bonilla are entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court:

1.     Issue a Declaratory Judgment on behalf of Plaintiffs with respect to the claims set forth in the First and Second Claims declaring that the actions of Defendants vis-à-vis the Plaintiffs as complained of herein violated the Fourth and Fifth Amendments to the United States Constitution;

2.     With respect to the claims set forth in the First and Second Claims, issue an order permanently enjoining and restraining Defendants, their agents, employees and successors in office and all others acting in concert with them, under the guise of a nationwide program to identify and arrest alleged aliens and undocumented persons within the United States, from:

   a.     Deploying groups of armed agents to descend upon the homes of Latinos in the pre-dawn hours with the intent to

enter such homes, without judicial warrants or permission from the residents to do so, through the use of force or by manufacturing "consent" from residents who are unable -- under law or due to the oppressive conditions of the raids -- to give legitimate consent;

b.      Deploying groups of armed agents to descend upon the homes of Latinos in the pre-dawn hours with the intent to search such homes, without judicial warrants or permission from the residents to do so, through the use of force or by manufacturing "consent" from residents who are unable -- under law or due to the oppressive conditions of the raids -- to give legitimate consent;

c.      Deploying groups of armed agents to descend upon the homes of Latinos in the pre-dawn hours with the intent to seize Latino individuals, without judicial warrants or permission from the Latino individuals to do so, through the use of force or by manufacturing "consent" from the residents who are unable -- under law or due to the oppressive conditions of the raids -- to give legitimate consent;

d.      Deploying groups of armed agents to descend upon the homes of Latinos in the pre-dawn hours with the intent to search Latino individuals, without judicial warrants or permission from the Latino individuals to do so, through

the use of force or by manufacturing "consent" from the residents who are unable -- under law or due to the oppressive conditions of the raids -- to give legitimate consent;

e. Unlawfully identifying and targeting locations based on the belief that Latino individuals are known to live in or frequent such locations;

f. Designing raids with the intent to detain, interrogate and seize Latinos based on their race, national origin or ethnicity;

g. Conducting raids without performing adequate pre-raid investigations of the targets and/or locations of such raids;

h. Conducting raids without providing effective and/or adequate training for the agents carrying out such raids;

i. Teaching, training, condoning, or encouraging law enforcement officers to target, enter or search homes or detain, seize or interrogate individuals in the manner described above;

3. With respect to the claims set forth in the First and Second Claims, issue an order compelling Defendants, their agents, employees and successors in office and all other acting in concert with them, to:

a. Implement and ensure compliance with policies that require law enforcement agents to accurately record the consent

they receive to enter homes that are targeted as part of ICE initiatives;

b.    Implement, maintain and update internal ICE databases to ensure that ICE agents do not (i) raid locations unnecessarily and unjustifiably, and/or (ii) repeatedly raid locations unnecessarily and unjustifiably;

c.    Design and maintain adequate training courses for ICE agents involved in ICE initiatives involving home raids;

d.    Implement corrective measures to prevent any policies, patterns and practices that teach, train, condone or encourage law enforcement officers to act in the constitutionally deficient manner described herein;

4.    Award the named Plaintiffs actual, compensatory, and punitive damages for violations of the Fourth and Fifth Amendments to the United States Constitution and their *Bivens* claim;

5.    Award the FTCA Plaintiffs actual and compensatory damages for their claims pursuant to the Federal Tort Claims Act;

6.    Award Plaintiffs costs of this action;

7.    Award Plaintiffs pre- and post-judgment interest, as permitted by law;

8.    Award Plaintiffs reasonable attorneys' fees; and

9.    Grant Plaintiffs such other relief as the Court deems appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims and issues properly triable to a jury.

New York, New York
December 21, 2009

DEWEY & LEBOEUF LLP

By: _____
    Aldo A. Badini
    Donna L. Gordon
    Kelly H. Tsai
    Kelly A. Librera
    Jennifer O. Whitener
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

LATINOJUSTICE PRLDEF

By: _____
    Foster Maer
    Ghita Schwarz
    Christina Iturralde
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 739-7504

Attorneys for Plaintiffs

# Exhibit 1



MIGRATION POLICY INSTITUTE

# COLLATERAL DAMAGE:
## An Examination of
## ICE's Fugitive
## Operations Program

By Margot Mendelson, Shayna Strom, Michael Wishnie

February 2009

Report prepared under the guidance
of Muzaffar Chishti and Doris Meissner

**Acknowledgments**

This report was written by the Worker and Immigrant Rights Advocacy Clinic of the Jerome N. Frank Legal Services Organization at Yale Law School for the Migration Policy Institute. The primary authors were Margot Mendelson, Shayna Strom, and Michael Wishnie.

For their valuable insight during the research and writing process, the authors thank Victor X. Cerda of Jackson Lewis; Bo Cooper of Paul Hastings; Dan Kesselbrenner of the National Immigration Project of the National Lawyers Guild, Inc.; Paul Virtue of Hogan & Hartson; retired Immigration and Naturalization Service administrator Johnny Williams; Father James Manship of St. Rose of Lima Church, New Haven, Connecticut; and James W. Ziglar of the Migration Policy Institute; as well as to MPI's Kirin Kalia for editing advice.

The Migration Policy Institute gratefully acknowledges support for its US Immigration Policy Program from the Open Society Institute and the Evelyn and Walter Haas Jr. Fund.

© 2009 Migration Policy Institute. All Rights Reserved.

No part of this publication may be reproduced or transmitted in any form by any means, electronic or mechanical, including photocopy, or any information storage and retrieval system, without permission from the Migration Policy Institute. A full-text PDF of this document is available for free download from www.migrationpolicy.org.

Permission for reproducing excerpts from this report should be directed to: Permissions Department, Migration Policy Institute, 1400 16th Street, NW, Suite 300, Washington, DC 20036, or by contacting communications@migrationpolicy.org.

Suggested citation: Mendelson, Margot, Shayna Strom, and Michael Wishnie. 2009. *Collateral Damage: An Examination of ICE's Fugitive Operations Program.* Washington, DC: Migration Policy Institute.

# Table of Contents

Executive Summary ........................................................................................................ I

I. Introduction .............................................................................................................. 3

II. Background .............................................................................................................. 4

    History ..................................................................................................................... 4

    Current program ..................................................................................................... 6

III. Findings ................................................................................................................ 11

IV. Issues and Analysis .............................................................................................. 17

    Use of Investigative Resources ........................................................................... 18

    Metrics for Success ............................................................................................. 19

    Failure to Distinguish *In Absentia* Orders ......................................................... 21

    Impacts on Community Relations ........................................................................ 21

    Officer Safety and Liability .................................................................................. 22

V. Conclusions and Recommendations ...................................................................... 25

    Recommendations ............................................................................................... 25

VI. Appendices ........................................................................................................... 29

    Appendix 1. ICE, DRO, and NFOP Budgets, FY 2005-2008 ............................. 29

    Appendix 2. Letter from DHS Assistant Secretary Julie Myers to MPI ............ 29

About the Authors ...................................................................................................... 34

## Executive Summary

Since 2003, no immigration enforcement program has experienced a more dramatic increase in funding, nor expanded its staffing and operations more rapidly, than the National Fugitive Operations Program (NFOP). This initiative, led by US Immigration and Customs Enforcement (ICE), a component of the US Department of Homeland Security (DHS), is intended to improve national security by locating and removing dangerous fugitive aliens. ICE defines "fugitive" as a person who has been ordered deported, excluded, or removed by an immigration judge, but has not left the country; or one who has failed to report to DHS as required. ICE further distinguishes between those fugitives who have a criminal history or are otherwise dangerous, and those who have no criminal history whatsoever. NFOP dispatches Fugitive Operations Teams (FOTs) across the country to arrest fugitives. While NFOP is focused specifically on residential operations targeted towards fugitives, it is only one of the federal initiatives that result in the apprehension and removal of deportable noncitizens, including those with criminal convictions.

The NFOP budget has soared over 23-fold in recent years, from $9 million in fiscal year 2003, its first year of operation, to more than $218 million in FY 2008. Moreover, the program has experienced a 1,300-percent growth in personnel since its inception. ICE estimates that the program has apprehended more than 96,000 persons through FY 2008. At the same time, NFOP has been at the center of many of the country's most controversial immigration enforcement operations in the past several years.

To date there has been little analysis of the program or the impact of its rapid growth. This report aims to fill that gap, measuring the program's actual conduct and accomplishments against its legislative purpose and stated mission priorities. Key findings include:

- Despite NFOP's mandate to arrest *dangerous* fugitives, almost three-quarters (73 percent) of the individuals apprehended by FOTs from 2003 through February 2008 had no criminal conviction.[1]

- Fugitive aliens with criminal convictions have constituted a steadily decreasing share of total arrests over time. In FY 2003, fugitives with criminal convictions represented 32 percent of all FOT arrests, a figure that dropped to 17 percent in FY 2006 and 9 percent in FY 2007, the most recent year for which there is data on criminal arrests available.

- In 2007, Congress appropriated $183 million for NFOP. With those funds, ICE reported that in 2007 its fugitive operations teams arrested only 672 fugitive aliens who either had a violent criminal history or were considered dangerous to the community.

- From 2003 to 2005, *nonfugitives*, or what ICE terms "ordinary status violators" — those who have never been charged before an immigration judge, but whom ICE

---

[1] As of this report's writing, ICE had only publicly released data on FOT criminal apprehensions from 2003 to February 2008.

1

arrests on the belief that they are unlawfully present in the country — represented an average of 22 percent of annual FOT apprehensions.

- In FY 2006, after ICE implemented a new arrest quota system, arrests of nonfugitives, or ordinary status violators, grew to 35 percent of total FOT arrests. In FY 2007, this figure rose to 40 percent of total arrests. Such ordinary status violator arrests are sometimes referred to as "collateral arrests."

The report concludes that NFOP has failed to focus its resources on the priorities Congress intended when it authorized the program. In effect, NFOP has succeeded in apprehending the easiest targets, not the most dangerous fugitives. Furthermore, the program's structure and design appear to encourage officers to jeopardize their own safety, alienate communities, and misdirect expensive personnel resources.

ICE needs to more rigorously and comprehensively manage and evaluate the program to ensure that there is appropriate oversight of operations and guidance for FOT officers. The report's key recommendations include the following:

- NFOP should replace the 1,000-person annual arrest quota with a system that prioritizes arresting dangerous fugitives over all other arrests.

- FOTs should approach only targeted houses and persons.

- NFOP should develop a specific protocol explicitly directed to address constitutional and humanitarian concerns that arise during FOT operations. All FOT agents should be required to undergo comprehensive training in accordance with this new protocol (as well as periodic refresher training), in addition to their basic law enforcement training.

- NFOP should expand its priority system to designate individuals with *in absentia* removal orders and no criminal history as lowest priority.

- ICE should direct substantial NFOP resources to improving the database it uses for information about fugitive aliens.

- NFOP should redeploy resources when particular FOTs are unable to identify or pursue higher-priority fugitives in their geographic region.

## I. Introduction

The National Fugitive Operations Program (NFOP) is central to the vision of the Department of Homeland Security (DHS) for national security and immigration enforcement in the post-September 11 world. The program is conducted by the Office of Detention and Removal Operations (DRO), the US Immigration and Customs Enforcement (ICE) division within DHS that is responsible for interior enforcement of immigration laws. In its strategic plan for 2003 to 2012, DHS explicitly justified the work of fugitive operations teams (FOTs) on national security grounds: "Moving toward a 100 percent rate of removal for all removable aliens is critical to allow ICE to provide the level of immigration enforcement necessary to keep America secure. Without this final step in the process, apprehensions made by other DHS programs cannot truly contribute to national security."[2,3] Because FOTs target specific fugitives, they often engage in residential enforcement operations, which DRO considers critical to "meet the challenge of this defining moment in our nation's history."[4] Despite the substantial resources allocated to NFOP, ICE estimates that as of October 2008, there were approximately 557,762 fugitive aliens in the United States.[5]

Since its inception in 2003, NFOP has expanded rapidly in size, scope, and cost. In 2003, DRO established eight FOTs; by October 2008, approximately 100 teams were operating across the country.[6] Congressional funding and NFOP apprehensions have both risen substantially. Annual spending on fugitive operations has grown from $9 million in 2003[7] to $218,945,000 in 2008.[8] In total, Congress allocated more than $625 million to the program in its first five years.[9]

Apart from the fact that the program now receives a substantial budget, public scrutiny of NFOP is important for at least two major reasons. First, NFOP is a massive operation with a very narrow congressional mandate: locating dangerous individuals with existing removal orders. It is appropriate to focus on dangerous fugitives, but the reality of NFOP operations indicates that the program is not operating in accordance with this mandate. Second, because FOTs often involve residential enforcement rather than workplace operations, NFOP raises a unique set of legal and humanitarian issues. Indeed, as FOTs have proliferated, they have directed or participated in operations drawing intense public criticism, from allegations of

[2] US DEPARTMENT OF HOMELAND SECURITY, ENDGAME: OFFICE OF DETENTION AND REMOVAL STRATEGIC PLAN, 2003-2012: DETENTION AND REMOVAL STRATEGY FOR A SECURE HOMELAND (June 27, 2003), at 2-2 [hereinafter ENDGAME].
[3] Apprehension and arrest are interchangeable words in ICE terminology.
[4] ENDGAME, at 1-1.
[5] Border Security and Immigration Enforcement Fact Sheet, ICE, Oct. 23, 2008, http://www.dhs.gov/xnews/releases/pr_1224777640655.shtm .
[6] Remarks by Homeland Security Secretary Michael Chertoff on the State of Immigration and the No Match Rule, Oct. 23, 2008, *available at* http://www.dhs.gov/xnews/speeches/sp_1224803933474.shtm; *see also* ICE Fugitive Operations Teams arrest more than 30,000 in FY2007, ICE News Release, Dec. 4, 2007, http://www.ice.gov/pi/news/newsreleases/articles/071204washington.htm.
[7] OFFICE OF INSPECTOR GENERAL, DEPARTMENT OF HOMELAND SECURITY, AN ASSESSMENT OF UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT'S FUGITIVE OPERATIONS TEAMS" (Mar. 4, 2007) [hereinafter OIG REPORT], at 6. *See generally* N.C. Aizenman and Spencer S. Hsu, US Targeting Immigrant Absconders, WASH. POST, May 5, 2007, at A1.
[8] Fact Sheet: Fiscal Year 2008, ICE, Dec. 28, 2007, http://www.ice.gov/doclib/pi/news/factsheets/2008budgetfactsheet.pdf.
[9] See *infra* Figure 2.

entering private homes without warrants or consent to detaining nursing mothers and sole caretakers of minor children.

This paper examines the history of NFOP, its current structure, and the available evidence about its practices and impact. It includes an analysis of previously unavailable data on the program's activities and examines NFOP's results in light of the objectives defined by executive branch officials to Congress to justify the program's significant growth. The analysis demonstrates substantial gaps between the public claims for the program and its actual results. The report concludes with recommendations designed to better align the agency's actions with the program's legislative intent and to ensure that enforcement is more carefully aimed at genuinely dangerous persons, and ultimately provides a greater public safety return for taxpayer investment.

## II. Background

### History

In 1995, Attorney General Janet Reno called for the creation of "abscondee removal teams" as part of a broad effort to focus enforcement priorities and resources of the Immigration and Naturalization Service (INS) on criminal alien issues.[10] INS preceded the immigration agencies within DHS. In 1996 appropriations established funding for these teams, which were intended to locate and remove immigrants with outstanding removal orders (see Table 1 for a definition of this and other common terms). The agency carried out its criminal alien removal mandate through its district offices where deportation officers were instructed to apprehend fugitive aliens as the highest priority task of their ongoing operations. Criminal alien removals increased steadily and were tracked as an explicit metric in the agency's reporting systems.

In 2002, in the aftermath of the September 11 attacks and heightened public concern about terrorism, INS began NFOP, although the program was not funded as an independent unit until 2003. When DHS was created in March 2003, the program was made part of DRO, within ICE.[11]

---

[10] OIG REPORT, *supra* note 7, at 3-4.
[11] *Id.* at 4. *See also* 79 No. 15 Interpreter Releases 528 (Apr. 8, 2002); 79 No. 7 Interpreter Releases 236, 237 (Feb. 11, 2002).

**Table 1: Common Immigration-Enforcement Terms and Definitions**

| Term | Definition |
|------|-----------|
| *Fugitive alien* | An individual with an outstanding removal order. |
| *Outstanding removal order* | A removal order issued by an immigration judge (requiring a given individual to leave the United States and return to his or her home country) that has not been obeyed. |
| *Immigration violator or ordinary status violator* | An individual whom ICE believes is out of status (i.e. not in the United States legally) or has violated a term of his or her status, but whose case has not yet been adjudicated by an immigration judge. |
| *Criminal alien* | A foreign national convicted of a criminal offense. |
| *Absconder* | Previous term that ICE and the Immigration and Naturalization Service (INS) used to describe the individuals now known as fugitive aliens. |

The events of September 11, 2001 drew new attention to noncitizens with outstanding removal orders. In December 2001, INS Commissioner James Ziglar announced during testimony before the US House of Representatives that information regarding absconders would be entered into the National Crime Information Center (NCIC),[12] the principal criminal law database of the Federal Bureau of Investigation (FBI), so as to make this information available to the local law enforcement officials who query the database millions of times each day.[13]

In January 2002, the Deputy Attorney General issued guidance to implement NFOP's predecessor program, the Absconder Apprehension Initiative (AAI), with the goal of locating, apprehending, and deporting noncitizens with outstanding removal orders.[14] The Department of Justice specified that AAI prioritize absconders who "come from countries in which there has been Al Qaeda terrorist presence or activity."[15] The program was designed as a collaborative effort between INS, FBI, and the US Marshals Service. Early stages focused on expanding the NCIC database and tasking multiagency fugitive operations teams with investigations.

NFOP became an independent unit within ICE in 2003 and has received targeted funding in every DHS appropriations bill since. Expanding NFOP was one of the "overarching goals" of Bush administration Homeland Security Secretary Michael Chertoff, who emphasized the program as part of his Secure Border Initiative (SBI) in November 2005. Secretary Chertoff

---

[12] Statement of James W. Ziglar to the National Commission on Terrorist Attacks upon the United States, Jan. 26, 2004, *available at* http://www.globalsecurity.org/security/library/congress/9-11_commission/040126-ziglar.htm.

[13] "Crime Index Sets Record: 5.6 Million Queries in a Single Day," FBI, Feb. 15, 2006, http://www.fbi.gov/page2/feb06/ncic021506.htm ("NCIC performs 4.8 million transactions daily, 24 hours a day, seven days a week.").

[14] Memorandum from Larry Thompson, Deputy Attorney General, to the INS Commissioner, the FBI Director, the US Marshals Service Director, and US Attorneys (Jan. 25, 2002), *available at* http://news.findlaw.com/hdocs/docs/doj/absndr012502mem.pdf. *See generally* Kevin Lapp, Pressing Public Necessity: The Unconstitutionality of the Absconder Apprehension Initiative, 29 N.Y.U. REV. L. & SOC. CHANGE 573.

[15] Memorandum from Larry Thompson, *supra* note 14, at 1.

mentioned NFOP again in the "Second Phase SBI" in April 2006.[16] It is important to note that while NFOP is an important program within DRO it is still only one of ICE's many initiatives to apprehend and remove deportable noncitizens, including those with criminal convictions.

## Current program

### *How FOTs work*

FOTs consist of seven-member teams, based in a particular region of the country, charged with identifying, locating, and apprehending fugitive aliens. Typically, teams include four deportation officers and a supervisory deportation officer.[17] According to then-Homeland Security Assistant Secretary Julie Myers, "[f]ugitive work is investigative in nature and primarily conducted 'under cover.'"[18] In some instances, FOT agents wear plain clothes; the agents sometimes also wear uniforms identifying themselves as "POLICE."[19]

Until August 2008, FOTs obtained immigration and criminal information about fugitive aliens from the Deportable Alien Control System (DACS), a database containing biographical records, detention records, case records, and jail records on more than 4 million individuals. [20] According to a 2007 report from the DHS Office of the Inspector General (OIG), the DACS database was notoriously inaccurate and incomplete, substantially hindering the work of FOTs: "One supervisor stated that the database has 'been neglected for the past 25 years.' An analyst, who has worked on the DACS help desk for ten years, estimated that approximately 50 percent of the data in the database is accurate."[21] After an October 2007 operation in Nassau County, New York, that utilized DACS, for example, officials reported that "all but nine of the 96 administrative warrants issued by the immigration enforcement agency . . . had wrong or outdated addresses."[22]

---

[16] *See, e.g.,* Fact Sheet: Secure Border Initiative, ICE, Nov. 2, 2005, *available at*
http://www.dhs.gov/xnews/releases/press_release_0794.shtm; Remarks by Homeland Security Secretary Michael Chertoff on 2007 Achievements and 2008 Priorities, Dec. 12, 2007, *available at*
http://www.dhs.gov/xnews/speeches/sp_1197513975365.shtm. It is worth noting that FOT apprehensions represent only a small fraction of all ICE apprehensions. In FY 2007, ICE removed 319,382 immigrants. Department of Homeland Security Office of Immigration Statistics, Immigration Enforcement Actions: 2007, DHS, Dec. 2008,
www.dhs.gov/xlibrary/assets/statistics/publications/enforcement_ar_07.pdf. Less than 10 percent of those removals were a result of the NFOP. *See* Table 3, page 29.

[17] OIG REPORT, *supra* note 7, at 6.

[18] Letter to New Haven Mayor John DeStefano, Jr., from Homeland Security Assistant Secretary Julie Myers, July 2, 2007 (on file with authors).

[19] OIG REPORT, *supra* note 7, at 6; Letter to Mayor Gavin Newsom from Ronald E. LeFevre, Chief Counsel, San Francisco, ICE, Mar. 26, 2006 (on file with authors).
OIG REPORT, *supra* note 7, at 15. *See also* US GOVERNMENT ACCOUNTABILITY OFFICE, IMMIGRATION ENFORCEMENT: ICE COULD IMPROVE CONTROLS TO HELP GUIDE ALIEN REMOVAL DECISION MAKING (Oct. 2007), *available at*
http://www.gao.gov/new.items/d0867.pdf [hereinafter GAO report].

[21] OIG REPORT, *supra* note 7, at 15.

[22] Nina Bernstein, *Raids Were a Shambles. Nassau Complains to US,* N.Y. TIMES, Oct. 3, 2007; *see also*
84 No. 39 Interpreter Releases 2368 (Oct. 8, 2007). In June 2006, DRO established the Fugitive Operations Support Center, which is designed to "enhance[] the efficiency and effectiveness of the National Fugitive Operations Program (NFOP) through the use of technology and partnerships with law enforcement agencies. The Fugitive Operations Support Center reviews and updates absconder cases; develops leads for and assists fugitive operations teams; develops national fugitive field operations and manages the absconder numbers." No data or assessments have been released with regard to the effectiveness of the Center or its impact on FOT operations. Fact Sheet: ICE Office of Detention and Removal, ICE, Nov. 2, 2006, http://www.ice.gov/pi/news/factsheets/dro110206.htm.

To modernize the outdated technology on which DACS and other immigration data systems had been built, DHS created ENFORCE, an updated electronic platform for immigration information.[23] DHS began using ENFORCE in August 2008, but since the data incorporate records previously held in DACS, ENFORCE data is problematic as well.

Based on information contained in DACS/ENFORCE, FOTs obtain administrative warrants from any of 49 categories of immigration officials authorized to execute such warrants.[24] The warrants, which specify the names of individuals with outstanding removal orders, are issued by ICE staff and are civil in nature, not traditional search or arrest warrants.[25] In other words, a neutral and detached judge has not approved the warrant after reviewing sworn evidence or making a finding of probable cause to believe a law has been violated, as is required for criminal warrants. Secretary Chertoff told the *New York Times* that FOTs "do not carry search warrants or arrest warrants approved by a judge . . . and their administrative warrants of deportation do not allow entry into dwellings without consent. But others they encounter during an operation can be questioned as to their right to be in the United States, and 'if deemed to be here illegally, may be arrested without warrant.'"[26]

In some but not all FOT operations, the local DRO office prepares an operations plan in advance.[27] The plan typically sets forth the number of fugitive alien targets, the basic plan for locating them, the staff assigned to the operation, and the equipment and uniforms needed for the assignment.[28] It appears the operations plan is usually submitted to DRO headquarters for approval.[29] In some circumstances, the local DRO office also sends the plan to the state or local police, the US Marshals Service, or other agencies, along with a list of targets and their relevant personal details.[30] Other agencies may also participate in the actual operation when they have shared jurisdiction or there is a need for additional resources. In the June 2007 FOT operation in New Haven, Connecticut, for example, personnel from the US Marshals Fugitive Task Force, US Department of State Diplomatic Security Service, and Connecticut State Police assisted FOT officers from ICE.[31]

---

[23] GAO report, *supra* note 19, at 31; *see also* E-mail from Doris Meissner, former Commissioner of the Immigration and Naturalization Service, to authors (Nov. 13, 2008, 12:12 PM EST) (on file with authors).

[24] 8 CFR § 287.5(e)(2).

[25] *See e.g.. Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 530 (1967).

[26] Nina Bernstein, *Hunts for 'Fugitive Aliens' Lead to Collateral Arrests*, N.Y. TIMES, July 23, 2007, at B5, *available at* http://www.nytimes.com/2007/07/23/nyregion/23operation.html.

[27] Hartford Field Office, Detention and Removal Operations, *Operational Order/Plan* (2007) (on file with authors).

[28] Much of this information was released as result of a Freedom of Information Act lawsuit. *Danaher v. Freedom of Information Communication*, 2008 WL 4308212 (Conn.Super. (Sept. 5, 2008).

[29] Letter from Julie Myers, Assistant Secretary of the Department of Homeland Sec., to Christina DeConcini, Director of Policy, National Immigration Forum (July 6, 2007) (on file with authors).

[30] E-mail from Justin Cox to author (Feb. 24, 2008, 11:45 AM EST) (on file with authors); Fax from US Marshals Service to Immigration and Customs Enforcement (April 27, 2007) (on file with authors).

[31] *See, e.g.*, Form I-213 for Luis Narciso Sedeno-Trujillo, signed by James E. Brown, Deportation Officer (June 6, 2007) (on file with authors)). A formal note written by DRO's Boston Field Office Director to Assistant Secretary Julie Myers also indicates that the Hartford Police, Franklin County Sheriff's Department, and the Connecticut Probation Department were involved in the operation. NFOP likely alerted the Hartford Police and the Franklin County Sheriff's Department in order to request bed space for those arrested and contacted the Probation Department to request that it run names through its database in order to update relevant addresses.

*Growth and Funding*

NFOP started with eight teams and grew to 75 by FY 2007. In FY 2008, Congress authorized 29 new teams, bringing the total to approximately 100.[32] The teams, based in at least 34 states, take part in operations nationwide (see Figure 1). California alone had 13 active FOTs as of February 2008.[33] Major FOT operations have included Operation Return to Sender, a nationwide initiative in May-June 2006 that netted 2,179 apprehensions,[34] Operation City Lights in Las Vegas, Operation Phoenix in Florida, Operation Deep Freeze in Chicago, and Operation FLASH in New England.[35] Recent ICE press releases suggest FOT operations continue in full force. In September 2008, ICE reported multiple operations. In Chicago, four FOTs arrested 144 individuals during a four-day operation.[36] The Miami FOT arrested 116 individuals in Miami, Broward, and the Florida Key areas in a five-day operation.[37] And FOTs in California arrested more than 1,157 people, including 432 in the San Francisco area, 420 in the Los Angeles area, and 301 in the San Diego area.[38]

**Figure 1. Location of Fugitive Operations Teams, 2007**



*Note*: ICE map. The locations of the 29 teams Congress approved in 2008 have not been released.[39]

---

[32] Two-Week ICE DRO Operation Targeting Fugitives Yields More Than 330 Arrests in Miami, Broward, and Palm Beach Counties, ICE News Release, April 7, 2008, http://www.ice.gov/pi/news/newsreleases/articles/080407miami.htm.

[33] Area ICE Fugitive Operations Teams Record Nearly 150 Arrests in January, ICE News Release, Feb. 11, 2008, http://www.ice.gov/pi/news/newsreleases/articles/080211sandiego.htm.

[34] ICE Apprehends More than 2,100 Criminal Aliens, Gang Members, Fugitives, and Other Immigration Violators in Nationwide Interior Enforcement Operation, ICE News Release, June 14, 2006, http://www.dhs.gov/xnews/releases/press_release_0926.shtm.

[35] OIG REPORT, *supra* note 7, at 27.

[36] Chicago ICE Fugitive Operations Teams Arrest 144 Aliens During 4-day Initiative, ICE News Release, Sept. 17, 2008, http://www.ice.gov/pi/nr/0809/080917chicago.htm.

[37] ICE Operation Targeting Fugitives 116 Arrests in Miami, Broward, and Florida Key Areas, ICE News Release, Sept. 29, 2008, http://www.ice.gov/pi/nr/0809/080929miami.htm.

[38] Francisco Vara-Orta, *Statewide Immigration Raids Result in 1,157 Arrests*, L.A. TIMES, Sept. 30, 2008; *see also* ICE Arrests More Than 1,000 in Largest Special Operation Yet Targeting Criminal Aliens and Illegal Alien Fugitives in California, ICE News Release, Sept. 29, 2008, http://www.ice.gov/pi/nr/0809/080929sanfrancisco.htm.

[39] "This year ICE is in the process of deploying teams in Birmingham, Ala.; Columbus, Ohio; Charleston, S.C.; Colorado Springs, Colo., Des Moines, Iowa; Fort Worth, Texas; and two in New York City. In California, ICE is adding new teams in

Congress funds fugitive operations as part of the DRO allocation in the DHS budget (see Appendix 1). The FY 2008 budget was $218,945,000, over 23 times the amount allocated five years ago (see Figure 2).[40] The largest absolute increase came between 2004 and 2005. In all, the program has experienced a 1,300-percent growth in personnel and 2,300-percent growth in funding since it began in 2003. From FY 2003 through 2008, Congress allocated more than $625 million[41] to FOTs, with an additional $200 million authorized for DRO over a two-year period in order to generally "improve and modernize efforts to identify criminal aliens and remove them from the United States."[42]

**Figure 2. Total Funding for Fugitive Operations Teams, FY 2003 to FY 2008**



*Source*: ICE budget fact sheets and DHS Office of Inspector General report, *An Assessment of United States Immigration and Customs Enforcement's Fugitive Operations Teams,"* March 2007, http://www.dhs.gov/xoig/assets/mgmtrpts/OIG_07-34_Mar07.pdf.

### *Objectives and Priorities*

As the NFOP budget and personnel levels have grown, so have the number of FOT arrests (see Figure 3).

San Bernardino, San Diego, San Jose, and Ventura County." Raj Jayadev, *When ICE Comes to Your Town*, NEW AMERICA MEDIA, Oct. 8, 2008.

[40] Fact Sheet: Fiscal Year 2008, *supra* note 8; OIG REPORT, *supra* note 7, at 6.

[41] Where possible, this report relies upon funding information directly released by ICE. Funding data for 2005 through 2008 was released in official ICE budget fact sheets: Fact Sheet: Fiscal Year 2007, ICE, Feb. 5, 2006, *available at* http://www.ice.gov/doclib/pi/news/factsheets/2007budgetfactsheet.pdf; Fact Sheet: Fiscal Year 2006, ICE, Feb. 5, 2006, *available at* http://www.ice.gov/doclib/pi/news/factsheets/2006budgetfactsheet.pdf; Fact Sheet: Fiscal Year 2005, ICE, Feb. 5, 2006, *available at*
http://www.ice.gov/doclib/pi/news/factsheets/2005budgetfactsheet.pdf. The funding totals for 2003 and 2004 are from the report of the OIG, OIG REPORT, *supra* note 7, at 6. Note that the OIG report and the ICE Fact Sheets contain slightly variant data for 2005 and 2006; for those years, the report relies on data from the official ICE Fact Sheets.

[42] Fact Sheet, Fiscal Year 2008, *supra* note 8.

**Figure 3. Fugitive Operations Team Arrests, FY 2003 to 2008**



*Note*: This chart represents *all* FOT arrests, without reference to the nature of the arrest – whether the individual was a fugitive alien or an ordinary status violator, or whether the individual had a criminal conviction of any type.
*Source*: ICE, "ICE Multifaceted Strategy Leads to Record Enforcement Results," (news release, October 23, 2008), http://www.ice.gov/pi/nr/0810/081023washington.htm?searchstring=349,041.

When the program was first funded in 2003, each FOT was expected to apprehend 125 fugitive aliens per year. Guidelines that DRO implemented in 2004 prioritized dangerousness, stating that at least 75 percent of the individuals apprehended had to be fugitive aliens with criminal convictions.[43] In January 2006, the goal increased to 1,000 individuals, a benchmark DRO officials have confirmed.[44] These revised benchmarks apparently no longer require either an absolute number or specific percentage of criminal alien arrests or fugitive alien arrests.

That said, Secretary Chertoff stated that FOTs target fugitives according to the following priorities, with those "posing a threat to the nation" at the top (see Table 2).[45]

---

[43] OIG REPORT, *supra* note 7, at 8.
[44] Aizenman & Hsu, *supra* note 7. Recent disclosures by ICE under the Freedom of Information Act confirm that as of summer 2007, ICE agents understood each FOT to be mandated to make 1,000 arrests per year, with up to 500 collateral arrests on headquarters-approved operations counting toward this mandate. These records were released by ICE in a Freedom of Information Act case, *Unidad Latina en Accion v. DHS*, No. 3:07-cv-1224 (D.Conn.). There has been some ambiguity about the precise nature of the quota. At an operational briefing by Homeland Security Secretary Chertoff and DRO Director John Torres, Torres confirmed that "[t]he current goal per team [is] to arrest 1,000 *people* annually." Remarks by Homeland Security Secretary Michael Chertoff, Border Patrol Chief David Aguilar, and Acting Director of Detention and Removal Operations John Torres, ICE, Feb. 9, 2006, *available at*
http://www.dhs.gov/xnews/releases/press_release_0852.shtm (emphasis added). Similarly, ICE's official response to the OIG report, stated that "[o]ne thousand administrative arrests are expected from each field office." OIG REPORT, *supra* note 7, at 50. A separate section of the OIG report, however, reported that the per team quota is 1,000 *fugitive aliens* per year. *Id.* at 8 (emphasis added).
[45] *Id.* (citing DRO Memorandum, "Fugitive Operations Case Priority and Annual Goals," Jan. 31, 2006). The *New York Times* reported that Secretary Chertoff confirmed in July 2007 that this priority system was in effect. Bernstein, *Hunts for 'Fugitive Aliens' Lead to Collateral Arrests, supra* note 26.

**Table 2. Apprehension Priorities for Fugitive Operations Teams**

| 1 | Fugitives posing a threat to the nation |
|---|---|
| 2 | Fugitives posing a threat to the community |
| 3 | Fugitive with a violent criminal history |
| 4 | Fugitive aliens with a criminal conviction |
| 5 | Fugitive aliens with no criminal conviction |

*Source:* ICE, "Area ICE Fugitive Operations Teams Record Nearly 150 Arrests in January," (news release, February 11, 2008), http://www.ice.gov/pi/news/newsreleases/articles/080211sandiego.htm.

# III. Findings[46]

While NFOP was designed to focus on apprehending dangerous fugitives, our results make clear that the program has primarily been arresting the easiest targets, including many persons without a criminal history and nonfugitives, whose cases have not yet been heard by an immigration judge. Key findings include:

- Almost three-quarters (73 percent) of the individuals apprehended by FOTs from 2003 through February 2008 had *no* criminal conviction.

- In 2007, fugitive aliens with criminal convictions represented just 9 percent of total FOT arrests.

- In 2007, Congress appropriated $183 million to NFOP. With those funds, in 2007 ICE reported that NFOP arrested only 672 fugitive aliens with violent criminal history or whom ICE considered dangerous to the community.

- From 2003 to 2005, ordinary status violators represented an average of 22 percent of annual FOT arrests. In 2006, after the 1,000-arrests-per-team quota was implemented, ordinary status violators constituted 35 percent of total FOT arrests. In 2007, the figure rose to 40 percent. Arrests of ordinary status violators are sometimes referred to as "collateral arrests."

*Incidence of Criminal Convictions*
The data released by ICE plainly contradict statements from senior ICE officials that FOTs apprehend "primarily criminal aliens."[47] In February 2008, ICE reported that "[n]ationwide,

---

[46] The following analysis of FOT arrest patterns is based almost exclusively upon data released by ICE through press releases and written requests for information. In a few instances in which ICE has not released critical data, the report relies upon data from the DHS Inspector General report, which ICE was given leave to respond to or correct. Sources are noted for all data.

[47] As part of DHS's request for almost $219 million in FY 2008, then-Assistant Secretary Myers told the House Appropriations Committee's Subcommittee on Homeland Security that FOTs target "primarily criminal aliens." Statement of Julie Myers, Assistant Secretary, ICE, Before House Appropriations Committee, Subcommittee on Homeland Security, *March 27, 2007,* available at *www.ice.gov/doclib/pi/news/testimonies/070327budget.pdf.* Eric Saldana, a deportation officer in a Los Angeles-based FOT, asserted that, "'[a]lmost everybody we target are criminals or have some sort of criminal connection . . . . The noncriminals will not get any attention.'" *Constant Watch: For Fugitive Operations Officers, Caseloads Can Be*

ICE Fugitive Operations Teams have arrested more than 72,000 illegal aliens since the first teams were created. Of those, roughly 19,000, or 27 percent, had criminal convictions."[48] In other words, 73 percent of the total individuals apprehended by FOTs from 2003 to February 2008[49] did not have any criminal convictions (see Figure 4). This finding is consistent with a 2007 ICE report that states that only 28 percent of the 61,000 immigration status violators FOTs apprehended from 2003 to 2007 had criminal convictions.[50]

The FY 2007 data are particularly striking — just 9 percent of those arrested had criminal convictions (see Figure 5). Yet ICE chief Julie Myers stated in August 2008 that NFOP's targets were still those with a criminal conviction.[51]

**Figure 4. Fugitive Operations Team Apprehensions, Mid-2003 to February 2008**



*Source:* ICE, "Area ICE Fugitive Operations Teams Record Nearly 150 Arrests in January," (news release, February 11, 2008),
http://www.ice.gov/pi/news/newsreleases/articles/080211sandiego.htm

---

*Overwhelming,* THE PRESS ENTERPRISE, Oct. 30, 2005, *available at*

http://www.pe.com/digitalextra/metro/immigration/vt_stories/PE_News_Local_D_cndicc30.660f9ac.html.

[48] Area ICE Fugitive Operations Teams Record Nearly 150 Arrests in January, *supra* note 33.

[49] As of this report's writing, ICE had only publicly released data on FOT criminal apprehensions from 2003 to February 2008.

[50] Predator arrested by ICE Fugitive Operations Team in Memphis, ICE News Release, Sept. 28, 2007,

http://www.ice.gov/pi/news/newsreleases/articles/070928memphis.htm. ("Of the more than 61,000 illegal aliens arrested by ICE fugitive operations teams since the first teams were created in 2003, roughly 17,331 had criminal convictions.")

[51] According to Secretary Chertoff, the priority system is intended to direct FOT resources to the capture of fugitive aliens with dangerous criminal histories. Letter from Julie Myers, Assistant Secretary of the Department of Homeland Security to Doris Meissner, Senior Fellow, Migration Policy Institute (Aug. 11, 2008) (on file with authors) [hereinafter Letter from Myers to Meissner].

**Figure 5. Percentage of Fugitive Aliens with Criminal Convictions as Share of All Arrests, FY 2007[52]**



*Sources*: ICE, "ICE Multifaceted Strategy Leads to Record Enforcement Results," (news release, October 23, 2008), http://www.ice.gov/pi/nr/0810/081023washington.htm?searchstring=349,041; Letter from Julie Myers, Assistant Secretary of the Department of Homeland Security, to Doris Meissner, Senior Fellow, Migration Policy Institute (August 11, 2008).

### *Nature of Criminal Convictions*

As described above, ICE categorizes the individuals it arrests from 1 ("fugitives posing a threat to the nation") to 5 ("fugitive aliens with no criminal convictions"). Three-quarters of the criminal fugitive aliens arrested in FY 2007 had committed nonviolent crimes,[53] such as shoplifting, placing them in category 4. In other words, these individuals do not pose a threat to national security or to their communities. In fact, fugitive aliens posing a threat to the community or with a violent criminal conviction represented just 2 percent of all FOT arrests in FY 2007.[54]

### *Trends over Time*

Fugitive aliens with criminal convictions constitute not only a small fraction of total FOT arrests, but a steadily decreasing share of the total arrests over time. In 2003, fugitive aliens with criminal convictions represented 32 percent of the total FOT arrests.[55] By 2006, that

---

[52] As of the writing of this report, ICE had not publicly released data about the incidence of criminal convictions among fugitive alien arrests in FY2008.

[53] According to information released by ICE, FOTs arrested 2,005 Priority 4 fugitive aliens in FY2007. That year, FOTs arrested 2,677 criminal fugitive aliens. Letter from Myers to Meissner, *supra* note 51.

[54] According to ICE information, FOTs arrested 672 fugitive aliens posing a threat to the community or with violent criminal convictions in FY2007. *Id.* FOTs arrested 30,407 individuals in FY2007. ICE Multifaceted Strategy Leads to Record Enforcement Results: Removals, criminal arrests, and worksite investigations soared in fiscal year 2008, ICE, October 23, 2008, http://www.ice.gov/pi/nr/0810/081023washington.htm.

[55] According to information released by ICE, FOTs arrested 613 fugitive aliens with criminal convictions in FY2003. Letter from Myers to Meissner, *supra* note 51. FOTs arrested 1,901 individuals total that year. *See* Table 3.

figure had dropped to 17 percent.[56] As mentioned earlier, by 2007, criminal fugitive aliens represented under 9 percent of the total arrests made by FOTs.[57]

**Figure 6. Fugitive Aliens with Criminal Convictions as a Percentage of all Fugitive Operations Team Arrests, FY 2003 to FY 2007:[58]**



*Source: August 11, 2008 letter from Homeland Security Assistant Secretary Julie Myers to MPI Senior Fellow Doris Meissner*

The share of fugitive aliens with criminal convictions declined most dramatically after the directive for 1,000-arrests-per-team quota was issued in January 2006. Since then, fewer and fewer of FOT arrests have been the fugitive aliens with criminal convictions whom the program was established to target.

While public arrest data for FY 2008 were incomplete as of this writing, the available statistics demonstrate that individuals with criminal histories continue to represent only a fraction of overall NFOP apprehensions. According to ICE press releases issued in late June 2008, the Chicago ICE office apprehended 1,167 individuals from October 1, 2007 through May 31, 2008. Of that total, 14 percent (164) had criminal histories.[59] During that same period, the ICE office in Bloomington, Minnesota reported that it had arrested 542 individuals; 19 percent (103) had criminal convictions.[60] In Boston, 10 percent (130) of the 1,283 apprehended individuals had criminal convictions.[61]

[56] According to information released by ICE, FOTs arrested 2,645 fugitive aliens with criminal convictions in FY2006. Letter from Myers to Meissner, *supra* note 51. FOTs arrested 15,462 individuals total that year. *See* Table 3.
[57] According to information released by ICE, FOTs arrested 2,677 fugitive aliens with criminal convictions in FY2007. Letter from Myers to Meissner, *supra* note 51. FOTs arrested 30,407 individuals total that year. *See* Table 3.
[58] As of the writing of this report, ICE had not publicly released data about the incidence of criminal convictions among fugitive alien arrests in FY2008.
[59] ICE Fugitive Operations Team Arrests 48 Illegal Aliens in 5-Day Operation, ICE News Release, June 26, 2008, http://www.ice.gov/pi/news/newsreleases/articles/080626gardencity.htm.
[60] ICE Fugitive Operations Team Arrests 44 Absconders, Illegal Aliens in Nebraska, ICE News Release, June 25, 2008, http://www.ice.gov/pi/news/newsreleases/articles/080625omaha.htm.
[61] ICE Fugitive Operations Team Arrest 42 in Rhode Island, ICE News Release, June 12, 2008, http://www.ice.gov/pi/news/newsreleases/articles/080612providence.htm.

**Table 3. Apprehensions by Priority Category, FY 2003-2007**

| Fiscal Year | Category 2-4 fugitive aliens (criminal history or danger to community) | | Category 5 fugitive aliens (no criminal convictions) | | Ordinary Status Violators | | Total arrests |
|---|---|---|---|---|---|---|---|
| | Number | % of total arrests | Number | % of total arrests | Number | % of total arrests | Number |
| 2003 | 613 | 32 | 946 | 50 | 341 | 18 | 1,900 |
| 2004 | 2,596 | 39 | 2,689 | 41 | 1,299 | 20 | 6,584 |
| 2005 | 2,416 | 30 | 3,365 | 42 | 2,178 | 27 | 7,959 |
| 2006 | 2,645 | 17 | 7,464 | 48 | 5,353 | 35 | 15,462 |
| 2007 | 2,677 | 9 | 15,646 | 51 | 12,084 | 40 | 30,407 |

*Notes:* Categories 2-4 represent fugitive aliens (people with removal orders) *with* criminal convictions or whom ICE deems a danger to the community. Category 5 is for fugitive aliens (people with removal orders) *without* criminal convictions. Ordinary status violators are individuals without removal orders, whose cases not been heard by an immigration judge (the incidence of criminal convictions among that population is not available).
*Sources:* Letter from Myers to Meissner; ICE, "ICE Multifaceted Strategy Leads to Record Enforcement Results," (news release, October 23, 2008),
http://www.ice.gov/pi/nr/0810/081023washington.htm?searchstring=349,041.

## *Funding*

Even as the percentage of arrests of fugitive aliens with criminal convictions declines, Congress has appropriated ever more money for NFOP. According to data released by ICE, the number of fugitive aliens with criminal convictions arrested by FOTs remained relatively constant between FY2004 and FY2008. Congressional allocations to NFOP, by contrast, grew 17-fold over the same period.

**Table 4. Congressional Funding to NFOP Relative to Arrests of Criminal Fugitive Aliens, FY 2004-2008**

| Year | Number of fugitive aliens with criminal convictions arrested (Categories 2-4) | Congressional funding to NFOP |
|---|---|---|
| 2004 | 2,596 | $12,683,962 |
| 2005 | 2,416 | $79,049,000 |
| 2006 | 2,645 | $121,852,000 |
| 2007 | 2,677 | $183,200,000 |
| 2008 | N/A | $218,945,000 |

*Note:* Complete data for FY 2008 is not available at the time of writing. Partial-year data, however, indicates that in FY 2008 arrests of criminal fugitives rose, in absolute and percentage terms, and that arrests of nonfugitives declined on a percentage basis.
*Sources:* Letter from Myers to Meissner; Fact Sheet: Fiscal Year 2008, ICE, December 28, 2007, http://www.ice.gov/doclib/pi/news/factsheets/2008budgetfactsheet.pdf ; Fact Sheet: Fiscal Year 2007, ICE, February 5, 2006,
http://www.ice.gov/doclib/pi/news/factsheets/2007budgetfactsheet.pdf; Fact Sheet: Fiscal Year 2006, ICE, February 5, 2006,
http://www.ice.gov/doclib/pi/news/factsheets/2006budgetfactsheet.pdf; Fact Sheet: Fiscal Year 2005, ICE, February 5, 2006,
http://www.ice.gov/doclib/pi/news/factsheets/2005budgetfactsheet.pdf; OIG REPORT 6.

### Arrests of Ordinary Status Violators

Perhaps even more significant than the number of low-priority fugitive alien apprehensions is the substantial percentage of ordinary status violators among all FOT arrests. Then-Secretary Chertoff emphasized that FOTs' "policy is to focus their efforts on specific fugitive aliens at specific locations," and not "to conduct 'raids,' or take an ad hoc approach to enforcing immigration law."[62] The data, however, are inconsistent with this claim and indicate that ordinary status violators represent a significant share of overall FOT arrests.

According to the OIG report, DRO made 49,473 arrests from 2003 to June 2006.[63] Of that total, 37,443 were fugitive aliens. The other 12,030 (24 percent) were ordinary status violators.

**Figure 7. FOT Apprehensions by Type of Alien, 2003 to June 2006**



**Ordinary Status Violators:** 12,030
**Fugitive aliens:** 37,443
**Total arrests:** 49,473

*Note*: DRO changed adopted the 1,000-per-team quota in January 2006.
*Source*: DHS Office of the Inspector General Report 8, 18.

That proportion, however, changed substantially in subsequent y ears. In 2006, 35 percent of the 15,462 individuals arrested by FOTs were ordinary status violators, not fugitive aliens.[64] The following year, FOTs arrested 12,085 ordinary status violators,[65] or 40 percent of the 30,407 total FOT arrests in FY 2007. The percentage of arrests of ordinary status violators doubled from 2004[66] to 2007 (see Figure 8). Operation Return to Sender, a major nationwide

---

[62] Letter from Secretary of Homeland Security Michael Chertoff to US Sen. Christopher Dodd (June 14, 2007), *available at* http://www.nytimes.com/packages/html/nyregion/20070723Chertoff.pdf.
[63] OIG REPORT, *supra* note 7, at 18. These statistics do not reflect FOT apprehensions, but rather apprehensions by *all* DRO officers as well as local law enforcement agents working in accordance with NCIC information. The OIG report notes that DRO recordkeeping is inadequate in this regard and does not allow for specific findings about FOT apprehension rates. "[B]ecause [DRO] reported apprehensions made by team and nonteam members, the statistics presented . . . overestimate the teams' productivity." OIG REPORT, *supra* note 7, at 9.
[64] FOTs arrested 10,109 fugitive aliens in FY2006. Letter from Myers to Meissner, *supra* note 51.
[65] FOTs arrested 18,323 fugitive aliens in FY2007. *Id.*
[66] FOTs arrested 5,285 fugitive aliens in FY2004. *Id.* Accordingly, ordinary status violators represented 20 percent of the 6,584 total individuals arrested by FOTs.

FOT initiative undertaken in May and June 2006, illustrates the general trend since 2003: FOTs arrested 2,179 individuals — 71 percent — of them ordinary status violators.[67]

**Figure 8. Ordinary Status Violators as Percent of Total FOT Arrests, FY 2003-2008**



*Sources*: Letter from Myers to Meissner; Figure 3 (above).

Although ICE has not released full data with respect to NFOP apprehensions in FY2008 at the time of writing, available data show that the share of ordinary status violators decreased in FY2008. It remains unclear, however, whether the decrease is the result of a specific policy change. According to ICE: "In fiscal year 2008, ICE's NFOP has made 34,000 arrests nationwide, which included more than 25,000 fugitives."[68]

## IV. Issues and Analysis

The large number of ordinary status violators arrested by FOTs naturally raises concerns about their practices, policies, and conduct. Here we focus on use of investigative resources, metrics of success, the failure to distinguish *in absentia* removal orders, community relations, and officer safety and liability. The larger picture that emerges from examining these areas is stark: ICE is out of touch with well-established norms in law enforcement, and its approach to fugitive aliens is inefficient and costly.

---

[67] ICE Apprehends More than 2,100 Criminal Aliens, Gang Members, Fugitives, and Other Immigration Violators in Nationwide Interior Enforcement Operation, ICE News Release, June 14, 2006, http://www.dhs.gov/xnews/releases/press_release_0926.shtm.
[68] 84 Aliens Arrested by ICE Fugitive Operations Teams in the Dallas Area, ICE News Release, Dec. 19, 2008, http://www.ice.gov/pi/nr/0812/081219dallas.htm.

## Use of Investigative Resources

Then-Secretary Chertoff emphasized that "DHS must be an effective steward of public resources."[69] Effectuating that vision for "greater efficiency and effectiveness throughout the entire system," he explained, requires "willingness to set priorities [and] disciplined execution of those priorities."[70]

Since its inception, NFOP has been described and justified as a program that promotes national security. In news releases, public remarks, budget proposals, and congressional testimony, DHS officials have consistently stated that the program is intended primarily to apprehend and remove threats to national security and dangerous criminal fugitive aliens.[71]

In keeping with those objectives, DHS has designed a detailed priority system for NFOP, in which the apprehension of fugitive aliens who pose threats to national and community security is explicitly assigned a higher priority than apprehension of fugitive aliens without criminal records or unauthorized immigrants who do not have outstanding removal orders.

Insofar as those statements and priorities reflect the underlying NFOP goals, there is a significant disparity between the program's stated goals and its actual results. Secretary Chertoff argued generally that ICE resources generally should "focus on drug dealers and terrorists," and not rounding up "maids and landscapers."[72] However, the above evidence shows that the vast majority of individuals apprehended by FOTs either represent the lowest-priority fugitive aliens (Category 5 noncriminal fugitive aliens) or fall outside the priority system entirely (nonfugitive ordinary status violators). In FY 2007, for example, 40 percent of the 30,407 individuals arrested by FOTs were ordinary status violators – not fugitives at all. If the priority system is to be meaningful and the program to focus on its underlying criminal removal and national security goals, resources must be directed in a more disciplined and targeted manner.

The majority of the arrests of ordinary status violators presumably occur because such individuals happen to be nearby while FOTs conduct their operations. ICE has argued that FOT agents are sworn to uphold immigration laws and therefore obliged to arrest all violators.[73] However, exercising discretion with respect to immigration apprehensions is well within ICE's power — and necessary for the administration of safe, efficient, and sustainable operations.[74] Indeed, FOTs are not designed, equipped, mandated, or funded to be general, roving enforcers of immigration law.

---

[69] Secretary Michael Chertoff, US Department of Homeland Security Second Stage Review Remarks (July 13, 2005), *available at* http://www.dhs.gov/xnews/speeches/speech_0255.shtm.

[70] *Id.*

[71] *See, e.g.,* Fugitive Operations Teams Active Across the Country, Inside ICE, June 27, 2007, *available at* http://www.ice.gov/pi/news/insideice/articles/InsideICE_070626_Web4.htm.

[72] *Immigration Breakthrough Could Pave Way for Citizenship,* CNN, May 18, 2007, http://www.cnn.com/2007/POLITICS/05/17/senate.immigration/index.html ("Right now, I've got my Border Patrol agents and my immigration agents chasing maids and landscapers. I want them to focus on drug dealers and terrorists").

[73] *See, e.g.,* Andres Viglucci, *Immigration Targeted Family, Activist Says,* MIAMI HERALD, March 4, 2008 ("In an e-mailed response to a request for comment, ICE spokeswoman Barbara Gonzalez…added: 'What I can tell you is that ICE officers are sworn to uphold our nation's immigration laws. Those who are in violation of US law should not be surprised if they are arrested.'").

[74] *See, e.g.,* GAO REPORT, *supra* note 19.

Both of the major independent reports written about NFOP have noted the importance of making targeted decisions about whom to arrest. The Government Accountability Office (GAO) pointed out in an October 2007 report that ICE, as a whole, already regularly exercises discretion about whom to apprehend in the course of operations: "[ICE] [o]fficers noted that several factors — such as the availability of detention space, travel time to an alien's location, and competing enforcement priorities — affect their decisions to initiate removal action against an alien." The GAO report also argued for greater use of discretion as a strategic matter: "[B]ecause of limited resources [ICE agents] have to make trade-offs between dedicating resources to aliens who pose a threat to public safety and those who do not — that is, noncriminal aliens. . . . [I]n some instances [this] result[s] in decisions to not initiate removal action against noncriminal aliens."[75]

Based on its audit, the OIG's initial report called upon ICE to "[u]se Fugitive Operations Team members solely for apprehending fugitive aliens with unexecuted final orders of removal or closing fugitive alien cases."[76] In support of that recommendation, the OIG referenced the Detention and Deportation Officer's Field Manual, which provided that FOTs "[s]hall *only* be assigned to fugitive cases with an emphasis on backlog cases" and "shall *not* be assigned to any duties that will deter them from conducting fugitive operations . . . including collateral duties normally accomplished by general assignment deportation officers."[77]

This exercise of discretion falls squarely in line with then-Secretary Chertoff's insistence upon the "disciplined execution of [ICE] priorities."

### Metrics for Success

The 1,000-arrests-per-team guidance established in January 2006 places significant pressure on FOTs to make hundreds of arrests.[78] And the agency's crediting of nonfugitive arrests towards that 1,000-arrest total channeled that overarching pressure towards enforcement against nonfugitives. For example, the arrest of an unauthorized mother who has no criminal history or outstanding removal order counts as much as the arrest of a fugitive alien who deliberately disregarded his removal order and who poses a serious risk to national security. Therefore, the quota system, and its crediting of nonfugitive arrests, does not encourage FOTs to direct scarce resources to higher-priority apprehensions; in fact, assuming it is more resource intensive to capture one person who threatens national security than ten arbitrary unauthorized immigrants, a team determined to reach 1,000 arrests would be wise to ignore hard-to-locate national security threats and concentrate on the least dangerous immigrants, including nonfugitives.

---

[75] *Id.* at 12.

[76] OIG REPORT, *supra* note 7, at 50.

[77] *Id.* at 49-50 (citing the Detention and Deportation Officer's Field Manual, Ch. 19, Sec. 4.1) (emphasis added). The OIG's recommendation that FOTs be used solely for apprehending fugitive aliens was later revised after ICE contested the recommendation and suggested that the OIG instead recommend that DRO "[a]ssign Fugitive Operations Team members in a manner consistent with its Detention and Deportation Officer's Manual or amend the manual to reflect current assignment practices." OIG REPORT, *supra* note 7, at 54.

[78] OIG REPORT, *supra* note 7, at 8; *see also* text accompanying note 44.

Indeed, research has shown that law enforcement quotas are highly susceptible to abuse and typically function to distract law enforcement officials from core public safety objectives. Professor Mary Fan of American University Washington College of Law recently observed that "[f]ocusing solely on output without consideration of contextual factors penalizes rather than recognizes the courage and integrity to go after the hard case that actually impacts crime."[79]

Police arrest quotas were widely discredited in the 1980s on the grounds that they "collapse qualitative difference and incentivizing undesirable behavior because of statistical pressure."[80] In the traffic violation context, for example, police officers concerned about meeting quotas have been known to "select easy targets . . . regardless of an officer's opinion of the seriousness of an offense or public safety implications."[81]

Many states, including California, Maryland, Florida, Connecticut, North Carolina, Minnesota, Nebraska, New Jersey, and Texas, have barred law enforcement agencies from establishing "formal or informal quota[s] for the law enforcement agency or law enforcement officers of the agency."[82]

FOT quotas run the risk of replicating these disincentives. In fact, quotas may be particularly troubling in the immigration context because the relative cost of apprehending an unauthorized immigrant is starkly different from the cost of identifying, targeting, and apprehending a *specific*, preidentified, high-priority fugitive alien. The Pew Hispanic Center estimated in 2006 that there were 11.5 to 12 million unauthorized immigrants living in the United States.[83] ICE estimates there are 557,762 fugitive aliens[84] — including those with no criminal records and those who were ordered removed *in absentia* (meaning they were not present at the hearing in which they were ordered removed). Fugitive aliens, then, represent approximately 5 percent of the total number of unauthorized immigrants in the United States, and high-priority fugitive aliens with criminal convictions constitute an even smaller fraction.[85] A quota system that does not distinguish among the different types of immigration violators *de facto* incentivizes arrests of ordinary status violators and the least dangerous fugitives, and undermines the principle that "DHS must base its work on priorities that are driven by *risk*."[86]

---

[79] Mary D. Fan, Disciplining Criminal Justice: The Peril Amid the Promise of Numbers, 26 YALE J. L. & POL'Y 1, 27 (2007).
[80] *Id.*
[81] Illya Lichtenberg, Police Discretion and Traffic Enforcement: A Government of Men?, 50 CLEV. ST. L. REV. 425, 445 (2002).
[82] Md. Code Ann., Pub. Safety, § 3-504(b) (2006); *see also* Ark. Code Ann. §§ 12-6-301 to -303 (West 2007) (arrest and citation quotas); Cal. Veh. Code §§ 41600-41603 (West 2007) (citation and arrest quotas); Conn. Gen. Stat. Ann. §§ 7-282d, 29-2b (West 2007) (traffic ticket quotas); Fla. Stat. Ann. § 316.640(1)(a)(2) (West 2007) (traffic citation quotas); Minn. Stat. Ann. §§ 169.985, 299D.08 (West 2007) (traffic citation quota); Md. Code Ann., Pub. Safety, § 3-504(b)(1) (2007) (arrest and citation quotas); Mont. Code Ann. § 46-6-420 (2007) (arrest and citation quotas); Neb. Rev. Stat. § 48-235 (2007) (traffic citation quotas); N.C. Gen. Stat. § 20-187.3(a) (2007) (traffic citations or ticket quotas); N.J. Stat. Ann. §§ 40A:14-181.1, 40A:14-181.2a (West 2007); Tex. Transp. Code § 720.002 (Vernon 2007) (traffic citations) (citing Fan, *supra* note 79, at 25 n.122).
[83] JEFFREY S. PASSEL, PEW HISPANIC CENTER, THE SIZE AND CHARACTERISTICS OF THE UNAUTHORIZED MIGRANT POPULATION IN THE US (2006), *available at* http://pewhispanic.org/files/reports/61.pdf.
[84] Border Security and Immigration Enforcement Fact Sheet, Oct. 23, 2008, ICE, http://www.dhs.gov/xnews/releases/pr_1224777640655.shtm.
[85] The precise number of high-priority fugitive aliens cannot be calculated because ICE has not released data about Priority 1 fugitive aliens. Letter from Myers to Meissner, *supra* note 51.
[86] Second Stage Review Remarks, *supra* note 69 (emphasis added).

### Failure to Distinguish *In Absentia* Orders

Efficient use of resources requires that ICE focus not simply on apprehensions but also on actual *removals*. Indeed, ICE has articulated the importance of "[m]oving towards a 100 percent removal rate for all removable aliens."[87] However, ICE has released little information about the removal rates of the individuals FOTs apprehended; its statistics focus instead almost entirely on the number of arrests.

In contrast to ordinary status violators, who generally have had no contact with ICE their arrest by an FOT, many of the fugitive aliens arrested by FOTs have been ordered removed *in absentia*. The *New York Times* reported in 2004 that two-thirds of removal orders are entered *in absentia*.[88] While some cases no doubt involve an intentional absence, in many other cases, the person has never received the hearing notice or is unaware of a resulting removal order for a number of common reasons: the immigration database might have inaccurate information about the person, causing notices to be sent to a wrong address;[89] the agency might have misplaced the person's change-of-address notice;[90] or the person's removal process as a whole might be plagued with administrative errors.

In addition to concerns about fairness and reasonable notice, removing a person with an *in absentia* order takes substantially longer than other removals and is particularly costly. To ensure constitutional due process in immigration proceedings, the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, permits a person to move to reopen an *in absentia* order "at any time" based upon a lack of proper notice of a hearing,[91] and provides for an automatic stay pending a decision by the immigration judge on any such motion.[92] Denial of a motion to reopen is subject to appeal to the Board of Immigration Appeals (BIA) and the appropriate US Court of Appeals. Thus, the removal of a person with an *in absentia* order is likely to be substantially more expensive than other removals; greater judicial resources and bed space are required due to the likelihood of lengthy administrative processes.[93]

### Impacts on Community Relations

Like most law enforcement activities, the ultimate success of ICE operations depends substantially on the degree of cooperation the agency receives. ICE frequently relies on state,

---

[87] ENDGAME, *supra* note 2, at 2-2.
[88] Nina Bernstein, *Old Deportation Orders Put Many Out Unjustly, Critics Say*, N.Y. TIMES, Feb. 19, 2004; *see also* NATIONAL IMMIGRATION FORUM, BACKGROUNDER: IMMIGRATION LAW ENFORCEMENT BY STATE AND LOCAL POLICE (2007), *available at* http://www.immigrationforum.org/documents/TheDebate/EnforcementLocalPolice/Backgrounder-StateLocalEnforcement.pdf.
[89] *See supra* text accompanying notes 21 and 22.
[90] *See, e.g.,* NATIONAL IMMIGRATION FORUM, SUMMARY OF SENATE IMMIGRATION REFORM LEGISLATION, (2006), *available at* http://www.immigrationforum.org/documents/PolicyWire/Legislation/SenBillPassedSummary.pdf ("It is worth noting that INS acknowledged that it had failed to record hundreds of thousands of change of address notices that were filed by immigrants").
[91] INA § 1229a(b)(5)(C).
[92] By law, a motion to reopen an *in absentia* deportation order (as opposed to a removal order) based on lack of notice results in an automatic stay during the pendency of the motion before an immigration judge and any appeal to the BIA. INA § 240(b)(5)(C) (1995).
[93] ICE estimates that a bed space for a single unauthorized immigrant costs taxpayers $97 per night, with additional costs associated with personnel. US Senate Committee on Homeland Security and Governmental Affairs Pre-hearing Questionnaire for the Nomination of Julie Myers to be Assistant Secretary, Department of Homeland Security, at 48.

local, and tribal law enforcement agencies for logistical and personnel support. In addition, businesses, civic institutions, and individual community residents must offer local knowledge and tips in order for FOT operations to function effectively. Accordingly, a compelling concern is that many business organizations, labor unions, faith leaders, community groups, local elected officials, and media commentators have reacted with fear and anger to FOT conduct and practices. Even the *perception* that FOTs are abusive jeopardizes community acceptance and support, and places FOTs in an adversarial stance toward the communities in which they work. Such poor community relationships can undermine ICE's effectiveness and endanger officers and civilians alike.

Critics have faulted ICE for detaining sole caretakers and nursing mothers, disregarding arrestees' significant health conditions, and failing to notify relatives and friends about detainees' whereabouts. Police departments have objected to ICE failures to advise them in advance of major operations.[94] School officials have reported sharp drops in attendance following FOT operations, and law enforcement agents have criticized the chilling effect of FOT operations on crime reporting, witness cooperation, and overall community policing strategies.[95] Local officials have condemned the operations, and cities have passed resolutions calling on ICE to cease its operations in their localities.[96] Media coverage critical of the program has been common.[97]

### Officer Safety and Liability

According to ICE, "[t]he foremost goal of ICE enforcement personnel is officer safety and public safety."[98] The reality of NFOP operations, however, may involve highly dangerous situations for FOTs and state or local police officers due to poor coordination and information. FOT agents who enter a private home with unreliable intelligence and without a warrant are at heightened risk of error or attack. This is particularly true in the case of FOTs, which often conduct residential enforcement operations and regularly make arrests without individualized warrants. Indeed, agents may already be creating dangerous situations. In October 2007, for example, the *New York Times* reported that in two instances when

---

[94] Raquel Aldana, *Of Katz and 'Aliens': Privacy Expectations and the Immigration Raids*, 41 U.C. DAVIS L. REV. 1081, 1115; Letter to Mayor Gavin Newsom from Ronald E. LeFevre, ICE, *supra* note 19.

[95] Jessie McKinley, *San Francisco Bay Area Reacts Angrily to Series of Immigration Raids*, N.Y. TIMES, Apr. 28, 2007; Julia Harumi Mass & Philip Hwang, *Immigration Raids Trample the Constitution Without Securing the Nation*, ACLU DAILY JOURNAL, July 10, 2007, *available at*

http://www.aclunc.org/news/opinions/immigration_raids_trample_the_constitution_without_securing_the_nation.shtml. In testimony before a congressional subcommittee in May 2008, elementary school principal Kathryn Gibney reported: "On a day when we were scheduled to administer the state exams, 40 students were absent – seven times the normal absentee rate. Throughout the day, muted and trembling voices asked teachers if agents would come to school and take them away, what would happen to their mommy or daddy or aunt or uncle, and what would happen to them." Kathryn M. Gibney, Principal, San Pedro Elementary School, Testimony before the Subcommittee on Workforce Protections of the US House of Representatives Education and Labor Committee (May 20, 2008), *available at* edlabor.house.gov/testimony/2008-05-20-KathrynGibney.pdf.

[96] McKinley, *supra* note 95.

[97] *See, e.g.*, Jennifer Radcliffe, *Students Suffer When Migrants Rounded Up*, HOUSTON CHRONICLE, Oct. 24, 2008; Bernstein, *Raids Were a Shambles*, *supra* note 22; Bernstein, *Hunts for 'Fugitive Aliens' Lead to Collateral Arrests*, *supra* note 26; McKinley, *San Francisco Bay Area Reacts Angrily to Series of Immigration Raids*, *supra* note 95; Nina Bernstein, *US Raid on an Immigrant Household Deepens Anger and Mistrust*, N.Y. TIMES, Apr. 10, 2007.

[98] Letter from Karyn Lang, Director, Office of Congressional Relations, ICE, to US Representative Anna G. Eshoo (Mar. 29, 2007) (on file with authors).

FOTs were entering homes in Nassau County, the agents mistakenly drew their guns on Nassau County police detectives.[99]

The Supreme Court has long recognized that warrants and advance intelligence in police settings are critical not only as a constitutional matter but also for basic officer safety. Justice Robert H. Jackson, for example, wrote in 1948 about the particular dangers associated with undertaking police operations without a search warrant: "When a woman sees a strange man, in plain clothes, prying up her bedroom window and climbing in, her natural impulse would be to shoot [him] . . . . I have no reluctance in condemning as unconstitutional a method of law enforcement so reckless and so fraught with danger and discredit to the law enforcement agencies themselves."[100] More recently, the Supreme Court emphasized the importance of so-called knock-and-announce rules for officers entering residences, in order to "protect . . . human life and limb, because an unannounced entry may provoke violence in supposed self-defense by the surprised resident."[101]

Considering the risks, it seems reasonable to expect that FOTs receive extensive training. As the International Association of Chiefs of Police has warned, "[f]ailure to train effectively carries significant ramifications, risks and liability."[102] However, FOTs lack sufficient training for their jobs. Both the OIG and GAO have called for more extensive, consistent, and specific training for FOT agents. The OIG report noted that although ICE provides a three-week training module for FOT agents in addition to basic law enforcement training, many team members have never attended the training program.[103] The OIG also expressed concern that ICE offers no national in-service or "refresher" training to provide information about changes in department policy or developments in immigration law.[104] Similarly, GAO pointed out that NFOP lacks mechanisms "to help ensure that officers receive consistent information regarding legal developments."[105] Consequently, GAO concluded, ICE officers are at heightened risk "of taking actions that do not support the agency's operational objectives" and running afoul of legal and constitutional requirements.[106]

Protecting officer safety is particularly important in the context of FOT operations. Residential immigration enforcement generally represents a significant departure for immigration officers. The complexities of immigration enforcement in residential settings are unique and are more typically handled by local law enforcement agencies. Thus, existing guidance is less likely to account for the unique legal, humanitarian, and safety issues involved.

ICE's position on training and educating its FOTs stands in stark contrast to standards in state and local law enforcement agencies, which have long appreciated the importance of

---

[99] Nina Bernstein, *Raids Were a Shambles*, *supra* note 22.
[100] *McDonald v. US*, 335 U. S. 451, 460-61 (1948) (Jackson, J., concurring). *See also Miller v. US*, 357 U.S. 301, 313 n.12 (1958) ("Compliance is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder").
[101] *Hudson v. Michigan*, 547 U. S. 586, 594 (2006).
[102] INTERNATIONAL ASSOCIATION OF CHIEFS OF POLICE, POLICE CHIEFS GUIDE TO IMMIGRATION ISSUES (2007), *available at* www.theiacp.org/documents/pdfs/Publications/PoliceChiefsGuidetoImmigration.pdf.
[103] OIG REPORT, *supra* note 7, at 29-30.
[104] *Id.* at 30-31, 38.
[105] GAO REPORT, *supra* note 19, at 17.
[106] *Id.*

taking proactive measures. For example, in its training materials, the Seattle Police Department encourages officers to focus on *dangerousness* when deciding whether to make an arrest ("[a]rrest quotas . . . should be avoided"). The department's training materials also express concern about database accuracy ("[d]on't rely solely on computer information that may be stale or otherwise erroneous") and call attention to the importance of individualized probable cause in order to avoid civil liability.[107]

As with any law enforcement agency, ICE should prioritize shielding itself from litigation and civil liability. Lawsuits demand time and resources and generate negative publicity and community resentment.

However, ICE faces numerous lawsuits challenging FOT practices. Cases are pending in Minnesota, Connecticut, New Jersey, New York, and California, among other locations.[108] The lawsuits seek damages for alleged FOT misconduct, such as unreasonable entry, illegal search and seizure, wrongful arrest, and racial profiling. Some plaintiffs have alleged that FOTs "regularly disregarded the obligation to secure a judicial warrant or probable cause in carrying out unlawful entries and dragnet searches of homes in which the agents only loosely suspect immigrant families may reside" and that they "conduct home raids without reasonable grounds for believing that the purported target of their search is present in the home being raided."[109]

Furthermore, litigants have contended that ICE has "conducted a campaign of intimidation . . . by identifying locations such as trailer parks and apartment buildings with known concentrations of Latino residents, then conducted unconstitutional stops and detentions of individuals based solely on the individual's race or apparent national origin."[110]

Irrespective of the outcome of these suits, the accusations are serious, the litigation is costly, and the negative media attention is considerable.

---

[107] Leo Poort, *Tips for Avoiding Civil Liability Lawsuits*, SEATTLEPI.COM, Feb. 27, 2008, http://seattlepi.nwsource.com/specials/strongarm/docs/obstruction/tipsforpolice.asp. The specific legal requirements for warrants and probable cause differ somewhat in the immigration context, but the importance of complying with constitutional search and seizure requirements in order to avoid civil liability applies equally to immigration operations.
[108] *See, e.g.,* Complaint, *Arias et al. v. US Immigrations and Customs Enforcement*, No. 07-CV-1959 (D. Minn. July 27, 2007), *available at* http://www.ailf.org/lac/chdocs/Arias-ammcmpl.pdf (Minnesota); Complaint, *Barrera et al. v. Boughton et al.*, No. 3:07-cv-01436-RNC (D. Conn., November 26, 2007), *available at* http://www.ailf.org/lac/chdocs/barrera-complaint.pdf (Connecticut); Complaint, *Reyes v. Alcantar* (N.D. Cal. April 26, 2007), *available at* http://www.ailf.org/lac/chdocs/Reyes-Complaint.pdf (California); Amended Class Action Complaint, *Aguilar et al. v. US Immigrations and Customs Enforcement*, No. 07 CIV 8224 (S.D.N.Y. October 4, 2007), *available at* http://www.ailf.org/lac/chdocs/Aguilar-complaint.pdf (New York); Complaint, *Flores et al. v. Myers* (D. N.J. April 3, 2008), *available at* http://law.shu.edu/csj/ice/complaint.pdf (New Jersey).
[109] Complaint, *Flores et al. v. Myers* (D. N.J. April 3, 2008), *available at* http://law.shu.edu/csj/ice/complaint.pdf (New Jersey).
[110] Memorandum, *Aguilar v. US Immigrations and Customs Enforcement*, No. 07 Civ. 8224 (S.D.N.Y. Dec. 7, 2007), *available at* http://www.ailf.org/lac/chdocs/Aguilar-msupport-mtd.pdf.

## V. Conclusions and Recommendations

NFOP was established to further important goals: locating, apprehending, and removing fugitive aliens who endanger the nation or their communities. Congress has exponentially increased NFOP's budget to enable ICE to achieve this mission.

Yet ICE's own data indicate NFOP has failed to focus on the priorities it claimed in justifying its program to Congress. Since shifting the objective in January 2006 to 1,000 arrests per fugitive operations team, and crediting arrests of some nonfugitives towards this total, the program has apprehended the easiest targets, not the most dangerous ones.

Furthermore, available data raise concerns about the program's basic design. At present, NFOP is structured as a national security program: officers are armed, appear at residences late at night and early in the morning, and often undertake operations without advising local law enforcement or social services agencies in advance. While these measures may be warranted for a program that solely or largely apprehends dangerous fugitives, this approach, when used to arrest immigrants who have no criminal history, may lead to excessive force, overuse of high-powered weapons, and other escalations. In addition, FOTs do not have adequate information or training to perform their jobs, placing themselves at risk, wasting resources, alienating communities, and exposing the agency to costly lawsuits. Clearly, NFOP needs more rigorous and comprehensive management and evaluation to ensure it meets its stated goals safely and efficiently.

### Recommendations

**Recommendation 1:** NFOP should replace the 1,000-arrests-per-team annual quota with a system that prioritizes arresting dangerous fugitives over all others.

Rather than binding itself to rigid arrest quotas, NFOP should set numerical objectives that reflect the program's goals and congressionally endorsed priorities. Specifically, NFOP should require that FOTs focus on *dangerous* fugitive aliens – those currently classified as threats to national security or the community, or with a violent criminal history. Between 2004 and January 2006, NFOP directed its teams to ensure that fugitive aliens with criminal convictions constituted at least 75 percent of their apprehensions.[111]

Alternatively, the NFOP could impose specific numerical goals for each priority category, which would serve DRO's desire to set and achieve rigorous goals while also reflecting the importance of using resources in a manner consistent with the program's stated goals. Both approaches would restore the program's congressionally-approved focus on *dangerousness* and direct resources to the greatest threats to public safety.
As a general rule, FOTs should not arrest ordinary immigration violators. NFOP was not designed as a general immigration enforcement and removal program, and arresting alleged status violators diverts resources intended for targeting and arresting higher-priority fugitive aliens. Indeed, it is worth noting that new Homeland Security Secretary Janet Napolitano on

---

[111] OIG REPORT, *supra* note 7, at 8.

January 30th issued a directive requiring ICE to examine its plans and policies, including those that differentiate between fugitives and ordinary status violators, so that NFOP can better prioritize its enforcement efforts.[112]

---

**Recommendation 2:** FOTs should approach only targeted houses and persons.

---

Since NFOP was designed to apprehend a specific group of dangerous fugitive aliens, FOTs should approach only targeted houses and persons and not question neighbors, pedestrians on the street, or other bystanders simply because they are nearby when the operation happens.

In addition to ensuring that NFOP uses resources efficiently, approaching only targeted individuals and houses would implement the constitutional command, and longstanding law enforcement value, of individualized suspicion as the touchstone for all investigations. Like other law enforcement officials, FOTs must have reasonable suspicion to question suspected fugitives and probable cause to arrest any person. Requiring individualized suspicion would reduce liability and restore community trust in ICE's enforcement initiatives.

Also, concentrating on specific targets would likely improve officer safety, as FOTs would be less likely to find themselves in risky circumstances. When FOTs approach residences simply because they are near targeted houses, they are less likely to know anything about the individuals inside those houses, to arrive prepared with surveillance or other advance intelligence, and could enter situations that are both inappropriate and dangerous for the agents.

Furthermore, officers should be trained to conduct basic investigations in advance of operations in order to ensure that the fugitive alien in question is likely to be inside of the targeted residence. Agents need not actually visit the home prior to the operation, but should be required to make an appropriate effort, using an improved database and the information accessible at their desks, to confirm to the best of their ability that the targeted person lives at that address and will likely be present at the time of the operation.

---

**Recommendation 3:** NFOP should develop a new protocol explicitly directed to address constitutional and humanitarian concerns that arise during FOT operations All FOT agents should be required to undergo comprehensive training in accordance with this new protocol (as well as periodic refresher trainings), in addition to their basic law enforcement training.

---

At present, fugitive operations agents are required to attend a three-week training session. The training course is conducted at the ICE Academy located at the Federal Law Enforcement Training Center and focuses on "enabl[ing] participants to effectively utilize Internet, database, and other sources of information to locate where a fugitive lives, visits and/or works."[113] According to ICE, there is a chapter in the Officer's Manual regarding

---

[112] Secretary Napolitano Issues Immigration and Border Security Action Directive, ICE News Release, Jan. 30, 2009, http://www.dhs.gov/ynews/releases/pr_1233353528835.shtm. ("Please provide the current metrics of fugitive apprehension and removal (clearly differentiate the number of fugitives that are actually removed versus those aliens unlawfully present who are simply encountered by the teams while on assignment). How can fugitives be more effectively prioritized for these purposes and what steps can be taken to expedite removal?").

[113] National Fugitive Operations Program, ICE, Nov.10, 2008, http://www.ice.gov/pi/dro/nfop.htm; *see also* OIG REPORT, *supra* note 7, at 30.

overall policies and procedures for DRO, including field directives about various aspects of FOT operations.[114] These materials are not publicly available, so it is difficult to assess how comprehensive they are. No formal, binding protocol exists to govern FOT operations.[115]

NFOP's residential focus and the enormous growth of the program call for careful and detailed standards to address officer conduct and community relations. A new, explicit protocol, which state and local law enforcement agencies rely on, is crucial.

At a minimum, any new protocol should require that FOTs:

- properly identify themselves, obtain lawful consent to enter residents' homes, and comply with the constitutional requirements governing their work;
- coordinate with, and provide advance notice to, local law enforcement agencies;
- coordinate with, and provide advance notice to, local social service organizations;
- comply with special guidelines for individuals of humanitarian concern, such as those with medical needs and sole caretakers of minor children;
- promptly issue a list of the people detained and their whereabouts, and share the list with local police and any social service organization that requests it.

In addition, the new protocol should require "refresher trainings" for agents to learn about the constitutional and legal requirements governing their work.[116]

Consistent, thorough, and rigorous training would help to realize congressional and agency commitments that all DHS actions in pursuit of national security take place "within established constitutional and legal limits," and also help NFOP avoid expending its limited financial, legal, and personnel resources defending against litigation.[117]

---

**Recommendation 4:** NFOP should expand its priority system to designate individuals with *in absentia* orders and no criminal history as Category 6.

---

To address the cost, efficiency, and fairness concerns that *in absentia* orders pose, ICE should add a sixth category to the existing priority system for persons with no criminal history who were ordered removed *in absentia*. In light of the real possibility that notice was never received, it makes sense to focus first on individuals who deliberately flouted the law before targeting and apprehending those whose claims for relief may not previously have been heard by any court. Moreover, the removal of individuals with *in absentia* orders is more

---

[114] Phone conversation between Doris Meissner, Migration Policy Institute, and James T. Hayes, Jr., Director, Office of Detention and Removal (Nov. 13, 2008).
[115] *Id.*
[116] According to the GAO's study, "ICE's guidance does not comprehensively address key aspects of the alien apprehension and removal process." GAO REPORT, *supra* note 19, at 34. The Standard Operating Procedure detailed above would replace the current operational manuals, "which are largely unchanged from before the creation of the Department of Homeland Security and ICE's placement in it, do not reflect ICE's expanded . . . fugitive operations, nor do they clearly and comprehensively address humanitarian and other issues associated with these operations." *Id.* at 7.
[117] Neil A. Lewis, *A Nation Challenged: The Hearings; Justice Dept. and Senate Clash over Bush Actions*, N.Y. TIMES, Nov. 29, 2001, *available at* http://query.nytimes.com/gst/fullpage.html?res=9C03E3DD143DF93AA15752C1A9679C8B63.

costly, lengthier, and more uncertain, due to the greater due process requirements entailed in the adjudication of their cases. In other words, these aliens should be NFOP's lowest priority.

---

**Recommendation 5:** ICE should direct substantial NFOP resources to improving the database from which information about fugitive aliens is drawn. Specific standards for database accuracy should be set, achieved, and verified by government audit.

---

Database accuracy is essential for NFOP success because of the specificity of its mandate and the unique invasiveness of residential operations. Although DRO has implemented ENFORCE, a new database system for storing and accessing information about fugitive aliens, the transition is recent and ongoing. Due to the known high degree of flawed information in the predecessor database DACS and ICE's history of chronic data management problems,[118] NFOP should not rely upon existing databases until they meet basic standards of accuracy.

---

**Recommendation 6:** NFOP should redeploy resources when FOTs are unable to identity or pursue dangerous fugitives.

---

FOTs have permanent offices throughout the country, and teams are responsible for apprehending individuals within their specific geographical regions. However, maintaining permanent staffing in areas where there are few high-priority targets or in which high-priority targets cannot be located can lead to high overhead costs and encourage teams to pursue nonpriority apprehensions. Redeploying resources in those situations would ensure that NFOP funds are expended where they are most needed and maximize the program's security goals.

Precisely how NFOP might alter its resource deployment to match its priorities is best left to DRO to determine, but several options are preferable to the status quo. For example, if an FOT in a given region has exhausted leads for Category 1, 2, or 3 fugitives (fugitive aliens who pose a threat to the nation or the community, or who have been convicted of violent crimes), DRO might (a) lend desk-staff time to FOTs in other regions that have leads on high-priority aliens; (b) detail agents to other regions; or (c) lend staff to other ICE programs targeting dangerous individuals in the same region. These programs include Operation Predator, an effort to protect young people from sex offenders, and Operation Community Shield, an effort to dismantle transnational street gangs by, among other things, deporting criminal aliens.[119]

---

[118] *See supra* text accompanying notes 21 and 22.

[119] *See generally* Operation Community Shield: Targeting Violent Transnational Street Gangs, ICE, http://www.ice.gov/pi/investigations/comshield; Fact Sheet: Operation Predator, The White House, July 2004, http://www.whitehouse.gov/news/releases/2004/07/20040707-10.html.

# VI. Appendices

## Appendix 1. ICE, DRO, and NFOP Budgets, FY 2005-2008

| Fiscal Year | ICE Total Budget | DRO Budget | | NFOP Budget | |
|---|---|---|---|---|---|
| | Dollars (in thousands) | Dollars (in thousands) | % of ICE budget | Dollars (in thousands) | % of DRO budget |
| 2005 | 3,557,454 | 1,218,391 | 34.2 | 79,049 | 6.5 |
| 2006 | 4,206,443 | 1,645,370 | 39.1 | 121,852 | 7.4 |
| 2007 | 4,726,641 | 1,984,345 | 42.0 | 183,200 | 9.2 |
| 2008 | 5,581,217 | 2,381,481 | 42.6 | 218,945 | 9.2 |

*Note:* The fiscal 2005 and 2006 budget numbers include enacted and supplemental funding.
*Source:* ICE Fact Sheets, Fiscal Year 2008, ICE, December 28, 2007,
http://www.ice.gov/doclib/pi/news/factsheets/2008budgetfactsheet.pdf ; Fact Sheet: Fiscal Year 2007, ICE, February 5, 2006,
http://www.ice.gov/doclib/pi/news/factsheets/2007budgetfactsheet.pdf; Fact Sheet: Fiscal Year 2006, ICE, February 5, 2006,
http://www.ice.gov/doclib/pi/news/factsheets/2006budgetfactsheet.pdf; Fact Sheet: Fiscal Year 2005, ICE, February 5, 2005,
http://www.ice.gov/doclib/pi/news/factsheets/2005budgetfactsheet.pdf

## Appendix 2. Letter from DHS Assistant Secretary Julie Myers to MPI (See next page)



**U.S. Immigration
and Customs
Enforcement**

AUG **1 1** 2008

Ms. Doris Meissner
Senior Fellow
Migration Policy Institute
1400 16th Street, NW, Suite 300
Washington DC 20036

Dear Ms. Meissner:

I write to thank you for meeting with me for lunch on June 26, 2008. I enjoyed hearing your views as the former Commissioner of the Immigration and Naturalization Service and the challenges you faced as head of that agency. I also write to follow-up on your July 16, 2008, letter related to the National Fugitive Operations Program (NFOP). In that letter, you asked me to inform you of any inaccurate information and to also provide information on the breakdown of the percentages of non-criminal fugitive aliens and immigration violators arrested by the NFOP.

To clarify, the definition of fugitive does not include mere immigration violators, such as individuals that have fallen out of status. Rather, the definition of an ICE fugitive is an alien who has failed to depart the United States pursuant to a final order of removal, deportation or exclusion or who has failed to report to a Detention and Removal Officer after receiving notice to do so. These individuals have been provided the opportunity for a hearing before an immigration judge and have either failed to abide by the judge's order to depart voluntarily or have failed to report to an ICE office after being ordered removed.

The enclosed charts provide a breakdown between criminal and non-criminal fugitive arrests over a six-year period. These charts show a marked increase in the overall arrests of all fugitive aliens since 2003. Most notably, arrests of criminal aliens increased 46 percent from 2007 to 2008. This increase is due to ICE's commitment to focus more resources, including manpower, to locating and finding fugitives within the NFOP's priority docket. In fact, in June 2008 alone, the NFOP targeted over 700 criminal fugitives. These targets will be arrested as quickly as possible. Keep in mind, however, that, criminal fugitives do everything in their power to evade law enforcement authorities, especially ICE.

The charts also reflect an increased number of non-criminal arrests during this six-year period. While ICE and the NFOP continue to focus attention and resources on criminal and dangerous fugitives, ICE would be remiss in its duties if it were to ignore non-criminal fugitives as non-criminal fugitives represent the bulk of fugitive aliens.

I would also like to highlight the remarkable strides ICE has made in other important areas that directly prevent individuals from ever becoming fugitives in the first place. ICE has made significant improvements in its ability to identify removable individuals currently detained in facilities throughout the United States than at any time in the past through the Criminal Alien Program (CAP), the Detention Enforcement and Processing Offenders by Remote Technology (DEPORT) Center, and the 287(g) program. ICE has also improved the coordination of detention facility bed space to prevent removable aliens that pose a danger to the community or are a flight risk from being released into our communities. As such, these individuals are placed into removal proceedings while still in custody and do not ultimately become fugitive aliens. Accordingly, the criminal fugitive alien population is less likely to markedly increase. To provide additional perspective, I will briefly explain how these programs work.

Consistent with ICE's goal of identifying and removing all incarcerated criminal aliens, CAP strives to achieve 100 percent screening at all jails and correctional facilities throughout the United States. ICE has made considerable progress in this area. In fiscal year (FY) 2007, the CAP located and initiated removal proceedings against 164,296 criminal aliens incarcerated in jails and prisons throughout the United States compared to only 67,850 in FY 2006. Not only does the CAP identify removable individuals in state and local jails, but it also presents cases for federal prosecution. In the near future, CAP will reach a milestone of identifying 5,000 federal prosecutions this year alone. The majority of these prosecutions are for illegal reentry after deportation, a felony, but, also include prosecution for illegal entry, unlawful alien in possession of a firearm, and escape or attempted escape from custody.

ICE established the DEPORT Center in 2006. ICE's DEPORT Center makes it possible to identify and screen criminal aliens incarcerated in federal prisons nationally and ensure their immediate removal upon the completion of their sentences. The DEPORT Center remotely interviews inmates from a centralized location. Through the combined effort of the DEPORT Center and local ICE resources, coverage is provided to all 114 federal detention facilities. This dramatic change has resulted in 11,292 charging documents being issued to criminal aliens housed in federal prisons.

The 287(g) program has emerged as a key partnership with local law enforcement that allows ICE to train state and local law enforcement officers in various aspects of immigration enforcement. As of July 23, 2008, ICE entered into 287(g) Agreements with 60 state and local municipalities. Once in place, the 287(g) agreement allows ICE to delegate enforcement powers and responsibilities to state and local agencies. In the last two years, the 287(g) program has identified more than 57,000 illegal aliens for potential deportation, many of whom have criminal arrests or convictions.

ICE is also looking for new ways to encourage individuals to voluntarily comply with an Immigration Judge's order. To that end, ICE launched the Scheduled Departure program on August 5, 2008, in five major metropolitan areas. Scheduled Departure allows fugitive aliens with no criminal history to work with ICE in coordinating their departure. The Scheduled Departure program addresses concerns raised by aliens, community groups, and immigration attorneys who contend ICE unnecessarily disrupts families while enforcing an Immigration Judge's order. By participating in the Scheduled Departure Program, those who have had their day in court and have been ordered to leave the country but have failed to do so, have yet another opportunity to comply with the law and control how their families are affected by their removal. ICE recognizes there are those less inclined to accept the intentions of such a compassionately conceived enforcement initiative, but ICE remains committed to providing sensible alternatives that balance the welfare of the individuals and families in question with ICE's clear obligation to uphold the law. The ICE press release on Scheduled Departure is enclosed for your convenience, and we would be grateful for your support of this new pilot program.

With our recent successes and the continued operation of these programs, ICE does not anticipate that the fugitive criminal population will increase in the foreseeable future. Rather, ICE expects an annual decrease in the number of criminal fugitive aliens. As the criminal fugitive population decreases, the NFOP is able to focus on the remaining non-criminal fugitives.

Thank you once again for your interest in this matter.

Sincerely,

Julie L. Myers
Assistant Secretary

Enclosures



**Priority Breakdown**
**Fugitive Operations Arrests**



| | | |
|---|---|---|
| Priority 1 | Fugitives that pose a threat to national security ⊗ |
| | Fugitives that pose a threat to the community |
| Priority 3 | Fugitives convicted of violent crimes |
| Priority 4 | Fugitives with criminal convictions |
| Priority 5 | Fugitives that are non-criminal |

| FY | | Priority 3 | Priority 4 | Total Crim | | Priority 5 | Total Non-Crim |
|---|---|---|---|---|---|---|---|
| 2003 | 77 | 88 | 448 | 613 | | 946 | 946 |
| 2004 | 187 | 310 | 2,099 | 2,596 | | 2,689 | 2,689 |
| 2005 | 170 | 322 | 1,924 | 2,416 | | 3,365 | 3,365 |
| 2006 | 167 | 330 | 2,148 | 2,645 | | 7,464 | 7,464 |
| 2007 | 259 | 413 | 2,005 | 2,677 | | 15,646 | 15,646 |
| 2008 | 252 | 483 | 3,188 | 3,923 | | 15,938 | 15,938 |

⊗ Note: Priority 1 Fugitives are not part of Criminal / Non-Criminal Statistics

## About the Authors

**Margot Mendelson** is a third-year student at Yale Law School. She graduated from Harvard College *magna cum laude* in 2003. After college, she spent a year community organizing in Central America on a Frederick Sheldon Fellowship, and then worked on behalf of immigrants in deportation proceedings for the following two years. While in law school, she has worked at the United Nations High Commissioner for Refugees in Geneva and the ACLU's Legislative Office in Washington, DC, where she concentrated on issues related to immigrants' rights and national security. Among her publications are an article in the *Berkeley Women's Law Journal* on the impact of drivers' license laws on unauthorized immigrant victims of violence and a guide to the immigration provisions of the Violence Against Women Act. She is a senior editor of the *Yale Law Journal* and has been active in the Yale Law School Worker and Immigrant Rights and Advocacy Clinic and the National Litigation Project.

**Shayna Strom** is a third-year law student at Yale Law School. She holds a master's degree in politics and international relations research from the University of Oxford, which she attended as a Rhodes Scholar. Her master's thesis focused on intercultural understanding and policies towards immigrants in Leicester, England. She also holds a bachelor's degree *summa cum laude* in ethics, politics, and economics from Yale University. While at law school, she has been a member of the Worker and Immigrant Rights Advocacy Clinic and has worked on the intersection of immigration and labor issues at the Service Employees International Union and the US Senate Committee on Health, Education, Labor, and Pensions. Before coming to law school, Ms. Strom was a community organizer and political organizer in Ohio, New York, and New Jersey.

**Michael J. Wishnie** is Clinical Professor of Law at Yale Law School. His teaching, scholarship, and law practice have focused on immigration, labor and employment, habeas corpus, civil rights, and administrative law. For years, he and his students have represented grassroots organizations in a range of litigation, legislative, media, and community education matters. He is counsel for nearly all of the 32 persons detained in the June 2007 New Haven FOT operation and for community groups that have brought state and federal Freedom of Information Act suits arising from the operation, *see Unidad Latina en Accion v. DHS*, No. 3:07-cv-1224 (D.Conn.), all mentioned in this paper. Wishnie is also a Nonresident Fellow of the Migration Policy Institute and frequently handles cases as a cooperating attorney for the American Civil Liberties Union Immigrants' Rights Project. He is a graduate of Yale College and Yale Law School and served as a law clerk to Judge H. Lee Sarokin of the US District Court of New Jersey and US Court of Appeals for the Third Circuit, and to Supreme Court Justices Harry A. Blackmun and Stephen G. Breyer.

---

**Doris Meissner,** former Commissioner of the US Immigration and Naturalization Service (INS), is a Senior Fellow at the Migration Policy Institute (MPI) where she directs MPI's work on US immigration policy. She also contributes to the Institute's work on immigration and national security, the politics of immigration, administering immigration systems and government agencies, and cooperation with other countries. Ms. Meissner has authored and

co-authored numerous reports, articles, and op-eds and is frequently quoted in the media. She recently served as director of MPI's Independent Task Force on Immigration and America's Future, a bipartisan group of distinguished leaders. The group's report and recommendations address how to harness the advantages of immigration for a 21st century economy and society. From 1993 to 2000, she served in the Clinton administration as Commissioner of the INS, then part of the US Department of Justice. She first joined the Department of Justice in 1973 as a White House Fellow and special assistant to the Attorney General. She served in various senior policy posts at Justice until 1981, when she became acting commissioner of INS and then executive associate commissioner, the third-ranking post in the agency. In 1986, she joined the Carnegie Endowment for International Peace as a senior associate. Ms. Meissner created the Endowment's Immigration Policy Project, which became MPI in 2001. A graduate of the University of Wisconsin-Madison, where she earned BA and MA degrees, she began her professional career there as assistant director of student financial aids. She was also the first executive director of the National Women's Political Caucus (NWPC).

**Muzaffar Chishti**, a lawyer, is director of MPI's office at New York University School of Law. His work focuses on US immigration policy, the intersection of labor and immigration law, civil liberties, and immigrant integration. Prior to joining MPI, Mr. Chishti was Director of the Immigration Project of the Union of Needletrades, Industrial & Textile Employees (UNITE). Mr. Chishti has testified extensively on immigration policy issues before various congressional committees. In 1992, as part of a US team, he assisted the Russian Parliament in drafting its legislation on forced migrants and refugees. He is a 1994 recipient of New York State Governor's Award for Outstanding Asian Americans, and a 1995 recipient of the Ellis Island Medal of Honor. Mr. Chishti was educated at St. Stephen's College, Delhi; the University of Delhi; Cornell Law School; and the Columbia School of International Affairs.

# Exhibit 2

# CONSTITUTION ON ICE
A Report on Immigration Home Raid Operations



IMMIGRATION JUSTICE CLINIC

CARDOZO
BENJAMIN N. CARDOZO SCHOOL OF LAW · YESHIVA UNIVERSITY

# CONSTITUTION ON ICE
A Report on Immigration Home Raid Operations

**Immigration Justice Clinic**
by
Bess Chiu
Lynly Egyes
Peter L. Markowitz
Jaya Vasandani

# ACKNOWLEDGEMENTS

This report was written by the Immigration Justice Clinic of the Benjamin N. Cardozo School of Law at Yeshiva University. The authors are Bess Chiu, Lynly Egyes, Peter L. Markowitz, and Jaya Vasandani.

The authors wish to acknowledge the valuable insights, assistance, and technical expertise of: Professor Baher Azmy, Professor Bassina Farbenblum, Jeremy Watson and Elyce Matthews of the Seton Hall School of Law Center for Justice; Sandra Dunn of the Hagedorn Foundation; Dan Kesselbrenner of the National Immigration Project of the National Lawyers Guild; Professor Bruce Levin, Chair of the Department of Biostatistics at the Mailman School of Public Health at Columbia University; Sergeant Israel Santiago of the Nassau County Police Department; Zsuzanna Toth of Cardozo School of Law; and Professor Michael Wishnie of Yale Law School.

The Cardozo Immigration Justice Clinic also gratefully acknowledges the generous support for this report provided by the Hagedorn Foundation.

© 2009 Cardozo Immigration Justice Clinic, All Rights Reserved

No part of this publication may be reproduced or transmitted in any form by any means, electronic or mechanical, including photocopying, or any information storage and retrieval system, without permission from the Cardozo Immigration Justice Clinic. A full-text PDF of this document is available for free download from http://www.cardozo.yu.edu/immigrationjustice.

Requests for permission to reproduce excerpts of this report should be directed to: Immigration Justice Clinic, Cardozo School of Law, 55 Fifth Avenue, rm. 1109, New York, NY 10003.

Suggested citation: Bess Chiu, Lynly Egyes, Peter L. Markowitz, and Jaya Vasandani, *Constitution on ICE: A Report on Immigration Home Raid Operations*, Cardozo Immigration Justice Clinic (New York, NY 2009).

# LAW ENFORCEMENT ADVISORY PANEL

This report was prepared under the invaluable guidance of an advisory panel comprised of law enforcement professionals. The authors wish to thank the members of the advisory panel for their important contributions, particularly in assisting the authors to develop the policy recommendations contained herein. The members of the Law Enforcement Advisory Panel are:

**Commissioner Lawrence W. Mulvey**, Commissioner of the Nassau County Police Department in New York. Commissioner Mulvey, who chaired the advisory panel, is a decorated veteran with 28 years of policing experience who also formerly served as a security contractor to the Department of Homeland Security.

**Chief George Gascón**, Chief of Police of the Mesa Police Department in Arizona. Prior to his current appointment, Chief Gascón spent over 28 years with the Los Angeles Police Department, rising to rank of Assistant Police Chief and Director of the Office of Operations.

**Professor Charles A. Lieberman**, Ph.D., full-time lecturer in the Department of Law, Police Science and Criminal Justice Administration at John Jay College of Criminal Justice in New York. Prior to joining academia, Professor Lieberman served in the New York City Police Department for 15 years.

**Chairman Anthony Miranda**, Executive Chairman of the National Latino Officers Association (NLOA). Prior to assuming leadership at NLOA, Chairman Miranda served in the New York City Police Department.

**Professor Christopher W. Ortiz,** Ph.D., Assistant Professor of Criminal Justice and the Deputy Director of the Center for Security and Disaster Response at the New York Institute of Technology. Professor Ortiz is also a Sergeant with the City of Glen Cove Police Department and has served as a Senior Research Associate at the Center on Immigration and Justice at the Vera Institute of Justice, New York, N.Y.

**General Counsel Michael Ramage**, General Counsel for the Florida Department of Law Enforcement (FDLE). Mr. Ramage has served in his current capacity since 1992. Prior to joining the FDLE, Mr. Ramage served as a state prosecutor under then State Attorney Janet Reno.

# TABLE OF CONTENTS

**ACKNOWLEDGEMENTS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**LAW ENFORCEMENT ADVISORY PANEL**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**I.**    **INTRODUCTION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**II.**   **OVERVIEW OF ICE HOME RAIDS STRATEGY**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        ICE Home Raid Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        Constitutional Requirements for ICE Home Raids  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

        ICE Policies Governing Home Raids . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

**III.**  **THE PREVALENCE OF CONSTITUTIONAL VIOLATIONS DURING ICE HOME RAIDS:
        ASSESSING THE EVIDENCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

        Empirical Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

           *Data From ICE Arrest Records* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

           *Suppression Motion Data*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        Law Enforcement and Political Leaders Accounts of ICE Home Raids . . . . . . . . . . . . . . . . . 14

        Uniform National Pattern of Constitutional Violations During ICE Home Raids . . . . . . . . . . 16

**IV.**   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

        Potential Causes of ICE's Home Raid Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

           *ICE's 2006 Performance Policy*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

           *Lack of Suppression Motions in Removal Proceedings*. . . . . . . . . . . . . . . . . . . . . . . . .24

           *Barriers to Civil Remedies*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

           *Management and Oversight Failures by ICE*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

        Impact of ICE Home Misconduct on Local Law Enforcement and Public Safety . . . . . . . . . . .26

**V.**    **POLICY RECOMMENDATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

During the last two years of the Bush Administration, the U.S. Immigration and Customs Enforcement agency (ICE) vastly expanded its use of home raid operations as a method to locate and apprehend individuals suspected of civil immigration law violations. These home raids generally involve teams of heavily armed ICE agents making pre-dawn tactical entries into homes, purportedly to apprehend some high priority target believed to be residing therein. ICE has admitted that these are warrantless raids and, therefore, that any entries into homes require the informed consent of residents. However, frequent accounts in the media and in legal filings have told a similar story of constitutional violations occurring during ICE home raids — a story that includes ICE agents breaking into homes and seizing all occupants without legal basis.

This report is the first public effort to compile and analyze the available evidence regarding the prevalence of constitutional violations occurring during ICE home raids. Through two Freedom of Information Act lawsuits, the authors of this report obtained significant samples of ICE arrest records from home raid operations in New York and New Jersey. Analysis of these records, together with other publicly available documents, reveals an established pattern of misconduct by ICE agents in the New York and New Jersey Field Offices. Further, the evidence suggests that such pattern may be a widespread national phenomenon reaching beyond these local offices. The pattern of misconduct involves:

- **ICE agents illegally entering homes without legal authority — for example, physically pushing or breaking their way into private residences.**

- **ICE agents illegally seizing non-target individuals during home raid operations — for example, seizing innocent people in their bedrooms without any basis.**

- **ICE agents illegally searching homes without legal authority — for example, breaking down locked doors inside homes.**

- **ICE agents illegally seizing individuals based solely on racial or ethnic appearance or on limited English proficiency.**

The report analyzes the variety of factors that have contributed to this pattern of ICE misconduct including: 2006 changes in ICE performance expectations; the inability of suppression motions or civil lawsuits to serve as a meaningful deterrent to ICE misconduct; and serious management and oversight failures by ICE supervisors. In order to correct course and to improve the ability of ICE to carry out its mission, we propose several policy recommendations aimed at: setting appropriate limits on the use of home raids; revising ICE's warrant & consent practices; improving supervision and training of ICE home raid teams; minimizing harm to local community policing

efforts; minimizing the intrusion to non-targets encountered during ICE home raids; and improving accountability for ICE agents and supervisors involved in illegal home raids. Our key recommendations include, among others:

- ICE should use home raids as a tactic of last resort, and then, only to make criminal arrests or civil arrests for targets who pose a real risk to national security or who have violent criminal records.

- ICE should obtain judicial warrants in advance of any home raid.

- ICE should require a high level supervisor to be on site for any home raid.

- ICE should videotape home raids.

- ICE should issue clear guidance that the sole objective of a home raid is to apprehend the target — agents should not generally question non-targets encountered about matters other than the location of the target.

- The Department of Homeland Security's (DHS) Office of the Inspector General (OIG) should undertake an investigation of the pattern of misconduct established in this report to better assess the national scope of the problem.

- DHS and/or the Department of Justice should enact regulations disallowing the use of evidence in immigration removal proceedings when such evidence has been obtained through violation of the Constitution.

The U.S. Immigration and Customs Enforcement agency (ICE or "the Agency") of the Department of Homeland Security (DHS or "the Department"), created in 2003, is primarily responsible for the enforcement of immigration laws in the interior of the United States.[1] ICE has historically used a number of strategies to locate and apprehend persons suspected of violating civil and criminal provisions of the Immigration and Nationality Act[2] (INA). Such strategies include, among others, coordinating with local criminal justice systems to identify deportable immigrants who have been arrested on criminal charges, coordinating with the United States Citizenship and Immigration Services agency to identify deportable immigrants who have applied for some form of immigration benefit, and conducting traditional criminal investigations of persons suspected of violating the criminal provisions of the INA. During the last two years of the Bush Administration, ICE substantially increased its use of one particular enforcement tactic: high profile swat-style raids on homes and workplaces targeting civil immigration violators.[3] Much has been written on the phenomenon of workplace raids and ICE has, in fact, recently revised its guidelines for such raids.[4] However, relatively little public scrutiny has been focused on the related phenomena of ICE home raids. This report seeks to begin filling that void.



ICE raid in Santa Ana, California. © AP/Mark Avery

Starting in 2006, a growing body of evidence has arisen which suggests that many ICE agents have failed to routinely observe constitutional requirements in carrying out ICE home raid operations. Citizens and non-citizens alike are protected by the Fourth Amendment's prohibition against unreasonable searches and seizures.[5] However, frequent accounts in the media and in legal filings have told a similar story of Fourth Amendment violations occurring during ICE home raids. From these accounts, the picture that emerges of a typical home raid depicts a team of heavily armed ICE agents approaching a private residence in the pre-dawn hours, purportedly seeking an individual target believed to have committed some civil immigration violation. Agents, armed only with administrative warrants, which do not grant them legal authority to enter private dwellings, then push their way in when residents answer the door, enter through unlocked doors or windows or, in some cases, physically break into homes. Once inside, agents immediately seize and interrogate all occupants, often in excess of their legal authority and even after they have located and apprehended their target — though in the large majority of cases, no target is apprehended. While these abuses are by no means universal, accounts of such behavior have occurred with sufficient frequency to warrant this inquiry.

This report is the first public document to collect and analyze the available evidence regarding the prevalence of constitutional violations occurring during ICE home raids. In addition to assessing the home raid incidents discussed in various news accounts and legal filings, this report relies upon the special perspective of local law enforcement and political leaders, and for the first time examines ICE's own records for empirical evidence of the prevalence of violations occurring during ICE home raids.

Section II presents a practical and legal overview of ICE's home raid strategy. Section III compiles and analyzes evidence regarding the prevalence of constitutional violations occurring during ICE home raids. Section IV analyzes the causes and costs of the problems with ICE's home raid strategy. Finally, Section V sets forth a series of policy recommendations designed to curb the widespread constitutional violations occurring during ICE home raids. These policy proposals were developed, in large part, in collaboration with a Law Enforcement Advisory Panel assembled for this report. The Advisory Panel, chaired by Nassau County Police Commissioner Lawrence W. Mulvey, is comprised of law enforcement leaders and scholars from across the United States. The Advisory Panel played a critical role in reviewing the report findings and in developing these specific policy proposals for ICE to ensure that its officers comply with constitutional requirements when conducting home raids.

Within ICE, there are two major divisions that carry out its interior immigration enforcement mandate: the Office of Detention and Removal (DRO), which primarily seeks to identify and arrest immigrants for civil immigration violations, and the Office of Investigations (OI), primarily a criminal investigative division of ICE,[6] tasked with investigating national security threats, financial and smuggling violations, gang offenses, commercial fraud, and other immigration violations.[7] Both DRO and OI regularly use home raids.

## ICE HOME RAID OPERATIONS

Several DRO and OI operations have, since 2006, come to rely heavily on home raids as a primary tactic. These operations include, among others, the National Fugitive Operations Program (NFOP), targeting individuals with orders of deportation; Operation Cross Check, encompassing enforcement efforts that target specific immigrant populations, such as immigrants from certain countries or immigrants working in certain industries;[8] Operation Community Shield, targeting immigrant gang members; and Operation Predator, targeting immigrant sex offenders. Despite these operations' purported focus on high priority targets, the evidence demonstrates that the large majority of arrests made in home raids carried out under these operations are not of high priority targets but rather are collateral arrests of mere civil immigration status violators.[9]

ICE's NFOP is worthy of further explanation because of its size and because of the publicity its home raid operations have garnered. ICE created the NFOP, within DRO, in 2003.[10] NFOP uses seven-person Fugitive Operations Teams (FOTs) to carry out the Program's mission. The stated purpose of these teams is to expand the agency's efforts to locate, arrest and remove immigrants with old orders of

**Despite these operations' purported focus on high priority targets, the evidence demonstrates that the large majority of arrests made in home raids carried out under these operations are not of high priority targets but rather are collateral arrests of mere civil immigration status violators.[9]**

deportation,[11] while giving priority to cases involving immigrants who pose a threat to national security and to the community. In 2006, ICE instituted several dramatic policy changes related to its FOTs which, collectively, help explain ICE's increased reliance on home raid operations and the constitutional violations occurring during such operations. The policy changes inflated the arrest expectations for FOTs eight-fold, while simultaneously removing a requirement that FOTs focus on "criminal aliens," and for the first time permitting FOTs to count collateral arrests of civil status violators toward their inflated arrest expectations. The impact of ICE's 2006 revised performance expectations is discussed in detail later in this report.[12] Over the course of time, the number of FOTs increased as well; while the NFOP started with eight FOTs, today there are over 100 teams.[13] Given the size of the NFOP and its primary reliance upon home raids, the behavior of FOTs are of particular importance in assessing ICE's home raid strategy.

## CONSTITUTIONAL REQUIREMENTS FOR ICE HOME RAIDS

The Supreme Court has held that "physical entry of a home is the chief evil against which the wording of the Fourth Amendment is directed."[14] In the absence of consent from an adult resident,[15] or exigent circumstances,[16] a search conducted without a judicial warrant issued by an impartial magistrate[17] is presumed to be in violation of the Fourth Amendment of the Constitution. Administrative warrants do not authorize agents to enter homes without consent because they are not issued by impartial magistrates.[18] Outside of the home, government agents are generally empowered to make warrantless arrests when they have probable cause to believe an individual has committed an arrestable offense.[19] However, even where probable cause exists to make an arrest, government agents may not enter a home without a judicial warrant. The nature of the arrest — criminal vs. civil-immigration — has no bearing on the constitutional protections applied to the home.[20]

In addition, the Fourth Amendment restricts the power of police to seize people for investigatory purposes or to search a home without consent. The Constitution requires that an officer have "reasonable suspicion" that an individual is engaged in unlawful activity before the officer can seize the person, even for brief questioning,[21] and generally requires a judicial warrant to search a home.[22] There is an exception to this rule when an officer, lawfully present inside a home, needs to search the home or briefly seize an individual to ensure the safety of the officer.[23] In addition, agents can never rely solely on the racial or ethnic appearance or the limited English proficiency of an individual to justify a seizure.[24]

**These constitutional requirements should govern ICE's conduct in home raids. When an ICE agent enters a home without consent, armed only with an administrative warrant, it is a constitutional violation that goes to the heart of the Fourth Amendment.**

These constitutional requirements should govern ICE's conduct in home raids. When an ICE agent enters a home without consent, armed only with an administrative warrant, it is a constitutional violation that goes to the heart of the Fourth Amendment.

Further, even if an ICE agent is lawfully in a dwelling, he generally violates the Constitution if he searches the home without consent (or beyond the scope of the consent) or if he seizes an occupant without a reasonable suspicion that the individual is engaged in unlawful conduct.

## ICE POLICIES GOVERNING HOME RAIDS

DHS's own regulations and policies incorporate the constitutional requirements set forth above. During home raids, ICE agents are generally armed only with administrative arrest warrants issued by an immigration official, rather than judicial search or arrest warrants issued by a neutral judge.[25] These administrative warrants do not require a showing of probable cause, as in the case of judicial warrants.[26] According to ICE's own Detention and Deportation Officer's Field Manual, "Warrants of Deportation and Removal are administrative rather than criminal, and do not grant the authority to breach doors. Thus *informed consent* must be obtained from the occupant of the residence prior to entering."[27]

Accordingly, when targeting residences, both DRO and OI agents are supposed to follow similar mandatory "knock-and-talk" procedures laid out in official ICE manuals.[28] The Field Manual explains that "Officers can knock on a door and request to speak with the occupants of the house without first obtaining a search warrant. However, in order to enter a residence, *someone who has authority to do so must grant informed consent, unless a court-approved search warrant is obtained in advance.*"[29]

If consent is given, ICE agents are permitted to enter the home and ask questions regarding the location of the intended target.[30] If agents encounter other people in the home, agents are permitted to seek consent to ask questions regarding immigration status.[31] However, agents may not detain the occupants for questioning unless they have a "reasonable suspicion, based on specific articulable facts, that the person being questioned … is an alien illegally in the United States."[32] If, after lawful questioning, agents develop a reason to believe that an individual is in the United States illegally, they can arrest them without a warrant and transport them to the local immigration processing center.[33]

ICE agents are also permitted to request consent to search the residence, or a portion of it.[34] But agents are "not permitted to search portions of the premises other than those for which consent to search has been given," and have been "instructed that consent to remain in the house and to search can be revoked at any time."[35] The only exception to this general rule is when ICE agents have "reasonable suspicion that the premises harbor a person who poses a danger to the agents" — in which case the agents are permitted to conduct a protective sweep.[36] However, "agents have been instructed that any protective sweep [can] extend only to areas in which the potentially dangerous person(s) could be hiding."[37]

n recent years, individual accounts from across the country demonstrate a suspiciously uniform pattern of constitutional violations during ICE home raids. These accounts are documented in civil law suits, suppression motions in immigration proceedings, and local and national media coverage. These narratives show a trend that establishes three distinct types of conduct which violate the Fourth amendment: *entering* and *searching* homes without warrants, exigency or consent, and then *seizing* residents without reasonable suspicion. The pattern which emerges from the individual narratives is supported by the observations and statements of local political and law enforcement leaders, who have a unique vantage point to view ICE misconduct in their communities. Finally, this report examines empirical data drawn from ICE's own arrest records from two separate ICE field offices and publicly available suppression motion data. Collectively, the evidence strongly suggests a significant and disturbing pattern of ICE misconduct during home raids.

## EMPIRICAL EVIDENCE

### Data From ICE Arrest Records

ICE regulations, which carry the force of law, require that:

> An immigration officer may not enter into … a residence … unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected. *When consent to enter is given, the immigration officer must note on the officer's report that consent was given and, if possible, by whom consent was given.*[38]

Accordingly, review of ICE arrest reports should reveal whether or not consent was obtained prior to the entrance of ICE agents into a residence. Since ICE does not obtain judicial warrants for its home raids, entering a home without consent is a violation of the Fourth Amendment of the Constitution.

Two data sets of ICE arrest records were reviewed in preparation for this report to examine whether, among other things, consent was noted on the arrest records. The first data set was obtained pursuant to a Freedom of Information Act (FOIA) lawsuit and included arrest records from home raid operations in Nassau and Suffolk County, New York between January 1, 2006 and April 18, 2008 (hereinafter "Long Island data set"). This data set included the ICE arrest records related to 100 randomly selected individuals arrested in home raids out of the total of

**ICE agents from the New York and New Jersey Field Offices failed to obtain lawful consent to enter homes in violation of the Constitution in a large percentage of cases.**

457 such arrests during this period.[39] The second data set was also obtained through a FOIA lawsuit and included 600 electronically available arrest reports from home raid operations conducted by the Newark, New Jersey ICE Office and the Central New Jersey ICE Office on certain dates between February 22, 2006 and December 7, 2007 (hereinafter the "New Jersey data set").[40]

## Fig. 1: **New Jersey** Consent Data



ICE Obtained Consent 76%

ICE Failed to Obtain Consent 24%

## Fig. 2: **Long Island** Consent Data



ICE Failed to Obtain Consent 86%

ICE Obtained Consent 14%

The data from both sets reveal several alarming trends. As set forth in Figures 1 & 2, based on the assumption that ICE is following its own legal requirements regarding notation of consent, and based upon ICE's public statements that it does not obtain judicial warrants in home raid operations, both data sets demonstrate that ICE agents from the New York and New Jersey Field Offices failed to obtain lawful consent to enter homes in violation of the Constitution in a large percentage of cases.

Interestingly, the data from the two data sets show significantly different rates of illegal entries by ICE agents during home raids. There are several possible explanations for the difference. The two data sets involve ICE agents from different field offices. It is possible that the supervision, training, and culture of the ICE offices are sufficiently different to account for the marked difference in the rate of illegal entries during home raids. It is also possible, that record keeping practices vary between the offices such that the New York office may be failing to note consent in some instances when it is actually obtained and/or the New Jersey office may be noting consent in some instances when it is not actually obtained.

Indeed, there are some indications that the officers from the New Jersey Field Offices are, in some instances, either fabricating consent in their reports or misunderstanding the legal requirements of consent. For example, in one arrest record from the New Jersey data set, an officer notes that "[t]he Newark Fugitive Operation team … gained access into apartment [redacted] by way of knocking, thus the door was opened from the intensity of the banging. Upon slowly entering the apartment at [redacted] I noticed that [redacted] was approaching the doorway." The same arrest report incorrectly states: "Gained Access to home via: Subject gave consent" — apparently boilerplate language that appeared in many New Jersey arrest records. Moreover, in a handful of cases from the New Jersey data set, we were able to match arrest records that noted consent, with detailed eyewitness accounts of those raids, which contradicted the arrest records accounts of consent. Even if the New Jersey arrest reports are taken at face value, it is possible that the New Jersey data was skewed in ICE's favor since, unlike the New York data, the New Jersey arrest records were not randomly drawn.

Whatever the cause of the divergence between the two data sets, they share one crucial trait: they both evince an unacceptable level of illegal entries by ICE agents during home raid operations in violation of the Fourth Amendment. If this data were the only evidence of such illegal entries it

**[T]he high percentage of collateral arrests is consistent with allegations that ICE agents are using home raids for purported targets as a pretext to enter homes and illegally seize mere civil immigration violators, in order to meet inflated arrest expectations.[41]**

might be possible to discount these statistics as record keeping failures. However, when placed in the context of the other evidence set forth below, these arrest records serve to confirm the widespread nature of the violations occurring in the New York and New Jersey field offices.

Figures 3 & 4 break out the percentage of target arrests versus collateral arrests of civil immigration violators made in each home raid data set. Both data sets demonstrate that the large majority of home raid arrests from the New Jersey and New York Field Offices do not involve the purported targets of the operations. This data is instructive because the high percentage of collateral arrests is consistent with allegations that ICE agents are using home raids for purported targets as a pretext to enter homes and illegally seize mere civil immigration violators, in order to meet inflated arrest expectations.[41]

Here, the data is notably consistent between the two data sets, showing that only approximately one-third of all home raid arrests are of targets. The remaining two-thirds of the arrests are of civil immigration violators who ICE happens to encounter during home raid operations.



Fig. 3: **New Jersey Target vs. Collateral Data**



Fig. 4: **Long Island Target vs. Collateral Data**

## A review of the arrest records also demonstrated that, notwithstanding the legal requirement that ICE has some reasonable suspicion before it detains and questions individuals, the large majority of arrest reports articulated no basis for the initial seizure.

A review of the arrest records also demonstrated that, notwithstanding the legal requirement that ICE has some reasonable suspicion before it detains and questions individuals, the large majority of arrest reports articulated no basis for the initial seizure.

Again, the data is extremely consistent and suggestive of widespread Fourth Amendment violations by agents from the New Jersey and New York Field Offices. While, unlike the consent data, there are no regulations specifically requiring ICE agents to note the basis for their initial stop, such information is precisely what one would expect to find in an arrest report. Further, the fact that such information is included in approximately one-third of such reports, suggests that ICE agents are trained to include the information.



Fig. 5: **New Jersey Basis for Seizing & Questioning**

Fig. 6: **Long Island Basis for Seizing & Questioning**

Finally, the data also revealed a disturbing trend suggestive of racial profiling by ICE agents during home raid operations by the New Jersey and New York Field Offices. Specifically, the data demonstrates that Latinos are significantly overrepresented in collateral arrests by ICE agents during home raids. Figure 7 below compares the percentage of Latinos arrested as targets with the percentage of Latinos arrested as collaterals in both data sets.

**[T]he data also revealed a disturbing trend suggestive of racial profiling ... Specifically, the data demonstrates that Latinos are significantly overrepresented in collateral arrests by ICE agents during home raids.**

Presumably, the ethnicities of the targets ICE seeks is a good indicator of the ethnic compositions of the immigrant communities in which ICE operations take place. Accordingly, it is difficult to explain why significantly more Latinos (21% more in New Jersey and 28% more in Long Island) are arrested as collaterals than as targets during home raid operations. Indeed, in both jurisdictions, the vast majority of collateral arrest records where ICE officers did not note any basis for seizing and questioning the individual were of Latino subjects — 90% in New Jersey and 94% in Long Island. This data lends empirical support to the community complaints that during home raids ICE agents seize Latino residents based simply on their ethnic appearance or limited English proficiency.



**Fig. 7**
**Percentage of Arrestees who were Latino**

**New Jersey** Data     **Long Island** Data

This arrest data raises profound concerns over the constitutionality of ICE's home raid operations. The data is, of course, limited to two jurisdictions and it is possible that data from other jurisdictions could vary. However, the consistency of the New Jersey and Long Island data on most points, at minimum, raises the possibility of an agency-wide problem. It is difficult to imagine why the problems identified in these jurisdiction would be any less prevalent in ICE operations elsewhere. The data on the rate of illegal entries is the exception — since it varied dramatically between the two jurisdictions. This is certainly worthy of further investigation, though it is important to remember that even the "better" jurisdiction still showed officers illegally entering homes in one quarter of home raids.

### Suppression Motion Data

The increasing prevalence in recent years of suppression motions being brought in removal proceedings, alleging constitutional violations by ICE officers is another indication of the widespread practice of illegal home entries during ICE operations. To be sure, not all such motions are reflective of an actual underlying constitutional violation. However, in immigration court, unlike in criminal court, suppression motions are not a standard part of removal defense practice — many

immigration attorneys will go their entire career without filing a suppression motion. Accordingly, the statistics set forth below demonstrating a sharp increase in the filing of such motions after ICE expanded its home raid operation in 2006 is one more indication of the widespread Fourth Amendment violations occurring during ICE home raid operations.

Suppression motions are rarely brought in immigration court, in part because in 1984 the Supreme Court ruled that, since deportation proceedings are civil, not criminal, respondents are not generally entitled to suppression *even when evidence was obtained in violation of the Constitution.*[42] However, the Supreme Court also reasoned that the exclusionary rule may be available in immigration proceedings for egregious or widespread Fourth Amendment violations, and lower courts and the immigration courts have subsequently recognized egregious constitutional violations as a basis for suppression.[43] Nevertheless, suppression motions remain extremely difficult to win in immigration proceedings, as they are very labor intensive, require Respondents to meet a high legal standard, and are often mooted out by evidence obtained independent of the constitutional violation.[44] Moreover, in most deportation cases ICE does not need to rely upon evidence it gathered during an arrest. Therefore, even if a respondent in a deportation proceeding can prove an egregious constitutional violation, it is uncommon that a suppression motion can alter the outcome of a deportation proceeding. Accordingly, in most cases suppression motions, even if meritorious, are futile and therefore will not be filed.

In preparation for this report, a Freedom of Information Act request was filed with the Executive Office for Immigration Review — the agency which oversees the federal immigration courts — seeking statistics on the prevalence and outcomes of suppression motions. Unfortunately, the agency does not track such data and was thus unable to substantively respond to the request. As a result, the best available data on the prevalence, outcome, and type of suppression motions being filed in immigration court is the on-line database which compiles opinions from the Board of Immigration Appeals (BIA) —

the administrative court that reviews immigration judge decisions.[45] This database does not, however, contain all agency decisions related to suppression motion. The database only contains published BIA decisions and selected unpublished BIA decisions, and does not contain any immigration court decisions — where we would expect to find the majority of decisions discussing suppression motions. Accordingly, the data set forth below significantly under-represents the prevalence of suppression motions. However, the data remains instructive, not in regard to the raw numbers, but rather in regard to the trends demonstrated by the prevalence, types, and outcomes of suppression motions.

Comparing the period between 2006, when ICE instituted its new arrest performance expectations and vastly expanded its home raid operations, and June 2009, to an equal period of time immediately

Fig. 8
**Number of Motions to Supress**



Pre 2006 motions
Post 2006 motions

| Overall | Regarding Home | Granted |
|---------|----------------|---------|
| 5 / 48 | 1 / 22 | 1 / 5 |

preceding 2006, we looked at three variables: (1) the number of suppression motions filed, (2) the number of suppression motions involving home raids, and (3) the number of suppression motions granted. Figure 8 compares the raw numbers in each category between the periods before and after the 2006 policy changes and the expansion of ICE's home raid campaign.

Again, the raw numbers are not particularly instructive because of the limitations in the data set

**Since 2006, there has been a nine-fold increase in the filing of suppression motions, a twenty-two-fold increase in suppression motions related to home raids, and a five-fold increase in the grant rate of suppression motions.**

discussed above. However, the trends are noteworthy. Since 2006, there has been a nine-fold increase in the filing of suppression motions, a twenty-two-fold increase in suppression motions related to home raids, and a five-fold increase in the grant rate of suppression motions.

While the data set of recent suppression motions is far from complete, the significant uptick in the filing of suppression motions is one more indicator of a pattern of illegality arising out of, among other things, ICE's home raid campaign. Together, the arrest report and suppression motion data appear to demonstrate a significant pattern of constitutional violations occurring during ICE home raid operations in New York and New Jersey and are suggestive of a national pattern.

### LAW ENFORCEMENT AND POLITICAL LEADERS' ACCOUNTS OF ICE HOME RAIDS

Concern over the prevalence of Fourth Amendment violations during ICE home raids reaches well beyond the immigrant communities targeted by ICE. Law enforcement and political leaders have voiced serious concerns specifically regarding ICE's violations of the Fourth Amendment, and more generally about how, because of local cooperation with ICE, ICE's conduct threatens to undermine the central crime suppression mission of local police departments.[46]

ICE will often request support for home raid operations from local police departments, usually in the form of having a marked local police car accompany ICE agents to target residences. Apparently, ICE's theory is that when they bang on the door of a residence and shout "police," as is standard in home raids, residents are more likely to open their doors if they see a local police car outside

**"[Immigration raids] break up families ... just kick[ing] down the door in the middle of the night, taking [a] father, a parent away, that's just not the American way. It must stop."[46]**

**— Rep. Nancy Pelosi (D-CA),**
**Speaker of the House of Representatives**

and, therefore, do not suspect an immigration raid. The fear of some local police leaders is that, to the extent local police are perceived as working with immigration agents, particularly when ICE agents are illegally entering homes, immigrant residents will be less likely to cooperate with police on criminal matters.[47] Such residents may be less likely to come forward as witnesses and victims of crimes, may be reluctant to call for police assistance in domestic violence situations, and may be less likely to open their doors for police officers.[48]

Two home raid operations have drawn particularly vocal responses from police and political leaders. In June 2007, ICE conducted a series of home raids in New Haven, Connecticut just two days after the city had adopted a municipal identification law that allowed all residents, including undocumented residents, to obtain government issued identification. Much of the criticism of those raids centered on suspicion that the raids were carried out in retaliation for the city's municipal identification policy, which is in tension with federal policy. However, political leaders also drew attention to the repeated accounts of how ICE agents pushed their way into homes, in violation of the Fourth Amendment.[49] New Haven's Mayor John DeStefano described a "very aggressive intervention" by ICE agents who "pushed into homes without warrants."[50] Senators Christopher Dodd and Joseph Lieberman, along with Congresswoman Rosa DeLauro wrote a formal letter

> **"I have been appalled by some of the practices I have heard about and I would like to work with your Department to end the practice of allowing immigration officers to forcefully enter people's homes with nothing more than an administrative warrant, and incarcerate anyone that can not immediately produce their immigration papers."[46]**
>
> **– Sen. Kirstin Gillibrand (D-NY)**

to then-Secretary of DHS Michael Chertoff requesting an explanation for the repeated accounts of ICE agents illegally entering homes.[51] Secretary Chertoff replied by affirming that the agents possessed only administrative arrest warrants that did not authorize them to enter homes without consent but he asserted that ICE obtained consent to enter all of the homes.[52]

It is also noteworthy that during the New Haven operation ICE agents failed to apprehend the large majority of targets, instead, consistent with the empirical data above, focusing on collateral arrests. The New Haven operation was part of the National Fugitive Operation Program. ICE was seeking to arrest sixteen target "fugitives" but ultimately arrested thirty-one individuals, only four of whom were targets of the raid — the rest were collateral arrests of undocumented immigrants encountered at the target residences.[53] The large percentage of collateral arrests and the fact that most of the arrestees were Latino, led Mayor DeStefano to raise concerns over potential racial profiling — a concern that Senator Dodd said warranted further investigation.[54] "We won't stand for the violation of constitutional rights and racial profiling in New Haven" said Mayor John DeStefano in reaction to the raids.[55]

Several months later, in September 2007, a large-scale home raid operation in Long Island, New York sparked similar allegations of illegality from police and political leaders in Nassau County.[56] This time, the raids were coordinated by ICE's Office of Investigation under its Operation Community Shield. Nassau County Police Department initially agreed to a request by ICE to assist in the multi-day operation by detailing officers in marked units to accompany each ICE team.[57] However, two days into the operation, Nassau County Police pulled out of the operation because of "serious allegations of misconduct and malfeasance."[58] ICE sought ninety-six target individuals[59] who were believed to be deportable members of violent gangs living in Nassau County. After three days of raids, ICE arrested only six targets and again the vast majority of arrests — ninety-five to be precise — were collateral arrests for civil immigration violations.[60]

Nassau County Police Commissioner, Lawrence Mulvey, and Nassau County Executive Thomas Suozzi both spoke out about a range of misconduct by ICE agents during the raids. Nassau County Executive Suozzi's letter to DHS Secretary Chertoff condemned "tactical actions which cross the lines of legality and law enforcement best practices," and asked Secretary Chertoff to look into the allegations that arose out of the Nassau County home raids.[61] Commissioner Mulvey relayed accounts from his officers of excess shows of force by ICE agents, undisciplined law enforcement tactics, and deplorable intelligence that resulted in ICE targeting incorrect residences in over 90% of the raids.[62]

**"In my 29 years of police work, I have executed countless warrants and have sought consent to enter countless homes. ICE's claim that they received 100% compliance with their requests to enter is *not credible even under the best of circumstances.*"[65]**

**— Commissioner Lawrence Mulvey, Nassau County Police Department**

ICE later revealed that ICE did not posses any warrants, not even administrative warrants, for the targets in the Nassau County Community Shield Operation.[63] However, DHS again claimed that it received consent to enter all of the homes it targeted during the Nassau Community Shield Operation.[64] In response to this claim, Commissioner Mulvey commented that "In my 29 years of police work, I have executed countless warrants and have sought consent to enter countless homes. ICE's claim that they received 100% compliance with their requests to enter is *not credible even under the best of circumstances.*"[65]

Obviously these two highly publicized incidents of political and police leaders criticizing ICE's home raid operations do not alone evince a nationwide problem. However, taken in the context of similar statements from other political and law enforcement leaders,[66] these highly unusual public conflicts between law enforcement agencies over police tactics lend credibility and color to the empirical evidence set forth above and anecdotal evidence set forth below.

## UNIFORM NATIONAL PATTERN OF CONSTITUTIONAL VIOLATIONS DURING ICE HOME RAIDS

Since 2006, when ICE vastly expanded its home raid operations, lawsuits have been filed in every region of the country — including two large class actions, and several lawsuits that include multiple defendants — all alleging a similar pattern of ICE misconduct. The accounts of ICE conduct in these lawsuits together with similar accounts in suppression motions in immigration court and in news reports evince a suspiciously uniform pattern of misconduct.

One common theme that emerges from the lawsuits, suppression motions, and news accounts is ICE officers' pattern of illegally entering residences. There is story after story of ICE agents, armed with only an administrative warrant, yelling and banging on doors and then forcing their way into homes in the pre-dawn hours by pushing their way in if residents unlock their doors, and

otherwise climbing through windows or kicking in doors. Some residents report being awakened by the presence of armed ICE officers in their bedrooms who illegally gained entry through unlocked doors. Once inside the homes, the lawsuits, suppression motions and news accounts all tell a similar story of ICE agents abandoning focus on a purported target and instead immediately seizing and questioning all occupants about their immigration status regardless of any legal basis to do so. The picture that emerges is that once ICE agents immediately detain all occupants, they generally conduct an illegal non-consensual search of the premises[67] looking for evidence of the occupants' immigration status — or lack thereof. Below are various accounts from across the country of this pattern of ICE misconduct:

> *Jimmy Slaughter, himself a DHS officer, filed suit against ICE for raiding his home: "I was at home with my wife when the door bell rang. I opened the door and noticed approximately 7 uniformed ICE agents with vests and guns standing at my door... I opened the door to look at the paperwork and five agents entered my house.... The agents then told my wife to stand in the center of 'OUR' living room. Not once did anyone say they had a warrant."*

March 2009, in Arizona, Jimmy Slaughter, himself a DHS officer, filed suit against ICE for raiding his home: "I was at home with my wife when the door bell rang. I opened the door and noticed approximately 7 uniformed ICE agents with vests and guns standing at my door ... I opened the door to look at the paperwork and five agents entered my house.... The agents then told my wife to stand in the center of 'OUR' living room. Not once did anyone say they had a warrant." *Slaughter v. Department of Homeland Security* (D.A.Z.) (Slaughters Aff., February 13, 2009).

September 2008, in Texas, "The 68-year-old woman told Action 4 News that she heard a knock at her door Tuesday morning. But before she had a chance to get up she said U.S. Immigration & Customs Enforcement (ICE) agents were inside her home ... When she asked them why they came into her home they allegedly responded, 'Show us your papers.' Savage complied by showing them documentation proving that she's been a United States citizen for 40 years." Jackie Diaz, *Call 4 Action: Mistaken Immigration Raid?*, Valleycentral.com (Sept. 30, 2008).

March 2008, in California, ICE agents came to the home of an immigration attorney, looking for another person; when the attorney closed his door and asked them to leave the premises because they could not produce a search warrant, the agents threatened to break his door down. Sandra Hernandez, *ICE Increases Use of Home Raids*, Daily Journal (Mar. 26, 2008).

January 2008, in North Bergen, NJ, a tenant opened her door and ICE agents searched the entire apartment without permission or legal justification. The tenant was arrested notwithstanding the fact that she had recently been granted legal immigration status and had documents proving that her official work permit card would soon be coming. *Argueta v. Myers*, No. 08-cv-01652 (D. NJ) (complaint filed Apr. 3, 2008).



December 2007, in Massachusetts, "eight to 10 ICE agents, with guns drawn, broke through the door of the three-family apartment building at 21 Jefferson St. about 5 a.m. Friday. 'They came through and shined flashlights in people's faces. They went into each room, they told everyone to lie down on the floor, they say not to move,' he said. 'They checked everyone's papers. They took everybody.'" Evidence of ICE's illegal search included "shards of the broken door frame they say ICE agents kicked through. A safe in one room lay open, its papers strewn all about. The men also showed the reporter another bedroom door they said ICE agents had kicked open." Aaron Nicodemus, *Illegal Aliens Arrested in Raid: Feds Nab 15 in Milford*, TELEGRAM & GAZETTE (Dec. 9, 2007)

December 2007, in Newark, NJ, between 5:30am and 6:00am, there was loud pounding on the door. Believing it was another tenant who was locked out, a resident opened the door to find six ICE agents displaying holstered firearms. The officers forced the door to stay open and detained the resident without a warrant, probable cause, exigent circumstances, or a reasonable basis for believing that he was unlawfully present in the United States. *Argueta v. Myers*, No. 08-cv-01652 (D. NJ) (complaint filed Apr. 3, 2008).

September 2007, in Passaic County, NJ, around 5:30am, around nine ICE agents forced their way illegally into a home after someone inside opened the door to see who was banging on the door. The ICE agents illegally searched the home and stopped everyone from leaving. *Argueta v. Myers*, No. 08-cv-01652 (D. NJ) (complaint filed Apr. 3, 2008).

*"Respondent persuasively argues that an egregious violation that was fundamentally unfair occurred during his arrest. . . . ICE agents used excessive force while searching his home . . . ICE agents entered his home and his private bedroom in the early hours of the morning armed with pistols. They forced him into the hall and required him to stand in his underwear before his brother, sister-in-law and their children. . . . ICE agents refused to produce a warrant or identify the person they claimed to be seeking. Finally, they tied a plastic cord around the Respondents wrists as handcuffs and forced him to accompany them to their office in Manhattan."*

— Immigration Judge Vivienna Gordon-Uruakpa,
New York Immigration Court

August 2007, in Hudson County, NJ, at 6:30am, ICE agents did not identify themselves while banging on the door. When a tenant opened the door to see who was outside, the ICE agents forced their way inside illegally, and illegally interrogated people in their home. One resident was forcibly stopped from calling her attorney. *Argueta v. Myers*, No. 08-cv-01652 (D. NJ) (complaint filed Apr. 3, 2008).

July 2007, in Staten Island, NY, in finding the ICE agents' conduct during a 5:30am home raid unconstitutional, one Immigration Judge wrote "Respondent persuasively argues that an egregious violation that was fundamentally unfair occurred during his arrest. ... ICE agents used excessive force while searching his home ... ICE agents entered his home and his private bedroom in the early hours of the morning armed with pistols. They forced him into the hall and required him to stand in his underwear before his brother, sister-in-law and their children. ...

ICE agents refused to produce a warrant or identify the person they claimed to be seeking. Finally, they tied a plastic cord around the Respondents wrists as handcuffs and forced him to accompany them to their office in Manhattan." *In the Matter of R-B-*, (New York, N.Y., Immigr. Ct., May 28, 2009).

June 2007, in New Haven, CT, in finding the ICE agents' conduct during a 6:30am home raid unconstitutional, one Immigration Judge wrote "Respondent's roommate testified that he opened the door ajar a few inches. Without saying a word, agents immediately and forcibly pushed the door wide open. Respondent's roommate did not consent to their entry and DHS concedes they had no warrant. ... The agents' unlawful early morning entry into a private residence strongly implicates "unreasonable" unlawful conduct." *In the Matter of Y-*, (Hartford, CT Immigr. Ct. June 2, 2009).

June 2007, in New Haven, CT, in finding the ICE agents' conduct unconstitutional, one Immigration Judge wrote "immigration agents forcefully entered a private home without a warrant, without probable cause, and without consent. ... Mr. [redacted] opened the door ajar a few inches. Agents immediately and forcibly pushed the door wide open, requiring Mr. [redacted] to step back and avoid being hit by the door. Mr. [redacted] did not consent to their entry and DHS concedes that they had no warrant to enter the home." *In the Matter of X-*, (Hartford, CT Immigr. Ct. June 1, 2009).

June 2007, in Connecticut, the Office of the Mayor of New Haven issued a press release following the highly publicized raids there, which explained how "federal agents [were] pushing their way into houses, brusquely ordering men, women and children to common areas, and leading family members and loved ones away in handcuffs." Press Release, Office of the Mayor of New Haven, Connecticut, June 6, 2007.

June 2007, in Morris County, NJ, at 6:45am, ICE agents took out their guns, banged on a door, and forced their way in once the tenant opened the door to find out who was there. ICE agents illegally entered and searched the home. An ICE agent yelled at one of the residents who tried to call her lawyer. The ICE agent used abusive language – yelling "F*** you" and "You are a piece of s***." *Argueta v. Myers*, No. 08-cv-01652 (D. NJ) (complaint filed Apr. 3, 2008).

April 2007, in Long Island, NY, in finding the ICE agents' conduct unconstitutional, one Immigration Judge wrote, "It is hard for me to fathom a country or a place in which we live in which the Government can barge into one's house without authority from the Third Branch after a probable cause finding. So for all these reasons I

*"It is hard for me to fathom a country or a place in which we live in which the Government can barge into one's house without authority from the Third Branch after a probable cause finding. So for all these reasons I find that what is essentially a warrantless search in the meaning of the Fourth Amendment ... was an egregious violation, and therefore I suppress all the evidence and order these proceedings terminated."*

— Immigration Judge Noel Brennan,
New York Immigration Court.

find that what is essentially a warrantless search in the meaning of the Fourth Amendment, meaning that the entry without a judicially authorized warrant on April 18 was an egregious violation, and therefore I suppress all the evidence and order these proceedings terminated." *Matter of P-M-* (New York, N.Y., Immigr. Ct., May 13, 2008)

April 2007, in Minnesota, the news reported that ICE agents showed up wearing bulletproof vests and armed with guns. They pushed their way into homes and terrified the children. Shannon Prather, *Immigration Raids, Arrests Trigger Lawsuits*, St. Paul Pioneer Press (Apr. 19, 2007).

April 2007, in Willmar, MN, "Defendants conducted these warrantless home searches by going to Plaintiffs' doors and knocking loudly on the doors. When asked by Plaintiffs to identify themselves, Defendant ICE agents would falsely claim 'It's the Police.'... When Plaintiffs would open their doors slightly to confirm that it was the police, Defendant ICE agents would force open the door and push their way into Plaintiffs' homes all without any knowing or voluntary consent of Plaintiffs to allow the ICE agents inside their homes." *Arias v. ICE*, No. 07-01959 (D. Minn. filed April 19, 2007).

April 2007, in Riverhead, NY, Residents were awakened by loud voices yelling "Police! Open the door!" and the sounds of windows and doors being forced open. When one resident entered his kitchen he found an ICE agent climbing through an unlocked window. With one leg inside the home, the armed agent yelled, "Open the f****** door!" When the resident unlocked the door, other agents stormed into the residence. Once inside, ICE agents immediately cuffed all residents, kicked in an interior door, and rifled through dresser drawers without consent, looking for immigration documents. *Matter of I-*, (New York, N.Y., Immigr. Ct.,) (on file with author).

March 2007, in California, "[ICE Agents] arrived at [the Reyes' home] in the early morning hours...Armed and wearing clothes bearing the word "police," [ICE Agents] entered the residence and demanded the immigration papers and passports of [7 year old] Kebin and his father...[ICE Agents] did not have lawful authorization or a valid warrant for entering the home... Despite being placed on notice that Kebin is a United States citizen, [Agents] instructed his father to waken Kebin because they were going to seize him as well...[Agents] took Kebin and his father to an ICE office in San Francisco and held them there against their will." *Reyes v. Alcantar*, No. 07-02271 (N.D. Cal., *filed* Apr. 26, 2007).

March 2007, in Paterson, NJ, at around 4:00am, a lawful permanent resident was awakened by shouts of "Paterson Police." The tenant opened the door to ask for a warrant and ICE agents illegally forced their way into the house and searched it without consent, permission, or legal justification. *Argueta v. Myers*, No. 08-cv-01652 (D. NJ) (complaint filed Apr. 3, 2008).

February 2007, in East Hampton, NY, "Armed ICE agents kicked in the door of [Nelly's] home ... between 4:00 and 5:00 a.m. The ICE agents forcibly entered her home without a search warrant, consent, or any exigent circumstances." *Aguilar v. ICE*, No. 07-1819 (S.D.N.Y.) (complaint filed Sep. 20, 2007).

February 2007, in East Hampton, NY, "The ICE agents pulled covers off of [Adriana's] bed and shone flashlights into her face and the face of her son, who began to cry. The ICE agents searched the Aguilar/Leon family home without the consent of the Leon or Aguilar families. [A]driana asked the ICE agents to see a warrant. However, the agents did not show her any warrant. Andres also asked the ICE agents to see a warrant. The ICE agents did not permit Andres to read a warrant." "The ICE agents positioned themselves so that the exits leading to the office were blocked. Adriana and Andres were not free to leave the office area." *Aguilar v. ICE*, No. 07-1819 (S.D.N.Y.) (complaint filed Sep. 20, 2007).

November 2006, in Clifton, NJ, at 3:00 am, Arturo heard loud banging at his door. When he opened his door slightly, ICE agents forced the door open, shoved him out of the way, and illegally searched his home. "During the time that the agents were in Arturo's home, none of the occupants were free to leave. One or more of the John Doe ICE Agents repeatedly shouted "Don't move!" at the occupants in the common room. The agents carried holstered firearms. If an occupant moved, the agents placed their hands on their holstered guns, suggesting they were preparing to draw their weapons." *Argueta v. Myers*, No. 08-cv-01652 (D. NJ) (complaint filed Apr. 3, 2008).

September 2006, in Metter, GA, "The ICE agents involved in the raids forcefully broke into many of the trailers in the Plaintiff Robinson's [trailer] parks. The ICE agents caused intentional damage to at least one door and four windows in the Highway 46 Park. In the Turkey Ridge Road Park, the ICE agents ripped the skirting from the perimeters of a trailer and caused damage to the flood boards. Upon information and belief, [ICE Agents] did not have warrants or other legal justification for their actions. As a result of the unlawful and terrorizing actions of the ICE agents, the tenants who rented from Plaintiff Robinson were so terrified that many simply fled from the area." *Mancha v. ICE*, No. 06-cv-12650 (N.D.Ga) (complaint filed Nov. 1, 2006).

September 2006, in Reidsville, GA, "Plaintiff Mancha, a tenth grade high school student, was getting ready for school [when her] mother, Plaintiff Martinez, left their home in Reidsville, Georgia, to run an errand. [Mancha] believed it was her mother returning, so she went to the front door, unlocked the door, left it closed, and went back to her bedroom. Shortly thereafter, Plaintiff Mancha heard voices coming from within the house. She left her bedroom, and, as she was walking down the hallway towards the living room, she heard people yelling, 'Police! Illegals!' When she reached the living room, she saw [ICE Agents] standing in the living room blocking the front door. [One ICE Agent] had his hand on his gun as if he was ready to take it out any minute." *Mancha v. ICE*, No. 06-cv-12650 (N.D.Ga) (complaint filed Nov. 1, 2006).

January 2006, in San Francisco, CA, "Mr. G" was installing a washing machine in his garage when he heard his doorbell ring. Assuming it was his friend whom he was expecting, Mr. G opened the garage door and was immediately grabbed, handcuffed and searched by two individuals in plain clothes. Without identifying themselves, the two ICE agents began questioning

him in English, of which he had limited knowledge. Meanwhile, Mrs. G was cooking when she heard the doorbell ring. She went to the front gate and saw a man and a woman in plain clothes. As she was unlocking the gate to ask them what they wanted, the man forced the gate open and the two individuals entered her house. Mr. G was led into his house without first being asked for his permission to enter. In the house, Mr. G saw his pregnant wife crying and handcuffed to a chair, along with two strangers. Because the officers failed to show Mr. and Mrs. G a warrant for their arrest, failed to identify themselves as immigration officers, and forced their way into their home and handcuffed them before asking them any questions, the Immigration Judge concluded that a separate hearing on Mr. and Mrs. G's motions to suppress was warranted to determine whether the suppression of any statements they made during their interrogation and arrest is necessary. *Matter of M-* (San Francisco, C.A., Immigr. Ct., August 16, 2007).

Another repeated theme emerging from the various accounts of ICE home raids is a lack of law enforcement professionalism and a kind of cowboy mentality that may contribute to the apparent lack of attention to the governing constitutional norms. For example, during the Nassau County 2007 Community Shield Operation, ICE agents were criticized for donning cowboy hats and flaunting shotguns and automatic weapons.[68] Another example involved an April 30, 2007 email, obtained under a Freedom of Information Act Request, in which a Connecticut ICE agent boasted to a state police officer, "We have an [operation] scheduled for Wed, 05/02/07 in New Haven … [I]f you're interested we'd love to have you! We have 18 addresses — so it should be a fun time!! Let me know if you guys can play!!"[69]

These individual accounts alone tell us little about the larger picture of ICE's conduct during home raid operations. However, the similar pattern of misconduct in these cases together with the complaints from political and law enforcement leaders and the empirical evidence drawn from arrest reports and suppression motions are sufficient to raise substantial concern over ICE's behavior during its home raid operations.[70] Together the evidence tells a disturbing story of ICE misconduct.

When viewed together, the evidence is strongly indicative of a pattern of misconduct by ICE agents in the New York and New Jersey Field Offices and is suggestive of a widespread national problem involving:

- **Agents illegally entering homes without legal authority.**

- **Agents illegally seizing non-target individuals during home raid operations.**

- **Agents illegally searching homes without legal authority.**

- **Agents illegally seizing individuals based on racial or ethnic appearance or based on limited English proficiency.**

n order to begin to evaluate policy remedies necessary to bring the agency's home raid operations into compliance with the Constitution, we must first understand the underlying causes of the problems and must evaluate the full costs of ICE's current home raid practices.

## POTENTIAL CAUSES OF ICE'S HOME RAID MISCONDUCT

The prevalence of constitutional violations occurring during ICE's home raids campaign can likely be attributed to a number of interrelated factors, including, at least: 1) a series of 2006 ICE policy changes which altered the arrest expectations of ICE's primary interior enforcement squads; 2) the fact that suppression motions are an ineffective deterrent to ICE officers; 3) the barriers that the vulnerable target population of ICE home raids faces in availing themselves of traditional civil remedies for government misconduct; and, 4) management, training and supervision failures by ICE.

### ICE's 2006 Performance Policy

In 2006, ICE issued three policy memoranda which set forth a series of dramatic changes in its enforcement strategy that collectively set the stage for the Bush Administration's widely publicized campaign of immigration home raids.[71] Prior to 2006, ICE Fugitive Operation Teams (FOTs), consisting of approximately seven agents each, were expected to arrest 125 target "fugitives" — people who had been ordered deported but remained in the United States — per year. Moreover, 75% of those arrests were required to be what ICE termed "criminal aliens." In early 2006, however, ICE increased each FOT's annual arrest quota from 125 arrests per year to 1000 arrests per year without any attendant increase in the size of the teams. Overnight, FOTs were expected to become eight times more efficient. Simultaneously, the new 2006 quota system eliminated the requirement that 75% of the arrests needed to be "criminal aliens." Several months later, in September 2006, ICE issued a further change which, for the first time, permitted FOTs to count "collateral" arrests of civil immigration status violators toward their new increased arrest expectations.[72]

These policy changes incentivized the pattern of unlawful behavior set forth above in at least two ways. First, it placed tremendous pressure on ICE agents to meet the new inflated arrest expectations. It seems no coincidence that the issuance of ICE's 2006 Performance Policy coincided with ICE's increased use of home raids and the spike in complaints of misconduct arising therefrom. The pressure of the new expectations likely contributed to ICE agents' disregard for law and policy in their zeal to meet their new performance expectations. Second, the abandonment of the requirement to focus on "criminal aliens" and the permission to count collateral arrests of civil immigration status

**It seems no coincidence that the issuance of ICE's 2006 Performance Policy coincided with ICE's increased use of home raids and the spike in complaints of misconduct arising therefrom. The pressure of the new expectations likely contributed to ICE agents' disregard for law and policy in their zeal to meet their new performance expectations.**

**By focusing on the easier to locate civil immigration violators, instead of the harder to locate dangerous targets, ICE agents were able to make more arrests in pursuit of their new arrest expectations. Unfortunately, the increased arrest numbers come at a significant cost, not only in terms of the constitutional violations occurring during home raids, but also because the focus on collateral arrests has caused a significant decrease in ICE's efficiency at capturing their purported priority targets: dangerous criminals and terrorists.[74]**

violators toward their arrest expectations likely contributed to the pattern of ICE agents seizing non-target residents without legal basis, and illegally searching homes for proof of immigration status and alienage without permission. The permission to count collateral arrests may also account for the high percentage of wrong or stale addresses raided by ICE agents.[73] Agents are not incentivized to take the time necessary to gather reliable intelligence on targets; rather, the 2006 Performance Policy encourages them to raid any house where they believe or suspect they may find immigration status violators. By focusing on the easier to locate civil immigration violators, instead of the harder to locate dangerous targets, ICE agents were able to make more arrests in pursuit of their new arrest expectations. Unfortunately, the increased arrest numbers come at a significant cost, not only in terms of the constitutional violations occurring during home raids, but also because the focus on collateral arrests has caused a significant decrease in ICE's efficiency at capturing their purported priority targets: dangerous criminals and terrorists.[74]

### Lack of Suppression Motions in Removal Proceedings

In criminal proceedings, the exclusionary rule is one of the primary mechanisms we rely upon to ensure police comply with constitutional search and seizure requirements; however, there are three factors which significantly undermine the deterrent effect of suppression motions on ICE agents.

First, suppression motions are extremely difficult for respondents to win in immigration court. In 1984, the Supreme Court made clear that suppression is not generally available in immigration court.[75] The Court did, however, leave the door open for suppression in cases of "egregious" or "widespread" constitutional violations. Subsequently, lower courts and the Board of Immigration Appeals (BIA) have recognized that egregious constitutional violations do warrant suppression in removal proceedings. While the definition of "egregiousness" remains murky and largely unsettled, one thing remains clear: proving an "egregious" constitutional violation remains a significantly higher hurdle than is required in criminal suppression motions.[76]

Second, there is only a relatively small subset of deportation cases where suppression motions can alter the outcome of the proceedings. Suppression motions are inconsequential if ICE has an alternative source of evidence wholly independent of the constitutional violation. Suppression motions are, therefore, only useful in the uncommon instances where there is some ambiguity

about whether or not the respondent is actually a United States citizen. ICE bears the burden of proving that a person is not a citizen before the person can be deported. If the only evidence ICE has of the person's nationality was obtained through an egregious violation of the constitution, then a suppression motion may bear fruit. However, in most other circumstances, a suppression motion — even if granted — would be futile.

Finally, largely because of these first two factors, unlike criminal practice, suppression motions have not traditionally been a standard part of removal defense practice. Thus, unlike their police counterparts, most ICE agents have never been called to testify and account for their conduct at a suppression hearing.

Accordingly, the threat of evidence being excluded due to the unconstitutional conduct of ICE officers does not act as an effective deterrent to ICE agents carrying out home raids, or conducting other types of operations. While the exclusionary rule has played a critical role in deterring Fourth Amendment violations in the criminal context, the factors set forth above, together, work to make suppression motions in deportation proceedings relatively rare occurrences and undermine the deterrent value of such motions on ICE officers' conduct in the field.

### Barriers to Civil Remedies

Due to a variety of systemic and cultural factors, immigrants are amongst the most vulnerable of populations in this nation's legal system. Fifty-two percent of the foreign born population are limited English proficient. Immigrants are also disproportionately poor and are significantly more likely to be lacking in basic education.[77] Accordingly, many immigrants simply lack the inclination and financial resources to hire private counsel.[78] Immigrants are also often unfamiliar with the U.S. legal system and unaware of their rights under domestic tort law. In addition, many victims of home raids are held in immigration detention following the raids on their homes and then deported — limiting their opportunities to pursue civil lawsuits. These realities make it extremely difficult for immigrants who are the subject of Fourth Amendment violations during ICE home raids to avail themselves of traditional civil remedies. Accordingly, traditional civil remedies are also ineffective deterrents to unlawful ICE home raids.

### Management and Oversight Failures by ICE

Finally, ICE official policy has been crystal clear for some time that officers cannot enter or search homes without judicial warrants or consent and may not seize persons without a reasonable suspicion that the person is illegally in the United States.[79] However, notwithstanding these clear official policies, the evidence indicates that ICE agents are not routinely observing these agency policies. This type of disconnect between agency policy and practice is likely indicative of management, training and oversight failures by ICE supervisors and officials.[80]

## IMPACT OF ICE HOME MISCONDUCT ON LOCAL LAW ENFORCEMENT AND PUBLIC SAFETY

The constitutional violations during ICE home raids are, of course, most directly harmful to the people whose homes are invaded and whose rights are violated, but the costs of ICE misconduct in its home raid operations reach far beyond those individuals. ICE's home raid misconduct also undermines the traditional crime fighting mission of local law enforcement agencies.

In immigrant communities, local police are increasingly perceived as in cahoots with ICE agents carrying out home raids. This is in part because of actual cooperation between many police agencies and ICE, often in the form of detailing local officers to accompany ICE agents on home raid operations. However, even in circumstances where no local police are actually involved, ICE agents often identify themselves as "police" presumably because they suspect residents are more likely to cooperate with local police than with ICE. Because of the actual and perceived cooperation between local police agencies and ICE agents conducting home raids, ICE misconduct during those raids threatens to taint local officers' relationships with immigrant communities.

The three major law enforcement reports on the role of local police in immigration enforcement have all recognized the ways local involvement in immigration enforcement can undermine community policing strategies by making immigrant witnesses and victims of crime less likely to cooperate with local police.[81] Renewed emphasis on community policing strategies by local police agencies has been credited, in part, with significant nationwide declines in crime. Community policing strategies are dependent on cooperative relationships between police and the communities they serve. To the extent ICE misconduct is undermining these relationships, it makes the job of local police officers more difficult and can thereby undermine public safety.

The policy recommendations below were developed in close consultation with the Law Enforcement Advisory Panel after the panel had the opportunity to review the findings above and share their experiences regarding ICE home raid operations. The Advisory Panel was guided by a collective belief that: ICE has a valid mission and that any recommendations should support and advance that mission, that all law enforcement officers must conform their behavior to the strictures of the Constitution, that ICE operations should always attempt to avoid interference with vital local community policing policies, and that sound law enforcement strategy and practices should inform ICE home raid operations. Moreover, the recommendations below should in no way be interpreted as an indictment of ICE agents who have followed ICE procedures and adhered to the Constitution.

It is worth noting at the outset that the Department of Homeland Security under current Secretary Janet Napolitano has already taken some positive steps toward reforming the 2006 Performance Policy that appears to have precipitated much of the abuses outlined in this report. On January 30, 2009, Secretary Napolitano issued a directive calling for an internal review and assessment of ICE's FOT program.[82] Subsequently, DHS announced the abandonment of its 1000 arrest per year goal. DHS now requires that each interior enforcement team "identify and target — though not necessarily arrest — 50 fugitives per month, as well as 500 a year as part of operations with other teams."[83] The increased focus on identification and targeting — in contrast to arrest expectations — is a significant improvement that should prompt ICE teams to concentrate their efforts on appropriate intelligence gathering. These are positive steps, which together with the recommendations set forth below, should help correct the problems outlined in this report.

## LIMIT USE OF HOME RAID OPERATIONS

### 1. Home raids should be used as a tactic of last resort, and then only to make criminal arrests or civil arrests for targets who pose a real risk to national security or who have violent criminal records.

DHS Secretary Napolitano has repeatedly emphasized her intention to focus ICE's limited enforcement resources on apprehending the narrow class of immigrants who pose a real danger to the public.[84] Home raids are extremely resource intensive and, as currently employed, an inefficient use of scarce internal enforcement resources.[85] In addition, home raid operations carry with them several significant costs, including: physical danger to residents and officers, costs to local community policing efforts, significant privacy intrusions for residents, and potential legal liability for the agencies involved. In light of these factors and in light of the record of abuses during home raid operations outlined in this report, sound policing policy dictates that home raids should be a tactic of last resort reserved for truly high priority targets.

## REVISE WARRANT PRACTICE

### 2. ICE should obtain judicial warrants in advance of any home raid.

Federal courts possess authority to issue search and/or arrest warrants for ICE home raids.[86] ICE's practice of using administrative warrants for home raids is, therefore, a policy decision presumably driven by administrative convenience, not law. Unfortunately, this convenience appears to have contributed to ICE's failure to devote adequate resources to intelligence gathering. By using administrative warrants, ICE is not required to demonstrate to a neutral magistrate its probable cause to arrest a target and its basis for believing that the target will be at a given residence. Too often, this has led ICE to identify target residences based on insufficient intelligence — leading to intrusions into innocent residents' homes and to ICE's failure to capture targets.

The procedures for obtaining a judicial warrant would be a healthy incentive for ICE to refocus its interior enforcement teams on appropriate intelligence gathering on high priority dangerous targets. In a related arena, DHS Secretary Napolitano has recently issued guidelines directing ICE agents to increase their use of judicial warrants in worksite enforcement operations as part of an attempt to impose "high investigative standards."[87] Having recognized the power of judicial oversight to heighten investigative standards, Secretary Napolitano should extend that same logic and guidance to home raid operations.

Obtaining judicial warrants would certainly impose some additional burden on ICE; however, it is a burden that virtually every other law enforcement agency in the nation is faced with and overcomes with relative ease. If ICE limits its use of home raids as suggested above, and refocuses its interior enforcement teams toward locating and arresting truly dangerous targets, it should have abundant resources to properly investigate its targets and obtain judicial warrants. Such warrants would not only incentivize appropriate pre-raid investigations but would also eliminate many of the problematic issues set forth in this report.

### 3. To the extent ICE continues to use home raids to execute administrative warrants, it should require field offices to obtain high-level centralized pre-approval in advance of any home raid operation.

While judicial review is preferable, proven and available, if ICE chooses to forego a judicial warrant, a procedure should be adopted requiring agents from ICE field offices to obtain pre-approval from ICE headquarters before conducting any home raid. The agents requesting approval should be required to justify their request by explaining the basis for their assessment of the dangerousness of the target, their determination that the target is likely to be at a given residence, and their conclusion that apprehending the target outside the home is impracticable.

## REVISE CONSENT PROCEDURES

### 4. **Whenever ICE conducts a home entry without a judicial warrant, it should ensure that it obtains valid consent by explicitly and clearly informing residents of their right to refuse consent and then obtaining written consent, of clear scope, before entry is made.**

The Constitution does not always require officers to advise residents of their right to refuse entry when officers seek consent to enter a home.[88] However, it is well established that factors such as: whether the individual understands the right to refuse to consent, whether an individual understands English, whether the individual was informed of her Miranda rights prior to the consent, whether the individual is familiar with the American legal system, and whether the police encounter occurred in a public or secluded location, are all relevant to determining whether valid consent was obtained.[89] Moreover, mere acquiescence to a show of force or legal authority is not consistent with the constitutional consent requirement nor is the mere failure of an individual to object to police intrusion.[90] Finally, permission to enter a residence does not necessarily authorize agents to search all parts of the residence — particularly in the case of multiple occupancy dwellings. Agents must clarify the scope of any consent obtained.

In light of these legal requirements and the record of non-consensual entries outlined in this report, sound policing policy dictates that ICE agents should, as a matter of policy, always explicitly and clearly inform residents of their right to refuse consent before entering a home without a judicial warrant. Many local police departments follow this practice and use standard consent forms — sometimes referred to as "speed sheets" — to deliver warnings and record written consent. ICE should adopt a similar practice. Moreover, ICE should always have an agent who speaks the language of the target on site for any home raid to ensure that informed consent is obtained.

### 5. **Tactical pre-dawn or nighttime home raids should only be conducted with judicial warrants.**

As ICE regulations explain, "in order to enter a residence [without a judicial warrant], someone who has authority to do so must grant *informed consent*."[91] Tactical pre-dawn or nighttime home entries, conducted by heavily armed seven member teams, with residents who often do not speak English and are unfamiliar with American legal norms, are simply not consistent with obtaining informed consent. Acquiescence to authority is not consent.[92] Accordingly, tactical pre-dawn or nighttime home raids should only be conducted with judicial warrants.

## IMPROVE SUPERVISION AND TRAINING OF ICE HOME RAID TEAMS

### 6. **Require a high level supervisor to be on site for all home raids.**

Because of the dangerousness and level of privacy intrusion involved, many police departments require a high level supervisor to be on site to supervise any home raid operation. ICE FOTs have one agent

designated as a "Team Leader" who is generally present during any home raid operation.[93] "Supervisors are encouraged," but not required, "to accompany teams into the field" for home raid operations.[94] However, as compared to the practice of many local police departments, such team leaders do not seem sufficiently senior to oversee highly sensitive home raid operations. The record of abuses occurring during home raid operations supports the conclusion that more intensive and responsible supervision is required. Accordingly, a high level supervisor should be on site for any ICE home raid operation to ensure that entry does not occur absent consent or a judicial warrant and, if consent is obtained, that the supervisor immediately notify the entire team of the bounds of the consent obtained.

### 7. **Videotape home raids.**

Increasingly, police departments are videotaping sensitive situations that may involve even allegations that officers failed to observe constitutional rights.[95] Given the sensitivity of home raid operations and the record of ICE abuses in such operations, ICE should institute a policy of videotaping home raids. Such a policy would both incentivize agents to comply with constitutional norms and would protect ICE against unfounded allegations of misconduct.

### 8. **Retrain relevant agents on home raid procedures. Require periodic refresher training on such procedures.**

At minimum, the findings of this report should be a strong indication to ICE that its interior enforcement teams are in need of additional training on home raid procedures. This includes additional training for ICE supervisors. Moreover, periodic refresher trainings should be a regular and ongoing part of agents' professional development.

## MINIMIZE HARM TO LOCAL POLICE AGENCIES' COMMUNITY POLICING EFFORTS

### 9. **Local police agencies should, at all times, be notified of the planning and results of ICE operations within their jurisdictions.**

Too often, ICE has failed to adequately collaborate with local police agencies. Police agencies need adequate advance warning of such operations to permit them time to collaborate with ICE on ways to mitigate harm to local community policing efforts. Moreover, ICE needs to share information in a timely fashion on the results of an operation, including the details of any individuals taken into custody. Such information is necessary to allow local police to respond to common community inquiries after an ICE operation.

### 10. **ICE should not request assistance of local police for the purpose of deceiving residents as to the identity of the agency conducting a home raid operation.**

As a general matter, local police should be called upon to assist ICE when such assistance is necessary to ensure community or officer safety or when ICE anticipates that it will encounter

individuals involved in local criminal activity. However, ICE's routine practice of requesting a marked local police cruiser to accompany ICE agents on home raids often produces the effect of deceiving residents about which agency is conducting a home raid — an outcome which significantly undermines local police agencies' community policing efforts. Such deception is likely to make residents less willing to open the door for local police in the future and may deter some immigrant victims and witnesses of crimes from contacting local police. To guard against the misimpression that ICE agents are local law enforcement, agents should be trained to stop identifying themselves as "police" and instead identify themselves as "immigration, " "ICE," or "federal agents." ICE must assure that those impacted by the raid clearly understand that those conducting the raid are federal agents, and the agencies involved are clearly identified.

## MINIMIZE INTRUSION TO NON-TARGETS ENCOUNTERED

**11. Ensure that performance targets for ICE interior enforcement teams set realistic goals, provide incentives for teams to focus on dangerous targets, and award teams no incentive to divert scarce resources to collateral arrests of mere civil immigration violators.**

The detrimental effects of ICE's 2006 Performance Policy are plain to see. The new policies precipitated both the increase in constitutional violations outlined in this report and the decrease in efficiency of interior enforcement teams at capturing dangerous high priority targets.[96] The 2006 policy should be abandoned and replaced with a policy that sets realistic goals for interior enforcement teams and creates incentives for teams to focus efforts exclusively on high priority targets.

DHS should be credited for the steps it has already taken to revise the 2006 policies.[97] However, without full details on the new policy, it is impossible to determine if the policy requires teams to focus on high priority targets. Specifically, ICE should make clear that teams get no additional performance credit for making collateral arrests and should focus their limited resources exclusively on violent criminals and national security threats.

**12. Clear guidance should be issued that the sole objective of a home raid is to apprehend the target — agents should not generally question non-targets encountered in or around the residence about matters other than the location of the target.**

Too often since 2006, ICE agents have used home raid operations, purportedly seeking an individual target, as an opportunity to seize and question non-targets in and around the target residence for the purpose of random investigatory questioning. Revision of the performance targets discussed above and eliminating credit for collateral arrests should help curb this type of behavior. However, in addition to the revised performance goals, ICE should issue clear guidance that the privacy of non-target individuals encountered during home raids should be respected and that such raids

should not be used as opportunities to question collaterals on subjects other than the location of the target. The sole objective of a home raid should be to apprehend the target.

When agents are lawfully inside a home, they are permitted to briefly seize individuals to conduct a protective sweep when they reasonably believe that the premises harbor a person who poses a danger to the agents. However, the temptation is for officers to improperly use such seizures as an opportunity to conduct baseless investigatory interviews of non-target individuals. If non-targets need to be temporarily seized for a protective sweep, such temporary detention should not be used as an opportunity for investigatory questions regarding non-targets' immigration status.

### 13. A new regulation should be issued to require officers to note the reason why they initially seized and questioned any individual in their arrest report.

Federal regulations already require ICE agents to note whether consent to enter a residence was obtained and, if so, from whom.[98] The apparent purpose of this regulation is to remind officers of their constitutional requirement to obtain consent and to hold them accountable for their behavior. The same rationale applies with equal force to the physical seizure of individuals by ICE agents — especially in light of the record set forth above regarding a pattern of unlawful seizures of non-target individuals. Accordingly, ICE should require its agents to note the basis for their initial seizure of individuals in their arrest reports.

### 14. Clear guidance should be issued that neither racial nor ethnic appearance nor limited English proficiency is ever a sufficient sole basis for seizing or questioning an individual.

ICE officers must have, at minimum, reasonable suspicion that a person has violated the law in order to seize the individual, even for investigatory questioning.[99] In no situation is racial or ethnic appearance or limited English proficiency ever a sufficient basis for seizing and questioning an individual.[100] The empirical data above, suggestive of racial profiling by ICE agents, warrants additional clear guidance on this settled point of law. Current ICE policy undoubtedly forbids this illegal behavior but additional guidance and training on this point is necessary to protect non-target individuals during ICE home raids.

### IMPROVE ACCOUNTABILITY

### 15. The DHS Office of the Inspector General (OIG) should undertake an investigation of the pattern of misconduct established in this report to better assess the national scope of the problem.

The data from Long Island and New Jersey are strong indicators of pervasive problems in the New York and New Jersey ICE field offices and the other evidence set forth above is suggestive of a national trend. The public's ability to fully assess the scope of this problem is, however, limited

by incomplete access to relevant ICE records and by our inability to interview ICE employees and arrestees. OIG does not suffer from these same limitations and, based upon the record of misconduct set forth in this report, should undertake a broader national investigation of ICE misconduct during home raid operations. Such a report should be followed up by periodic spot checks of arrest records and interviews with agents and arrestees at various field offices to monitor the problem over time.[101]

## 16. **Establish a revised clear public complaint procedure, managed by OIG, for allegations involving violations of constitutional rights by ICE agents.**

Currently ICE's Office of Professional Responsibility (OPR) generally handles any investigation of ICE constitutional violations occurring during home raid or other operations. Unfortunately, OPR has been unresponsive to many such complaints and appears to lack the independence necessary to properly scrutinize ICE conduct. In contrast, OIG is more removed from ICE field offices and has, in the past, demonstrated its ability to provide effective oversight to ICE operations.[102] Accordingly, DHS should establish an oversight unit in OIG to handle community complaints of ICE misconduct. OIG should make its complaint procedure widely known and easily available to local law enforcement and political leaders, immigrant advocates, and the general public. OIG should ensure that complaints are thoroughly investigated and that complainants receive timely responses. OIG should, of course, receive such additional funding and staffing as is necessary to accomplish these tasks.

## 17. **Enact regulations disallowing the use of evidence that has been obtained through violation of the constitution in removal proceedings.**

In 1984, the Supreme Court held that constitutional violations do not require suppression of evidence in immigration removal proceedings; at least in the absence of egregious or widespread constitutional violations.[103] However, nothing prohibits DHS or the Department of Justice (which oversees the immigration courts) from excluding constitutionally tainted evidence as a matter of policy. Moreover, the rationale of the Supreme Court's 1984 decision is in some tension with the findings of this report. Most importantly, the Court placed significant reliance upon ICE's ability to develop its "own comprehensive scheme for deterring Fourth Amendment violations by its officers."[104] This report strongly suggests that ICE's "comprehensive scheme" has broken down. Local police officials recognize the power of the exclusionary rule to help conform officers' behavior to the strictures of the Constitution. In light of the record of misconduct set forth in this report, imposing this common rule of law enforcement in the immigration realm would be an important step toward ensuring that ICE home raid operations, and all ICE operations, are conducted in accordance with the Constitution.

1. The other two DHS agencies principally involved in immigration matters are the U.S. Customs and Border Protection agency (CBP), charged with securing the nation's borders, and the U.S. Citizenship and Immigration Services agency (USCIS), charged with administrating immigration benefits such as citizenship and permanent residence. These three agencies were created to replace the former U.S. Immigration and Naturalization Service (INS) and the U.S. Customs Service. For a recent assessment of these three agencies, see generally Doris Meissner and Donald Kerwin, Migration Policy Institute, *DHS and Immigration: Taking Stock and Correcting Course* (2009), *available at* http://www. migrationpolicy.org/pubs/DHS_Feb09.pdf.

2. Immigration and Nationality Act, 8 U.S.C. § 1101 et seq. The INA is the federal statute that governs naturalization and deportation law.

3. The most common civil immigration status violations are overstaying the time permitted by one's visa and having entered the country without inspection.

4. *See* DHS Fact Sheet, Worksite Enforcement Strategy (Apr. 30, 2009), *available at* http://www.ice.gov/doclib/pi/news/factsheets/worksite_strategy.pdf; *see, e.g.,* Julia Preston, *U.S. Shifts Strategy on Illicit Work by Immigrants,* N.Y. TIMES, July 3, 2009.

5. U.S. CONST. amend. IV; *see also INS v. Lopez-Mendoza,* 468 U.S. 1032, 1047 (1984) (majority assuming that all persons in the United States, including undocumented immigrants, have Fourth Amendment rights); *Au Yi Lau v. U.S. INS,* 445 F.2d 217, 223 (D.C. Cir. 1971) ("[A]liens in this country are sheltered by the Fourth Amendment in common with citizens.").

6. ICE has five operational components, four of which are domestic law enforcement divisions: 1) Office of Investigations, 2) Detention and Removal Operations, 3) Federal Protective Service, 4) Office of Intelligence. *See* About U.S. Immigrations and Customs Enforcement (ICE), http://www.ice.gov/about/index.htm. *See generally* Department of Homeland Security Office of Inspector General, An Assessment of Immigration and Customs Enforcement's Fugitive Operations Teams, OIG-07-34 (Mar. 5, 2007), *available at* http://www.dhs.gov/xoig/assets/mgmtrpts/OIG_07-34_Mar07.pdf [hereinafter OIG FOT Report].

7. *See generally* U.S. Immigration and Customs Enforcement Website, http://www.ice.gov/index.htm; OIG FOT Report *supra* note 6.

8. Declaration of Darren Williams, Supervisory Detention and Deportation Officer with the NYC FOT in the New York Field Office of ICE's DRO (Dec. 2007), submitted in *Aguilar v. ICE,* No. 07 Civ. 1782 (S.D.N.Y. 2007) [hereinafter Williams Declaration].

9. *See* discussion *infra* at note 41 & 71 and accompanying text.

10. OIG FOT Report *supra* note 6, p. 4.

11. ICE Fugitive Operations Program Fact Sheet, http://www.ice.gov/pi/news/factsheets/NFOP_FS.htm.

12. *See* discussion *infra* at note 71-74 and accompanying text.

13. Margot Mendelson, Shayna Strom & Michael Wishnie, Migration Policy Institute, Collateral Damage: An Examination of ICE's Fugitive Operations Program 8 (Feb. 2009), *available at* http://www.migrationpolicy.org/pubs/NFOP_Feb09.pdf [hereinafter MPI Collateral Damage Report].

14. *Payton v. New York,* 445 U.S. 573, 585 (1980) (quoting *United*

States v. United States District Court, 407 U.S. 297, 313 (1972)).

15. *United States v. Matlock,* 415 U.S. 164, 171 (1974).

16. *Michigan v. Tyler,* 436 U.S. 499, 509 (1978) (citing *Warden v. Hayden,* 387 U.S. 294, 298-99 (1967)).

17. *Katz v. United States,* 389 U.S. 347, 357 (1967).

18. *See generally See v. City of Seattle,* 387 U.S. 541 (1963); *Camara v. Municipal Court of City and County of San Francisco,* 387 U.S. 523 (1963).

19. *Payton,* 445 U.S. at 587.

20. DHS incorporates this constitutional requirement in its regulations. *See* 8 C.F.R. § 287.8(f)(2); *see also* note 17.

21. *Brown v. Texas,* 443 U.S. 47, 50 (U.S. 1979).

22. *Payton,* 445 U.S. at 587.

23. *Terry v. Ohio,* 392 U.S. 1 (1968).

24. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 886-87 (1975) ("The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens."); *United States v. Manzo-Jurado,* 457 F.3d 928, 937 (9th Cir. 2006) ("By itself, however, an individual's inability to understand English will not justify an investigatory stop because the same characteristic applies to a sizable portion of individuals lawfully present in this country."); *Gonzales-Rivera v. INS,* 22 F.3d 1441, 1443 (9th Cir. 1994) ("We conclude that the stop, which resulted solely from Gonzalez' Hispanic appearance, constituted a bad faith and egregious violation of the Fourth Amendment.").

25. Letter from Michael Chertoff, Former Sec'y of Homeland Security, to U.S. Sen. Christopher Dodd (June 14, 2007), *available at* http://www.nytimes.com/packages/html/nyregion/20070723Chertoff.pdf [hereinafter Chertoff Letter, June 2007]; Nina Bernstein, *Hunts for 'Fugitive Aliens' Lead to Collateral Arrests,* NY TIMES, July 23, 2007, at B5; *see also* 8 C.F.R. § 287.5(e)(1) (2008).

26. 8 C.F.R. § 287.5(e)(2) (2008); *see also* INA § 287(a)(3), 8 U.S.C. § 1357(a)(3); discussion *supra* at note 18 and accompanying text.

27. "Revisions of Chapter 10 Title and Realignment of the Section Titles of the Detention and Deportation Officer's Field Manual," August 21, 2008 (emphasis added); *see also* Chertoff Letter, June 2007 *supra* note 25.

28. The conduct of ICE agents in OI operations is governed by policies and procedures set out in Chapter 42 of the Special Agent's Handbook entitled Search and Seizure [hereinafter Special Agent's Handbook] and the Law of Arrest, Search and Seizure Manual, commonly referred to as the M-69. Similarly, the conduct of ICE agents in DRO Fugitive Operations Program are governed by policies and procedures set out in Chapter 19 of the Detention and Removal Operations Policy and Procedure Manual [hereinafter DROPPM]. *See also* 8 C.F.R § 287.8(b) (2). Information about DROPPM and the Special Agent's Handbook was obtained from the Declaration of Jeffrey Knopf, Group Supervisor in the NY Special Agent-in-Charge (SAC) Office of ICE's Office of Investigations (Dec. 2007) [hereinafter Knopf Declaration], submitted in *Aguilar v. ICE,* No. 07 Civ. 8224 (S.D.N.Y. 2007) and the Williams Declaration *supra* note 8.

29. DROPPM *supra* note 28, as quoted in paragraph 21 of Williams Declaration *supra* note 8 (emphasis in original); "Voluntary and effective consent to search obviates the

need for a warrant or probable cause. To justify a search without a warrant on this ground, there must be a volitional [sic], duress-free permission to enter and make the kind of search agreed to." Special Agent's Handbook *supra* note 28; "Warrants of Deportation or Removal are administrative rather than criminal, and do[] not grant the authority to breach doors. Thus informed consent must be obtained from the occupant of the residence prior to entering." DROPPM *supra* note 28.

30. Knopf Declaration *supra* note 28, para. 9.

31. *Id.*, para. 10.

32. 8 C.F.R § 287.8(b)(2).

33. INA §287(a)(2), 8 U.S.C. § 1357(a)(2). Section 287(a)(2) of the Immigration and Nationality Act states that "any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant … to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest.…"

34. *Id.*

35. *Id.*

36. *Id.*

37. *Id.*

38. 8 C.F.R. § 287.8(f)(2) (emphasis added).

39. *See Families for Freedom v. ICE,* 08-cv-5566 (Sept. 24, 2008 S.D.N.Y.) (Amended Stipulation and Order). The standard ICE arrest report is an I-1213, Record of Deportable Alien. However, in the Families for Freedom litigation ICE identified two other documents which could contain information regarding the legal basis of entry, including Fugitive Operation Worksheets (FOW) and Significant Incident Reports (SIR), though these documents are not generated in every arrest. Pursuant to a court ordered stipulation, ICE agreed to hand over the 100 randomly selected I-213s and any related FOWs and SIRs.

40. Stipulation of Partial Settlement and Revised Scheduling Order, *Seton Hall School of Law Center for Justice and Evicao El Brasileira v. DHS et al.,* No. 08 Civ. 00521 (D.N.J. Oct. 29, 2008). ICE actually handed over 885 arrest records pursuant to this stipulation but only 600 or 68% involved home raid operations. The analysis of the New Jersey data set was performed by the Seton Hall School of Law Center for Justice.

41. Indeed, the 2006 performance policy changes permitting collateral arrests to count toward performance expectations encouraged this pretextual behavior by allowing collaterals to count "but only where these arrests are made as part of a DRO Headquarters-approved operation." DRO Memorandum, *Fugitive Case Management System Reporting and the 1,000 Arrests Annual Goal for Fugitive Operations Teams* (Sept. 29, 2006), available at http://cardozo.yu.edu/uploadedFiles/ Cardozo/Profiles/immigrationlaw-741/memos%20and%20 data.pdf .

42. *INS v. Lopez-Mendoza,* 468 U.S. 1032, 1050 (1984).

43. *Id.* at 1050; *Lopez-Rodriguez v. Mukasey,* 536 F.3d 1012 (9th Cir. 2008); *Almeida-Amaral v. Gonzalez,* 461 F.3d 231, 235 (2d Cir. 2006).

44. *See* discussion *infra* at note 75-76 and accompanying text.

45. *See* Westlaw Database, "Federal Immigration - Board of Immigration Appeals' Administrative Decisions,"

*available at* https://web2.westlaw.com/scope/default. wl?rs=WLW9.9&ifm=NotSet&fn=_top&sv=Split&tc=110 1&tf=770&db=FIM-BIA&vr=2.0&rp=%2fscope%2fdefault. wl&mt=Immigration.

46. *See, e.g.,* Spencer Hsu, *DHS Signals Policy Changes Ahead for Immigration Raids,* Wash. Post, Mar. 29, 2009 (quoting House Speaker Nancy Pelosi's statement that immigration raids "break up families in that way, just kick down the door in the middle of the night, taking [a] father, a parent away, that's just not the American way. It must stop."); Letter from Sen. Kirstin Gillibrand (D-NY) to Janet Napolitano, DHS Sec'y (Feb. 5, 2009), *available at* http://gillibrand.senate.gov/imo/media/doc/ Napolitano_Raids1.pdf ("I have been appalled by some of the practices I have heard about and I would like to work with your Department to end the practice of allowing immigration officers to forcefully enter people's homes with nothing more than an administrative warrant, and incarcerate anyone that can not immediately produce their immigration papers."); Will Oremus, *P.A. Sends Message On Federal Raids, Immigrants,* San Jose Mercury News, Oct. 23, 2008 (reporting on Palo Alto resolution decrying "improper and unlawful law enforcement tactics by the U.S. Immigration and Customs Enforcement agents" and asking federal agents to "respect its residents' constitutional rights"); *Broken Borders Need More Than Lip Service,* USA Today, June 27, 2008 (reporting on Senator Robert Menendez's (D-NJ) speech condemning the way U.S. citizens and lawful permanent residents have been "denied their constitutional rights" during ICE home raids); Fernando Quintero, *Greeley Mayor's Call For End To Raids Ignites Firestorm,* Denver Rocky Mountain News, May 17, 2007 (reporting on Mayor's call for end of immigration raids in his community); Jesse McKinley, *San Francisco Bay Area Reacts Angrily to Series of Immigration Raids,* N.Y. Times, Apr. 28, 2007 (Mayor Al Boro of San Rafael explained that following recent ICE home raids "[c]alls to the local police have decreased in recent weeks"; he attributed the drop-off to the immigration raids' "'chilling effect because people think our police were involved.'"); Press Release, Senator John Kerry (D-Mass.) (Mar. 17, 2007) ("The recent raids conducted by the Immigration and Customs Enforcement (ICE) across the country have exposed for all to see the horrific enforcement tactics and reprehensible treatment of families."); Letter from Sen. Joe Lieberman (Ind-CT), Sen. Chris Dodd (D-CT), and Rep. Rosa DeLauro (D-CT) to Michael Chertoff, former DHS Sec'y (June 11, 2007), *available at* http://dodd.senate.gov/index.php?q=node/3936 [hereinafter Leiberman, Dodd, DeLauro Letter] (seeking clarification about the way in which a New Haven immigration raid was conducted, its timing, and if violations of protocol may have occurred); Letter from Thomas R. Suozzi, Nassau County Executive to Michael Chertoff, former DHS Secretary (Oct. 2, 2007) *available at* http://www.nassaucountyny.gov/agencies/countyexecutive/ newsrelease/2007/10-2-2007.html [hereinafter Suozzi Letter] (calling for a federal investigation into the tactics and practices used in ICE raids in Nassau County communities); Letter from Lawrence W. Mulvey, Nassau County Police Commissioner, to Joseph A. Palmese, Resident Agent-in-Charge, ICE Office of Investigation, Bohemia N.Y. (Sept. 27, 2007) (on file with author) [hereinafter Mulvey Letter]; Senators Menendez (D-N.J.) and Kennedy (D-Mass) have introduced legislation that, among other things, would enforce the protection of fundamental constitutional rights of persons wrongfully swept up in immigration raids. A Bill To Protect United States Citizens From Unlawful Arrest And Detention, S. 3594, 110th Cong. (2008).

47. *See generally* Anita Khashu, Police Foundation, *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* (Apr. 2009), *available at* http://www.policefoundation.org/; *see generally* Nicole J. Henderson, Christopher W. Ortiz, Naomi F. Sugie, Joel Miller, Vera Institute of Justice, Law Enforcement and Arab American community relations after September 11, 2001: technical report (June 2006), *available at* http://www.vera.org/content.law-enforcement-and-arab-american-community-relations-after-september-11-2001-technical-repo; *see, e.g.,* Damien Cave, *Big-City Police Chiefs Urge Overhaul of Immigration Policy,* N.Y. TIMES, July 2, 2009 (Miami Police Department Chief Timoney explained, "The problem for us is they don't discern between federal authorities and local authorities. As far as they're concerned it's all law enforcement.").

48. *Id.; see, e.g.,* Damien Cave, *Big-City Police Chiefs Urge Overhaul of Immigration Policy,* N.Y. TIMES, July 2, 2009 ("[Miami Police Department] Chief Timoney, Chief Art Acevedo of the Austin Police Department in Texas and former Chief Art Venegas of the Sacramento Police Department said local law enforcement had been undermined by the blurred line between crimes and violations of immigration law, which are civil. Those who call illegal immigrants "criminals"... are misreading the law and hurting their own communities by scaring neighbors who could identify criminals."); Kareem Fahim, *Should Immigration Be a Police Issue?,* N.Y. TIMES, Apr. 29, 2007, at CN14 (Former New Haven Police Chief Francisco Ortiz explained, "'I have two undocumented individuals who are murder victims.... You need people to tell you about the lives of the victims.' If his officers were also charged with enforcing immigration policy -- no matter how small the role -- witnesses would say, 'You're on your own.'"); Nina Bernstein, *Raids Were a Shambles, Nassau Complains to U.S.,* N.Y. TIMES, Oct. 3, 2007 (Nassau County Police Commissioner Lawrence Mulvey explains that the reason Nassau has the lowest crime rate in the nation for a county of its size is in part because the police have good cooperation from the community. The conduct of the raids could undermine that relationship, he added. "I was misled," Mr. Mulvey said. "In good conscience, I can't continue to cooperate unless these problems are ironed out."); Craig E. Ferrell Jr., Deputy Director and Administration General Counsel, Chief's Command Legal Services, Houston Police Department, International Association of Chiefs of Police, Immigration Enforcement: Is It a Local Issue?, (Feb. 2004) (Deputy Director Ferrell writes, "Immigration enforcement by state and local police could have a chilling effect in immigrant communities and could limit cooperation with police by members of those communities. Local police agencies depend on the cooperation of immigrants, legal and illegal, in solving all sorts of crimes and in the maintenance of public order. Without assurances that they will not be subject to an immigration investigation and possible deportation, many immigrants with critical information would not come forward, even when heinous crimes are committed against them or their families. Because many families with undocumented family members also include legal immigrant members, this would drive a potential wedge between police and huge portions of the legal immigrant community as well."). *See also* National Immigration Law Center Fact Sheet, Immigration Enforcement, Know Your Rights at Home and at Work (revised May 2008), *available at* www.nilc.org.

49. Leiberman, Dodd, DeLauro Letter *supra* note 46.

50. *New Haven Urges End To Federal Immigration Raids,* ASSOCIATED PRESS, June 12, 2007.

51. Leiberman, Dodd, DeLauro Letter *supra* note 46.

52. Chertoff Letter, June 2007 *supra* note 25.

53. Jennifer Medina, *Arrests of 31 In U.S. Sweep Bring Fear In New Haven,* N.Y. TIMES, June 8, 2007, p. B1.

54. *New Haven Urges End To Federal Immigration Raids,* ASSOCIATED PRESS, June 12, 2007; Mark Spencer, *U.S. Defends Raids In New Haven: Chertoff Letter Says Sweep Was Not In Retaliation,* HARTFORD COURANT, June 18, 2007.

55. Joelle Fishman & Dorothy Johnson, *New Haven Unites To Stop Immigrant Raids,* PEOPLE'S WEEKLY WORLD, June 20, 2007.

56. *See generally* Suozzi Letter *supra* note 46; Mulvey Letter *supra* note 46.

57. Affidavit of Lawrence Mulvey, Nassau County Police Commissioner, ¶¶ 5-7 (signed on Sept. 9, 2008) (on file with authors) [hereinafter Mulvey Aff.]

58. Suozzi Letter *supra* note 46; Suevon Lee, *Gang Members Illegally in U.S. Are Arrested in Federal Sweep,* N.Y. TIMES (Oct. 10, 2007).

59. Nina Bernstein, *Raids Were a Shambles, Nassau Complains to U.S.,* N.Y. TIMES, p. B1 (Oct. 3, 2007).

60. Editorial, *Stop the Raids,* N.Y. TIMES, p. A28 (Oct. 4, 2007); Nina Bernstein, *Raids Were a Shambles, Nassau Complains to U.S.,* N.Y. TIMES, Oct. 3, 2007, p. B1. Commissioner Mulvey, reported a slightly different number of targets and target arrests: 131 targets sought, 9 targets arrested. Mulvey Aff. *supra* note 57, ¶¶ 5-6, 9. The difference is insignificant, however, since both reports have ICE arresting only 6-7% of the targets they sought.

61. Suozzi Letter *supra* note 46.

62. Mulvey Letter *supra* note 46; Mulvey Aff. *supra* note 57, ¶ 8.

63. Peter J. Smith, the Special Agent in Charge (SAC) denied Suozzi's allegations, but conceded, "We didn't have warrants...We don't need warrants to make the arrests. These are illegal immigrants." Nina Bernstein, *Raids Were a Shambles, Nassau Complains to U.S.,* N.Y. TIMES, Oct. 3, 2007, p. B1.

64. Mulvey Aff. *supra* note 57, ¶ 10.

65. *Id.* (emphasis added).

66. *See* discussion *supra* at notes 46 & 48.

67. ICE agents may have the authority to perform a protective sweep of a residence when there is a reasonable basis to believe an individual posing a danger to the officers is hiding in the premises. *See Maryland v. Buie,* 494 U.S. 325, 327 (1990). Such searches, however, are only justified if an officer has legally entered a premises and must be limited to looking in places where dangerous people may be hiding. *Id.*

68. Nina Bernstein, *Raids Were a Shambles, Nassau Complains to U.S.,* N.Y. TIMES, Oct. 3, 2007.

69. Email on file with author.

70. Organizations from all over the country have gotten involved in the discussion of these Fourth Amendment violations. Resources have been created and distributed regarding ways to prepare for home raids, how to respond to home raids, what to do in the event of home raids and community education and training regarding safety plans and legal rights. *See, e.g.,* Jen Smyers, Church World Service, Community Responses to

Immigration Raids: A Collection of Resources, www.nclr.org/
files/54953_file_Comprehensive_Raids_Resources.pdf; Bay Area
Immigrant Rights Coalition, Toolkit for Community Response
to ICE Raids, Section 3: Additional Resources, Attachments and
Handouts, http://www.immigrantrights.org/toolkit/Toolkit_
Section3_pg20-24%20-%20Documentation%20Forms%20
Eng%20and%20Spn.pdf. These resources document the
expansion of the issue of home raids and Fourth Amendment
violations from a simple community issue to an issue that
reaches inside the homes of people throughout the country.
Evidence of a growing concern of Fourth Amendment violations
during home raids is also showing up in local, state and national
organizing campaigns. Organizations have created Action
Toolkits to allow people all over the country to take part in actions
to end home raids. One organization created a Night of 1,000
Conversations which allows people from all over the country to
gather in homes, offices, coffee shops, and places of worship to
talk about how to work together to ensure that the Department
of Homeland Security no longer undermines the civil liberties
and human rights of people living in America. See, e.g., Night of
1,000 Conversations Website, www.nightof1000conversations.
org (encouraging website visitors to host conversations about
ICE raids). They have also organized rallies, protests and
petitions aimed at ending immigration home raids. Support
groups for victims of Fourth Amendment violations during
home raids have been created throughout the country. See,
e.g., Bob McCobbin, Immigrants, supporters say: End ICE raids
International Action Center Website, May 28, 2008, http://www.
iacenter.org/immigrants/ice_iowa0530008 (noting public protest
of ICE raids in Iowa, Northern California, and San Diego). Blogs,
Facebook and Twitter have also been an important organizing
tool that have brought the issue of home raids into the homes
of young and old alike. See, e.g., Stop ICE Raids on Twitter,
http://twitter.com/Stop_ICE_Raids; Demand an End to the
ICE Raids and Support Comprehensive Immigration Reform
Facebook Group, http://www.facebook.com/home.php?#!/group.
php?gid=41007976096.

71. See Nina Bernstein, Target of Immigrant Raids Shifted, N.Y.
Times, Feb. 4, 2009, at A1; Spencer S. Hsu, Immigration
Priorities Questioned, Report Says Focus on Deporting
Criminals Apparently Shifted, Wash. Post, Feb. 5, 2009, at
A2; see also MPI Collateral Damage Report supra note 13;
Memorandum from John P. Torres, Acting Director, ICE
Office of Detention and Removal Operations to All Filed
Office Directors, Fugitive Operations Case Priority and
Annual Goals (Jan. 31, 2006), available at http://cardozo.
yu.edu/uploadedFiles/Cardozo/Profiles/immigrationlaw-741/
memos%20and%20data.pdf.; Memorandum from John P.
Torres, Acting Director, ICE Office of Detention and Removal
Operations to Assistant Directors, Deputy Assistant Directors
and Field Officers, ICE Office of Detention and Removal
Operations, Fugitive Case Management System Reporting and
the 1,000 Arrests Goal for Fugitive Operations Teams (Sept.
29, 2006) [hereinafter DRO Sept. 29, 2006 Memo], available
at http://cardozo.yu.edu/uploadedFiles/Cardozo/Profiles/
immigrationlaw-741/memos%20and%20data.pdf.

72. The DRO Sept. 29, 2006 Memo supra note 71 provides that
"[I]n calculating Field Offices' success in reaching the goal
of 1,000 arrests ... non-fugitive arrests may now be included
in that total. However, each Field Office must nonetheless
average at least 500 fugitive arrests per Fugitive Operation
Team."

73. DHS Office of Inspector General, Department of Homeland
Security, An Assessment of United States Immigration and
Customs Enforcement's Fugitive Operations Teams, p.
15 (March 4, 2007) (discussing how targets are identified
using internal government databases that are rife with well-
documented inaccuracies); Suozzi Letter supra note 46.
See generally MPI Collateral Damage Report supra note 13;
Marisa Antos-Fallon, The Fourth Amendment and Immigration
Enforcement in the Home: Can ICE Target the Utmost Sphere
of Privacy, 35 Fordham Urb. L.J. 999 (2008).

74. See MPI Collateral Damage Report supra note 13; Cardozo
Immigration Justice Clinic Press Release, Previously Secret
Memos And Data Show Bush-Era Immigration Raids Were
Law Enforcement Failure, available at http://www.cardozo.
yu.edu/immigrationnews (explaining how since the 2006
expectations were implemented, the number of "criminal
aliens" arrested per FOT has dropped 62% and FOTs have
become 23% less efficient at capturing "fugitives" and that
between 2005 and 2008 ICE arrested only one "fugitive that
posed a threat to national security").

75. INS v. Lopez-Mendoza, 468 U.S. 1032 (1984).

76. In fact, ICE's standard litigation position is that immigration
courts lack the power to suppress evidence even in the face of
egregious constitutional violations. See, e.g., In re I., A#XXX
XX XXX , DHS Brief in Opp. To Mot. To Suppress (N.Y.
Immigr. Ct.) (on file with author).

77. Press Release, U.S. Census Bureau, Census Bureau Data
Show Characteristics of the U.S. Foreign Born Population
(Feb. 19, 2009), available at http://www.census.gov/Press-
Release/www/releases/archives/american_community_
survey_acs/013308.html (stating that 68% of the foreign-
born population has high school degrees, compared to
88% of native born. Also noting that 52% of the foreign
born population say they speak English "less than very well"
compared to 2% of the native born).

78. While there are no statistics available on the economic status
of respondents in removal proceedings, census statistics
on the foreign born population generally demonstrate that
foreign born individuals are more likely to live in poverty and
have lower median household incomes than the native born
population. See id.

79. See discussion supra at notes 25-37 and accompanying text.

80. In addition, there is some indication that ICE's Office of
Professional Responsibility (OPR) has failed to adequately
investigate allegations of misconduct. For example, OPR
concluded that every report of misconduct it reviewed arising
out of the highly publicized 2007 Long Island Community
Shield Operation was "unsubstantiated." E-mail from ICE
Counsel in Families for Freedom v. U.S. Bureau of Immigration
and Customs Enforcement, No. 08 Civ. 5566 (S.D.N.Y.
filed June 20, 2008) to author (Apr. 9, 2009) (on file with
author). While it is possible that all allegations were in
fact unsubstantiated, the uniformity of OPR's self-serving
outcome is somewhat suspect in light of the eyewitness
accounts of Nassau County Police Officers. See generally
Mulvey Aff. supra note 57.

81. The Police Foundation, The Role of Local Police: Striking
a Balance Between Immigration Enforcement and Civil
Liberties, pp. 23-25 (April 2009); International Association
of Chiefs of Police, Police Chiefs Guide to Immigration
Issues, pp. 24, 35 (July 2007); Major Cities Chiefs (MCC),

Immigration Committee Recommendations For Enforcement Of Immigration Laws By Local Police Agencies, pp. 5-6 (June 2006).

82. DHS Press Release, *Secretary Napolitano Issues Immigration and Border Security Action Directive* (Jan. 30, 2009), available at http://www.dhs.gov/ynews/releases/pr_1233353528835.shtm.

83. N.C. Aizenman, *Conflicting Accounts of an ICE Raid in Md.*, WASH. POST, p. A1 (Feb. 18, 2009).

84. *See, e.g.*, Josh Meyer and Anna Gorman, *Napolitano Shifts Focus to Employers of Illegal Workers*, LOS ANGELES TIMES (Mar. 31, 2009) (a DHS spokesperson explained that Napolitano is "focused on using our limited resources to the greatest effect, targeting criminal aliens …"); Spencer S. Hsu, *Immigration Priorities Questioned. Report Says Focus on Deporting Criminals Apparently Shifted*, WASHINGTON POST, p.A2 (Feb. 5, 2009) (Napolitano rejecting the assertion that focusing on "criminal fugitives" is equivalent to "amnesty" for civil immigration violators and explaining "No, it's a matter of where you put your emphasis.").

85. For example, according to Commission Mulvey, ICE's Nassau County Community Shield Operation in September 2007, involved ICE flying in and housing approximately 80 agents from other jurisdiction who worked together with approximately 150 agents from the local New York field office. Over the course of three days these agents apprehended only thirteen targets in Nassau County, and fifteen targets in Suffolk County, NY, according to ICE. *See also* MPI Collateral Damage Report *supra* note 13 at p. 1 ("In 2007, Congress appropriated $183 million for NFOP. With those funds, ICE reported that in 2007 its fugitive operations teams arrested only 672 fugitive aliens who either had a violent criminal history or were considered dangerous to the community.").

86. *See* 8 C.F.R § 287.8(f)(2); *see generally* Fed. R. Crim Pro. 41; 28 U.S.C. § 1651; *see Kotler Industries, Inc. v. I.N.S.*, 586 F. Supp. 72, 74 (D.C. Ill., 1984) ("Kotler argues first that the magistrate had no authority to issue civil warrants permitting the INS to search for illegal aliens. This contention is meritless. As the District of Columbia Circuit Court of Appeals has explained, the power of the INS to obtain search warrants for commercial premises may be inferred from its general statutory power to seek out and question suspected illegal aliens"); *see also INS v. Delgado*, 466 U.S. 210, 217 n.5 (1984); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1219-22 (D.C.Cir.1981), *cert. denied*, 455 U.S. 940 (1982).

87. DHS Worksite Enforcement Strategy Fact Sheet (Apr. 30, 2009), available at http://www.ice.gov/doclib/pi/news/factsheets/worksite_strategy.pdf

88. *See generally Schneckloth v. Bustamonte*, 412 U.S. 218, 234 (1973); *see also United States v. Drayton*, 536 U.S. 194, 206 (2002).

89. *See, e.g., United States v. Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001); *United States v. Ivy*, 165 F.3d 397, 402 (6th Cir. 1998); *United States v. Jerez*, 108 F.3d 684, 720 (7th Cir. 1997); *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).

90. *See Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) (government's burden to show consent "cannot be discharged by showing no more than acquiescence to a claim of lawful authority"); *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir.1996) ("[I]t is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to

establish voluntary consent."); *MacKenzie v. Robbins*, 248 F. Supp. 496, 501 (D.Me.1965) (stating that "all of the cases" found by the court "have held that mere acquiescence in the entry to private living quarters by police officers acting under color of their office is insufficient to constitute the type of consent" required to validate a search). As a federal appellate court recently explained:

> The purpose of a "knock and talk" is not to create a show of force, nor to make demands on occupants, nor to raid a residence. Instead, the purpose of a "knock and talk" approach is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search…. To have conducted a valid, reasonable "knock and talk," the officers could have knocked on the front door to the front house and awaited a response; they might have then knocked on the back door or the door to the back house. When no one answered, the officers should have ended the "knock and talk" and changed their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance. Here, however, the officers made a show of force, demanded entrance, and raided the residence, all in the name of a "knock and talk." The officers' "knock and talk" strategy was unreasonable…*United States v. Gomez-Moreno*, 479 F.3d 350, 355-56 (5th Cir. 2007).

91. *Id.* (emphasis in original). *See generally* discussion *supra* at notes 25-37 and accompanying text.

92. *See* discussion *supra* at note 90 and accompanying text.

93. ICE Memorandum from Anthony S. Tangeman, Director DRO , *Addition to Chapter 19, Section 5 (Field Operations/Tactics) of Detention and Deportation Field Officer's Manual*, p. 4 (undated or date redacted) (on file with author).

94. *Id.* at p. 6.

95. *See generally* Jim O'Hara, *Fitzpatrick Wants Confessions On Tape: District Attorney Expects Police To Balk At Having Suspects' Statements On Video*, POST STANDARD, Mar. 16, 2009; Laura Cadiz, *Questions On Video Assisting Justice Police Policy In Md. Varies; Legislation On Tap In Assembly*, BALTIMORE SUN, Feb. 20, 2006; P.L. Wyckoff, *Where Trooper Video Cams Roam, Questions Arise: Many Policy Decisions Loom For State Police*, THE NEWARK STAR-LEDGER, July 1, 1998.

96. *See generally* MPI Collateral Damage Report *supra* note 13.

97. *See* discussion *supra* at note 83 and accompanying text.

98. 8 C.F.R. § 287.8(f)(2).

99. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881-83 (1975).

100. *See* discussion *supra* at note 24.

101. These spot checks should include, among other things: review of whether consent is being noted on arrest reports; examinations of whether the reason for initial seizures are being noted on arrest reports; examination of the ethnic composition of non-targets arrested; examination of the ratio of targets to non-targets arrested; and a comparison of the number of home raid operations conducted where a target was arrested versus those home raids where no targets were apprehended.

102. *See, e.g.*, OIG FOT Report *supra* note 6.

103. *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984).

104. *Id.* at 1044-45.

# IMMIGRATION JUSTICE CLINIC

Cardozo School of Law
55 Fifth Avenue
New York, New York 10003
Tel: 212-790-0340

# Exhibit 3

**Nassau County**    **Police Department**

THOMAS R. SUOZZI
COUNTY EXECUTIVE

1490 Franklin Avenue
Mineola, New York 11501
(516) 573-7000

LAWRENCE W. MULVEY
COMMISSIONER

September 27, 2007

Joseph A. Palmese
Resident Agent in Charge
Office of Investigations
Immigration and Customs Enforcement
3900 Veterans Memorial Highway
Suite 200
Bohemia, New York 11716

Dear RAC Palmese:

During our conversation earlier this afternoon I expressed my displeasure with the operations conducted on Monday, September 24th and Wednesday, September 26th in various communities within Nassau County. As I told you, this department was led to believe your agency would be effecting arrest warrants on gang members and you were seeking our assistance in the form of transportation (bus) and a uniform presence in the event that there were local charges to be processed.

On Thursday, September 20th we were assured by team leader Dennis Baggia that he would e-mail us a list of the targets. This was not done.

On Friday, September 21st SAC Jeff Knopf advised that he would e-mail us the list of targets and indicated that he would be present for a pre-operation briefing on Monday morning before the operation. The e-mail was never sent and Knopf did not attend the briefing.

The operation on Monday lacked current intel. My members report that your addresses were in many cases wrong and your pictures were outdated. In one case you were looking for a subject born in 1979 and had a picture of him when he was 7 years old.

**DLNAU00000013**

Joseph A. Palamese                                          page 2
Resident Agent in Charge
Office of Investigations

September 27, 2007

_____

Tactically, the operation was structured poorly. You had border patrol personnel from
different parts of the country that clearly do not train together. They were armed with
a mix of tactical weapons including shotguns and MP-5's. There was no consistency
in uniforms and in fact some members wore cowboy hats, and in the view of some of
my members, displayed a "cowboy" mentality. This in my view, posed unnecessary
danger to all parties including my members, who in fact were drawn upon by some of
the agents present.

Despite. repeated requests for a list of who you picked up on Monday, we did not
receive any information until 12:30 today. This made it extremely difficult to resolve
issues such as missing person reports etc. According to our records, of the 40 people
picked up on Monday, only 3 were affiliated actively with gangs in Nassau County
and most of those picked up were not the targets of warrants, but were in fact people
you determined to be undocumented.

I would like to reiterate my position as stated in my earlier phone call that the Nassau
County Police Department will be unable to render your agency any assistance in
your planned operations for Friday evening in Hempstead and West Hempstead and
any future assistance will be contingent on rectifying the aforementioned delineated
problems.

Sincerely,


Lawrence W. Mulvey
Commissioner of Police

cc: Bill Cunningham
    Counsel to the County Executive

cc: Timothy Driscoll
    Deputy County Executive
    Law Enforcement & Public Safety

**DLNAU00000014**

# Exhibit 4

October 2, 2007

Michael Chertoff
Secretary of the Department of Homeland Security
Department of Homeland Security
Washington, D.C. 20536

Dear Mr. Chertoff:

I bring to your attention serious allegations of misconduct and malfeasance committed by Immigration and Customs Enforcement personnel in executing arrest warrants in various Nassau County communities on September 24 and 26, 2007. I ask that you investigate the allegations and advise me of your written findings.

The immigration laws of the United States should be enforced and I fully support the execution of lawfully issued arrest warrants in Nassau County, particularly for known gang members. I condemn, however, any tactical actions which cross the lines of legality and law enforcement best practices.

In order to facilitate an appropriate inquiry, enclosed is a copy of Nassau County Police Commissioner Lawrence W. Mulvey's September 27, 2007 letter to Joseph A. Palmese, the Resident Agent in Charge of the Immigration and Customs Enforcement ("I.C.E.") office located in Bohemia, New York. A portion of the letter has been redacted so as not to interfere with planned I.C.E. operations. Commissioner Mulvey's letter raises important issues as to how I.C.E. personnel, in the presence of Nassau County police officers, conducted themselves, including these observations:

- "The operation on Monday lacked current intel." I.C.E. officials failed on three occasions to check the names and addresses of their arrest targets against the Nassau County Police Department's Gang Intelligence Files. The result was that many wrong residential addresses were raided and in one instance I.C.E. sought a 28 year old defendant using a photograph taken when he was a 7 year old boy. Of the reported 82 Nassau County arrests, our police records indicate that 8 are active gang members and 1 is a gang associate.
- "Tactically the operation was structured poorly." The federal operation utilized border patrol personnel from around the country who had not trained together for this complex mission. "[S]ome [I.C.E.] members wore cowboy hats and in the view of some of my members displayed a "cowboy" mentality. This, in my view,

**DLNAU00000015**

posed unnecessary danger to all parties, including my members, who in fact were drawn upon by some of the agents."

I know you agree that these are serious allegations and deserve a serious and prompt response.

Very truly yours,

Thomas R. Suozzi
County Executive

Cc:  Julie Meyers, Assistant Secretary for I.C.E.
Roslynn Maskopf, United States Attorney for the Eastern District
Kathleen Rice, Nassau County District Attorney

DLNAU00000016

# Exhibit 5

# Congress of the United States

Washington, DC 20510

June 11, 2007

The Honorable Michael Chertoff
Secretary of Homeland Security
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Chertoff:

We write in regard to an immigration enforcement operation that took place in New Haven, Connecticut on Wednesday, June 6, 2007. We were informed that 31 individuals were detained by Immigration and Customs Enforcement (ICE) agents as part of an ongoing fugitive operation initiative. These individuals were removed from their homes and placed in detention facilities outside of the state. We are troubled by reports about the manner in which this enforcement operation was conducted, and about the timing of the action, and we are seeking additional information from the Department.

Several aspects of the enforcement operation have raised concerns for us, the Mayor of New Haven, and many residents in Connecticut. For instance, while it is our understanding that the enforcement action that took place in New Haven was part of a nationwide initiative to target and apprehend individuals with final orders of removal, we have received reports that only 4 of the 31 individuals who were detained had deportation orders. Eyewitnesses reported to the Mayor's office that ICE agents pushed their way into homes, which could be a violation of protocol if they were armed only with administrative warrants, and treated both adults and children inappropriately. Family members of those detained reported that they did not receive adequate information about the whereabouts of detainees. Finally, this enforcement action followed the approval by the City of New Haven of a plan to offer all city residents, including the undocumented community, identification cards that could be used to open bank accounts and use other local services. As a result, some believe the ICE operation might have been retaliation for this new initiative.

In order to fully understand how this enforcement action took place and whether any abuses or violations of protocol occurred that should be addressed; we respectfully request that you provide timely responses to the following questions:

- Please explain the timing of the raid. What precipitated this particular fugitive operation?

- Was the immigration enforcement operation linked to New Haven's new municipal ID policy?

- How do ICE agents identify people who are targets of these fugitive operations? Is this targeting based on intelligence about specific individuals?

- How does ICE choose where to undertake these initiatives?

- How many people were detained? How many of the people detained were targets of the fugitive operation?

- What type of warrants did ICE use for this fugitive operation? Did ICE have warrants for all of the people detained? What steps did ICE take to identify any person with a humanitarian concern, such as a medical condition, status as sole caregiver of a child or elderly parent or pregnant women? Have such individuals been provided humanitarian release?

- Did ICE conduct any advance planning with local social service agencies to ensure that the needs of affected families would be addressed? Did they coordinate with local agencies after the raids?

- What information was provided to the families of the individuals who were detained about their relative's whereabouts at the time the enforcement action occurred? Once the individuals were placed in detention, were relatives provided information about their relative's whereabouts? How was this information communicated?

- What steps were taken to inform people detained about opportunities to obtain legal counsel? If they had legal counsel, what steps were taken to inform counsel of their client's whereabouts?

- Did ICE agents enter any home without consent? If so, did they have the proper warrant to enter without consent?

- Are ICE officials aware of any reports that agents treated adults or children inappropriately? What steps have been taken to investigate any such reports?

- Why was the New Haven Police Department (NHPD) informed about the raids only after they began to take place? What method was used to contact the NHPD contacted and who received the notice from ICE?

The Honorable Michael Chertoff
June 11, 2007
Page 3

We thank you in advance for your prompt response to these questions. We look forward to continuing to work with you on this matter.

Sincerely,

Joseph I. Lieberman
U.S. Senate

Christopher J. Dodd
U.S. Senate

Rosa L. DeLauro
U.S. Congress

# Exhibit 6

[•• •54•]



June 14, 2007

The Honorable Christopher J. Dodd
United States Senate
Washington, DC 20510

Dear Senator Dodd:

Thank you for your June 11, 2007 letter co-signed by Senator Joseph I. Lieberman and
Representative Rosa L. DeLauro, regarding a U.S. Immigration and Customs Enforcement (ICE)
immigration enforcement operation that occurred in New Haven, Connecticut, on
June 6, 2007. Senator Lieberman and Representative DeLauro will receive separate, identical
responses.

In addition to committing significant resources to prevent aliens from illegally entering the
United States, the Department of Homeland Security (DHS) has also committed resources to
arresting immigration law violators within the Nation's interior. Any alien who has failed to
depart the United States pursuant to a final order of removal, deportation or exclusion, or who
has failed to report to an ICE Detention and Removal Office after receiving notice to do so, is
considered to be a fugitive. At present, there are over 632,000 fugitive aliens at large in the
United States, according to ICE's Office of Detention and Removal Operations' (DRO)
Deportable Alien Control System (DACS). Fugitive Operations Teams (FOTs) were established
to address the burgeoning number of fugitive aliens present in the United States. FOTs are a
crucial part of ICE's interior immigration enforcement mission.

A critical element of the FOT strategy is to identify, locate, arrest, and remove criminal aliens,
fugitives, and other immigration law violators from the United States. FOTs use leads and other
intelligence-based information to find, arrest, and remove aliens who have been ordered to leave
the country by an immigration judge (or ordered removed through an alternate immigration
process) but have failed to comply.

In FY 2006, there was funding in place for 52 teams. During FY 2007, Congress provided
funding for an additional 23 teams, increasing the total number of funded teams to 75. As of
May 28, 2007, 61 teams are operational. These teams are being deployed at DRO Field Offices
throughout the United States, and each of the 24 DRO Field Offices will have at least one
operational FOT by the end of FY 2007.

Further, on May 26, 2006, ICE began Operation Return to Sender, a nationwide interior
enforcement initiative that applies an organized and methodical approach to the identification,
location, and arrest of fugitive aliens. Conducted as part of ICE's National Fugitive Operations

Program (NFOP). Operation Return to Sender combines NFOP resources with those of other Federal, State, and local law enforcement entities to eliminate the backlog of ICE fugitive cases.

In your letter, you inquired about the timing of ICE's operation in New Haven and whether the targets of operations are determined based on intelligence about specific individuals. FOTs act on specific intelligence-based data gathered through law enforcement channels. Once intelligence is gathered on several fugitives located within the same general vicinity, a FOT will develop an operational plan for the swift and safe arrest of the fugitive aliens in the most fiscally efficient way. As of June 11, 2007, 29 illegal aliens were arrested as a result of this enforcement initiative. Five of the 29 aliens arrested were fugitives with outstanding orders of removal. The remaining 24 illegal aliens were arrested at targeted locations of the operation.

I want to emphasize that it is not our policy for FOTs to conduct "raids," or take an ad hoc approach to enforcing immigration law; rather, the policy is to focus their efforts on specific fugitive aliens at specific locations. According to ICE policy, FOTs prioritize their efforts using the following criteria (in order of priority): (1) fugitives who are a threat to national security, (2) fugitives who pose a threat to the community; (3) fugitives who were convicted of violent crimes; (4) fugitives who have criminal records; and, (5) non-criminal fugitives.

In regard to your questions related to warrants, DRO issues a *Warrant of Deportation/Removal* (I-205) upon an order of removal by an immigration judge. If the alien fails to appear for removal, the alien is deemed an ICE fugitive. A warrant of removal is administrative in nature and does not grant the same authority to enter dwellings as a judicially approved search or arrest warrant. During the course of normal targeted operations, while attempting to arrest ICE fugitives, FOTs often encounter other individuals at the targeted location. A warrant is not necessary when arresting someone who is in the country illegally. Pursuant to section 287(a)(1) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1357(a)(1), an officer has the authority to question any person as to their right to enter, reenter, pass through, or reside in the United States. If a person is deemed to be an alien in the United States illegally and is believed to be removable, they may be arrested without warrant and processed accordingly for removal.

Questioning as to identity or request for identification does not constitute a Fourth Amendment seizure. The individual being interviewed must voluntarily agree to remain during questioning. To detain an individual for further questioning, however, the immigration officer must have reasonable suspicion that the individual has committed a crime, is an alien who is unlawfully present, is an alien with status who is either inadmissible or removable from the United States, or is a nonimmigrant who is required to provide truthful information to DHS upon demand. *See* 8 C.F.R. § 214.1(f). In addition, section 264(e) of the INA, 8 U.S.C. § 1304(e), requires aliens 18 years of age and older to carry proof of alien registration at all times. Failure to carry such proof is a misdemeanor punishable by up to 30 days in imprisonment and a fine of $100.

At no time did any ICE FOTs enter a dwelling without consent. To ensure consent was obtained knowingly and voluntarily from the dwelling's occupant, each team had a Spanish speaking officer assigned to it. After consent was obtained, the occupant was asked how many other individuals were in the house. If other persons were present, those individuals were asked to come into a common area for officer safety.

ICE officers ascertained during this questioning whether there were any humanitarian concerns at the scene of arrest by asking those arrested if they had any medical conditions or child care issues. ICE agents did not take any children into custody and ensured no child was left unattended without a parent or caregiver. In one instance, ICE officers stayed with an 11-year-old child who had been left home alone by her parents and awaited the father's arrival from work.

Family members were provided the address and telephone number of the local ICE office at the scene of arrest in order to ascertain the whereabouts of those arrested. Family members were also instructed that it may take a few hours before they would know definitively in which facility those arrested would be housed as they would have to be processed and transported to those facilities. As a matter of policy, those arrested without outstanding Warrants of Removal were provided a list of free legal services. Additionally, once processed, the opportunity to make phone calls was provided. Local ICE offices routinely provide information to attorneys as to their clients' whereabouts.

ICE did not coordinate with any local social service agencies prior to or after the operation as children were not taken into custody nor were they left unattended without a parent or caregiver. However, during the course of any official large-scale operation, FOTs are instructed to contact the local law enforcement having jurisdiction over the area of operations prior to commencement of an operation for officer safety, liaison, additional support, and courtesy. On the day of the New Haven operation, local law enforcement was called 1 hour and 15 minutes after the commencement of the operation.

DRO's Boston Field Office and Hartford Sub-Office normally work closely with local police departments. In fact, prior to the operation's commencement, DRO's Hartford Sub-Office contacted the New Haven Police Department regarding the operation on three occasions beginning in early April. The Hartford Fugitive Operation Supervisor initially attempted to contact Sgt. Lisa Daddio, the officer in charge of the Detective Bureau, and left a message. The Hartford Fugitive Operation Supervisor attempted a second call a few weeks later and did speak to Sgt. Daddio. During his conversation with Sgt. Daddio, the Hartford Fugitive Operation Supervisor indicated that his office anticipated executing an approximately 20-target warrant operation in the near future and inquired as to what type of assistance and cooperation ICE could expect from the police department.

Sgt. Daddio requested the Hartford Fugitive Operation Supervisor speak with her superior. Lt. Pat Redding, regarding ICE activities in the city. Within days, the Hartford Fugitive Operation Supervisor spoke to Lt. Redding. The Hartford Fugitive Operation Supervisor was informed that Lt. Redding would speak with his Assistant Chief for Operations in order to provide him more information. Lt. Redding never contacted the Hartford Fugitive Operation Supervisor with a response.

After the Hartford Fugitive Operation Supervisor consulted with the Hartford Assistant Field Office Director (AFOD), it was decided that the New Haven Police Department would be given a courtesy call on the morning of the operation and there would not be a request for assistance

-3-

from the New Haven Police Department. This call was placed to New Haven Dispatch at approximately 7:15 a.m. on June 6, 2007.

I want to assure you there is no relationship between the operation's execution date and the City of New Haven's immigration policy.

I appreciate your interest in this matter. Please be assured that officials at DHS and ICE take allegations of misconduct seriously and will fully investigate all allegations. If I may be of further assistance, please contact the Office of Legislative Affairs at (202) 447-5890.

Sincerely,

Michael Chertoff

TRANSMITTED/STORED   JUN. 14. 2007  6:26PM
FILE MODE            OPTION            ADDRESS                        RESULT          PAGE
IN-8 MEMORY TX                         93   SENATE                    OK              P.5
                                            2

        REASON FOR ERROR
        E.1) HANG UP OR LINE FAIL

U.S. Department of Homeland
Security
Washington, DC 20528



# Homeland Security

## Facsimile Transmission

To:  The Honorable Christopher Dodd          Fax:   (202) 224-1083

---

Date: June 14, 2007

---

From: Clayton Sanderson                       Phone:  (202) 282-8871

---

| Urgent | Action | Concurrence | FYI | Number of pages including cover: 5 |
|--------|--------|-------------|-----|-----------------------------------|

Comments:

**Clayton D. Sanderson**
Department of Homeland Security
Component Liaison and Corresponece Analyst
Office of the Secretary / Executive Secretariat
Phone: 202-282-8871

# Exhibit 7

# Judge Rules Raids Violated Illegal Immigrants' Rights

HARTFORD, Conn. -- Federal agents violated the constitutional rights of four illegal immigrants in raids that critics say were retaliation for a New Haven program that provided ID cards to foreigners in the country illegally, a federal judge has ruled.

The sweeps in New Haven on June 6, 2007, came two days after the city approved issuing identification cards to all city residents, regardless of immigration status. Immigration and Customs Enforcement officials deny the early-morning raids were retaliatory, saying planning began the year before.

Immigration Judge Michael Straus, in decisions last week, said the ICE agents went into the immigrants' homes without warrants, probable cause or their consent, and he put a stop to deportation proceedings against the four defendants, whose names weren't released. ICE officials claim all four are from Mexico, but all four cited their Fifth Amendment rights in refusing to say which country they are from.

Two of the four immigrants lived in one home, and two lived in a second home. They said in affidavits that agents barged into both homes after residents had opened their doors only a little. The agents went into both homes looking for specific illegal immigrants on a "target list," who weren't found, court documents say.

Immigration officials have denied claims that the 32 arrests that morning were improper, and they said the people who were arrested had been ordered by judges to leave the country. They said in court documents that they were allowed into the homes during the sweep.

ICE authorities are reviewing the judge's ruling and will decide later whether to appeal, agency spokeswoman Paula Grenier said Monday. The department has 30 days to file a challenge. Ms. Grenier declined further comment.

Witnesses alleged in court documents that parents were arrested in front of their frightened children, agents refused to identify themselves and told people in the homes to shut up.

In his rulings issued June 1 and 2, Mr. Straus said the four immigrants' rights were "egregiously violated" and the agents' entries in the apartments were "unlawful."

"Examination of the agents'...conduct confirms (the defendant's) Fourth Amendment rights were flagrantly violated," Mr. Straus wrote in one immigrant's case.

"The touchstone of the Fourth Amendment is "reasonableness" and, by natural extension, one's reasonable expectation of privacy," the judge wrote. "Nowhere is that expectation of privacy more sacrosanct than in the confines of one's home."

Of the 32 people arrested, 30 were released on bond or supervision orders. Seventeen of those 30 immigrants challenged their arrests in court.

Mr. Straus denied motions in 11 of the 17 cases, granted motions in four of them and reserved decision in the remaining two. Of the 11 cases in which motions were denied, one person was later granted asylum by the judge and the other 10 have appealed.

Yale Law School students are representing the immigrants, who still live in New Haven.

"We're obviously very happy about it," Anant Saraswat, one of the students, said Monday. "We think our clients had a very strong case."

Mr. Saraswat said it won't be known for about a month whether federal authorities will appeal Mr. Straus's ruling. He said the case can be appealed to the Board of Immigration Appeals, then to the 2nd U.S. Circuit Court of Appeals in New York.

New Haven officials have said the raids appeared to be retaliatory for the ID cards, which are meant to help immigrants open bank accounts and receive city services.

# Exhibit 8

**File:** ███████████

**In the Matter of:**                              )
                                                   )
███████████████████████                            )          **IN REMOVAL**
                                                   )          **PROCEEDINGS**
Respondent                                         )

**CHARGE(S):**    Section 212(a)(6)(A)(i) of the Immigration and Nationality Act
                  ("INA" or "Act"): An alien present in the United States without
                  being admitted or paroled ... is inadmissible.

                  Section 237(a)(1)(A) of the INA: An alien who at the time of entry
                  ... was ... inadmissible ... is deportable.

**APPLICATION(S):** Motion to Suppress
                    Motion to Terminate Removal Proceedings

ON BEHALF OF RESPONDENT:                ON BEHALF OF DHS:
Michael J. Wishnie, Esq.                Leigh Mapplebeck, Senior Litigation
The Jerome N. Frank Legal Services      Counsel DHS
P.O. Box 209090                         450 Main Street – Room 483
New Haven, CT  06520-9090               Hartford, Connecticut 06103

## DECISION AND ORDER OF THE IMMIGRATION JUDGE

### I.    Procedural History

A Notice to Appear ("NTA") was served upon ███████████████████████
("Respondent"), in person, on June 6, 2007. In the NTA, the Department of Homeland
Security ("DHS" or "the Government") alleges that Respondent is a native and citizen of
Mexico who entered the United States at an unknown place on an unknown date and was
not then inspected by an immigration officer. Accordingly, the Government charged
Respondent with removability pursuant to INA § 212(a)(2)(6)(A)(i). The NTA was filed
with the Court on June 13, 2007, thereby vesting the Court with jurisdiction over these
proceedings. See 8 C.F.R. § 1003.14(a) (2008). On April 22, 2008, Respondent filed his
responsive pleadings, stating his intention to file a motion to suppress evidence and
terminate proceedings. He filed such motions, and has submitted supplementary briefs,

- 1 -

declarations, documentary evidence, and other evidence.

The Form I-213 recounts Respondent's arrest as such: The Hartford, Connecticut Fugitive Operations team encountered Respondent while conducting an enforcement operation. The target of the search, an alien fugitive (A# ███████ with an outstanding warrant of removal, was not found. The form states "[e]ntry into the residence was granted by █████████

Respondent asserts, in his motion and supporting briefs, that Immigration and Customs Enforcement ("ICE") agents egregiously violated his Fourth Amendment right against unreasonable searches and seizures. Specifically, he avers that ICE agents illicitly entered his home without a warrant and without consent. He also claims that ICE agents egregiously violated his Fifth Amendment right to equal protection and fundamental fairness in his immigration proceedings. Specifically, Respondent asserts that he was targeted solely on the basis of his race and because ICE agents coerced him into making certain statements. Moreover, he claims that ICE agents' violation of ICE regulations and sub-regulatory rules, which bear on his fundamental rights, require termination of his removal proceedings.[1]

The DHS submitted a response to Respondent's Motions to Suppress Evidence and Terminate Proceedings. Therein, the DHS contends Respondent has failed to establish a *prima facie* showing that: 1) his Fourth Amendment rights were egregiously violated by ICE agents, 2) his Fifth Amendment rights were egregiously violated by ICE agents, and 3) ICE agents violated any applicable regulation necessitating the suppression of evidence or the termination of proceedings.

Respondent has also filed a number of subpoena requests relating to immigration agents involved in his arrest and detention, some dated April 2, 2008.

## II.    **Testimonial Summary**

### A.    **Respondent's Testimony**

Respondent lived in the apartment at ██████████████ New Haven, Connecticut, with his cousin, his cousin's wife, and their two children. He asserted his Fifth Amendment privilege when asked what identification he provided to the officers.

The following is a synopsis of his testimony as it relates to the discrete

---

[1] Respondent also contends that his arrest was conducted in a manner that egregiously violated his First and Tenth amendment rights. The Court has been unable to find precedent for the proposition that First and Tenth Amendment claims may be properly entertained in a removal proceeding. In fact, the Second Circuit has expressly declined to fashion an exclusionary rule for evidence obtained in violation of an individual's First Amendment rights in the context of removal proceedings. See Montero v. I.N.S., 124 F. 3d 381, 386 (2d. Cir. 1997). "Beyond violations of the Fourth Amendment, it is clear from Lopez-Mendoza that the exclusionary rule is applicable, if at all, only to deprivations that affect the fairness or reliability of the deportation proceeding." Id. Thus, because it is not within the competence of this Court to resolve such claims, they will not be considered.

- 2 -

constitutional claims he has proffered:

At 6:30 a.m. on June 6, 2007, Respondent was sleeping when he was awakened by knocking on his bedroom door. He woke up and, upon turning towards the door, observed someone standing in the doorway. When asked whether it was light or dark out, he stated that 'he could see' because there was a 'little light' emanating from the television. His room light was not on. Respondent spoke first, asking 'what happened,' and he heard 'it's the police' as an answer. One of the officers instructed him, in English, to put clothes on and to come to him, as well as by motioning to him and pantomiming putting on pants. Respondent did not understand the instruction made in English, but discerned the instructions by the officer's motions. ICE agents then instructed the Respondent, in English, to show them his identification, and he complied by giving the agents identification. The officers did not ask him any additional questions.

### B. Respondent's Declaration and Supplemental Declaration

Respondent attested to the following in his Declaration and Supplemental Declaration, dated November 28, 2007 and February 20, 2008, respectively:

Respondent is 25 years old and has lived on the first floor of ▮▮▮▮ New Haven, Connecticut for the past seven years, with his cousin ▮▮▮▮ ▮▮ and his cousin's family. Respondent has not graduated from high school.

Respondent was sleeping in his bedroom on June 6, 2007, when at around 6:30 a.m., officers entered his room while he was sleeping, turned the lights on, and yelled "police". The officers ordered Respondent into the living room. When he entered the living room, he could see ▮▮▮▮ in his bedroom with an agent. Respondent was told to sit down. There were officers at both exits of his apartment. He did not give his consent for the officers to enter and no one else in the house consented to their entry. Additionally, he "did not feel … free to leave when the officers blocked off all of the exits and ordered [him] into the living room."

One of the agents instructed the Respondent, in Spanish, to put a shirt on and he complied by retrieving a shirt from his room. Respondent was then handcuffed and sat in the living room for several minutes. He asked the officers several times what was happening, but they refused to answer. A few minutes later, ▮▮▮▮ emerged from his room with an officer and sat in a chair next to him. Respondent does not recall exactly how many officers were in the apartment, but he remembers at least four, some of whom were armed.

When the officers ordered Mr. ▮▮▮▮ into the living room, "no one had asked [him] any questions. The only information the officers knew about [him] was [his] appearance and the fact the [he] spoke Spanish."

### C. Testimony of ▮▮▮▮ ▮▮▮ (A# ▮▮▮▮)

- 3 -

Mr. ████ has lived in Connecticut for approximately fifteen years. He has lived at ████ ████ ████ New Haven, Connecticut, for eight or nine years. Mr. ████ rents the apartment and lives with his family, composed of his son, daughter, wife, and his cousin. He speaks Spanish and has limited comprehension of English. He asserted his Fifth Amendment privilege to the following inquires: The date he entered the United States, if and for how long he resided in Virginia, where he went to high school, in what language he was educated, and whether his wife and cousin were born in the United States.

The following is a synopsis of Mr. ████ testimony as it relates to the discrete constitutional claims he has proffered:

On the morning of June 6, 2007, Mr. ████ was at home with his then ten-year old daughter and his cousin. At about 6:30 a.m., he was in his bathroom brushing his teeth when someone began knocking on the back door. His daughter came to tell him that someone was at the door. Mr. ████ then exited the bathroom, approached the door, and asked, in Spanish, 'who is it?' 'It's the police' was the reply, communicated in English. Mr. ████ opened the door 'a little,' and saw the men. Agents then pushed the door open completely but did not say anything to him. Approximately four officers entered the premises. Mr. ████ did not tell the officers to leave because he had no time to tell them. At some point he asked what was going on and did not receive an answer. Rather, the agents only smiled at him. With his daughter by his side, Mr. ████ was asked who else was in the apartment and he replied, in English, that his cousin was sleeping in his room. He was then asked, in English, whether or not he knew a fugitive identified in a photograph shown to him. He replied 'no' in English. He was also asked for identity documentation and Mr. ████ told the agents that his identification was in his room. He offered them a Virginia driver's license. He does not recall whether he was asked additional questions. Without asking Mr. ████ an ICE agent instructed his daughter to call his wife, and Mr. ████ was instructed to sit down on a chair in the living room. His daughter remained with the officer.

**D.    Declaration and Supplemental Declaration of ████ ████ ████ (A# ████**

Mr. ████ attested to the following in his Declaration dated November 28, 2007:

Mr. ████ is 30 years old. He attended school until the age of 16. He lives on the first floor of ████ ████ New Haven, Connecticut and has lived there for the past eight years. He lives there with his wife, their two children, and his cousin, Respondent. His apartment has three bedrooms and two doors – one in the front facing the street, and one in the back facing the adjoining parking lot.

At 6:30 a.m. on June 6, 2007, Mr. ████ was in his bathroom. His wife was at work, his son with a babysitter, and his daughter and cousin were asleep in their bedrooms. He heard someone banging very loudly on the back door. Mr. ████

- 4 -

daughter came into the bathroom, and fearfully told him there was someone at the door. He went to the back door and asked 'who is it?' and someone replied "police" through the door. He also heard people climbing the stairs to the apartment on the second floor.

Because he thought something might be wrong, Mr. ██████ opened the door 'just a crack.' The man on the other side of the door 'pushed open the door' and four officers ran into the premises. One of the officers asked him where the front door was located. Two officers blocked off the front door and one officer stood at the back door. He did not "give [his] consent for the officers to enter. No one in [h]is house consented to their entry." The officers wore jackets emblazoned with "ICE" or "POLICE". Some of the officers were armed.

One of the officers showed Mr. ██████ a picture of a man and asked, in English, if he recognized the individual in the photo, whose last name was 'Chavez'. He stated that he did not know the man. Mr. ██████ did not feel "free to leave when the officers blocked off all of the exits and began questioning [him]."

An officer asked him if anyone else lived in the apartment. After he responded that his cousin lived there and was sleeping in his bedroom, one of the other agents opened the door to ██████ room and went inside. Mr. ██████ kept asking who the officers were and why they had entered the premises, but "[n]o one would answer [him] and several of the agents started laughing."

Mr. ██████ daughter was very scared and tried to stand by her father. Then a "female agent grabbed her roughly and took her into her bedroom." The agent "terrified" the daughter, who was on the precipice of crying "because she thought it was the police." His daughter did not resist and went with the agent, who asked her where her mother was. The daughter replied her mother was at work. A male agent instructed Mr. ██████ to go to his bedroom, and the officer followed him in.

Later, Mr. ██████ daughter and the female officer entered his bedroom. The female agent had instructed the daughter, without Mr. Trujillo's permission, to dial the phone number of her mother's workplace (the number was posted on a note on the dresser mirror).

"After the agent dialed the numbers," she instructed Mr. ██████ daughter to speak to her mother and his daughter related that the police were there and that she should come home. The female agent and his daughter then left the room.

Another officer told him to go back to the living room, where he saw Respondent, handcuffed, sitting in a chair. Mr. ██████ was ordered to sit down and complied. One of the agents requested his identification. Mr. ██████ replied it was in his bedroom. The agent followed him into the bedroom so he could retrieve his identification. He gave the agent his identification – a Virginia state identification card.

Mr. ██████ wife arrived at the house. One of the agents handcuffed him in front

of his wife and daughter, and 'they' told him to '[s]ay goodbye to [his] family'.

Mr. ███ attested to the following, in pertinent or novel part, in his Declaration dated February 20, 2008:

He is 'of Latino appearance.' The walls in his apartment are thin, which allow voices and footsteps of people in the hallway, living room, and kitchen, to be heard from inside the bathroom.

**E.    Affidavit provided by the DHS**

**1.**    On February 12, 2009, the Government submitted an affidavit from Richard McCaffrey, a Supervisory Detention and Deportation Officer, and an affidavit from Deportation Officer David Hamilton:

The following is a synopsis of the relevant contents of Mr. McCaffrey's affidavit:

Richard McCaffrey has worked in the immigration enforcement field for fifteen years. In 2006, ICE Detention and Removal Operations ("DRO") implemented 'Operation Return to Sender,' which was aimed at apprehending immigration absconders. The operation was planned for June 6, 2007 and a target list was prepared.

With respect to the execution of the enforcement operation at issue, Mr. McCaffrey is "not aware of any internal report that any Deportation Officer needed to brandish his or her firearm for any reason." Furthermore, "at no time during or after the completion of ... this operation" did Mr. McCaffrey "observe or learn that any house or apartment was entered without informed, voluntary consent," and he did not observe and was not informed "that any consent was withdrawn."

With regards to Respondent's arrest, Mr. McCaffrey was initially outside ███ ███ ███ along with ICE agents, and "there may have been outside law enforcement officers there as well." He proceeded to the rear of the building and entered the common hallway area.

At that point, he observed Officer David Hamilton standing in the hallway talking to a man, later identified as Mr. ███ Mr. ███ was standing in an open doorway to the first floor apartment. Mr. McCaffrey observed Officer Hamilton show a photograph to him and asked him, in English, whether he knew the man in the photo.

At this point, Mr. McCaffrey interrupted their conversation and asked Mr. ███ if they could come in to talk. Respondent said 'yes' and stepped out of the doorway and into the apartment and both Mr. McCaffrey and Officer Hamilton followed him in. Then, "[o]nce an interpreter arrived at the apartment, additional questioning led to the arrest of [Respondent."

**2.**    The following is a synopsis of the relevant contents of Mr. Hamilton's affidavit:

David Hamilton is a Deportation Officer for ICE, assigned to 'Deportation Case Management.' He was assigned to assist in a fugitive enforcement operation that took place in New Haven, Connecticut on or about June 6, 2007 and specifically participated in the arrest of Respondent.

As part of that operation, Mr. Hamilton was assigned to go to the back door of the building ( ███ ███ and attempt to make contact with the occupants on the first floor. Mr. Hamilon went 'into a common hallway area and knocked on the first floor apartment and a male occupant,' later identified as Mr. ███ 'opened the door.'

Mr. Hamilton identified himself as a police officer to Mr. ███ and asked if he lived at the present site. Mr. ███ replied that he did. Mr. Hamilton then asked if he could talk to Mr. ███ and he agreed. Mr. Hamilton then showed a photograph of a fugitive alien that they were targeting at the address and asked Mr. ███ if he knew the person in the photo.

At that moment, Mr. McCaffrey arrived and intervened by asking Mr. ███ if the both he and Mr. Hamilton could speak with him in his apartment. Mr. ███ agreed and began walking to the kitchen. Both officers followed him.

The DHS also sought to introduce both a computer screen printout from ENFORCE, an immigration-enforcement related data collection program and a transfer data sheet relaying information incident to a later-scheduled JPATS flight. However, the Court will not consider this submission. First, the materials were only offered to the Court well after Respondent had testified. The Court had provided multiple notices to both parties regarding the durational limits for submission of supplementary materials and the administrative record was closed. The Court also notes that the Government has not established an adequate foundation for introduction of either document into the evidentiary record.[2]

### III.  Exhibit List

Exhibit List – Omnibus Appended Materials to Motion to Suppress – Filed November 30, 2007

Exhibit A – Declaration of law student Intern Stella Burch.

Exhibit B – Declaration of Respondent.

Exhibit C – Policy Document from Junta for Progressive Action & Unidad Latina en

---

2 The Court notes that, while the DHS "submits the attached evidence regarding the respondent's alienage and removability [were] obtained prior to and independently of [Respondent's] arrest," the submission does not elaborate on this contention. The DHS does not adequately explain the mode or method by which it obtained the documents. Thus, the DHS fails to make a detailed offer as to its admissibility irrespective of Respondent's contested seizure, arrest, and detention.

Accion, "A City to Model: Six Proposals for Protecting Public Safety and Improving Relationships Between Immigrant Communities and the City of New Haven" (2005).

Exhibit D – William Yardley, "New Haven Mayor Ponders ID Cards for Illegal Immigrants," N.Y. Times, Oct. 8, 2005.

Exhibit E – Jennifer Medina, "New Haven Welcomes Immigrants, Legal or Not," N.Y. Times, Mar. 5, 2007.

Exhibit F – New Haven Police Department General Order 06-02.

Exhibit G – Mary O'Leary, "Group Wants ID Cards Ready Sooner," New Haven Register, Dec. 26, 2006.

Exhibit H – Mary O'Leary, "Leader of Hispanic Church Welcomes All, Including Undocumented," New Haven Register, July 1, 2007.

Exhibit I – "Time to Fix Immigration," N.Y. Times, Oct. 14, 2005.

Exhibit J – Allan Appel, "Mayor, Chief Promise to Build on Immigrant Plan,: New Haven Independent, Jan. 19, 2007.

Exhibit K – Transcript of NBC news clip: "In Depth: Whose America? Local Governments Find Different ways of Dealing with Illegal Immigrants Who Congregate on Streetcorners Looking for Work," NBC Nightly News, March 20, 2007.

Exhibit L – Anthony Fiola, "Looking the Other way on Immigrants; Some Cities Buck Federal Policies," Washington Post, April 12, 2007.

Exhibit M – Robert Jamieson, "Is Seattle Ready to Be Immigrant Sanctuary?" The Seattle Post-Intelligencer, April 12, 2007.

Exhibit N – Michele Wucker, "A Safe Haven in New Haven," N.Y. Times, April 15, 2007.

Exhibit O – Letter from Julie Myers to John DeStefano, dated July 2, 2007.

Exhibit P – Copy of email messages between unidentified ICE agent and Trooper Carmine Verino, of the Connecticut Department of Public Safety.

Exhibit Q – City of New Haven Board of Aldermen Minutes, Finance Committee, May 17, 2007.

Exhibit R – Henry Fernandez, "Today I am Proud to Call New Haven My Hometown," New Haven Independent, June 5, 2007.

Exhibit S – Statement of Mayor John DeStefano, Jr. to Board Of Alderman Finance Committee on Municipal Identification Program, May 17, 2007.

Exhibit T – Melissa Bailey, "City ID Plan Approved," New Haven Independent, June 5, 2007.

Exhibit U – Mary E. O'Leary, "Ortiz Again Claims No Knowledge of Raid," New Haven Register, June 19, 2007.

Exhibit V – City of New Haven, Elm City Resident Card Fact Sheet.

Exhibit W – Mary O'Leary, "Municipal ID Cards Likely," New Haven Register, May 18, 2007.

Exhibit X – Abbe Smith, "More than 1,000 March Downtown," June 17, 2007.

Exhibit Y – Mara Revkin, "Offering Noncitizens a Local Identity," American Prospect, July 30, 2007.

Exhibit Z – Mary E. O'Leary, "City Irate, Claims It's Retaliation Over IDs," New Haven Register, June 7, 2007.

Exhibit AA – Nina Bernstein, "Promise of ID Cards is Followed by Peril of Arrest for Illegal Immigrants," N.Y. Times, July 23, 2007.

Exhibit BB – Copy of Letter from the Connecticut Congressional Delegation to Secretary Chertoff, June 11, 2007.

Exhibit CC – Mark Spencer, "New Haven's Immigration Drama Grows," Hartford Courant, June 15, 2007.

Exhibit DD – Copy of Letter from Julie Myers to National Immigration Forum, July 6, 2007.

Exhibit EE – Mark Zaretsky, "Fear Grips Immigrant Community," New Haven Register, June 17, 2007.

Exhibit FF – Jennifer Medina, "Arrests of 31 in U.S. Sweep Bring Fear in New Haven," N.Y. Times, June 8, 2007.

Exhibit GG – Copy of Letter from Secretary Chertoff to Senator Chris Dodd, June 14, 2007.

Exhibit HH – Department of Homeland Security Office of Inspector General, An Assessment of United States Immigration and Customs Enforcements' Fugitive Operations Teams, March 2007.

Exhibit II - Print-out from ICE Office of Detention and Removal Operations National Fugitive Operations Program.

Exhibit JJ – Melinda Tuhus, "Despite Raids, IDs for All," In These Times, Aug. 2007.

Exhibit KK – Elizabeth Hamilton, "Passion for Justice," Hartford Courant, July 23, 2007.

Exhibit LL – Donna Schaper, "Punishing Immigrants, Whatever Happened to Land of Welcome and Opportunity," Hartford Courant, June 17, 2007.

Exhibit MM – Copy of the ICE Pre-Operations Plan.

Exhibit NN – Robert C. Davis & Edna Erez, "Immigration Populations as Victims," National Institute of Justice (1998).

Exhibit OO – Orde F. Kittrie, "Federalism, Deportation, and Crime Victims Afraid to Call the Police," 91 Iowa L. Rev. 1449, 1450-51 (2006).

Exhibit PP – Robert C. Davis, Edna Erez & Nancy Avitabile, "Access to Justice for Immigrants Who are Victimized: The Perspectives of Police and Prosecutors," 12 Crim. Justice Policy Rev. 183 (2001).

Exhibit QQ – Virginia MOU and its adverse Implications for Immigrant Women and Girls, Tahirih Justice Center.

Exhibit RR – Nawal H. Ammar, et al., "Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA," 7 Int'l J. of Pol. Sci. and Management 230 (2005).

Exhibit SS – "City of New Haven, Board of Aldermen Approve Acceptance of Funds for Municipal Identification Program".

Exhibit TT – Statement by Richard D. Clarke, Former White House National Security Coordinator for Security and Counter-Terrorism in the Clinton and Bush Administrations, Oct. 19, 2007.

Exhibit UU – Mary E. O'Leary, "City IDs Don't Prove Voter Eligibility, Blumenthal Rules," New Haven Register, Sept. 7, 2007.

Exhibit VV – Mary O'Leary, "Group may Urge Illegal Aliens to Make City their Destination," New Haven Register, June 14, 2007.

Exhibit WW – In re: Herrara-Priego, USDOJ EOIR (New York, N.Y., July 10, 2003) (Lamb, IJ).

Exhibit XX – Letter from Karen V. Lang to Congresswoman Zoe Lofgren Letter on ICE raids, dated March 14, 2007.

Exhibit YY – Declaration of Father James Manship, St. Rose of Lima Catholic Church, New Haven, Connecticut, dated June 20, 2007.

Exhibit ZZ – M-69: The Law of Arrest, Search, and Seizure for Immigration Officers, last updated January 1993 by Patrick McDermott, William Odencrantz, Liz Hacker, and Judith Patterson. Available on Lexis-Nexis, at INS Manuals 80-89.

Omnibus Appended Materials to Respondent's Reply to the Government's Brief in Opposition – Filed February 25, 2008

Exhibit A – Declaration of Law Student Intern Stella Burch.

Exhibit B – Supplemental Declaration of Respondent.

Exhibit C – Declaration of ███████ ██████ █████

Exhibit D – Photograph of Respondent's Living Room.

Exhibit E – Photograph of Respondent's Kitchen.

Exhibit F – Photograph of Respondent's Back Stairway.

Exhibit G – Photograph of ██████ ██████ Bedroom.

Exhibit H – Photograph of Respondent's Bathroom.

Exhibit I – Declaration of Law Student Intern Jane Lewis.

Exhibit J – Floor Plan of Respondent's Apartment.

Exhibit K – Barrera v. Boughton, No. 3:07-cv-01436 (D. Conn.) (Nov. 26, 2007); Dacorim v. DHS, No. 3:06-cv-01992 (D. Conn.) (complaint filed Dec. 14, 2006).

Exhibit L – El Badrawi v. DHS, No. 3:07-cv-01436 (D. Conn.) (amended complaint filed Nov. 26, 2007); DACORIM v. DHS, No. 3:06-cv-01992 (D. Conn.) (complaint filed Dec. 14, 2006).

Exhibit M – In re: Herrera-Priego, US DOJ EOIR (New York, N.Y., July 10, 2003) (Lamb, IJ).

Exhibit N – In re: RABANI, USDOJ EOIR (New York, N.Y.).

Exhibit O – Aguilar v. ICE, No. 07-cv-08224 (S.D.N.Y.) (complaint filed Sept. 20, 2007)

and supporting affidavits.

Exhibit P – Motion to Suppress & Affidavit filed in Immigration Court for Dionisio Chicas Moran, US DOJ (New York, N.Y.).

Exhibit Q - Motion to Suppress & Affidavit filed in Immigration Court for Carlos Lopez Ramos, US DOJ (New York, N.Y.).

Exhibit R – Nina Bernstein, Raids were a Shambles, Nassau Complains to U.S., N.Y. Times, Oct. 3, 2007.

Exhibit S – Affidavit filed in Immigration Court for Gonzalo Juarez of Newark, NJ.

Exhibit T – Motions to Suppress and Terminate, Memorandum of Law, and Supporting Affidavit filed in Immigration Court for Roberto Cervantes Valerio of Memphis, TN.

Exhibit U – Flores-Morales v. George and ICE, No. 07-cv-00050 (M.D. Tenn.) (complaint filed July 27, 2007) and supporting affidavits.

Exhibit V – Mancha v. ICE, No. 06-cv-12650 (N.D. Ga.) (complaint filed Nov. 1, 1006).

Exhibit W – Testimony of Marie Justeen Mancha before the House Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law Hearing on: "Problems with ICE Interrogation, Detention, and Removal Procedures" February 13, 2008.

Exhibit X – Reyes v. ICE, No. 07-cv-02271 (N.D. Cal.) (complaint filed April 26, 2007)

Exhibit Y – Paloma Esquivel, Civil Rights Groups Allege Immigrant Workers were Denied Rights, L.A. Times, Feb. 15, 2008.

Exhibit Z – Affidavit of Jose Ordonez Salanec of TX.

Exhibit AA – UFCW v. Chertoff, No. 07-cv-00188 (N.D. Tex.) (class action complaint filed Sept. 12, 2007).

Exhibit BB – Testimony of Michael Graves, Member of the United Food and Commercial Workers International Union (UFCW), Local 1149 before the Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law for the Hearing: "ICE Interrogation, Detention, Removal Issues" Feb. 13, 2008.

Exhibit CC – Barrera v. DHS, No. 07-cv-03879 (D. Minn.) (complaint filed Sept. 4, 2007).

Exhibit DD – Border Network for Human Rights v. County of Otero, No. 07-cv-10145 (D.N.M.) (complaint filed Oct. 17, 2007).

Exhibit EE – <u>Daniel T v. Board of Commissioners of the County of Otero</u> (D.N.M.) (complaint filed October 17, 2007).

Exhibit FF – <u>Matter of X-</u> (Seattle, WA Immigration Court Feb. 8, 2007).

Exhibit GG – Written Testimony Kara Hartzler, Esq. Florence Immigrant & Refugee Rights Project U.S. House of Representatives Subcommittee on Immigration, Feb. 13, 2008.

Omnibus Exhibits in Support of Respondent's Motion to Supplement the Record and to Advise Court of Recent Authority – Sept. 9, 2008

Exhibit A – Declaration of law student intern Anant Saraswat.

Exhibit B – Series of emails dated May 21, 2007.

Exhibit C – Series of emails dated June 4, 2007.

Exhibit D – Letter from Michelle L. Colson, AUSA, to Michael Wishnie, dated July 23, 2008.

Exhibit E – – Letter from Michelle L. Colson, AUSA, to Michael Wishnie, dated July 29, 2008.

Exhibit F - – Letter from Michelle L. Colson, AUSA, to Michael Wishnie, dated August 4, 2008.

Exhibit G - – Letter from Michelle L. Colson, AUSA, to Michael Wishnie, dated August 19, 2008.

Omnibus Appended Materials to Respondent's Motion to Supplement the Record – November 14, 2008

Exhibit A – Declaration of law student intern Sara Edelstein.

Exhibit B – 'Target List' of June 2007 ICE enforcement operation in New Haven, CT.

Exhibit C – <u>Danahar v. Freedom of Information Com'n</u>, 2008 WL 4308212 (Conn. Super., Sept. 5, 2008).

Exhibit D – Letter from Henri Alexandre, Assistant Attorney General of the State of Connecticut, to Michael Wishnie, dated October 20, 2008.

Exhibit E – Series of E-mails dated June 11, 2007.

Exhibit F – Letter from Douglas P. Morabito, Assistant United States Attorney, to Micheal Wishnie, dated Oct. 15, 2008.

Exhibit G – Declaration of Lawrence Mulvey, Police Commissioner of Nassau Country, New York.

Omnibus Brief and Exhibits to Supplement Record – December 3, 2008

Exhibit A – Declaration of law student intern Hunter Smith.

Exhibit B – Target List, for the June 2007 enforcement operation in New Haven, CT.

Exhibit C – Vaughn Index, ULA v. DHS, No. 3:07-cv-1224 (MRK), Dkt. # 53, 1-2 (D. Conn., filed November 6, 2008).

Exhibit I – Declaration of law student intern Sara Edelstein.

Exhibit J – Letter from Michael Wishnie and Deborah Marcuse to Michael Cameron, dated October 30, 2007.

Respondent has also submitted two additional exhibits dated March 3, 2009: Respondents' omnibus brief in response to the Government's evidentiary submissions, and Respondent's motion to supplement the record.

## IV.    Legal Standards

### A.    Motion to Suppress in Removal Proceedings

#### 1.    Respondent's *prima facie* burden

A motion to suppress must be made in writing and be accompanied by a detailed affidavit that explains the reasons why the evidence in question should be suppressed. Matter of Wong, 13 I & N Dec. 820, 822 (BIA 1971). The individual seeking to suppress evidence initially bears the burden of proof and must establish a *prima facie* case that the evidence should be suppressed. Matter of Tang, 13 I & N Dec. 691 (BIA 1971). To establish a *prima facie* case, the individual seeking suppression must provide specific, detailed statements based upon personal knowledge; such allegations cannot be general, conclusory, or be based on counsel. Id.; see also Matter of Barcenas, 19 I & N Dec. 609 (BIA 1988); Matter of Wong, 13 I & N Dec. at 821-22; Matter of Tang, 13 I & N Dec. at 692.

"Where a party wishes to challenge the admissibility of a document, the mere offering of an affidavit is not sufficient to sustain his burden. First, if an affidavit is offered, which, if accepted as true, would not form a basis for excluding the evidence, the contested document may be admitted into the record . . . If the affidavit is such that the facts alleged, if true, could support a basis for excluding the evidence in question, then

the claims must also be supported by testimony. The respondent's declaration alone is therefore insufficient to sustain his burden." Id. at 611-612. Even a technically defective arrest of an alien does not necessarily render the deportation proceeding null and void. See Avila-Gallegos v. Immigration and Naturalization Service, 525 F.2d 666 (2d. Cir. 1975). Lastly, it is important to note "[r]espondents may only litigate what happened to them." INS v. Delgado, 466 U.S. 210, 2221 (1984).

## 2. Responsive Government Burden

When a respondent comes forward with proof establishing a *prima facie* case for suppression, the DHS then must assume the burden of justifying "the manner in which it obtained the evidence." Barcenas, 19 I & N Dec. at 611. Furthermore, an alien in removal proceedings is entitled to cross-examine witnesses the Government deploys against them. INA § 240(b)(4)(B).

As to the first point, the Court is aware of no authoritative precedent revealing the precise quantum of evidence the Government must proffer 'to justify the manner in which it obtained the evidence.' However, logic informs that to meet the *prima facie* case established by the respondent (of an egregious constitutional violation), the burden on the Government must therefore be equivalent.

Then, it is the Government's obligation to submit a facially sustaining affidavit, as well as make reasonable attempts to produce supporting testimony from the agents with knowledge of the contested events. See Barcenas, 19 I. & N. Dec. at 611.

As to the second point, evidence is generally admissible in immigration proceedings if it is probative and its use is fundamentally fair, Matter of Velasquez, 19 I. & N. Dec. 377, 380 (BIA 1996). Furthermore, an "immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case..." 8 C.F.R. §1240.7(a).

Three circuit courts have required that the DHS make reasonable attempts to produce witnesses before finding the admission of affidavits or sworn statements to be fundamentally fair. See Singh v. Mukasey, 553 F. 3d 207, 212 n.1 (2d. Cir. 2009) (Without further broaching the subject, noting that the First, Fifth and Ninth Circuits have agreed that the government violates principles of fundamental fairness when it submits an affidavit without first attempting to secure the presence of those potential witnesses for cross-examination); see also Ocasio v. Ashcroft, 375 F. 3d 105, 107 (1st. 2004) ("One of these outer limits is that the INS may not use an affidavit from an absent witness 'unless the INS first establishes that, despite reasonable efforts, it was unable to secure the presence of the witness at the hearing.'") (quoting Olabanji v. INS, 973 F. 2d 1232, 1234 (5th Cir. 1992); Saidane v. INS, 129 F. 3d 1063, 1065 (9th Cir. 1997). In particular, federal circuit courts have expressed concern that INA § 240(b)(4)(B)'s purpose would be thwarted "if the government's choice of whether to produce a witness or to use a hearsay statement were wholly unfettered." See, e.g., Baliza v. INS, 709 F. 2d 1231, 1234

(9th Cir. 1983).[3]

Furthermore, INA § 240(b)(4) provides an alien in removal proceedings "shall have a reasonable opportunity to examine the evidence against the alien ... and to cross-examine witnesses presented by the Government..." 8 U.S.C. § 1229a(b)(4)(B).[4]

This statutory provision is steeped in Fifth Amendment due process rights. "It is well established that the Fifth Amendment affords aliens due process of law during deportation proceedings." See Singh v. Mukasey, 553 F. 3d 207, 214 (2d. Cir. 2009). A failure in admitting unsupported evidence may constitute a constitutional due process violation if its inclusion prejudices the respondent.[5] See Farrokhi v. INS, 900 F. 2d 697, 702 (4th Cir. 1990).

So, while the rules of evidence do not govern removal proceedings, Felzcerek v. INS, 75 F. 3d 112, 116 (2d. Cir. 1996), and "an IJ has some latitude to receive evidence without demanding live testimony ... an IJ's evidentiary rulings must comport with due process." Marku v. Board of Immigration Appeals, No. 03-40871, 2005 WL 1162978, *1 (2d. Cir. May 16, 2005) (unpublished decision). The Court also has a concomitant responsibility to help establish and develop the record. See Yang v. McElroy, 277 F. 3d 158, 162 (2d. Cir. 2002). The United States Court of Appeals for the Second Circuit has previously recognized that a fact finder who assesses testimony together with witness demeanor is in the best position to evaluate credibility. See Zhou Yun Zhang v. United States INS, 386 F. 3d 66, 73 (2d. Cir. 2004).

Furthermore, in removal proceedings, hearsay testimony is admissible if it is probative, and its use is not fundamentally unfair because the alien has an opportunity to cross-examine the witness and offer rebuttal testimony. See Olowo v. Ashcroft, 368 F. 3d

3 The Court notes that the DHS has refused to produce the affiants for in-court examination. Furthermore, in addition to submitting affidavits to the Court, Mr. Hamilton is also the author of the contested Form I – 213 and Mr. McCaffrey is listed as the examining officer. Nor has the Government offered the individual credited on the Form I – 213 with the location and apprehension of Respondent, Ms. Michelle Vetrano-Antuna, for testimony. The Court does not wish to imply an author of an I – 213, or its designees, in the ordinary course, need substantiate the narrative contained therein by means of live testimony. However, where Respondent has advanced a viable claim and fulfilled an initial demanding *prima facie* burden of establishing a constitutional violation, testimony by an author of this crucial piece of evidence would have great probative value.

4 We note that, subsequent to the commencement of proceedings, and assuming a petitioning party has met the statutory preconditions, if an IJ is satisfied that a witness will not appear to testify and that his or her testimony is essential, the IJ possesses exclusive jurisdiction to issue subpoenas requiring, *inter alia,* the attendance of that witness. 8 C.F.R. § 1003.35(b)(1),(3). Respondent has filed numerous subpoena requests. See Respondents' Subpoena Requests (April 2, 2008); Respondents' Subpoena Requests (October 20, 2008). However, these requests were made before Respondent testified and established his requisite *prima facie* case; thus, the Court was not satisfied that the ICE agents' evidence was 'essential.' And our disposition of Respondent's Motion to Suppress Evidence and Motion to Terminate Proceedings obviates the need to gauge if the ICE agents' evidence is now indeed 'essential.' In any event, the Government has in no uncertain terms refused to produce any of the agents involved for testimony.

5 The Notice to Appear (Form I – 862), the seminal document referring an alien to his or her rights in a removal proceeding, and the filing of which commences removal proceedings, states that the alien 'will have the opportunity ... to cross-examine any witnesses presented by the Government.'

692, 700 (7th Cir. 2004) ("In a due process analysis, problems of fundamental fairness associated with hearsay testimony are dispelled when the testimony is subject to cross-examination.") (internal citations omitted). "It is clear that the burden of producing a government's hearsay declarant that a petitioner may wish to cross-examine is on the government..." Hernandez-Guadarrama v. Ashcroft, 394 F.3d 674, 682 (9th. Cir. 2005) (internal quotations and citations omitted).

Ultimately, once a respondent has satisfied his initial obligation to provide a personal-knowledge based affidavit and sworn testimony, and successfully establishes a *prima facie* case that his constitutional rights were egregiously violated, the Government then has a reciprocal obligation to the Respondent (and the Court) to produce and make available agents involved in the enforcement operation at issue for examination in court (insofar as it seeks to admit contested evidence of alienage authored by an agent, or it submits a written declaration or affidavit by the agent). See Lopez-Rodriguez, 536 F. 3d at 1015-17. (court determination, that IJ's full adoption of Respondent's testimony, characterized as 'conclusive' factual findings, regarding the contested entry into her private residence, where Government failed to produce any of the agents involved in the raid, to be supported by substantial evidence); see also In re: Ruben Cruz-Campos, A44 555 267, 2006 WL 3088780, *1 (BIA Aug. 7, 2006) (unpublished decision).

**B.    "Egregiousness"**

### 1.    Supreme Court

The Supreme Court ruled in I.N.S. v. Lopez-Mendoza, 468 U.S. 1032 (1984) that the exclusionary rule is not generally applicable in removal proceedings. Lopez-Mendoza, 468 U.S. at 1050. However, a plurality of the Court made plain that their conclusion did "not deal with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained."[6] Id. As the issues in the case addressed "the exclusion of credible evidence gathered in connection with peaceful arrests" by immigration officials at a workplace factory site, no such concerns were implicated. Id.

### 2.    United States Court of Appeals for the Second Circuit

The Second Circuit "adopted the reservations of the Lopez-Mendoza plurality as part of the 'law of [the] circuit,'" Pinto-Montoya v. Mukasey, 540 F. 3d 126, 131 (2d. Cir. 2008), holding that evidence ought to be suppressed only when the evidence established either "that an egregious violation that was fundamentally unfair had occurred, or [] that the violation . . . undermined the reliability of the evidence in dispute." Almeida-Amaral v. Gonzales, 461 F. 3d 231, 235 (2d. Cir. 2006).

As to the "fundamental fairness" prong, the Court posited that since the egregiousness of a constitutional violation "cannot be gauged solely on the basis of the

---

6 Black's Law Dictionary defines 'egregious' as "extremely or remarkably bad; flagrant." Black's Law Dictionary (8th ed. 2004).

[invalidity] of the stop, but must also be based on the characteristics and severity of the offending conduct," not all Fourth Amendment violations authorized the suppression of evidence in removal proceedings. Id. Instead, the Court devised a sliding scale: A seizure suffered for no reason at all would constitute an egregious violation only if it was sufficiently severe, or if the stop was based on race or some other "grossly improper consideration." Id.

The Court noted that their formulation was non-exhaustive but remarked suppression would require "more than a violation;" it would "demand[] egregiousness." Id. at 236; cf. Gonzales-Rivera v. INS, 22 F. 3d 1441 (9th Cir. 2004).[7] The Court listed two factors that might render a seizure "gross or unreasonable" in excess of its unlawfulness and meet the 'egregious' threshold: a "particularly lengthy" initial illegal stop and the show or use of force. Id. Ultimately, the Court concluded the petitioner had failed to marshal sufficient evidence to support any such finding.

The Court, in dicta, did state that if the stop in question was based on race, the violation would have been egregious. However, as the petitioner "offered nothing other than his own intuition to show that race played a part in the arresting agent's decision," his argument failed. Id. at 236; see also Pinto-Montoya, 540 F. 3d at 131 (finding that the court in Almeida-Amaral concluded "that petitioner's mere assertion, without more, that he was stopped on the basis of race was insufficient to establish that the stop was race-based.").

Another Second Circuit case that followed, Melnitsenko v. Mukasey, 517 F. 3d 42 (2d. Cir. 2008), focused the analysis on alleged violations where race did not play a consideration. The Court concluded that a three-hour detention of an alien, at a checkpoint about 100 miles from the Canadian-United States border, was not an egregious constitutional violation and that the agent's actions at bar were less severe than the agent's actions in Lopez-Mendoza, as petitioner was neither arrested nor taken to jail during the complained-of seizure. Id. at 47 (even assuming that "once she was stopped, she was escorted to a trailer by four or five uniformed officers and interrogated, fingerprinted, and photographed, for three hours without any evidence of Miranda or other warnings given," and "even assuming the Checkpoint itself was illegal," the complained-of conduct fell short of egregious conduct.) Id.

## C.    Consent

1.    "It is well settled under the Fourth Amendment that a search conducted without a warrant issued upon probable cause is 'per se unreasonable' . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412

---

7 The Ninth Circuit's characterization of 'egregiousness' is less circumscribed that the Second Circuit's. In the Ninth Circuit, "all bad faith violations [i.e. where 'evidence is obtained by deliberate violations of the fourth amendment, or by conduct a *reasonable officer should have known* is in violation of the Constitution'] of an individual's fourth amendment rights are considered sufficiently egregious to require application of the exclusionary sanction in a civil proceeding." Gonzales-Rivera v. INS, 22 F. 3d at 1449 (internal quotations and citations omitted) (emphasis in original).

U.S. 218, 219 (1973); Payton v. New York, 445 U.S. 573, 586 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home, absent a warrant, are presumptively unreasonable."). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth, 412 U.S. at 218.

Consent must be given voluntarily and by an individual possessing the requisite authority. See Illinois v. Rodriquez, 497 U.S. 177, 181 (1990). Voluntariness is a question of fact determined by a 'totality of all the circumstances.' United States v. Isiofia, 370 F. 3d, 226, 231 (2004) (quoting Schneckloth, 412 U.S. at 227). While knowledge of the right to refuse consent is not a *sine qua non* to a finding of voluntariness, "it may be a factor in ascertaining whether the consent was coerced." Schneckloth, 412 U.S. at 248-49.

Specific factors bearing on whether consent was given, and whether it was freely given, in the context of an initial entry encounter with police at the door of a private residence, include 1) whether the officers knocked, 2) whether the officers identified themselves (in a non-coercive manner), 3) whether the officers engaged in threatening or abusive actions to induce a resident to open the door and admit them, 4) whether the door was opened for the officers, and 5) whether the police entry was protested. See United States v. Valencia, 645 F. 2d 1158, 1165 (1980); United States v. Ledbetter, No. 02-1757, 2003 WL 22221347, *2 (2d. Cir. Sept. 26, 2003) (unpublished decision); United States v. Crespo, 834 F. 2d 267, 269 (2d. Cir. 1987) (district court's finding that agents' display of weapons and kicking of door caused the door to be opened by the threat of force and not with consent, met with approval by reviewing court).

"Fourth Amendment privacy interests are most secure when an individual is at home with doors closed and curtains drawn tight." United States v. Gori, 230 F. 3d 44, 51 (2d. Cir. 2000); Matter of Louissaint, 24 I & N Dec. 754, 761 (BIA 2009) (Pauley, J., concurring) (citing Payton as an exemplar for the axiom that "[t]he home is an area of utmost privacy, uniquely protected under our law."). In Gori, the majority took umbrage with the dissent's characterization of their opinion and emphatically stated that "the mere opening of a "door to a home does not transform[] the entire home into a public place. [The dissent] generalizes the holding and reach of the opinion beyond its scope or ambition, where the critical fact was that the interior of the apartment was exposed to public view when the door was voluntarily opened." Id. at 52.

An individual, by words or acts, may limit the scope of consent he has given, or revoke his consent, in whole or in part. See United States v. Moran Vargas, 376 F. 3d 112, 113-14 (2d. Cir. 2004). Finally, though consent can be constructed from an individual's words, acts or conduct, Krause v. Penny, 837 F. 2d 595, 597 (2d. Cir. 1988), "the ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." Garcia, 56 F. 3d 418, 423 (1995) (internal quotations and citations omitted).

**2.**     There are also regulatory restrictions regarding consent in the immigration

context. Regarding 'site inspections,' which are "enforcement activities untaken [by the BTSD] to locate and identify aliens illegally in the United States . . . where there is a reasonable suspicion, based on articulable facts, that such aliens are present." 8 C.F.R. 287.8(f)(1). Subsection (f)(2) delimits the authority of an immigration officer to enter into a private residence to act in their official capacity:

> An immigration officer may not enter into the non-public areas of a business, a residence including the curtilage of such residence . . . except as provided in section 287(a)(3) of the Act, for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected. When consent to enter is given, the immigration officer must note on the officer's report that consent was given and, if possible, by whom consent was given. If the immigration officer is denied access to conduct a site inspection, a warrant may be obtained.

8 C.F.R. 287.8(f)(2).

## D. Seizure

1. "A person is seized by the police . . . when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." Brendlin v. California, 127 S. Ct. 2400, 2405 (2007).

Ordinarily, the pertinent test is whether "a reasonable person would have believed that he was not free to leave if he [did] not respond[ ]" to the questions put to him. Pinto-Montoya, 540 F. 3d at 131 (citing INS v. Delgado, 466 U.S. 210, 216 (1984 )); see also United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968) . "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a [Fourth Amendment] seizure..." Delgado, 466 U.S. at 215.

"When a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" Brendlin, 127 S. Ct at 2405-06 (quoting Florida v. Bostick, 501 U.S. 429, 435-36 (1991).

2. When a police officer has restrained the freedom of an individual sufficient to constitute a 'seizure' under the Fourth Amendment, it must be 'reasonable'. U.S. v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (citing Terry, 392 U.S. at 16). "[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Id. The Fourth Amendment forbids "stopping or detaining persons for questioning about

their citizenship on less than a reasonable suspicion that they may be aliens." Brignoni-Ponce, 422 U.S. at 884; see also Rajah v. Mukasey, 544 F. 3d 427, 441 (2d. Cir. 2008).[8]

In evaluating the validity of a stop, the Court must consider "the totality of the circumstances-the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981).

"Pertinent factors identifying a police seizure can include the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects . . . and a request by the officer to accompany him to the police station or a police room." Gilles v. Repicky, 511 F. 3d 239, 245 (2007).

When stopping an individual, the Fourth Amendment requires "a police officer's actions be justified at its inception." U.S. v. Swindle, 407 F. 3d 562, 567 (2d. Cir. 2005) (quoting Terry, 392 U.S. at 20). "The settled requirement is . . . that reasonable suspicion must arise before a search or seizure is actually affected." Swindle, 407 F. 3d at 568 (citing Florida v. J.L., 529 U.S. 266, 271 (2000)).

**3.**     The Immigration and Nationality Act ("INA"), and its attendant regulations, echo this sentiment. INA § 287(a)(1) states "[a]ny [authorized immigration officer] shall have power without warrant to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States..." With regards to interrogation and detention not amounting to arrest, interrogation is defined as "questioning designed to elicit specific information [not amounting to arrest]... an immigration officer . . . has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away." 8 C.F.R. 287.8(b)(1).

However, "[i]f the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning." 8 C.F.R. 287.8(b)(2).

### E.     Arrest

**1.**     A warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "Probable cause exists where the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." U.S. v. Delossantos, 536 F. 3d 155, 158 (2d. Cir. 2008) (internal quotations and citations omitted). "Because the standard is fluid and contextual, a court must examine the totality

---

8 The Second Circuit, in Rajah, noted that the Supreme Court has left unanswered whether "suspicion must be of illegal alienage or may be of mere alienage." Id. at 441.

of the circumstances of a given arrest. . . . These circumstances must be considered from the perspective of a reasonable police officer in light of his training and experience." Id. (internal quotations and citations omitted).

2.      INA § 287(a)(2) allows authorized officers to arrest without warrant "any alien in the United States, if he has reason to believe that the alien so arrested is in the United States, in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest..." This subsection also allows officers to make arrests for felonies that have been committed or are in the process of being committed, but subjects them to several limitations. See INA § 287(a)(4), (a)(5)(B).

The concomitant regulations specify "[o]nly designated immigration officers are authorized to make an arrest." 8 C.F.R. § 287.8(c)(1) "An arrest shall only be made when the designated immigration officer has reason to believe that the person arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i). A warrant for arrest must be obtained unless the officer has reason to believe that the person is likely to escape before a warrant can be obtained. 8 C.F.R. § 287.8(c)(2)(ii). The officer must identify himself or herself as an immigration officer authorized to make an arrest, state that the person is under arrest, and extrapolate the reason for the arrest, upon ensuring the communications can be made in safety. 8 C.F.R. § 287.8(c)(2)(iii).

## F.      Regulatory Violations

Regulatory violations counsel suppression of evidence when they are "egregious or fundamentally unfair or impaired the reliability of the evidence of ... deportability." Rajah, 544 F. 3d at 446.[9] It is noteworthy that no Court of Appeals has actually determined that deportation or removal proceedings should be terminated based on a violation of a regulation or internal agency guideline. It is true that the Second Circuit, in Waldron v. INS, 17 F.3d 511 (2d. Cir. 1993), determined that, when a regulation is promulgated to protect a fundamental right derived from the Constitution or federal statute, and the INS fails to adhere to it, the challenged proceedings is invalid and a remand is required. See Waldron, 17 F.3d at 518. However, there is no clear holding sanctioning that a violation of a regulation could result in termination of proceedings, thereby allowing a respondent to continue his unlawful presence in the United States, absent egregious conduct.

---

9 Respondent also avers that ICE agents failed to inform him that he was entitled to be represented by counsel during any interrogation-by-examination, in derogation of 8 C.F.R. § 292.5(b) and his Fifth Amendment rights. The Second Circuit has not made an express determination on this ground, but noted in Melnitsenko that the petitioner's argument that "she was escorted to a trailer by four or five uniformed officers and interrogated, fingerprinted and photographed, for three hours without any evidence of any Miranda or other warnings given," did not enhance the officers' conduct to constitutionally 'egregious' conduct. Melnitsenko, 517 F. 3d at 47; see also Lopez-Mendoza, 468 U.S. at 1037 (Supreme Court concluded arrest of petitioner in violation of his Fourth Amendment rights, followed by brief detention and transfer to country jail for questioning, all without warning petitioner of his right to remain silent, did not constitute 'egregious' constitutional violation.).

## G. Exclusionary Rule

Evidence obtained from an unlawful search or seizure is generally subject to exclusion as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). Courts will also suppress evidence that is the indirect product of the illegal police activity as 'fruit of the poisonous tree.' See United States v. Oscar-Torres, 507 F. 3d 224, 227 (4th Cir. 2007) (citing Wong Sun, 371 U.S. at 471).

The relevant constitutional question for later-discovered evidence is "whether the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint." United States v. Ceccolini, 435 U.S. 268, 273-74 (1975). "The so-called 'attenuation doctrine' allows introduction of evidence obtained after an unlawful arrest when 'the causal link' between a Fourth Amendment violation and a subsequent confession, identification, or other form of evidence is so long or tortuous that suppression of the evidence is unlikely to have the effect of deterring future violations of the same type." Mosby v. Senkowski, 470 F. 3d 515, 521 (2d. Cir. 2006) (internal quotations and citations omitted).

The United States Supreme Court has enumerated several factors germane to the attenuation analysis, including 1) "the temporal proximity of the arrest and the confession," 2) "the presence of intervening circumstances," and "particularly," 3) "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-04 (1975).

In the context of obtaining fingerprints as an incident of arrest, gathered in the absence of a warrant or probable cause, the Supreme Court has on multiple occasions held that when an illegal arrest is used as an investigatory subterfuge to obtain fingerprints, the fingerprints are regarded as an inadmissible fruit of an illegal detention. See Davis v. Mississippi, 394 U.S. 721, 727-28 (1969); Hayes v. Florida, 470 U.S. 811, 817-18 (1985); see also United States v. Olivares-Rangel, 458 F. 3d 1104, 1115 (10th Cir. 2006).

Succinctly phrased by the United States Court of Appeals for the Tenth Circuit, "[t]he exclusionary rule applies whenever evidence has been obtained 'by exploitation' of the primary illegality instead of 'by means sufficiently distinguishable to be purged of the primary taint.' Evidence may be obtained 'by exploitation' of an unlawful detention even when the detention is not for the sole purpose of gathering evidence." Olivares-Rangel, 458 F. 3d at 1115 (10th Cir. 2006) (internal citations omitted).

Moreover, the Fourth Circuit has advanced even farther and held "an alien's fingerprints taken as part of routine booking procedures but intended to provide evidence for a criminal prosecution are still *motivated* by an investigative, rather than an administrative, purpose," and accordingly are "subject to exclusion." Oscar-Torres, 507 F. 3d at 232 (citing Olivares-Rangel, 458 F. 3d at 1114.).

While the Second Circuit has not expressly pronounced its position on this issue,

it has in previous cases indicated its disapproval of a rigid illicit-purpose requirement. See United States v. Ortiz-Gonzalbo, 133 F. 3d 908, 909 (2d. Cir. 1997) (unpublished opinion) (rejecting a district court's ruling that a defendant's fingerprints are not excludable unless the police made the illegal arrest for the purpose of obtaining the fingerprints, and instead sustaining the lower court's denial of a motion to suppress on alternate grounds); Johnson v. Ross, 955 F. 2d 178, 182 (2d. Cir. 1992) (Newman, J., concurring) ("In some circumstances, evidence is deemed tainted by prior police misconduct even if the reliability of the subsequent evidence is not challenged."). Furthermore, that these indications have arisen in criminal case precedent does not seem to be the paramount, or even prominent, factor in the Second Circuit's analysis. See United States v. Alvarez-Porras, 643 F. 2d 54, 63 (2d. Cir. 1981) ("where flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule.") (quoting United States v. Edmons, 432 F. 2d 577, 584 (2d. Cir. 1977).

## H.    'Body' or 'Identity' Evidence

The United States Supreme Court concluded, in Lopez-Mendoza, that "the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Lopez-Mendoza, 468 U.S. at 1039.

The United States Court of Appeals for the Tenth Circuit has interpreted this statement to mean, based on the cases cited in Lopez-Mendoza, to support the proposition, that the Court was referencing the Ker-Frisbie doctrine, that illegal police activity affects only the admissibility of evidence, and not the jurisdiction of the trial court or otherwise serves as a basis for dismissing the prosecution. Olivares-Rangel, 458 F.3d at 1110.

This view is in accord with both the Eighth Circuit, which has also concluded "that the 'identity' language in Lopez-Mendoza referred only to jurisdictional challenges and did not foreclose suppression of all identity related evidence," United States v. Guevera-Martinez, 262 F. 3d 751, 754 (8th Cir. 2001), as well as the Fourth Circuit, which has concluded "Lopez-Mendoza does not prohibit suppression of evidence of a defendant's identity." United States v. Oscar-Torres, 507 F. 3d 224, 228 (4th Cir. 2007). Thus, the United States Court of Appeals for the Fourth, Eighth, and Tenth Circuits all agree that "the Supreme Court's statement that the "body" or identity of a defendant are "never suppressible" applies only to cases in which the defendant challenges the jurisdiction of the court over him or her based upon the unconstitutional arrest, not to cases in which the defendant only challenges the admissibility of the identity-related evidence." Olivares-Rangel, 458 F. 3d at 1111.

Each of these Circuits have scrutinized two especially compelling keystones supporting their conclusion: 1) The Supreme Court's founding of its own statement on past cases elucidating the long-standing rule known as the Ker-Frisbie doctrine, and 2)

the fact that in Lopez-Mendoza, a consolidated appeal, the alien who objected to evidence offered against him was deemed to have a 'more substantial' claim than the alien who only objected to being hauled into deportation hearings and entered no objection to the evidence offered against him. See United States v. Oscar-Torres, 507 F. 3d at 228 (quoting Lopez-Mendoza, 468 U.S. at 1040); Guevera-Martinez, 262 F.3d at 754 ("These cases [relied upon by the Court in Lopez-Mendoza ] deal with jurisdiction over the person, not evidence of the defendant's identity illegally obtained. The language in Lopez-Mendoza should only be interpreted to mean that a defendant may be brought before a court on a civil or criminal matter even if the arrest was unlawful.").[10]

While the Second Circuit has not explicitly voiced a stance on this issue, it has previously quoted United States v. Crew, 445 U.S. 463, 474 n.20 (1980), in a criminal context, recognizing that "[i]n some cases, of course, prosecution may effectively be foreclosed by the absence of the challenged evidence. But this contemplated consequence is the product of the exclusion of specific evidence tainted by the Fourth Amendment violation and is not the result of a complete bar to prosecution." Brown v. Doe, 2 F.3d 1236, 1243 (2d. Cir. 1993).

## I.  Custody / Bond Applications and Requests

With respect to custody and bond determinations, "[c]onsideration by the Immigration Judge of an application or request of a respondent regarding custody or bond ... shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding. 8 C.F.R. § 1003.19(d). Premised on this regulation, the Board has concluded that evidence presented only in an alien's removal proceeding cannot be considered during the separate bond proceeding. See In re Adeniji, 20 I & N Dec. 1102, 1115 (BIA 1991).

## J.  Consideration of Constitutional Claims

While "courts should not decide constitutional issues unnecessarily," courts ought to adjudicate such claims when they are "unavoidable." Jean v. Nelson, 472 U.S. 846, 854 (1985). For example, it is true that the federal rules of evidence do not apply in removal proceedings; however, evidence is properly admitted only so long as it "does not violate the alien's right to due process of law." Aslam v. Mukasey, 537 F. 3d 110, 114 (2d. Cir. 2008) (internal quotations omitted). The United States Court of Appeals for the Second Circuit has implicitly approved of frontal review by an Immigration Court of constitutional claims driving a motion to suppress evidence, at least insofar as the motions are premised on alleged Fourth and Fifth Amendment violations. See, e.g., Almeida-Amaral, 461 F. 3d at 232; Pinto-Montaya, 540 F. 3d at 127.

## V.  Respondent has established his requisite *prima facie* burden of an egregious

---

10 Oscar-Torres collects cases from the Third, Fifth, and Sixth Circuits that have diametrically determined that Lopez-Mendoza bars suppression of all evidence of identity. Oscar-Torres, 507 F. 3d at 228 (collecting cases). Oscar-Torres also recognizes that the Ninth Circuit has inconsistently come to different conclusions on the issue in different cases. Id. at 228 n.2.

## Fourth Amendment violation.

**A.**    The Court finds Respondent's testimony to be credible. Respondent submitted a facially adequate affidavit relating that he was in his bed sleeping when immigration agents opened his bedroom door, ordered him into the living room, and later arrested him. Respondent supplemented his documentary affirmations by testifying in open court and making himself amenable to cross-examination. He testified in a candid and straightforward manner, based upon his personal knowledge, chronicling the events that took place in his bedroom and apartment, on the morning of June 6, 2007.

At 6:30 a.m. in the morning, Respondent was sleeping when he was awakened by someone knocking on his bedroom door. Roused, he observed someone standing in his bedroom doorway. Respondent asked "what happened" and received as a reply "it's the police."

An agent instructed the Respondent, in English, to get up and sit in the living room. He was then directed to put clothes on and placed in handcuffs. He asked the agents several times what was happening, but received no answer.

Respondent's testimonial narrative is substantially consistent with his declarations, as well as the testimony and declarations supplied by his roommate, ██████ ████ █████ Importantly, there are few discrepancies. Despite a few points of difference between his testimony and his declarations (*e.g.* whether the agents opened his bedroom door and then stood in the doorway or took a few steps in and entered his room), he presents a comprehensive and credible account of the events he observed the morning on June 6, 2007.

It is true that the Court cannot determine precisely when the agents asked Respondent for identity documentation or what identity documentation Respondent provided. Nor can we discern whether this exchange occurred before or after he was handcuffed. However, we nonetheless find Respondent's account to be consistent, credible, and sufficiently complete and, as discussed *infra*, his account allows the Court to tether its conclusion to the events preceding the exchange regarding the request and procurement of Respondent's identity documentation.

In sum, Respondent's declaration satisfied the evidentiary burdens imposed upon him and he substantiated the contents therein with credible testimony that was both specific, and based on his personal knowledge. Thus, the Court finds Respondent sustained his *prima facie* burden of establishing his constitutional rights were violated. The Court wishes to underscore the vital role our credibility determination plays in our accompanying determination that Respondent has successfully demonstrated a *prima facie* case that his Fourth Amendment rights were violated when, during an early morning raid, immigration agents entered his apartment without a warrant, probable cause, or consent, and proceeded to enter his bedroom.

**B.** Our analysis does not end there. An egregious constitutional violation must be 'sufficiently severe,' or 'gross or unreasonable,' in additional to being unlawful. Almeida-Amaral, 461 F. 3d at 235-37.

On June 6, 2007, near pre-dawn hours, Respondent was asleep in his bedroom. Someone knocked on his bedroom door and then opened the door without Respondent's acquiescence. An agent instructed him to sit down in the living room. Later, Respondent was handcuffed.

That this pre-dawn enforcement raid targeted a private residence is especially pertinent to our decision. The touchstone of the Fourth Amendment is 'reasonableness' and, by natural extension, one's reasonable expectation of privacy. Nowhere is that expectation of privacy more sacrosanct than in the confines of one's home and nowhere is that right more jealously guarded against encroachment. We are not addressing a claim made by an alien seeking admission into the country, outside of a restaurant, driving on the street, or at a workplace site. We are addressing a claim that immigration agents forcefully entered a private home without a warrant, without probable cause, and without consent.

Notably, there are scant facts that might furnish a plausible basis upon which communicated consent might reasonably have been interpreted by the agents during their initial entry into the apartment. Respondent's roommate testified that he opened the door ajar a few inches. Without saying a word, agents immediately and forcibly pushed the door wide open. Respondent's roommate did not consent to their entry and the DHS concedes that they had no warrant to enter the home.

Our conclusion that the agents' entry into the apartment and then into his bedroom violated Respondent's Fourth Amendment rights is not the end of our inquiry. As outlined *supra*, the constitutional violation, when not based on race or some other improper consideration, must be 'gross' or 'unreasonable' in addition to having no plausible legal ground. Thus, the Court must examine the actual conduct of the immigration agents involved in the violation, including their physical entry into Respondent's home and their subsequent encroachment into his bedroom.

The agents' unlawful early morning entry into a private residence strongly implicates "unreasonable" unlawful conduct. The agents did not limit their entry into the immediate area of the apartment; they instead entered into the closed-door bedroom of Respondent. The subsequent conduct of the immigration officers lends further support to our conclusion that Respondent has displayed the necessary aggravating circumstances, a *sine qua non* for his claim. Specifically, examination of the agents' subsequent conduct confirms Respondent's Fourth Amendment rights were flagrantly violated.

The agents impermissibly entered into Respondent's home and bedroom without permission. The agents failed to explain to Respondent why they were in his home, the identity of the individual or individuals they sought, or why they had ordered Respondent to get out from his bed and sit in the living room, despite Respondent's multiple queries.

It is true the Court is not aware precisely when the agents asked Respondent for identity documentation or what documentation Respondent provided in response. Nor do we know, based on Respondent's testimony, precisely when Respondent was handcuffed in relation to the aforementioned exchange. However, the Court concludes that Respondent satisfied his *prima facie* burden on events preceding the agents' consideration of his proffered identity documentation. After consideration of all the facts present in the record, up to that point, we find sufficient evidence sustaining Respondent's demanding initial burden.

The facts at bar reflect that, unlike in <u>Lopez-Mendoza</u>, the evidence gathered here was not in connection with 'peaceful arrests' made by immigration officers. However the term 'peaceful'[11] may be defined, it cannot be reasonably squared with the agents' conduct in this case.

To conclude, Respondent has established a *prima facie* case for the suppression of evidence directly connected to the unlawful entry of his home, such as the Form I – 213. Respondent submitted a motion to suppress that specified the requisite constitutional basis for his motion, gave a detailed and specific account of the events leading to his arrest, specified the evidence to be suppressed, and cogently supported his position with in-court testimony, and provided testimony in response to questions asked by the DHS on cross-examination.

## VI.   The DHS, while submitting affidavits from two of the agents who entered into Respondent's home, categorically refused to produce the affiants for live testimony.

The DHS submitted affidavits from two of the agents involved in the arrest of Respondent, Mr. McCaffrey and Mr. Hamilton. Considered in conjunction, both affirm that consent to enter the premises was freely and voluntarily granted by Respondent's roommate, Mr. ███████ ██████.

Specifically, Mr. Hamilton states that he was assigned to make contact with the occupants on the first floor of the residence. He walked into the common hallway area and knocked on the first floor apartment door. When ██████ opened the door, Mr. Hamilton identified himself as a police officer, asked ██████ whether he lived at the apartment, and showed him a photograph of a fugitive alien the enforcement operation was targeting.

At that point, Mr. McCaffrey arrived and asked ██████ if they could 'come in and talk to him.' ██████ replied that they could and turned, walking into the kitchen. Both officers followed. This event is affirmed by both officers.

The DHS has adduced affidavits from two officers that directly contravene

---

11 Black's law dictionary defines 'peaceful' as "[a] state of public tranquility; freedom from civil disturbance or hostility." <u>Black's Law Dictionary</u> (8th ed. 2004).

▇▇▇▇▇▇ testimony concerning the agents' entry into his apartment. However, the affidavits submitted are incomplete as they relate to Respondent's seizure and arrest. No affidavit is provided by any agent who may have opened Respondent's bedroom door, ordered him into the living room, handcuffed him, asked him for identity documentation, analyzed that documentation and made a determination of the legality of his presence in the United States, or eventually arrested him. In fact, neither submitted affidavit broaches on the subject of Respondent's seizure and arrest post-entry save Mr. McCaffrey's declaration that "[o]nce an interpreter arrived at the apartment, additional questioning led to the arrest of [Respondent] from this apartment…"

The DHS has not submitted affidavits from any of the immigration agents involved in Respondent's arrest. No affidavit was submitted by the interpreter who was called in and whose additional questioning led to Respondent's arrest.[12] His or her identity is not stated in the affidavit and the DHS has not attempted to explain why no affidavit from the interpreter was produced.

Nor have all the agents listed on the Form I – 213, the document Respondent seeks to suppress, come forward and submitted affidavits. 'Michelle Vetrano-Antuna' is listed as the arresting officer, but she had not submitted written testimony, nor is she referred to by either affiant.

The Form I – 213 lists Mr. Hamilton as the author of the narrative contained therein. He states Respondent was interviewed, and later arrested, by Deportation Officer Vetrano-Antuna, though this information is not found in his affidavit. Mr. Hamilton's affidavit says nothing about agents addressing Respondent in his bedroom or the later questioning or arrest of Respondent.[13]

Ultimately, much more fundamental to our determination than the aforementioned evidentiary omissions, is the refusal to make available either affiant in this case for cross-examination. Respondent, who has satisfied his exacting initial burden, was thus absolutely deprived a reasonable opportunity to confront and cross-examine Mr. McCaffrey and Mr. Hamilton. This due process requires.[14] Functionally, the upshot is that the Court can give but scant, if any, weight to these submissions.

---

12 Mr. McCaffrey's affidavit, in pertinent part, indicates that the exchange involving Respondent and the interpreter provided the necessary information needed to arrest Respondent.

13 It may be that the narrative documented by Officer Hamilton is based not on his personal knowledge, but upon what he was told by fellow agents. Even if this is true, it fails to explain why no testimony was produced by these individuals. The Court is mindful that the Federal Rules of Evidence do not apply and hearsay evidence is and routinely admitted in removal proceedings. However, the current case stands at a starkly divergent and demanding procedural posture, from the ordinary course of removal proceedings and, where the onus is on the Government to "justify the manner in which it obtained the evidence." Resolution of this issue would have been immensely aided by the production of affidavits from those other agents directly involved in Respondent's seizure and arrest.

14 Apart from Respondent's constitutional privilege to cross-examine the Government's affiants, the testimony elicited therefrom would be exceptionally probative, as Respondent's and the Government's account of how entry was effectuated are in stark contradiction to one another, and our finding that the agents lacked consent to enter the apartment is a primary basis upon which the Court determined that Respondent has satisfied his *prima facie* burden.

The Court has demanded Respondent file a satisfactory declaration based on his personal knowledge, present himself before the Court and provide testimony, be subject to the DHS' cross-examination, and sustain his *prima facie* burden of establishing that his constitutional rights were egregiously violated. Respondent has complied with each of these demands and met his obligations. Case law dictates that the burden now falls on the DHS to produce evidence in support of its burden of "justifying the manner in which it obtained the evidence." Barcenas, 19 I & N Dec. at 611. The DHS has simply failed to do so.

The Court would be afield to juxtapose our decision in relation to the Supreme Court's identification of one benefit of utilizing the exclusionary rule in immigration hearings: deterrence of immigration agents' unconstitutional conduct. Lopez-Mendoza, 468 U.S. at 1041. This issue falls outside the Court's judicial ken. We remark, however, that this case, as it has been factually represented before us in the record, does not appear to be on the margins. Here, the raid was conducted in the early morning hours while some of the occupants, including a young girl, were sleeping. Agents forcibly entered, without warrant or consent, into a private home and then into a private bedroom. The agents failed to ask preliminary questions that might demonstrate probable cause or at least reasonable suspicion. Neither Respondent, nor anyone else present in the apartment, was the targeted fugitive alien sought by the agents.

The Court finds that there was an egregious violation of the Fourth Amendment that was fundamentally unfair. See Almeida Amaral, 461 F.3d at 236. It realizes that reasonable people can differ on their interpretation of the term egregious. In considering all the evidence in the record, this Court finds that the Respondent's Fourth Amendment rights were egregiously violated.

## VII.   Conclusion

Considering the totality of the circumstances, the Court determines that Respondent has demonstrated a *prima facie* case that the immigration agents' conduct worked an egregious violation to his Fourth Amendment rights.[15] Thus, the Court finds that the contested Form I – 213 must be suppressed.

Furthermore, based on the record before us, it appears that Respondent was placed in removal proceedings exclusively upon the information that he provided to immigration agents during the course of their interrogation. The Form I – 213 expressly states that Respondent was "interviewed at his residence" and "questioned," and was arrested on the basis of his admissions and resultant information that was subsequently gathered.

Furthermore, the Government has not produced additional evidence to sustain the charge of removability independent of the Form I – 213.

---

15 Because of our disposition in this case, *supra*, we have no occasion to evaluate Respondent's other constitutional, regulatory, and sub-regulatory claims.

Finally, we agree with Respondent that his removal proceedings must be terminated, because the Government has not introduced admissible independent evidence supporting the factual allegations stated in the NTA, and thus it has failed to meet its burden of establishing Respondent's removability by clear and convincing evidence. See INA § 240(c)(3)(A).

## VIII.  Orders

Based on the foregoing, the following **ORDERS** shall enter:

> **IT IS ORDERED** that Respondent's Motion to Suppress be **GRANTED**;
>
> **IT IS FURTHER ORDERED** that Respondent's Motion to Terminate removal proceedings be **GRANTED**.

June 2, 2009
Date

MICHAEL W. STRAUS
Immigration Judge

# Exhibit 9

UNITED STATES DEPARTMENT OF JUSTICE
EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
IMMIGRATION COURT
450 MAIN ST., ROOM 509
HARTFORD, CT 06103


JEROME FRANK LEGAL ORGANIZATION - YALE LAW SCHOOL
WISHNIE, MICHAEL
P.O. BOX 209090
NEW HAVEN, CT 06520

IN THE MATTER OF          FILE A ▓▓▓▓          DATE: Jun 1, 2009
▓▓▓▓▓▓▓▓▓▓

__ UNABLE TO FORWARD - NO ADDRESS PROVIDED

✓ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE. THIS DECISION
IS FINAL UNLESS AN APPEAL IS FILED WITH THE BOARD OF IMMIGRATION APPEALS
WITHIN 30 CALENDAR DAYS OF THE DATE OF THE MAILING OF THIS WRITTEN DECISION.
SEE THE ENCLOSED FORMS AND INSTRUCTIONS FOR PROPERLY PREPARING YOUR APPEAL.
YOUR NOTICE OF APPEAL, ATTACHED DOCUMENTS, AND FEE OR FEE WAIVER REQUEST
MUST BE MAILED TO:     BOARD OF IMMIGRATION APPEALS
                       OFFICE OF THE CLERK
                       P.O. BOX 8530
                       FALLS CHURCH, VA 22041

__ ATTACHED IS A COPY OF THE DECISION OF THE IMMIGRATION JUDGE AS THE RESULT
OF YOUR FAILURE TO APPEAR AT YOUR SCHEDULED DEPORTATION OR REMOVAL HEARING.
THIS DECISION IS FINAL UNLESS A MOTION TO REOPEN IS FILED IN ACCORDANCE
WITH SECTION 242B(c)(3) OF THE IMMIGRATION AND NATIONALITY ACT, 8 U.S.C.
SECTION 1252B(c)(3) IN DEPORTATION PROCEEDINGS OR SECTION 240(c)(6),
8 U.S.C. SECTION 1229a(c)(6) IN REMOVAL PROCEEDINGS. IF YOU FILE A MOTION
TO REOPEN, YOUR MOTION MUST BE FILED WITH THIS COURT:

                    IMMIGRATION COURT
                    450 MAIN ST., ROOM 509
                    HARTFORD, CT 06103

__ OTHER: _____
       _____
                          _____
                          COURT CLERK
                          IMMIGRATION COURT                    FF

     CC: MAPPLEBECK, LEIGH
         450 MAIN STREET ROOM 483
         HARTFORD, CT, 061030000

File: ██ ██████

In the Matter of:                               )
                                                )
██████ ████████ ████                            )     IN REMOVAL
                                                )     PROCEEDINGS
Respondent                                      )

CHARGE(S):      Section 212(a)(6)(A)(i) of the Immigration and Nationality Act
                ("INA" or "Act"): An alien present in the United States without
                being admitted or paroled ... is inadmissible.

                Section 237(a)(1)(A) of the INA: An alien who at the time of entry
                ... was ... inadmissible ... is deportable.

APPLICATION(S): Motion to Suppress
                Motion to Terminate Removal Proceedings

<u>ON BEHALF OF RESPONDENT</u>:          <u>ON BEHALF OF DHS</u>:
Michael J. Wishnie, Esq.                 Leigh Mapplebeck, Senior Litigation
The Jerome N. Frank Legal Services       Counsel DHS
P.O. Box 209090                          450 Main Street – Room 483
New Haven, CT  06520-9090                Hartford, Connecticut 06103

## <u>DECISION AND ORDER OF THE IMMIGRATION JUDGE</u>

### I.    <u>Procedural History</u>

        A Notice to Appear ("NTA") was served upon ██████ █████ ███████
("Respondent"), in person, on June 6, 2007.[1] In the NTA, the Department of Homeland
Security ("DHS" or "Government") alleges that Respondent is a native and citizen of
Mexico, entered the United States at an unknown place on an unknown date, and was not
then inspected by an immigration officer. Accordingly, the Government charged
Respondent with removability pursuant to INA § 212(a)(2)(6)(A)(i). The NTA was filed
with the Court on June 11, 2007, thereby vesting jurisdiction with the Court over these
proceedings. See 8 C.F.R. § 1003.14(a) (2008).

---

[1] The NTA indicates Respondent refused to sign the charging document.

The Form I-213 recounts Respondent's arrest as such: Respondent was located at  New Haven, Connecticut, as part of an enforcement operation dubbed 'Operation Return to Sender.' Respondent was located by the Hartford Fugitive Operations Unit, working in conjunction with other law enforcement officers. The officers were at the address in an attempt to locate a known fugitive alien (A# ███ ███ who was the subject of an outstanding warrant of removal. The fugitive alien was not then located. Regarding the issue of consent, the Form I – 213 states simply "[c]onsent to enter the first floor of the premises was given by ███████ ███████ and consent to enter the 2nd floor was given by ███████"

In his responsive pleadings, Respondent indicated his intention to file a motion to suppress evidence and to terminate his removal proceedings. On November 30, 2007, Respondent submitted a brief in support of both motions.

In his submissions, Respondent claims that ICE agents egregiously violated his Fourth Amendment right against unreasonable searches and seizures. Specifically, he avers that ICE agents illicitly entered his home without a warrant and without consent. He also claims that ICE agents egregiously violated his Fifth Amendment right to equal protection and fundamental fairness in his immigration proceedings. Specifically, Respondent asserts that he was targeted solely on the basis of his race and because ICE agents coerced him into making certain statements. Moreover, he claims that ICE agents' violation of ICE regulations and sub-regulatory rules, which bear on his fundamental rights, require termination of his removal proceedings.[2]

The DHS submitted a response to Respondent's Motions to Suppress Evidence and Terminate Proceedings. Therein, the DHS contended Respondent had failed to establish a *prima facie* showing that: 1) his Fourth Amendment rights had been egregiously violated by ICE agents, 2) his Fifth Amendment rights had been egregiously violated by ICE agents, and 3) ICE agents had violated any applicable regulation necessitating the suppression of evidence or the termination of proceedings.

## II.    Testimonial Summary

## A.    Respondent's Testimony

Respondent has attained one year of high school education. He asserted his Fifth

---

2 Respondent also contends that his arrest was conducted in a manner that egregiously violated his First and Tenth amendment rights. The Court has been unable to find precedent for the proposition that First and Tenth Amendment claims may be properly entertained in a removal proceeding. In fact, the Second Circuit has expressly declined to fashion an exclusionary rule for evidence obtained in violation of an individual's First Amendment rights in the context of removal proceedings. See Montero v. I.N.S., 124 F. 3d 381, 386 (2d. Cir. 1997). "Beyond violations of the Fourth Amendment, it is clear from Lopez-Mendoza that the exclusionary rule is applicable, if at all, only to deprivations that affect the fairness or reliability of the deportation proceeding." Id. Thus, because it is not within the competence of this Court to resolve such claims, they will not be considered.

Amendment privilege to the following inquires: the whereabouts of his girlfriend and the name of an 'unidentified relative,' who is a distant cousin of his roommate, Mr.  ('███████ or "Mr. █████ and who was mentioned in Respondent's affidavit.

The following is a synopsis of his testimony as it relates to the discrete constitutional claims he has proffered:

On the morning of June 6, 2007, Respondent was sleeping in his room when he heard knocking coming from the front door on the first floor. He was roused but remained lying in his bed. Respondent then heard footsteps coming up the stairs to the second floor. He could hear voices but he could not discern what the voices were saying. Someone knocked twice on his door and then came into his room. The door to his room was unlocked. Respondent said nothing. The agents who entered his bedroom told him that they were looking for a man identified as 'Chavez' and Respondent answered he did not know the individual. Respondent did not say anything else. He was then asked for identification, which he provided to the officers. The agents then instructed Respondent to get dressed and accompany them and he was informed that he would be placed under arrest. Respondent was then handcuffed.

On re-direct, Respondent stated that no one explained to him why he was being handcuffed; he was only told to accompany the officers.

## B.    Respondent's Declaration and Supplemental Declaration

Respondent attested to the following in his Declaration, dated November 28, 2007:

Respondent is 22 years old and a resident of New Haven, CT. He has not graduated from high school. He lives on the Second floor of ███ ███ ███ New Haven, Connecticut, where he has lived for the past 6 years. He lives with his uncle, ████ ████ wife, and their two children, as well as a 'distant cousin' of ████

On the morning of June 6, 2007, Respondent was asleep in his bedroom with his girlfriend, ████ ██████ ████ At around 6:30 a.m., Respondent heard banging on the door to the apartment. Before he could get up, two agents entered into his room. He asked "Who is it?" One of the agents shouted "Where is Chavez?" and showed Respondent a photo of the individual, while Respondent was still in repose. Respondent replied that he did not know anyone named Chavez. He and his girlfriend were ordered to get out of bed, and then handcuffed and led to the living room. Respondent "did not give [his] consent for the agents to enter."

In the living room, ██████ and his wife were speaking to the officers. They were accompanied by their 12 year old son. Respondent believes that there were four officers in total, and some of the officers were armed. Officers blocked all of the exits to the apartment. He was then taken "straight outside to a van".



Respondent attested to the following in his Supplemental Declaration, dated February 20, 2008:

Respondent's apartment has three bedrooms: one is his, another is for his uncle and his uncle's family, and the other is for his uncle's 'distant cousin'. The apartment also has a living room, a kitchen, and a bathroom. The apartment has two doors; one in the front facing the street and another door in the back that faces the parking lot. The walls in Respondent's apartment are thin, which allow the voices and footsteps of people in the hallway, living room, and kitchen, to be heard from inside his bedroom.

At the point that the officer 'blocked all exits to the apartment,' no one had asked Respondent any questions. He states that '[a]ll the officers knew about me when they entered my bedroom and ordered me into the living room was that I appeared Latino and spoke Spanish.'

**C.  Testimony of** ███████ ███████ **(A#** ███ ███

Mr. ███ lives with his wife, children, cousin (the Respondent), and nephew on the second floor of ███ ███ ███ He speaks Spanish, and attended high school. Mr. ███ speaks limited English. He still lives with his 'distant cousin,' and has been living with him for four years. He last saw his distant cousin a few days prior to the date he proffered testimony. Mr. ███ asserted his Fifth Amendment privilege to the following inquires: information regarding his 'distant cousin' mentioned in his affidavit, including his cousin's name, the whereabouts of his nephew's girlfriend, and the nature of the identification he provided to the ICE agents.

The following is a synopsis of his testimony:

On June 6, 2007, he was at home with his wife, two children, and nephew; his 'distant cousin' was at work. That morning, he, his wife, and his children were all in the same room, sleeping. Mr. ███ was awakened by the sound of knocking originating from the front door. He then heard someone "beating on the back door." He went to the back door and asked 'who's there' in Spanish. He heard 'police' in reply, also spoken in Spanish. He then asked 'who are you looking for' and the officers answered that they were looking for someone named 'Chavez.' Mr. ███ opened the door ajar and saw two policemen. The 'heavyset' officer pushed the door open. Mr. ███ stepped back to avoid being hit by the pushed door. He did not ask the officers to come inside. The officers did not ask him any further questions and entered into his apartment. The officers asked about where the front door led and then questioned Respondent about his immigration status, in English. Mr. ███ son translated their questions for his father. Per request by the agents, Respondent furnished identity documentation containing his name and his birth date. Mr. ███ was then arrested, as were his nephew and his nephew's girlfriend.

On re-direct examination, Mr. ███ stated that he was awakened by knocking

- 4 -

coming from the first-floor door facing the street. Also, he estimated that he wedged open the door three or four inches to observe the officers outside his apartment door before the officer forced it open.

**D.    Declaration of**  **(A# ▮ ▮**

Mr. ▮ attested to the following in his Declaration dated October 19, 2008:

He is a 34 year old man who is 'of Latino appearance,' and who attended school until the age of 15.

He has lived on the second floor of ▮ ▮ ▮ New Haven, CT for eight years. He lives there with his family, composed of his wife, their son and daughter, his nephew ▮ ▮ ▮ and his 'distant cousin'.

Early in the morning of June 6, 2007, Mr. ▮ was asleep in his bedroom with his wife and two children. Every occupant of the house was present save for the 'distant cousin,' who in conformity with his custom, left for work at 6 a.m. At approximately 6:30 a.m., Mr. ▮ was awakened by someone 'beating' on the front door. In response, he arose and went to the living room, partially dressed. He states 'they started ringing the doorbell and beating as if they were going to break down the door. Then I heard beating on the back door.' Mr. ▮ yelled through the back door "who is it?" and someone answered "police". He opened the back door "just a little bit," in order to observe who was at the door, observed two uniformed officers, and shouted back 'who are you looking for?' One of the officers said "we're looking for Chavez."

Then, one of the officers "pushed open the door and entered [the] apartment." The officer came inside the apartment and stationed himself in front of the back door, with his arms outstretched, blocking the door "to prevent anyone from leaving." The officer momentarily dropped one arm to allow his fellow officer in, and then resumed his corporeal blockade. Mr. ▮ wife and son came running into the living room.

Mr. ▮ the only person at the door, never told the officers that they had his permission to enter the apartment. No other occupant gave the officers permission to enter and none of the officers showed him a warrant.

The second officer came inside the apartment, walked to the front door, and asked in English were it led. Respondent's son answered that it was the front door. The officer opened the front door, then closed it, and left the apartment through the back door.

Moments later, a male officer armed with a pistol, and a female officer, came up the back stairway. The first officer, who was also carrying a firearm, and stationed at the back door, moved his arm to allow the officers ingress, but then raised his arm again, and resumed blocking the door. Mr. ▮ "did not feel free to leave."

The officer at the back door asked him a question in English. Mr. ▮ son

told him that the officer was asking whether he had immigration papers. Mr. ███ told the officer, through his son, that he did not want to answer. The officer continued to ask questions of Mr. ███ after he communicated that he did not want to answer. Mr. ███ "did not feel free to leave because the officers had blocked off all of the exits to [the] apartment before they began questioning [him]."

He was standing in the living room and could see the doors of all the bedrooms. While one of the officers was questioning him, he observed a male officer trying to open the door to his cousin's room. The door was locked, and the officer 'hit the door with his hand and then kicked repeatedly at the door.' Mr. ███ later discovered that this kicking caused 'permanent damage to the lock.' His cousin was not in the room.

The male officer who kicked the cousin's door went to the door of Respondent's bedroom. The door was unlocked, and the male officer and a female officer entered the room. Several moments later, Respondent and his girlfriend came out from the room in handcuffs. The two were taken outside via the back door. Mr. ███ was asked for his identification by an officer and he complied by showing identification. The officer then handcuffed him.

### E.     Affidavit provided by the DHS

On February 12, 2009, with respect to Respondent's motions, the DHS submitted an affidavit from Richard McCaffrey, a Supervisory Detention and Deportation Officer.

The following is a synopsis of the contents of that affidavit:

Richard McCaffrey has worked in the immigration enforcement field for fifteen years. In 2006, ICE Detention and Removal Operations ("DRO") implemented "Operation Return to Sender," which was aimed at apprehending immigration absconders. The operation was planned for June 6, 2007, and a target list was prepared.

At no time during the June 6, 2007 operation did Mr. McCaffrey "observe or become aware of the use of 'unnecessary' force in the interaction between officers involved in the operation and the aliens." Furthermore, "at no time during or after the completion of … this operation" did Mr. McCaffrey "observe or learn that any house or apartment was entered without informed, voluntary consent," and he did not observe and was not informed "that any consent was withdrawn."

With regards to Respondent's arrest, Mr. McCaffrey was initially outside ███ ███ ███ along with ICE agents, and "there may have been outside law enforcement officers there as well." He proceeded to the rear of the building, entered the common hallway area, and observed and interacted with the first floor occupants of the apartment.

Mr. McCaffrey explains that "[e]ach officer who requested consent to enter a building was specifically instructed to radio that information into [the] command center as soon as possible … [and] the name of the person granting consent was then recorded at

the command center for inclusion into the Form I-213."

Mr. McCaffrey has "reviewed the Form I-213" for Respondent.

Lastly, "n[]one of the officers involved in making an entry into [Respondent's] apartment can recall further detail about the encounter beyond that stated in the I-213 due to the passage of time."

## III.    **Exhibit List**

Exhibit List – Omnibus Appended Materials to Motion to Suppress

Exhibit A – Declaration of law student Intern Stella Burch.

Exhibit B – Declaration of Respondent.

Exhibit C – Policy Document from Junta for Progressive Action & Unidad Latina en Accion, "A City to Model: Six Proposals for Protecting Public Safety and Improving Relationships Between Immigrant Communities and the City of New Haven" (2005).

Exhibit D – William Yardley, "New Haven Mayor Ponders ID Cards for Illegal Immigrants," N.Y. Times, Oct. 8, 2005.

Exhibit E – Jennifer Medina, "New Haven Welcomes Immigrants, Legal or Not," N.Y. Times, Mar. 5, 2007.

Exhibit F – New Haven Police Department General Order 06-02.

Exhibit G – Mary O'Leary, "Group Wants ID Cards Ready Sooner," New Haven Register, Dec. 26, 2006.

Exhibit H – Mary O'Leary, "Leader of Hispanic Church Welcomes All, Including Undocumented," New Haven Register, July 1, 2007.

Exhibit I – "Time to Fix Immigration," N.Y. Times, Oct. 14, 2005.

Exhibit J – Allan Appel, "Mayor, Chief Promise to Build on Immigrant Plan,: New Haven Independent, Jan. 19, 2007.

Exhibit K – Transcript of NBC news clip: "In Depth: Whose America? Local Governments Find Different ways of Dealing with Illegal Immigrants Who Congregate on Streetcorners Looking for Work," NBC Nightly News, March 20, 2007.

Exhibit L – Anthony Fiola, "Looking the Other way on Immigrants; Some Cities Buck Federal Policies," Washington Post, April 12, 2007.

Exhibit M – Robert Jamieson, "Is Seattle Ready to Be Immigrant Sanctuary?" The Seattle Post-Intelligencer, April 12, 2007.

Exhibit N – Michele Wucker, "A Safe Haven in New Haven," N.Y. Times, April 15, 2007.

Exhibit O – Letter from Julie Myers to John DeStefano, dated July 2, 2007.

Exhibit P – Copy of email messages between unidentified ICE agent and Trooper Carmine Verino, of the Connecticut Department of Public Safety.

Exhibit Q – City of New Haven Board of Aldermen Minutes, Finance Committee, May 17, 2007.

Exhibit R – Henry Fernandez, "Today I am Proud to Call New Haven My Hometown," New Haven Independent, June 5, 2007.

Exhibit S – Statement of Mayor John DeStefano, Jr. to Board Of Alderman Finance Committee on Municipal Identification Program, May 17, 2007.

Exhibit T – Melissa Bailey, "City ID Plan Approved," New Haven Independent, June 5, 2007.

Exhibit U – Mary E. O'Leary, "Ortiz Again Claims No Knowledge of Raid," New Haven Register, June 19, 2007.

Exhibit V – City of New Haven, Elm City Resident Card Fact Sheet.

Exhibit W – Mary O'Leary, "Municipal ID Cards Likely," New Haven Register, May 18, 2007.

Exhibit X – Abbe Smith, "More than 1,000 March Downtown," June 17, 2007.

Exhibit Y – Mara Revkin, "Offering Noncitizens a Local Identity," American Prospect, July 30, 2007.

Exhibit Z – Mary E. O'Leary, "City Irate, Claims It's Retaliation Over IDs," New Haven Register, June 7, 2007.

Exhibit AA – Nina Bernstein, "Promise of ID Cards is Followed by Peril of Arrest for Illegal Immigrants," N.Y. Times, July 23, 2007.

Exhibit BB – Copy of Letter from the Connecticut Congressional Delegation to Secretary Chertoff, June 11, 2007.

Exhibit CC – Mark Spencer, "New Haven's Immigration Drama Grows," Hartford

Courant, June 15, 2007.

Exhibit DD – Copy of Letter from Julie Myers to National Immigration Forum, July 6, 2007.

Exhibit EE – Mark Zaretsky, "Fear Grips Immigrant Community," New Haven Register, June 17, 2007.

Exhibit FF – Jennifer Medina, "Arrests of 31 in U.S. Sweep Bring Fear in New Haven," N.Y. Times, June 8, 2007.

Exhibit GG – Copy of Letter from Secretary Chertoff to Senator Chris Dodd, June 14, 2007.

Exhibit HH – Department of Homeland Security Office of Inspector General, An Assessment of United States Immigration and Customs Enforcements' Fugitive Operations Teams, March 2007.

Exhibit II - Print-out from ICE Office of Detention and Removal Operations National Fugitive Operations Program.

Exhibit JJ – Melinda Tuhus, "Despite Raids, IDs for All," In These Times, Aug. 2007.

Exhibit KK – Elizabeth Hamilton, "Passion for Justice," Hartford Courant, July 23, 2007.

Exhibit LL – Donna Schaper, "Punishing Immigrants, Whatever Happened to Land of Welcome and Opportunity," Hartford Courant, June 17, 2007.

Exhibit MM – Copy of the ICE Pre-Operations Plan.

Exhibit NN – Robert C. Davis & Edna Erez, "Immigration Populations as Victims," National Institute of Justice (1998).

Exhibit OO – Orde F. Kittrie, "Federalism, Deportation, and Crime Victims Afraid to Call the Police," 91 Iowa L. Rev. 1449, 1450-51 (2006).

Exhibit PP – Robert C. Davis, Edna Erez & Nancy Avitabile, "Access to Justice for Immigrants Who are Victimized: The Perspectives of Police and Prosecutors," 12 Crim. Justice Policy Rev. 183 (2001).

Exhibit QQ – Virginia MOU and its adverse Implications for Immigrant Women and Girls, Tahirih Justice Center.

Exhibit RR – Nawal H. Ammar, et al., "Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA," 7 Int'l J. of Pol. Sci. and Management 230 (2005).

Exhibit SS – "City of New Haven, Board of Aldermen Approve Acceptance of Funds for Municipal Identification Program".

Exhibit TT – Statement by Richard D. Clarke, Former White House National Security Coordinator for Security and Counter-Terrorism in the Clinton and Bush Administrations, Oct. 19, 2007.

Exhibit UU – Mary E. O'Leary, "City IDs Don't Prove Voter Eligibility, Blumenthal Rules," New Haven Register, Sept. 7, 2007.

Exhibit VV – Mary O'Leary, "Group may Urge Illegal Aliens to Make City their Destination," New Haven Register, June 14, 2007.

Exhibit WW – In re: Herrara-Priego, USDOJ EOIR (New York, N.Y., July 10, 2003) (Lamb, IJ).

Exhibit XX – Letter from Karen V. Lang to Congresswoman Zoe Lofgren Letter on ICE raids, dated March 14, 2007.

Exhibit YY – Declaration of Father James Manship, St. Rose of Lima Catholic Church, New Haven, Connecticut, dated June 20, 2007.

Exhibit ZZ – M-69: The Law of Arrest, Search, and Seizure for Immigration Officers, last updated January 1993 by Patrick McDermott, William Odencrantz, Liz Hacker, and Judith Patterson. Available on Lexis-Nexis, at INS Manuals 80-89.

Omnibus Appended Materials to Respondent's Reply to the Government's Brief in Opposition

Exhibit A – Declaration of Law Student Intern Stella Burch.

Exhibit B – Supplemental Declaration of Respondent.

Exhibit C – Photograph of Respondent's Living Room.

Exhibit D – Photograph of Respondent's Kitchen.

Exhibit E – Photograph of Respondent's Front Stairway.

Exhibit F – Photograph of Respondent's Back Stairway.

Exhibit G – Photograph of Respondent's Bedroom.

Exhibit H – Declaration of Law Student Intern Jane Lewis.

Exhibit I – Floor Plan of Respondent's Apartment.

Exhibit J – Barrera v. Boughton, No. 3:07-cv-01436 (D. Conn.) (Nov. 26, 2007); Dacorim v. DHS, No. 3:06-cv-01992 (D. Conn.) (complaint filed Dec. 14, 2006).

Exhibit K – El Badrawi v. DHS, No. 3:07-cv-01436 (D. Conn.) (amended complaint filed Nov. 26, 2007); DACORIM v. DHS, No. 3:06-cv-01992 (D. Conn.) (complaint filed Dec. 14, 2006).

Exhibit L – In re: Herrera-Priego, US DOJ EOIR (New York, N.Y., July 10, 2003) (Lamb, IJ).

Exhibit M – In re: RABANI, USDOJ EOIR (New York, N.Y.).

Exhibit N – Aguilar v. ICE, No. 07-cv-08224 (S.D.N.Y.) (complaint filed Sept. 20, 2007) and supporting affidavits.

Exhibit O – Motion to Suppress & Affidavit filed in Immigration Court for Dionisio Chicas Moran, US DOJ (New York, N.Y.).

Exhibit P - Motion to Suppress & Affidavit filed in Immigration Court for Carlos Lopez Ramos, US DOJ (New York, N.Y.).

Exhibit Q – Nina Bernstein, Raids were a Shambles, Nassau Complains to U.S., N.Y. Times, Oct. 3, 2007.

Exhibit R – Affidavit filed in Immigration Court for Gonzalo Juarez of Newark, NJ.

Exhibit S – Motions to Suppress and Terminate, Memorandum of Law, and Supporting Affidavit filed in Immigration Court for Roberto Cervantes Valerio of Memphis, TN.

Exhibit T – Flores-Morales v. George and ICE, No. 07-cv-00050 (M.D. Tenn.) (complaint filed July 27, 2007) and supporting affidavits.

Exhibit U – Mancha v. ICE, No. 06-cv-12650 (N.D. Ga.) (complaint filed Nov. 1, 1006).

Exhibit V – Testimony of Marie Justeen Mancha before the House Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law Hearing on: "Problems with ICE Interrogation, Detention, and Removal Procedures" February 13, 2008.

Exhibit W – Reyes v. ICE, No. 07-cv-02271 (N.D. Cal.) (complaint filed April 26, 2007)

Exhibit X – Paloma Esquivel, Civil Rights Groups Allege Immigrant Workers were Denied Rights, L.A. Times, Feb. 15, 2008.

Exhibit Y – Affidavit of Jose Ordonez Salanec of TX.

Exhibit Z – UFCW v. Chertoff, No. 07-cv-00188 (N.D. Tex.) (class action complaint filed Sept. 12, 2007).

Exhibit AA – Testimony of Michael Graves, Member of the United Food and Commercial Workers International Union (UFCW), Local 1149 before the Subcommittee on Immigration, Citizenship, Refugees, Border Security and International Law for the Hearing: "ICE Interrogation, Detention, Removal Issues" Feb. 13, 2008.

Exhibit BB – Barrera v. DHS, No. 07-cv-03879 (D. Minn.) (complaint filed Sept. 4, 2007).

Exhibit CC – Border Network for Human Rights v. County of Otero, No. 07-cv-10145 (D.N.M.) (complaint filed Oct. 17, 2007).

Exhibit DD – Daniel T v. Board of Commissioners of the County of Otero (D.N.M.) (complaint filed October 17, 2007).

Exhibit EE – Matter of X- (Seattle, WA Immigration Court Feb. 8, 2007).

Exhibit FF – Written Testimony Kara Hartzler, Esq. Florence Immigrant & Refugee Rights Project U.S. House of Representatives Subcommittee on Immigration, Feb. 13, 2008.

Omnibus Exhibits in Support of Respondent's Motion to Supplement the Record and to Advise Court of Recent Authority – Sept. 9, 2008

Exhibit A – Declaration of law student intern Anant Saraswat.

Exhibit B – Series of emails dated May 21, 2007.

Exhibit C – Series of emails dated June 4, 2007.

Exhibit D – Letter from Michelle L. Colson, AUSA, to Michael Wishnie, dated July 23, 2008.

Exhibit E – – Letter from Michelle L. Colson, AUSA, to Michael Wishnie, dated July 29, 2008.

Exhibit F - – Letter from Michelle L. Colson, AUSA, to Michael Wishnie, dated August 4, 2008.

Exhibit G - – Letter from Michelle L. Colson, AUSA, to Michael Wishnie, dated August 19, 2008.

Omnibus Appended Materials to Respondent's Motion to Supplement the Record - Sept. 9, 2008

Exhibit A – Declaration of law student intern Anant Saraswat.

Exhibit B – Declaration of ███ ███ ███

Exhibit C – Series of E-mails, latest dated May 21, 2007, between various government officials regarding New Haven 'ID Program'.

Exhibit D – Series of E-mails, latest dated June 4, 2007, between various government officials regarding the New Haven 'ID Program'.

Exhibit E – Cover letter sent from the U.S. Attorney for the District of Connecticut to the Jerome N. Frank Legal Services Organization accompanying July 23, 2008 release of records.

Exhibit F – Cover letter sent from the U.S. Attorney for the District of Connecticut to the Jerome N. Frank Legal Services Organization accompanying July 29, 2008 release of records.

Exhibit G – Cover letter sent from the U.S. Attorney for the District of Connecticut to the Jerome N. Frank Legal Services Organization accompanying August 4, 2008 release of records.

Exhibit H - Cover letter sent from the U.S. Attorney for the District of Connecticut to the Jerome N. Frank Legal Services Organization accompanying August 19, 2008 release of records.

Omnibus Appended Materials to Respondent's Motion to Supplement the Record – November 14, 2008

Exhibit A – Declaration of law student intern Sara Edelstein.

Exhibit B – 'Target List' of June 2007 ICE enforcement operation in New Haven, CT.

Exhibit C – Danahar v. Freedom of Information Com'n, 2008 WL 4308212 (Conn. Super., Sept. 5, 2008).

Exhibit D – Letter from Henri Alexandre, Assistant Attorney General of the State of Connecticut, to Michael Wishnie, dated October 20, 2008.

Exhibit E – Series of E-mails dated June 11, 2007.

Exhibit F – Letter from Douglas P. Morabito, Assistant United States Attorney, to Micheal Wishnie, dated Oct. 15, 2008.

Exhibit G – Declaration of Lawrence Mulvey, Police Commissioner of Nassau Country, New York.

Omnibus Brief and Exhibits to Supplement Record – December 3, 2008

Exhibit A – Declaration of law student intern Hunter Smith.

Exhibit B – Target List, for the June 2007 enforcement operation in New Haven, CT.

Exhibit C – Vaughn Index, ULA v. DHS, No. 3:07-cv-1224 (MRK), Dkt. # 53, 1-2 (D. Conn., filed November 6, 2008).

Exhibit I – Declaration of law student intern Sara Edelstein.

Exhibit J – Letter from Michael Wishnie and Deborah Marcuse to Michael Cameron, dated October 30, 2007.

    Respondent has also submitted two additional exhibits dated March 3, 2009: Respondents' omnibus brief in response to government's evidence, and Respondent's motion to supplement the record.

## IV.    **Legal Standards**

### A.    **Motion to Suppress in Removal Proceedings**

#### 1.    **Respondent's *prima facie* burden**

    A motion to suppress must be made in writing and be accompanied by a detailed affidavit that explains the reasons why the evidence in question should be suppressed. Matter of Wong, 13 I & N Dec. 820, 822 (BIA 1971). The individual seeking to suppress evidence initially bears the burden of proof and must establish a *prima facie* case that the evidence should be suppressed. Matter of Tang, 13 I & N Dec. 691 (BIA 1971). To establish a *prima facie* case, the individual seeking suppression must provide specific, detailed statements based upon personal knowledge; such allegations cannot be general, conclusory, or be based on counsel. Id.; see also Matter of Barcenas, 19 I & N Dec. 609 (BIA 1988); Matter of Wong, 13 I & N Dec. at 821-22; Matter of Tang, 13 I & N Dec. at 692.

    "Where a party wishes to challenge the admissibility of a document, the mere offering of an affidavit is not sufficient to sustain his burden. First, if an affidavit is offered, which, if accepted as true, would not form a basis for excluding the evidence, the contested document may be admitted into the record . . . If the affidavit is such that the facts alleged, if true, could support a basis for excluding the evidence in question, then the claims must also be supported by testimony. The respondent's declaration alone is therefore insufficient to sustain his burden." Id. at 611-612. Even a technically defective

arrest of an alien does not necessarily render the deportation proceeding null and void. See Avila-Gallegos v. Immigration and Naturalization Service, 525 F.2d 666 (2d. Cir. 1975). Lastly, it is important to note "[r]espondents may only litigate what happened to them." INS v. Delgado, 466 U.S. 210, 221 (1984).

## 2.     Responsive Government Burden

When a respondent comes forward with proof establishing a *prima facie* case for suppression, the Government then must assume the burden of justifying "the manner in which it obtained the evidence." Barcenas, 19 I & N Dec. at 611. Furthermore, an alien in removal proceedings is entitled to cross-examine witnesses the Government deploys against them. INA § 240(b)(4)(B).

As to the first point, the Court is aware of no authoritative precedent revealing the precise quantum of evidence the Government must proffer "to justify the manner in which it obtained the evidence." However, logic informs that to meet the *prima facie* case established by the respondent (of an egregious constitutional violation), the burden on the Government must therefore be equivalent.

Then, it is the Government's obligation to submit a facially sustaining affidavit, as well as make reasonable attempts to produce supporting testimony from the agents with knowledge of the contested events. See Barcenas, 19 I. & N. Dec. at 611.

As to the second point, evidence is generally admissible in immigration proceedings if it is probative and its use is fundamentally fair.[3] Matter of Velasquez, 19 I. & N. Dec. 377, 380 (BIA 1996). Furthermore, an "immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case..." 8 C.F.R. §1240.7(a).

However, INA § 240(b)(4) provides that an alien in removal proceedings "shall have a reasonable opportunity to examine the evidence against the alien ... and to cross-examine witnesses presented by the Government..." 8 U.S.C. § 1229a(b)(4)(B).[4]

---

3 Some courts have required the DHS to make reasonable attempts to produce witnesses before finding the admission of affidavits or sworn statements to be fundamentally fair. See Singh v. Mukasey, 553 F. 3d 207, 212 n.1 (2d. Cir. 2009) (without further broaching the subject, noting that the First, Fifth and Ninth Circuits have agreed that the Government violates principles of fundamental fairness when it submits an affidavit without first attempting to secure the presence of those potential witnesses for cross-examination); see also Ocasio v. Ashcroft, 375 F. 3d 105, 107 (1st. 2004) ("One of these outer limits is that the INS may not use an affidavit from an absent witness 'unless the INS first establishes that, despite reasonable efforts, it was unable to secure the presence of the witness at the hearing.'") (quoting Olabanji v. INS, 973 F. 2d 1232, 1234 (5th Cir. 1992); Saidane v. INS, 129 F. 3d 1063, 1065 (9th Cir. 1997). In particular, federal circuit courts have expressed concern that INA § 240(b)(4)(B)'s purpose would be thwarted "if the government's choice of whether to produce a witness or to use a hearsay statement were wholly unfettered." See, e.g., Baliza v. INS, 709 F. 2d 1231, 1234 (9th Cir. 1983). We note that the Government has not introduced any evidence that it has made reasonable efforts to produce the affiant or the author of the Form 1 – 213 in this case, Ms. Michelle Vetrano-Antuna, for in-court examination, or that either is otherwise unavailable.

4 We note that, subsequent to the commencement of proceedings, and assuming a petitioning party has met the statutory preconditions, if an IJ is satisfied that a witness will not appear to testify and that his or her

- 15 -

This statutory provision is steeped in Fifth Amendment due process rights. "It is well established that the Fifth Amendment affords aliens due process of law during deportation proceedings." See Singh v. Mukasey, 553 F. 3d 207, 214 (2d. Cir. 2009). A failure in admitting unsupported evidence may constitute a constitutional due process violation if its inclusion prejudices the respondent.[5] See Farrokhi v. INS, 900 F. 2d 697, 702 (4th Cir. 1990).

So, while the rules of evidence do not govern removal proceedings, see Felzcerek v. INS, 75 F. 3d 112, 116 (2d. Cir. 1996), and "an IJ has some latitude to receive evidence without demanding live testimony ... an IJ's evidentiary rulings must comport with due process." Marku v. Board of Immigration Appeals, No. 03-40871, 2005 WL 1162978, *1 (2d. Cir. May 16, 2005) (unpublished decision). The Court also has a concomitant responsibility to help establish and develop the record. See Yang v. McElroy, 277 F. 3d 158, 162 (2d. Cir. 2002). The United States Court of Appeals for the Second Circuit has previously recognized that a fact finder who assesses testimony together with witness demeanor is in the best position to evaluate credibility. See Zhou Yun Zhang v. United States INS, 386 F. 3d 66, 73 (2d. Cir. 2004).

Ultimately, once a respondent has satisfied his initial obligation to provide a personal-knowledge based affidavit and sworn testimony, and successfully establishes a *prima facie* case that his constitutional rights were egregiously violated, the Government then has a reciprocal obligation to the respondent (and the Court) to produce and make available agents involved in the enforcement operation at issue for examination in court (insofar as it seeks to admit evidence of alienage as documented by an agent, or it seeks to submit a written declaration or affidavit by the agent). See Lopez-Rodriguez, 536 F. 3d at 1015-17. (court determination that IJ's full adoption of Respondent's testimony, characterized as 'conclusive' factual findings, regarding the contested entry into her private residence, where Government failed to produce any of the agents involved in the raid, to be supported by substantial evidence.

## B.    "Egregiousness"

### 1.    **Supreme Court**

The Supreme Court ruled in I.N.S. v. Lopez-Mendoza, 468 U.S. 1032 (1984) that

---

testimony is essential, the IJ possesses exclusive jurisdiction to issue subpoenas requiring, *inter alia*, the attendance of that witness. 8 C.F.R. § 1003.35(b)(1),(3). Respondent has filed numerous subpoena requests. See Respondents' Subpoena Requests (April 2, 2008); Respondents' Subpoena Requests (October 20, 2008). However, these requests were made before Respondent testified and established his requisite *prima facie* case; thus, the Court was not satisfied that the ICE agents' evidence was 'essential.' And our disposition of Respondent's Motion to Suppress Evidence and Motion to Terminate Proceedings obviates the need to gauge if the ICE agents' evidence is now indeed 'essential.' In any event, the Government has plainly stated it will not produce any of the agents involved in Respondent's arrest to testify.

5 The Notice to Appear (Form I – 862), the seminal document referring an alien to his or her rights in a removal proceeding, and the filing of which commences removal proceedings, states that the alien "will have the opportunity ... to cross-examine any witnesses presented by the Government."

the exclusionary rule is not generally applicable in removal proceedings. Lopez-Mendoza, 468 U.S. at 1050. However, a plurality of the Court observed that their conclusion did "not deal with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained."[6] Id. As the issues in the case addressed "the exclusion of credible evidence gathered in connection with peaceful arrests" by immigration officials at a workplace factory site, no such concerns were implicated. Id.

## 2. United States Court of Appeals for the Second Circuit

The Second Circuit "adopted the reservations of the Lopez-Mendoza plurality as part of the 'law of [the] circuit,'" Pinto-Montoya v. Mukasey, 540 F. 3d 126, 131 (2d. Cir. 2008), holding that evidence ought to be suppressed only when the evidence established either "that an egregious violation that was fundamentally unfair had occurred, or [] that the violation . . . undermined the reliability of the evidence in dispute." Almeida-Amaral v. Gonzales, 461 F. 3d 231, 235 (2d Cir. 2006).

As to the "fundamental fairness" prong, the Court posited that, since the egregiousness of a constitutional violation "cannot be gauged solely on the basis of the [invalidity] of the stop, but must also be based on the characteristics and severity of the offending conduct," not all Fourth Amendment violations authorized the suppression of evidence in removal proceedings. Id. Instead, the Court devised a sliding scale: A seizure suffered for no reason at all would constitute an egregious violation only if it was sufficiently severe, or if the stop was based on race or some other "grossly improper consideration." Id.

The Court noted that their formulation was non-exhaustive but remarked suppression would require "more than a violation;" it would "demand[] egregiousness." Id. at 236; cf. Gonzales-Rivera v. INS, 22 F. 3d 1441 (9th Cir. 2004).[7] The Court listed two factors that might render a seizure "gross or unreasonable" in excess of its unlawfulness and meet the 'egregious' threshold: a "particularly lengthy" initial illegal stop and the show or use of force. Id. Ultimately, the Court concluded the petitioner had failed to marshal sufficient evidence to support any such finding.

The Court, in dicta, did state that if the stop in question was based on race, the violation would have been egregious. However, as the petitioner "offered nothing other than his own intuition to show that race played a part in the arresting agent's decision," his argument failed. Id. at 236; see also Pinto-Montoya, 540 F. 3d at 131 (finding that the court in Almeida-Amaral concluded "that petitioner's mere assertion, without more, that

---

6 Black's Law Dictionary defines 'egregious' as "extremely or remarkably bad; flagrant." Black's Law Dictionary (8th ed. 2004).

7 The Ninth Circuit's characterization of 'egregiousness' is less circumscribed that the Second Circuit's. In the Ninth Circuit, "all bad faith violations [*i.e.* where 'evidence is obtained by deliberate violations of the fourth amendment, or by conduct a *reasonable officer should have known* is in violation of the Constitution'] of an individual's fourth amendment rights are considered sufficiently egregious to require application of the exclusionary sanction in a civil proceeding." Gonzales-Rivera v. INS, 22 F. 3d at 1449 (internal quotations and citations omitted) (emphasis in original).

he was stopped on the basis of race was insufficient to establish that the stop was race-based.").

Another Second Circuit case that followed, <u>Melnitsenko v. Mukasey</u>, 517 F. 3d 42 (2d. Cir. 2008), focused the analysis on alleged violations where race did not play a consideration. The Court concluded that a three-hour detention of an alien, at a checkpoint about 100 miles from the Canadian-United States border, was not an egregious constitutional violation and that the agent's actions at bar were less severe than the agent's actions in <u>Lopez-Mendoza</u>, as petitioner was neither arrested nor taken to jail during the complained-of seizure. <u>Id</u>. at 47 (even assuming that "once she was stopped, she was escorted to a trailer by four or five uniformed officers and interrogated, fingerprinted, and photographed, for three hours without any evidence of Miranda or other warnings given," and "even assuming the Checkpoint itself was illegal," the complained-of conduct fell short of egregious conduct.) <u>Id</u>.

## C.   Consent

1.   "It is well settled under the Fourth Amendment that a search conducted without a warrant issued upon probable cause is 'per se unreasonable' . . . subject only to a few specifically established and well-delineated exceptions." <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973); <u>Payton v. New York</u>, 445 U.S. 573, 586 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home, absent a warrant, are presumptively unreasonable."). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." <u>Schneckloth</u>, 412 U.S. at 218.

Consent must be given voluntarily and by an individual possessing the requisite authority. <u>See Illinois v. Rodriquez</u>, 497 U.S. 177, 181 (1990). Voluntariness is a question of fact determined by a 'totality of all the circumstances.' <u>United States v. Isiofia</u>, 370 F. 3d, 226, 231 (2004) (quoting <u>Schneckloth</u>, 412 U.S. at 227). While knowledge of the right to refuse consent is not a *sine qua non* to a finding of voluntariness, "it may be a factor in ascertaining whether the consent was coerced." <u>Schneckloth</u>, 412 U.S. at 248-49.

Specific factors bearing on whether consent was freely given, in the context of an initial entry encounter with police at the door of a private residence, include 1) whether the officers knocked, 2) whether the officers identified themselves (in a non-coercive manner), 3) whether the officers engaged in threatening or abusive actions to induce a resident to open the door and admit them, 4) whether the door was opened for the officers, and 5) whether the police entry was protested. <u>See United States v. Valencia</u>, 645 F. 2d 1158, 1165 (1980); <u>United States v. Ledbetter</u>, No. 02-1757, 2003 WL 22221347, *2 (2d. Cir. Sept. 26, 2003) (unpublished decision); <u>United States v. Crespo</u>, 834 F. 2d 267, 269 (2d. Cir. 1987) (district court's finding that agents' display of weapons and kicking of door caused the door to be opened by the threat of force and not with consent, met with approval by reviewing court).

"Fourth Amendment privacy interests are most secure when an individual is at home with doors closed and curtains drawn tight." United States v. Gori, 230 F. 3d 44, 51 (2d. Cir. 2000); Matter of Louissaint, 24 I & N Dec. 754, 761 (BIA 2009) (Pauley, J., concurring) (citing Payton as an exemplar for the axiom that "[t]he home is an area of utmost privacy, uniquely protected under our law."). In Gori, the majority took umbrage with the dissent's characterization of their opinion and emphatically stated that "the mere opening of a "door to a home does not transform[] the entire home into a public place. [The dissent] generalizes the holding and reach of the opinion beyond its scope or ambition, where the critical fact was that the interior of the apartment was exposed to public view when the door was voluntarily opened." Id. at 52.

An individual, by words or acts, may limit the scope of consent he has given, or revoke his consent, in whole or in part. See United States v. Moran Vargas, 376 F. 3d 112, 113-14 (2d. Cir. 2004). Finally, though consent can be constructed from an individual's words, acts, or conduct, Krause v. Penny, 837 F. 2d 595, 597 (2d. Cir. 1988), "the ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." Garcia, 56 F. 3d 418, 423 (1995) (internal quotations and citations omitted).

**2.**   There are also regulatory restrictions regarding consent in the immigration context. Regarding 'site inspections,' which are "enforcement activities untaken [by the BTSD] to locate and identify aliens illegally in the United States . . . where there is a reasonable suspicion, based on articulable facts, that such aliens are present." 8 C.F.R. 287.8(f)(1). Subsection (f)(2) delimits the authority of an immigration officer to enter into a private residence to act in their official capacity:

> An immigration officer may not enter into the non-public areas of a business, a residence including the curtilage of such residence . . . except as provided in section 287(a)(3) of the Act, for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected. When consent to enter is given, the immigration officer must note on the officer's report that consent was given and, if possible, by whom consent was given. If the immigration officer is denied access to conduct a site inspection, a warrant may be obtained.

8 C.F.R. 287.8(f)(2).

### D.   Seizure

**1.**   "A person is seized by the police . . . when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." Brendlin v. California, 127 S. Ct. 2400, 2405 (2007).

Ordinarily, the pertinent test is whether "a reasonable person would have believed

that he was not free to leave if he [did] not respond[ ]" to the questions put to him. Pinto-Montoya, 540 F. 3d at 131 (citing INS v. Delgado, 466 U.S. 210, 216 (1984 )); see also United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968) . "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a [Fourth Amendment] seizure..." Delgado, 466 U.S. at 215.

"When a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" Brendlin, 127 S. Ct at 2405-06 (quoting Florida v. Bostick, 501 U.S. 429, 435-36 (1991).

**2.** When a police officer has restrained the freedom of an individual sufficient to constitute a 'seizure' under the Fourth Amendment, it must be 'reasonable'. U.S. v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (citing Terry, 392 U.S. at 16). "[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Id. The Fourth Amendment forbids "stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." Brignoni-Ponce, 422 U.S. at 884; see also Rajah v. Mukasey, 544 F. 3d 427, 441 (2d. Cir. 2008).[8]

In evaluating the validity of a stop, the Court must consider "the totality of the circumstances-the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981).

"Pertinent factors identifying a police seizure can include the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects . . . and a request by the officer to accompany him to the police station or a police room." Gilles v. Repicky, 511 F. 3d 239, 245 (2007).

When stopping an individual, the Fourth Amendment requires "a police officer's actions be justified at its inception." U.S. v. Swindle, 407 F. 3d 562, 567 (2d. Cir. 2005) (quoting Terry, 392 U.S. at 20). "The settled requirement is . . . that reasonable suspicion must arise before a search or seizure is actually affected." Swindle, 407 F. 3d at 568 (citing Florida v. J.L., 529 U.S. 266, 271 (2000)).

**3.** The Immigration and Nationality Act ("INA"), and its attendant regulations, echo this sentiment. INA § 287(a)(1) states "[a]ny [authorized immigration officer] shall have power without warrant to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States..." With regards to interrogation and detention not amounting to arrest, interrogation is defined as "questioning designed to

---

8 The Second Circuit, in Rajah, noted that the Supreme Court has left unanswered whether "suspicion must be of illegal alienage or may be of mere alienage." Id. at 441.

elicit specific information [not amounting to arrest]... an immigration officer . . . has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away." 8 C.F.R. 287.8(b)(1).

However, "[i]f the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning." 8 C.F.R. 287.8(b)(2).

### E.    Arrest

**1.**    A warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "Probable cause exists where the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." U.S. v. Delossantos, 536 F. 3d 155, 158 (2d. Cir. 2008) (internal quotations and citations omitted). "Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest. . . . These circumstances must be considered from the perspective of a reasonable police officer in light of his training and experience." Id. (internal quotations and citations omitted).

**2.**    INA § 287(a)(2) allows authorized officers to arrest without warrant "any alien in the United States, if he has reason to believe that the alien so arrested is in the United States, in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest..." This subsection also allows officers to make arrests for felonies that have been committed or are in the process of being committed, but subjects them to several limitations. See INA § 287(a)(4), (a)(5)(B).

The concomitant regulations specify "[o]nly designated immigration officers are authorized to make an arrest." 8 C.F.R. § 287.8(c)(1) "An arrest shall only be made when the designated immigration officer has reason to believe that the person arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i). A warrant for arrest must be obtained unless the officer has reason to believe that the person is likely to escape before a warrant can be obtained. 8 C.F.R. § 287.8(c)(2)(ii). The officer must identify himself or herself as an immigration officer authorized to make an arrest, state that the person is under arrest, and extrapolate the reason for the arrest, upon ensuring the communications can be made in safety. 8 C.F.R. § 287.8(c)(2)(iii).

### F.    Regulatory Violations

Regulatory violations counsel suppression of evidence when they are "egregious or fundamentally unfair or impaired the reliability of the evidence of ... deportability."

<u>Rajah</u>, 544 F. 3d at 446.[9] It is noteworthy that no Court of Appeals has actually determined that deportation or removal proceedings should be terminated based on a violation of a regulation or internal agency guideline. It is true that the Second Circuit, in <u>Waldron v. INS</u>, 17 F.3d 511 (2d. Cir. 1993), determined that, when a regulation is promulgated to protect a fundamental right derived from the Constitution or federal statute, and the INS fails to adhere to it, the challenged proceedings is invalid and a remand is required. <u>See Waldron</u>, 17 F.3d at 518. However, there is no clear holding sanctioning that a violation of a regulation could result in termination of proceedings, thereby allowing a respondent to continue his unlawful presence in the United States, absent egregious conduct.

## G.    Exclusionary Rule

Evidence obtained from an unlawful search or seizure is generally subject to exclusion as "fruit of the poisonous tree." <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-85 (1963). Courts will also suppress evidence that is the indirect product of the illegal police activity as "fruit of the poisonous tree." <u>See United States v. Oscar-Torres</u>, 507 F. 3d 224, 227 (4th Cir. 2007) (citing <u>Wong Sun</u>, 371 U.S. at 471).

The relevant constitutional question for later-discovered evidence is "whether the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint." <u>United States v. Ceccolini</u>, 435 U.S. 268, 273-74 (1975). "The so-called 'attenuation doctrine' allows introduction of evidence obtained after an unlawful arrest when 'the causal link' between a Fourth Amendment violation and a subsequent confession, identification, or other form of evidence is so long or tortuous that suppression of the evidence is unlikely to have the effect of deterring future violations of the same type." <u>Mosby v. Senkowski</u>, 470 F. 3d 515, 521 (2d. Cir. 2006) (internal quotations and citations omitted).

The United States Supreme Court has enumerated several factors germane to the attenuation analysis, including 1) "the temporal proximity of the arrest and the confession," 2) "the presence of intervening circumstances," and "particularly," 3) "the purpose and flagrancy of the official misconduct." <u>Brown v. Illinois</u>, 422 U.S. 590, 603-04 (1975).

In the context of obtaining fingerprints as an incident of arrest, gathered in the absence of a warrant or probable cause, the Supreme Court has, on multiple occasions,

---

9 Respondent also avers that ICE agents failed to inform him that he was entitled to be represented by counsel during any interrogation-by-examination, in derogation of 8 C.F.R. § 292.5(b) and his Fifth Amendment rights. The Second Circuit has not made an express determination on this ground, but noted in <u>Melnitsenko</u> that the petitioner's argument that "she was escorted to a trailer by four or five uniformed officers and interrogated, fingerprinted and photographed, for three hours without any evidence of any Miranda or other warnings given," did not enhance the officers' conduct to constitutionally 'egregious' conduct. <u>Melnitsenko</u>, 517 F. 3d at 47; <u>see also</u> <u>Lopez-Mendoza</u>, 468 U.S. at 1037 (Supreme Court concluded arrest of petitioner in violation of his Fourth Amendment rights, followed by brief detention and transfer to country jail for questioning, all without warning petitioner of his right to remain silent, did not constitute 'egregious' constitutional violation.).

held that when an illegal arrest is used as an investigatory subterfuge to obtain fingerprints, the fingerprints are regarded as an inadmissible fruit of an illegal detention. See Davis v. Mississippi, 394 U.S. 721, 727-28 (1969); Hayes v. Florida, 470 U.S. 811, 817-18 (1985); see also United States v. Olivares-Rangel, 458 F. 3d 1104, 1115 (10th Cir. 2006).

Succinctly phrased by the United States Court of Appeals for the Tenth Circuit, "[t]he exclusionary rule applies whenever evidence has been obtained 'by exploitation' of the primary illegality instead of 'by means sufficiently distinguishable to be purged of the primary taint.' Evidence may be obtained 'by exploitation' of an unlawful detention even when the detention is not for the sole purpose of gathering evidence." Olivares-Rangel, 458 F. 3d at 1115 (10th Cir. 2006) (internal citations omitted).

Moreover, the Fourth Circuit has advanced even farther and held "an alien's fingerprints taken as part of routine booking procedures but intended to provide evidence for a criminal prosecution are still *motivated* by an investigative, rather than an administrative, purpose," and accordingly are "subject to exclusion." Oscar-Torres, 507 F. 3d at 232 (citing Olivares-Rangel, 458 F. 3d at 1114.).

While the Second Circuit has not expressly pronounced its position on this issue, it has in previous cases indicated its disapproval of a rigid illicit-purpose requirement. See United States v. Ortiz-Gonzalbo, 133 F. 3d 908, 909 (2d. Cir. 1997) (unpublished opinion) (rejecting a district court's ruling that a defendant's fingerprints are not excludable unless the police made the illegal arrest for the purpose of obtaining the fingerprints, and instead sustaining the lower court's denial of a motion to suppress on alternate grounds); Johnson v. Ross, 955 F. 2d 178, 182 (2d. Cir. 1992) (Newman, J., concurring) ("In some circumstances, evidence is deemed tainted by prior police misconduct even if the reliability of the subsequent evidence is not challenged."). Furthermore, that these indications have arisen in criminal case precedent does not seem to be the paramount, or even prominent, factor in the Second Circuit's analysis. See United States v. Alvarez-Porras, 643 F. 2d 54, 63 (2d. Cir. 1981) ("where flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule.") (quoting United States v. Edmons, 432 F. 2d 577, 584 (2d. Cir. 1977).

## H.    'Body' or 'Identity' Evidence

The United States Supreme Court concluded, in Lopez-Mendoza, that "the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Lopez-Mendoza, 468 U.S. at 1039.

The United States Court of Appeals for the Tenth Circuit has interpreted this

statement to mean, based on the cases cited in Lopez-Mendoza, to support the proposition, that the Court was referencing the Ker-Frisbie doctrine, which stands for the proposition that illegal police activity affects only the admissibility of evidence, and not the jurisdiction of the trial court or otherwise serves as a basis for dismissing the prosecution. Olivares-Rangel, 458 F.3d at 1110.

This view is in accord with both the Eighth Circuit, which has also concluded "that the 'identity' language in Lopez-Mendoza referred only to jurisdictional challenges and did not foreclose suppression of all identity related evidence," United States v. Guevera-Martinez, 262 F. 3d 751, 754 (8th Cir. 2001), as well as the Fourth Circuit, which has concluded "Lopez-Mendoza does not prohibit suppression of evidence of a defendant's identity." United States v. Oscar-Torres, 507 F. 3d 224, 228 (4th Cir. 2007). Thus, the United States Court of Appeals for the Fourth, Eighth, and Tenth Circuits agree that "the Supreme Court's statement that the 'body' or identity of a defendant are 'never suppressible' applies only to cases in which the defendant challenges the jurisdiction of the court over him or her based upon the unconstitutional arrest, not to cases in which the defendant only challenges the admissibility of the identity-related evidence." Olivares-Rangel, 458 F. 3d at 1111.

Each of these Circuits have scrutinized two especially compelling keystones supporting their conclusion: 1) The Supreme Court's founding of its own statement on past cases elucidating the long-standing rule known as the Ker-Frisbie doctrine, and 2) the fact that in Lopez-Mendoza, a consolidated appeal, the alien who objected to evidence offered against him was deemed to have a 'more substantial' claim than the alien who only objected to being hauled into deportation hearings and entered no objection to the evidence offered against him. See United States v. Oscar-Torres, 507 F. 3d at 228 (quoting Lopez-Mendoza, 468 U.S. at 1040); Guevera-Martinez, 262 F.3d at 754 ("These cases [relied upon by the Court in Lopez-Mendoza ] deal with jurisdiction over the person, not evidence of the defendant's identity illegally obtained. The language in Lopez-Mendoza should only be interpreted to mean that a defendant may be brought before a court on a civil or criminal matter even if the arrest was unlawful.").[10]

While the Second Circuit has not explicitly voiced a stance on this issue, it has previously quoted United States v. Crew, 445 U.S. 463, 474 n.20 (1980), in a criminal context, recognizing that "[i]n some cases, of course, prosecution may effectively be foreclosed by the absence of the challenged evidence. But this contemplated consequence is the product of the exclusion of specific evidence tainted by the Fourth Amendment violation and is not the result of a complete bar to prosecution." Brown v. Doe, 2 F.3d 1236, 1243 (2d. Cir. 1993).

## I.     Custody / Bond Applications and Requests

---

10 Oscar-Torres also collects cases from the Third, Fifth, and Sixth Circuits that have diametrically determined that Lopez-Mendoza bars suppression of all evidence of identity. Oscar-Torres, 507 F. 3d at 228 (collecting cases). Oscar-Torres also recognizes that the Ninth Circuit has inconsistently come to different conclusions on the issue in different cases. Id. at 228 n.2.

With respect to custody and bond determinations, "[c]onsideration by the Immigration Judge of an application or request of a respondent regarding custody or bond ... shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding. 8 C.F.R. § 1003.19(d). Premised on this regulation, the Board has concluded that evidence presented only in an alien's removal proceeding cannot be considered during the separate bond proceeding. See In re Adeniji, 20 I & N Dec. 1102, 1115 (BIA 1991).

## J.    Consideration of Constitutional Claims

While "courts should not decide constitutional issues unnecessarily," courts ought to adjudicate such claims when they are "unavoidable." Jean v. Nelson, 472 U.S. 846, 854 (1985). For example, it is true that the federal rules of evidence do not apply in removal proceedings; however, evidence is properly admitted only so long as it "does not violate the alien's right to due process of law." Aslam v. Mukasey, 537 F. 3d 110, 114 (2d. Cir. 2008) (internal quotations omitted). The United States Court of Appeals for the Second Circuit has implicitly approved of frontal review by an Immigration Court of constitutional claims driving a motion to suppress evidence, at least insofar as the motions are premised on alleged Fourth and Fifth Amendment violations. See, e.g., Almeida-Amaral, 461 F. 3d at 232; Pinto-Montaya, 540 F. 3d at 127.

## V.    Respondent has established his requisite *prima facie* burden of an egregious Fourth Amendment violation.

**A.**    After observing Respondent's testimony, evaluating his demeanor, and comparing the substance of his testimony to constituent evidence in the record, including his own affidavit, the Court credits Respondent's testimony in its entirety. Our favorable credibility determination plays a crucial role in the resolution of this case, especially with regards to questions of sufficiency-of-evidence relating to Respondent's initial *prima facie* burden.

Respondent testified that he heard knocking on the first floor door and remained in bed. He then heard sounds of steps coming up the stairs going up to his second floor apartment. He heard a man's voice speaking but could not understand what was being said. He then heard a voice outside his bedroom door and someone knocked twice. Almost simultaneously, immigration agents entered his bedroom, while he was in a state of semi-dress. The agents asked him to identify an individual in a photo and then asked him to present identification. Respondent was later handcuffed without being informed why, as the agents only ordered him to accompany them.

The Respondent's oral narrative is in substantial agreement to both of his declarations, as well as Mr. ██████ declaration.

Also, Respondent testified in a sincere manner regarding an unidentified relative, described as a distant cousin of Mr. ██████ who was living with him in the apartment. Importantly, both Respondent and Mr. ██████ credibly testified that this individual was

not present on the premises during that morning.

In sum, Respondent's motion was supported by specific and credible testimony and based on personal knowledge, as well as the direct testimony and declaration proffered by Mr. █████ Respondent's account did not contradict itself, or Mr. █████ account. Nor were there any other significant inconsistencies or infirmities in Respondent's account.[11]

The internal consistency between Respondent's testimony and declaration contributed materially to our finding that he was a credible witness. Nor did his testimony contain fanciful facts that might suggest embellishment or provide grounds for disbelief.

The Court concludes that Respondent's testimony was credible. The Court also wishes to emphasize the credibility determination in our accompanying determination that Respondent has successfully demonstrated a *prima facie* case that his Fourth Amendment rights were egregiously violated when immigration agents unilaterally entered his apartment without a warrant, probable cause, or consent.

**B.** An egregious constitutional violation must be 'sufficiently severe,' or 'gross or unreasonable' in additional to being unlawful. Almeida-Amaral, 461 F. 3d at 235-37. Here, Mr. █████ heard knocking on the doors of his home and asked the knockers to identify themselves. He was told, in Spanish, that it was the police. Mr. █████ asked the officers why they were at his front door at six-thirty in the morning. The voice answered only that they sought someone named 'Chavez.' Mr. █████ then wedged open the door a few inches. Immigration agents then forcibly opened the door.

That this pre-dawn enforcement raid targeted a private residence is especially pertinent to our decision. The touchstone of the Fourth Amendment is 'reasonableness' and, by natural extension, one's reasonable expectation of privacy. Nowhere is that expectation of privacy more sacrosanct than in the confines of one's home and nowhere is that right more jealously guarded against encroachment. We are not addressing a claim made by an alien seeking admission into the country, outside of a restaurant, driving on the street, or at a workplace site. We are addressing a claim that immigration agents forcefully entered a private home without a warrant, without probable cause, and without consent. Notably, there are scant facts that might furnish a plausible basis upon which communicated consent might reasonably have been interpreted by the agents. Mr. █████ opened the door ajar a few inches. Agents immediately and forcibly pushed the door wide open, requiring Mr. █████ to step back to avoid being hit by the door. Mr. █████ did not consent to their entry and the DHS concedes that they had no warrant to enter the home.

However, our conclusion that the agents' entry violated Respondent's Fourth Amendment rights is not the end of our inquiry. As outlined *supra*, the constitutional

---

11 Respondent did invoke his Fifth Amendment privilege when asked what identification documents he supplied to the immigration agents. He was clearly entitled to do so, and the Court finds that he has satisfied his evidentiary obligations notwithstanding his failure to inform the Court on this matter.

violation (when not based on race or some other improper consideration) must be 'gross' or 'unreasonable' in addition to being without a plausible legal ground. Thus, the Court must examine the actual conduct of the immigration agents involved in the violation; their physical entry into Respondent's home and their ensuing questioning and arrest of the Respondent.

The aggressive nature of the forced entry (which required a resident to move back out of fear of being struck by the door)[12] into a private residence at dawn strongly implicates, on a stand-alone basis, "unreasonable," unlawful conduct. However, the subsequent conduct of the immigration officers lends further support to our conclusion that Respondent has displayed the necessary aggravating circumstances. Specifically, examination of the agents' subsequent conduct confirms that Respondent's Fourth Amendment rights were flagrantly violated.

The agents burst into Respondent's bedroom immediately after rapping on his shut bedroom door twice. Respondent was in a state of semi-dress and in his bed with his girlfriend. The agents did not tell Respondent that they were police. They did not tell him that they were conducting an enforcement operation. They did not pose any questions to Respondent. Instead, they asked the recently roused Respondent to identify an individual in a photograph they showed him. Respondent answered only that he did not know the identity of the individual. The agents then asked him for identification and then handcuffed him. They did not tell Respondent why he was being taken from his room or why he was being handcuffed.

The Court is keenly mindful of the agents' need to take certain precautions to preserve their safety, as well as the safety of their fellow officers and the public. Mr. McCaffrey states that, in order to accomplish this task, "the contact officer would request that individuals within the residence congregate in one common area..." However, this need does not bestow upon the officers free reign to ride roughshod over an individual's rights to privacy and personal dignity, especially when that individual is in his own home, in his own bedroom, sleeping.

Nor is can it be tenably advanced that the officers were conducting a 'protective sweep' of the premises. See Maryland v. Buie, 494 U.S. 325, 334 (1990) ("we hold that there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."). In any event, the object of such a "cursory inspection" is strictly circumscribed to "dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Buie, 494 at 335-36. The facts of Buie make its holding

---

12 This fact may very well distinguish this case in Ninth Circuit Judge Bea's view, dissenting from the denial of rehearing *en banc* of Rodriguez v. Mukasey, 536 F. 3d 1012 (9th Cir. 2008) (commenting that, in Rodriguez, "[t]he agents neither broke the door down nor pushed it open so forcefully as to injure either woman in any way." See generally, Lopez-Rodriguez v. Holder, No. 06-70868, 2009 WL 792777 (9th Cir. 2009) (Bea, J., dissenting from the denial of rehearing *en banc*). Furthermore, in Rodriguez, the unlawful entrance was limited, at least initially, to a common area. That is not the case here.

inapposite here.

To be sure, the Court is not aware of the nature of the identification produced by Respondent. Thus, we cannot say with any certainty what information was gathered by the agents or upon what basis they felt justified to handcuff and arrest Respondent. Respondent invoked his Fifth Amendment privilege when asked what identification he provided to the agents. Thus, the Court remains unaware of precisely what information the agents possessed at that point. However, we conclude that Respondent satisfied his *prima facie* burden on events preceding this exchange. After consideration of all the facts present in the record, up to the point when agents requested identification from Respondent, we find sufficient evidence sustaining Respondent's initial burden. We note that the Government did not submit any evidence evincing what information the agents possessed or reasonably believed they possessed when 1) they forced open the front door of the apartment, and 2) when they entered the Respondent's bedroom. The propinquity between the two events indicates that the agents possessed the same quantum of information.

Thus, unlike in <u>Lopez-Mendoza</u>, the evidence gathered here was not in connection with 'peaceful arrests' made by immigration officers. However the term 'peaceful'[13] may be defined, it cannot be reasonably squared with the agents' conduct in this case.

To conclude, Respondent has established a *prima facie* case for the suppression of evidence directly connected to the unlawful entry of his home, such as the Form I – 213. Respondent submitted a motion to suppress that specified the requisite constitutional basis for his motion, gave a detailed and specific account of the events leading to his arrest, specified the evidence to be suppressed, and cogently supported his position via testimony.

## VI. <u>The DHS has submitted inadequate affidavits pertaining to the agents' entrance into Respondent's home, and categorically refused to produce the affiants or other officers possessing personal knowledge of the relevant issues.</u>

Pervading throughout our entire analysis is the DHS' inability or unwillingness to sustain its evidentiary burden. The Court simply lacks knowledge of large chunks of the event at issue and, at this stage of the proceedings, this shortage is directly attributable to the paucity of evidence submitted by the DHS. The only evidence that they have adduced to support their burden of "justifying the manner" in which they obtained the contested evidence consists only of a bare-bones affidavit from an individual with no personal knowledge of what transpired the morning of June 6, 2007, at ▮▮▮ ▮▮ ▮▮ ▮▮▮ ▮▮▮ Consequently, the Court has been hamstrung from capturing a fuller understanding of the events as they transpired that morning. Neither the affiant, nor anyone else, has been made available to testify in court. Respondent has unqualifiedly been denied his opportunity to cross-examine anyone associated with his arrest and detention.

---

13 Black's law dictionary defines 'peaceful' as "[a] state of public tranquility; freedom from civil disturbance or hostility." <u>Black's Law Dictionary</u> (8th ed. 2004).

The DHS submitted an affidavit from Richard McCaffrey, a supervisory immigration officer for ICE. Much of the affidavit address the normal operating protocols Detention and Removal Operation ("DRO") officers are instructed to adhere to while acting in their official enforcement capacity. However, the affidavit says little about the training and teaching of 'ICE personnel from programs other than DRO' that 'may be tasked with assisting in fugitive operations.' It has even less to say about what training non-ICE personnel, such as local law enforcement authorities, who may participate in such activities, are given. Moreover, some of the 'Team Leaders,' the individuals vested with the responsibility of knocking on a door of a private residence, identifying themselves as police, and obtaining consent from an authorized individual, are not DRO officers.

More fundamentally, Mr. McCaffrey wholly lacks personal knowledge with respect to the event of entry for ██ ██ ██ ██ ██ He states only that he went to the first floor apartment where he saw an Officer Hamilton already inside the apartment.

Then, the only support he can lend to the DHS' contention that there was a consensual entry is that he has 'reviewed' Respondent's Form I – 213, the precise document Respondent is seeking to exclude. As to the officers actually involved in the initial entry of Respondent's apartment, "None of the officers involved in making an entry into [Respondent's] apartment can recall further detail about the encounter … due to the passage of time." The upshot here is that the evidence proffered by the DHS is scant. Furthermore, this scant evidence is unsubstantiated hearsay and, at points, hearsay upon hearsay.

The deficiencies in the DHS' threadbare submission are exacerbated by their categorical and unexplained refusal to offer or make available agents to testify in open court. No cited reason or motivation was stated; the Court might generously educe that since none of the officers can recall anything about the incident, there might be little to be gained from their testimony. However, this does not explain why Respondent was denied an opportunity to cross-examine the affiant who provided testimony *against* him. Thus, Respondent, who satisfied his initial burden, was deprived a reasonable opportunity to confront and cross-examine Mr. McCaffrey (as well Ms. Michelle Vetrano-Antuna, the examining officer stated on the Form I – 213), which due process requires. Granted, Mr. McCaffrey's affidavit has little to say about the contested entry into Respondent's apartment; still, the DHS' utter lack of an explanation raises the specter of whether 'reasonable efforts' were made to obtain his testimony or the testimony of anyone else.

The Court has demanded Respondent file a satisfactory declaration based on his personal knowledge, present himself before the Court and provide testimony, be subject to the Government's cross-examination, and sustain his *prima facie* burden of establishing his constitutional rights were egregiously violated. Respondent has complied with each of these demands and met his obligations. Case law dictates that the burden now falls on the Government to produce evidence in support of its burden of "justifying

the manner in which it obtained the evidence." Barcenas, 19 I & N Dec. at 611. The Government has simply failed to do so.

The Court would be afield to juxtapose our decision in relation to the Supreme Court's identification of one benefit of utilizing the exclusionary rule in immigration hearings: deterrence of immigration agents' unconstitutional conduct. Lopez-Mendoza, 468 U.S. at 1041. This issue falls outside the Court's judicial ken. We remark, however, that this case, as it has been factually presented, does not appear to be on the margins. Here, the raid was conducted in the early morning hours while the occupants, some of them children, would likely be, and indeed were, sleeping. Agents forcibly entered, without warrant or consent, into a private home. They then entered into a bedroom, door closed, without permission. The agents failed to ask preliminary questions that might demonstrate probable cause, or at least reasonable suspicion. Agents positioned themselves to block the doorways. Neither Respondent, nor anyone else present in the apartment, was the targeted fugitive alien sought by the agents. Respondent was restrained in handcuffs without being told why he was being placed under arrest.

The Court finds that there was an egregious violation of the Fourth Amendment that was fundamentally unfair. See Almeida Amaral, 461 F.3d at 236. It realizes that reasonable people can differ on their interpretation of the term egregious. In considering all the evidence in the record, this Court finds that the Respondent's Fourth Amendment rights were egregiously violated.

## VII.    **Conclusion**

Considering the totality of the circumstances, the Court determines Respondent has demonstrated a *prima facie* case that the immigration agents' conduct worked an egregious violation to his Fourth Amendment rights.[14] Thus, the Court finds that the contested Form I – 213 must be suppressed.

Furthermore, based on the record before us, it appears Respondent was placed in removal proceedings exclusively upon the information he provided to immigration agents during the course of their interrogation.

The Form I – 213 explicitly states Respondent's status and length of residence in the United States as pieces of information extracted directly from Respondent, as the term "subject claims" and "subject does not claim" appear in the relevant portions on the document. In turn, the congruity between the factual allegations contained in the NTA and the information contained in the Form I – 213 reflect the latter served as the primary, if not exclusive, basis, for the former.

Furthermore, the Government has not produced additional evidence to sustain the charge of removability independent of the Form I – 213.

---

14 Because of our disposition in this case, *supra*, we have no occasion to evaluate Respondent's other constitutional, regulatory, and sub-regulatory claims.

Finally, we agree with Respondent that his removal proceedings must be terminated, because the Government has not introduced admissible independent evidence supporting the factual allegations stated in the NTA and, thus, it has failed to meet its burden of establishing Respondent's removability by clear and convincing evidence. See INA § 240(c)(3)(A).

## VIII.  Orders

Based on the foregoing, the following **ORDERS** shall enter:

**IT IS ORDERED** that the Respondent's Motion to Suppress be **GRANTED**;

**IT IS FURTHER ORDERED** that the Respondent's Motion to Terminate removal proceedings be **GRANTED**.

June 1, 2009
Date

MICHAEL W. STRAUS
Immigration Judge

- 31 -

# Exhibit 10

**File:** A███████

**In the Matter of:**                                    )
                                                          )
███████  ███████  ███████                                 )    **IN REMOVAL**
                                                          )    **PROCEEDINGS**
Respondent                                                )

**CHARGE(S):**    Section 212(a)(6)(A)(i) of the Immigration and Nationality Act
("INA" or "Act"): An alien present in the United States without
being admitted or paroled ... is inadmissible.

Section 237(a)(1)(A) of the INA: An alien who at the time of entry
... was ... inadmissible ... is deportable.

**APPLICATION(S):**  Motion to Suppress
Motion to Terminate Removal Proceedings

ON BEHALF OF RESPONDENT:              ON BEHALF OF DHS:
Michael J. Wishnie, Esq.              Leigh Mapplebeck, Senior Litigation
The Jerome N. Frank Legal Services    Counsel DHS
P.O. Box 209090                       450 Main Street – Room 483
New Haven, CT  06520-9090             Hartford, Connecticut 06103

## DECISION AND ORDER OF THE IMMIGRATION JUDGE

### I.    Procedural History

A Notice to Appear ("NTA") was served upon ███████  ███████  ███████
("Respondent"), in person, on June 6, 2007.[1] In the NTA, the Department of Homeland
Security ("DHS" or "the Government") alleges that Respondent is a native and citizen of
Mexico who entered the United States at an unknown place on an unknown date and was
not then inspected by an immigration officer. Accordingly, the Government charged
Respondent with removability pursuant to INA § 212(a)(2)(6)(A)(i). The NTA was filed
with the Court on August 20, 2008, thereby vesting it with jurisdiction over these
proceedings. See 8 C.F.R. § 1003.14(a) (2008). On October 20, 2008, Respondent filed
his responsive pleadings as well as submitted a brief in support of his motion to suppress

---

1 A date-stamp on the NTA indicates it was not filed with the Court until August 20, 2008.

evidence and terminate removal proceedings.

The Form I-213 recounts Respondent's arrest as such: The Hartford, Connecticut Fugitive Operations Unit arrested Respondent while attempting to locate an alien fugitive (A# ███████ with the last known address of ████████ New Haven, Connecticut.

In submissions in support of his motion to suppress evidence and terminate proceedings, Respondent asserts that Immigration and Customs Enforcement ("ICE") agents egregiously violated his Fourth Amendment right against unreasonable searches and seizures. Specifically, he avers that ICE agents illicitly entered his home without a warrant and without consent. He also claims that ICE agents egregiously violated his Fifth Amendment right to equal protection and fundamental fairness in his immigration proceedings. Specifically, Respondent asserts that he was targeted solely on the basis of his race and because ICE agents coerced him into making certain statements. Moreover, he claims that ICE agents' violation of ICE regulations and sub-regulatory rules, which bear on his fundamental rights, require termination of his removal proceedings.[2]

The DHS submitted a response to Respondent's Motions to Suppress Evidence and Terminate Proceedings. Therein, the DHS contended Respondent had failed to establish a *prima facie* showing that: 1) his Fourth Amendment rights had been egregiously violated by ICE agents, 2) his Fifth Amendment rights had been egregiously violated by ICE agents, and 3) ICE agents had violated any applicable regulation necessitating the suppression of evidence or the termination of proceedings.

Respondent has also filed a number of subpoena requests relating to immigration agents involved in his arrest and detention, dated October 20, 2008.

## II.   **Testimonial Summary**

### A.   **Respondent's Testimony**

Respondent has lived in Connecticut for approximately a year.[3] He lives with his wife, children, cousin, and nephew on the second floor of ████████ New Haven, Connecticut. He speaks Spanish and attended high school. Respondent speaks only a meager amount of English. He still lives with his 'distant cousin' and has been living with him for four years. Respondent last saw him a few days prior to the date testimony

---

2 Respondent also contends that his arrest was conducted in a manner that egregiously violated his First and Tenth amendment rights. The Court has been unable to find precedent for the proposition that First and Tenth Amendment claims may be properly entertained in a removal proceeding. In fact, the Second Circuit has expressly declined to fashion an exclusionary rule for evidence obtained in violation of an individual's First Amendment rights in the context of removal proceedings. See Montero v. I.N.S., 124 F. 3d 381, 386 (2d. Cir. 1997). "Beyond violations of the Fourth Amendment, it is clear from Lopez-Mendoza that the exclusionary rule is applicable, if at all, only to deprivations that affect the fairness or reliability of the deportation proceeding." Id. Thus, because it is not within the competence of this Court to resolve such claims, they will not be considered.

3 His affidavit states that he has lived in Connecticut for eight years.

-2-

was proffered. Respondent asserted his Fifth Amendment privilege to the following inquires: information regarding his 'distant cousin' mentioned in his affidavit, including the cousin's name, the whereabouts of his nephew's girlfriend, and the nature of the identification that he provided to the ICE agents.

The following is a synopsis of his testimony as it relates to the discrete constitutional claims he has advanced:

On June 6, 2007, Respondent was home with his wife, two children, and nephew. His 'distant cousin' was at work. Respondent, his wife, and his children were all in the same room, sleeping. He was awakened by the sound of knocking originating from the door facing the front. Then he heard knocking on the back door. Respondent went to the back door and asked 'who's there' in Spanish. He heard 'police' in reply, also spoken in Spanish. He then asked 'who are you looking for' and the officers answered that they were looking for someone named 'Chavez.' Respondent opened the door "a little bit" and observed two policemen. The "heavyset" officer pushed the door open. Respondent stepped back to avoid being hit by the door. Respondent did not ask the officers to come inside. The officers did not ask Respondent any further questions and entered into his apartment. The officers asked about where the front door led and then questioned Respondent about his immigration status, in English. Respondent's son translated the request for his father. Respondent complied and provided the officers with identity documentation containing his name and birth date. He was then arrested, as were his nephew and his nephew's girlfriend.

On re-direct examination, Respondent stated that he was awakened by knocking coming from the first floor door facing the street. He estimated that he opened the door three or four inches to observe the officers at the front door.

## B.    Respondent's Declaration

Respondent attested to the following in his Declaration, dated October 19, 2008:

Respondent is a 34 year old man who is 'of Latino appearance'. He attended school until the age of 15.

Respondent has lived on the second floor of ▌▌ ▌▌ ▌▌ New Haven, Connecticut, for eight years. He lives there with his family, composed of his wife, their son and daughter, his nephew ▌▌ ▌▌ ▌▌ and a 'distant cousin'.

Early in the morning of June 6, 2007, Respondent was asleep in his bedroom with his wife and two children. Every occupant of the house was present save for his 'distant cousin,' who ordinarily left for work at 6 a.m. At approximately 6:30 a.m., Respondent was awakened by someone 'beating' on the front door. In response, he arose and went to the living room, partially dressed. Respondent states that 'they started ringing the doorbell and beating as if they were going to break down the door. Then I heard beating on the back door.' He yelled "who is it?" through the back door and someone answered

"police" through the back door. Respondent opened the back door 'just a little bit,' to ascertain who was at the door, observed two uniformed officers, and shouted back 'who are you looking for?' One of the officers said 'we're looking for Chavez.' Respondent answered that there was no one named Chavez living in the apartment.

Then, one of the officers 'pushed open the door and entered [the] apartment'. Respondent was forced to step back to avoid being hit by the door.[4] The officer came inside the apartment and stationed himself in front of the back door, with his arms outstretched, blocking the door 'to prevent anyone from leaving.' The officer momentarily dropped one arm to allow his fellow officer in, and then resumed outstretching his arm. Respondent's wife and son came running into the living room.

Respondent, the only person at the door, never told the officers that they had his permission to enter the apartment. No other occupant gave the officers permission to enter and none of the officers showed him a warrant.

The second officer came inside the apartment, walked to the front door, and asked in English were it led. Respondent's son answered that 'it's the front door'. The officer opened the front door, then closed it, and left the apartment through the back door.

Moments later, a male officer, armed with a pistol, and a female officer, came up the back stairway. The first officer, who was carrying a firearm, stationed at the back door, moved his arm to allow them ingress, but then raised his arm again. Respondent 'did not feel free to leave.'

Respondent did not give his 'consent for any of the officers to enter. No one in [his] house consented to their entry. None of the officers showed [him] a warrant.' His wife asked the officers what was happening but they did not respond.

The officer at the back door asked Respondent a question in English. His son told him that the officer was asking whether he had immigration papers. Respondent told the officer, through his son, that he did not want to answer. The officer continued to ask questions even after he was informed Respondent did not want to answer. Respondent 'did not feel free to leave because the officers had blocked off all of the exits to [the] apartment before they began questioning [him].'

Respondent was standing in the living room and could see the doors of all the bedrooms. While one of the officers was questioning him, he observed a male officer trying to open the door to his cousin's room. The door was locked, and the officer 'hit the door with his hand and then kicked repeatedly at the door.' Respondent later discovered that this kicking caused 'permanent damage to the lock.'[5] His cousin was not in the room.

The male officer who kicked the cousin's door went to the door of ████████

---

4 This piece of information is stated in Respondent's declaration dated September 7, 2008, as a constituent exhibit in his Motion to Advance, filed October 14, 2008.
5 His declaration dated September 7, 2008 states that the officer 'broke the lock by kicking the door.'

bedroom. The door was unlocked, and he and a female officer entered the room. Several moments later, ███████ and his girlfriend emerged from the room in handcuffs. The two were taken outside via the back door. Respondent was asked for his identification by an officer and Respondent complied by showing identification. The officer then handcuffed Respondent.

**C.     Testimony of** ███████████████ **(A# ██ ██ ██**

Mr. ███████ has attained one year of high school education. He asserted his Fifth Amendment privilege to the following inquires: the whereabouts of his girlfriend and the name of an 'unidentified relative,' who is a distant cousin of Respondent, and who was mentioned in his affidavit.

The following is a synopsis of his testimony as it relates to the discrete constitutional claims he has proffered:

On the morning of June 6, 2007, Mr. ███████ was sleeping in his room when he heard knocking coming from the front door on the first floor. He was roused but remained lying in his bed. He then heard footsteps coming up the stairs to the second floor. He could hear voices but he could not discern what the voices were saying. Someone knocked twice on his door and then came into his room. The door to his room was unlocked. Mr. ███████ said nothing. Agents who entered his bedroom told him that they were looking for a man identified as 'Chavez' and Mr. ███████ answered he did not know the individual. He did not say anything else. He was then asked for identification, which he provided to the officers. The agents then instructed him to get dressed and accompany them and he was informed that he would be placed under arrest. Mr. ███████ was then handcuffed.

On re-direct, he stated no one explained to him why he was being handcuffed; he was only told to accompany the officers.

**D.     Declaration and Supplemental Declaration of** ███████████████
**(A# ██ ██ ██**

Mr. ███████ attested to the following in his Declaration, dated November 28, 2007:

He is 22 years old and a resident of New Haven, Connecticut. He has not graduated from high school. He lives on the second floor of ███████ New Haven, Connecticut, where he has lived for the past six years. He lives with his uncle, ███████ █████████ wife, and their two children, as well as a 'distant cousin' of

On the morning of June 6, 2007, Mr. ███████ was asleep in his bedroom with his girlfriend, ███████████ At around 6:30 a.m., he heard banging on the door to the apartment. Before he rose out of bed, two agents entered into his room. He

- 5 -

asked "who is it?" One of the agents shouted "where is Chavez?" and showed him a photo of the individual. Mr. ▮▮▮▮ replied that he did not know anyone named Chavez. He and his girlfriend were ordered to get out of bed, and then handcuffed and led to the living room. He "did not give [his] consent for the agents to enter."

In the living room, ▮▮▮▮ and his wife were speaking to the officers. They were accompanied by their twelve year old son. Mr. ▮▮▮▮ believes that there were four officers in total and some of the officers were armed. Officers blocked all of the exits to the apartment. He was then taken "straight outside to a van".

Mr. ▮▮▮▮ attested to the following in his Supplemental Declaration, dated February 20, 2008:

His apartment has three bedrooms: one is his, another is for his uncle and his uncle's family, and the other bedroom is for his uncle's 'distant cousin'. The apartment also has a living room, a kitchen, and a bathroom. The apartment has two doors; one in the front facing the street, and another door in the back that faces the parking lot. The walls in his apartment are thin, which allow the voices and footsteps of people in the hallway, living room, and kitchen, to be heard from inside his bedroom.

At the point that the officer 'blocked all exits to the apartment,' no one had asked Mr. ▮▮▮▮ any questions. He states that '[a]ll the officers knew about me when they entered my bedroom and ordered me into the living room was that I appeared Latino and spoke Spanish.'

### E.  Affidavit provided by the DHS

On February 12, 2009, with respect to Respondent's motions, the Government submitted an affidavit from Richard McCaffrey, a Supervisory Detention and Deportation Officer.

The following is a synopsis of the contents of that affidavit:

Richard McCaffrey has worked in the immigration enforcement field for fifteen years. In 2006, ICE Detention and Removal Operations ("DRO") implemented 'Operation Return to Sender,' which was aimed at apprehending immigration absconders. The operation was planned for June 6, 2007, and a target list was prepared.

At no time during the June 6, 2007, operation did Mr. McCaffrey "observe or become aware of the use of 'unnecessary' force in the interaction between officers involved in the operation and the aliens." Furthermore, "at no time during or after the completion of ... this operation" did Mr. McCaffrey "observe or learn that any house or apartment was entered without informed, voluntary consent," and he did not observe and was not informed "that any consent was withdrawn."

With regards to Respondent's arrest, Mr. McCaffrey was initially outside 200

Peck Street, along with ICE agents, and "there may have been outside law enforcement officers there as well." He proceeded to the rear of the building, entered the common hallway area, and observed and interacted with the first floor occupants of the apartment.

Mr. McCaffrey explains that "[e]ach officer who requested consent to enter a building was specifically instructed to radio that information into [the] command center as soon as possible ... [and] the name of the person granting consent was then recorded at the command center for inclusion into the Form I-213."

Mr. McCaffrey has "reviewed the Form I-213" for Respondent.

Lastly, "n[]one of the officers involved in making an entry into [Respondent's] apartment can recall further detail about the encounter beyond that stated in the I-213 due to the passage of time."

The DHS also sought to introduce both a photocopy of a Mexican passport purported to be Respondent's as well as a computer screen printout from ENFORCE, an immigration-enforcement related data collection program. However, the Court will not consider these untimely submissions. First, the materials were only offered to the Court well after Respondent had testified. The Court had provided multiple notices to both parties regarding the limits for submission of supplementary materials and the administrative record was closed. The Court also notes that the Government has not established an adequate foundation for introduction of either document into the evidentiary record.[6]

## III.  Exhibit List

Exhibit List – Respondent' Exhibits in Support of his Brief in Support of his Motions, dated October 20, 2008

Exhibit A – Declaration of law student Intern Stella Burch.

Exhibit B – Declaration of Respondent.

Exhibit C – Policy Document from Junta for Progressive Action & Unidad Latina en Accion, "A City to Model: Six Proposals for Protecting Public Safety and Improving Relationships Between Immigrant Communities and the City of New Haven" (2005).

Exhibit D – William Yardley, "New Haven Mayor Ponders ID Cards for Illegal Immigrants," N.Y. Times, Oct. 8, 2005.

Exhibit E – Jennifer Medina, "New Haven Welcomes Immigrants, Legal or Not," N.Y.

---

6 In its submission, the Government states that the proffered passport was "obtained in conjunction with [Respondent's] arrest," but has not attempted to demonstrate that the document was obtained in a sufficiently unconnected manner, and thus upon independent grounds, to the contested seizure, arrest, and detention of Respondent.

Times, Mar. 5, 2007.

Exhibit F – New Haven Police Department General Order 06-02.

Exhibit G – Mary O'Leary, "Group Wants ID Cards Ready Sooner," New Haven Register, Dec. 26, 2006.

Exhibit H – Mary O'Leary, "Leader of Hispanic Church Welcomes All, Including Undocumented," New Haven Register, July 1, 2007.

Exhibit I – "Time to Fix Immigration," N.Y. Times, Oct. 14, 2005.

Exhibit J – Allan Appel, "Mayor, Chief Promise to Build on Immigrant Plan,: New Haven Independent, Jan. 19, 2007.

Exhibit K – Transcript of NBC news clip: "In Depth: Whose America? Local Governments Find Different ways of Dealing with Illegal Immigrants Who Congregate on Streetcorners Looking for Work," NBC Nightly News, March 20, 2007.

Exhibit L – Anthony Fiola, "Looking the Other way on Immigrants; Some Cities Buck Federal Policies," Washington Post, April 12, 2007.

Exhibit M – Robert Jamieson, "Is Seattle Ready to Be Immigrant Sanctuary?" The Seattle Post-Intelligencer, April 12, 2007.

Exhibit N – Michele Wucker, "A Safe Haven in New Haven," N.Y. Times, April 15, 2007.

Exhibit O – Letter from Julie Myers to John DeStefano, dated July 2, 2007.

Exhibit P – Copy of email messages between unidentified ICE agent and Trooper Carmine Verino, of the Connecticut Department of Public Safety.

Exhibit Q – City of New Haven Board of Aldermen Minutes, Finance Committee, May 17, 2007.

Exhibit R – Henry Fernandez, "Today I am Proud to Call New Haven My Hometown," New Haven Independent, June 5, 2007.

Exhibit S – Statement of Mayor John DeStefano, Jr. to Board Of Alderman Finance Committee on Municipal Identification Program, May 17, 2007.

Exhibit T – Melissa Bailey, "City ID Plan Approved," New Haven Independent, June 5, 2007.

Exhibit U – Mary E. O'Leary, "Ortiz Again Claims No Knowledge of Raid," New Haven

Register, June 19, 2007.

Exhibit V – City of New Haven, Elm City Resident Card Fact Sheet.

Exhibit W – Mary O'Leary, "Municipal ID Cards Likely," New Haven Register, May 18, 2007.

Exhibit X – Abbe Smith, "More than 1,000 March Downtown," June 17, 2007.

Exhibit Y – Mara Revkin, "Offering Noncitizens a Local Identity," American Prospect, July 30, 2007.

Exhibit Z – Mary E. O'Leary, "City Irate, Claims It's Retaliation Over IDs," New Haven Register, June 7, 2007.

Exhibit AA – Nina Bernstein, "Promise of ID Cards is Followed by Peril of Arrest for Illegal Immigrants," N.Y. Times, July 23, 2007.

Exhibit BB – Copy of Letter from the Connecticut Congressional Delegation to Secretary Chertoff, June 11, 2007.

Exhibit CC – Mark Spencer, "New Haven's Immigration Drama Grows," Hartford Courant, June 15, 2007.

Exhibit DD – Copy of Letter from Julie Myers to National Immigration Forum, July 6, 2007.

Exhibit EE – Mark Zaretsky, "Fear Grips Immigrant Community," New Haven Register, June 17, 2007.

Exhibit FF – Jennifer Medina, "Arrests of 31 in U.S. Sweep Bring Fear in New Haven," N.Y. Times, June 8, 2007.

Exhibit GG – Copy of Letter from Secretary Chertoff to Senator Chris Dodd, June 14, 2007.

Exhibit HH – Department of Homeland Security Office of Inspector General, An Assessment of United States Immigration and Customs Enforcements' Fugitive Operations Teams, March 2007.

Exhibit II - Print-out from ICE Office of Detention and Removal Operations National Fugitive Operations Program.

Exhibit JJ – Melinda Tuhus, "Despite Raids, IDs for All," In These Times, Aug. 2007.

Exhibit KK – Elizabeth Hamilton, "Passion for Justice," Hartford Courant, July 23, 2007.

Exhibit LL – Donna Schaper, "Punishing Immigrants, Whatever Happened to Land of Welcome and Opportunity," Hartford Courant, June 17, 2007.

Exhibit MM – Copy of the ICE Pre-Operations Plan.

Exhibit NN – Robert C. Davis & Edna Erez, "Immigration Populations as Victims," National Institute of Justice (1998).

Exhibit OO – Orde F. Kittrie, "Federalism, Deportation, and Crime Victims Afraid to Call the Police," 91 Iowa L. Rev. 1449, 1450-51 (2006).

Exhibit PP – Robert C. Davis, Edna Erez & Nancy Avitabile, "Access to Justice for Immigrants Who are Victimized: The Perspectives of Police and Prosecutors," 12 Crim. Justice Policy Rev. 183 (2001).

Exhibit QQ – Virginia MOU and its adverse Implications for Immigrant Women and Girls, Tahirih Justice Center.

Exhibit RR – Nawal H. Ammar, et al., "Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA," 7 Int'l J. of Pol. Sci. and Management 230 (2005).

Exhibit SS – "City of New Haven, Board of Aldermen Approve Acceptance of Funds for Municipal Identification Program".

Exhibit TT – Statement by Richard D. Clarke, Former White House National Security Coordinator for Security and Counter-Terrorism in the Clinton and Bush Administrations, Oct. 19, 2007.

Exhibit UU – Mary E. O'Leary, "City IDs Don't Prove Voter Eligibility, Blumenthal Rules," New Haven Register, Sept. 7, 2007.

Exhibit VV – Mary O'Leary, "Group may Urge Illegal Aliens to Make City their Destination," New Haven Register, June 14, 2007.

Exhibit WW – In re: Herrara-Priego, USDOJ EOIR (New York, N.Y., July 10, 2003) (Lamb, IJ).

Exhibit XX – Letter from Karen V. Lang to Congresswoman Zoe Lofgren Letter on ICE raids, dated March 14, 2007.

Exhibit YY – Declaration of Father James Manship, St. Rose of Lima Catholic Church, New Haven, Connecticut, dated June 20, 2007.

Exhibit ZZ – M-69: The Law of Arrest, Search, and Seizure for Immigration Officers,

last updated January 1993 by Patrick McDermott, William Odencrantz, Liz Hacker, and Judith Patterson. Available on Lexis-Nexis, at INS Manuals 80-89.

Exhibit AAA – Declaration of Student Intern Jane Lewis, dated Oct. 20, 2008.

Exhibit BBB – Floor Plan of Respondent's Apartment.

Respondent's Motion to Supplement the Record, filed October 20, 2008

Exhibit A – Declaration of Sara Edelstein

Exhibit B – Declaration of Respondent

Omnibus Appended Materials to Respondent's Motion to Supplement the Record – November 14, 2008

Exhibit A – Declaration of law student intern Sara Edelstein.

Exhibit B – 'Target List' of June 2007 ICE enforcement operation in New Haven, CT.

Exhibit C – Danahar v. Freedom of Information Com'n, 2008 WL 4308212 (Conn. Super., Sept. 5, 2008).

Exhibit D – Letter from Henri Alexandre, Assistant Attorney General of the State of Connecticut, to Michael Wishnie, dated October 20, 2008.

Exhibit E – Series of E-mails dated June 11, 2007.

Exhibit F – Letter from Douglas P. Morabito, Assistant United States Attorney, to Micheal Wishnie, dated Oct. 15, 2008.

Exhibit G – Declaration of Lawrence Mulvey, Police Commissioner of Nassau Country, New York.

Omnibus Brief and Exhibits to Supplement Record – December 3, 2008

Exhibit A – Declaration of law student intern Hunter Smith.

Exhibit B – Target List, for the June 2007 enforcement operation in New Haven, CT.

Exhibit C – Vaughn Index, ULA v. DHS, No. 3:07-cv-1224 (MRK), Dkt. # 53, 1-2 (D. Conn., filed November 6, 2008).

Exhibit I – Declaration of law student intern Sara Edelstein.

Exhibit J – Letter from Michael Wishnie and Deborah Marcuse to Michael Cameron,

dated October 30, 2007.

Respondent has also submitted two additional exhibits dated March 3, 2009: Respondents' omnibus brief in response to the Government's evidentiary submissions, and Respondent's motion to supplement the record.

## IV. Legal Standards

### A. Motion to Suppress in Removal Proceedings

#### 1. Respondent's *prima facie* burden

A motion to suppress must be made in writing and be accompanied by a detailed affidavit that explains the reasons why the evidence in question should be suppressed. Matter of Wong, 13 I & N Dec. 820, 822 (BIA 1971). The individual seeking to suppress evidence initially bears the burden of proof and must establish a *prima facie* case that the evidence should be suppressed. Matter of Tang, 13 I & N Dec. 691 (BIA 1971). To establish a *prima facie* case, the individual seeking suppression must provide specific, detailed statements based upon personal knowledge; such allegations cannot be general, conclusory, or be based on counsel. Id.; see also Matter of Barcenas, 19 I & N Dec. 609 (BIA 1988); Matter of Wong, 13 I & N Dec. at 821-22; Matter of Tang, 13 I & N Dec. at 692.

"Where a party wishes to challenge the admissibility of a document, the mere offering of an affidavit is not sufficient to sustain his burden. First, if an affidavit is offered, which, if accepted as true, would not form a basis for excluding the evidence, the contested document may be admitted into the record . . . If the affidavit is such that the facts alleged, if true, could support a basis for excluding the evidence in question, then the claims must also be supported by testimony. The respondent's declaration alone is therefore insufficient to sustain his burden." Id. at 611-612. Even a technically defective arrest of an alien does not necessarily render the deportation proceeding null and void. See Avila-Gallegos v. Immigration and Naturalization Service, 525 F.2d 666 (2d. Cir. 1975). Lastly, it is important to note "[r]espondents may only litigate what happened to them." INS v. Delgado, 466 U.S. 210, 2221 (1984).

#### 2. Responsive Government Burden

When a respondent comes forward with proof establishing a *prima facie* case for suppression, the DHS then must assume the burden of justifying "the manner in which it obtained the evidence." Barcenas, 19 I & N Dec. at 611. Furthermore, an alien in removal proceedings is entitled to cross-examine witnesses the Government deploys against them. INA § 240(b)(4)(B).

As to the first point, the Court is aware of no authoritative precedent revealing the precise quantum of evidence the Government must proffer 'to justify the manner in which it obtained the evidence.' However, logic informs that to meet the *prima facie* case

established by the respondent (of an egregious constitutional violation), the burden on the Government must therefore be equivalent.

Then, it is the Government's obligation to submit a facially sustaining affidavit, as well as make reasonable attempts to produce supporting testimony from the agents with knowledge of the contested events. See Barcenas, 19 I. & N. Dec. at 611.

As to the second point, evidence is generally admissible in immigration proceedings if it is probative and its use is fundamentally fair,[7] Matter of Velasquez, 19 I. & N. Dec. 377, 380 (BIA 1996). Furthermore, an "immigration judge may receive in evidence any oral or written statement that is material and relevant to any issue in the case..." 8 C.F.R. §1240.7(a).

However, INA § 240(b)(4) provides an alien in removal proceedings "shall have a reasonable opportunity to examine the evidence against the alien ... and to cross-examine witnesses presented by the Government..." 8 U.S.C. § 1229a(b)(4)(B).[8]

This statutory provision is steeped in Fifth Amendment due process rights. "It is well established that the Fifth Amendment affords aliens due process of law during deportation proceedings." See Singh v. Mukasey, 553 F. 3d 207, 214 (2d. Cir. 2009). A failure in admitting unsupported evidence may constitute a constitutional due process violation if its inclusion prejudices the respondent.[9] See Farrokhi v. INS, 900 F. 2d 697,

---

7 Some courts have required the DHS to make reasonable attempts to produce witnesses before finding the admission of affidavits or sworn statements to be fundamentally fair. See Singh v. Mukasey, 553 F. 3d 207, 212 n.1 (2d. Cir. 2009) (Without further broaching the subject, noting that the First, Fifth and Ninth Circuits have agreed that the government violates principles of fundamental fairness when it submits an affidavit without first attempting to secure the presence of those potential witnesses for cross-examination); see also Ocasio v. Ashcroft, 375 F. 3d 105, 107 (1st. 2004) ("One of these outer limits is that the INS may not use an affidavit from an absent witness 'unless the INS first establishes that, despite reasonable efforts, it was unable to secure the presence of the witness at the hearing.') (quoting Olabanji v. INS, 973 F. 2d 1232, 1234 (5th Cir. 1992); Saidane v. INS, 129 F. 3d 1063, 1065 (9th Cir. 1997). In particular, federal circuit courts have expressed concern that INA § 240(b)(4)(B)'s purpose would be thwarted "if the government's choice of whether to produce a witness or to use a hearsay statement were wholly unfettered." See, e.g., Baliza v. INS, 709 F. 2d 1231, 1234 (9th Cir. 1983). We note that the Government has not introduced any evidence that it has made reasonable efforts to produce the affiant or the author of the Form 1 – 213 in this case, Mr. George Lewis, for in-court examination, or that either is otherwise unavailable.

8 We note that, subsequent to the commencement of proceedings, and assuming a petitioning party has met the statutory preconditions, if an IJ is satisfied that a witness will not appear to testify and that his or her testimony is essential, the IJ possesses exclusive jurisdiction to issue subpoenas requiring, inter alia, the attendance of that witness. 8 C.F.R. § 1003.35(b)(1),(3). Respondent has filed numerous subpoena requests. See Respondents' Subpoena Requests (April 2, 2008); Respondents' Subpoena Requests (October 20, 2008). However, these requests were made before Respondent testified and established his requisite prima facie case; thus, the Court was not satisfied that the ICE agents' evidence was 'essential.' And our disposition of Respondent's Motion to Suppress Evidence and Motion to Terminate Proceedings obviates the need to gauge if the ICE agents' evidence is now indeed 'essential.' In any event, the Government has in no uncertain terms refused to produce any of the agents involved for testimony.

9 The Notice to Appear (Form I – 862), the seminal document referring an alien to his or her rights in a removal proceeding, and the filing of which commences removal proceedings, states that the alien 'will have the opportunity ... to cross-examine any witnesses presented by the Government.'

702 (4th Cir. 1990).

So, while the rules of evidence do not govern removal proceedings, Felzcerek v. INS, 75 F. 3d 112, 116 (2d. Cir. 1996), and "an IJ has some latitude to receive evidence without demanding live testimony ... an IJ's evidentiary rulings must comport with due process." Marku v. Board of Immigration Appeals, No. 03-40871, 2005 WL 1162978, *1 (2d. Cir. May 16, 2005) (unpublished decision). The Court also has a concomitant responsibility to help establish and develop the record. See Yang v. McElroy, 277 F. 3d 158, 162 (2d. Cir. 2002). The United States Court of Appeals for the Second Circuit has previously recognized that a fact finder who assesses testimony together with witness demeanor is in the best position to evaluate credibility. See Zhou Yun Zhang v. United States INS, 386 F. 3d 66, 73 (2d. Cir. 2004).

Ultimately, once a respondent has satisfied his initial obligation to provide a personal-knowledge based affidavit and sworn testimony, and successfully establishes a *prima facie* case that his constitutional rights were egregiously violated, the Government then has a reciprocal obligation to the Respondent (and the Court) to produce and make available agents involved in the enforcement operation at issue for examination in court (insofar as it seeks to admit evidence of alienage authored by an agent, or it submits a written declaration or affidavit by the agent). See Lopez-Rodriguez, 536 F. 3d at 1015-17. (court determination, that IJ's full adoption of Respondent's testimony, characterized as 'conclusive' factual findings, regarding the contested entry into her private residence, where Government failed to produce any of the agents involved in the raid, to be supported by substantial evidence.

## B.    "Egregiousness"

### 1.    Supreme Court

The Supreme Court ruled, in I.N.S. v. Lopez-Mendoza, 468 U.S. 1032 (1984), that the exclusionary rule is not generally applicable in removal proceedings. Lopez-Mendoza, 468 U.S. at 1050. However, a plurality of the Court made plain that their conclusion did "not deal with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained."[10] Id. As the issues in the case addressed "the exclusion of credible evidence gathered in connection with peaceful arrests" by immigration officials at a workplace factory site, no such concerns were implicated. Id.

### 2.    United States Court of Appeals for the Second Circuit

The Second Circuit "adopted the reservations of the Lopez-Mendoza plurality as part of the 'law of [the] circuit,'" Pinto-Montoya v. Mukasey, 540 F. 3d 126, 131 (2d. Cir. 2008), holding that evidence ought to be suppressed only when the evidence established either "that an egregious violation that was fundamentally unfair had

---

10 Black's Law Dictionary defines 'egregious' as "extremely or remarkably bad; flagrant." Black's Law Dictionary (8th ed. 2004).

occurred, or [] that the violation . . . undermined the reliability of the evidence in dispute." Almeida-Amaral v. Gonzales, 461 F. 3d 231, 235 (2d. Cir. 2006).

As to the "fundamental fairness" prong, the Court posited that, since the egregiousness of a constitutional violation "cannot be gauged solely on the basis of the [invalidity] of the stop, but must also be based on the characteristics and severity of the offending conduct," not all Fourth Amendment violations authorized the suppression of evidence in removal proceedings. Id. Instead, the Court devised a sliding scale: A seizure suffered for no reason at all would constitute an egregious violation only if it was sufficiently severe, or if the stop was based on race or some other "grossly improper consideration." Id.

The Court noted that their formulation was non-exhaustive but remarked suppression would require "more than a violation;" it would "demand[] egregiousness." Id. at 236; cf. Gonzales-Rivera v. INS, 22 F. 3d 1441 (9th Cir. 2004).[11] The Court listed two factors that might render a seizure "gross or unreasonable" in excess of its unlawfulness and meet the 'egregious' threshold: a "particularly lengthy" initial illegal stop and the show or use of force. Id. Ultimately, the Court concluded the petitioner had failed to marshal sufficient evidence to support any such finding.

The Court, in dicta, did state that if the stop in question was based on race, the violation would have been egregious. However, as the petitioner "offered nothing other than his own intuition to show that race played a part in the arresting agent's decision," his argument failed. Id. at 236; see also Pinto-Montoya, 540 F. 3d at 131 (finding that the court in Almeida-Amaral concluded "that petitioner's mere assertion, without more, that he was stopped on the basis of race was insufficient to establish that the stop was race-based.").

Another Second Circuit case that followed, Melnitsenko v. Mukasey, 517 F. 3d 42 (2d. Cir. 2008), focused the analysis on alleged violations where race did not play a consideration. The Court concluded that a three-hour detention of an alien, at a checkpoint about 100 miles from the Canadian-United States border, was not an egregious constitutional violation and that the agent's actions at bar were less severe than the agent's actions in Lopez-Mendoza, as petitioner was neither arrested nor taken to jail during the complained-of seizure. Id. at 47 (even assuming that "once she was stopped, she was escorted to a trailer by four or five uniformed officers and interrogated, fingerprinted, and photographed, for three hours without any evidence of Miranda or other warnings given," and "even assuming the Checkpoint itself was illegal," the complained-of conduct fell short of egregious conduct.) Id.

---

11 The Ninth Circuit's characterization of 'egregiousness' is less circumscribed that the Second Circuit's. In the Ninth Circuit, "all bad faith violations [*i.e.* where 'evidence is obtained by deliberate violations of the fourth amendment, or by conduct a *reasonable officer should have known* is in violation of the Constitution'] of an individual's fourth amendment rights are considered sufficiently egregious to require application of the exclusionary sanction in a civil proceeding." Gonzales-Rivera v. INS, 22 F. 3d at 1449 (internal quotations and citations omitted) (emphasis in original).

## C. Consent

1. "It is well settled under the Fourth Amendment that a search conducted without a warrant issued upon probable cause is 'per se unreasonable' . . . subject only to a few specifically established and well-delineated exceptions." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973); Payton v. New York, 445 U.S. 573, 586 (1980) ("It is a basic principle of Fourth Amendment law that searches and seizures inside a home, absent a warrant, are presumptively unreasonable."). "It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth, 412 U.S. at 218.

Consent must be given voluntarily and by an individual possessing the requisite authority. See Illinois v. Rodriquez, 497 U.S. 177, 181 (1990). Voluntariness is a question of fact determined by a 'totality of all the circumstances.' United States v. Isiofia, 370 F. 3d, 226, 231 (2004) (quoting Schneckloth, 412 U.S. at 227). While knowledge of the right to refuse consent is not a *sine qua non* to a finding of voluntariness, "it may be a factor in ascertaining whether the consent was coerced." Schneckloth, 412 U.S. at 248-49.

Specific factors bearing on whether consent was freely given, in the context of an initial entry encounter with police at the door of a private residence, include 1) whether the officers knocked, 2) whether the officers identified themselves (in a non-coercive manner), 3) whether the officers engaged in threatening or abusive actions to induce a resident to open the door and admit them, 4) whether the door was opened for the officers, and 5) whether the police entry was protested. See United States v. Valencia, 645 F. 2d 1158, 1165 (1980); United States v. Ledbetter, No. 02-1757, 2003 WL 22221347, *2 (2d. Cir. Sept. 26, 2003) (unpublished decision); United States v. Crespo, 834 F. 2d 267, 269 (2d. Cir. 1987) (district court's finding that agents' display of weapons and kicking of door caused the door to be opened by the threat of force and not with consent, met with approval by reviewing court).

"Fourth Amendment privacy interests are most secure when an individual is at home with doors closed and curtains drawn tight." United States v. Gori, 230 F. 3d 44, 51 (2d. Cir. 2000); Matter of Louissaint, 24 I & N Dec. 754, 761 (BIA 2009) (Pauley, J., concurring) (citing Payton as an exemplar for the axiom that "[t]he home is an area of utmost privacy, uniquely protected under our law."). In Gori, the majority took umbrage with the dissent's characterization of their opinion and emphatically stated that "the mere opening of a "door to a home does not transform[] the entire home into a public place. [The dissent] generalizes the holding and reach of the opinion beyond its scope or ambition, where the critical fact was that the interior of the apartment was exposed to public view when the door was voluntarily opened." Id. at 52.

An individual, by words or acts, may limit the scope of consent he has given, or revoke his consent, in whole or in part. See United States v. Moran Vargas, 376 F. 3d 112, 113-14 (2d. Cir. 2004). Finally, though consent can be constructed from an individual's words, acts, or conduct, Krause v. Penny, 837 F. 2d 595, 597 (2d. Cir. 1988).

"The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." Garcia, 56 F. 3d 418, 423 (1995) (internal quotations and citations omitted).

**2.** There are also regulatory restrictions regarding consent in the immigration context. Regarding 'site inspections,' which are "enforcement activities untaken [by the BTSD] to locate and identify aliens illegally in the United States . . . where there is a reasonable suspicion, based on articulable facts, that such aliens are present." 8 C.F.R. 287.8(f)(1). Subsection (f)(2) delimits the authority of an immigration officer to enter into a private residence to act in their official capacity:

> An immigration officer may not enter into the non-public areas of a business, a residence including the curtilage of such residence . . . except as provided in section 287(a)(3) of the Act, for the purpose of questioning the occupants or employees concerning their right to be or remain in the United States unless the officer has either a warrant or the consent of the owner or other person in control of the site to be inspected. When consent to enter is given, the immigration officer must note on the officer's report that consent was given and, if possible, by whom consent was given. If the immigration officer is denied access to conduct a site inspection, a warrant may be obtained.

8 C.F.R. 287.8(f)(2).

## D. Seizure

**1.** "A person is seized by the police . . . when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied." Brendlin v. California, 127 S. Ct. 2400, 2405 (2007).

Ordinarily, the pertinent test is whether "a reasonable person would have believed that he was not free to leave if he [did] not respond[ ]" to the questions put to him. Pinto-Montoya, 540 F. 3d at 131 (citing INS v. Delgado, 466 U.S. 210, 216 (1984 )); see also United States v. Mendenhall, 446 U.S. 544, 554 (1980). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Terry v. Ohio, 392 U.S. 1, 19 n. 16 (1968) . "[A]n initially consensual encounter between a police officer and a citizen can be transformed into a [Fourth Amendment] seizure..." Delgado, 466 U.S. at 215.

"When a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'" Brendlin, 127 S. Ct at 2405-06 (quoting Florida v. Bostick, 501 U.S. 429, 435-36 (1991).

**2.** When a police officer has restrained the freedom of an individual sufficient to

constitute a 'seizure' under the Fourth Amendment, it must be 'reasonable'. U.S. v. Brignoni-Ponce, 422 U.S. 873, 878 (1975) (citing Terry, 392 U.S. at 16). "[T]he reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Id. The Fourth Amendment forbids "stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." Brignoni-Ponce, 422 U.S. at 884; see also Rajah v. Mukasey, 544 F.3d 427, 441 (2d. Cir. 2008).[12]

In evaluating the validity of a stop, the Court must consider "the totality of the circumstances-the whole picture." United States v. Cortez, 449 U.S. 411, 417 (1981).

"Pertinent factors identifying a police seizure can include the threatening presence of several officers; the display of a weapon; physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects . . . and a request by the officer to accompany him to the police station or a police room." Gilles v. Repicky, 511 F. 3d 239, 245 (2007).

When stopping an individual, the Fourth Amendment requires "a police officer's actions be justified at its inception." U.S. v. Swindle, 407 F. 3d 562, 567 (2d. Cir. 2005) (quoting Terry, 392 U.S. at 20). "The settled requirement is . . . that reasonable suspicion must arise before a search or seizure is actually affected." Swindle, 407 F. 3d at 568 (citing Florida v. J.L., 529 U.S. 266, 271 (2000)).

**3.** The Immigration and Nationality Act ("INA"), and its attendant regulations, echo this sentiment. INA § 287(a)(1) states "[a]ny [authorized immigration officer] shall have power without warrant to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States..." With regards to interrogation and detention not amounting to arrest, interrogation is defined as "questioning designed to elicit specific information [not amounting to arrest]... an immigration officer . . . has the right to ask questions of anyone as long as the immigration officer does not restrain the freedom of an individual, not under arrest, to walk away." 8 C.F.R. 287.8(b)(1).

However, "[i]f the immigration officer has a reasonable suspicion, based on specific articulable facts, that the person being questioned is, or is attempting to be, engaged in an offense against the United States or is an alien illegally in the United States, the immigration officer may briefly detain the person for questioning." 8 C.F.R. 287.8(b)(2).

## E.    Arrest

**1.** A warrantless arrest is unreasonable under the Fourth Amendment unless the arresting officer has probable cause to believe a crime has been or is being committed. Devenpeck v. Alford, 543 U.S. 146, 152 (2004). "Probable cause exists where the

---

12 The Second Circuit, in Rajah, noted that the Supreme Court has left unanswered whether "suspicion must be of illegal alienage or may be of mere alienage." Id. at 441.

arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." U.S. v. Delossantos, 536 F. 3d 155, 158 (2d. Cir. 2008) (internal quotations and citations omitted). "Because the standard is fluid and contextual, a court must examine the totality of the circumstances of a given arrest. . . . These circumstances must be considered from the perspective of a reasonable police officer in light of his training and experience." Id. (internal quotations and citations omitted).

**2.** INA § 287(a)(2) allows authorized officers to arrest without warrant "any alien in the United States, if he has reason to believe that the alien so arrested is in the United States, in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest..." This subsection also allows officers to make arrests for felonies that have been committed or are in the process of being committed, but subjects them to several limitations. See INA § 287(a)(4), (a)(5)(B).

The concomitant regulations specify "[o]nly designated immigration officers are authorized to make an arrest." 8 C.F.R. § 287.8(c)(1) "An arrest shall only be made when the designated immigration officer has reason to believe that the person arrested has committed an offense against the United States or is an alien illegally in the United States." 8 C.F.R. § 287.8(c)(2)(i). A warrant for arrest must be obtained unless the officer has reason to believe that the person is likely to escape before a warrant can be obtained. 8 C.F.R. § 287.8(c)(2)(ii). The officer must identify himself or herself as an immigration officer authorized to make an arrest, state that the person is under arrest, and extrapolate the reason for the arrest, upon ensuring the communications can be made in safety. 8 C.F.R. § 287.8(c)(2)(iii).

## F. Regulatory Violations

Regulatory violations counsel suppression of evidence when they are "egregious or fundamentally unfair or impaired the reliability of the evidence of ... deportability." Rajah, 544 F. 3d at 446.[13] It is noteworthy that no Court of Appeals has actually determined that deportation or removal proceedings should be terminated based on a violation of a regulation or internal agency guideline. It is true that the Second Circuit, in Waldron v. INS, 17 F.3d 511 (2d. Cir. 1993), determined that, when a regulation is promulgated to protect a fundamental right derived from the Constitution or federal statute, and the INS fails to adhere to it, the challenged proceedings is invalid and a

---

13 Respondent also avers that ICE agents failed to inform him that he was entitled to be represented by counsel during any interrogation-by-examination, in derogation of 8 C.F.R. § 292.5(b) and his Fifth Amendment rights. The Second Circuit has not made an express determination on this ground, but noted in Melnitsenko that the petitioner's argument that "she was escorted to a trailer by four or five uniformed officers and interrogated, fingerprinted and photographed, for three hours without any evidence of any Miranda or other warnings given," did not enhance the officers' conduct to constitutionally 'egregious' conduct. Melnitsenko, 517 F. 3d at 47; see also Lopez-Mendoza, 468 U.S. at 1037 (Supreme Court concluded arrest of petitioner in violation of his Fourth Amendment rights, followed by brief detention and transfer to country jail for questioning, all without warning petitioner of his right to remain silent, did not constitute 'egregious' constitutional violation.).

remand is required. See Waldron, 17 F.3d at 518. However, there is no clear holding sanctioning that a violation of a regulation could result in termination of proceedings, thereby allowing a respondent to continue his unlawful presence in the United States, absent egregious conduct.

## G.    Exclusionary Rule

Evidence obtained from an unlawful search or seizure is generally subject to exclusion as "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). Courts will also suppress evidence that is the indirect product of the illegal police activity as 'fruit of the poisonous tree.' See United States v. Oscar-Torres, 507 F. 3d 224, 227 (4th Cir. 2007) (citing Wong Sun, 371 U.S. at 471).

The relevant constitutional question for later-discovered evidence is "whether the connection between the lawless conduct of the police and the discovery of the challenged evidence has become so attenuated as to dissipate the taint." United States v. Ceccolini, 435 U.S. 268, 273-74 (1975). "The so-called 'attenuation doctrine' allows introduction of evidence obtained after an unlawful arrest when 'the causal link' between a Fourth Amendment violation and a subsequent confession, identification, or other form of evidence is so long or tortuous that suppression of the evidence is unlikely to have the effect of deterring future violations of the same type." Mosby v. Senkowski, 470 F. 3d 515, 521 (2d. Cir. 2006) (internal quotations and citations omitted).

The United States Supreme Court has enumerated several factors germane to the attenuation analysis, including 1) "the temporal proximity of the arrest and the confession," 2) "the presence of intervening circumstances," and "particularly," 3) "the purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-04 (1975).

In the context of obtaining fingerprints as an incident of arrest, gathered in the absence of a warrant or probable cause, the Supreme Court has, on multiple occasions, held that, when an illegal arrest is used as an investigatory subterfuge to obtain fingerprints, the fingerprints are regarded as an inadmissible fruit of an illegal detention. See Davis v. Mississippi, 394 U.S. 721, 727-28 (1969); Hayes v. Florida, 470 U.S. 811, 817-18 (1985); see also United States v. Olivares-Rangel, 458 F. 3d 1104, 1115 (10th Cir. 2006).

Succinctly phrased by the United States Court of Appeals for the Tenth Circuit, "[t]he exclusionary rule applies whenever evidence has been obtained 'by exploitation' of the primary illegality instead of 'by means sufficiently distinguishable to be purged of the primary taint.' Evidence may be obtained 'by exploitation' of an unlawful detention even when the detention is not for the sole purpose of gathering evidence." Olivares-Rangel, 458 F. 3d at 1115 (10th Cir. 2006) (internal citations omitted).

Moreover, the Fourth Circuit has advanced even farther and held "an alien's fingerprints taken as part of routine booking procedures but intended to provide evidence

for a criminal prosecution are still *motivated* by an investigative, rather than an administrative, purpose," and, accordingly, are "subject to exclusion." Oscar-Torres, 507 F. 3d at 232 (citing Olivares-Rangel, 458 F. 3d at 1114.).

While the Second Circuit has not expressly pronounced its position on this issue, it has in previous cases indicated its disapproval of a rigid illicit-purpose requirement. See United States v. Ortiz-Gonzalbo, 133 F. 3d 908, 909 (2d. Cir. 1997) (unpublished opinion) (rejecting a district court's ruling that a defendant's fingerprints are not excludable unless the police made the illegal arrest for the purpose of obtaining the fingerprints, and instead sustaining the lower court's denial of a motion to suppress on alternate grounds); Johnson v. Ross, 955 F. 2d 178, 182 (2d. Cir. 1992) (Newman, J., concurring) ("In some circumstances, evidence is deemed tainted by prior police misconduct even if the reliability of the subsequent evidence is not challenged."). Furthermore, that these indications have arisen in criminal case precedent does not seem to be the paramount, or even prominent, factor in the Second Circuit's analysis. See United States v. Alvarez-Porras, 643 F. 2d 54, 63 (2d. Cir. 1981) ("where flagrantly illegal arrests were made for the precise purpose of securing identifications that would not otherwise have been obtained, nothing less than barring any use of them can adequately serve the deterrent purpose of the exclusionary rule.") (quoting United States v. Edmons, 432 F. 2d 577, 584 (2d. Cir. 1977).

## H. 'Body' or 'Identity' Evidence

The United States Supreme Court concluded, in Lopez-Mendoza, that "the 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." Lopez-Mendoza, 468 U.S. at 1039.

The United States Court of Appeals for the Tenth Circuit has interpreted this statement to mean, based on the cases cited in Lopez-Mendoza, to support the proposition, that the Court was referencing the Ker-Frisbie doctrine, that illegal police activity affects only the admissibility of evidence, and not the jurisdiction of the trial court or otherwise serves as a basis for dismissing the prosecution. Olivares-Rangel, 458 F.3d at 1110.

This view is in accord with both the Eighth Circuit, which has also concluded "that the 'identity' language in Lopez-Mendoza referred only to jurisdictional challenges and did not foreclose suppression of all identity related evidence," United States v. Guevera-Martinez, 262 F. 3d 751, 754 (8th Cir. 2001), as well as the Fourth Circuit, which has concluded "Lopez-Mendoza does not prohibit suppression of evidence of a defendant's identity." United States v. Oscar-Torres, 507 F. 3d 224, 228 (4th Cir. 2007). Thus, the United States Court of Appeals for the Fourth, Eighth, and Tenth Circuits all agree that "the Supreme Court's statement that the "body" or identity of a defendant are "never suppressible" applies only to cases in which the defendant challenges the jurisdiction of the court over him or her based upon the unconstitutional arrest, not to cases in which the defendant only challenges the admissibility of the identity-related

evidence." <u>Olivares-Rangel</u>, 458 F. 3d at 1111.

Each of these Circuits have scrutinized two especially compelling keystones supporting their conclusion: 1) The Supreme Court's founding of its own statement on past cases elucidating the long-standing rule known as the Ker-Frisbie doctrine, and 2) the fact that in <u>Lopez-Mendoza</u>, a consolidated appeal, the alien who objected to evidence offered against him was deemed to have a 'more substantial' claim than the alien who only objected to being hauled into deportation hearings and entered no objection to the evidence offered against him. <u>See</u> <u>United States v. Oscar-Torres</u>, 507 F. 3d at 228 (quoting <u>Lopez-Mendoza</u>, 468 U.S. at 1040); <u>Guevera-Martinez</u>, 262 F.3d at 754 ("These cases [relied upon by the Court in <u>Lopez-Mendoza</u> ] deal with jurisdiction over the person, not evidence of the defendant's identity illegally obtained. The language in <u>Lopez-Mendoza</u> should only be interpreted to mean that a defendant may be brought before a court on a civil or criminal matter even if the arrest was unlawful.").[14]

While the Second Circuit has not explicitly voiced a stance on this issue, it has previously quoted <u>United States v. Crew</u>, 445 U.S. 463, 474 n.20 (1980), in a criminal context, recognizing that "[i]n some cases, of course, prosecution may effectively be foreclosed by the absence of the challenged evidence. But this contemplated consequence is the product of the exclusion of specific evidence tainted by the Fourth Amendment violation and is not the result of a complete bar to prosecution." <u>Brown v. Doe</u>, 2 F.3d 1236, 1243 (2d. Cir. 1993).

## I. Custody / Bond Applications and Requests

With respect to custody and bond determinations, "[c]onsideration by the Immigration Judge of an application or request of a respondent regarding custody or bond ... shall be separate and apart from, and shall form no part of, any deportation or removal hearing or proceeding. 8 C.F.R. § 1003.19(d). Premised on this regulation, the Board has concluded that evidence presented only in an alien's removal proceeding cannot be considered during the separate bond proceeding. <u>See</u> <u>In re Adeniji</u>, 20 I & N Dec. 1102, 1115 (BIA 1991).

## J. Consideration of Constitutional Claims

While "courts should not decide constitutional issues unnecessarily," courts ought to adjudicate such claims when they are "unavoidable." <u>Jean v. Nelson</u>, 472 U.S. 846, 854 (1985). For example, it is true that the federal rules of evidence do not apply in removal proceedings; however, evidence is properly admitted only so long as it "does not violate the alien's right to due process of law." <u>Aslam v. Mukasey</u>, 537 F. 3d 110, 114 (2d. Cir. 2008) (internal quotations omitted). The United States Court of Appeals for the Second Circuit has implicitly approved of frontal review by an Immigration Court of

---

14 <u>Oscar-Torres</u> collects cases from the Third, Fifth, and Sixth Circuits that have diametrically determined that <u>Lopez-Mendoza</u> bars suppression of all evidence of identity. <u>Oscar-Torres</u>, 507 F. 3d at 228 (collecting cases). <u>Oscar-Torres</u> also recognizes that the Ninth Circuit has inconsistently come to different conclusions on the issue in different cases. <u>Id.</u> at 228 n.2.

constitutional claims driving a motion to suppress evidence, at least insofar as the motions are premised on alleged Fourth and Fifth Amendment violations. See, e.g., Almeida-Amaral, 461 F. 3d at 232; Pinto-Montaya, 540 F. 3d at 127.

## V.    Respondent has established his requisite *prima facie* burden of an egregious Fourth Amendment violation.

**A.**    The Court found Respondent's testimony to be credible. Respondent testified based on personal knowledge and was candid and forthright in providing testimony on direct examination and, more importantly, on cross-examination. His testimony was internally consistent, consistent with his declaration, and consistent with the testimony and declarations provided by Mr. █████████

Respondent testified that he was sleeping in his room with his wife and children in the early morning of June 6, 2007. He was awakened by knocking on the front door and then heard knocking on the back door. Respondent went to the back door and asked for the identity of the knocker. After he was informed it was the police, Respondent asked who they were looking for. Upon being told that the police were looking for someone named 'Chavez,' Respondent opened the door ajar a few inches. Then, an officer forcibly pushed the door open. No one asked Respondent permission to enter his home. Respondent was then asked about his immigration status through translation by the Respondent's son. Respondent was later arrested.

Again, Respondent's oral narrative is in substantial agreement with his declaration that he submitted to the Court. While there are a few particular dissimilarities between Respondent's testimony and his declaration, on the whole, his testimonial account is substantially similar, especially concerning material facts, to his declaration. Furthermore, notwithstanding Respondent's invocation of his Fifth Amendment privilege, his testimony presents a comprehensive and workable account of what transpired in his home that morning. The cogency of his testimony is further bolstered by its congruence with Mr. █████████ testimony.

Respondent also testified openly about an unidentified relative, whom he described as his distant cousin, who was living with him in the apartment. Importantly, both Respondent and Mr. █████████ credibly testified that this individual was not present on the premises during the early morning raid.

In sum, Respondent's motion was facially adequate and his *prima facie* burden sustained by specific and credible testimony, based on his own personal knowledge.[15] The Court emphasizes the importance of our credibility determination in our accompanying determination that Respondent has successfully demonstrated a *prima facie* case that his Fourth Amendment rights were egregiously violated when immigration agents entered his apartment without a warrant, probable cause, or consent.

---

15 Respondent did invoke his Fifth Amendment privilege when asked what identification documents he supplied to the immigration agents. He was clearly entitled to do so, and the Court finds that he has satisfied his evidentiary obligations notwithstanding his failure to inform the Court on this matter.

**B.**    An egregious constitutional violation must be 'sufficiently severe,' or 'gross or unreasonable,' in additional to being unlawful. Almeida-Amaral, 461 F. 3d at 235-37. Here, Respondent heard knocking on the doors of his home and asked the knockers to identify themselves. He was told, in Spanish, that it was the police. Respondent asked the officers why they were at his front door at six-thirty a.m. in the morning. The voice answered only that they sought someone named 'Chavez.' Respondent opened the door slightly ajar. Without requesting permission to enter, an officer forcefully barged into Respondent's home.

That this pre-dawn enforcement raid targeted a private residence is especially pertinent to our decision. The touchstone of the Fourth Amendment is 'reasonableness' and, by natural extension, one's reasonable expectation of privacy. Nowhere is that expectation of privacy more sacrosanct than in the confines of one's home, and nowhere is that right more jealously guarded against encroachment. We are not addressing a claim made by an alien seeking admission into the country, outside of a restaurant, driving on the street, or at a workplace site. We are addressing a claim that immigration agents forcefully entered a private home without a warrant, without probable cause, and without consent. Notably, there are scant facts that might furnish a plausible basis upon which communicated consent might reasonably have been interpreted by the agents. Respondent testified that he opened the door ajar a few inches. Agents immediately and forcibly pushed the door wide open, requiring Respondent to step back to avoid being hit by the door. Respondent did not consent to their entry and the DHS concedes that they had no warrant to enter the home.

However, our conclusion that the agents' entry violated Respondent's Fourth Amendment rights is not the end of our inquiry. As outlined *supra*, the constitutional violation (when not based on race or some other improper consideration) must be 'gross' or 'unreasonable' in addition to being without a plausible legal ground. Thus, the Court must examine the actual conduct of the immigration agents involved in the violation, including their physical entry into Respondent's home and their ensuing questioning and arrest of the Respondent.

The aggressive nature of the forced entry, which required a resident to move back out of fear of being struck by the door[16] into a private residence at dawn, strongly implicates, on a stand-alone basis, "unreasonable," unlawful conduct. However, the subsequent conduct of the immigration officers lends further support to our conclusion that Respondent has displayed the necessary aggravating circumstances. Specifically, examination of the agents' subsequent conduct, confirms that the Respondent's Fourth Amendment rights were flagrantly violated.

---

16 This fact may very well distinguish this case in Ninth Circuit Judge Bea's view, dissenting from the denial of rehearing *en banc* of Rodriguez v. Mukasey, 536 F. 3d 1012 (9th Cir. 2008) (commenting that, in Rodriguez, "[t]he agents neither broke the door down nor pushed it open so forcefully as to injure either woman in any way." See generally, Lopez-Rodriguez v. Holder, No. 06-70868, 2009 WL 792777 (9th Cir. 2009) (Bea, J., dissenting from the denial of rehearing *en banc*). Furthermore, in Rodriguez, the unlawful entrance was limited, at least initially, to a common area. That is not the case here.

The agents impermissibly entered into Respondent's home. Then, standing in the comfort of his home, Respondent was asked, in English, where the front door led and for 'immigration papers.' Respondent was unable to understand what the officers were asking and his son had to translate the officers' questions. Respondent affirmatively informed the officers that he did not want to answer. But the officers ignored his request and continued to ask him questions.

In the context of one's own home, an officer's refusal to abide by an occupant's stated desire not to answer questions posed to him, instead insisting upon him further questions, occasions a much greater risk of coercion, as an occupant's freedom is by definition restrained by the persistent questioning, insofar as he or she cannot (and surely should not be expected to) simply walk away. See 8 C.F.R. 287.8(b)(1); see also Brendlin v. California, 551 U.S. 249, 255-56 (2007) (recognizing that the general touchstone of what constitutes a seizure – whether or not a reasonable person would have believed he was not free to leave – is modified "when a person 'has no desire to leave' for reasons unrelated to the police presence." Then, "the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.'") (quoting Bostick, 501 U.S., at 435-36).

Put another way, Respondent's passive acquiescence by turning over identity documentation upon agents' persistent demands, in his own home and when he has not voiced consent to their entry, can be directly and readily tied to the 'show of government authority,' whether or not the agents have an 'unambiguous intent to restrain.' (though Respondent plainly testified that each point of entry and exit from his apartment was actively and physically blocked by agents). Id. It is also highly unlikely such evidence may be gained from an independent source when an individual who exercises his right not to speak, but eventually falters, makes statements or submits evidence not borne from his free will. Finally, the Court finds it troubling that the agents continued to ask questions in English of Respondent, after it was plain that he did not understand what they were asking and his young son either spoke directly to the agents or translated their questions for his father.

Additionally, Respondent personally observed a male officer attempting to enter his cousin's locked bedroom by 'hit[ting] the door with his hand and then kick[ing] repeatedly at the door.' Respondent later discovered that this kicking caused 'permanent damage to the lock.'[17]

To be sure, the Court cannot factor into its analysis whether Respondent produced identification, or the nature and quality of such identification. However, we conclude that Respondent satisfied his *prima facie* burden on events preceding Respondent's compliance with the agents' demand that he produce for them identity documentation. After consideration of all the facts present in the record, up to that point, we find

---

17 Respondent's declaration, filed October 20, 2008, states that the officer's kicking caused permanent damage to the lock. Resp. Decl., Pg. 8.

sufficient evidence to sustain Respondent's demanding initial burden. We note that the DHS has not submitted any evidence evincing what pieces of information the agents possessed or reasonably believed they possessed when 1) they forced open the front door of the apartment, and 2) when they continued to question Respondent after he expressly communicated that he did not wish to answer their questions. The propinquity between the two events suggests that the agents possessed the same quantum of information during both instances.

A review of the facts at bar reflect that, unlike in Lopez-Mendoza, the evidence gathered here was not in connection with 'peaceful arrests' made by immigration officers. However the term 'peaceful'[18] may be defined, it cannot be reasonably squared with the agents' conduct in this case.

To conclude, Respondent has established a *prima facie* case for the suppression of evidence directly connected to the unlawful entry of his home, such as the Form I – 213. Respondent submitted a motion to suppress that specified the requisite constitutional basis for his motion, gave a detailed and specific account of the events leading to his arrest, specified the evidence to be suppressed, and cogently supported his position with testimony.

## VI. The DHS has submitted an inadequate affidavit pertaining to the agents' entrance into Respondent's home, and categorically refused to produce the affiants or other officers possessing personal knowledge of the relevant issues.

Pervading throughout our entire analysis is the DHS's inability or unwillingness to sustain its evidentiary burden. The Court simply lacks knowledge of large chunks of the event at issue and, at this stage of the proceedings, this shortage is directly attributable to the paucity of evidence submitted by the DHS. The only evidence that they have adduced to support their burden of "justifying the manner" in which they obtained the contested evidence consists only of a bare-bones affidavit from an individual with no personal knowledge of what transpired the morning of June 6, 2007, at ▉▉▉ ▉▉▉ ▉▉▉ ▉▉▉. Consequently, the Court has been hamstrung from capturing a full understanding of the events as they transpired that morning. Neither the affiant, nor anyone else, has been made available to testify in court. Respondent has unqualifiedly been denied his opportunity to cross-examine anyone associated with his arrest and detention.

The DHS submitted an affidavit from Richard McCaffrey, a supervisory immigration officer for ICE. Much of the affidavit address the normal operating protocols Detention and Removal Operation ("DRO") officers are instructed to adhere to while acting in their official enforcement capacity. However, the affidavit says little about the training and teaching of 'ICE personnel from programs other than DRO' that 'may be tasked with assisting in fugitive operations.' It has even less to say about what training non-ICE personnel, such as local law enforcement authorities, who may participate in

---

18 Black's law dictionary defines 'peaceful' as "[a] state of public tranquility; freedom from civil disturbance or hostility." Black's Law Dictionary (8th ed. 2004).

such activities, are given. Moreover, some of the 'Team Leaders,' the individuals vested with the responsibility of knocking on a door of a private residence, identifying themselves as police, and obtaining consent from an authorized individual, are not DRO officers.

More fundamentally, Mr. McCaffrey wholly lacks personal knowledge with respect to the event of entry at ████ ████ ████ ████ He states only that he went to the first floor apartment where he saw an Officer Hamilton already inside the apartment.

Then, the only support he can lend to the DHS's contention that there was a consensual entry is that he has 'reviewed' Respondent's Form I – 213, the precise document Respondent is seeking to exclude. As to the officers actually involved in the initial entry of Respondent's apartment, "None of the officers involved in making an entry into [Respondent's] apartment can recall further detail about the encounter ... due to the passage of time." The upshot here is that the evidence proffered by the DHS is scant. Furthermore, this scant evidence is unsubstantiated hearsay and, at points, hearsay upon hearsay.

The deficiencies in the Government's threadbare submission are exacerbated by their categorical and unexplained refusal to offer or make available agents to testify in open court. No cited reason or motivation was stated; the Court might generously educe that since none of the officers can recall anything about the incident, there might be little to be gained from their testimony. However, this does not explain why Respondent was denied an opportunity to cross-examine the affiant who provided testimony *against* him. Thus, Respondent, who satisfied his initial burden, was deprived a reasonable opportunity to confront and cross-examine Mr. McCaffrey (who is also listed as the examining officer on the Form I - 213), which due process requires.[19] Granted, Mr. McCaffrey's affidavit has little to say about the contested entry into Respondent's apartment; still, the DHS's utter lack of an explanation raises the specter of whether 'reasonable efforts' were made to obtain his testimony or the testimony of anyone else.

The Court has demanded Respondent file a satisfactory declaration based on his personal knowledge, present himself before the Court and provide testimony, be subject to the Government's cross-examination, and sustain his *prima facie* burden of establishing that his constitutional rights were egregiously violated. Respondent has complied with each of these demands and met his obligations. Case law dictates that the burden now falls on the Government to produce evidence in support of its burden of "justifying the manner in which it obtained the evidence." Barcenas, 19 I & N Dec. at 611. The Government has simply failed to do so.

The Court would be afield to juxtapose our decision in relation to the Supreme Court's identification of one benefit of utilizing the exclusionary rule in immigration

---

19 The Form I -213 further states Respondent was apprehended by Ms. Michelle Vetrano-Antuna, Mr. James E. Brown, and Mr. George Lewis. It further states that the narrative contained therein was composed by Mr. Lewis.

hearings: deterrence of immigration agents' unconstitutional conduct. <u>Lopez-Mendoza</u>, 468 U.S. at 1041. This issue falls outside the Court's judicial ken. We remark, however, that this case, as it has been factually presented, does not appear to be on the margins. Here, the raid was conducted in the early morning hours while the occupants, some of them children, would likely be, and indeed were, sleeping. Agents forcibly entered, without warrant or consent, into a private home. The agents failed to ask preliminary questions that might demonstrate probable cause, or at least reasonable suspicion. Respondent unequivocally expressed to the agents that he did not wish to answer their questions or comply with their instructions. The agents continued questioning Respondent in a language in which he has little competence. The agents positioned themselves to block the doorways. Neither Respondent, nor anyone else present in the apartment, was the targeted fugitive alien sought by the agents.

The Court finds that there was an egregious violation of the Fourth Amendment that was fundamentally unfair. See Almeida Amaral, 461 F.3d at 236. It realizes that reasonable people can differ on their interpretation of the term egregious. In considering all the evidence in the record, this Court finds that the Respondent's Fourth Amendment rights were egregiously violated.

## VII.   <u>Conclusion</u>

Considering the totality of the circumstances, the Court determines that Respondent has demonstrated a *prima facie* case that the immigration agents' conduct worked an egregious violation to his Fourth Amendment rights.[20] Thus, the Court finds that the contested Form I – 213 must be suppressed.

Furthermore, based on the record before us, it appears that Respondent was placed in removal proceedings exclusively upon the information that he provided to immigration agents during the course of their interrogation.

The Form I – 213 explicitly states that determination of Respondent's status in the United States was informed by his "inability" to procure relevant documentation, and an inculpatory "self-admission".[21] In turn, the factual allegations contained in the NTA and the claimed grounds of removability hew closely to the information contained in the Form I – 213.

Furthermore, the Government has not produced additional evidence to sustain the charge of removability independent of the Form I – 213.[22]

Finally, we agree with Respondent that his removal proceedings must be terminated, because the Government has not introduced admissible independent evidence supporting the factual allegations stated in the NTA, and thus it has failed to meet its

---

20 Because of our disposition in this case, *supra*, we have no occasion to evaluate Respondent's other constitutional, regulatory, and sub-regulatory claims.

21 The third basis listed is 'LESC system checks'.

22 <u>See</u> discussion of the Government's belated filing, *supra*.

burden of establishing Respondent's removability by clear and convincing evidence. See INA § 240(c)(3)(A).

## VIII. Orders

Based on the foregoing, the following **ORDERS** shall enter:

**IT IS ORDERED** that Respondent's Motion to Suppress be **GRANTED**;

**IT IS FURTHER ORDERED** that Respondent's Motion to Terminate removal proceedings be **GRANTED**.

June 1, 2009
Date

MICHAEL W. STRAUS
Immigration Judge

- 29 -

# Exhibit 11



October 3, 2007

# Raids Were a Shambles, Nassau Complains to U.S.

By NINA BERNSTEIN

Scores of federal immigration agents from around the country, some wearing cowboy hats and brandishing shotguns and automatic weapons, endangered residents and local police officers last week as they raided homes in Nassau County in a poorly planned antigang operation, county officials charged yesterday.

Lawrence W. Mulvey, the Nassau County police commissioner, said that in two instances the immigration agents mistakenly drew their guns on Nassau County police detectives during operations that resulted in the arrests of 186 immigrants on Long Island.

Thomas R. Suozzi, the Nassau County executive, said yesterday that he was demanding an investigation into the agents' conduct by the Department of Homeland Security, which oversees Immigration and Customs Enforcement.

Mr. Mulvey said that many United States citizens and legal residents were rousted from bed and were required to produce papers during an operation so ill-conceived that all but 6 out of 96 administrative warrants issued by the immigration enforcement agency in the search for gang members had wrong or outdated addresses.

In one case, agents were seeking a 28-year-old man with a photo taken when he was 7. Of more than 90 people arrested in Nassau County, most were illegal immigrant workers with no criminal record, Mr. Mulvey said, some with young children who were frightened by the immigration agents' "inappropriate" behavior. "There were clear dangers of friendly fire," he said of the operation, in which Nassau police provided standby support.

In a sharply worded letter to Michael Chertoff, the secretary of homeland security, Mr. Suozzi asked for an investigation into what he called "serious allegations of misconduct and malfeasance committed by Immigration and Customs Enforcement personnel in executing arrest warrants in various Nassau County communities on Sept. 24 and 26, 2007."

Peter J. Smith, the special agent in charge of the raids for the agency, denied the charges.

"All those allegations that he's making, they're without merit," he said. Only one of 180 special agents assigned to the operation from the agency's Office of Investigations was wearing a cowboy hat out of personal preference, he said. "We didn't have warrants," he added. "We don't need warrants to make the arrests. These are illegal immigrants."

But in fact, Mr. Smith said, one of the 186 arrested last week turned out to be a United States citizen. "I believe it was a woman in Westbury," he said. The woman, he said, was released after an hour or two either

with taxi fare or a ride home. "That is not uncommon," he said of the citizen's mistaken arrest as a deportable immigrant.

He noted that the unit's 7,000 special agents have conducted similar operations around the country in recent years. "You're arresting individuals who are in association, they're in the area, they're in houses that are known for illegal aliens. Gang members were going to be there."

But Mr. Mulvey said that in most cases the federal agents did not seem to have good reason to believe gang members would be present. They repeatedly passed up the invitation to check a list of 96 deportable gang associates active in Nassau County against a local police database that is updated daily, he said. They also broke promises to share a list of targets, and failed to attend a preoperation briefing, he added.

"You have to have some reason to believe the target will be there when you enter a home," Mr. Mulvey, said. "When you have 96 warrants and you only find six of them, it's hard to make the argument that you had a good faith basis to enter those houses."

Mr. Mulvey said that his department had agreed to have uniformed officers present at the raids in case they resulted in local drug or weapons charges. They did not. He said he withdrew all support on Thursday, before a third night of raids, vowing not to join future operations. In contrast, Mr. Mulvey said, the department conducted a smooth and successful antigang operation with the Federal Bureau of Investigation in April. Nassau has the lowest crime rate in the nation for a county of its size, Mr. Mulvey said, in part because the police have good cooperation from the community. The conduct of the raids could undermine that relationship, he added.

"I was misled," Mr. Mulvey said. "In good conscience, I can't continue to cooperate unless these problems are ironed out." Among the problems, he wrote in a Sept. 27 letter to Joseph A. Palmese, resident agent in charge of the immigration agency's Office of Investigations in Bohemia, N.Y., was that the Nassau police could not even get a list of the 40 people arrested Monday night, leaving local officials unable to deal with a deluge of missing persons reports and inquiries from churches whose members had disappeared. Only three of the 40 were gang members, he said.

By then, he added, complaints were coming not only from immigrant advocates, but from his own officers who had seen what they said was the undisciplined conduct of the federal agents.

"These are my people that came to me," he said in an interview after the news conference held at the Nassau County Police Department in Mineola. "These are aggressive gang enforcement investigators. Day in, day out, they work the streets, arresting gang members, and it's unusual for them to come to me like that."

In Suffolk County, the police commissioner, Richard Dormer, expressed complete support for the operation.

"We will continue to support their efforts," he said in a written statement. "The gang members and violent felons have now been removed from the streets of Suffolk County, which will come as a great relief to the parents who tell us on a regular basis about their concerns that their own children will be lured into gang activity or targeted by gang members in their communities."

Just how many gang members and associates were taken into custody, and how they were categorized,

remains uncertain.

Mr. Smith said that in Suffolk County, the raids resulted in the arrests of 15 identified as gang members, and 50 as "associates of gang members." Mr. Dormer provided different figures. He said 85 were arrested and 55 were gang members or associates. And while Mr. Smith said 59 out of 186 arrested in both counties had criminal records, Mr. Dormer said 61 of those arrested in Suffolk County alone had criminal records and 14 were violent felons.

Mr. Smith said the agency did not count up the number of homes that agents searched where they found neither gang members nor illegal immigrants, only citizens and legal residents.

"These people are very transient," he said of those being hunted. "They don't stay at that location. We keep going to these different places until we find them."

*Ann Farmer contributed reporting.*

# Exhibit 12

# SERRANO OUTLINES SERIOUS CONCERNS ABOUT IMMIGRATION RAIDS IN LETTER TO CHERTOFF

Earlier this week, Congressman José E. Serrano elaborated his serious concerns about increasingly harsh and destructive immigration raids in a letter to Homeland Security Secretary Michael Chertoff. The full text of the letter follows:

***

February 11, 2008

Secretary Michael Chertoff
U.S. Department of Homeland Security
U.S. Naval Security Station
3801 Nebraska Avenue, NW
Washington, DC 20393

Dear Mr. Secretary:

I represent the 16th Congressional District, a part of New York with a long history as a gateway for new Americans. It is a place where currently one out of every three residents was born outside of the country. I write to express my deep concern regarding the escalation of home and workplace immigration raids and what I believe is their profound impact on children and families in and around my district. In nearby neighborhoods and counties, immigration raids are devastating communities and local economies, and sowing fear among neighbors; citizen and non-citizen alike. My office has received numerous reports of abusive behavior and perceived racial profiling on the part of some ICE field officers—behavior which compounds the atmosphere of crisis that has gripped immigrant communities. As you know, these raids have also been a source of concern for local law enforcement officials, because it is clear they increase the distrust of any law enforcement officers within immigrant communities, thereby rendering community policing efforts ever more difficult.

It has come to my attention that there are serious flaws in the tactics employed by ICE to detain and deport, a practice which has invariably swept numbers of law-abiding citizens and non-citizens into its net. I am concerned that ICE officers are routinely using excessive force and intimidation tactics in their raids, even when the targets have no violent criminal background. Transparent, humane policies that define officer conduct during raids need to be established and an impartial system of oversight implemented. These policies and oversight mechanisms should be developed in conjunction with independent legal experts.

I understand that ICE guidelines for screening detainees regarding dependents under their care have been codified. However, it seems that wide latitude is given to agents with regard to their conduct towards these dependents during the course of a raid. Many children and their caretakers, for instance, have reported that they have been threatened by gun-wielding immigration agents, despite having little connection to the raid's intended targets. Furthermore, the collateral damage of these raids is inflicted upon many beyond their initial targets. Children of hard-working citizens, residents, and undocumented people have often been traumatized by the interrogation tactics of agents in the field. I believe that this approach to immigration enforcement will not only complicate ICE's enforcement efforts going forward, but also drive the undocumented further underground, seriously eroding any hope of future cooperation with immigrant communities such as those in my District.

Mr. Secretary, you have the ability to improve the relationship between the federal government and communities of new Americans by reforming ICE's approach to immigration enforcement and codifying officer conduct during raids. I believe the federal government should strive to protect mixed-status families which often include American children and spouses. We can do this by spending our limited resources on steps to reduce the backlog in applications for citizenship and permanent residency instead of on raids that cause these families to live in fear.

Sincerely,

José E. Serrano
Member of Congress

###

Previous Page

| WASHINGTON OFFICE | BRONX OFFICE |
|---|---|
| 2227 Rayburn House Office Building | 788 Southern Blvd. |
| Washington, D.C. 20515-3216 | Bronx, New York 10455 |
| (202) 225-4361 | (718) 620-0084 |
| Fax: (202) 225-6001 | Fax: (718) 620-0658 |

Print Page

# Exhibit 13

# United States Senate

WASHINGTON, DC 20510–2101

May 16, 2008

Michael Chertoff
Secretary of Homeland Security
U.S. Department of Homeland Security
3801 Nebraska Avenue, NW
Washington, DC 20528

Michael O. Leavitt
Secretary of Health and Human Services
U.S. Department of Health and Human Services
200 Independence Avenue, SW
Washington, DC 20201

Dear Secretary Chertoff and Secretary Leavitt:

I'm writing as Chairman of the Senate Committee on Health, Education, Labor, and Pensions and the Judiciary Subcommittee on Immigration, Refugees and Border Security to request that you adopt an interagency agreement, issue guidelines, and take other appropriate steps to reduce the impact of enforcement actions by Immigration and Customs Enforcement (ICE) on children participating in Head Start and other federally-assisted child development programs.

It has come to my attention that in the past year, as part of its increased immigration enforcement, ICE has targeted programs serving children whose parents are suspected of being illegally in the United States. Numerous incidents have been reported in which ICE or local law enforcement agencies acting in cooperation with ICE have staked out Head Start and other child-oriented service programs to intimidate or apprehend such parents of children participating in such programs. Local law enforcement officials, in cooperation with ICE, have arranged for ICE agents to enter federally-funded early childhood programs armed and in full gear to remove children. In several communities, ICE enforcement activities have blockaded roads leading to such programs, interfering with traffic patterns and hindering access to the programs by children and their families. In other cases, ICE agents have followed school buses and employees of early care and education programs to identify families suspected of being undocumented for apprehension and arrest.

Numerous children have already been affected by these activities and potentially millions more are at risk. Nearly two-thirds of the children affected by such raids are U.S. citizens under the age of ten. It is projected that for every two immigrants who are detained, one child is left behind.

1

Forcible separation from their parents can have a profoundly negative impact on children's mental health, schooling, and well-being. In some instances, children removed from early childhood programs as a result of ICE enforcement are placed in child protective services and later subjected to the child welfare and foster care systems. Educational disruption can also have severe consequences, potentially resulting in an increased need for remediation, special education or other educational support services. Carrying out such enforcement actions also places significant burdens on social institutions that care for children, such as schools, early childhood education centers, and child welfare agencies that must meet the needs of children in the aftermath of a raid. In addition, such enforcement actions affect not only the children whose parents are apprehended but also the children's peers who witness such actions.

I fully appreciate that ICE has the authority to take individuals into custody who are in the United States illegally. However, ICE also has the responsibility to exercise this authority in ways that are effective, humane, and result in the least disruption to children and their families. I was encouraged by ICE's decision to take an important step toward handling such vulnerable cases with appropriate care and compassion, by issuing humanitarian guidelines to ensure appropriate treatment of care providers and their dependents following its raid on the New Bedford Michael Bianco plant.

In keeping with that sound decision, I urge your agencies to work together to reach an agreement and issue guidelines defining appropriate limitations on enforcement that respect the needs of children participating in early childhood education and care programs. Such action is essential to the developmental needs of these children, and is critical to the sound implementation of federally-assisted early care and education programs.

As we deal with the many immigration challenges facing us, it is essential to develop and implement policies and procedures that respect the dignity and humanity of the communities, families, and children that are most affected. I look forward to your response, and my staff and I stand ready to assist you in this effort in any way that will be helpful.

With respect and appreciation,

Sincerely,

Edward M. Kennedy

2

# Exhibit 14

Rep. Alcee L. Hastings, *Florida*
Chairman

Rep. Louise McIntosh Slaughter, *New York*
Rep. Mike McIntyre, *North Carolina*
Rep. Hilda L. Solis, *California*
Rep. G. K. Butterfield, *North Carolina*
Rep. Christopher H. Smith, *New Jersey*
Rep. Joseph R. Pitts, *Pennsylvania*
Rep. Robert B. Aderholt, *Alabama*
Rep. Mike Pence, *Indiana*

Fred L. Turner, Chief of Staff



Sen. Benjamin L. Cardin, *Maryland*
Co-Chairman

Sen. Russell D. Feingold, *Wisconsin*
Sen. Christopher J. Dodd, *Connecticut*
Sen. Hillary Rodham Clinton, *New York*
Sen. John F. Kerry, *Massachusetts*
Sen. Sam Brownback, *Kansas*
Sen. Gordon H. Smith, *Oregon*
Sen. Saxby Chambliss, *Georgia*
Sen. Richard Burr, *North Carolina*

Hon. David J. Kramer, *Department of State*
Hon. David Bohigian, *Department of Commerce*
Hon. Mary Beth Long, *Department of Defense*

June 12, 2008

The Honorable Michael Chertoff
Secretary
U.S. Department of Homeland Security
Washington, DC 20528

Dear Secretary Chertoff:

We write regarding the recent report in the Washington Post, "Some Detainees Are Drugged for Deportation" (by Amy Goldstein and Dana Priest, May 14, 2008). According to this article, the Washington Post has identified more than 250 cases since 2003 in which the government has, without medical reason and without consent, given psychiatric drugs to immigrant deportees. The forced medication of detainees may violate both domestic and international law; moreover, these reports further tarnish the already badly damaged reputation of the United States. We urge the Department of Homeland Security to cooperate fully with investigations of these allegations undertaken by Congress.

As members of the Commission on Security and Cooperation in Europe (the Helsinki Commission), we were particularly alarmed to read that in 2007, of the 53 deportees drugged without their consent, 50 of them were administered Haldol, a medication designed to treat schizophrenia and acute psychotic states. Due to its abuse by Soviet psychiatric prisons, Haldol has a particularly noxious reputation. The Helsinki Commission has long voiced its concern about medical treatment that may violate international norms, from Russia to Slovakia, and we urge your department to respond seriously and credibly to the issues raised by the Post article. This includes examination of the threat to detainees' health; possible violation of medical ethics by persons employed by DHS; and the policy-making process which resulted in practices that may have been both dangerous and illegal.

Sincerely,

Alcee L. Hastings, M.C.
Chairman

Benjamin L. Cardin, U.S.S.
Co-Chairman

Hilda L. Solis, M.C.
Commissioner

G.K. Butterfield, M.C.
Commissioner

Hon. Michael Chertoff
Page 2
June 12, 2008


John F. Kerry, U.S.S.
Commissioner

Christopher J. Dodd, U.S.S.
Commissioner

# Exhibit 15

The New York Times

August 12, 2009

# Napolitano Focuses on Immigration Enforcement

**By JAMES C. McKINLEY Jr.**

EL PASO — A day after President Obama announced that legislation to overhaul immigration laws would have to wait until next year, the secretary of homeland security played down the need for change in a speech here and took a tough stance on enforcing current immigration laws.

The secretary, Janet Napolitano, defended the administration's assertive strategy against illegal immigrants and companies that employ them, relying largely on programs started under President George W. Bush.

That strategy has drawn fire from immigrant groups and many of Mr. Obama's Hispanic supporters, who say the president has not lived up to campaign promises to ease the pressure on illegal workers and to seek changes in immigration laws that would give more workers visas.

But Ms. Napolitano argued that the Obama administration had changed Mr. Bush's programs in critical ways, such as putting an emphasis on deporting criminals and holding more employers responsible for hiring illegal workers.

"Make no mistake, our overall approach is very, very different," she said Tuesday at a conference on border security at the University of Texas, El Paso. "It is more strategic, more cooperative, more multilateral and, in the long run, more effective."

Ms. Napolitano said security problems on the border were inextricably linked not only to the drug trade, but also to the problem of illegal workers in far-flung cities across the country. The government needs to address illegal immigration at the same time it attacks the Mexican mafias, she said.

Her remarks disappointed advocates for immigrants, who questioned whether increasing enforcement would improve security as much as overhauling immigration laws would.

"How many more millions if not billions of dollars are we going to put into the border without fixing the immigration system?" asked Ali Noorani, executive director of the National Immigration Forum.Joshua Hoyt, executive director of the Illinois Coalition for Immigrant and Refugee Rights, said of Ms. Napolitano, "She's increasing enforcement of laws that President Obama and she have both said are broken, and the result is going to be a lot of human misery."

Ms. Napolitano and other administration officials have argued that a tough stance on illegal immigration is necessary to convince American voters to accept a wider overhaul that would give legal status to millions of foreigners.

Still, the speech was notable for its lack of a single passage about the positive role many illegal immigrants play in society, a concession that has become standard in most political pronouncements from Democrats on the subject.

Ms. Napolitano pointed to the buildup of federal agents on the border as part of the fight against drug dealers, saying the nation must take advantage of a historic level of cooperation with Mexico under President Felipe Calderón to stamp out organized crime.

This year, she said, the government has seized more than $69 million in drug money, 2.4 million pounds of drugs, 95,000 rounds of ammunition and about 500 assault rifles, far more than last year.

"But border security will not itself stop illegal entrants into our country," Ms. Napolitano said. "Our border strategy must be combined with better enforcement of the immigration laws within the United States."

On that score, she pointed out that the Obama administration had outdone the Bush White House. Immigration agents have arrested 181,000 illegal immigrants and deported 215,000 people so far this year. Both figures are double what they were for the same period two years ago, she said.

But Ms. Napolitano said she had shifted the emphasis away from arresting immigrants who have not broken other laws.

# Exhibit 16

# DEPARTMENT OF HOMELAND SECURITY

# Office of Inspector General

An Assessment of United States
Immigration and Customs Enforcement's
Fugitive Operations Teams



**OIG-07-34**                    **March 2007**

*Office of Inspector General*

**U.S. Department of Homeland Security**
Washington, DC 20528



# Homeland
# Security

March 5, 2007

Preface

The Department of Homeland Security (DHS) Office of Inspector General (OIG) was established by the *Homeland Security Act of 2002* (Public Law 107-296) by amendment to the *Inspector General Act of 1978*. This is one of a series of audit, inspection, and special reports prepared as part of our oversight responsibility to promote economy, effectiveness, and efficiency within the department.

This report addresses the effectiveness of United States Immigration and Customs Enforcement's Fugitive Operations Teams. It is based on interviews with employees and officials of relevant agencies and institutions, direct observations, statistical analyses, and a review of applicable documents.

The recommendations herein have been developed to the best knowledge available to our office, and have been discussed in draft with those responsible for implementation. It is our hope that this report will result in more effective, efficient, and economical operations. We express our appreciation to all of those who contributed to the preparation of this report.

*Richard L. Skinner*

Richard L. Skinner
Inspector General

# Table of Contents

**Executive Summary** ...........................................................................................................1

**Background** .....................................................................................................................2

**Results of Review** .........................................................................................................7

Fugitive Apprehension Reports Should Accurately Reflect the Teams' Activities ...............7
Fugitive Alien Backlog Is Increasing Despite the Teams' Efforts .......................................12
Removal Rate of Teams' Fugitive Alien Apprehensions Cannot be Determined................17
Team Members Performed Non-Fugitive Operations Duties...............................................19
Progress Has Been Made in Staffing the Teams.................................................................21
Partnerships with Federal, State, and Local Agencies are Effective ...................................24
Team Members Have Basic Law Enforcement Training ......................................................29

**Management Comments and OIG Analysis** .............................................................32

## Tables

Table 1:   Funds Allocated to Fugitive Operations ......................................................................6
Table 2:   Fugitive Apprehensions Reported by Field Offices with Authorized Teams................9
Table 3:   Estimated Fugitive Alien Backlog............................................................................12
Table 4:   Fugitive Alien Apprehensions Reported by All Field Offices.....................................13

## Figures

Figure 1:   United States Immigration and Customs Enforcement Organization Chart.................2
Figure 2:   Fugitive Operations Team…………………………………………………………..6

## Appendices

Appendix A:   Removal Proceedings Process..........................................................................39
Appendix B:   Fugitive Operations Support Units....................................................................41
Appendix C:   Purpose, Scope, and Methodology ...................................................................43
Appendix D:   Recommendations ..........................................................................................45
Appendix E:   Management Response to Draft Report .............................................................46
Appendix F:   Major Contributors to this Report .....................................................................62
Appendix G:   Report Distribution..........................................................................................63

**Abbreviations**

| | |
|---|---|
| CBP | United States Customs and Border Protection |
| DHS | Department of Homeland Security |
| ICE | United States Immigration and Customs Enforcement |
| INS | Immigration and Naturalization Service |
| OIG | Office of Inspector General |
| PL | Public Law |
| USC | United States Code |

# OIG

## Executive Summary

To bring integrity to the immigration process, in February 2002, the legacy Immigration and Naturalization Service established the National Fugitive Operations Program under the auspices of the Office of Detention and Removal Operations. When the Department of Homeland Security was formed in March 2003, the office became a part of United States Immigration and Customs Enforcement.

The purpose of the National Fugitive Operations Program is to identify, locate, apprehend, and remove fugitive aliens from the United States. Fugitive aliens are individuals who have unexecuted final orders of removal from the Executive Office for Immigration Review. The orders require the aliens to be removed from this country. The ultimate goal of the program is to eliminate the backlog of fugitive aliens. As of August 2006, the Office of Detention and Removal Operations estimated there were 623,292 fugitive aliens in the United States. Since 2003, the office allocated more than $204 million to deploy 52 Fugitive Operations Teams. As of October 2006, 50 teams are operational and apprehending fugitive aliens in various cities nationwide. Following are the results of our review:

- Fugitive alien apprehensions reported by the Office of Detention and Removal Operations did not accurately reflect the teams' activities;
- The fugitive alien backlog increased despite the teams' efforts;
- The teams' effectiveness was hampered by insufficient detention capacity, limitations of an immigration database, and inadequate working space;
- The removal rate of fugitive aliens apprehended by the teams could not be determined;
- The teams performed duties unrelated to fugitive operations, contrary to Office of Detention and Removal Operations policy;
- Despite hiring obstacles, progress has been made in staffing the teams;
- The teams have effective partnerships with federal, state, and local agencies; and
- The teams have basic law enforcement training.

We are making seven recommendations to the Assistant Secretary for United States Immigration and Customs Enforcement to address our concerns. The Office of Detention and Removal Operations concurs with all seven recommendations and has taken steps to address them.

# Background

United States Immigration and Customs Enforcement (ICE) is the largest investigative branch within the Department of Homeland Security (DHS). ICE's mission is to protect America and uphold public safety by targeting the people, money, and materials that support terrorist and criminal activities. Sections 236 and 287 of the Immigration and Nationality Act provide authority to ICE officers to arrest, detain, and remove certain aliens from the United States.[1] ICE has more than 15,000 employees working in offices nationally and around the world, and its fiscal year (FY) 2006 budget was $3.1 billion. ICE is comprised of four divisions:

**Figure 1:   ICE Organization Chart**



The Office of Detention and Removal Operations is responsible for promoting public safety and national security by making certain, through the enforcement of national immigration laws, that all removable aliens depart the United States. This task is accomplished through the apprehension, detention, and removal of illegal aliens. This office manages illegal aliens in its custody, known as the "detained docket," and tracks illegal aliens who are not in custody, known as the "non-detained docket." As of June 2006, there were 4,170 full-time staff members working in 23 field offices throughout the country. For FY 2006, the Office of Detention and Removal Operations' budget was $1.0 billion.

<u>Fugitive Aliens</u>

Fugitive aliens are non-United States citizens not currently in the custody or control of ICE who have failed to depart the United States pursuant to a final order of removal, deportation or exclusion, or have failed to report to a DRO officer after receiving notice to do so.[2] The most common reasons a fugitive alien's whereabouts are unknown include:

---

[1] 8 USC §§ 1226 and 1357.
[2] In this report, the terms "fugitive alien" and "absconder" are used interchangeably.

- The alien did not appear for deportation as ordered by the Executive Office for Immigration Review immigration judge's final order of removal;

- The fugitive left the United States by his or her own choice without the knowledge of the Office of Detention and Removal Operations; or

- The Office of Detention and Removal Operations is unaware that the fugitive changed his or her immigration status or has died.

As of March 2006, there were an estimated 11.5 to 12 million illegal aliens living in the United States.[3] As of August 2006, the Office of Detention and Removal Operations estimated there was a backlog of 623,292 fugitive aliens. Therefore, fugitive aliens constitute about 5.4 percent of the estimated illegal alien population.

<u>Early Efforts to Apprehend Fugitives</u>

The Office of Detention and Removal Operations deportation officers have always apprehended fugitive aliens on an ad hoc basis, but teams were not exclusively devoted to this task. In an attempt to establish teams dedicated to this mission, in June 1995, the Commissioner of the legacy Immigration and Naturalization Service (INS) and the Attorney General signed *The National Detention, Transportation and Removal Plan*, an effort to stop the increase of fugitive aliens in this country. The plan called for the creation of "abscondee removal teams," and the 1996 Appropriation Bill provided funding for these new positions. According to one Office of Detention and Removal Operations document, although the positions were earmarked for the teams, the appropriation bill did not mandate that the positions be used for the teams. Consequently, the positions were absorbed into day-to-day INS detention and deportation operations.

In August 1998, INS instituted another effort to apprehend fugitive aliens. The INS Executive Associate Commissioner for Field Operations signed the *Fugitive Apprehension Operations, Detention & Deportation Operations Unit Planning Initiative*. This initiative called for the creation of Fugitive Operations Teams and specific training necessary to apprehend fugitives. According to an Office of Detention and Removal Operations document, the training was initially provided, but no teams were ever established.

---

[3] Pew Hispanic Center, *The Size and Characteristics of the Unauthorized Migrant Population in the U.S.*, March 7, 2006, page i.

### Absconder Apprehension Initiative

The terrorist attacks of September 2001 brought new attention to the fugitive alien backlog. The Deputy Attorney General's Absconder Apprehension Initiative made fugitive apprehension a priority for legacy INS, the Federal Bureau of Investigation, and the United States Marshals Service.[4] At that time, INS determined there were approximately 314,000 fugitive aliens in the United States. The objective of the initiative was to "locate, apprehend, interview, and deport" those fugitive aliens. In support of the USA PATRIOT Act, ICE authorized 40 positions to be used exclusively for dedicated teams to apprehend fugitives.[5] Subsequently, the Office of Detention and Removal Operations' headquarters deployed eight five-person teams in seven cities.

An additional objective of the Absconder Apprehension Initiative was the use of the National Crime Information Center to enhance federal authorities' ability to locate fugitives. This center is a nationwide law enforcement consortium and computerized index of criminal justice information. The Absconder Apprehension Initiative called for the information on 300,000 fugitive aliens to be placed into the National Crime Information Center database. Through its Law Enforcement Support Center, part of ICE's Office of Investigations, ICE administers and controls information on immigration violators in the database. The Law Enforcement Support Center provides immigration identity and status information to federal, state, and local law enforcement agencies on criminal aliens.

### National Fugitive Operations Program

To enforce unexecuted final orders of removal and bring integrity to the immigration process, in February 2002, legacy INS established the National Fugitive Operations Program under the auspices of the Office of Detention and Removal Operations. When DHS was created in March 2003, ICE absorbed the National Fugitive Operations Program. According to an ICE fact sheet:

> The primary mission of [the National Fugitive Operations Program] is to identify, locate, apprehend, process, and remove fugitive aliens from the United States with the highest priority placed on those fugitives who have been convicted of crimes. Further, [the National Fugitive Operations Program's] goal is to eliminate the backlog of fugitives and ensure that the

---

[4] Department of Justice Memorandum, "Guidance for Absconder Apprehension Initiative," January 25, 2002.
[5] Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, PL-107-56.

number of aliens deported equals the number of final orders of removal issued by the immigration courts in any given year.

In its Strategic Plan, *Endgame*, dated June 2003, the Office of Detention and Removal Operations indicated that the National Fugitive Operations Program's goal was to eliminate the backlog of fugitive aliens by the end of 2012 and acknowledged that the initial allocation of 40 positions to fugitive operations would not be enough to reach that goal.

> The [National Fugitive Operations Program] will target this backlog by facilitating the apprehension and subsequent removal of those fugitives. The goal over the next ten years [2003 – 2012] will be to eliminate this backlog and to ensure that our efforts in terms of apprehension and removal of fugitive cases equal the number of new cases falling into this category. While woefully inadequate to achieve the goal, the creation of 40 positions dedicated to the [National Fugitive Operations Program] is a promising start.

However, in its Detention and Deportation Officer's Field Manual, dated August 2003, the Office of Detention and Removal Operations stated a more aggressive goal for the program: "The intended goal of this manual is the elimination of backlog fugitive … cases by the conclusion of fiscal year 2009."

Whether by 2009 or 2012, apprehending and removing fugitive aliens and ensuring that final orders of removal are executed are clearly priorities for the Office of Detention and Removal Operations.

Funding for Fugitive Operations

Since FY 2003, Congress has provided the Office of Detention and Removal Operations funding to support fugitive operations. According to our analysis of ICE financial reports, since FY 2003, this office has allocated more than $204 million for the apprehension, detention, and removal of fugitive aliens.

### Table 1: Funds Allocated to Fugitive Operations

| Fiscal Year | Total Funds Allocated |
|---|---|
| FY 2003 | $9,333,519 |
| FY 2004 | $12,683,962 |
| FY 2005 | $72,186,192 |
| FY 2006 | $110,638,837 |
| Total | $204,842,510 |

Source: ICE Federal Financial Management System reports

Fugitive Operations Team Structure

Under the National Fugitive Operations Program, each team consists of seven members, as depicted in the figure below. The four deportation officers, who report to the supervisory deportation officer, are responsible for identifying, locating, and apprehending fugitive aliens.[6] The immigration enforcement agent assists in apprehending fugitives and transporting them from the place of arrest to an Office of Detention and Removal Operations detention facility or processing center. The deportation assistant is a clerical employee who performs administrative tasks.

### Figure 2: Fugitive Operations Team



Typically, a team has seven members. However, there are instances in which this does not apply. For example, when one city has two teams, only one supervisory deportation officer is assigned to supervise both teams. Additionally, one field office assigned two immigration enforcement agents, instead of one, to a team.

---

[6] Supervisory deportation officers and supervisory detention and deportation officers have the same responsibilities and both are GS-13 supervisory officers. In this report, we use both titles to refer to Fugitive Operations Teams' supervisors.

Originally, only experienced GS-12 or "journeyman level" deportation officers were hired for the teams. However, the Office of Detention and Removal Operations recently decided to hire Fugitive Operations Teams' deportation officers at the GS-11 level as well. A United States Customs and Border Protection (CBP) human resources manager speculated that hiring at the GS-11 level was due to the depletion of the available GS-12 level applicant pool.

# Results of Review

## Fugitive Apprehension Reports Should Accurately Reflect the Teams' Activities

To measure the Fugitive Operations Teams' performance, the Office of Detention and Removal Operations used weekly field office apprehension reports provided to headquarters. However, these reports did not accurately reflect the teams' productivity. The Office of Detention and Removal Operations' statistical reports for the teams included apprehensions they made, as well as deportation officers within field offices who are not team members, and other federal, state, and local law enforcement agencies. The reports also included case closures, in which the Fugitive Operations Team verified that a fugitive alien died, voluntarily left the country, or changed their immigration status by, for example, becoming a United States citizen or legal permanent resident. The reported apprehensions involved varying levels of Fugitive Operations Teams' effort, from taking custody of and processing aliens already arrested by other law enforcement agencies to receiving leads, searching databases, talking to informants, and making apprehensions.

While it is not a requirement that the Fugitive Operations Teams and non-Fugitive Operations Teams apprehensions be recorded separately, the current reporting system does not provide a means by which managers can assess teams' performance. There is also no requirement that the level of the teams' involvement be a determining factor when receiving credit for apprehensions made by other sources, such as National Crime Information Center matches and arrests by other law enforcement agencies.

The fugitive apprehensions, as reported by the Office of Detention and Removal Operations, do not represent the productivity of the Fugitive Operations Teams but those of all field offices. In order to assess the true performance of the teams, it is essential that their activities be documented separately from other activities in the field offices. For this reason, the apprehension numbers used in this section of our report are presented as field office apprehensions rather than those of the teams.

Fugitive Operations Teams' Goals and Reported Apprehensions in Fiscal Years 2003 – 2006

Varying apprehension priorities have been established since the formation of Fugitive Operations Teams in FY 2003. Statistical information compiled by the Office of Detention and Removal Operations shows all apprehensions made in each field office from FY 2003 to FY 2006, making it virtually impossible to determine the actual number of apprehensions made by the teams. Consequently, the productivity of Fugitive Operations Teams is uncertain as well as whether the teams met their annual apprehension goals.

In FY 2003, eight teams were created and distributed to field offices within the Office of Detention and Removal Operations, then a part of legacy INS. A headquarters manager said statistics for the first teams were compiled as of March 2003. He said there was no funding specifically for Fugitive Operations Teams in FY 2002, but fugitive apprehensions had been a duty for deportation officers before the inception of the National Fugitive Operations Program.

The goal of each team in FY 2003 was to apprehend 125 fugitive aliens, with priority given to backlog fugitive alien cases and aliens released on orders of supervision, a form of relief from detention that is similar to a parole. The Office of Detention and Removal Operations sets conditions of release on orders of supervision. Five of the seven field offices apprehended more than 125 fugitive aliens. Two field offices did not attain the goal.

In June 2004, the fugitive apprehension goal was changed and required that at least 75% of each team's apprehensions be criminal aliens.[7] This requirement remained in effect until January 2006. Field office reports indicated that the fugitive apprehension goal was not met during this period of time.

In late January 2006, the fugitive apprehension goal was changed again. This goal required the apprehension of 1,000 fugitive aliens per team each year. The apprehensions were prioritized as follows: (1) fugitives posing a threat to the nation; (2) fugitives posing a threat to the community; (3) fugitives with a violent criminal history; (4) criminal fugitives; and (5) non-criminal fugitives.[8] We were unable to determine whether this goal was achieved since it changed four months into the fiscal year.

---

[7] Office of Detention and Removal Operations Memorandum, "Case Load Priority with Fugitive Operations," January 22, 2004. A "criminal fugitive" is a fugitive alien who has a criminal conviction identified in their Deportable Alien Control System record.
[8] Office of Detention and Removal Operations Memorandum, "Fugitive Operations Case Priority and Annual Goals," January 31, 2006.

The office's then-acting director cited two reasons why the goal changed to 1,000 apprehensions. First, the creation of the Fugitive Operations Support Center would give teams more time to focus on apprehensions by vetting leads and performing database checks on fugitive aliens.[9] Purportedly, this would reduce the burden on Fugitive Operations Teams in performing these tasks. Secondly, because teams would no longer be required to apprehend 75% criminal aliens, the teams would be able to apprehend more fugitives aliens overall. He said the previous 75% goal predisposed the teams to focus on capturing criminal fugitives aliens, which was more time-consuming and neglected the arrests of non-criminal fugitives aliens. A second manager said apprehending criminal fugitives required more time due to tasks such as following up on leads and surveillance activities.

The table below shows the fiscal years in which Fugitive Operations Teams were authorized and the apprehensions reported by the field offices assigned those teams. These figures include all apprehensions made within field offices, whether by team members or not. The Office of Detention and Removal Operations official responsible for compiling statistical reports said this reporting method did not allow him to distinguish fugitive aliens apprehended by teams from those apprehended by others. Therefore, the table is not an accurate portrayal of the Fugitive Operations Teams' productivity, but it is our best effort to reconcile the figures given the manner in which the office reported fugitive apprehensions. Furthermore, because it reported apprehensions made by team and non-team members, the statistics presented below overestimate the teams' productivity.

**Table 2: Fugitive Apprehensions Reported by Field Offices with Authorized Teams**

| Fiscal Year[10] | Authorized Teams | Fugitive (Criminals) | Fugitive (Non-Criminals) | Total Fugitive Apprehensions |
|---|---|---|---|---|
| 2003 | 8 | 474 | 749 | 1,223 |
| 2004 | 18 | 4,378 | 3,956 | 8,334 |
| 2005 | 44 | 4,651 | 4,304 | 8,955 |
| 2006 | 52 | 4,158 | 7,706 | 11,864 |
| Total | 52 | 13,661 | 16,712 | 30,376 |

Source: Office of Detention and Removal Operations fugitive apprehensions reports

---

[9] The Fugitive Operations Support Center is described in greater detail in Appendix B.

[10] The statistics for FY 2003 only reflect apprehensions reported during the second half of FY 2003, March 2003 through September 2003, and the statistics for FY 2006 only reflect apprehensions reported during the first three quarters of FY 2006, October 2005 through June 2006.

<u>Additional Statistics Included in Fugitive Apprehension Reports</u>

The Office of Detention and Removal Operations reported fugitive alien apprehensions from its field offices and satellite offices that do not have dedicated Fugitive Operations Teams. The apprehensions made by deportation officers in those offices are combined with apprehensions made by teams and other officers assigned to field offices where teams are deployed. For example, a supervisor explained that a satellite office under his field office's supervision has two officers assigned to the non-detained docket who also participated in fugitive operations. Fugitive arrests made by those deportation officers are included in the field office weekly apprehension report even though these officers are not assigned to the team.

In addition, reported fugitive apprehension statistics included arrests of fugitive aliens by other law enforcement agencies using information extracted from the National Crime Information Center. For example, a local police officer might encounter a suspected illegal alien and check the person's identity with the Law Enforcement Support Center. When the person is identified as a fugitive alien in National Crime Information Center, the officer contacts the Office of Detention and Removal Operations. A manager explained that if local or state authorities intend to prosecute the fugitive alien on local charges, the affected authority will take custody of the individual, and the Fugitive Operations Team members place a detainer on the fugitive alien. When no charges are filed, team members arrange to pick up the fugitive alien for processing.

A detainer is an agreement that state or local prison or jail officials will notify the Office of Detention and Removal Operations that illegal aliens are about to be released. Officers from the Office of Detention and Removal Operations' can then take the aliens into custody. Detainers placed on fugitive aliens were reported as apprehensions, even though the alien was not in the office's custody. However, as another officer noted and an Office of Detention and Removal Operations headquarters manager confirmed, headquarters told Fugitive Operations Teams to cease counting detainers as apprehensions. One officer said that state and local authorities sometimes fail to honor detainers and release the fugitive without notifying the office.

Case closures are another means by which field offices are given credit for apprehensions. A case closure represents a fugitive alien who is determined by the Office of Detention and Removal Operations to have (1) changed immigration status, for example, the fugitive became a naturalized United States citizen or a legal permanent resident; (2) died; or (3) left the country voluntarily. Once a deportation officer verifies that the fugitive alien meets one of the above conditions, the case may be closed. A majority of managers

and supervisors said they advised the teams to include case closures as apprehensions based on the amount of time deportation officers spend following leads and identifying aliens as fugitives.

Accurate Reporting Needed to Assess Progress of Fugitive Operations Teams

The Fugitive Case Management System, a database that became operational in June 2006, has replaced apprehension reports. This replacement provides the Office of Detention and Removal Operations with a computerized system to manage fugitive alien leads and track fugitive arrests or case closures. The database allows apprehension information to be entered by field office personnel and sent directly to headquarters for preparation of statistical apprehension reports. Since the database became operational after the conclusion of our fieldwork, we were unable to assess its effectiveness or accuracy.

Due to the various ways the office characterizes and reports apprehensions, it was difficult to determine with certainty whether the agency met the target goals from FY 2003 to FY 2005. Also, we were unable to predict whether the FY 2006 target goal of 1,000 apprehensions per team might be achieved since the goal changed four months into the fiscal year. Each Fugitive Operations Team must now arrest 1,000 fugitives a year, yet it cannot be determined whether the teams have ever met any performance threshold based on the past reporting of apprehensions per field office.

Performance measures should be valid representations of the progress toward achieving program goals and objectives. Without accurate tracking of program performance, the office's managers cannot make sound judgments about the program. Also, program managers cannot effectively estimate the benefit of additional Fugitive Operations Teams. Since the reporting process was a cumulative accounting of all apprehensions made within the field office, it was not representative of apprehensions made by the teams. Consequently, the Office of Detention and Removal Operations' fugitive operations apprehension reports did not properly reflect team performance.

**Recommendation**

We recommend that the Assistant Secretary for United States Immigration and Customs Enforcement:

**Recommendation 1:** Establish a Fugitive Operations Team reporting system that enables Office of Detention and Removal Operations managers to classify all categories of apprehensions.

## Fugitive Alien Backlog Is Increasing Despite the Teams' Efforts

The Office of Detention and Removal Operations' officers and managers cited several factors that limited the effectiveness of Fugitive Operations Teams in decreasing the fugitive alien backlog. These factors include the inaccuracy and functionality of the Office of Detention and Removal Operations' immigration database, unavailability of adequate bed space to detain fugitive alien apprehensions, and inadequate working space for additional staff hired to serve on the teams.

The office established the National Fugitive Operations Program to aid in identifying, locating, apprehending, processing, and removing fugitive aliens by deploying teams nationwide. According to the Detention and Deportation Officer's Field Manual, the Fugitive Operations Team's "immediate mission is the elimination of fugitive cases in their assigned office." However, despite the efforts of the teams, the backlog of fugitive alien cases has increased each fiscal year since the program was established in February 2002. The fugitive alien population is growing at a rate that exceeds the teams' ability to apprehend. The factors mentioned earlier contributed to the inability of Fugitive Operations Team apprehensions to keep pace with the increase in the backlog of fugitive aliens, not to mention reduce it.

**Table 3: Estimated Fugitive Alien Backlog**

| Date | Total Number of Fugitives | Change From Previous Year | Percent Change |
|------|---------------------------|---------------------------|----------------|
| September 2001 | 331,734 | | |
| September 2002 | 376,003 | 44,269 | 13.3 % |
| September 2003 | 418,753 | 42,750 | 11.4 % |
| September 2004 | 465,353 | 46,600 | 11.1 % |
| September 2005 | 536,644 | 71,291 | 15.3 % |
| August 2006 | 623,292 | 86,648 | 16.1 % |

Sources: DHS OIG, *An Assessment of the Proposal to Merge Customs and Border Protection with Immigration and Customs Enforcement*, OIG-06-04, November 2005, page 90 and the Office of Detention and Removal Operations.

The backlog of fugitive alien cases has increased, on average, 51,228 each year over the four-year period ending September 2005. Also, the increase for the period from October 2005 to August 2006 was 86,648 fugitive alien cases. As of August 2006, the Office of Detention and Removal Operations estimated there were 623,292 fugitive aliens.

**Table 4: Fugitive Alien Apprehensions Reported by All Field Offices**

| Time Period | Fugitive (Criminal) | Fugitive (Non-Crim.) | Total Fugitive Apprehensions |
|---|---|---|---|
| March 2003 – September 2003 | 1,302 | 2,088 | 3,390 |
| October 2003 – February 2004 | 1,631 | 2,176 | 3,807 |
| March 2004 – September 2004 | 3,917 | 3,261 | 7,178 |
| October 2004 – February 2005 | 2,152 | 2,833 | 4,985 |
| March 2005 – September 2005 | 2,550 | 3,669 | 6,219 |
| October 2005 – February 2006 | 2,104 | 2,557 | 4,661 |
| March 2006 – June 2006 | 2,054 | 5,149 | 7,203 |
| **Total** | **15,710** | **21,733** | **37,443** |

Source: Office of Detention and Removal Operations fugitive apprehension reports.

According to our analysis presented in Table 2, the field offices with authorized Fugitive Operations Teams reported apprehending 30,376 fugitives since FY 2003. In our review of all apprehensions reported from March 2003 through June 2006 by all field offices, the Office of Detention and Removal Operations apprehended 37,443 fugitives. With a backlog of 623,292 fugitives that is growing at a rate of more than 50,000 fugitives per year, the National Fugitive Operations Program's progress in addressing the backlog has been limited. It is highly improbable that it will be eliminated in the near future.

Inadequate detention bed space, the overall capabilities of the Deportable Alien Control System and insufficient or nonexistent workspace are factors that limit the effectiveness of the Fugitive Operations Teams. Other factors that limit the teams' effectiveness are members performing non-fugitive operations duties and insufficient staffing, both discussed in more detail later in this report.

Bed Space Constraints

Some of the Office of Detention and Removal Operations' officers noted that the lack of adequate detention space limits the effectiveness of the Fugitive Operations Teams. A field office director reported ceasing fugitive operations for six weeks because of insufficient bed space and another manager reported slowing team operations for the same reason. Other managers indicated that as more officers are hired to serve on the teams, managing the increased fugitive apprehensions with their current bed space capacity would become more difficult.

Aliens in the Office of Detention and Removal Operations' custody are held in three types of detention facilities. These include Service Processing Centers, which are government-owned and operated, Contract Detention Facilities, which are contractor-owned, and local or county jails. A headquarters official estimated that about half of the office's detained population is in local or county jails. Additionally, the office has bed space allocated by the Federal Bureau of Prisons, which can only be used for aliens who have been convicted of crimes.

A supervisory deportation officer from a field office, which was authorized 400 beds per day, said his office's three teams stopped apprehending fugitive aliens for approximately six weeks because no facilities were available to house the aliens. Additionally, the Office of Detention and Removal Operations' field offices often share bed space with other field offices. According to a field office director in a neighboring city, which was authorized 707 bed spaces per day, he had to slow down fugitive operations because all the office's beds in the region were full. The director told us he did not think the team would achieve its goal because of a lack of adequate bed space. By June 2006, the three teams in the nearby city had apprehended approximately 800 fugitives. The field office director foresaw apprehending 1,500 to 2,000 fugitives by the end of the year, depending on bed space availability.

Another supervisor indicated that a lack of adequate detention space is the team's biggest limitation. The field office director said that even if a team could apprehend 1,000 fugitives, they would have no place to put them. For FY 2006, this field office was funded for 246 bed spaces to hold not only Fugitive Operations Team's fugitive alien apprehensions, but also aliens apprehended by the other office's officers, the ICE Office of Investigations, and CBP Inspections at airports. The field office director stated that he is attempting to convince the office's headquarters managers to increase funding for this field office to 270 or 280 bed spaces. He reported that his detained population for that day was about 280.

Deportable Alien Control System Limitations

The Office of Detention and Removal Operations manages cases in the Deportable Alien Control System, a database that is the office's system of records. Legacy INS implemented this database, which provides ICE with data concerning the detention and deportation of aliens in accordance with immigration and nationality laws. The database also serves as a docket and control system by providing the Office of Detention and Removal Operations management with information concerning the status or disposition of deportable aliens.

The database contains four types of information: (1) "biographical records," including name, alias(es), nationality, date of birth, etc.; (2) "detention records," including whether the alien is in the Office of Detention and Removal Operations' custody and where; (3) "case records," which include deportation or removal case information; and (4) "jail records," which include information on aliens serving sentences. According to an analyst, there were approximately 4 million records in the database and 1.3 million open cases, of which almost half were fugitive aliens.

Fugitive Operations Team officers said that the database limits the capability of the teams. Specifically, they said the information in the Deportable Alien Control System was inaccurate or incomplete. One supervisor stated that the database has "been neglected for the past 25 years." An analyst, who has worked the Deportable Alien Control System help desk for ten years, estimated that approximately 50% of the data in the database is accurate, and there is more incomplete than inaccurate information. Having a large number of aliens to manage and few staff members to handle them made maintaining information difficult. For example, New York City had 200,000 aliens on its non-detained docket and at one point only 10 deportation officers to manage both detained and non-detained cases in the Deportable Alien Control System. Because of the ratio of cases to deportation officers, timely updating of the database was nearly impossible.

Recognizing the problems associated with the database's data integrity, the Office of Detention and Removal Operations issued a directive mandating that all personnel "completely enter all data fields in [Deportable Alien Control System]" and ensure the information is accurate and accessible to both the field and headquarters.[11] In addition, some field offices were directed to update the fugitive data in their area of responsibility to reflect actual cases of fugitives that are removable and to update past due call-up dates, which is a case call-up function in the database that allows officers to review cases periodically.

Some officers and managers mentioned a proposed replacement for the Deportable Alien Control System, called the ENFORCE Removals Module, which is an automated law enforcement information system. According to the Office of Detention and Removal Operations, the purpose of the program is to deploy a service-wide, information-based system that uses automation to reduce the amount of time agents spend on manual administrative work. However, as of August 2006, the replacement has not been implemented.

---

[11] Office of Detention and Removal Operations Memorandum, "Reiteration of Data Entry Policy for the Deportable Alien Control System," January 12, 2006.

## Insufficient or Nonexistent Work Space

Many members said they are working in cramped and overly crowded work areas. It is not clear whether the availability of adequate working space was taken into account as new positions were generated for the deployment of the teams. Additionally, as of July 2006, a Rock Island team that was authorized in FY 2004 has not been established because there is no available facility from which team members can work. An officer explained that the team was designated, but the building to house them has not been completed. A supervisor noted that officers were selected for the Rock Island team, but they have since taken other jobs because the team was never formed.

In FY 2005, the Office of Detention and Removal Operations established a team that would be housed at a later date in a satellite office 60 miles from the team's field office. This team began operations in October 2005 and was staffed with four deportation officers and one supervisory deportation officer. Because no office space was available in the satellite office at the time, the team operated out of the field office from October 2005 to March 2006. The team performed their duties in the field office, such as database checks and other tasks associated with locating fugitives, while apprehending fugitives in the area of the satellite office. During this time, the officers were on "per diem" as the location of their office was not their official duty station, although they were apprehending fugitives in the area of the official duty location.

In March 2006, the team was given limited office space in their satellite office. Two deportation officers and one immigration enforcement agent assigned to the team work in a small room that was previously a detention cell and was later converted to an interview room. One officer measured the room and said that it was 12 feet by 15 feet, or 180 square feet. Another deportation officer sits at a table that holds the team's fax machine. The supervisory deportation officer has an office that was previously an interview room, and the deportation assistant sits at the desk of the satellite office receptionist.

Other teams have working conditions that are less than ideal. Because the Office of Detention and Removal Operations' building in one Midwest city was already overcrowded when the Fugitive Operations Team was established in FY 2003, team members worked in office space loaned to them from CBP in a terminal at the local airport. In another example, five members of a Northeast team work in a "chopped up office" that was originally designed for two people.

Without sufficient office space, accurate and up-to-date databases, and detention space commensurate with apprehensions made by Fugitive

Operations Teams, the teams' effectiveness is limited, making it difficult to work at maximum capacity.

**Recommendation**

We recommend that the Assistant Secretary for United States Immigration and Customs Enforcement:

**Recommendation 2:** Conduct an assessment of the working space presently available to all Fugitive Operations Team members and develop a detailed plan to ensure that current and future officers are provided an adequate working environment that meets applicable federal standards.

## Removal Rate of Teams' Fugitive Alien Apprehensions Cannot Be Determined

We were unable to determine the removal rate of fugitive aliens apprehended by Fugitive Operations Teams. If fugitives captured by teams are not removed, the ultimate objective of final orders of removal has not been achieved, and the efforts of the teams are undermined. As the Office of Detention and Removal Operations noted in its Strategic Plan, *Endgame*:

> Moving toward a 100% rate of removal for all removable aliens is critical to allow the ICE to provide the level of immigration enforcement necessary to keep America secure. Without this final step in the process, apprehensions made by other DHS programs cannot truly contribute to national security.

Also, according to an ICE fact sheet, the "[National Fugitive Operations Program's] goal is to eliminate the backlog of fugitive aliens and ensure that the number of aliens deported equals the number of final orders of removal issued by the immigration courts in any given year."

We could not determine the percentage of team-apprehended fugitive aliens removed from the United States by the Office of Detention and Removal Operations. In its National Fugitive Operations Program weekly statistical report, the office recorded, in separate columns, the total number of apprehended fugitive and non-fugitive aliens. According to the Detention and Deportation Officer's Field Manual, these non-fugitive alien apprehensions, also referred to as "collateral apprehensions" or "incidental arrests," are the "apprehensions of persons other than fugitive aliens," which have not been issued final orders of removal. Fugitive Operations Team members are charged with taking these individuals into custody and placing them into

removal proceedings. However, the numbers of apprehended fugitives and non-fugitive aliens were combined to account for the total number of apprehensions.

The report also contained a column showing the total number of aliens removed from the country. However, the report does not specify whether the removed aliens were fugitive or non-fugitive aliens or whether a Fugitive Operations Team or non-Fugitive Operations Team member made the apprehensions. Accordingly, we were unable to determine the percentage of fugitive alien apprehensions removed.

As of June 2006, according to reports from the Office of Detention and Removal Operations, 49,473 illegal aliens were apprehended, of which 37,443 were fugitives. Also according to data extracted from the Deportable Alien Control System as of July 2006, the office reported removing 32,206 of those illegal aliens, or 65% of the total apprehended. Since the office does not distinguish between fugitives and non-fugitives in its removal figures, we could not determine the percentage of fugitive aliens removed from the country. More specifically, it is unknown how many of the fugitive aliens apprehended by the teams were removed. When fugitive aliens have not been removed, they are likely released into the United States on their own recognizance or an order of supervision.

The United States Supreme Court has determined that aliens could not be held indefinitely if there was no likelihood they would be removed from the country in the foreseeable future.[12] In these situations, aliens who cannot be removed are released from custody. The release of fugitive aliens undercuts the productivity of Fugitive Operations Teams and counteracts the deterrence posed by effective apprehension.

**Recommendation**

We recommend that the Assistant Secretary for United States Immigration and Customs Enforcement:

**Recommendation 3:** Provide the resources needed by the Office of Detention and Removal Operations to detain, process, and remove all fugitive aliens apprehended by the Fugitive Operations Teams.

---

[12] Zadvydas v Davis, 533 U.S. 678 (2001); Clark v Martinez, 543 U.S. 371 (2005). (The Office of Detention and Removal Operations may detain an alien for a presumptively reasonable six-month period. If after six months it is determined that the alien's removal is not significantly likely in the reasonable foreseeable future, then the alien must be released, unless the alien meets stringent criteria for continued detention.)

## Team Members Performed Non-Fugitive Operations Duties

Although Fugitive Operations Teams are prohibited from performing duties not associated with fugitive operations, almost all team members reported performing collateral duties while assigned as team members. Collateral duties include firearms instructor, juvenile coordinator, and jail inspector.

According to an Office of Detention and Removal Operations document, "non-fugitive operations duties" include, but are not limited to, docket management, bond management, Institutional Removal Program operations, travel document issues, domestic and foreign alien escorts, and jail inspection. "Fugitive operations duties" are identified as case preparation, field investigation, surveillance, apprehension operations, criminal prosecutions, court time, and task force participation.

Team members also reported that, while serving as a member of the team, they were involved in escorting aliens returning to their country of origin or from local jails to an Office of Detention and Removal Operations facility, taking bonds, escorting special interest aliens to court appearances, and managing the detained and non-detained dockets.

While team members are performing non-fugitive operations duties, they are unable to identify, locate, or apprehend fugitives. However, many officers we interviewed indicated that in January 2006, management began to enforce its policy restricting team members from performing non-fugitive operations duties. The exception to this policy was assigning them to serve as firearms instructors for mandatory quarterly firearms qualifications. Certified firearms instructors oversee the qualifications and assist remedial officers who have difficulty meeting the qualification standards.

The Office of Detention and Removal Operations' policy prohibits team members from performing non-fugitive operations duties. According to the Detention and Deportation Officer's Field Manual, Fugitive Operations Team members:

- Shall only be assigned to fugitive cases with an emphasis on backlog cases.

- Shall not be assigned to any duties that will deter them from conducting fugitive operations, including but not limited to, case management of the general detained or non-detained dockets, escorts and collateral duties normally accomplished by general assignment deportation officers.

Also, according to an ICE fact sheet, "The designated [Fugitive Operations Teams], strategically deployed around the country, work *solely* on those cases identified as fugitives and attempt to locate and apprehend those persons who will ultimately be removed from the United States." (Emphasis added.)

Additionally, a previous Office of Detention and Removal Operation's director sent a memorandum to all field office directors in December 2003 reiterating that team members are only to conduct fugitive operations duties.[13] The memorandum cited examples of prohibited tasks, such as escorts, taking bonds, court details, and consular liaison.

For example, one team member was a juvenile coordinator for the field office and, as such, had to attend to the special needs of juveniles in the Office of Detention and Removal Operations' custody. Although he could not estimate the time he devoted to juvenile coordinator duties, he recalled escorting at least seven juveniles since being assigned to the team in October 2005. The director for this field office indicated there had not been a juvenile coordinator training course offered in some time. Therefore, he could not assign this duty to another officer in the field office. Without available training, non-Fugitive Operations Team members cannot be certified to perform juvenile coordinator duties to supplant the officers assigned to the teams.

Another team member reported that the team provided transportation for special interest aliens suspected of terrorist activity. This involves picking up illegal aliens in local jails and transporting them to the Office of Detention and Removal Operations' detention facilities or to criminal court appearances. This officer indicated that the team normally spent approximately two days per week transporting aliens. The director for this office said he assigned Fugitive Operations Teams to jail transport activities because of their training and proficiency in handling rifles and assault-type weapons.

Several team members were also certified firearms instructors. Most reported overseeing the quarterly firearms qualifications for all officers in their field office. One officer reported spending about five weeks during the year performing this collateral duty. Another supervisory officer estimated that a firearms instructor spends two hours per day for four or five days each quarter on firearms instruction. That estimate equates to 40 hours per year. Even after management began enforcing its policy restricting Fugitive Operations Teams from performing non-fugitive operations duties, officers continued to perform firearms instructor duties.

---

[13] Office of Detention and Removal Operations Memorandum, "Utilization of Fugitive Operations Team Members," December 3, 2003.

Also, many Fugitive Operations Team officers explained that they were required to continue performing the duties for which they were assigned before joining the teams. These assignments primarily involved managing non-detained docket cases until another officer was hired to backfill the vacancy created when the deportation officer was reassigned to the team.

### Recommendations

We recommend that the Assistant Secretary for the United States Immigration and Customs Enforcement:

**Recommendation 4:** Assign Fugitive Operations Team members in a manner consistent with its Detention and Deportation Officer's Manual or amend the manual to reflect current assignment practices.

**Recommendation 5:** Train and certify deportation officers who are not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

## Progress Has Been Made in Staffing the Teams

Despite operating under hiring restrictions that hindered staffing for more than two years, ICE has made progress in establishing additional teams. In October 2006, the Office of Detention and Removal Operations announced there were 50 Fugitive Operations Teams nationwide.[14] This is a significant achievement considering the 16 teams apprehending fugitive aliens in June 2005.[15] According to the office's acting director at the time, the Office of Detention and Removal Operations planned to have all 52 authorized teams in place by the end of FY 2006.

Although progress has been made to establish Fugitive Operations Teams, all teams are not fully staffed. Only 225, or 76%, of the 297 positions authorized for 44 teams through FY 2005 have been filled.

In May 2006, the Office of Detention and Removal Operations provided a staffing list that outlined 352 authorized field positions for 52 Fugitive Operations Teams. Our analysis of filled positions does not include an additional 55 personnel authorized for eight teams in FY 2006. We were

---

[14] ICE news release, "ICE Adds Seven New Fugitive Operations Teams to its Nationwide Arsenal: 496 Fugitives Arrested by San Antonio Team," August 10, 2006.
[15] ICE news release, "187 Arrested in Major ICE Criminal Alien Fugitive Operation: ICE and New England Law Enforcement Partners Arrest Criminals with Convictions for Violent Crimes," June 16, 2005.

provided an updated staffing list in August 2006, which did not provide sufficient information to be analyzed and, therefore, was not included.

Obstacles to Hiring Team Members on a Timely Basis

The most significant obstacle to resolving the staffing shortfall was the ICE hiring restrictions imposed from March 2004 to July 2006. During this period, ICE was subject to three phases of hiring restrictions: (1) an initial hiring freeze through September 2004; (2) a period of severely restrictive hiring of crucial positions pending approval from a waiver board that was established to review all requests and justifications for hiring lasting through May 2005; and (3) 14 months of minor hiring restrictions, during which waivers were only required before a date could be set for a selected individual to enter on duty and actions involving permanent change of stations requiring moving funds. The waiver board and all hiring restrictions were finally dissolved in July 2006.

A large volume of applicants seeking positions within the Office of Detention and Removal Operations also affected hiring. When hiring restrictions were lifted, many general vacancies, including Fugitive Operations Team positions, had to be filled. A human resources manager stated there was a minimum of 120 vacant positions announced at that time that resulted in the office receiving thousands of applications. The manager also said the applicant pool for Fugitive Operations Team positions had been very large, with the office receiving nearly 500 applications from deportation officers, immigration enforcement agents, CBP inspectors, and Border Patrol agents for one vacancy. Processing substantial numbers of applications contributed to hiring delays for team positions.

The Office of Detention and Removal Operations' dependence on a human resources service center managed by CBP in Laguna Niguel, California, which itself is understaffed, is another factor that affects filling positions. The service center is responsible for non-entry level hiring of the Office of Detention and Removal Operations' employees and provides support to the office for staffing, personnel actions, payroll, promotions, and benefits.

In FY 2005, the service center announced 379 vacancies, reviewed 26,764 applications, issued 1,196 selection lists, and processed 455 selections.[16] The service center's staffing unit is authorized 15 staff members. As of July 2006, it had nine staffing specialists and four human resources assistants. Five of the specialists service the Office of Detention and Removal Operations' programs full time. In addition, the office recently agreed to provide the staffing unit with four contractors, who will assist them in performing human

---

[16] The Laguna Niguel Service Center provided statistics in a report dated October 18, 2005.

resource assistant work. The shortage of manpower to process large volumes of applications was a contributing factor to delays in hiring team members.

Another factor inhibiting the timely staffing of Fugitive Operations Teams was DHS' Secure Border Initiative, which was announced in November 2005. As a result of the initiative, new detention facilities were to be opened in various locations, which also required supervisory deportation officers, deportation officers, supervisory immigration enforcement agents, immigration enforcement agents, and support staff. A CBP human resources manager noted the initiative created a "volume and urgency" to hire for that program alone, adding to the already heavy workload of the staffing unit.

The security clearance process has also been an impediment to hiring. Under legacy INS, verifying whether applicants had security clearances involved only checking current employees' social security numbers. After this cursory check, the individual would be cleared since no background investigation was needed. However, under DHS, the security clearance verification process changed. When the individual was an ICE employee, the process described above was followed. When, however, the applicant came from CBP or another entity, a background investigation had to be conducted even when the applicant already had a valid security clearance. The security clearance required submission of the necessary paperwork, conduct of the background investigation, and adjudication of the results of the investigation before the security clearance could be granted.

In January 2006, the requirements changed again, allowing for quicker security checks for both ICE and CBP employees. Now, they only have to fill out forms when a five or ten-year reinvestigation is necessary. This policy change expedited the hiring process.

## Progress in Hiring Made But Teams Not Fully Staffed

Despite the obstacles to hiring, progress has been made as demonstrated by the increase of teams from 16 to 45 since June 2005.[17] As of May 2006, 76% of the positions authorized for 44 teams through FY 2005 were filled, while only four were fully staffed. At the time of our fieldwork, twenty teams had five or six members on board, and the remaining teams had four or less members. The Rock Island team remained vacant.

Eight Fugitive Operations Teams were authorized for FY 2006, five of which were deployed to locations that did not have teams in prior years. Of the 35 authorized personnel for these five teams, only five members, or 14%, were

---

[17] ICE news release, "ICE Adds Seven New Fugitive Operations Teams to its Nationwide Arsenal: 496 Fugitives Arrested by San Antonio Team," August 10, 2006.

on board. We did not include the three remaining teams authorized for FY 2006 because they were deployed to locations that previously had Fugitive Operations Teams.

Headquarters and other locations that support Fugitive Operations Teams are also not fully staffed. In addition to the field staff, the National Fugitive Operations Program has additional positions to support the teams that are assigned to the Office of Detention and Removal Operations' headquarters, the Federal Law Enforcement Training Center in Glynco, Georgia, and the Fugitive Operations Support Center in Burlington, Vermont. In February 2006, only 20 of the 40 authorized support staff, or 50%, were on-board. The staffing list provided on May 26, 2006 did not include figures for Fugitive Operations Teams' support staff. Therefore, our analysis does not include the authorized staff for the Fugitive Case Management Unit because these numbers were not provided in the February 2006 staffing list. In addition, these figures do not include authorized positions that have not been assigned.

The hiring restrictions imposed from March 2004 to July 2006 and the delays associated with the CBP service center inhibited the timely hiring of the teams. Lifting the waiver requirements, conducting faster security checks, and employing additional personnel to the human resources unit will expedite the hiring process. Many teams have been established nationwide, but numerous vacancies remain. As a consequence, the teams' effectiveness is reduced.

## Partnerships with Federal, State, and Local Agencies are Effective

The teams are successfully liaising and coordinating with other entities to locate and apprehend fugitive aliens through partnerships in obtaining information on fugitive aliens and enlisting other entities' participation in Fugitive Operations Team-led apprehensions.

### Networking Important to Obtain Fugitive Leads

With 623,292 fugitive aliens to locate and apprehend, all teams obtain information on fugitives and generate leads as to their locations by enlisting the aid of federal, state, and local partners, including the following:
- Department of Labor
- Social Security Administration
- United States Marshals Service
- Federal Bureau of Prisons
- State departments of corrections, parole, and probation
- Local law enforcement and jails

•

The Detention and Deportation Officer's Field Manual directs the Fugitive Operations Teams to establish relationships with external agencies to share information on fugitive aliens that may lead to successful apprehensions.[18] The teams' reliance on these agencies for intelligence gathering provides added resources that might not have been available otherwise.

Although such contacts are useful to maintain the networking capacity between the agencies, access to the agencies' databases can be more effective than coordinating information requests. Having the ability to search a number of databases allows access to a larger pool of information.

### Information Sharing and Data Reconciliation Important in Providing Valid Fugitive Leads

The Fugitive Operations Teams have successfully partnered with individual federal, state, and local departments and agencies on an ad hoc basis to acquire information about fugitive aliens. At the national level, data collection can be expanded through the use of information sharing agreements with various federal agencies. The Office of Detention and Removal Operations has negotiated three agreements to access data from the databases of other federal agencies and obtain information on the identification and location of potential fugitive aliens.

In pursuit of information sharing practices encouraged in the USA PATRIOT Act and the Immigration and Nationality Act, which directs any government agency to provide information as to the identity and location of aliens in the United States "to the Service upon request made by the Attorney General to the head of any such department or agency,"[19] ICE signed three memoranda of understanding with the Departments of State, Labor, and Housing and Urban Development.[20] Under those agreements, ICE provides data on fugitive aliens from the Deportable Alien Control System to those agencies. The agencies then reconcile the data provided with information in their respective databases and any matches found are shared with ICE. A fourth agreement with the United States Marshals Service gives the Marshals direct access to the Deportable Alien Control System to obtain selected aliens' status, history, and other information. This agreement does not give ICE access to the Marshals' databases.

---

[18] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 4, "Case Assignment, Preparation and Management," and Chapter 19, Section 19, "ICE Most Wanted Poster."

[19] PL 82-414, Section 290(b). Codified at 8 USC, Section 1360(b).

[20] Memorandum of Understanding between ICE's Office of Detention and Removal Operations and the Department of State, Bureau of Consular Affairs, November 2003; the Department of Labor OIG, April 2004; and the Department of Housing and Urban Development OIG, November 2004. Interconnection Security Agreement between ICE's Office of Detention and Removal Operations and the United States Marshals Service, August 5, 2004.

According to a headquarters manager, the Office of Detention and Removal Operations has been in the process of negotiating two additional memoranda for the past year with the Social Security Administration and the Chicago Police Department. However, those agreements had not been finalized as of July 2006.

After the data are exchanged between the Office of Detention and Removal Operations and its federal partners, the data must be reconciled. A headquarters manager explained that although the data exchange might have identified matches between the databases, further data resolution must occur before leads are sent to the field. This ensures that the fugitive's identity and background information are valid.

The exchange and reconciliation of data at the headquarters level would provide access to larger amounts of data that the individual teams might not have access to at the local level. The reconciliation of fugitive alien data and the preparation of viable leads for the teams originating at headquarters would permit the teams to focus on apprehensions and spend less time performing searches in various databases. Although information-sharing agreements exist, they have not been fully utilized because the exchange of data and its reconciliation have not been occurring on a regular basis.

Currently, deportation officers search for fugitives in various federal, state, and local databases. A formal information-sharing agreement or approved access to external databases would expand the scope of searches compared to the officers' individual queries.

### Fugitive Operations Conducted with Federal, State, and Local Law Enforcement Agencies

Coordination exists between the Fugitive Operations Teams and federal, state, and local law enforcement agencies in conducting multi-jurisdictional fugitive operations. Specifically, the teams contact law enforcement officers to inform them of their anticipated activities in the area prior to conducting an operation. This coordination allows teams to tailor their operations to avoid conflicts with any ongoing investigations concerning the targeted fugitive or the jurisdiction in which the operation would take place.

In addition, many teams have solicited the assistance of local law enforcement officers to participate in fugitive alien apprehensions. In such instances, the local police typically only provide support through their uniformed presence and do not participate in apprehensions or the interview process.

According to a local law enforcement officer who participated in Fugitive Operations Team-led operations, most people are afraid of the officers in plainclothes and a uniformed police officer often eases their concerns. Therefore, Fugitive Operations Teams frequently seek uniformed officers' presence during apprehensions when possible. In one fugitive apprehension we observed, the team called the local police department and requested uniformed assistance. Upon the two uniformed police officers' arrival, the team provided them with information on the targets, such as their identity, photographs, and criminal history. At the fugitive's residence, we observed the team and police officers secure the exterior and interior of the house.

Although the police officers were present, the Fugitive Operations Team was responsible for watching the target and others in the residence to ensure they did not present a threat. Team members conducted the interview and obtained the fugitive's passport, which identified the fugitive's country of origin. Once the apprehension was made, the team took custody of the fugitive and the police officers departed the scene.

The process is largely the same in major operations planned by the Fugitive Operations Teams. Since June 2005, the teams have conducted major operations throughout the nation, including:

- Operation Return to Sender, a nationwide initiative,
- Operation City Lights in Las Vegas,
- Operation Phoenix in Florida,
- Operation Deep Freeze in Chicago, and
- Operation FLASH in New England.

These major operations were coordinated efforts to identify, locate, and apprehend a large number of fugitive aliens in a short period of time. Combinations of Fugitive Operations Teams from various areas, investigators from ICE's Office of Investigations, the United States Marshals Service, various state departments of corrections and motor vehicles, and other federal, state, and local departments and law enforcement agencies participated. For example, according to a county sheriff whose deputies participated in Operation FLASH, the Fugitive Operations Team contacted his office and requested deputies to assist in an operation. He explained that the participating deputies received direction from the Office of Detention and Removal Operations' field commander.

In addition, the teams participate in operations and task forces led by other agencies, such as ICE's Office of Investigations' Operation Predator and the United States Marshals Service's Operation Falcon. The Fugitive Operations Teams strengthen and reinforce their networks with other agencies by offering their resources and manpower to these initiatives.

To enhance their effectiveness further, one field office has sought the aid of three local law enforcement agencies by formalizing cooperative agreements to establish a joint fugitive task force. The agreements specify that additional law enforcement officers will be provided at the expense of the partnering agencies to assist the team in locating, apprehending, and locally transporting fugitive aliens. According to one non-Fugitive Operations Team task force member, his responsibilities are the same as the Fugitive Operations Team members but the teams are more knowledgeable of the administrative aspects of immigration procedures.

These agreements were negotiated under legacy INS. The Office of Detention and Removal Operations' field office is currently drafting cooperative agreements with the same agencies outlining identical roles and responsibilities under ICE authority. As of August 2006, the agreements had not been finalized.

Although the degree of coordination with federal, state, and local law enforcement agencies differs among Fugitive Operations Teams, the teams are networking effectively with the wider law enforcement community. This coordination of activities has proven beneficial in increasing the teams' effectiveness.

### Certain Cities Prohibit Local Law Enforcement Authorities from Assisting with Immigration Enforcement

A few Fugitive Operations Team members explained that some cities have policies prohibiting local law enforcement agencies from assisting teams to locate fugitive aliens. Specifically, a few major cities have policies that prohibit local law enforcement officers from questioning immigrants, contacting federal authorities, or providing the identity and location of illegal immigrants in the communities.

The Denver Police Department, for example, has a policy stating that officers should not initiate any action to determine a person's immigration status. Furthermore, officers will generally "not detain, arrest, or take enforcement action" against an individual on suspicion of being illegal.[21] One Office of Detention and Removal Operations officer said San Francisco is considered a "sanctuary city" and local police departments are prohibited from assisting team members. Specifically, a San Francisco ordinance limits the

---

[21] This policy is not applicable when the individual is arrested for other charges. Denver Police Department, Denver Police Department Operations Manual, "Arrests," 104.52(3), Revised July 2005.

circumstances under which city and county officers assist in enforcing federal immigration law or gathering or disseminating information on residents' immigration status.[22]

According to the Office of Detention and Removal Operations officer, the San Francisco Fugitive Operations Teams coordinate with only a few non-federal agencies in the region. Although the teams reach out to other agencies, there are cities with policies that limit the teams from effectively partnering with local law enforcement agencies.

The Fugitive Operations Teams need the resources and manpower that local law enforcement agencies possess. Partnerships with local officers, who are more connected to the communities they serve, are a major tool team members can use to locate and apprehend fugitive aliens.

### Recommendations

We recommend that the Assistant Secretary for the United States Immigration and Customs Enforcement:

**Recommendation 6:** Negotiate information sharing agreements with federal, state, or local agencies that can provide access to information pertaining to fugitive aliens and provide the resources needed by the Office of Detention and Removal Operations to reconcile data from those agencies.

## Team Members Have Basic Law Enforcement Training

The Fugitive Operations Training Program offered at the Federal Law Enforcement Training Center provides team members basic tools to locate and apprehend fugitive aliens and introduces participants to standard procedures involving fugitive operations. Since many teams have been recently staffed, not all team members have attended the training program, which they are required to attend within two years of their assignment to the team.[23] According to the Detention and Deportation Officer's Field Manual, though, before a field office director can authorize an officer's participation in fugitive operations, the officer must have completed some basic law enforcement training.[24] Although not all team members have attended the Fugitive

---

[22] City of San Francisco, San Francisco Administrative Code, Ordinance Code Chapter 12H, 1989.

[23] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 16, "Fugitive Operations Training Requirements," December 10, 2004.

[24] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 1, "Introduction to Fugitive Operations Policy and Procedure Manual and Historical Perspective," August 21, 2003, page 5.

Operations Training Program, at a minimum, they all have completed some basic law enforcement training.

## Fugitive Operations Training Program

The three-week Fugitive Operations Training Program offers basic training in fugitive operations to all officers performing fugitive operations. This includes fugitive case file preparation and review, database queries useful for locating fugitives, networking options, use of confidential informants, surveillance, and planning and conducting apprehension operations.[25]

There have been 21 courses and 469 Office of Detention and Removal Operations personnel have attended the course from FY 2004 to FY 2006. The Federal Law Enforcement Training Center provided the training program's student rosters as of May 1, 2006. The FY 2003 rosters were not included. Other Office of Detention and Removal Operations officers not serving on the Fugitive Operations Teams attended the training program as well.

Many team supervisors noted that most of their deportation officers have completed the requisite training to conduct fugitive operations but not all team members have attended the Fugitive Operations Training Program. The supervisors said those members would be scheduled to attend. Some team members completed the training more than once and others attended the course before joining the team.

In addition, while teams are encouraged to seek refresher training at the local level, there is no national refresher course for the Fugitive Operations Teams. Although the Fugitive Operations Training Program course may be updated to reflect changes in immigration law or procedures, the new or updated information would be presented only to those attending subsequent course sessions.

## Experience in Law Enforcement and Fugitive Operations

With the exception of the deportation assistants, all team members must have successfully completed the Immigration Officer Basic Training Course or the United States Border Patrol Academy prior to being assigned to a Fugitive Operations Team.[26] Vacancy announcements for officer positions indicate applicants must have completed either of these entry-level courses or other equivalent ICE training programs. These training courses offer instruction on

---

[25] DHS, ICE, *Fugitive Operations Training Course: Participant Workbook*, July 8, 2003.
[26] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 1, "Introduction to Fugitive Operations Policy and Procedure Manual and Historical Perspective," August 21, 2003, page 5.

laws pertaining to immigration and nationality, criminal statutes and statutory authorities, agency operations and procedures, defensive tactics, use of firearms, and drivers training.[27]

Fugitive operations require team members to review and update the Deportable Alien Control System and documentation in alien files to determine whether an alien is illegal, subject to removal, and whether actions, such as a petition to change their immigration status or an appeal with the immigration courts, are pending.[28] The Fugitive Operations Teams are to verify whether a fugitive has filed a petition for a change in immigration status or has an appeal pending before the Executive Office for Immigration Review's Board of Immigration Appeals or the federal courts because this will affect the ability to remove the fugitive.

Such determinations call for a comprehensive understanding of immigration laws and regulations, as well as knowledge of the immigration court process involving the Executive Office for Immigration Review. Once this determination is made, the fugitive must be located and apprehended without endangering the officers. Training assists in equipping team members to successfully perform their jobs. Therefore, it is crucial that all Fugitive Operations Team members complete their training requirements. Further, team members should receive periodic refresher instruction whenever there are legislative changes or information technology upgrades.

**Recommendation**

We recommend that the Assistant Secretary for the United States Immigration and Customs Enforcement:

**Recommendation 7:** Assess the training requirements and needs of the Fugitive Operations Teams and consider establishing a fugitive operations refresher course.

---

[27] DHS, *Federal Law Enforcement Training Center Catalog of Training Programs, 2005-2006*, March 2005, page 96 and CBP Border Patrol Academy courses at
http://www.cbp.gov/xp/cgov/careers/customs_careers/border_careers/bp_academy/bp_acad_courses.xml.
[28] Office of Detention and Removal Operations, Detention and Deportation Officer's Field Manual, Chapter 19, Section 4, "Case Assignment, Preparation and Management," page 3.

## Management Comments and OIG Analysis

ICE provided specific responses on each of the seven recommendations and technical comments on particular statements and facts contained within the draft report. ICE requested that the technical comments be published with the final report if not adopted in their entirety. In addressing ICE's technical comments, we evaluated each comment on its merit and modified our report where appropriate. ICE requested language changes throughout the report, such as "apprehensions" to "arrests" and "apprehension reports" to "enforcement activity reports." We did not make the technical changes because use of those terms occurred after the completion of our fieldwork. However, the technical comments were included in their entirety in Appendix E of this report. We revised Recommendation 4 and ICE provided an amended response to that recommendation, which is also included in Appendix E. ICE concurred with all seven recommendations. One recommendation is closed and six remain open.

**Recommendation 1:** Establish a Fugitive Operations Team reporting system that enables Office of Detention and Removal Operations managers to classify all categories of apprehensions.

**ICE Response:** ICE concurred with this recommendation. ICE developed the Fugitive Case Management System in April 2005 but the system was not certified and accredited for use by the ICE Office of the Chief Information Officer until March 3, 2006. From June 27-28, 2006, ICE supervisors met in St. Louis, Missouri, for Fugitive Case Management System training. The system was made available to all field offices on August 28, 2006 to report fugitive operations activities, generate various management reports, and measure team performance.

As officers enter activities into the Fugitive Case Management System, they differentiate between various actions by choosing the appropriate classification for each case from a "drop-down" menu. Additionally, the system is capable of identifying the officer who performed the action, thereby differentiating between Fugitive Operations Team and non-Fugitive Operations Team personnel. Using data entered into the Fugitive Case Management System, the Office of Deportation and Removal Operations can now track field activity by actual arrests, case closures, category changes, and placement of detainers. This function was not previously available.

**OIG Analysis:** We consider the recommendation resolved and closed. ICE's actions meet the requirements of this recommendation. We reviewed reports from the Fugitive Case Management System and were satisfied that the system appropriately classified each category of apprehensions.

In addition to ICE's response to this recommendation, the Office of Deportation and Removal Operations submitted technical comments under separate cover, requesting that all comments be included in the draft report. The comments pertaining to this recommendation were a reiteration of the formation and capability of the Fugitive Case Management System, which was described in detail in ICE's response and incorporated into our report. To avoid repetition, we did not include these comments because comparable language had been used in ICE's response to the draft report.

**Recommendation 1 – Resolved – Closed**

**Recommendation 2:** Conduct an assessment of the working space presently available to all Fugitive Operations Team members and develop a detailed plan to ensure that current and future officers are provided an adequate working environment that meets applicable federal standards.

**ICE Response:** ICE concurred with this recommendation and is taking steps toward its implementation. In its response, ICE said that a Space Allocation Survey is incorporated into the systematic process for identifying the needs of additional workspace and then assessing the available resources to accommodate such requests. In addition to the Space Allocation Survey, in October 2006, ICE asked affected field offices to identify their facility needs for the deployment of new Fugitive Operations Teams for FY 2007.

ICE said that space acquisition must be coordinated with the General Services Administration and CBP. In the second quarter of FY 2007, the Office of Detention and Removal Operations will propose and develop a coordinated space acquisition plan with all entities involved in the process.

**OIG Analysis:** ICE is taking steps to implement this recommendation, therefore it is resolved. However, the recommendation will remain open until ICE provides us with copies of the space acquisition plan and the Space Allocation Survey. We will determine at that time whether they have complied with the recommendation.

**Recommendation 2 – Resolved – Open**

**Recommendation 3:** Provide the resources needed by the Office of Detention and Removal Operations to detain, process, and remove all fugitive aliens apprehended by the Fugitive Operations Teams.

**ICE Response:** ICE concurred in part with this recommendation. In its response, ICE reported that not all the issues contained in the recommendation

were within the purview of the Office of Detention and Removal Operations. ICE described steps it had taken to improve its ability to detain, process, and remove aliens and reported that Congress had earmarked additional funds to address detention bed space. ICE said the Office of Detention and Removal Operations had satisfied the recommendation within the areas directly under its control.

With the creation of the Detention Operations Coordination Center, ICE now coordinates the movement and placement of detained aliens in order to effectively allocate detention space. Various Office of Detention and Removal Operations units are engaged in activities to develop a comprehensive infrastructure that would improve coordinated removal efforts and management of detention space. According to ICE, this coordination will occur through expeditious information sharing between the Detention Operations Coordination Center, the Justice Prisoner and Alien Transportation System, and the Office of Detention and Removal Operations' Air Transportation Unit.

In addition, the Office of Detention and Removal Operations is identifying air hubs throughout the United States, with supporting detention space and ground transportation contracts, to maximize efficiencies. Justice Prisoner and Alien Transportation System flights would serve these hubs through regularly established air schedules.

ICE reported that through capacity planning and bed space management, the average number of detained aliens has increased from 20,683 on October 1, 2005, to 27,390 on September 30, 2006. ICE added that, since November 2005, 6,300 bed spaces have been added in support of the Secure Border Initiative.

ICE reported that many factors outside the Office of Detention and Removal Operations' control impede its ability to execute removal operations. For example, foreign embassies and consulates could refuse or delay the issuance of travel documents for their nationals. ICE also said that the Executive Office for Immigration Review and the federal courts could directly impact the removal process through grants of relief, motions to reopen, issuances of stays, and other legal decisions. Additionally, the United States Supreme Court has ordered that after 180 days, an alien in ICE custody who possesses a final order of removal and is not subject to mandatory custody must be released if it appears that removal is not reasonably foreseeable.

**OIG Analysis:** ICE's response described steps taken to implement this recommendation, including efforts to improve efficiencies in the detention and removal system and increase its detention capacity. ICE described factors outside its control that impeded its ability to execute removal operations and

explained that it must comply with the decisions of the United States Supreme Court. ICE's response addresses difficulties associated with all aliens subject to removal. However, ICE has not quantified the extent to which these factors have impeded the removal of fugitive aliens apprehended by Fugitive Operations Teams.

Moreover, while ICE is correct that the Executive Office for Immigration Review and federal courts can directly affect the removal process through grants of relief, motions to reopen, issuances of stays, and other legal decisions, once these decisions are made the alien is no longer a fugitive alien. Assuming this change in status is appropriately made in the Deportable Alien Control System, this would result in a fugitive alien case closure in the Fugitive Case Management System. As such, the alien would not constitute a fugitive alien apprehended by a Fugitive Operations Team member that the Office of Detention and Removal Operations did not remove.

This recommendation is resolved since ICE is taking steps to implement it within the areas directly under its control. In order to understand the extent of the effect of factors outside ICE's control, we request that ICE provide the number of fugitive aliens apprehended by the teams who were released from custody during FYs 2003-2006 due to (1) consulates or embassies delaying the issuance of, or refusing to issue, travel documents; and (2) decisions made by the Executive Office for Immigration Review or the federal courts, such as grants of relief, motions to reopen, or issuances of stays. Additionally, we request that ICE identify the total number of fugitive aliens apprehended by Fugitive Operations Teams during FYs 2003-2006, and, of that number, the total number removed by the Office of Detention and Removal Operations. We will evaluate this information to determine whether ICE has complied with this recommendation within the areas directly under its control.

**Recommendation 3 – Resolved – Open**

**Recommendation 4:** Assign Fugitive Operations Team members in a manner consistent with its Detention and Deportation Officer's Manual or amend the manual to reflect current assignment practices.

**ICE Response:** ICE concurred with this recommendation. ICE reported that although Fugitive Operations Teams are primarily called upon to perform administrative arrests of fugitive aliens, they are also required to assist in the overall implementation of ICE compliance measures.

In its response, ICE said that the Office of Detention and Removal Operations policy that restricts team members from performing non-fugitive operations duties was not intended to exclude all other collateral assignments. Also, the

policy was not intended to prohibit the ability of field office directors to redirect resources to accommodate an evolving national agenda or to meet existing circumstances. ICE said it would evaluate these policies within 90 days to determine if revisions are necessary.

**OIG Analysis:** This recommendation is resolved and open. ICE's policy prohibits Fugitive Operations Team members from performing any duties that will deter them from conducting fugitive operations, including collateral duties. A previous Office of Detention and Removal Operations' director sent a memorandum to all field office directors in December 2003 reiterating that Fugitive Operations Team members were only to conduct fugitive operations duties.[29]

This recommendation will remain resolved and open until ICE implements the recommendation, persuades us that this recommendation is not beneficial or not readily achievable, or proposes an acceptable alternative solution.

**Recommendation 4 – Resolved – Open**

**Recommendation 5:** Train and certify deportation officers who are not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

**ICE Response:** ICE concurred in part with this recommendation. In its response, ICE reported that it regularly trains and certifies deportation officers not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

However, ICE said that any overarching plan that limits the field office directors' ability or discretion to assign duties would also limit their flexibility to allocate resources for existing circumstances, such as responding to ICE and DHS national priorities.

ICE explained that it believes the current level of training and certification for deportation officers not assigned to Fugitive Operations Teams is adequate to meet the collateral needs of the teams and support the broader mission of the agency.

---

[29] Office of Detention and Removal Operations Memorandum, "Utilization of Fugitive Operations Team Members," December 3, 2003.

**OIG Analysis:** ICE reported that it regularly trains and certifies deportation officers not assigned to a Fugitive Operations Team to perform collateral duties. However, ICE's discussion of an overarching plan that limits the field office directors' ability or discretion to assign duties to their staff seems to address Recommendation 4.

Because ICE said it regularly trains and certifies deportation officers not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators, this recommendation is resolved.

ICE reported that the current level of training and certification of non-team members was adequate to meet the collateral needs of the teams and support the broader mission of the agency. However, ICE did not provide supportive information concerning its current level of trained and certified non-team members.

This recommendation will remain open until ICE identifies the number of officers not assigned to a Fugitive Operation Team who have been trained and certified to perform specific collateral duties in each field office with a Fugitive Operations Team. We will evaluate this information and determine whether the level of training and certification complies with the recommendation.

**Recommendation 5 – Resolved – Open**

**Recommendation 6:** Negotiate information sharing agreements with federal, state, or local agencies that can provide access to information pertaining to fugitive aliens and provide the resources needed by the Office of Detention and Removal Operations to reconcile data from those agencies.

**ICE Response:** ICE concurred with this recommendation and said that it continually pursues and maintains information-sharing agreements with numerous federal, state, and local agencies. Specifically, ICE said it has approximately 330 agreements that support specific ICE needs.

In addition, ICE is pursuing contractor assistance for the Fugitive Operations Support Center. The center, which became fully operational in July 2006, will assist the Office of Detention and Removal Operations process data received through negotiated information-sharing agreements in several ways. It will review and update absconder cases in the Deportable Alien Control System, develop leads for and provide assistance to the Fugitive Operations Teams, and develop major operations that the teams will conduct. In its response,

ICE said that since it has been in operation the center has resolved 2,488 absconder cases in the Deportable Alien Control System.

**OIG Analysis:** We recognize that ICE has negotiated a number of agreements with various federal, state, and local agencies that are designed to support and advance specific mission needs. We encourage them to continue this effort. Furthermore, ICE established the Fugitive Operations Support Center, which will provide assistance in processing data from outside agencies and sources. The center will also reconcile the data received and send viable leads to support fugitive operations in the field.

Because of these initiatives, this recommendation is resolved. During our review, we learned of four negotiated agreements that provide the Office of Detention and Removal Operations access to fugitive alien information. Although ICE has other agreements in place, it did not specify in its comments how many of those agreements pertain to fugitive aliens. This recommendation will remain open until ICE identifies those relevant agreements that provide information specifically on fugitive aliens.

**Recommendation 6 - Resolved - Open**


**Recommendation 7:** Assess the training requirements and needs of Fugitive Operations Teams and consider establishing a fugitive operations refresher course.

**ICE Response:** ICE concurred with this recommendation and initiated a review of the existing fugitive operations curriculum in August 2006 to determine whether current training manuals and subject matter are relevant. In addition, ICE intends to develop a supplemental or refresher course during FY 2007 and foresees the development of a refresher course proposal in 90 days.

**OIG Analysis:** ICE's plan to develop a refresher course proposal during FY 2007 is responsive to this recommendation. However, the recommendation will remain open until ICE provides an update on the status of the refresher course proposal.

**Recommendation 7 – Resolved – Open**

# Removal Proceedings Process

The Executive Office for Immigration Review, an agency of the Department of Justice, oversees three components that adjudicate matters involving immigration law at both the trial and appellate level. The Executive Office for Immigration Review immigration judges hold evidentiary removal hearings to determine whether certain aliens are removable from the United States.

When a Department of Homeland Security (DHS) enforcement official determines that a person is in the United States illegally and the alleged illegal alien denies that allegation, the official serves the alleged illegal alien with a Notice to Appear. The Notice to Appear is a "charging document" that initiates formal removal proceedings and can be served either in person or through the mail. Once this document has been issued, DHS is not permitted to remove the alleged illegal alien from the United States. Generally, a Notice to Appear includes the date, time, and place of the removal hearing, although sometimes it will indicate that a future document will provide the date, time, and place of the hearing. DHS also files these notices with the Executive Office for Immigration Review. At the hearings, attorneys from United States Immigration and Customs Enforcement's Office of Principal Legal Advisor present evidence that the alleged illegal alien, or "respondent," is removable.

The immigration judge makes two determinations:

1. Whether the alleged illegal alien is removable. For example, when an immigration judge determines that the respondent is a United States citizen, he or she would not be removable.

2. When the respondent is deemed to be removable, then the immigration judge determines whether the alien is entitled to any relief from removal. The most common forms of relief are adjustment of status to that of a lawful permanent resident, asylum, and cancellation of removal.

The immigration judge makes the decision during a recorded proceeding. When the judge finds against the respondent, he or she is issued a final order of removal. When the respondent fails to appear at the hearing, the DHS attorney presents evidence to the immigration judge that the respondent is removable. Based on the evidence, the immigration judges issues an *in absentia* order. The result of the *in absentia* hearing is mailed to the respondent. When an immigration judge's decision is against the respondent, the respondent can appeal to the Board of Immigration Appeals. Likewise, when the immigration judge's decision is in favor of the respondent, the government may appeal to the Board of Immigration Appeals. The Board's

decisions are subject to review by the federal courts. Aliens who have been issued a final order of removal are required to leave the country.

# Fugitive Operations Support Units

Two support units, the Fugitive Case Management Unit in Laguna Niguel, California, and the Fugitive Operations Support Center in Burlington, Vermont, assist United States Immigration and Customs Enforcement's (ICE) Fugitive Operations Teams.

## Fugitive Case Management Unit

In March 2004, ICE's Office of Detention and Removal Operations established the Fugitive Case Management Unit to coordinate all fugitive case leads for the National Fugitive Operations Program. The unit receives information from various sources, primarily from the United States Citizenship and Immigration Services, other agencies such as the Departments of State and Labor, and the Department of Homeland Security's Transportation Security Administration. The Fugitive Case Management Unit also receives leads generated by the Office of Detention and Removal Operations' headquarters.

The unit's staff consolidates the information and each week provides a list of fugitive alien leads to appropriate field offices. Also, the Fugitive Case Management Unit might send "hot leads" on fugitive aliens to field offices. Either the Office of Detention and Removal Operations' headquarters or the Transportation Security Administration makes the determination as to what constitutes "hot leads," which appear to be credible information that would lead to immediate apprehensions and require the Fugitive Operations Team's immediate attention. A response must be received within seven days by the unit on the action taken to pursue these type leads. Data in the Fugitive Case Management Unit system are regularly compared to Deportable Alien Control System data to determine if fugitives have criminal convictions. Leads on fugitive aliens with criminal convictions require the Fugitive Operations Team to respond to the Fugitive Case Management Unit with the results of the inquiry within 30 days, and non-criminal leads require a response in 180 days.

## Fugitive Operations Support Center

In October 2005, the Office of Detention and Removal Operations established the Fugitive Operations Support Center to support the teams' efforts and "enhance the efficiency and effectiveness of the [National Fugitive Operations Program]."[30] The center's operational plan, which was approved in June 2006, proposes three goals for the center: (1) improving the integrity of data in

---

[30] Office of Detention and Removal Operations, *Fugitive Operations Support Center Operational Plan*, June 2006.

the Deportable Alien Control System; (2) developing leads on fugitives for the field; and (3) supporting national ICE and the Office of Detention and Removal Operations' initiatives, including Operation Community Shield and Operation Predator. Community Shield is designed to disrupt, dismantle, and prosecute violent gang organizations by employing the authorities and investigative tools available to ICE. Operation Predator identifies child predators and removes them from the United States, subject to deportation.

As of September 2006, the chief of the Fugitive Operations Support Center said that the staffing plan for the center has not yet been approved. Currently, the center has a staff of ten, including one supervisor, five officers, and four support personnel. Four additional staff members have been authorized but have not come on board as of September 2006.

# Purpose, Scope, and Methodology

The purpose of our review was to determine: (1) the adequacy of the performance measures used to assess the effectiveness of Fugitive Operations Teams in completing their mission; (2) the teams' progress in reducing the backlog of fugitive alien cases; (3) the adequacy of teams staffing levels resulting from additional funding and the Office of Detention and Removal Operations' recruitment efforts; and (4) what factors affect the teams' operations, such as coordination activities with internal and external entities and the Office of Detention and Removal Operations' training policies.

We performed fieldwork from February 2006 through June 2006. We interviewed numerous Office of Detention and Removal Operations' managers and analysts at headquarters in Washington, DC. We traveled to Baltimore, Chicago, Detroit, and Los Angeles; interviewed field office directors and Fugitive Operations Team members in those cities; and accompanied officers on fugitive apprehensions. We conducted telephone interviews of field office directors and team supervisors in Atlanta; Boston; Buffalo; Cherry Hill, New Jersey; Denver; Fairfax, Virginia; Houston; Miami; Newark; New York City; Richmond, Virginia; Salt Lake City; San Francisco; and Seattle.

We visited the Fugitive Case Management Unit and United States Customs and Border Protection service center in Laguna Niguel, California, and interviewed staff from both offices. Additionally, we conducted a telephone interview with the chief of the Fugitive Operations Support Center in Burlington, Vermont. We interviewed, by telephone, a detective from the Boston Police Department and two sheriffs from Plymouth City, Massachusetts, Sheriff's Departments. Also, we obtained information on the Fugitive Operations Training Program conducted at the Federal Law Enforcement Training Center in Glynco, Georgia.

During our fieldwork, we reviewed Fugitive Operations Teams' documents, such as alien files, target folders, fugitive operations worksheets, weekly fugitive apprehension reports, performance work plans, and fugitive operations plans. We also reviewed fugitive operations documents, the Office of Detention and Removal Operations' financial management reports, and information on team staffing levels from headquarters. Additionally, we collected and analyzed data from the Deportable Alien Control System and the Fugitive Case Management System and documentation from the Fugitive Case Management Unit, the Fugitive Operations Support Center, and the Federal Law Enforcement Training Center.

This review was scheduled as part of our annual work plan. Our work was conducted under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspections* issued by the President's Council on Integrity and Efficiency.

## Recommendations

We recommended that the Assistant Secretary for United States Immigration and Customs Enforcement:

**Recommendation 1:** Establish a Fugitive Operations Team reporting system that enables Office of Detention and Removal Operations managers to classify all categories of apprehensions.

**Recommendation 2:** Conduct an assessment of the working space presently available to all Fugitive Operations Team members and develop a detailed plan to ensure that current and future officers are provided an adequate working environment that meets applicable federal standards.

**Recommendation 3:** Provide the resources needed by the Office of Detention and Removal Operations to detain, process, and remove all fugitive aliens apprehended by the Fugitive Operations Teams.

**Recommendation 4:** Assign Fugitive Operations Team members in a manner consistent with its Detention and Deportation Officer's Manual or amend the manual to reflect current assignment practices.

**Recommendation 5:** Train and certify deportation officers who are not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

**Recommendation 6:** Negotiate information sharing agreements with federal, state, or local agencies that can provide access to information pertaining to fugitive aliens and provide the resources needed by the Office of Detention and Removal Operations to reconcile data from those agencies.

**Recommendation 7:** Assess the training requirements and needs of the Fugitive Operations Teams and consider establishing a fugitive operations refresher course.

# Management Response to Draft Report

Office of the Assistant Secretary
U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536



U.S. Immigration
and Customs
Enforcement

DEC 2 7

MEMORANDUM FOR:   Richard L. Skinner
                          Inspector General
                          Department of Homeland Security

FROM:                   Julie L. Myers
                   Assistant Secretary

SUBJECT:          Response to OIG Draft Report: An Assessment of
                          United States Immigration and Customs Enforcement's
                          Fugitive Operations Teams

The following response is provided to the subject report

**Recommendation 1:**

Establish a Fugitive Operations Team reporting system that enables Office of Detention and Removal Operations managers to classify all categories of apprehensions.

**Response:**

ICE concurs with this recommendation. U.S. Immigration and Customs Enforcement (ICE) Detention and Removal Operations (DRO) has satisfied this recommendation and requests that it be considered closed. ICE/DRO initiated the planning and development of the Fugitive Case Management System (FCMS) in April 2005. On March 3, 2006, the ICE Office of the Chief Information Officer (OCIO) certified and accredited the system for use. From June 27 through June 28, 2006, supervisors met in St. Louis, Missouri for FCMS training. The system was ultimately made available to all field offices on August 28, 2006 for Fugitive Operations Team (FOT) activity reporting.

ICE/DRO utilizes FCMS to track statistics in support of its overall mission. FCMS is also used to create reports and measure FOT weekly activity. Data entered by the field into FCMS populates statistical reports regarding fugitive team activity generated by Headquarters DRO (HQDRO).

FCMS extracts data from the Deportable Alien Control System (DACS) to reconcile FCMS data and increase the quality of information used to populate reports.

When officers enter activity into FCMS, they differentiate between various "Actions" by choosing the appropriate action for each case from a "drop-down" menu. Furthermore, the system is capable of identifying the officer who conducted the action, thereby differentiating between FOT and non-FOT personnel. Using data entered into FCMS, HQDRO now can track field activity by actual arrests, case closures, category changes, and detainers placed. This function was not previously available.

www.ice.gov

Subject. Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams

Page 2

The following are definitions used by the field to determine which "Actions" to select when
entering data into FCMS:

Apprehension: FOT personnel took an individual into custody as a result of an arrest.

Located Detainer (I-247 Lodged): FOT personnel located and placed a detainer on an
individual detained by another agency, including the Federal Bureau of Prisons, and
state, county, or local law enforcement agencies or Departments of Corrections

Case Category Changed: The individual's category has changed from a fugitive status
to another category in DACS. This section may relate to a change in legal proceedings;
for instance, if an immigration judge granted a motion to reopen.

Case Closure: FOT personnel determine that the alien is no longer a fugitive and that
the DACS case has been closed for one of these reasons (i.e., self-removal, death, or
receipt of an immigration benefit).

The continuation and development of FCMS is essential to accurate reporting. Using FCMS as
the reporting tool for all fugitive team enforcement activity will allow HQDRO to clearly
distinguish and prospectively report the different types of activity the field conducts, such as
actual arrests (fugitive as well as non-fugitive), the number of case closures, category changes,
and detainers placed

### Recommendation 2.

Conduct an assessment of the working space presently available to all Fugitive Operations Team
members and develop a detailed plan to ensure that current and future officers are provided an
adequate working environment that meets applicable federal standards.

### Response:

ICE concurs with this recommendation. This recommendation has been satisfied in part. A
Space Allocation Survey (SAS) is incorporated into the systematic process for identifying the
need for additional workspace and then assessing available resources to accommodate such
requests. The space acquisition must be coordinated with several entities, including ICE
Facilities, the General Services Administration (GSA) and U.S. Customs and Border Protection
(CBP) Facilities. DRO continues to work with these entities to acquire the space necessary to
fulfill the ICE mission.

In October 2006, in an effort to facilitate the deployment of new fiscal year (FY) 2007 FOTs, the
affected field offices were asked to determine their facility needs. This request was made in
addition to the regular SAS, and specifically asked whether the new sites or pre-existing sites
needed additional storage space, additional parking space, gyms, and holding facilities.

By conducting this additional survey, ICE assessed the current FOT workspace and assisted the
efficient allocation of future resources to the most appropriate venues. Field offices are now in
various stages of the procurement process. The survey produced the following results:

- Facility issues have been settled and no action is required for the deployment of five of
  the additional 23 fugitive teams for FY 2007.

Subject: Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams

Page 3

- Three teams require temporary space while their new field/suboffices are being constructed/relocated. The new facilities will have adequate space to accommodate the fugitive teams.

- For seven of the teams, DRO is aggressively pursuing the acquisition of space and is currently working with ICE Facilities and GSA.

- Five teams have identified existing space at ICE facilities that can accommodate the teams' requirements. Two of the five teams only require additional parking spaces. The National Fugitive Operations Program (NFOP) believes that the parking issues will be settled in the second quarter of this fiscal year.

- Three field offices are working to identify areas within their existing space to be utilized as accommodations for their new team

GSA and ICE/CBP Facilities were provided the results of the supplemental survey in order to ensure that space acquisition is completed in a timely manner. Within the second quarter of FY 2007, DRO will propose and develop a coordinated space acquisition plan with all entities involved in the process.

### Recommendation 3:

Provide the resources needed by the Office of Detention and Removal Operations to detain, process, and remove all fugitive aliens apprehended by the Fugitive Operations Teams.

### Response:

ICE concurs in part with this recommendation, as not all of the issues contained therein are within ICE/DRO's purview. ICE/DRO has satisfied this recommendation within the areas directly under its control, and therefore requests that it be closed. It should be noted that at the time of the OIG assessment and audit of the NFOP, the ICE Detention Operations Coordination Center (DOCC) was not yet fully operational. However, since the assessment, Congress allotted additional funds to DRO, which were earmarked specifically to address detention bed space.

The DOCC coordinates the movement and placement of detained aliens throughout the United States in order to effectively allocate detention space and accommodate the numerous enforcement actions that ICE conducts on a daily basis. The DOCC acts as a clearinghouse by providing information in a timely manner to the field and headquarters so that space, which remains at a premium and can directly and adversely impact field operations, is managed effectively.

Various units within ICE/DRO are currently engaged in an ongoing effort to develop a cohesive, comprehensive infrastructure that would improve coordinated removal efforts and the management of detention space through immediate information sharing between the DOCC, Justice Prisoner and Alien Transportation System (JPATS), and Air Transportation Unit (ATU). This effort is developing an integrated detention and air and ground transportation program to maintain the equilibrium between apprehension and detention throughout the ICE/DRO field offices, in order to sustain the "catch and remove" policy. This requires that field offices articulate their detention space and transportation needs based on coordination with non-Department of Homeland Security (DHS) partners and with those within DHS such as the ICE Office of Investigations, ICE/DRO Criminal Alien Program, ICE/DRO FOTs, the 287(g)

Subject: Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams

Page 4

program, and CBP. These detention space and transportation requirements are then articulated to
the DOCC, which coordinates with ATU and JPATS. The DOCC identifies available bed space
and coordinates the air and ground transportation resources to effect the movement of detainees.

ICE/DRO is also identifying "air hubs" at strategic locations in the United States, with
supporting detention space and ground transportation contracts, to maximize transportation
efficiencies while maintaining the detention equilibrium of its field offices. JPATS flights would
serve these hubs through regularly established air schedules. ICE/DRO also authorized the
acquisition of two additional aircraft, which will increase the JPATS fleet to six medium-sized
aircraft dedicated to facilitating ICE movements and one smaller aircraft to be based in Puerto
Rico. Modified flight schedules, "air hubs", and supporting detention and ground transportation
will expedite transportation for field offices and increase operational flexibility.

It should be noted that the immigration process is affected by many factors beyond the control of
ICE/DRO. Foreign embassies and consulates can delay or refuse the issuance of travel
documents for their nationals, while the Executive Office for Immigration Review and federal
courts can directly impact the removal process through grants of relief, motions to reopen,
issuance of stays, and other legal decisions.

Furthermore, ICE/DRO must adhere to standing legal requirements for detention. The Supreme
Court of the United States has ordered that after 180 days, an alien in ICE custody who possesses
a final order of removal and is not subject to mandatory custody must be released if it appears
that removal is not reasonably foreseeable. Under the Immigration and Nationality Act (INA), §
241, DHS has 90 days to remove a detained alien after a final order of removal is issued. After
90 days, the alien receives a custody review. ICE/DRO releases certain aliens when there is not
sufficient evidence to believe they pose a risk of flight or danger to the community, or that their
removal is imminent. For certain classes of aliens, INA § 241 allows for continued detention
even after the removal period. However, all aliens are subject to the Supreme Court's decisions
in <u>Zadvydas v. Davis</u> and <u>Clark v. Martinez</u>, which interpret authority to detain beyond 90 days
as reasonably necessary to effect that alien's removal from the United States. The Supreme
Court held that six months is a reasonable period of time. Under the regulations promulgated
post-<u>Zadvydas</u>, an alien must be released after 180 days if there is no significant likelihood of
removal in the reasonably foreseeable future. Exceptions occur when the alien fails to cooperate,
is granted a stay of removal, or is designated as a special circumstances case under the
regulations of 8 CFR 241.14. This six-month analysis is based largely on whether ICE can
obtain a travel document for the alien. Many countries unreasonably delay issuing travel
documents to their nationals or refuse to issue travel documents altogether. In FY 2005, 1,007
aliens were released under <u>Zadvydas</u>, and in FY 2006, 431 aliens were released.

These external conditions impede the ability of ICE to execute removal operations.

### Recommendation 4:

Use Fugitive Operations Team members solely for apprehending fugitive aliens with unexecuted
final orders of removal or closing fugitive alien cases.

### Response:

ICE does not concur with this recommendation. The identification and arrest of fugitive aliens is
an obligatory enforcement action on the part of all ICE enforcement divisions and components
including the FOTs. The FOTs, although primarily called upon to administratively arrest

Subject: Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams

Page 5

fugitive aliens, are also required to assist in ensuring the overall effective implementation of ICE compliance measures. ICE must ensure that the primary mission of protecting the borders and preventing future terrorist attacks is accomplished, therefore, ICE must effectively utilize and allocate all of its resources. The OIG report references Chapter 19 Section 4.1 of the Detention and Deportation Officer's Field Manual (DDFM) (*sic*), which indicates that a permanent Fugitive Operations Team's (FOT) mission is the elimination of fugitive cases in their assigned office and as such would abide by the following guidelines:

1) Shall only be assigned to fugitive cases with an emphasis on backlog cases.

2) Shall not be assigned to any duties that will deter them from conducting fugitive operations, including but not limited to, case management of the general detained or non-detained dockets, escorts, and collateral duties normally accomplished by general assignment deportation officers.

The intent of these strictures was to ensure that the funded positions for fugitive operations would be utilized as such and the primary focus for the fugitive units should be to aggressively pursue the reduction of the extant fugitive alien population. ICE/DRO established a unit to identify, locate, arrest, and remove fugitive aliens as well as reduce the fugitive case backlog. ICE/DRO did not intend for the guidelines to exclude all other collateral assignments or prohibit the Field Office Directors' ability to allocate needed resources in order to accommodate an evolving national agenda or to meet existing circumstances.

ICE has also established measurable fiscal-year goals for the FOTs located throughout the field offices. One thousand administrative arrests are expected from each field office based on the number of teams located within the area of operational responsibility (AOR). Furthermore, the implementation and use of FCMS, in addition to the production and dissemination of weekly and monthly reports from Headquarters to the field offices, will assist in the effective management of FOTs. Such a system facilitates frequent feedback between operations in the field and Headquarters, which in turn allows Field Office Directors to receive data that will assist them in assessing their progress toward specific fiscal year goals. If the data indicates that goals are not currently being met, the information will serve as an effective management tool to determine the causes for the performance or lack thereof.

ICE/DRO will develop a plan of action to assess these DDFM guidelines within 90 days and determine if revisions to the manual are necessary. If ICE/DRO revises the manual, all alterations will be implemented by the close of the second quarter of FY 2007.

### Recommendation 5:

Train and certify deportation officers who are not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators.

### Response:

ICE concurs in part. ICE regularly trains and certifies deportation officers not assigned to a Fugitive Operations Team to perform collateral duties, as needed in each field office, including firearms instructors, jail inspectors, and juvenile coordinators. Yet, in order effectively implement ICE compliance measures and accomplish ICE's overall mission of protecting the borders and preventing future terrorist attacks, ICE/DRO must have the flexibility to utilize and

Subject: Response to OIG Draft Report, An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams

Page 6

allocate all of its resources, including personnel not assigned to FOTs, to meet constantly
evolving conditions and national mandates.

Any overarching plans that limit the Field Office Directors' ability or discretion to assign duties
would also limit the their flexibility to allocate resources for existing circumstances, such as
responding to ICE and DHS national priorities.

Furthermore, collective bargaining issues will require union negotiations if there is an attempt to
limit or categorize an officer to a specific job responsibility that could adversely impact their
career growth. ICE requires a multi-disciplined, dynamic workforce that can provide
comprehensive support to ICE's multi-faceted mission. Permitting officers to participate in a
variety of assignments allows them to enhance their careers by gaining valuable field experience
in several enforcement and non-enforcement venues.

ICE believes the current level of training and certification for deportation officers not assigned to
FOTs is adequate to meet the collateral needs of the FOTs and support the broader mission of the
agency.

### Recommendation 6:

Negotiate information-sharing agreements with federal, state, or local agencies that can provide
access to information pertaining to fugitive aliens and provide the resources needed by the
Office of Detention and Removal Operations to reconcile the data from those agencies.

### Response:

ICE concurs with this recommendation and has satisfied its requirements. ICE respectfully
requests that this recommendation be closed. ICE/DRO has continually pursued and maintained
information-sharing agreements with numerous federal, state, and local agencies.

ICE Program Offices enter into a variety of information-sharing agreements with outside
agencies to include federal, state and local law enforcement agencies. All information-sharing
agreements are developed under and abide by the appropriate DHS and ICE governing legal
authorities and Information Technology security standards and may be subject to Privacy Impact
Assessments. All agreements are subject to Third Party Agency rules and are coordinated
between the respective Program Office, Office of Principal Legal Advisor (OPLA) and, OCIO,
and are executed by the appropriate information owner or Designated Accredited Authority. All
ICE information-sharing initiatives such as Enterprise Agreements, which includes Memoranda
of Understanding and Interconnection Security Agreements, are designed to support and advance
a specific mission need.

Currently, ICE/DRO has approximately 330 Enterprise Agreements in place with a variety of
federal agencies, such as the United States Marshals Service and the Federal Bureau of Prisons,
as well as state and local municipalities, such as the New York State Police and the Riverside
County Sheriff's Office. Although ICE aggressively pursues information sharing with outside
agencies in order to provide ICE personnel the most accurate information possible, it does not
have the legal authority to legislate and require that every federal, state, and local agency must
provide information to ICE or enter into Memoranda of Understanding. Enterprise Agreements
are freely entered into between ICE and the respective agencies and there is no legal mechanism
to enforce compliance.

Subject: Response to OIG Draft Report: An Assessment of United States
Immigration and Customs Enforcement's Fugitive Operations Teams

Page 7

Moreover, through the prior establishment of the Fugitive Operations Support Center (FOSC),
ICE provides resources to assist DRO in processing data from outside agencies and sources. The
FOSC reconciles data from both external government and private sources. After collation,
vetting, and compilation, actionable information is disseminated to support fugitive operations in
the field.

Furthermore, ICE has enhanced the DRO infrastructure through the development and
maintenance of the FOSC, which assists in reconciling and vetting data received from those
agencies with whom ICE has information-sharing agreements. DRO developed the FOSC in
2005 in an effort to enhance the efficiency and effectiveness of the NFOP. By close of calendar
year 2005, a Director for the FOSC was selected. In March 2006, the FOSC hired some staff and
provided some support to individual field exercises. In June 2006, the FOSC began limited
operations and by July of the same year the FOSC became fully operational.

The FOSC, through the use of technology and partnerships with law enforcement agencies, will
serve as a force multiplier for the NFOP. The FOSC is located in Burlington, Vermont, and
reports to the Compliance Enforcement Division in Washington, D.C. The FOSC reviews and
updates absconder cases in DACS, develops leads for and provides assistance to FOTs, develops
National Fugitive Field Operations, and manages the absconder numbers. The FOSC is currently
seeking contractor assistance to conduct analysis, screening, background checks, and related
support activities for the vetting of fugitive/absconder aliens. During October 2006, the FOSC
resolved 2,488 absconder cases in DACS due to an appropriate case category change, and/or by
locating the absconder while incarcerated and placing a detainer on the absconder. During the
same month, the FOSC compared all of the absconder case data to the data located within the
Central Index System and is currently conducting an analysis to determine the appropriate case
categories.

The FOSC remains committed to pursuing information-sharing resources to aid in their function
with the FOTs as the ultimate beneficiaries.

### Recommendation 7:

Assess the training requirements and needs of the Fugitive Operations Teams and consider
establishing a fugitive operations refresher course.

### Response:

ICE concurs and has partially satisfied the recommendation. In August 2006, the
HQ Fugitive Operations Unit consulted with the DRO training division at the
Federal Law Enforcement Training Center (FLETC) to review the existing fugitive operations
curriculum and to determine the relevance of current training manuals and subject matter.

Based on these discussions, ICE revised the current lesson plans and incorporated a larger
selection of contemporaneous material, such as the identification of methamphetamine
laboratories.

This endeavor provides fugitive operations officers in the field with real world scenarios so that
daily operational tactics may be better assessed. Because the curriculum has not been finalized,
ICE has decided to postpone the currently scheduled basic Fugitive Operations course. It is
anticipated that courses will recommence during the second quarter of FY 2007. Measures have
been taken to ensure that this delay does not adversely impact the rigorous training schedule.

Subject: Response to OIG Draft Report: An Assessment of United States
         Immigration and Customs Enforcement's Fugitive Operations Teams
Page 8

Furthermore, it is estimated that every officer previously scheduled to attend the basic Fugitive
Operations course will be accommodated, and the Fugitive Operations Unit will not be remiss by
failing to provide an enhanced training module.

Currently, there is an insufficient number of permanent instructors for the Fugitive Operations
training program at FLETC, however, it is anticipated that this will be remedied within the FY
2007. Upon the Human Capital Training Unit receiving additional staff, ICE anticipates the
creation of a supplemental/refresher course which will be developed for implementation during
FY 2007. A refresher course proposal will be developed and forthcoming in 90 days.

Should you or your staff have any questions, please contact Clinett Short at (202) 616-7629.

cc  Steven Pecinosvsky, DHS Audit Liaison
    Clinett Short, ICE OIG Audit Portfolio Manager

*Office of the Assistant Secretary*
U.S. Department of Homeland Security
425 I Street, N W
Washington, DC 20536



U.S. Immigration
and Customs
Enforcement

February 13, 2007

Memorandum for:    Richard L. Skinner
                   Inspector General
                   Department of Homeland Security

From:              Julie L. Myers
                   Assistant Secretary

Subject:           Modification to Response to OIG Draft Report: An Assessment
                   of United States Immigration and Customs Enforcement's
                   Fugitive Operations Teams.

ICE submits the following modified response to the recommendations of the subject report, per
the OIG's e-mail memorandum of February 13, 2007

In its e-mail memorandum, OIG proposed the following change:

**(OLD) Recommendation 4:** Use Fugitive Operations Team members solely for apprehending
fugitive aliens with unexecuted final orders of removal or closing fugitive alien cases.

**(PROPOSED NEW) Recommendation 4:** Assign Fugitive Operations Team members in a
manner consistent with its Detention and Deportation Officer's Manual or amend the manual to
reflect current assignment practices

ICE submits the following for the proposed new recommendation:

1) Change the start of the ICE response to "ICE concurs with this recommendation."

2) Strike the following sentence from the end of Paragraph 2- "ICE/DRO did not intend for the
guidelines to exclude all other collateral assignments or prohibit the Field Office Directors'
ability to allocate needed resources in order to accommodate an evolving national agenda or
meet existing circumstances."

3) Insert the following sentence in its place- "ICE/DRO intended for the guidelines to enhance Field Office Director ability to allocate resources as needed, including through collateral assignments as necessary, to accommodate evolving national enforcement efforts or meet existing circumstances."

If you have any questions concerning this response, please contact Clinett Short, the ICE OIG audit portfolio manager, at (202) 616-7629.

*Office of Detention and Removal Operations*

U.S. Department of Homeland Security
425 I Street, NW
Washington, DC 20536



U.S. Immigration
and Customs
Enforcement

**DEC - 1** 2006

MEMORANDUM FOR:           Traci Lembke
                          Acting Director
                          Office of Professional Responsibility

FROM:                     John P. Torres
                          Director

SUBJECT:                  Comments on the Office of Inspector General's
                          Draft Report Entitled *"An Assessment of United
                          States Immigration and Customs Enforcement's
                          Fugitive Operations Teams"*

Attached are technical comments prepared by the Office of Detention and Removal
Operations (DRO) related to the Office of Inspector General's draft Report entitled, "An
Assessment of the United States Immigration and Customs Enforcement's Fugitive
Operations Teams." Following a careful review of the report, DRO has concluded that
the draft Report fails to acknowledge many of the positive steps already independently
taken by DRO to address issues identified therein. The attached technical comments
explain these positive steps and identify other apparent misperceptions in the draft
Report. DRO would request that these technical comments be published with the Report
when it is finalized, if not adopted in their entirety.

Attachment

## Office of Detention and Removal Operations Review of the Report

The U.S. Immigration and Customs Enforcement (ICE) Office of Detention and Removal Operations (DRO) has reviewed the Inspector General's draft Report. The following discussion represents a page-by-page analysis of that document, including areas where DRO believes that the report either lacks adequate updated information or has incorrectly described the program.

## General Recommendations for Draft Report Clarification

ICE refers to the act of taking an alien into ICE custody as an arrest, and no longer uses the term "apprehension(s)." Throughout the draft report, where OIG has used the term "apprehension" to refer to the act of taking a subject into ICE custody please replace the word "apprehension" with the word "arrest."

ICE refers to "fugitive aliens" rather than the much broader term of "fugitives." A "fugitive" is any absconder from justice, and is a much broader category than "fugitive alien."

In March 2006, DRO changed the name of the *Detention and Deportation Officer's Field Manual (DDFM)* to the Detention and Removal Operations Policy and Procedure Manual (DROPPM). References to the DDFM should be changed to DROPPM throughout the report.

## Executive Summary

Page 1, second paragraph: We suggest deleting the following sentences: *"A fugitive alien is an individual who has been issued an unexecuted final order of removal from the Executive Office for Immigration Review. The order requires the alien to be removed from this country."*

> It seems incorrect to describe "issuance" of an unexecuted final order, as the Executive Office for Immigration Review could not issue an "executed" final order. Issuance and execution of a removal order are distinct events. Once an "issued" order becomes administrative final, DRO may lawfully "execute" the order.

Page 1, second paragraph reads, *"Since 2003, the office allocated more than $204 million to deploy 52 Fugitive Operations Teams and, as of August 2006, 45 teams are apprehending fugitives in various cities nationwide."*

> The sentence should read as follows: "Since 2003, the office allocated more than $204 million to deploy 52 Fugitive Operations Teams and, as of **October** 2006, **50** teams are **arresting** fugitives in various cities nationwide."

2

## Background

Pages 2, third paragraph: The following sentence should be deleted: *"Fugitive aliens are non-United States citizens who have been placed into formal removal proceedings, have been issued a final order of removal by an immigration judge from the Executive Office for Immigration Review (EOIR), and whose whereabouts are unknown."*

> The sentence above should be replaced with the following: "Fugitive aliens are non-United States citizens not currently in the custody or control of ICE who have failed to depart the United States pursuant to a final order of removal, deportation or exclusion or have failed to report to a DRO officer after receiving notice to do so."

Page 3, second paragraph: *"an effort to stop the increase of fugitives in this country"* would be more accurately phrased as "an effort to stop the increase of fugitive <u>aliens</u> in this country."

## Results of Review

### *Fugitive Apprehension Reports Should Accurately Reflect the Teams' Activities*

Page 7, first paragraph: The weekly field office "apprehension reports" were renamed weekly field office "enforcement activity" reports in September 2006 to more accurately reflect the statistics measured by the reports.

Please change all references to "apprehension reports" in this Draft Report to "enforcement activity reports".

> For example, the sentence in the draft Report which reads, *"To measure the FOTs' performance, DRO uses weekly field office apprehension reports provided to DRO headquarters."* should now read as follows: "To measure the FOTs' performance, DRO uses weekly field office enforcement activity reports provided to DRO headquarters."

Page 7, first paragraph, sentence states: *"The reports also included case closures, in which the FOT verified that a fugitive alien died, voluntarily left the country, or changed their immigration status by, for example, becoming a United States citizen or legal permanent resident."*

> Fugitive aliens do not *"voluntarily leave the country"* (i.e., a phrase which evokes such legal concepts as "voluntary departure" and "voluntary return"); instead, they self-execute their outstanding orders of removal.

Page 7, first paragraph, sentence states: *"The reported apprehensions involved varying levels of FOT effort from taking custody of and processing aliens already arrested by*

3

*other law enforcement agencies to receiving leads, searching databases, talking to informants, and making apprehensions."*

As stated in the comment above, please change the language to read as follows: "The reported **enforcement activities** involved varying levels of FOT effort...

Page 7, second paragraph: Please add the following information to the draft report.

In August 2006, DRO implemented the Fugitive Case Management System (FCMS) at all its field offices nationwide to track FOT statistics. The use of FCMS has improved DRO FOT metrics, allowing enhanced tracking of FOTs' progress toward annual arrest target goals. Notably, FCMS has the ability to record the name of the officer responsible for conducting the enforcement activity. Recording the name of the officer associated with the enforcement action allows DRO to audit all activities and determine whether a FOT officer was responsible for the activity, thereby providing a means by which managers can assess FOT performance.

The ultimate goal of DRO and the FOTs is to reduce the fugitive alien population in the U.S. Although the primary responsibility of reducing the fugitive alien population in the United States resides with the FOTs, all DRO officers are responsible for the arrest and closure of fugitive alien cases that they encounter during the course of their duties. FCMS enforcement activity reports track the total number of fugitive aliens deducted from the fugitive alien population, regardless of whether the enforcement activity was conducted by FOTs or other DRO officers.

Page 8, fourth paragraph: Please add a footnote indicating that Acting Director Torres was appointed to the position of Director of DRO in October 2006.

Page 8, fourth paragraph: Please update footnote 18. The FOSC became operational in July 2006.

Page 9, Table 2: Title for Table 2 should be changed from "*Fugitive Apprehension Reported by Field Offices with Authorized Teams*" to "Fugitive **Enforcement Activity** Reported by Field Offices with Authorized Teams"

Change column name "*Total Fugitive Apprehensions*" to "**Total Fugitive Enforcement Activities**". This change would also apply to Page 13, Table 4.

Change "*Source: DRO fugitive apprehensions report*" to Source: DRO fugitive **enforcement activity** report."

Page 10, first and second paragraphs: Change all references to "*apprehension*" or "*apprehensions*" to "**enforcement activity**" and "**enforcement activities**," respectively.

Page 11, first paragraph: change reference to "*apprehension*" to "**enforcement activity**".

4

*Fugitive Alien Backlog Is Increasing Despite the Teams' Efforts*

Page 13 – <u>Bed Space Constraints</u> - Please add the following paragraphs:

ICE implemented a number of significant mission enhancing efficiencies, such as shortened removal cycle times; increased use of the Justice Prisoner and Alien Transportation System (JPATS) and other air assets; and rapid activation of detention facilities. These efficiencies have created additional detention capacity at various locations around the country and provided Immigration and Customs Enforcement (ICE) and other Federal, State and local law enforcement agencies opportunities to dramatically increase the apprehension and removal of illegal aliens.

In July 2006, ICE established the Detention Operations Coordination Center (DOCC). The DOCC was established to ensure that all ICE field offices have adequate detention space for routine apprehensions, coordinating special operations that require large numbers of detention beds, and bed space management on a national scale, thus ensuring no alien amenable to removal proceedings will be released from Detention and Removal Operations (DRO) custody due to a lack of detention space.

Through capacity planning and bed space management, the average number of aliens detained in FY06 has increased from 20,683 on October 1, 2005 to 27,390 on September 30, 2006. This results in a total increase of 6,707 detained aliens per day. In particular, since November 2005, a total of 6,300 beds have been added to support the President's Secure Border Initiative. Initially, 2,300 SBI beds were provided along the SW Border. For fiscal year 2007, Congress earmarked an enhancement of 6,700 beds to ICE/DRO. As part of Operation Jumpstart, the first 4,000 of the FY07 enhancement beds were provided during the fourth quarter of fiscal year 2006.

Page 15, second paragraph: Please note that although DACS does not have zip code search capabilities; the FOSC utilizes DACS data in conjunction with information from outside vendors to provide a central source of zip code information to FOTs, thereby eliminating the need for *ad hoc* databases within each field office.

*Removal Rate of Teams' Fugitive Alien Apprehensions Cannot Be Determined*

Pages 17-18: This entire section should be removed; DRO does in fact track the removal rate of fugitive aliens.

Our FCMS-generated enforcement activity reports are reconciled with DACS data to determine the total number of fugitive aliens removed as a result of FOT enforcement activities. From March 2003 to September 30, 2006, NFOP enforcement activities have resulted in the removal of more than 30,470 fugitive aliens from the United States.

*Effective Partnerships with Federal, State, and Local Agencies Exist*

Pages 25-26: Please note that the Fugitive Operation Support Center (FOSC) is in the process of advertising a support contract solicitation to identify a vendor with existing

data-sharing agreements in place with federal, state, and local law enforcement agencies. The FOSC will utilize the contractor's law enforcement data, and the contractor will be responsible for maintaining its data sharing agreements with these agencies. When completed, the contract will allow the FOSC to make use of a single data system, which is continually updated and consistently formatted, to collect other law enforcement agency information relevant to fugitive alien enforcement activity.

In addition, the FOSC has begun an extensive electronic review of fugitive cases, which will last for several months. The FOSC will close appropriate cases and provide comprehensive leads to the Field Offices on many others, facilitating efforts to meet the per-team goal of 1,000 arrests.

### Appendix A: Removal Proceedings Process

Page 33: The report references a form of immigration relief called "change of immigration status." This term is not entirely clear. Perhaps the writer intended to indicate "adjustment of status to that of a lawful permanent resident" (such as under sections 209 or 245 of the Immigration and Nationality Act).

6

## Major Contributors to this Report

Jacqueline Simms, Senior Inspector, Department of Homeland Security, Office of Inspections

Kristine Odiña, Inspector, Department of Homeland Security, Office of Inspections

Michael Zeitler, Inspector, Department of Homeland Security, Office of Inspections

## Report Distribution

### Department of Homeland Security

Secretary
Deputy Secretary
Chief of Staff
Deputy of Staff
General Counsel
Executive Secretary
Assistant Secretary for Immigration and Customs Enforcement
Assistant Secretary for Policy
Assistant Secretary for Public Affairs
Assistant Secretary for Legislative Affairs and Intergovernmental Affairs
DHS OIG Audit Liaison
ICE Audit Liaison
Chief Privacy Officer

### Office of Management and Budget

Chief, Homeland Security Branch
DHS Program Examiner

### Congress

Congressional Oversight and Appropriations Committees, as appropriate

# Exhibit 17

The New York Times

nytimes.com

July 23, 2007

# Promise of ID Cards Is Followed by Peril of Arrest for Illegal Immigrants

### By NINA BERNSTEIN

NEW HAVEN — Under his family's homemade shrine to the Virgin of Guadalupe, Alan Flores, 8, spoke softly about the morning last month when federal immigration agents entered his home.

It was part of a raid that has complicated, but not defeated, this city's novel plan to bring illegal immigrants out of the shadows.

The agents separated the children from the men. They placed Alan and three cousins, ages 7, 2 and 1, in a row on the living room couch. Then they asked the women, including Teresa Vara-Gonzalez, a housemate, if any of the children were theirs.

"Teresa said no, and that's when they took her," Alan said in Spanish last week, pressing closer to his mother, Norma Sedeño. "They took away Teresa, and my father and my two uncles. And then I got scared that they were going to come back and take away my mom."

Those taken from Alan's household were among the 32 immigrants arrested in the New Haven area by Immigration and Customs Enforcement, and scattered to jails in Rhode Island, Massachusetts and Maine, in an operation that began June 6 and ended June 11.

The operation started two days after the city's Board of Aldermen approved the plan to offer municipal identification cards to all residents, including an estimated 15,000 illegal immigrants settled in this city of 125,000.

But as the city prepares to issue the first municipal cards tomorrow, 28 of the 32 are home on bond — a rare outcome that underscores how the arrests galvanized community protest, bail money and legal help.

And while the operation made many illegal immigrants more fearful of applying for the Elm City Resident Card, as the New Haven identification card is called, Ms. Vara-Gonzalez, 32, a waitress, said the risks are now outweighed by the benefits: a valid photo ID that she could use in daily life and that could help her open a bank account. "For us who have already been arrested," she added, "we have nothing to lose."

New Haven's mayor, John DeStefano Jr., remains convinced that the operation was retaliation for the card initiative, he said in an interview Thursday. Despite denials by Michael Chertoff, the secretary of the Department of Homeland Security, that charge has been central to the unusual legal arguments raised by Yale University law students and professors who are working with the immigrants to challenge the arrests. The debate casts a spotlight on tactics used in raids around the country as municipalities grapple with immigration issues that have defied Congressional consensus.

During the raid, one man was up in a cherry picker when immigration agents called him down, waving a photo of someone else, and arrested him when he could not produce immigration papers, the lawyers said.

In some cases, they said, agents who found no one home at an address specified in a deportation order simply knocked on other doors until one opened, pushed their way in, and arrested residents rousted from bed when they acknowledged that they lacked legal status. Of the 32 arrested, most of whom are Mexican, only five had outstanding deportation orders, and only one or two had criminal records.

Many immigrants do not know that they have a right to remain silent, or to deny agents entry to their homes without a search warrant, said Michael Wishnie, a Yale law professor directing the legal challenge. Immigration statutes give government wide latitude to question people, he said, but the law requires agents to have a valid reason for suspicion, not one based on an illegal motive like racial or ethnic profiling.

In this case, Professor Wishnie contended, the overall motive for the operation was unconstitutional retaliation for New Haven's card program. The evidence collected from the arrests, he said, is therefore "the fruit of an illegal act" and should be thrown out.

In a letter to Connecticut's Congressional delegation, which sharply questioned the timing and conduct of the operation, Mr. Chertoff defended what his agency calls Operation Return to Sender, a national enforcement effort to reduce a backlog of more than 632,000 "fugitive aliens." He insisted that in New Haven the agents "at no time" entered a dwelling without consent.

Professor Wishnie said, however, that Mr. Chertoff wrote that agents had waited with an 11-year-old girl for her father to come home from work. A child cannot give legal consent for entry, Professor Wishnie said.

The conflict has also energized opponents of the city ID card. On Friday, an immigration control group based in the suburbs of New Haven, Southern Connecticut Immigration Reform, demanded a list of applicants under Freedom of Information laws and vowed to sue for it, fanning fears among illegal immigrants that if they sign up, they could become the targets of future raids.

"Everytown U.S.A. has got their eyeballs fixed on this," said Sean McMurray, a demolition foreman in the group. "I don't want to see innocent people hurt, but I'm talking security for the legal residents of this country."

On the other side, John Jairo Lugo, director of Unidad Latina en Acción, an immigrant self-help group in New Haven, also said towns across the country are watching.

"This was to make New Haven a model city in the United States," Mr. Lugo said of the card, which is meant to be useful to all New Haven residents by combining access to city pools, libraries, the municipal golf course and the dump, and doubling as a debit card for parking meters. "Maybe that's one of the prices you pay: the raids happened, people got detained. But the rest of the community came together. It's a symbolic lesson: You cannot fight for the immigrants alone."

In interviews last week with seven of those arrested, the fear remained palpable.

Alan Flores's father, Apolinar Flores Romero, a pizza maker, said that in the first days after his release, he

was afraid to leave the house.

Florente Baranda, another man, said he is haunted by his detention: "They had us with chains on our feet in Hartford, 23 or 24 people in this tiny room." Mr. Baranda, 32, has lived in New Haven since 1998, packaging bread at a bakery from 5 p.m. to 2 a.m. for $11 an hour. He and his wife have two children and, like many of those arrested, attend St. Rose of Lima Catholic Church, which played a major role in raising bail.

"I'm nervous taking my kids to the park," Mr. Baranda said at Junta, an immigrant organization that helped feed families when the raid left them without breadwinners.

A Yale law intern, Stella Burch, tried to reassure Mr. Baranda. Now that he is in deportation proceedings and out on $15,000 bond, she explained, "No one can arrest you for immigration issues, and we're going to fight with you to win your case — St. Rose, Junta, the law school."

The lawyers are still working for the release of Ivania Sotelo, 48, a Nicaraguan woman who was one of the few arrested on an outstanding deportation order. Her son, Jerry Sarmiento, 14, a United States citizen and the chess champion of his school, said her early-morning arrest left him in shock.

"I didn't want to tell anybody," he said. "But I started crying right in the middle of the seventh-and-eighth-grade morning circle."

His mother is in the county jail in Portland, Me. "It's a horrible place," said Jerry, who was able to visit only once. "They're all in orange and she's right next to the drug addicts and murderers, and I don't know why."

Others had no families to call when they were bused in shackles to a private prison in Rhode Island. "I felt like I could disappear," José Yangua, 27, a landscaper, said through a translator.

Ms. Burch had called jails in three states to find Mr. Yangua and his brother Edinson, who was also arrested. She collected handwritten testimonials from their landlord and bosses to win their release on bail.

Their landlord, Michael Quoka, wrote that the brothers were "solid members of the community" who studied English at night and paid the rent on time.

Most of the cases will probably take years to resolve. But just 18 days in jail has turned José Yangua's life upside down. Immigration authorities confiscated all his identity documents, he said, including his valid Michigan driver's license and the bank card he needs for access to his savings.

A municipal card, he said, may now be his best chance to prove his identity.

# Exhibit 18

Westlaw.

(c) 2007 Associated Press. All rights reserved.

   (THIS IS THE FULLTEXT)
Groups question immigration raid in central Idaho
Associated Press
 September 21, 2007
  T21:19:54Z

TEXT:
BOISE, Idaho -
The Idaho Community Action Network has denounced early morning raids
carried out by Immigration and Customs Enforcement agents in central Idaho
that resulted in about 21 arrests.

The American Civil Liberties Union of Idaho said it is investigating to see
if anyone's civil rights were violated.

The pre-dawn raids in Ketchum, Hailey and Bellevue on Sept. 15 were carried
out by federal agents with the help of the Blaine County sheriff's office,
said sheriff's Detective Steve Harkins.

He said the raids were meant to find undocumented immigrants with criminal
convictions, previous deportations, or people who had been asked to leave
the country but remained.

During the raids, Harkins said, federal agents also detained people who
were not able to prove they were U.S. citizens or legal residents.

He said those who were detained in the raids were being held in the Ada and
Canyon county jails.

'It is clear that ICE agents terrorized the community, including U.S.
citizen children who were sleeping when the raid occurred,' said Leo
Morales, a community organizer for ICAN, at a meeting Tuesday in Hailey.
'In several homes, children were left crying as ICE agents interrogated
parents and hauled them away.'

Some people whose homes were raided said they were unsure what was
happening.
'They pounded on my door so hard that my walls shook,' said Dana Ayala. 'My
19-year-old son opened the door to see what was happening, and six agents
armed with guns, Tasers and flashlights pushed their way into my home.'

Ayala said she and her children are U.S. citizens, and that her husband, a
native of Mexico, has legal residency in the United States.

She said agents told her they were looking for a sexual predator with a

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Hispanic surname, a person she had never heard of before.

'I've not heard that anybody had a warrant,' said Jack Van Valkenburgh, executive director of ACLU of Idaho. 'I'm trying to get the word out. You don't need to let (the agents) in if they don't have a warrant. I don't think that a lot of people understand their rights.'

Karl Rusok, an ICE spokesman based in Dallas, said information was collected before the operation was carried out in central Idaho.

'This was a targeted operation,' he told The Associated Press on Friday. 'All of our operations are targeted to go after specific individuals. During the course of the operation we may also encounter and arrest others we determine to be in the country illegally.'

He did not immediately call back with information on what prompted the operation in central Idaho, or the specific number of people arrested.
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit 19

# Immigration agents seize 20 suspected illegal aliens

## ACLU investigating to see if civil rights were violated

### by TERRY SMITH

Federal immigration officers descended on the Wood River Valley over the weekend and scooped up some 20 people who are suspected of being illegal immigrants.

The raid by Immigration and Customs Enforcement officers has left a bitter taste in the mouths of at least one Blaine County family, and the American Civil Liberties Union of Idaho is investigating to see if civil rights were violated.

ICE officials have declined to comment on the raid, but Blaine County Sheriff's Detective Steve Harkins said the federal agents were from a "special fugitive unit" out of Boise that was searching for non-native convicted felons who have returned to the United States illegally.

Harkins, who wasn't directly involved in the raid, said Tuesday that he heard 21 people were arrested. Ketchum police spokesman Kim Rogers put the number at 20. She described some of the detainees as "Peruvian."

Harkins explained that not all the people arrested are necessarily convicted felons, since in the course of raids ICE agents will detain other suspects who are unable to demonstrate that they are U.S. citizens or legal residents.

Neither the sheriff's office nor Ketchum police were directly involved in the operation, but both local agencies assigned officers as uniformed escorts.

"As far as the actual operation, that wasn't us," said Ketchum Assistant Police Chief Mike McNeil. "All I know is they came in and requested our assistance."

ICE agents in unmarked white or black sport-utility vehicles were seen conducting pre-dawn raids in Ketchum and Bellevue on Saturday morning at about 6:30 a.m.

A Bellevue woman said ICE agents showed up at her door at the Westwood Mobile Home Park at about that time.

"They pounded on my door so hard that my walls shook," said Dana Ayala, a Filipino native and U.S. citizen who has lived in the Wood River Valley for 13 years. "My 19-year-old son opened the door to see what was the matter and six agents pushed their way into my home.

"They never informed us who they were, they just barged into our house. They never showed us a warrant."

Ayala said the agents later told her that they were looking for a "sexual predator" by the name of Luis Gonzales, someone she had never heard of and had never lived in her home.

"I have two teenage daughters," she said. "I'm not going to let a pedophile stay here."

Ayala said her children are U.S. citizens and her husband is a Mexican native who has legal residency in the United States.

She said the agents searched the home and questioned the occupants for about half an hour, were rude and abrupt and have left her family traumatized, especially her 18-year-old daughter who is mentally retarded.

"I would say that they're Cracker Jack cops," said Ayala. "You don't treat citizens that way. Not even so much as an apology. That's crazy. If they would have contacted the Bellevue Marshal's Office first they would have known who we are."

Jack Van Valkenburgh, executive director of ACLU of Idaho, said the ACLU is investigating the raid to determine if civil rights were violated.

"You don't have to be a citizen to have many of the constitutional rights afforded by the Bill of Rights," he said. "You can't vote, but you still have protection from unlawful search and seizures."

He said ICE agents are required to have search warrants and that people detained or questioned by the agents have the right to an attorney.

Copyright © 2007 Express Publishing Inc.

# Exhibit 20

4/28/07 DAILY REVIEW (HAYWARD, CA) (Pg. Unavail. Online)
2007 WLNR 8680101

Daily Review, The (Hayward, CA)

Copyright 2007 The Daily Review. All rights reserved. Reproduced with the
permission of Media NewsGroup, Inc. by NewsBank, Inc.

April 28, 2007

Section: News

### ACLU sues for boy in immigration raid

Mark Prado, MEDIANEWS STAFF

SAN FRANCISCO -- The American Civil Liberties Union filed a lawsuit Thursday on
behalf of a 7-year-old San Rafael boy who was taken from his bed as part of an
early-morning Immigration and Custom Enforcement sweep last month.

Kebin Reyes, an American citizen born in Greenbrae, has nightmares from the
incident, the boy's father said Thursday.

"Kebin is still showing signs of trauma," Noe Reyes said through an interpreter at
a news conference at ACLU offices. "He always needs to be next to his dad or
another adult. What I want is justice so this doesn't happen to any other child."

In its suit, the ACLU alleges Nancy Alcantar, the U.S. Immigration and Customs
Enforcement San Francisco field office director, and officers under her command
violated the boy's constitutional rights.

The suit, filed in U.S. District Court in San Francisco, specifically cites the
Fourth and Fifth Amendments -- the right to be secure in one's home against
unreasonable search and seizure, and that no person shall be deprived of liberty
without due process.

ACLU attorneys allege the federal government did not have a search warrant for the
boy's home. But an ICE spokeswoman said warrants are obtained for all arrests.

Armed with dozens of arrest warrants, federal immigration officers swept into the
Canal neighborhood in San Rafael at dawn March 6 and arrested illegal immigrants.

Caught up in the sweep was Kebin, who was with his family in an apartment on
Belvedere Street when officers made the arrests.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Agents were targeting Noe Reyes, who was in the United States illegally from Guatemala and had been ordered deported in 2000, according to ICE.

Noe Reyes gave the ICE agents his son's U.S. passport identifying Kebin as a U.S. citizen, according to the ACLU. An ICE agent then told Noe to awaken his son, saying they would take them in for only an hour or two.

Noe Reyes asked several times to make a phone call to arrange for a family member or family friend to care for Kebin. Each of the requests was denied, and Kebin watched as his father was handcuffed and taken away.

Immigration officers then told Kebin to place his arms behind his back, like his father, but he was not put in handcuffs. The pair were taken to San Francisco, according to the ACLU.

ICE officials said they took Kebin to San Francisco for his well-being until a relative could pick him up.

"He was not arrested," said Lori Haley, immigration spokeswoman. "We didn't want to leave that little boy alone."

The agency's policy on dealing with children is to allow the adult being detained to make arrangements for the minor's care.

If that's not possible, the arresting officer's supervisor makes arrangements, which vary according to the situation.

At the ICE processing center in San Francisco, additional requests to make a phone call were denied, and the boy and his father were placed in a locked room for about 10 hours and given bread and water, according to the ACLU.

Kebin was released that evening after his uncle learned about the incident from neighbors.

The uncle had to wait several hours before Kebin was finally released, ACLU attorneys said.

"ICE's treatment of children is not in line with American values of decency and fairness," said Julia Harumi Mass, staff attorney with the ACLU. "In addition to Kebin's case, we have heard reports of children left without care after their parents are detained, immigration agents targeting areas around elementary schools, and children too upset to participate in class after witnessing early morning raids in their communities. The human cost of these tactics is unacceptable."

The suit seeks unspecified damages and would require federal immigration officials to develop a policy on caring for children they might find during enforcement so cases like Kebin's aren't repeated, attorneys said.

Immigration attorneys and others said Kebin's case is the most serious example of children being harmed by immigration policy.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

The sweep was part of a stepped-up Immigration and Custom Enforcement program called Operation Return to Sender, which aims to arrest people in the country illegally.

About 18,000 people have been detained by this enforcement action since it began last year.

From Massachusetts to Colorado and California, children have been left without their parents when the adults were seized, civil rights attorneys said.

Noe Reyes is dealing with his immigration issue in court and has a hearing set for June. Kebin's mother lives outside the country.

Kebin's citizenship does not give his parents any legal standing as residents in the United States, ICE officials said.

"Having a child here is a risk people take," Haley said, "and then they are faced with decisions."


The Associated Press contributed to this report.


Contact Mark Prado at mprado@marinij.com.

---- INDEX REFERENCES ----

COMPANY: CANAL PLUS

NEWS SUBJECT: (Crime (1CR87); Social Issues (1SO05))

INDUSTRY: (Smuggling & Illegal Trade (1SM35))

REGION: (USA (1US73); Americas (1AM92); North America (1NO39); California (1CA98))

Language: EN

OTHER INDEXING: (ACLU; AMERICAN; AMERICAN CIVIL LIBERTIES; CANAL; ICE; IMMIGRATION; US DISTRICT COURT; US IMMIGRATION AND CUSTOMS) (Caught; Haley; Julia Harumi; Kebin; Kebin Reyes; Lori Haley; Nancy Alcantar; Noe; Noe Reyes)

Word Count: 954
4/28/07 DAILYREVIEW (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit 21

4/27/07 S.F. Chron. A1
2007 WLNR 7966892

San Francisco Chronicle (CA)
Copyright 2007 San Francisco Chronicle

April 27, 2007

Section: NEWS

The **human face** of immigration raids in Bay Area : Arrests of parents can
deeply traumatize children caught in the fray, experts argue

**Tyche Hendricks**

Immigration agents arrested siblings Victor and Elvira Mendoza, 21 and 17, when it
turned out the fugitive they were looking for no longer lived at the Mendozas'
home. Officers detained 6-year-old U.S. citizen Kebin Reyes for 12 hours when they
arrested his father as an illegal immigrant.

These and many other families across the Bay Area and the nation were turned
upside down this year by Operation Return to Sender, a federal immigration
crackdown begun last May. The raids focus on illegal immigrants who have ignored
deportation orders, but 37 percent of the 18,149 people arrested nationwide through
Feb. 23 were not wanted fugitives.

Mental health experts say the raids are traumatizing children. Legal scholars and
public officials are raising constitutional questions about the way the raids are
carried out and about their impact on communities as a whole. And immigrant
advocates say changes in immigration law -- including tougher provisions enacted in
1996 -- leave little room for illegal immigrants to correct their status.

"They (the raids) are putting some teeth back in immigration law," said Tim
Aitken, deputy director for detention and removal operations in the San Francisco
office of the U.S. Immigration and Customs Enforcement agency. "Our focus is, we
want to go after the worst of the worst. ... But we can't be blind to someone who
doesn't have lawful status in the United States."

The American Civil Liberties Union and the Lawyers' Committee for Civil Rights
sued federal authorities in San Francisco on Thursday on behalf of Kebin Reyes, now
7, saying agents violated the child's civil rights when they took him into custody.
Attorneys charge that the federal government violated Kebin's Fourth and Fifth

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Amendment rights to liberty and to being secure in his own home.

When agents arrested his father, Guatemalan-born Noe Reyes, on March 6, they would not allow him to call relatives who could take charge of Kebin and instead held the boy until an alarmed uncle heard about the arrest from neighbors, Noe Reyes and his lawyers said Thursday. "He went with his dad so he wouldn't be left home alone," said immigration agency spokeswoman Lori Haley. "We work with the families to find someone to take care of the child."

Noe Reyes, the boy's sole parent in the United States, who was released April 18, said Kebin has been fearful and withdrawn since the arrest and suffers recurring nightmares.

Lawyers and legal scholars have raised constitutional concerns about how the raids are being conducted. They accuse agents of gaining access to homes by insufficiently identifying themselves and bearing warrants that often contain inaccurate addresses for the fugitives they're seeking. Elected officials also said that when federal agents announce that they are "police," it undermines local law enforcement. And many people have questioned the right of agents to interrogate people not named in warrants about their own immigration status.

But immigration officials said questioning people who live with or associate with the targets of warrants meets the federal standard of "reasonable suspicion" that those people might be illegal immigrants.

"If agents are going to the home of a target they believe is in the country illegally, they could reasonably suspect that others in the house might be here illegally as well," said Haley.

Under federal law as amended in 1996, agents have the authority to interrogate anyone "believed to be an alien" about his or her right to be in the country.

Blake Chisam, legal counsel to the House Judiciary Committee's subcommittee on immigration, said some rationales for reasonable suspicion might not stand up in court.

"You'd have to have an articulable basis," he said. "I don't think profiling would work."

Immigrant advocates agree

"Just because someone is Latino or has an accent doesn't mean an officer has reasonable suspicion they are undocumented," said Lawyer's Committee staff attorney Philip Hwang. "Even being in the household where one occupant is undocumented doesn't create reasonable suspicion, because there are legion mixed-status households."

San Rafael Mayor Al Boro, Richmond Police Chief Chris Magnus and San Francisco District Attorney Kamala Harris -- among many officials here and across the country -- have said agents' practice of identifying themselves as police damages the trust local law enforcement agencies have built in immigrant communities.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Immigration officials defend their use of the word "police," saying all law enforcement agents have that right. But Hwang said residents might open their doors because they believe the agents are local police concerned for their safety. "It can't be consent unless the individual knows who they're letting into their home," Hwang said.

Kevin Johnson, an immigration law specialist at the UC Davis School of Law, said it seems like agents don't care whether the information in their warrants is wrong if it enables them to make arrests.

"That seems like an abuse of the warrant," Johnson said, "an abuse of the legal process."

Professor Rachel Moran at UC Berkeley's Boalt Hall School of Law said a warrant naming a specific individual doesn't authorize agents to search that person's home or question other residents there.

Victor and Elvira Mendoza were detained for weeks after agents arrived at their San Pablo home in January to serve a warrant for someone who didn't live there. The brother and sister had come to the Bay Area from Mexico in 2003 to be reunited with their parents, legal U.S. residents, whom they had last seen when Victor was 13 and Elvira 9.

Victor has studied English and has honed his skills as a clown, performing at schools and nursing homes and on the St. Paul's Catholic Church float in San Pablo's Cinco de Mayo parade, where he plans to appear again this year. And Elvira pulled down straight A's at De Anza High School, where she is preparing to graduate in June.

"Everyone else in our family has papers except my sister and me," said Victor Mendoza. "When we were in Mexico, we tried to get papers to come but we couldn't, so we crossed the border without permission. It's kind of hard to be without your parents."

Now the siblings await hearings on their fate before an immigration judge. Their lawyer, Stephen Coghlan of San Francisco, said many factors conspire against Mexican citizens gaining legal status here.

The wait for immigration visas for Mexican family members of U.S. citizens and permanent residents is six to 19 years. And the 1996 changes in the law greatly tightened the standards by which illegal immigrants can stave off deportation and get a "green card."

Undocumented immigrants now must prove they have been in the country 10 years and have good moral character, and their deportation must be deemed to cause a relative "exceptionally unusual hardship," a threshold almost impossible to meet, Coghlan said.

"It was a complete sea change," said Coghlan. "It's heartbreaking. Victor's a nice, articulate, soft-spoken guy who's had no contact with the law. ... He would be a fine, upright, outstanding citizen, a productive member of society. ... They call them illegal, but there's no way to be legal."

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Bay Area residents have said farewell to devoted parent volunteers, talented soccer coaches and close friends. Scores of Berkeley residents mourned the departure of Felipe and Norma Espinoza, who lived undocumented in the United States for two decades and built a much richer life for their three boys than they would have had in their hamlet in Michoacan, Mexico.

The Espinozas were placed in deportation proceedings before the current federal campaign. They hired a lawyer to try to gain legal residency, but the lawyer -- later disbarred -- didn't show up for court appearances after he took their money. In February, the couple told their sons to say goodbye to their classmates and pack their bags. The court had ordered them deported and the family returned to the two-room house where Felipe was born.

Felipe, a former steelworker, said in a phone interview that he hasn't yet found work, even as a field hand. Felipe Jr., 14, said he is studying math two years behind the geometry class he left at Berkeley High School and wishes he could return to the Bay Area, even without his parents.

Child psychology experts say children suffer most from the disruption of armed agents coming into their homes and taking away their parents -- and sometimes themselves. Children can experience stress, depression and anxiety disorders, said Amana Ayoub, a psychologist at the Center for Survivors of Torture, located in San Jose, who is familiar with Kebin Reyes' experience.

Psychiatrist Dr. Alicia Lieberman, director of the Child Trauma Research Project at UCSF, said children who witness their parents being taken into custody lose trust in their parents' ability to keep them safe and begin to see danger everywhere.

"Over and above the sense of terror about, 'What will happen to my mommy and daddy and what will happen to me?' the common thread is, 'We cannot trust the authorities,' " Lieberman said.

Many adults have responded the same way, said Evelyn Sanchez, advocacy coordinator with the Bay Area Immigrant Rights Coalition.

"We've been in touch with a lot of families that have been affected by the raids, and understandably they are scared," Sanchez said. "Being undocumented is no light matter anymore, and they are really taking cover."

Kebin Reyes' lawyers also said immigration officials need clear procedures to ensure children's welfare. Agents are supposed to allow detainees to arrange care for their children, according to a letter Karyn Lang, a top immigration official, wrote March 14 to Rep. Zoe Lofgren, D-San Jose, who leads the House's immigration subcommittee.

Elected officials who support the raids say the onus for protecting children is on their immigrant parents.

"It's unfortunate that families become detached," said Kurt Bardella, spokesman for Rep. Brian Bilbray, R-Carlsbad (San Diego County), who chairs the House

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Immigration Reform Caucus. "But when someone enters this country illegally, and they have a child here, they have made conscious decisions while their status in this country is uncertain. They are subjecting themselves and their families to the risk that the law might be enforced."

Sen. Dianne Feinstein of California last month wrote to Homeland Security Secretary Michael Chertoff, who oversees the immigration enforcement agency, expressing concern about how children are being treated during raids.

"I believe the federal government has a special obligation to ensure that the children of the undocumented individuals are treated humanely and left with appropriate caregivers," Feinstein wrote.

Rocío Avila, a lawyer for La Raza Centro Legal in San Francisco, said an adult client of hers was detained during a raid even though he is a U.S. citizen.

"He attempted to let them know he was a U.S. citizen, and they didn't initially believe him," she said. "He asked, 'Who are you here to see? Do you have a warrant?' They handcuffed him immediately and put him on the floor."

The man, fearful of publicizing his name, is considering legal action.

Elizabeth Larose Dunn, who leads Marin Montessori School, said a sixth-grade student whose parents were arrested in immigration raids in March and did not want to be identified by name is a high achiever and "beloved in the school."

"This is America, a place we'd like to think all of our children are safe," she said. "I'm so sad about this on a personal level." -------------------------------
-------

The arrests

In a crackdown begun last May against illegal immigrants who ignored deportation orders, including convicted criminals, U.S. Immigration and Customs Enforcement agents arrested 18,149 people by Feb. 23.

More than one-third were people the agents encountered and independently suspected were illegal immigrants; officials are calling these "collateral" arrests.

Here's a breakdown of total and "collateral" arrests in California and the country:

National: 18,149 arrests -- 36.9 percent collateral (6,696)

Los Angeles region: 1,198 arrests -- 41.5 percent collateral (497)

San Diego region: 511 arrests - 56.6 percent collateral (289)

San Francisco region: 1,423 arrests -- 44.8 percent collateral (638)

Source: Associated Press (Immigration and Customs Enforcement data covers May 26,

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

2006-Feb. 23, 2007)

---- INDEX REFERENCES ----

COMPANY: AMERICAN CIVIL LIBERTIES UNION

NEWS SUBJECT:   (Legal (1LE33); Children (1CH89); Social Issues (1SO05); Health &
Family (1HE30); Government (1GO80); Police (1PO98); Parents & Parenting (1PA25);
Crime (1CR87); Judicial (1JU36); Criminal Law (1CR79); Economics & Trade (1EC26))

INDUSTRY:   (Smuggling & Illegal Trade (1SM35))

REGION:   (Americas (1AM92); North America (1NO39); Mexico (1ME48); USA (1US73);
California (1CA98))

Language:   EN

OTHER INDEXING:   (AMERICAN CIVIL LIBERTIES UNION; BERKELEY; BERKELEY HIGH SCHOOL;
BOALT HALL SCHOOL OF LAW; CATHOLIC CHURCH; CHILD TRAUMA RESEARCH; COMMITTEE FOR
CIVIL; CUSTOMS ENFORCEMENT; FELIPE; HOUSE; HOUSE IMMIGRATION REFORM CAUCUS; HOUSE
JUDICIARY COMMITTEE; IMMIGRATION; KEBIN; KEBIN REYES; LA RAZA CENTRO LEGAL;
LAWYERS; MARIN MONTESSORI SCHOOL; MENDOZAS; NOE REYES; SECURITY; SOURCE; US
IMMIGRATION AND CUSTOMS ENFORCEMENT; UC BERKELEY; UC DAVIS SCHOOL OF LAW; UCSF)
(Al Boro; Amana Ayoub; Avila; Blake Chisam; Brian Bilbray; Chris Magnus; Coghlan;
Dianne Feinstein; Elected; Elizabeth Larose Dunn; English; Espinozas; Evelyn
Sanchez; Feinstein; Haley; Hwang; Johnson; Kamala Harris; Karyn Lang; Kevin
Johnson; Kurt Bardella; Lawyer; Lori Haley; Mental; Michael Chertoff; Noe; Norma
Espinoza; Philip Hwang; Psychiatrist Dr. Alicia Lieberman; Rachel Moran; RocÃ;
Sanchez; Stephen Coghlan; Tim Aitken; Tyche Hendricks; Victor; Zoe Lofgren)

KEYWORDS:   (CHILDREN);   (CIVIL RIGHTS);   (DEPORTATION);   (FAMILIES);   (ILLEGAL
IMMIGRANTS);   (PROTEST);   (SF)

EDITION: FINAL

Word Count: 2496
4/27/07 SFCHR A1
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit 22

2/3/07 Alameda Times-Star (CA) (Pg. Unavail. Online)
2007 WLNR 2213816

Alameda Times-Star (CA)
Copyright 2007 Alameda Times-Star. All rights reserved. Reproduced with the
permission of Media NewsGroup, Inc. by NewsBank, Inc.

February 3, 2007

Section: Local

## Immigrants in Richmond live in fear of deportation

### David DeBolt, CORRESPONDENT

RICHMOND -- Before leaving her Richmond apartment, Jenni Spezeski peeks out the
front door and looks down both ends of the street. She is looking to see if any
agents from the Immigration and Customs Enforcement Agency, who have recently been
cracking down and arresting illegal immigrants in Richmond, are waiting outside.

But it's not Spezeski they're after. Once the graduate of the University of
California, Berkeley, who grew up in Arizona, determines it is safe to leave, she
escorts her fianc out the door. He is identified only as Junior, an illegal
immigrant from Brazil who came to the United States four years ago.

Spezeski said she and her fianc are afraid of ICE, which has arrested more than 100
residents in Richmond and Concord within the last few weeks. They have considered
moving out of Richmond to avoid Junior's possible arrest or deportation.

"We've thought of moving to Canada," Spezeski said. "But I have a job and stability
here, and I have to think about the future."

The couple were part of a packed audience at a public forum Sunday at St. Mark's
Church in Richmond, where local residents, including legal and illegal immigrants,
met with city officials, politicians and police. Residents spoke who have been
affected by the ICE raids, which the government has carried out as part of
Operation Return to Sender. The forum was organized by the church and the Contra
Costa Interfaith Sponsoring Committee. The government effort began in June.

While ICE officials have said the agency targets individuals who are illegal
immigrants with criminal histories or gang involvement, residents complained that
people who have not been in any kind of trouble have been picked up while ICE has
been searching for targeted individuals.

Ruben Gonzales, a Richmond resident, said ICE recently entered his home without a
warrant and without knocking. They broke the door, he said on Sunday.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

"I was only in my underwear," Gonzales said. The federal officials made his wife, his grandchild and a family friend lie on the floor.

Local officials, including Mayor Gayle McLaughlin, have spoken out recently in defense of the city's immigrant population.

"I do not want our residents to live under terror," McLaughlin said Sunday.

Casa de Esperanza, a nonprofit organization housed at St. Mark's, has been working on a resolution to bring before the Richmond City Council on Tuesday.

As of Jan. 22, federal officials said they had arrested 119 people, primarily in Richmond and Concord. Sixteen were deported. In a Jan. 23 news release, ICE reported removing more than 750 foreigners from Southern California. The news release also said, "Since its launch in June 2006, Operation Return to Sender has resulted in more than 13,000 arrests nationwide."

Junior said many of the illegal immigrants in the Brazilian community were too afraid to attend Sunday's event.

"They didn't show up," he said outside the church. "They thought ICE would be here at the door." Junior, who runs his own construction company, employs workers from Brazil. It has been hard for them to focus at work the last few weeks, he said.

"They couldn't work because they would watch up the street to see if anyone was coming for them," he said. The couple said their fear partly stems from stories they have heard from friends and neighbors. They said one of their friends abandoned his apartment with his family to hide from ICE. The friend returned to the apartment to pick up more clothes for the family, but when he arrived he saw ICE agents outside the residence.

"They did a quick U-turn," Spezeski said. A friend of Junior's was arrested with his wife and a family friend when ICE entered their home at 6 a.m. looking for someone else, Junior said. The three were arrested because they lacked documentation, Junior said.

After a short time in jail, the three posted bail and now have six months to appeal their court ruling or go back to Brazil. They were at St. Mark's on Sunday and said they were afraid to give their names.

"I never was an activist, but this has gotten me out there," Spezeski said. She has been copying fliers explaining illegal immigrants' rights in dealing with the police and federal agents. She said ignorance of rights can result in "people (being) taking advantage of."

At St. Mark's Church, Mark Silverman, a staff attorney at Immigrant Legal Resource Center, explained immigration and other civil rights to the crowd, using demonstrations and skits to help them understand those rights.

Silverman told the audience to demand to see a badge before opening the door for police and to ask for the warrant to be slid under the door before opening it.

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

"Whether you are a citizen or undocumented, we are all protected by the Fourth and Fifth Amendments (to the U.S. Constitution)," he said.

Spezeski and Junior remain unsure about where the next few months will take them. Because of their jobs, they said they don't anticipate moving away soon. Spezeski said they have recently been staying in hotels in other East Bay cities such as Pinole, but that has become too costly.

Junior is saving $1,000 to send to his mother in Brazil to help pay for her much-needed surgery.

"In that sense, there's no money for a deposit," she said. "We are afraid to walk out the door, and that's not the life we want to be living."

---- INDEX REFERENCES ----

NEWS SUBJECT: (Crime (1CR87); Legal (1LE33); Social Issues (1SO05); Criminal Law (1CR79))

INDUSTRY: (Smuggling & Illegal Trade (1SM35))

REGION: (Brazil (1BR84); USA (1US73); Americas (1AM92); North America (1NO39); South America (1SO03); Latin America (1LA15))

Language: EN

OTHER INDEXING: (CONTRA COSTA INTERFAITH SPONSORING COMMITTEE; IMMIGRANT LEGAL RESOURCE CENTER; IMMIGRANTS; IMMIGRATION AND CUSTOMS ENFORCEMENT AGENCY; JUNIOR; PINOLE; UNIVERSITY OF CALIFORNIA) (Berkeley; Casa de Esperanza; Gayle McLaughlin; Gonzales; Mark Silverman; McLaughlin; Operation Return; Ruben Gonzales; Silverman; Sixteen; Spezeski)

Word Count: 1059
2/3/07 ALMDATIMSTR (No Page)
END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit 23


November 25, 2007

# Immigrant Workers Caught in Net Cast for Gangs

**By NINA BERNSTEIN**

GREENPORT, N.Y. — It was still dark the morning of Sept. 27 when armed federal immigration agents, guided by local police officers, swept into this village on the East End of Long Island. Within hours, as the team rousted sleeping families, 11 men were added to a running government tally of arrests made in Operation Community Shield, a two-year-old national program singling out violent gang members for deportation.

"Violent foreign-born gang members and their associates have more than worn out their welcome," Julie L. Myers, assistant secretary of Immigration and Customs Enforcement, said at an October news conference announcing the arrests of 1,313 people in the operation over the summer and fall nationwide. "And to them I have one message: Good riddance."

But, to the dismay of many of Greenport's 2,500 residents, the raid here did not match her words.

Only one of the 11 men taken away that morning was suspected of a gang affiliation, according to the Southold Town police, who patrol Greenport and played the crucial role of identifying targets for the operation.

The 10 others, while accused of immigration violations, were not gang associates and had no criminal records.

Instead, they were known as good workers and family men. When they suddenly vanished into the far-flung immigration detention system, six of their employers hired lawyers to try to find and free them. Some went further, like Dan and Tina Finne, who agreed to take care of the 3-year-old American-born daughter of a Guatemalan carpenter who was swept up in the raid, if her mother was detained, too.

"This is un-American," said Ms. Finne, 41, a Greenport native, echoing other citizens who condemned the home raids in public meetings and letters to The Suffolk Times, a weekly newspaper. "We need to do something about immigration, but not this."

Greenport's experience with Operation Community Shield sheds light on the inner workings of an antigang crackdown that has brought immigration raids to private homes across the country. The crackdown relies heavily on local police forces to identify suspects, often based on loosely defined or subjective criteria.

But the raid in Greenport also underscores the potential for backlash from local residents and officials when results conflict with expectations.

As the details of the Sept. 27 raid spread through this village, where about 17 percent of residents are

Hispanic, some citizens began to protest the very premise of the operation — and the participation of local officers.

David Nyce, Greenport's mayor, said, "The whole gang issue is something to keep the white majority scared about the Latino population, and to come in and bust as many people as they want."

"I spoke to the police chief," he added, "and I said, 'This is going to set you back a lot.' "

Elsewhere in Suffolk County, many welcomed the sweep. The Suffolk County police, who patrol towns in the western part of the county, had only praise for the operation.

'Collateral Arrests'

But the county executive and the county police commissioner in neighboring Nassau County disagreed. They said that the vast majority of those arrested in their county were not gang associates, and that residents and police alike had been endangered by what they called the agents' "cowboy mentality," including armed raids on the wrong homes.

Officials at Immigration and Customs Enforcement dismiss such criticism. They say that the operation was properly conducted and methodically planned, based on intelligence provided by the local police departments themselves. "Collateral arrests" of illegal immigrants who are not gang suspects are always appropriate to the agency's mission, they said.

"We're not here stomping all over anybody's rights," said Peter J. Smith, the special agent in charge of the Long Island operation, which led to the roundup of 186 men. "We've got immigration powers."

One of the things that clearly unsettled residents of Greenport was that the immigrants were arrested in their homes, without warrants, an immigration enforcement tactic that has been used more and more since 2005.

By law, immigration agents without judicial warrants may enter homes only with the consent of the residents. They may not use racial or ethnic profiling to single people out. But they have broad authority to detain anyone they encounter if they have grounds for suspicion that the person is not in the country legally. The legality of recent home raids has been challenged in federal court in New York and elsewhere.

Case law on the constitutional limits of immigration powers in home raids is still unsettled, said Prof. Daniel Kanstroom, a legal historian of deportation at Boston College. For decades, such raids were rare, in part because the idea of home as an inviolable space has been enshrined by the Fourth Amendment's protection against unreasonable search and seizure. "We are now in the midst of a major resurgence" in home raids, Professor Kanstroom said.

The operation in Greenport began a month before the raid, with a phone call from Agent Smith to the Southold Town police, said Detective Sgt. John Sinning. The federal agency was planning an antigang sweep on Long Island, and he was asked if he had names of gang members who might also be deportable immigrants.

Like many police departments, the Southold force keeps a database of young men suspected of gang ties, in many cases because of their clothes, their tattoos or the company they keep.

Planning the Raids

Since there is no legal definition of criminal street gang membership, officers have tremendous discretion in deciding whom to classify as a gang associate, notes Jennifer Chacon, a law professor at the University of California, Davis, who has written critically about Operation Community Shield.

In Greenport, Detective Sinning, 43, took the lead. He speaks no Spanish, but after years of regional meetings on the topic, he said, he knows the signs of gang participation.

"I gave them 15 or 16 names that we had as gang members or gang associates," he said. "They ran them through their systems and came back with four, late the night before the raid."

Detective Sinning said he suspected that two of the four, Salvadore Salazar-Orellana and Carlos Enrique Campos, were already in custody on assault and robbery charges. But he plugged all four names into a general database, and came up with six or seven home addresses roughly associated with the names he had been given.

The next day, accompanied by two uniformed officers, he guided the federal agents to those addresses.

In the end, only one of the men they were seeking was found: Pedro Rodriguez, a 19-year-old Greenport High School graduate who was facing his first criminal indictment, for assault. He had been released on bail to his mother's house, protesting innocence.

The fourth man sought by the team was José Fuentes, an 18-year-old with no criminal record, who had been designated a gang associate by a Southold officer, Detective Sinning said. But at each address they were told he had moved or had never lived t here.

One address on the list turned out to be the home of a Greenport firefighter, James Berry, who lives across the street from the mayor. Mr. Berry, 48, an American citizen, said a dozen armed agents and officers were on his lawn. "I thought they were going to kick the door in," he recalled. But when he opened the door with a curse, an agent said, "I think we have the wrong address."

Detective Sinning said agents also left an address where the residents who opened their door did not appear to be Hispanic. But at several other houses on the detective's list, Latino residents answered the door, and the agents gained entry. They searched the premises, demanded immigration papers, and arrested any man who could not produce the right documents. Women and children were left behind.

At one house where the agents were looking for Mr. Fuentes, they arrested three men who had been asleep in separate bedrooms when an aunt opened the door. Two were cousins from El Salvador, Marvin Lopez, 21, a packer of baby vegetables at Satur Farm i n Cutchogue, and Omar Lopez, 25, a Shelter Island landscaper, who had been asleep with his fiancée and infant son. The third man, Valentin Rudy Escobar Montenegro, a Guatemalan carpenter, also was with his wife and baby.

At an apartment mistakenly linked to Mr. Campos, one of the men who were in jail, the agents instead arrested Israel Salazar, 54, a full-time gardener for a retired couple in nearby Orient.

At Mr. Rodriguez's home, agents handcuffed him in the basement bedroom he shared with his American

fiancée, who was pregnant. Then they took six other men in the house: Mr. Rodriguez's cousin, Arturo, 17; Walter Tzun, the Guatemalan carpenter who worked for Mr. Finne; and — from a separate apartment upstairs — four Guatemalan landscapers who had worked for the same Shelter Island company for five years.

For the first six to eight days, the Lopez cousins and Mr. Salazar were held incommunicado, without access to counsel, at the maximum-security Metropolitan Detention Center in Brooklyn, where Muslim immigrants considered terror suspects were held after 9/11.

Moving From Jail to Jail

Eberhard Müller, the former executive chef of Lutèce, who runs Satur Farms with his wife, hired a lawyer to find Marvin Lopez, the vegetable packer. Two weeks after the raid, the lawyer found him: he had been sent in shackles from Brooklyn to a detention center in Rhode Island, and on to a New Jersey jail.

Mr. Tzun was sent through two county jails to a federal detention center in York, Pa. But even as his boss was driving to York to hire a Pennsylvania lawyer to seek bond, Mr. Tzun was being flown to a privately run prison in rural New Mexico.

Until recently, men like these, with no criminal record or outstanding deportation orders, would have been released pending a deportation hearing. But none of those arrested in the September sweep in New York were released by the New York field office. The whereabouts of four of the men — the Guatemalan landscapers — could not be learned.

Still, several of the others eventually managed to return to Greenport, and some are fighting to stay. Mr. Salazar, after three weeks behind bars, was released from the jail in Hudson County, N.J., on $10,000 bond paid by Charlotte Gemmel and Maureen Sanders, the retirees who employed him as a gardener. Marvin Lopez is also out on $10,000 bond, posted by the owners of Satur Farms. Both are applying for asylum.

Omar Lopez hopes to do so, too, based on his fear of violent gangs in El Salvador. For now, though, he worries what will happen to his fiancée, Yanci, and son, Kevin, if he is deported.

"I cry here inside prison, just thinking about Yanci," he said recently from jail in Monmouth County, N.J.

Mr. Tzun, who overstayed a visa in 2000, was released on $10,000 bond on Nov. 6 after he agreed to leave for Guatemala by Dec. 15. He has returned to say goodbye to his daughter, Sarah, and her mother, Amanda Rodriguez, with whom he had lived for six years. Mr. Tzun considered himself the stepfather of Ms. Rodriguez's three other children, including Pedro Rodriguez, who was on the original target list. Pedro Rodriguez said he was persuaded in detention to sign deportation papers — as were his cousin Arturo and Mr. Montenegro. Mr. Rodriguez, who was 12 when his mother brought him to the United States, was deported to Mexico in late October.

But that deportation left unresolved the misdemeanor assault case that Detective Sinning had brought against him in August — to the frustration of both the detective and the defendant.

The detective wanted a grand jury to indict Mr. Rodriguez for a gang-related felony in the case. The defendant wanted to clear his name, and had asked to testify and to bring alibi witnesses to a grand jury.

Mr. Rodriguez's criminal defense lawyer, Luis A. Pagan, said he was startled to learn that Detective Sinning had given Mr. Rodriguez's name to immigration agents as a target while the case was pending.

"That's scary," Mr. Pagan said. "They're not even giving this guy the right to defend himself."

The misdemeanor charge remains on the defendant's record, but because he was deported before he could be heard by the grand jury, prosecutors say they can no longer pursue a felony indictment. That matters, the detective said, because he expects Mr. Rodriguez to eventually make his way back to Greenport, where he has family and a child on the way.

Detective Sinning said he stood ready to help immigration agents again. But he added, "In this case, the one system is working against the other system."

# Exhibit 24

# Immigration raid nets 491 in region

**Wednesday, June 4, 2008**
Last updated: Wednesday June 4, 2008, EDT 10:14 AM
BY ELIZABETH LLORENTE
STAFF WRITER

Immigration agents arrested 491 people in May in New Jersey and New York, the largest number taken in a single month in the region since an operation targeting immigration violators began in 2003.

U.S. Immigration and Customs Enforcement, or ICE, says the monthlong operation was part of a six-state effort that swept up 1,800 immigrants who had criminal records, outstanding deportation orders or other immigration violations.

Of the 491 people taken into custody in this region, 251 were arrested in New Jersey, said Harold Ort, the public affairs officer for ICE in Newark. Arrests took place at private residences in 16 New Jersey municipalities, including Teaneck, Hackensack, Paterson, Passaic and Dover, Ort said.

"We're committed to protecting the integrity of the immigration system," Ort said.

The arrests are part of the Fugitive Operations Program, which was established in 2003 to track down and deport what ICE calls "immigration fugitives," largely people who were ordered deported by an immigration judge but were not detained and did not leave the United States. Agents on the Fugitive Operations teams often also arrest immigration violators they encounter during a raid aimed at someone else.

**Of the people arrested in New Jersey or New York, 347 had outstanding deportation orders, including 207 with criminal records.**

ICE has four Fugitive Operations teams in New Jersey, which has a population of 8.7 million and an estimated 500,000 illegal immigrants. The agency has 75 teams across the country, and plans to add 29 by the end of September.

Groups that favor strict immigration enforcement applauded the arrests.

"We have laws that are supposed to be respected," said Ed Durfee, a Northvale resident and member of United Patriots of America, which favors strict immigration policies. "I'm glad immigration agents are doing their jobs."

But he added: "I'm surprised that people were even let go free after they were ordered deported. If people are ordered deported, they should be held until they are sent on their way, back to their country."

But immigration advocacy groups, who frown on raids on private dwellings, denounced the arrests. Seton Hall University Law School's Center for Social Justice filed a lawsuit in federal court in April challenging ICE raids in New Jersey. The suit alleges that ICE agents violate constitutional rights by entering homes without consent or a judicial warrant during the typically pre-dawn raids.

"The name for this is witch-hunt," said Tamara Morales, vice president of the Passaic-based Casa Puebla-NJ, which serves mainly Mexican immigrants. "They're just busting into places and breaking up families and going after people who are hard working and want to legalize their status."

ICE officials defend the raids.

**"Everything we do is a surgical operation that is clearly well thought out and planned," Ort said. "Nothing is random; it's all done by the book."**

**"The law is what it is," he said. "We are going to be unrelenting in this; it's going to continue."**

E-mail: llorente@northjersey.com

http://www.northjersey.com/news/crimeandcourts/19517069.html

# Exhibit 25

 U.S. Immigration
and Customs
Enforcement

## U.S. Immigration and Customs Enforcement

## News Releases

**August 26, 2008**

## New York ICE Fugitive Operations Teams arrest 130 fugitives and immigration violators in 10-day operation
### *600th criminal alien fugitive arrested by the New York Fugitive Operations Teams this fiscal year*

NEW YORK - U.S. Immigration and Customs Enforcement (ICE) announced today its four New York Fugitive Operations Teams arrested a total of 120 fugitive aliens during a nearly two-week long operation that concluded Friday.

Of the 120 fugitives arrested, 35 had criminal records. During the operation, an additional 10 immigration violators were arrested, six of whom had criminal histories.

Criminal histories of the aliens arrested by the Fugitive Operations Teams during this operation included convictions for: drugs, assault, bank fraud, bribery, burglary, robbery and prostitution. Drug convictions included various drug offenses such as criminal importation, distribution, sale and possession of a variety of controlled substances such as heroine, cocaine and marijuana. Other convictions included criminal trespass, disorderly conduct, DWI, forgery, harassment, illegal entry, possession of a forged instrument, possession of stolen property, and theft.

"The removal of fugitive aliens, especially those with a criminal history, is a top ICE priority," said Bartolome Rodriguez, acting field office director for the ICE Office of Detention and Removal Operations (DRO) in New York. ICE's Fugitive Operations Teams prioritize cases involving immigration violators who pose a threat to national security and community safety. Foreign nationals who violate our laws and commit crimes in our communities should be on notice that ICE is going to use all of its resources to find you and send you home."

An immigration fugitive is an alien who has failed to depart the United States pursuant to a final order of removal, deportation or exclusion; or who has failed to report to a DRO Officer after receiving notice to do so. Those fugitives have already been ordered removed and are subject to immediate removal from the United States. Individuals who have illegally re-entered the U.S. after deportation are subject to

criminal prosecution and immediate removal from the U.S.

The non-fugitive immigration violators arrested during this operation have been charged with immigration violations, placed in removal proceedings and are awaiting a hearing before an Immigration Judge.

The following are examples of fugitive aliens arrested by the New York Fugitive Operations Teams during this operation:

- An Italian national arrested in Port Chester, New York, who had been previously convicted of distribution of cocaine;
- A Jordanian national arrested in the Bronx, New York, who had prior convictions for sexual misconduct and disorderly conduct;
- A Colombian national arrested in Brooklyn, New York, who had been previously convicted of bribery of an officer of the former Immigration and Naturalization Service;
- A Colombian national arrested in Mount Kisco, New York, who had been previously convicted of importation of heroin into the United States; and
- A Barbadian national arrested in Manhattan, who had prior convictions for criminal possession of a controlled substance and attempted robbery. This individual was the 600th criminal alien fugitive arrested by the New York Fugitive Operations Teams during the current fiscal year.

The National Fugitive Operations Program (NFOP) was established in 2003 to eliminate the nation's backlog of immigration fugitives. Today, ICE has 95 teams deployed across the country and 9 additional teams will be added by the end of September. So far this year, ICE's NFOP has made nearly 28,000 arrests, with over 21,000 being ICE fugitives. Last year, the Fugitive Operations Teams nearly doubled the number of arrests made in 2006 (15,000) to more than 30,000 in 2007. Additionally, in 2007, the nation's fugitive alien population declined for the first time in history and continues to do so in large part due to the work of the Fugitive Operations Teams and the Fugitive Operations Support Center, which helps to clear outstanding cases. Estimates now place the number of immigration fugitives in the United States at approximately 570,000, a decrease of nearly 25,000 since October 2007.

-- ICE --

U.S. Immigration and Customs Enforcement (ICE) was established in March 2003 as the largest investigative arm of the Department of Homeland Security. ICE is comprised of five integrated divisions that form a 21st century law enforcement agency with broad responsibilities for a number of key homeland security priorities.

Last Modified: Friday, August 29, 2008

# Exhibit 26

# The Washington Post

## Conflicting Accounts of an ICE Raid in Md.

Officers Portray Detention of 24 Latinos
Differently in Internal Probe and in Court

By N.C. Aizenman
Washington Post Staff Writer
Wednesday, February 18, 2009; A01

The boss was not happy. His elite team of immigration officers had been raiding targets across Prince George's and Montgomery counties all night long in search of fugitive and criminal immigrants but had netted only a handful.

As the unit regrouped in its Baltimore office that frigid January morning two years ago, the supervisor warned members that they were well behind a Washington-mandated annual quota of 1,000 arrests per team and ordered them back out to boost their tally.

"I don't care where you get more arrests, we need more numbers," he said, according to one account in a summary of an internal investigation. The boss then added that the agents could go to any street corner and find a group of illegal immigrants, according to the summary, not previously made public.

About an hour later, the nine-person team went to a nearby 7-Eleven and arrested 24 Latino men. But most of the detainees were hardly the threats to the United States that the team was designed to focus on.

The officers were part of a special unit that U.S. Immigration and Customs Enforcement (ICE) launched in the wake of the Sept. 11, 2001, attacks to hunt suspected terrorists or dangerous criminals who are "fugitive aliens," meaning they have evaded a deportation order. And although many of the 24 Latinos detained at the 7-Eleven were found to have been in the country illegally, 14 were not fugitive immigrants. One, Ernesto Guillen, was merely stopping for coffee on his way to join his wife at Johns Hopkins Hospital, where their 4-year-old son was undergoing chemotherapy for leukemia.

The Jan. 23, 2007, incident, described in ICE documents and shown in security camera footage obtained by The Washington Post, offers a glimpse into how Washington's directives on arrest targets might have spurred officers in the field to stray from their mission and stage a random sweep for illegal immigrants, possibly in violation of ICE's stated practice.

Even as ICE's National Fugitive Operations Program has garnered more than $625 million from Congress since its launch in 2003, critics have long suspected that Washington's practice of setting goals for apprehensions has led teams to bring in tens of thousands of immigrants who have not evaded a deportation order or committed a crime -- as opposed to being in the country unlawfully, which is a civil violation.

Recently, researchers from the Benjamin N. Cardozo School of Law in New York and the Migration

1

Policy Institute in Washington released a report revealing a dramatic leap in arrests of immigrants who were neither fugitives nor criminals in 2006 and 2007 after officers were permitted to count non-fugitives toward their goal if such detainees were encountered in the course of an operation.

When a reporter contacted ICE for this article, spokeswoman Kelly A. Nantel disclosed that as of Feb. 4, ICE leadership had altered the annual goal of 1,000 arrests for each team. Instead, each team must now identify and target -- though not necessarily arrest -- 50 fugitives each month, as well as 500 a year as part of operations with other teams.

Nantel cited new statistics showing that in the 2008 fiscal year, the share of non-fugitive arrests by the teams dropped -- from 40 percent to 24 percent of arrests nationwide and to 6 percent of those made by the Baltimore team. Meanwhile, the new secretary of homeland security, Janet Napolitano, has requested a review of fugitive operations.

Yet the aftermath of the 7-Eleven incident points to potential difficulties in changing ICE's institutional culture.

The initial account given by the agency, and supported in sworn declarations later made by some of the officers involved, was that the team had stopped at the 7-Eleven for a break when a group of Latino men approached, looking for day labor work. The officers said the men, when asked, voluntarily admitted to being in the country illegally, thus providing lawful grounds for their arrest.

But some of the officers and their colleagues later gave ICE investigators a different account. They described how, after their supervisor had instructed them to boost arrest numbers by arresting non-fugitives if necessary, they had stopped at the 7-Eleven for the express purpose of checking it for illegal immigrants. Moreover, security camera footage appears to show that at least eight of the Latino men arrested had no previous visible contact with the officers before they were detained.

The agency's internal probe -- launched at the request of Sen. Barbara A. Mikulski (D-Md.) -- was limited to the question of whether the officers had engaged in improper racial profiling and concluded on Oct. 9, 2007, that they had not. ICE has continued to stand by the initial declarations provided by its officers, submitting them in the detainee's deportation appeals as recently as Jan. 14.

Shortly after The Post contacted ICE about the incident, spokeswoman Nantel said Acting Assistant Secretary John P. Torres immediately asked the Department of Homeland Security's inspector general to investigate whether the officers' statements were inconsistent. The inspector general has not formally received the request. Nantel said Torres did not seek a further probe into the actions of the team's bosses.

"There's no conclusion in [the internal investigation report] that would indicate whether or not the supervisor gave any direction that they should go out and conduct random arrests," Nantel said. "There are accounts that say he did, and accounts that say he didn't."

Justin Cox, an attorney with

CASA of Maryland, an immigrant rights group representing some of the detained men in both a civil claim and in immigration court, said ICE's response has been inadequate.

"Changing the arrest quotas alone is not going to make ICE more transparent or accountable," Cox said. "The officer on the street really has to be completely on board with the mission of the agency, because they have so much discretion to do whatever they want in situations where no one will ever really find

out what happened." Only the security cameras and the discovery of ICE's internal documents, he said, made this situation different.

\* \* \*

By all accounts, John D. Alderman, then the acting field office director of ICE's Baltimore Office of Detention and Removal Operations, was dissatisfied upon the team's return from its night of fugitive hunting.

According to the investigation's summary, deportation officer Sean C. Ervin said Alderman told him that headquarters in Washington was "unhappy with Baltimore's results." He then "instructed [Ervin] to go out and get more aliens, that he as an experienced officer knew where potential illegal aliens tended to gather, and gave examples such as Home Depot or Lowe's parking lots."

Ervin told investigators that he sought out his immediate superior, Raymond R. Smith, "to tell him that he was uncomfortable with [the] orders." Smith told investigators that when he tried to intercede, Alderman "related that he didn't really care where they had to go and whether the aliens were fugitives or not, he just wanted them to bring more bodies in."

(All ICE officers mentioned by name in this article declined to be interviewed or did not respond to messages left at their office and mobile phone numbers.)

According to the summary, in his interview with ICE investigators, Alderman said he told team members that "they were well behind in their quota of 1,000 apprehensions per team" and pointed out that the recent change in ICE policy allowed them to count non-fugitive arrests toward the target. But Alderman said he "did not direct anyone to the 7-Eleven store or any other site as a means to obtain quick fugitive apprehensions." Nonetheless, about an hour later, that's where the team ended up.

\* \* \*

The lead vehicle, driven by Ervin, pulled into the parking lot first. Several officers told investigators that, as one put it, someone on the team suggested they "check the 7-Eleven parking lot for potential targets." Others, including Smith, who was also in the lead vehicle, said it was simply a convenient place to wait for the rest.

The store's security videos show that within three minutes of the lead car's arrival, the rest of the detention officers had arrived and corralled 20 of the men they would ultimately load onto the vans. Four more were later picked up on the street, out of sight of the cameras.

The video appears to show that at least three of the men detained were among a group that initially raced toward the lead vehicle and spoke with the officers, but at least eight had no visible contact with the officers before their detention.

In his declaration for the immigration court, Ervin said, "I believed that I had seen two individuals from the initial group that approached my vehicle get into the passenger seat of a brown pick-up truck." According to Ervin, he walked to the truck and asked the men if they were in the country illegally. When one said he was, Ervin said, he ordered both of them out.

But the video confirms that the two men ordered out of the pickup were not part of the group that approached Ervin's vehicle. One of the men, Jose del Transito, said in a phone interview from El

Salvador that he and a friend had been offered a job and were waiting outside the store for their employer to emerge when the ICE vehicles arrived. The video shows del Transito and the other man entering the pickup with their employer, only to be ordered out by Ervin seconds later.

Similarly, deportation officer Kenneth B. Giove told both the immigration court and ICE investigators that as the roundup began, "I noticed two of the men, who had been in the group surrounding [Ervin's] vehicle, turn away and enter the [7-Eleven] store," in the words of his court declaration. Giove said he went in after them and "determined who was to be removed from the store by their clothing and the fact that they were hiding behind the coffee pot," according to the investigation summary.

The video, however, shows that only one man appears to have entered the store at that point. The other two men at the coffee counter were Ernesto Guillen and a second man of Latino appearance, who, like Guillen, appears to have had no interaction with agents. The video then shows Giove direct all three men outside.

In a recent interview, Guillen recalled his mounting desperation as he tried to explain to Giove that he needed to get to his son at the hospital. "My boy was so weak and he was so scared of all the injections. I needed to be there," he recalled.

Cox and Michelle Mendez, his co-counsel at CASA of Maryland, said the events call into question whether the officers overstepped their authority. Although law enforcement officers can question anyone who speaks to them voluntarily, Cox and Mendez said, they cannot legally detain someone without reasonable suspicion.

Nantel, the ICE spokeswoman, said: "These officers were reacting to a situation that was unfolding in front of them. . . . We have the luxury to go back in time and look at it in slow motion. They don't."

The CASA of Maryland lawyers argued that ICE's investigation summary contradicts the initial testimony of some of the officers that they sought to arrest only those who had freely admitted to them that they were in the country illegally.

For instance, Ervin told ICE investigators that when he asked some of the men in the original group about their status, the men only "looked down at the ground, or away and mumbled or said nothing." Several of the detainees also filed affidavits swearing they did not voluntarily admit to being illegal immigrants.

* * *

After three fretful nights in jail, Guillen, who declined to discuss his immigration status on the advice of lawyers, was granted supervised humanitarian release by ICE. Lawyers said another man was released after 18 days because he proved he was in the country legally, while three others continue to fight their cases in immigration court. The other 19 were either deported or permitted to take "voluntary departure." Del Transito is one of them. However, he and two of the detainees still in the United States have filed claims seeking $500,000 each in damages from ICE. The agency has six months to reply.

Alderman and most of the officers involved in the 7-Eleven action are still employed by ICE. According to the investigation summary, Ervin told ICE investigators that although he did not believe the team had violated any laws, "he believed that the fugitive operations team was not appropriately used. . . . [Ervin] believed strongly in the Fugitive Operations mission, and felt from the start that the orders given to the team were outside their operational mandate."

# Exhibit 27

August 4, 2009
# Staying Tough in Crackdown on Immigrants
By JULIA PRESTON

After early pledges by President Obama that he would moderate the Bush administration's tough policy on immigration enforcement, his administration is pursuing an aggressive strategy for an illegal-immigration crackdown that relies significantly on programs started by his predecessor.

A recent blitz of measures has antagonized immigrant groups and many of Mr. Obama's Hispanic supporters, who have opened a national campaign against them, including small street protests in New York and Los Angeles last week.

The administration recently undertook audits of employee paperwork at hundreds of businesses, expanded a program to verify worker immigration status that has been widely criticized as flawed, bolstered a program of cooperation between federal and local law enforcement agencies, and rejected proposals for legally binding rules governing conditions in immigration detention centers.

"We are expanding enforcement, but I think in the right way," Janet Napolitano, the homeland security secretary, said in an interview.

Ms. Napolitano and other administration officials argue that no-nonsense immigration enforcement is necessary to persuade American voters to accept legislation that would give legal status to millions of illegal immigrants, a measure they say Mr. Obama still hopes to advance late this year or early next.

That approach brings Mr. Obama around to the position that his Republican rival, Senator John McCain of Arizona, espoused during last year's presidential campaign, a stance Mr. Obama rejected then as too hard on Latino and immigrant communities. (Mr. McCain did not respond to requests for comment.) Now the enforcement strategy has opened a political rift with some immigrant advocacy and Hispanic groups whose voters were crucial to the Obama victory.

"Our feelings are mixed at best," said Clarissa Martinez De Castro, immigration director of the National Council of La Raza, which has joined in the criticism, aimed primarily at Ms. Napolitano. "We understand the need for sensible enforcement, but that does not mean expanding programs that often led to civil rights violations."

Under Ms. Napolitano, immigration authorities have backed away from the Bush administration's frequent mass factory roundups of illegal immigrant workers. But federal criminal prosecutions for immigration violations have actually increased this year, according to a study by the Transactional Records Access Clearinghouse, a nonpartisan group that analyzes government data. In April, there were 9,037 immigration cases in the federal courts, an increase of 32 percent over April 2008, the group found.

Ms. Napolitano said in the interview that she would not call off immigration raids entirely as some Hispanic lawmakers have suggested. "We will continue to enforce the law and to look for effective ways to do it," she said. "That's my job."

Ms. Napolitano, who as governor of Arizona sparred with Republican legislators seeking tougher steps against illegal immigration, said she was looking for ways to make enforcement programs inherited from President George W. Bush less heavy-handed. She also wants to put the enforcement focus on illegal-immigrant gang

members and convicts and on employers who routinely hire illegal immigrants so as to exploit them.

Immigration authorities have started audits of employees' hiring documents at more than 600 businesses nationwide. If an employer shows a pattern of hiring immigrants whose documents cannot be verified, a criminal investigation could follow, Ms. Napolitano said.

She has also expanded a federal program, known as E-Verify, that allows employers to verify electronically the identity information of new hires. Immigrant and business groups have sued to try to stop the program, saying the databases it relies on are riddled with inaccuracies that could lead to American citizens' being denied jobs.

But officials of the Homeland Security Department say technological improvements have enhanced the speed and accuracy of E-Verify. With 137,000 employers now enrolled, only 0.3 percent of 6.4 million queries they have made so far in the 2009 fiscal year have resulted in denials that later proved incorrect, the officials say. That, opponents note, still means false denials for more than 19,000 people.

In addition, Ms. Napolitano has expanded a program that runs immigration checks on every person booked into local jails in some cities. And she recently announced the expansion of another program, known as 287(g) for the provision of the statute authorizing it, that allows for cooperation between federal immigration agents and state and local police agencies.

In extending 287(g), federal officials also drew up a new agreement, which all of some 66 localities currently participating have been asked to sign, that is intended to enhance federal oversight and clarify the priority on deporting those immigrants who are criminal fugitives or are already behind bars.

But advocates for immigrants were dismayed that the new agreement did not include strong protections against ethnic profiling. They were surprised, they say, that Ms. Napolitano did not terminate the cooperation agreement with the sheriff of Maricopa County, Ariz., Joe Arpaio, who calls himself the "toughest sheriff in America." Latino groups in Arizona have accused Mr. Arpaio of using the program to harass Hispanic residents.

"If they reform the 287(g) program and Arpaio doesn't change, it won't be reform," said Frank Sharry, executive director of America's Voice, a national immigrant advocacy group.

Ms. Napolitano said it would be up to Mr. Arpaio, like other current participants, to decide whether to sign and abide by the new cooperation agreement. Separately, the Justice Department has opened a civil rights investigation of Mr. Arpaio's practices.

The Obama administration has received support for its immigration position from a leading Democrat, Senator Charles E. Schumer of New York, the chairman of the Judiciary subcommittee on immigration, who will be writing an immigration overhaul bill later this year.

In preparation for what is likely to be a furious debate, Mr. Schumer has called on Democrats to show that they are serious about immigration enforcement and is even asking them to stop using the term "undocumented" to refer to immigrants who are here illegally.

Democrats have to "convince the American people there will not be new waves of illegal immigrants" after an overhaul passes, Mr. Schumer said in an interview.

Republicans who oppose any legalization of the status of illegal immigrants say they remain unimpressed by the new enforcement measures.

"After 20 years of broken promises, it takes a lot more than token gestures," said Representative Brian P. Bilbray, a California Republican who heads an immigration caucus in the House.

Michael A. Olivas, a professor of immigration law at the University of Houston, said Hispanic advocates were irked by the enforcement measures because they had seen scant sign that the administration was also moving deliberately toward an overhaul bill.

"We literally have the worst of all worlds," Professor Olivas said.

8/4/2009