UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| ADRIANA AGUILAR, et al., | x : | |
| Plaintiffs, | : : | |
| -against- | : : | ECF Case Civil Action No. |
| IMMIGRATION AND CUSTOMS ENFORCEMENT DIVISION OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, et al., | : : : : | 07 CIV 8224 (JGK) (FM) |
| Defendants. | : : | |
| | x | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF

DEWEY & LEBOEUF LLP
Aldo A. Badini
Donna L. Gordon
Kelly A. Librera
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

LATINOJUSTICE PRLDEF
Foster Maer
Ghita Schwarz
Christina Iturralde
99 Hudson Street, 14th Floor
New York, NY 10013
(212) 739-7504

Attorneys for Plaintiffs

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT .......................................................................................................... 3

I.     PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF
AND DEFENDANTS' MOTION UNDER FED. R. CIV. P. 12(B)(1)
SHOULD BE DENIED ...................................................................................... 3

     A.   Prior Injury, Threats of Recurrence, and Repeat Violations Show
Standing ...................................................................................................... 5

     B.   Plaintiffs Face Harm While Engaging in Everyday, Law-Abiding
Behavior ...................................................................................................... 8

     C.   Plaintiffs Are Members of an Identifiable Class Targeted by ICE
and Therefore Are Likely To Be Injured Again ............................................. 9

     D.   Harm is Likely to Recur Because of ICE's Unlawful Pattern,
Practice and *De Facto* Policies .................................................................. 11

        1.   ICE Agents Engaged in a Widespread Pattern and Practice of
Misconduct ............................................................................................ 11

           (a)   ICE Pervasively Violated the Fourth Amendment During
Warrantless Home Operations and Failed to Obtain
Voluntary Consent to Enter and Search the Homes .................... 12

           (b)   ICE Engages in a Pattern, Practice, and *De Facto* Policy
of Racial Profiling During Warrantless Home Operations .......... 17

           (c)   ICE's So-Called "Mandatory" Policies Are, in Fact,
Not Mandatory ......................................................................... 21

        2.   ICE's Misconduct Rises to the Level of *De Facto* Policy
Because ICE's Unconstitutional Practices are Persistent and
Widespread, and Because ICE Does Not Address
Constitutional Misconduct by ICE Agents through Discipline
or Re-training ........................................................................................ 22

        3.   ICE Policies Actively Condone and Authorize Constitutional
Violations .............................................................................................. 26

           (a)   Policies Authorizing Use of Unlawful Ruses and Pretexts .......... 27

           (b)   ICE Training and Policy Regarding Protective Sweeps Is
Contrary To Settled Case Law ................................................... 29

(c) ICE Policy Permitted and Encouraged Unlawful
Warrantless "Stops" and Seizures of Residents............................31

II.   PLAINTIFFS HAVE STATED A CLAIM FOR A PERMANENT
INJUNCTION ........................................................................................33

A.   Standard ........................................................................................33

B.   Plaintiffs Have Alleged Irreparable Harm ...................................34

1.   Constitutional Harm Is Presumed to be Irreparable............................35

2.   Plaintiffs Have Sufficiently Pled Factual Matter Demonstrating
Irreparable Harm ..............................................................................35

3.   Plaintiffs Have Suffered Irreparable Harm Because Their
Injury Cannot Be Remedied By Mere Money Damages ...................36

III.   IF THIS COURT DOES NOT DENY DEFENDANTS' MOTION IT
SHOULD DEFER RULING UNTIL AFTER TRIAL AS THIS MOTION
IS INTERTWINED WITH THE MERITS OF THE UNDERLYING CASE
AND PLAINTIFFS ARE IN NEED OF FURTHER DISCOVERY .................38

A.   The Evidence Concerning Standing Overlaps with Issues Reserved
for the Jury Under the Seventh Amendment..................................40

B.   Plaintiffs Are in Need of Further Discovery ................................40

CONCLUSION.............................................................................................41

**TABLE OF AUTHORITIES**

**CASES**                                                                    Page(s)

31 Foster Children v. Bush,
  329 F.3d 1255 (11th Cir. 2003) ................................................................... 5

Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,
  436 F.3d 82 (2d Cir. 2006)....................................................................... 39

Alliance of Am. Ins. V. Cuomo,
  854 F.2d 591 (2d Cir. 1988)....................................................................... 5

Anobile v. Pelligrino,
  303 F. 3d 107 (2d Cir. 2002)..................................................................... 13

Antares Aircraft L.P. v. Fed. Repub. Of Nigeria,
  948 F.2d 90 (2d Cir. 1991)........................................................................ 6

Armstrong v. Davis,
  275 F.3d 849 (9th Cir. 2001) ..................................................................... 8

Baur v. Veneman,
  352 F.3d 625 (2d Cir. 2003)..................................................................... 11

Bennett v. City of Eastpoint,
  410 F.3d 810 (6th Cir 2005) ..................................................................... 20

Bivens v. Six Unknown Federal Narcotics Agents,
  403 U.S. 388 (1971)......................................................................... *passim*

Bray v. City of New York,
  346 F. Supp. 2d 480 (S.D.N.Y. 2004)............................................... 3, 5, 11

Bumper v. North Carolina,
  391 U.S. 543 (1968)................................................................................ 12

Caraveo v. United States EEOC,
  96 Fed. Appx. 738 (2d Cir. 2004)............................................................. 38

Choi v. Gaston,
  220 F.3d 1010 (9th Cir. 2000) ................................................................. 21

City of Los Angeles v. Lyons,
  461 U.S. 95 (1983)........................................................................... *passim*

Conn. Dep't of Envtl. Prot. v. OSHA,
  356 F.3d 226 (2d Cir. 2004)..................................................................... 35

Connecticut v. Am. Elec. Power Co.,
  582 F.3d 309 (2d Cir. 2009)...................................................................... 6

CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP,
  562 F. Supp. 2d 511 (S.D.N.Y. 2008)....................................................... 34

Delphi-Delco Elecs. Sys. v. M/V Nedlloyd Europa,
  324 F. Supp. 2d 403 (S.D.N.Y. 2004)....................................................... 40

DeShawn E. by Charlotte E. v. Safir,
  156 F.3d 340 (2d. Cir. 1998)....................................................................... 26

Diaz v. New York City Bd. of Elections,
  335 F. Supp. 2d 364 (E.D.N.Y. 2004) ...................................................... 35

Doe v. Bridgeport Police Dep't.,
  198 F.R.D. 325 (D. Conn. 2001).................................................................. 37

Doe v. Hagee,
  473 F. Supp. 2d 989 (N.D.Cal. 2007) ........................................................ 22

Doe v. Mamaroneck,
  462 F. Supp. 2d 520 (S.D.N.Y. 2006)........................................................ 19

Farez-Espinoza v. Napolitano,
  No. 08 Civ. 11060(HB), 2009 U.S. Dist. LEXIS 35392 (S.D.N.Y. Apr. 27, 2009)... 8

FDIC v. Meyer,
  510 U.S. 471 (1994)...................................................................................... 38

Fiacco v. City of Rensselaer,
  783 F.2d 319 (2d Cir. 1986)......................................................................... 23

Filetech S.A. v. France Telecom S.A.,
  157 F.3d 922 (2d Cir. 1988)........................................................................... 6

Ford v. Reynolds,
  316 F.3d 351 (2d Cir. 2003).......................................................................... 36

Friends of the Earth Inc. v. Laidlaw Envtl Svcs. Inc.,
  528 U.S. 167 (2000)................................................................................... 6, 8

Gordon v. City of Moreno Valley,
  687 F. Supp. 2d 930 (C.D.Cal. 2009) ........................................................... 7

Hayden v. Paterson,
  594 F.3d 150 (2d Cir. 2010)......................................................................... 33

Hernandez v. Cremer,
  913 F.2d 230 (5th Cir. 1990) ......................................................................... 9

Ill. Migrant Council v. Pilliod,
  398 F. Supp. 882 (N.D. Ill. 1975) ............................................................... 38

Ill. Migrant Council v. Pilliod,
  540 F.2d 1062 (7th Cir. 1976) ....................................................................... 9

Johnson v. Miles,
  355 Fed. Appx. 444 (2d Cir. 2009)............................................................. 34

JSG Trading Corp. v. Tray-Wrap, Inc.,
  917 F.2d 75 (2d Cir. 1990)........................................................................... 35

Kaupp v. Texas,
  538 U.S. 626 (2003).............................................................................. 16, 32

Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Excelsior Trading Corp.,
No. 07-CV-3224(CPS)(SMG), 2007 U.S. Dist. LEXIS 69025
(E.D.N.Y. Sept. 18 2007) ............................................................................... 38

LaDuke v. Nelson,
762 F.2d 1318 (9th Cir. 1985) ................................................... 4, 6, 9, 16

LaLonde v. County of Riverside,
204 F. 3d 947 (9th Cir. 2000) ............................................................. 31, 32

Leighton Techs. LLC v. Oberthur Card Sys.,
531 F. Supp. 2d 591 (S.D.N.Y. 2008)............................................................ 40

Leinster Inter S.A. v. Botley Ltd.,
No. 09 Civ. 3874(SHS), 2009 U.S. Dist. LEXIS 122628
(S.D.N.Y. Dec. 30, 2009) ............................................................................. 36

Local 32B-32J, SEIU v. Port Auth.,
3 F. Supp. 2d 413 (S.D.N.Y. 1998).............................................................. 34

Lopez-Rodriguez v. Mukasey,
536 F.3d 1012 (9th Cir. 2008) ................................................................... 31

LSO, Ltd. v. Stroh,
205 F.3d 1146 (9th Cir. 2000) ..................................................................... 5

Lynch v. City of New York,
589 F.3d 94 (2d Cir. 2009)........................................................................... 35

Maryland v. Buie,
494 U.S. 325 (1990)............................................................................. 29, 30

Md. State Conference of NAACP Branches v. Md. Dep't of State Police,
72 F. Supp. 2d 560 (D. Md. 1999) ............................................................... 10

Mendoza v. Immigration and Naturalization Serv.,
559 F. Supp. 842 (D. Tex. 1982) ................................................................. 37

Nat'l Cong. for Puerto Rican Rights v. City of New York,
75 F. Supp. 2d 154 (S.D.N.Y. 1999)................................................... passim

Nat'l Federation of Federal Employees v. Weinberger,
818 F.2d 935 (D.C. Cir. 1987) ..................................................................... 38

Nicacio v. United States INS,
797 F.2d 700 (9th Cir. 1985) ........................................................................ 5

O'Shea v. Littleton,
414 U.S. 488 (1974)....................................................................................... 5

Ortiz v. Pearson,
No. 97 Civ. 0885 (KMW)(THK), 1999 U.S. Dist. LEXIS 22450
(S.D.N.Y. Nov. 5, 1999) ............................................................................... 39

Payton v. New York,
445 U.S. 573 (1980)..................................................................................... 31

Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.,
    602 F.3d 57 (2d Cir. 2010)...................................................................... 33

Ramirez v. Webb,
    787 F.2d 592 (6th Cir. 1986) ................................................................ 37

Ricciuti v. N.Y.C. Transit Authority,
    941 F.2d 119 (2d Cir. 1991)................................................................... 23

Rizzo v. Goode,
    423 U.S. 362 (1976).............................................................................. 26

Rodriguez v. DeBuono,
    175 F.3d 227 (2d Cir. 1998).................................................................. 34

Roe v. City of New York,
    151 F. Supp. 2d 495 (S.D.N.Y. 2001)............................................. *passim*

Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,
    547 U.S. 53 (2006)................................................................................. 6

Sango v. City of New York,
    No. 83 CV 5177(JMM)(ARR) 1989 U.S. Dist. LEXIS 18212
    (E.D.N.Y.  June 16, 1989) .................................................................... 23

Schneckloth v. Bustamonte,
    412 U.S. 218 (1973)................................................................... 4, 12, 27

Spinale v. USDA,
    621 F. Supp. 2d 112 (S.D.N.Y. 2009)................................................... 23

State v. Maldonado-Arreaga,
    772 N.W.2d 74 (Minn. Ct. App. 2009) ................................................ 12

Stauber v. City of New York,
    No. 03 Civ. 9162 (RWS), 2004 U.S. Dist. LEXIS 13350
    (S.D.N.Y. Jul. 19, 2004) ................................................................ 8, 37

Tarvarez v. Reno,
    54 F.3d 109 (2d Cir. 1995)................................................................... 23

Terry v. Ohio,
    392 U.S. 1 (1968)................................................................................. 32

Thomas v. County of Los Angeles,
    978 F.2d 504 (9th Cir. 1992) ............................................................ 8, 10

Tom Doherty Assocs., Inc. v. Saban Entertainment,
    60 F.3d 27 (2d Cir. 1995) .................................................................... 34

Turpin v. Mailet,
    619 F.2d 196 (2d Cir. 1980)................................................................. 23

UBS Secs. LLC v. Voegeli,
    684 F. Supp. 2d 351 (S.D.N.Y. 2010).................................................. 33

United States v. Ali,
    No. 05-CR-785(NG), 2006 U.S. Dist. LEXIS 21543 (E.D.N.Y March 7, 2006)
    *aff'd and adopted by,* 2006 U.S. Dist. LEXIS 21544
    (E.D.N.Y. Apr. 7, 2006) ................................................................................... 24, 30

United States v. Barrera-Martinez,
    No. 03 CR 21, 2003 U.S. Dist. LEXIS 13125 (N.D.Ill. 2003) ................................ 15

United States v. Brignoni-Ponce,
    422 U.S. 873 (1975) .............................................................................................. 17

United States v. Brown,
    961 F.2d 1039 (2d Cir. 1992) ............................................................................... 15

United States v. Castellanos,
    518 F.3d 965 (8th Cir. 2008) ............................................................................... 15

United States v. Corral,
    No. Ep-04-CR-543-PRM, 339 F.Supp.2d 781 (W.D.Texas Oct. 1, 2004) ............... 15

United States v. Dunn,
    480 U.S. 294 (1987) .............................................................................................. 16

United States v. Gandia,
    424 F.3d 255 (2d Cir. 2005) ............................................................................ 16, 29

United States v. Hernandez-Juarez,
    No. SA-09-CR-19-XR, 2009 U.S. Dist. LEXIS 22031
    (W.D. Tex. Mar. 16, 2009) .............................................................................. 27, 28

United States v. Hope,
    No. 2:06CR571DAK, 2008 U.S. Dist. LEXIS 6353 (C.D.Utah Jan. 29, 2008) ....... 15

United States v. Isiofia,
    370 F.3d 226 (2d Cir. 2004) ................................................................................. 16

United States v. Mapp,
    476 F.2d 67 (2d Cir. 1973) ................................................................................... 16

United States v. Mendenhall,
    446 U.S. 544 (1980) ......................................................................................... 16, 32

United States v. Montes-Reyes,
    547 F. Supp.2d 281 (S.D.N.Y. 2008) ............................................................... 27, 28

United States v. Waller,
    426 F.3d 838 (6th Cir. 2005) ............................................................................... 15

United States v. Wilson,
    11 F.3d 346 (2d Cir. 1993) ................................................................................... 12

Villante v. Dept. of Corrections,
    786 F.2d 516 (2d Cir. 1986) ................................................................................. 23

Zepeda v. U.S. Immigration & Naturalization Service,
    753 F.2d 719 (9th .Cir. 1983) ........................................................................... 4, 37

**RULES**

8 C.F.R. § 287.8 ................................................................................................................ 7

Fed. R. Civ. P. 12(b)(1) ................................................................................................... 3

Fed. R. Civ. P. 12(c) ..................................................................................................... 33

## PRELIMINARY STATEMENT

Plaintiffs in this action are two-dozen Latino men, women, and children – including U.S. citizens and lawful permanent residents – whose homes were subject to unconstitutional raids at the hands of Immigration and Custom Enforcement ("ICE").  These individuals were not gang members or fugitive aliens, nor were they targets of the raids.   Voluminous evidence demonstrates that ICE agents surrounded, seized, entered and searched plaintiffs' homes without judicial warrants, valid consent or exigent circumstances and detained residents within, in violation of the Fourth and Fifth Amendments.  ICE agents continue to engage in such conduct as part of ICE's ongoing pattern, practice and *de facto* policy of unlawful conduct during warrantless home operations.

Defendants in this action are ICE, various ICE and Department of Homeland Security ("DHS") supervisory officials in their official capacity, and the individual ICE agents and officers ("ICE agents") present at, or directly involved in the planning of raids at, named plaintiffs' homes.  Defendants claim that ICE agents entered and searched plaintiffs' homes only after obtaining consent to do so.  The record categorically refutes this defense.  Strikingly, defendants themselves fail to cite testimony of *any* plaintiff, defendant or third-party witness showing that ICE agents obtained valid consent to enter or search plaintiffs' homes.  The reason for this is simple – none exists.  By contrast, every plaintiff and many witnesses, *including law enforcement witnesses and even ICE agents themselves*, have testified to ICE's coercive and sometimes violent conduct during home operations.

In addition to their damages claims, plaintiffs in this matter seek injunctive relief to remedy ICE's violation of the Fourth and Fifth Amendments.  The injunctive relief sought would

ensure than any warrantless home operations are conducted pursuant to constitutional procedures and standards that should govern the conduct of ICE agents.

Contrary to defendants' position, plaintiffs have standing to seek injunctive relief because they are likely to suffer future injury at the hands of ICE for four independent reasons. First, plaintiffs have suffered repeated harms in the past, and have been threatened by ICE with future harm. ICE agents pushed, coerced, and, in some cases, physically forced their way into plaintiffs' homes; rounded up residents within the homes, regardless of their status; demanded identification documents without reasonable suspicion of alienage; and, on several occasions, caused extensive property damage. ICE agents raided the home of four plaintiffs twice, looking in vain for the same target both times, and expressly threatened to return to two other homes.

Second, the risk of repeated constitutional injury is significant where, as here, the past injury is not linked with any unlawful behavior by plaintiffs. None of the plaintiffs here were doing anything unlawful to bring about the injuries they endured. They were simply sleeping or living quietly in their homes, disturbing no one. Thus, the circumstances of this case are nothing like those in City of Los Angeles v. Lyons, 461 U.S. 95 (1983) (a case defendants emphasize heavily in their brief), where the lone plaintiff was subjected to a chokehold after being stopped for breaking the law.

Third, plaintiffs are members of an identifiable class targeted by ICE. ICE's unlawful conduct overwhelmingly impacts Latinos, while it excludes similarly situated non-Latinos from the same unlawful treatment. ICE agents raid the homes of numerous Latinos, like plaintiffs, using the pretext that they are looking for a specific target; however, in most cases the agents have no reasonable basis to believe that the purported target is present at the homes.

Fourth, ICE's misconduct is part of a widespread pattern and practice across the New York area and around the country that is the result of official policy. ICE fails to train its agents appropriately to conduct these raids and fails to adequately investigate serious, credible allegations of unconstitutional conduct. What is more, ICE does not discipline agents even after courts find constitutional violations by such agents.

For all these independent reasons, plaintiffs have standing to seek injunctive relief.

## ARGUMENT

## I. PLAINTIFFS HAVE STANDING TO SEEK INJUNCTIVE RELIEF AND DEFENDANTS' MOTION UNDER FED. R. CIV. P. 12(B)(1) SHOULD BE DENIED

Defendants' argument that plaintiffs' claim for injunctive relief should be dismissed for lack of standing pursuant to Federal Rule of Civil Procedure 12(b)(1) focuses on the fact that ICE has a "written policy" requiring agents to "obtain consent" and no official policy requiring unconstitutional conduct. Even if we assume, *arguendo,* that ICE's official policies comply with the U.S. Constitution (which many do not, see Section D.3), this argument ignores case law finding standing to seek injunctive relief where plaintiffs successfully demonstrate that law enforcement agencies engaged in a pattern and practice of constitutional misconduct in spite of "official" policies or constitutional strictures to the contrary. See, e.g., Bray v. City of New York, 346 F. Supp. 2d 480, 487 (S.D.N.Y. 2004) (finding standing where NYPD engaged in an unconstitutional pattern of seizing plaintiffs' bicycles without citing them for violations "as a matter of departmental routine"); Roe v. City of New York, 151 F. Supp. 2d 495, 499 (S.D.N.Y. 2001) (finding standing where NYPD engaged in pattern of stops and searches "without individualized reasonable suspicion" in allegedly known "drug areas" and in doing so "ignore[d] the Public Health Law and its own 'official policy'").

Despite defendants' contentions otherwise, the existence of written policies requiring agents to "obtain consent" does not demonstrate that in practice, agents follow such policies or even that they understand the factors that determine whether valid consent was granted. "Consent" is a fact-sensitive inquiry that depends on "the totality of the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).  Evidence shows that in practice ICE's warrantless home operations routinely exhibit multiple indicia of coercive conduct as well as racial profiling.  Defendants fail to address plaintiffs' claims and extensive evidence of discriminatory conduct toward Latinos.

Courts not only have found standing, but also have issued injunctions against the Immigration and Naturalization Service ("INS"), the predecessor to ICE, for constitutional violations during strikingly similar warrantless operations.  In Zepeda v. U.S. Immigration & Naturalization Service, 753 F.2d 719 (9th Cir. 1983), the Ninth Circuit upheld a finding of standing where plaintiffs showed that INS agents forcibly entered and searched residences without consent and detained and questioned Latinos on the basis of the plaintiffs' appearance, use of Spanish or presence in a Latino area.  Similarly, in LaDuke v. Nelson, 762 F.2d 1318, 1324, 1326 (9th Cir. 1985), the Ninth Circuit affirmed an injunction prohibiting a "standard pattern" of unlawful checks of the homes of migrant housing residents without warrants, probable cause or articulable suspicion during which INS "station[ed] officers at all doors and windows' of the dwellings to prevent egress" thus effecting seizures that "preceded alleged consent."  Defendants here have engaged in a similar pattern and practice of misconduct.

Further, ICE admits that the operations at issue in this case are ongoing.  ICE RFA Nos. 37-39 (attached hereto as Exhibit 1 to the Declaration of Donna L. Gordon in Opposition to Defendant's Motion to Dismiss Plaintiffs' Claim for Injunctive Relief (July 9, 2010) ("DG

Decl.")); J. Knopf Tr. 330:11-15;[1] see also DG Decl. Exh. 2.  ICE spokespersons have confirmed that these warrantless home operations will continue in the future and will be "unrelenting." Fourth Amended Class Action Complaint ("Compl.") Exh. 24 at 2.  Given that, as well as ICE's failures to make any significant changes to the way these raids are conducted, future constitutional violations are likely to occur.

### A.   Prior Injury, Threats of Recurrence, and Repeat Violations Show Standing

Plaintiffs have particularly strong arguments that they are likely to suffer future harm where they have: (1) suffered prior injury, Bray, 346 F. Supp. 2d at 487; (2) were threatened with future injury, 31 Foster Children v. Bush, 329 F.3d 1255, 1266 (11th Cir. 2003); or (3) were injured "more than once," Nat'l Cong. for Puerto Rican Rights v. City of New York, 75 F. Supp. 2d 154, 161-62 (S.D.N.Y. 1999) (Scheindlin, J.).  Because ICE has repeatedly violated the U.S. Constitution causing injury to plaintiffs,[2] threatened to return to two homes, and raided the home of four plaintiffs twice, plaintiffs face a credible and likely threat of future injury.

"It is well settled that evidence of past instances of enforcement is important in a standing inquiry."  LSO, Ltd. v. Stroh, 205 F.3d 1146, 1155 (9th Cir. 2000).  Although "a plaintiff need not wait for an injury to occur," in order to demonstrate standing,  31 Foster Children, 329 F.3d at 1265, accord, Alliance of Am. Ins. v. Cuomo, 854 F.2d 591, 596 (2d Cir. 1988), every plaintiff in this case has been subject to unconstitutional raids.  That a defendant has engaged in wrongful acts is indicative of a likelihood that the defendant will do so again.  O'Shea v. Littleton, 414

---

[1] All deposition transcripts cited herein are attached as exhibits to the Declaration of Donna L. Gordon in Opposition to Defendants' Motion to Dismiss Plaintiffs' Claims for Injunctive Relief.  The transcripts of ICE agent defendants who are known publicly by their anonymous ICE # are attached thereto in numerical order.  All other transcripts, including the transcripts of ICE supervisors who are named in the Complaint and plaintiffs, are attached in alphabetical order.

[2] In cases of multiple raids, courts presume the likelihood of recurrence.  While "there is no per se rule requiring more than one past act, or any prior act, for that matter, as a basis for finding a likelihood of future injury," Roe, 151 F. Supp. 2d at 503, the "possibility of recurring injury ceases to be speculative when actual repeated incidents are documented."  Nicacio v. United States INS, 797 F.2d 700, 702 (9th Cir. 1985).

U.S. 488, 496 (1974) ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury."); Nat'l Cong., 75 F. Supp. 2d at 161-62 (finding standing where some plaintiffs were harmed "more than once") (internal citation omitted).  Moreover, a reasonable fear of future injury is sufficient for standing purposes.  See Friends of the Earth Inc. v. Laidlaw Envtl Servs. Inc., 528 U.S. 167, 184-85 (2000).

Here, ICE agents expressly threatened to return to two homes in the future.[3]  These explicit threats are more than sufficient to establish standing for injunctive relief.  See LaDuke, 762 F.2d at 1330 (distinguishing Lyons and noting that "[t]he likelihood that class members will suffer prospective injury is buttressed not only by the defendant's past conduct but also by the defendant's avowed future intent").[4]

Further, ICE admits both that it has no policy preventing repeat raids of the same home and that ICE agents have perpetrated repeat operations at an unknown number of homes.  ICE RFA Nos. 43, 44 (DG Decl. Exh. 1).  As ICE itself testified, "[W]e have no policies that would discourage [a repeat operation at the same address] or instruct [an] agent not to go back a second time."  30(b)(6) OI Deponent Tr. 198:7-9.[5]  Likewise, that ICE does not require its agents to record instances where no arrests were made or the target was not found increases the likelihood that ICE agents will return to these same homes to conduct additional unconstitutional warrantless home operations.  See RFA No. 26-27 (DG Decl. Exh. 1); 30(b)(6) OI Deponent Tr. 269:5-7; 30(b)(6) DRO Deponent Tr. 261:2; 30(b)(6) ICE TECS & DACS Deponent Tr. 207:20-

---

[3] DG Decl. Exh. 10 ¶ 20; DG Decl. Exh. 9 ¶ 21, A. Aguilar Tr. 81:7-82:5.
[4] Moreover, standing on behalf of any one of the plaintiffs is sufficient to establish standing for all.  See Rumsfeld v. Forum for Acad. & Inst. Rights, Inc., 547 U.S. 53 n.2 (2006); Connecticut v. Am. Elec. Power Co., 582 F.3d 309, 339 n.17 (2d Cir. 2009).
[5] "Where subject matter jurisdiction is challenged, the Court need not accept as true contested jurisdictional allegations and may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings." Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1988) (quoting Antares Aircraft L.P. v. Fed. Repub. of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991).

208:2.[6]  Not only does ICE not have a policy prohibiting return visits, the record in this case demonstrates that ICE *does* in fact return to homes more than once, looking for the same target. For instance, ICE 4 testified that he might visit a house more than once looking for the same target, even if he obtained no new information that the target lived in the designated home.  ICE 4 Tr. 139:18-140:9.

Moreover, four plaintiffs – Pelagia de la Rosa and her three sons – suffered two unconstitutional warrantless home operations conducted by ICE in a thirteen-month period.  ICE agents engaged in almost identical unlawful conduct both times.[7]  Where plaintiffs "have been victim[iz]ed by these unconstitutional practices repeatedly . . . this alone establishes that plaintiffs face a realistic threat of future harm." Nat'l Congress, 75 F. Supp. 2d at 161; see also Gordon v. City of Moreno Valley, 687 F. Supp. 2d 930 (C.D. Cal. 2009) (finding standing for injunctive relief to stop law enforcement raids of businesses where African-American business owners claimed racial discrimination, documented that raids had occurred in the past and had occurred at some businesses twice).[8]

---

[6] This is yet another instance where ICE's *de facto* policy contradicts official, written policy.  8 C.F.R. § 287.8 (specifically requiring that all activities must be documented, even if to report negative results).

[7] In August 2006 and September 2007, ICE agents surrounded the home in the early morning, banged so loudly on the front door that residents thought they would knock it down and yelled "open the door!"  P. De La Rosa Tr. 107:15-18; 112:19-115:4; 123:17-22) (describing 2006 raid); C. Jimenez 117:11 (describing the 2006 raid); B. Jimenez Tr. 118:10-12; 215:22-25; 217:24 (describing the 2007 raid); (A. Jimenez Tr. 126:23; 133:20-22 (describing the 2006 raid); A. Jimenez Tr. 249:7-257:9; 256:21-22 (describing 2007 raid); C. Jimenez Tr. 170:20-23; 171:16-172 (describing the 2007 raid).  The agents then barged into the home, looking for the same target both times, searched bedrooms without seeking permission from undressed or sleeping residents, and physically pulled boys from their beds. P. De La Rosa Tr. 123:18-22; 124:12-13 (describing the 2006 raid); B. Jimenez Tr. 125:19-20; 126:7; 177:7-10 (describing the 2006 raid); B. Jimenez Tr. 219:18; 232:19-21; 291:21 (describing 2007 raid); A. Jimenez Tr. 125:17; 142:11-20; 149:3-10 (describing 2006 raid); A. Jimenez Tr. 250:22-251:4; 257:19-21; 288:5-9 (describing 2007 raid).  The agents then corralled residents in common areas for questioning.  B. Jimenez Tr. 145:24-25 (describing the 2006 raid); B. Jimenez Tr. 238:3-4 (describing 2007 raid); A. Jimenez Tr. 196:2-9; 202:22 (describing the 2006 raid); A. Jimenez Tr. 270:19 (describing 2007 raid).  Agents ignored residents' inquiries as to ICE's purpose. P. De La Rosa Tr. 135:3-16; 146:12-17; 158:5-159:4 (describing the 2006 raid); C. Jimenez Tr. 185:7-16; 237:14-23 (describing the 2007 raid).

[8] Gordon v. City of Moreno Valley, No. EDCV-09-688-SGL (SSx) (C.D. Cal. March 31, 2010) (DG Decl. Exh. 13).

Contrary to defendants' argument, the fact that ICE has not returned to plaintiffs' homes since 2007 does not negate standing for injunctive relief.  "[A] defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."  Farez-Espinoza v. Napolitano, No. 08 Civ. 11060 (HB), 2009 U.S. Dist. LEXIS 35392, at *13 (S.D.N.Y. Apr. 27, 2009), citing Friends of the Earth, Inc., 528 U.S. at 189.  Here, defendants decided to not subject plaintiffs to further raids after plaintiffs initiated this action in October 2007, assuring this Court that they would not retaliate against the named plaintiffs.  See Hearing Tr. (Oct. 5, 2007) 28:14-29:19; Hearing Tr. (Oct. 9, 2007) 29:4-11.[9]  Courts have routinely rejected arguments where defendants have sought to moot plaintiffs' claims through voluntary cessation of a challenged practice.  Stauber v. City of New York, No. 03 Civ. 9162 (RWS), 2004 U.S. Dist. LEXIS 13350, at *52-53 (S.D.N.Y. Jul. 19, 2004).  Thus, defendants cannot moot plaintiffs' claims by intentionally avoiding their homes for the duration of this litigation.

**B.   Plaintiffs Face Harm While Engaging in Everyday, Law-Abiding Behavior**

Where plaintiffs need only engage in law-abiding, routine activities to be subject to the future government action they seek to enjoin, it is more likely that they will face future injury. Courts have distinguished Lyons where plaintiffs suffered harm when engaging in routine and law-abiding behavior.  See, e.g., Roe, 151 F. Supp. 2d at 502-3 (distinguishing Lyons where complaint alleged law enforcement action against lawful behavior); Armstrong v. Davis, 275 F.3d 849, 866 (9th Cir. 2001) (standing granted where "plaintiffs need not engage in unlawful conduct to become subject to the unlawful practices they seek to enjoin"); Thomas v. County of

---

[9] Indeed, a number of the defendants have admitted that they were given specific instructions to avoid named plaintiffs' addresses during future operations.  ICE 4 testified that *after* this litigation commenced, ICE distributed an e-mail providing the names and addresses of the named plaintiffs, as well as instructions not to attempt to remove them.  ICE 4 Tr. 25:17-26:7.  Similarly, Group Supervisor Knopf confirmed that ICE agents knew not to raid named plaintiffs' homes.  J. Knopf Tr. 105:22-106:23.

Los Angeles, 978 F.2d 504, 508 (9th Cir. 1992) ("In contrast [to Lyons] . . . many victims purportedly did nothing to warrant detention or apprehension prior to the mistreatment"); Hernandez v. Cremer, 913 F.2d 230, 234-35 (5th Cir. 1990) (the injury "did not result from an individual's disobedience of official instructions and [the plaintiff] was not engaged in any form of misconduct"); LaDuke, 762 F.2d at 1326 ("the members of plaintiff class do not have to induce a police encounter before the possibility of injury can occur . . . . [and] are subject to constitutional injury based on . . . completely innocent behavior").

Unlike the plaintiff in Lyons, the plaintiffs here were engaging in a host of innocuous activities — sleeping, doing laundry, and watching television[10] — when ICE agents raided their homes.  *None* of the plaintiffs was a gang member, fugitive or other target of any ICE operation. ICE seized plaintiffs while they were engaging in lawful activities.  The string of speculative contingencies that doomed Lyons's claim for injunctive relief simply do not exist here, where there is nothing that plaintiffs can affirmatively do to avoid ICE's home raids in the future. These circumstances strongly militate in favor of standing.  See Nat'l Cong., 75 F. Supp. 2d at 161 ("The fact that plaintiffs were stopped while engaging in everyday tasks further illustrates a realistic risk of future harm.").

### C.   Plaintiffs Are Members of an Identifiable Class Targeted by ICE and Therefore Are Likely To Be Injured Again

Courts have repeatedly found that plaintiffs who are members of an "identifiable class of targeted individuals," such as a race-based class, have standing for injunctive relief where they are subject to a persistent unlawful practice.  Roe, 151 F. Supp. 2d at 504; accord Nat'l Congress, 75 F. Supp. 2d at 162 (finding standing to enjoin racially discriminatory stop and frisk policy); Ill. Migrant Council v. Pilliod, 540 F.2d 1062, 1067 (7th Cir. 1976) (affirming standing of six

---

[10] See, e.g., A. Aguilar Tr. 46:16-23; C. Jimenez Tr. 80:21-24; D. Velasquez Tr. 91:13-18.

individuals and civil rights groups seeking to prohibit INS officers from stopping individuals due to their ethnicity; this practice was evidenced by only three individual stops and two farm dormitory raids). Where defendants' practices are "purposely aimed at minorities," the case for standing is stronger.[11]

The evidence shows that the vast majority of the official targets of these operations were Latino. See, e.g., DG Decl. Exh. 44 (of the 131 targets for Operation Community Shield ("OCS") in September 2007 only 20 were *not* Latino).[12] In fact, the Case Agent for OCS readily admitted that the majority of the targets were Latino. ICE 27 Tr. 120:13-16. Moreover, evidence demonstrates that ICE targeted these Latinos in order to effectuate collateral arrests on other Latinos who were undocumented. See Section I.D.2.b., infra.

All of the named plaintiffs in this case, including citizens, lawful permanent residents, and children, are Latino. The members of the putative class are all Latino.[13] Because none of the named plaintiffs was an official target of any ICE operation, a fugitive or an alleged gang member, and because ICE pattern, practice and *de facto* policy injured Latinos not because they were targets, fugitives or gang members but because of their race or national origin, the named plaintiffs and the putative plaintiff class are likely to be subject to future injury.

---

[11]   See, e.g., Thomas, 978 F.2d at 508 (finding standing where police "misconduct is purposefully aimed at minorities"); Md. State Conference of NAACP Branches v. Md. Dep't of State Police, 72 F. Supp. 2d 560, 565 (D. Md. 1999) ("[T]he plaintiff's likelihood of injury depends only on their status as a member of a minority group and their need to travel on I-95.").

[12]   Defendants have not produced a target list for the DRO operations at issue here, precluding plaintiffs from conducting the same analysis for those operations. This is but one example of the additional discovery needed by plaintiffs. The 56(f) affidavit sets forth in more detail the scope of discovery plaintiffs seek.

[13]   Plaintiffs here bring this case not only in their individual capacities but also as a putative class action on behalf of "Persons who, because they (1) are Latino, and (2) reside in the jurisdiction of the New York City regional office (or field office) of ICE have been subjected to and/or are at imminent risk of home raids by the New York City regional office (or field office) of ICE." Compl. ¶ 443. Plaintiffs intend to file a motion for class certification before trial.

### D.   Harm is Likely to Recur Because of ICE's Unlawful Pattern, Practice, and *De Facto* Policies

Courts have routinely found that plaintiffs have standing to obtain injunctive relief where a defendant previously engaged in a pattern, practice or *de facto* policy of unlawful conduct.  In such cases, courts have found a sufficient likelihood that a defendant will engage in such conduct again and thus the harm plaintiffs suffered will recur.  See, e.g., Bray, 346 F. Supp. 2d at 487 ("Where a defendant has previously engaged in a pattern of similar acts, there is a sufficient likelihood that it will do so again in the near future") (internal citation omitted); Roe, 151 F. Supp. at 503 (where plaintiffs alleged an ongoing "specific, systematic, city-wide NYPD practice. . . ." such practice is "likely to lead to arrests of [plaintiffs] in the future").

The threatened harm need only be "credible" and not "certainly impending."  Baur v. Veneman, 352 F.3d 625, 641 (2d Cir. 2003).  Here, given the constitutional importance of safeguarding the home against arbitrary government invasion and of outlawing government action based on suspect classifications, plaintiffs have alleged and sustained severe constitutional injury.  Plaintiffs easily show that they have standing to bring a claim for injunctive relief.

### 1.   ICE Agents Engaged in a Widespread Pattern and Practice of Misconduct

In raids of the homes of plaintiffs and numerous other Latinos, ICE agents consistently violated the Fourth and Fifth Amendments.  Plaintiffs' allegations are remarkably similar to allegations made in other lawsuits all over the country: large teams of heavily-armed ICE agents surrounded and seized the homes; entered without requesting or obtaining valid consent and in some cases forced doors open; proceeded to search the homes by, among other things, barging into private bedrooms without obtaining consent; interrogated all Latinos present and handcuffed individuals prior to any questioning; failed to speak in a language understandable by the individuals with whom the ICE agents were communicating; and made clear, through force and

intimidation, that occupants were not free to move in their own homes.[14]   Further, testimony

from both local law enforcement personnel and ICE agents demonstrates that ICE agents

engaged in a pattern, practice, and *de facto* policy of racial profiling and discriminatory conduct.

### (a)   ICE Pervasively Violated the Fourth Amendment During Warrantless Home Operations and Failed to Obtain Voluntary Consent to Enter and Search the Homes

Defendants' brief fails to cite to *any* testimony describing the actual conduct of the raids

at plaintiffs' and others' homes.   This is not surprising, given that numerous plaintiffs, third-

party witnesses, and, in some cases, even ICE agents themselves have described conduct

demonstrating that ICE agents routinely violated the Fourth Amendment by failing to obtain

valid consent before entering and searching homes during warrantless home operations.   Indeed,

as discussed infra at 23, several courts have already found egregious violations of the Fourth

Amendment by ICE agents in the context of home raids, including some of the very raids at issue

in this case.

"Consent must be a product of [an] individual's free and unconstrained choice, rather

than a mere acquiescence in a show of authority."   United States v. Wilson, 11 F.3d 346, 351 (2d

Cir. 1993); see also Bumper v. North Carolina, 391 U.S. 543, 549 (1968).   Further, valid consent

must be determined through an examination of the "totality of the circumstances."   Schneckloth,

412 U.S. at   227.   And although it is defendants' burden to prove that they obtained valid

---

[14] See Compl. Exh. 2 at 16-22, Exhs. 18-23, 26 (detailing accounts of ICE's Fourth Amendment violations from California to Idaho to New York).   In Connecticut, an immigration judge found that ICE committed egregious Fourth Amendment violations on at least three different occasions during raids in June 2007.   See Compl. Exhs. 8, 9, 10.   The Minnesota Court of Appeals detailed an instance of "flagrant and egregious" – and apparently undisputed – Fourth Amendment violations.   State v. Maldonado-Arreaga, 772 N.W.2d 74, 76 (Minn. Ct. App. 2009).   In Arizona, Department of Homeland Security employee Jimmy Slaughter is suing ICE for violating his Fourth Amendment rights during a warrantless home operation.   Affidavit of Jimmy Slaughter (DG Decl. Exh. 3).   In addition to documenting allegations of unlawful home raids across the country, a study released by the Cardozo School of Law's Immigration Justice Clinic, *Constitution on ICE*, analyzed documentation of consent in I-213 forms, which ICE creates for each respondent in a removal proceeding in immigration court.   This report concluded that ICE failed to obtain consent of 86% of the time during warrantless home operations in Long Island.   Compl. Ex. 2 at 9-10.

consent, <u>Anobile v. Pelligrino</u>, 303 F. 3d 107, 124 (2d Cir. 2002), *no* defendant ICE agent deposed thus far has been able to testify about the specific circumstances of how valid consent to enter or search was obtained from any plaintiff. In fact, as set forth below, ICE seized plaintiffs in their homes prior to seeking consent (vitiating any purported consent), and then proceeded to conduct nonconsensual searches.

First, the operations at plaintiffs' homes occurred in the pre-dawn early morning hours, usually between 4:30 a.m. and 5:45 a.m.,[15] in keeping with ICE's contention that time of day does not matter in determining whether consent is valid. 30(b)(6) OI Deponent Tr. 90:4-12.

Second, virtually every defendant deposed testified that ICE agents typically secure a "perimeter" at the exits and windows of homes prior to seeking consent to enter.[16] Thus, ICE's undisputed practice is to enter private property, including backyards, before any consent is requested. ICE operation plans and training documents endorse this procedure.[17] Unfortunately for defendants, however, these practices fly in the face of case law that warrantless entry onto the curtilage of a home without valid consent is unlawful.

Third, after securing the perimeter ICE agents "banged on doors" so hard that many residents thought the doors would "break";[18] shone flashlights into windows;[19] and at times forced open front doors and bedroom doors.[20] In some instances, ICE agents drew weapons at the front door,[21] or lied about the purpose of their visit.[22]

---

[15] D. Lazaro Perez Tr. 23:17-20; M. Patzan del Leon Tr. 42:25; P. De La Rosa Tr. 107 :18 ; C. Jimenez Tr. 84:10; A. Jimenez Tr. 127 :14-16 ; R. Rodriguez de Flores Tr. 129 :10 ; B. Jimenez Tr. 129 :7-8.
[16] Indeed, several ICE agents have admitted to knocking on windows when residents did not come to the door. <u>See, e.g.</u>, ICE 45 Tr. 157:11-18; ICE 16 Tr. 137:17-24; ICE 41 Tr. 115:15-18.
[17] DG Decl. Exh. 30; DG Decl. Exh. 33.
[18] J. Berry Tr. 17:23-18:6; N. Velasquez Tr. 54:10-22; M. Patzan DeLeon 137:8-10 ; P. De La Rosa Tr. 112:19-113:4; C. Jimenez Tr. 171:16-19 ; B. Jimenez Tr. 217 :20; A. Jimenez Tr. 250 :5-251 :7.
[19] D. Velasquez Tr. 132 :3-20; V. Morales Tr. 63:5-7; Y. Revolorio Tr. 73:24-74:3.
[20] ICE 20 Tr. 338:9-17 (admitting he forced open a bedroom door at 20 Chase St.), C. Bedi Tr. 87:23-88:11; V. Bedi Tr. 105:22-23; C. Licona Tr. 35:5-6.
[21] DG Decl. Exh. 36.

Fourth, once doors were opened, either by ICE agents forcing them open, or by stunned, suddenly awakened residents opening the door to see large teams of visibly armed people,[23] ICE agents stormed in without permission,[24] even pushing past occupants who were minor children.[25] ICE permits its agents to enter homes during warrantless operations outfitted with heavy firearms such as the Remington 870 police shotgun and the M4 semi-automatic rifle.[26]  Indeed, numerous plaintiffs and witnesses observed agents with machine guns and other long arms,[27] hands on holsters,[28] or guns drawn.[29]  ICE 34 himself concedes that he entered 22 Dogwood Lane with his weapon drawn, as he does for "all enforcement actions," even those purportedly based on "consent."[30]  ICE 47 testified that his practice is to ask for consent *after* entering a home, and did not appear to be aware that he needed valid consent to enter at all.[31]

Fifth, once inside, ICE agents swept through the homes, searching the premises, even after admittedly locating the target at the front door and even though the ICE agents were unable to testify to any articulable suspicion of danger.[32]  See infra D.3(b).

Sixth, ICE agents entered the bedrooms of sleeping residents, rousted them from their beds,[33] ordered them out of their bedrooms,[34] searched closets, drawers, and under beds,[35] and

---

[22] B. Velasquez Tr. 82:24-83:2; DG Decl. Exh. 35.
[23] P. De La Rosa Tr. 114 :18-115 :4; C. Licona Tr. 28 :22-31 :11.
[24] P. De La Rosa Tr. 114 :16-115:4; 123:17-22; C. Jimenez Tr. 171:16-172:8; B. Jimenez Tr. 118:10-12 ; 217:24; A. Jimenez Tr. 139:14-15.
[25] Id.
[26] 30(b)(6) DRO Deponent Tr.250:21-23.
[27] G. Escalante Tr. 51:20-22; C. Licona Tr. 52:19-22; R. Rodriguez De Flores Tr. 73:19-74:8.
[28] A. Aguilar Tr. 54:9-10; D. Velasquez Tr. 184:21-23; D. Lazaro Perez Tr. 39:7-9.
[29] DG Decl. Exh. 36; R. Rodriguez De Flores Tr. 175:23-176:2.
[30] ICE 34 Tr. 86:18-21.
[31] ICE 47 Tr. 25:23-27:6, 123:20-124:24, 126:18-128:2.
[32] ICE 34 Tr. 86 :22-87:5; ICE 42 Tr. 235:21-236:6; ICE 41 Tr. 212:17-19; 249:8; ICE 52 Tr. 180:25-181:3; ICE 37 Tr. 175:24-176:3; ICE 9 Tr. 181:13-20; ICE 43  Tr. 201:3-6.
[33] B. Jimenez Tr. 232 :25-233 :3; A. Jimenez Tr. 141:20-142:6.
[34] B. Jimenez Tr. 232 :25-233 :3 ; A. Jimenez Tr. 149:6-10.
[35] C. Licona Tr. 63:9-17; P. De La Rosa Tr. 220:20-221:11; S. Bonilla Tr. 141:5-8; R. Rodriguez de Flores 127:4-5; B. Velasquez Tr. 156:20.  ICE policy dictates that agents must obtain consent to enter first and then separately obtain consent to search.  DG Decl. Exh. 33 (Field Operations Student Handout, discussing the "8 Critical Mission Steps." Under "Consent," it is noted that "Consent to Enter the dwelling is not the same as Consent to Search the

proceeded to interrogate the individuals present in a brutally coercive manner, frequently without communicating effectively in the language of the residents of the home.[36]  ICE 6, for example, testified that when he opened the door to a sleeping woman's bedroom at 30 Copeces Lane – apparently that of plaintiff Adriana Aguilar[37] – she "leapt out of bed . . . and she may have screamed" – he obviously did not have her consent to enter or search her bedroom.[38]  While it is the ICE agents' burden to establish that they had a belief that a third party had authority to grant valid consent, United States v. Waller, 426 F.3d 838, 845 (6th Cir. 2005),[39] this same agent testified that he "had no idea" whether that was the case at 30 Copeces Lane.[40]  Indeed, this agent admitted that he *never* requested consent to enter private bedrooms from the occupants of those bedrooms because "one consent would be good for one house or one residence."[41]  Similarly, ICE 41 testified that she entered the bedroom of another sleeping woman in a different plaintiff home without requesting consent and did not believe this was unlawful.[42]  ICE agents also purportedly obtained consent to enter a tenant's dwelling from a landlady at 20 Boatsteerers Court.[43]

---

premises.").  The case law also makes this distinction.  United States v. Castellanos, 518 F.3d 965, 970 (8th Cir. 2008) (distinguishing consent for agents merely to enter from consent to search).

[36] V. Morales Tr. 159:15-18; D. Lazaro Perez Tr. 44:18-20.

[37] A. Aguilar Tr. 46:16-23

[38] ICE 6 Tr. 223:12-224:20.

[39] The law is clear that third parties cannot consent to searches of areas over which they have no "common authority, mutual use, and substantial interest."  See United States v. Brown, 961 F.2d 1039, 1041-42 (2d Cir. 1992) (landlady cannot consent to entry of tenant's dwelling); United States v. Barrera-Martinez, No. 03-CR-21, 2003 U.S. Dist. LEXIS 13125, at *29 (N.D.Ill. 2003); United States v. Corral, No. Ep-04-CR-543-PRM, 339 F.Supp.2d 781, 793 (W.D.Texas Oct. 1, 2004); United States v. Hope, No. 2:06CR571DAK, 2008 U.S. Dist. LEXIS 6353, at *16 (C.D.Utah Jan. 29, 2008).

[40] ICE 6 Tr. 253:7-254:19.

[41] ICE 6 Tr. 151:10-152:16.

[42] ICE 41 Tr. 177:23-178:10; 184:8-15.

[43] DG Decl. Exh. 8 ¶¶ 8,9,14.

Finally, in some cases ICE agents handcuffed residents without even bothering to question them and refused to explain their justification for being present.[44]   ICE agents prohibited occupants from making phone calls – a practice in keeping with ICE's official procedures[45] – and did not permit them to use bathrooms in private.[46]

This pattern, practice, and *de facto* policy of coercive conduct amounted to a seizure of residents within their homes and vitiated any purported consent.  See Kaupp v. Texas, 538 U.S. 626, 631-32 (2003) ( "a group of police officers rousting an adolescent out of bed in the middle of the night with the words 'we need to go and talk' presents no option but 'to go'"); United States v. Mendenhall, 446 U.S. 544, 554 (1980) (stating that threatening presence of officers, display of weapon, and physical touching vitiates consent); LaDuke v. Nelson, 762 F.2d 1318, 1321 (9th Cir. 1985) (no consent where immigration agents conducted searches "during early morning or late evening hours, surrounded the residences in emergency vehicles with flashing lights, approached the homes with flashlights, and stationed officers at all doors and windows"); see also United States v. Mapp, 476 F.2d 67, 78 (2d Cir. 1973) ("gun in hand" a factor in invalidating consent); United States v. Gandia, 424 F.3d 255, 264 (2d Cir. 2005) (protective sweeps permissible only when "justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene"); United States v. Isiofia, 370 F.3d 226, 233 (2d Cir. 2004) (language barrier and "abusive" manner of agents indicate lack of consent); United States v. Dunn, 480 U.S. 294, 301 (1987) (curtilage of home "should be placed under the home's 'umbrella' of Fourth Amendment protection").

---

[44] J. Mijangos Tr. 132:2-14; D. Rodriguez Tr. 80:7-13, 95:17-97:25; R. Gonzales Tr. 89:22-91:5, 95:16-99:24; W. Lazaro Melchor Tr 63:14-65:13.
[45] See DG Decl. Exh. 5.
[46] DG Decl. Exh. 7 ¶ 25; Y. Revolorio Tr. 193:8-15.

**(b)     ICE Engages in a Pattern, Practice, and *De Facto* Policy of Racial Profiling During Warrantless Home Operations**

Decades of Supreme Court precedent establishes that government agents may not engage in conduct that violates the Constitution, and even immigration agents may not seize individuals based on race or national origin alone.  See, e.g., United States v. Brignoni-Ponce, 422 U.S. 873, 887 (1975) (invalidating agents' discriminatory use of 8 USC § 1357 and holding that agents violated the Fourth Amendment by "stopping all Mexican-Americans to ask if they are aliens").[47]  Defendants' brief does not address plaintiffs' claims of a pattern and practice of equal protection violations.  But as the allegations and evidence demonstrate, ICE agents engaged in a pattern, practice, and *de facto* policy of racial discrimination by improperly targeting Latino homes and neighborhoods and treating Latinos encountered during warrantless home operations differently from non-Latinos.

When ICE agents encountered a Latino at the front door of a home, they routinely entered and searched the entire home regardless of whether they had reason to believe their purported target resided there.  ICE agents seized residents based on their Latino appearance, handcuffing some without bothering to question them. At 165 Main Street, for example, two lawful permanent residents were handcuffed and one was shoved into a vehicle and detained before ICE agents questioned him about his status.[48] ICE 6 justified interrogations of non-targets by stating that ICE agents have reasonable suspicion of illegal alienage when they encounter someone sharing a residence with a fugitive target.  But at 20 Boatsteerers Court, where ICE agents

---

[47] Courts take a broad view of the definition of national origin.  Further, courts in the Second Circuit have consistently declined to address whether Latinos constitute a "race or national origin."  The important issue here is whether immigration agents are permitted to question, detain or seize individuals based on suspect classifications alone; United States v. Brignoni Ponce, 422 U.S. 873, resoundingly answers that question in the negative.

[48] R. Gonzales Tr. 110:24; 127:14-15; 136:6-9 (describing 25-year-old lawful permanent resident being handcuffed without being questioned); D. Lazaro Perez Tr. 72:8-24 (describing interrogation of Gilberto Soto); Complaint in Soto v. United States filed 10/16/08 (DG Decl. Exh. 117) ¶¶ 4-9 (describing 79-year-old lawful permanent resident being handcuffed).

encountered a plaintiff's white landlady, they made no effort to question her or to search her dwelling space, and proceeded to enter and search only the dwellings of her Latino tenants.[49]

In contrast, at homes where non-Latinos opened the front door, agents routinely walked away without entering or making any further inquiries. This disparity was graphically illustrated by the behavior of ICE agents during an OCS operation at 318 Second Street in Greenport. When James Berry, a white male, opened the door, the ICE agent at the door immediately apologized, stating "I think we have the wrong address," and departed, without questioning Mr. Berry or attempting to seek entry into his home.[50]  Similarly, a different OCS team at 34 Elk Street in Hempstead encountered an African-American man at the door and then declined to seek entry or to search the home.[51]  At yet another home targeted by OCS, ICE agents who encountered a white woman at entry were offered milk and cookies and declined to conduct a search.[52]

A statistical review of the targets and collaterals also reveals that the raids were marked by racial profiling. In its analysis of ICE arrest data between January 1, 2006 and April 18, 2008, *Constitution on ICE* found that in Long Island, New York, while 66% of the targets ICE arrested were Latino, Latinos made up 94% of the collateral arrests.[53]  As the *Constitution on ICE* put it, "during home raids ICE agents seize Latino residents based simply on their ethnic appearance or limited English proficiency."[54]  In the vast majority of those collateral arrests, ICE agents *noted no basis for seizing and questioning individuals who were Latino*.[55]

---

[49] DG Decl. Exh. 8 ¶ 6-7.
[50] J. Berry Tr. 13:23-14:21.
[51] E. Egan Tr. 328:11-329:10.
[52] ICE 50 Tr. 186:17-188:16.
[53] Compl. Exh. 2 at 12.
[54] Compl. Exh. 2 at 12.
[55] Compl. Exh. 2 at 12.

Lastly, although the purported purpose of the operations was to apprehend the targeted fugitives,[56] the evidence shows this stated purpose to be pretextual; their true intent was to target Latinos and boost collateral arrests.   Indeed, ICE knowingly initiated raids without adequate investigation or surveillance confirming the location of the purported target.[57]  Such "evidence of pretext" strongly supports a claim of discriminatory intent.  Doe v. Mamaroneck, 462 F. Supp. 2d 520, 553-54 (S.D.N.Y. 2006) (unprecedented law enforcement activity in locations where day laborers were known to congregate was pretextual).

Law enforcement officials have, in fact, reported that administrative warrants issued for the September 2007 Operation Community Shield raids contained inaccurate addresses.[58] Tellingly, ICE did not seek additional assistance from local law enforcement that could have provided more accurate intelligence of a target's whereabouts[59] and, in at least one instance, ICE used a photograph that was twenty-one years out of date to identify a target during a raid.[60]  And, NCPD Commissioner Mulvey stated he "was led to believe [ICE] would be effecting arrest warrants on gang members," only to discover that "most of those picked up were not the targets of warrants."[61]

---

[56] Compl. Exh. 1 at 18,

[57] Compl. Exh. 16 at 15.

[58] DG Decl. Exh. 15. In fact, in 2006, the OIG documented that only about 50% of the information in ICE's database used to locate targets was accurate (Compl. Exh. 16 at 15).  Raids that occurred long after the publication of the OIG report lacked current intelligence and possessed incorrect addresses for many of the targeted homes.  DG Decl. Exh. 14.

[59] A. Mulrain Tr. 314:17-20, L. Mulvey Tr. 26:15-25

[60] M. Bolitho Tr. 151:21-22.

[61] DG Decl. Exh. 14.  The impact of this lack of concern for the apprehension of actual targets was all too clear in plaintiffs' homes.  For example, at 165 Main Street, where three plaintiffs lived in two different apartments, agents purportedly searching for one 48-year-old target handcuffed numerous residents throughout the building ranging in age from 18 to 79.  DG Decl. Exh. 20.  An immigration judge who found that ICE's conduct at this home constituted egregious violations of the Fourth Amendment "observed that ICE 'could not have had reason to believe that the target was in multiple apartments at once.'"  DG Decl. Exh. 11 at 10.  At 710 Jefferson Street, ICE *knew that its 25-year-old target had been deported two years before the raid*, DG Decl. Exh. 29 (TECS II record showing Mata was deported), and had no evidence that he had returned to the United States, much less to the home they raided.  Yet agents stormed through the home and arrested numerous residents, including a man twenty years older than the purported target and another man recently recovering from surgery.  S. Bonilla Tr. 39:13-18; 41:18-25; DG Decl. Exh. 41.  At 30 Copeces Lane, DHS ignored the evidence in *its own files* showing that plaintiff Adriana Aguilar was

ICE's selection of non-residential locations for OCS were also based not on the presence of targets, but rather on the anticipated presence of non-target Latino individuals. During OCS, ICE agents conducted operations at bars and restaurants frequented by Latinos,[62] despite the fact that ICE had not pre-identified any specific target.[63] Similarly, Case Agent ICE 27 affirmed that he took his team to laundromats, bodegas, bus and train stations and other places in Latino neighborhoods frequented by purported gang members to try to locate targets, despite the fact that these locations were not listed in the operation plan.[64] When those efforts were not successful, his team arrested collaterals at these locations instead. Id.

Further evidence of discriminatory animus is the fact that ICE agents used derogatory terms for Latinos during the operations. Both ICE agents and third-party witnesses have testified that agents of both DRO and OI referred to Latinos as "wetbacks."[65]

ICE admits that it did not have probable cause or exigent circumstances to enter or search plaintiffs' homes,[66] and some defendants have admitted that they did not even have any reasonable suspicion to detain residents for the purpose of questioning them.[67] Such lack of suspicion and ICE agents' consistent practice of routinely arresting Latinos they encountered during the operations are strongly suggestive of racial profiling. See Bennett v. City of Eastpointe, 410 F.3d 810, 822 n.1 (6th Cir 2005) (in a racial profiling claim alleging a discriminatory stop, "the lack of suspicion admitted by [law enforcement officer] may properly

---

divorced from the target and was in fact remarried to another man, and that she resided with him and their four-year-old son. DG Decl. Exh. 32 (Adriana Aguilar's A-file).

[62] M. Bolitho Tr. 165:12-17; G. Hoeler Tr. 259:16-20.

[63] ICE 51 Tr. 236:7-14; ICE 59 Tr. 112:3-13; ICE 48 Tr. 111:16-18; ICE 35 Tr. 216:6-218 :16; ICE 15 Tr. 299:2-24.

[64] ICE 27 Tr. 202:7-212:2; DG Decl. Exh. 116; Id. Exh. 117.

[65] ICE 4 Tr. 332:13-25; A. Mulrain Tr. 95:25-96:16; L. Mulvey Tr. 70:3-16.

[66] Answer of Immigration and Customs Enforcement and Official Capacity Defendants ("Answer") ¶¶ 204, 205, 233, 262, 263, 321, 339, 350, 360, 394, 399, 400.

[67] See ICE 15 Tr. 243:4-245:9.

be considered"); Choi v. Gaston, 220 F.3d 1010, 1012 (9th Cir. 2000) (lack of reasonableness in detention or arrest may support allegation of racial profiling).

**(c)    ICE's So-Called "Mandatory" Policies Are, in Fact, Not Mandatory**

Defendants contend that ICE's written policies are mandatory and govern ICE agents' conduct during warrantless home operations.  ICE's declarant, Assistant Field Office Director ("AFOD") Darren Williams, submitted two sworn statements to this Court regarding these policies.[68]  But during his June 3, 2010 deposition, he conceded that many of the policies which his sworn statements referenced as "mandatory" or standard operating procedure were in fact not mandatory or standard at all.

By way of example, declarations of AFOD Williams attest that "Chapter 19 of the Detention and Deportation Officer's Field Manual sets forth policies and standard operating procedures governing DRO's Fugitive Operations Program"[69] and that "[t]he policies in Chapter 19 impose mandatory obligations on DRO officers. . . [and officers] were not permitted to deviate from those policies. . . ."[70]  But in his deposition, AFOD Williams conceded that "only some policies . . . impose mandatory obligations, but the majority of Chapter 19 are guides for the officers to go by, not mandatory policy."[71]  For example, Chapter 19 instructs that "actual arrest of a fugitive in a residence *will be conducted as a last resort* when all other possible apprehension locations have been exhausted."   Chapter 19 at 16 (emphasis added).  But when asked whether this instruction was mandatory, Williams answered, "No.   It's a guide."[72] According to Williams, it is *not* the policy of DRO to conduct residence checks as a last resort

---

[68] D. Williams Decl. 12/07/07; 5/19/10 (noting that his previous declaration was still accurate).
[69] D. Williams Decl. 12/07/07 at ¶ 17.
[70] D. Williams Decl. 12/07/07 at ¶ 18.   These policies were in effect in 2006 and 2007 during the time  periods that ICE agents conducted raids at plaintiffs' homes.  30(b)(6) DRO Deponent Tr. 117:4-6.
[71] D. Williams Tr. (June 3, 2010) 315:11-15.
[72] D. Williams Tr. 319:22.

but rather only a "suggestion."[73]   Similarly, while Chapter 19 directs ICE agents that "if the fugitive is on probation you should be present at the probation office the next time the fugitive is required to report in order to effect the arrest," DG Decl. Exh. 37, AFOD Williams admitted that this instruction is merely a guide.[74]   Indeed, ICE agents did not even follow this guidance.  For example, the Case Agent for OCS himself testified that despite knowing that his target was on probation, the idea of apprehending him at the probation office never occurred to him.[75]

Even where certain of ICE's policies are "truly" mandatory, ICE agents violated them with impunity.  For example, according to written ICE policy, ICE agents are required to conduct warrantless home operations between the hours of 6 a.m. and 10 p.m.[76]   At DRO, if agents desired to initiate an operation outside those hours, then they had to provide "justification for after hours operation" on the Field Operations Worksheet ("FOW").  Although ICE conducted DRO warrantless home operations in this case before 6 a.m.,[77] ICE failed to provide such justification on *any* of the corresponding FOWs.[78]

> **2.   ICE's Misconduct Rises to the Level of *De Facto* Policy Because ICE's Unconstitutional Practices are Persistent and Widespread, and Because ICE Does Not Address Constitutional Misconduct Through Discipline or Re-Training**

The fact that ICE actively condoned the ICE agents' constitutional violations is sufficient to confer standing.  In Doe v. Hagee, 473 F. Supp. 2d 989 (N.D. Cal. 2007), plaintiffs, potential Marine Corps recruits, sued the Marine Corps for injunctive relief after being sexually assaulted by recruiters.  Though the Marine Corps had no official, written policy authorizing its recruiters

---

[73] D. Williams Tr. 314:17-18.

[74] D. Williams Tr. 338:23.

[75] ICE 27 Tr. 289:7-11.

[76] DRO 30(b)(6) Tr. 196:24-197:7; see also DG Decl. Exh. 24 (Fourth Amendment Training Refresher Powerpoint outlining that knock-and-talks are to be conducted during "daytime hours" between 6 a.m. and 10 p.m.).

[77] See, e.g., A. Aguilar Tr. 45:10-13; DG Decl. Exh. 8 ¶ 4, Id. Exh. 17, Id. Exh. 23; Id. Exh. 34; ICE 19 Tr. 102:15-23; ICE 21 Tr. 167:11-25; ICE 31 Tr. 52:13-14; ICE 43 Tr. 78:10-13.

[78] See DG Decl. Exhs. 19; Id. Exh. 21, Id. Exh. 18; Id. Exh. 20; Id. Exh. 28.

to sexually assault recruits, the court denied the Marine Corps' 12(b)(1) motion to dismiss plaintiffs' injunctive relief claims because plaintiffs had shown that the Marine Corps condoned the practice and that a "cognizable threat" to plaintiffs thus remained.  Id. at 996-97.

Courts infer a *de facto* policy in circumstances similar to those presented by this case. "[W]here supervisory officials have or should have knowledge of such widespread violations and yet fail to take corrective action despite the power and ability to do so, it may be proper to infer a *de facto* policy, by implied or tacit authorization or approval or encouragement of the offensive conduct."  Sango v. City of New York, No. 83 CV-5177 (JMM) (ARR), 1989 U.S. Dist. LEXIS 18212, at *19 (E.D.N.Y. June 16, 1989).[79]  Here, ICE's pattern and practice of misconduct was so widespread, so persistent, and so rewarded, that it constituted a *de facto* policy of violating the Fourth and Fifth Amendments.

Moreover, the Second Circuit has found that a policy can be "inferred from the informal acts or omissions" of supervisors.  Turpin v. Mailet, 619 F.2d 196, 200 (2d Cir. 1980); see also Ricciuti v. N.Y.C. Transit Authority, 941 F.2d 119, 123 (2d Cir. 1991) (plaintiff did not have to show that the "municipality had an explicitly stated rule or regulation") (citing Villante v. Dep't. of Corrections, 786 F.2d 516 (2d Cir. 1986)); Fiacco v. City of Rensselaer, 783 F.2d 319, 332 (2d Cir. 1986) (noting the possibility of a policy of deliberate indifference to the use of excessive force where a police department failed to take disciplinary or proper investigatory action).

Here, despite numerous judicial findings of unconstitutional conduct by ICE agents, not one ICE agent has been disciplined as a result of misconduct during warrantless home operations.  ICE RFA Nos. 32, 33 (DG Decl. Exh. 1).  In fact, defendant Christopher Shanahan, the New York Field Office Director for DRO, testified that in 2006 all Fugitive Operations

---

[79] "Courts apply the same substantive standards to Bivens and Section 1983 claims."  Spinale v. USDA, 621 F. Supp. 2d 112, 119-20 (S.D.N.Y. 2009), citing Tarvarez v. Reno, 54 F.3d 109, 110 (2d Cir. 1995).

agents were rated "Outstanding" and all received cash awards, DG Decl. Exh. 46 at 7, including

three individual defendants in this case – ICE 1, 3 and 4 – whose protective sweep during a

warrantless home operation was found unlawful by a federal district court judge that same year.

See generally United States v. Ali, No. 05-CR-785 (NG), 2006 U.S. Dist. LEXIS 21543

(E.D.N.Y. Mar. 7, 2006) aff'd and adopted by, 2006 U.S. Dist. LEXIS 21544 (E.D.N.Y. Apr. 7,

2006).   This is so despite the fact that immigration judges have found that the ICE agents

committed "egregious violations" of the Fourth Amendment during the warrantless home

operations at 417 East Avenue and 165 Main Street (which are two homes at issue in this case).[80]

Shockingly, the Assistant Field Office Director who participated in these operations testified that

he has not been informed of the judges' findings.  ICE 1 Tr. 340:4-341:4; 341:23-342:8.  Nor has

the Eastern District Court's finding regarding an unlawful protective sweep conducted by the

above three defendants in this case been communicated to them, see, e.g., ICE 4 Tr. 328:5-14, or

their supervisor, ICE 1 Tr. 339:23-340:16.  Indeed, these three agents, in addition to ICE 6, ICE

2, and ICE 9, have even received promotions.[81]  Similarly, OI Group Supervisor Knopf testified

he had never heard of any complaint against an ICE agent being substantiated by ICE or of any

agent ever being reprimanded as a result of a complaint of misconduct during a warrantless home

operation.  J. Knopf Tr. 291:15-21; 69:15-18.

        Even when ICE received multiple reports of constitutional misconduct from *other law*

*enforcement personnel*, including ICE agents and Nassau County police officers who had

participated in the operations, ICE failed to take adequate steps to investigate, much less remedy,

the misconduct.   One "investigation" was so cursory, for example, that even though the

---

[80] DG Decl. Exh. 11 at 8-9 ("Respondent has. . . presented evidence which shows that the conduct of the Department was particularly egregious"); DG Decl. Exh. 12 at 10 ("I find that all the evidence the Government seized about the individual before me. . .  was improperly seized as an egregious violation of the Fourth Amendment").
[81] DG Decl. Exh. 31.

complaints came from Nassau County police officers, ICE responded to the complaints by denying any wrongdoing *without having interviewed a single Nassau County police officer who had been involved.* DG Decl. Exh. 16.  Further, Nassau County Police Commissioner Mulvey testified that he reported the "wetback" comments up the chain of command at ICE, yet there is no evidence that any investigation was ever conducted by ICE with respect to the use of ethnic slurs by ICE agents.  L. Mulvey Tr. 70:3-16.

Similarly, in response to an anonymous racial profiling complaint by an ICE agent, the ICE Office of Professional Responsibility ("OPR") concluded that the matter did not warrant prosecutorial action, even though it failed to conduct any field investigation and only chose to interview team leaders and their supervisors involved in the operation.[82]  Significantly, OPR never asked agents whether individuals were arrested during the operation in a manner that was unconstitutional or illegal – which was the heart of the complaint.  See, e.g., DG Decl. Exh. 40.

Additionally, a second ICE agent who participated in the OCS operations on September 24, 2007, in Glen Cove, Long Island, filed a complaint of constitutional misconduct by members of his team.  DG Decl. Exh. 36.  First and foremost, the complaint asserted that entry had been made to at least one residence by that ICE team on that day without obtaining consent to do so.  In addition, the complaint set forth a long list of other operational deficiencies, including that: agents were instructed to tell home occupants that they were searching for an individual with an Arabic name even though ICE agents were looking for members of a Central American gang; the team leader did not assign Spanish-speaking agents to entry teams; weapons were drawn at various locations, including one location where an agent pointed the muzzle of his MP5 shotgun at other law enforcement officers "as well as occupants of the house."  Id.  Notwithstanding these

---

[82] Notably, even before beginning any investigation, John P. Clark, then Deputy Assistant Secretary of ICE, dismissed the complaint as "spurious" in an email to then-Assistant Secretary for ICE Julie Myers and then-Director of the Office of Public Affairs Nicholas J. Smith.  DG Decl. Exh. 45.

serious allegations of misconduct, ICE again investigated this complaint with leading questions (see, e.g., DG Decl. Exh. 47) and ultimately summarily concluded that the complaint was unfounded.  DG Decl. Exh. 39.

In short, ICE's and OPR's investigations were cursory, incomplete and seemingly designed not to uncover any malfeasance.  Indeed, even senior ICE officials who received complaints from members of Congress seemingly reacted to the complaints with indifference.[83]  Moreover, the majority of the individuals who committed and condoned these violations are still employed by ICE.[84]

### 3. ICE Policies Actively Condone and Authorize Constitutional Violations

While plaintiffs need not show the existence of official policies authorizing constitutional misconduct in order to establish standing (see discussion at Sections A, B, C, and D, supra), they can in fact demonstrate that in many instances ICE's training programs, practice manuals, and official policies encouraged and authorized violations of the Fourth and Fifth Amendments.  Where plaintiffs establish the existence of such unlawful policies, they have standing to seek injunctive relief.  DeShawn E. v. Safir, 156 F.3d 340, 345 (2d Cir. 1998) ("In contrast [to Lyons], the challenged interrogation methods in this case are officially endorsed policies; there is a likelihood of recurring injury because the [police's] activities are authorized"); see also Rizzo v. Goode, 423 U.S. 362, 371 (1976) (standing requirements are satisfied if plaintiff can allege

---

[83] For example, on June 11, 2007, Senators Christopher Dodd and Joe Lieberman and U.S. Representative Rosa DeLauro sent Michael Chertoff a letter stating that they were "troubled" by reports concerning the manner in which ICE conducted the raids in Connecticut five days earlier.  They remarked that only four of the thirty-one individuals who were detained were the subject of deportation orders, that "ICE agents pushed their way into homes," and that they "treated both adults and children inappropriately."  See Compl. Exh. 5.  Chertoff sent a reply letter a mere three days later – which speaks volumes to the depth of any investigation he conducted or initiated in response to these serious allegations – summarily denying all the allegations of inappropriate conduct and asserting that "[a]t no time did any ICE FOTs enter a dwelling without consent."  See Compl. Exh. 6.

[84] For example, Marcy Forman, Christopher Shanahan, Peter Smith, Joseph Palmese, and John Torres are all still ICE employees.

"any plan or policy by petitioners – express or otherwise – showing their authorization or approval of such misconduct").

      (a)     **Policies Authorizing Use of Unlawful Ruses and Pretexts**

ICE official policies endorse the use of ruses when apprehending targets, including in the case of allegedly "consent-based" home operations such as the ones at issue here.  But while use of deception in order to "facilitate the exercise of authority already obtained from another source" is permissible in order to ensure officer safety, it may not be permissible where officers use deception in order to obtain consent.  See United States v. Montes-Reyes, 547 F. Supp. 2d 281, 288 n.6 (S.D.N.Y. 2008) (Cote, J.), (distinguishing between cases where "deception is used in order to execute an arrest warrant" and cases where deception is used "to generate the authority to search (i.e. consent))."  Indeed, the Fifth, Eighth and Ninth Circuits have articulated a rule that "'misrepresentation may even invalidate the consent if the consent was given in reliance on the officer's deceit.'"  Id. at 288 n.7 (internal citations omitted).  As the court in Montes-Reyes makes clear, where "the person whose consent is sought is left with the impression that his consent cannot be unlawfully withheld . . . [i]t is universally agreed that in such circumstances, the resulting consent is not 'the product of an essentially free and unconstrained choice.'"  Id. at 287, citing Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).

Nor may ICE agents misrepresent the purpose of the home visit in order to obtain consent.  In United States v. Hernandez-Juarez, No. SA-09-CR-19-XR, 2009 U.S. Dist. LEXIS 22031 (W.D. Tex. Mar. 16, 2009), the court described operations that were strikingly similar to those at issue here: ICE agents, shouting "police," gained entry to an apartment at 6:00 a.m. by falsely stating that they were looking for a fugitive they had no reason to believe was present, and proceeded to interrogate and then arrest others whom they knew could not have been the

purported target.   Under those circumstances, which are virtually identical to this case, the

district court found that the deception invalidated the purported consent:

> The ICE agents entered the most private of spaces, a home, without a
> warrant and with only a hunch that the person they were looking for would
> be inside.  The ICE agents used a ruse upon a non-English speaking alien
> to obtain entry.  The typical reasonable person would have understood that
> the exchange between the agent and Mrs. Hernandez would have
> amounted at most to allowing a search of the premises for the man in the
> ruse photograph.  The questioning of a female American citizen with a
> nursing infant indicates that the agents used their fraudulent entry for the
> purposes of a general roundup once they realized that [the target] was not
> in the premises.

2009 U.S. Dist. LEXIS 22031, at *10.

Despite this case law, *official* ICE policy permits and encourages the use of ruses during

warrantless home operations.  In memoranda distributed to all DRO and OI officers and agents,

high-level ICE officials authorized the very ruses found to vitiate consent in <u>Montes-Reyes</u> and

<u>Hernandez-Juarez</u>.  During his tenure as Director of DRO, John Torres issued three memoranda

to his staff authorizing the use of a wide range of ruses.[85]  One memo states that "[t]he use of

ruses in law enforcement operations is an effective law enforcement tool that enhances officer

safety."  DG Decl. Exh. 38.  The most recent memorandum is co-signed by Marcy Forman, then-

Director of OI.[86]  None of these memoranda state that the use of ruses during warrantless home

operations could vitiate consent or otherwise make any distinction between warrantless home

operations and operations involving judicial warrants.[87]  ICE has admitted that these memoranda

---

[85] DG Decl. Exh. 26; <u>Id</u>. Exh. 27; <u>Id</u>. Exh. 38.
[86] <u>Id</u>. Exh. 38.
[87] Additionally, both ICE 30(b)(6) deponents testified that ICE policy dictates that agents can use ruses to gain
consent to enter, but not to search.  30(b)(6) OI Deponent Tr. 163:17-164:19; 30(b)(6) DRO Deponent Tr. 183:7-16.
ICE's ruse memoranda make no such distinction.  In fact, the 30(b)(6) deponents could not identify any written
policy or training document articulating this distinction.  30(b)(6) DRO Deponent Tr. 183:13-20.  To the contrary,
ICE training documents actively instruct agents not to distinguish between entries and searches, and indeed not to
use the word "search" at all when seeking consent, instead suggesting that ICE agents state "[do] you mind if we
take a quick look around for this person."   DG Decl. Exh. 42 at 6; <u>Id</u>. Exh. 43 at USE09387 (stating that the term,
"search, by most people is considered a very intrusive act").  While ICE's 30(b)(6) deponents appeared to

and the policies contained within them remain in effect.  RFAs 12-14 (DG Decl. Exh. 1). Pursuant to these policies, ICE agents routinely make use of a wide range of deceptive tactics in order to enter and search homes.[88]

> **(b)     ICE Training and Policy Regarding Protective Sweeps Is Contrary to Settled Case Law**

Since at least 1990, the Supreme Court has warned against using protective sweeps as a pretext for conducting a warrantless search of a home.  Maryland v. Buie, 494 U.S. 325, 327 (1990).  As this Circuit has made clear, without an articulable suspicion of a specific danger to themselves or others, law enforcement officers may not conduct protective sweeps.  United States v. Gandia, 424 F.3d at 263-64; see also Ali, 2006 U.S. Dist. LEXIS 21543, at **13-14 (to justify a protective sweep, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene.") (citing Maryland v. Buie, 494 U.S. 325, 334 (1990)).

In the face of this clear legal precedent, ICE training and policy permits agents to conduct protective sweeps without any articulable suspicion of a specific danger.  30(b)(6) OI Deponent

---

understand that such instructions could result in conduct that violates the law, they could not point to any written policy or training document that made this principle clear to ICE agents conducting warrantless home operations. 30(b)(6) OI Deponent Tr. 168:16-169:6; 213:16-21.

[88] In fact, it appears that it was always ICE's plan to use ruses during these operations.  DG Decl. Exh. 6 at 2. During the course of the raids, ICE Agents routinely failed to identify themselves or their purpose, instead shouting "Police!" and "Open the Door!" to create the impression that residents had no choice but to permit entry.  B. Velasquez Tr. 83:11-15; D. Rodriguez Tr. 74:18-22.  In the most egregious instance, ICE agents shouted that "someone is dying upstairs" to a 12-year-old girl in order to convince her to open the door at 710 Jefferson Street, then told her they were looking for a man, "Will," who was not their target.  B. Velasquez Tr. 82:24-83:2, 97:18-20; DG Decl. Exh. 35 (showing that the target was a man named Luis Mata).  When the landlady at 20 Boatsteerers Court, a retired East Hampton police officer herself, asked whether the ICE agents had warrants, they answered "yes," without explaining that they needed consent to enter because their warrants were administrative, not judicial. DG Decl. Exh. 8.  Indeed, neither Nassau County Police Commissioner Mulvey nor his officers who assisted with Operation Community Shield were informed that administrative warrants lack judicial support and that consent must be obtained from the residents of homes in order to effect arrests.  L. Mulvey Tr 13:16-14:2; 18:13-20.  Given that the Commissioner of Police of Nassau County was not aware of this distinction, it strains credulity to believe that the residents of the homes in this case were.

Tr. 239:13-18.  Nothing in ICE's policies informs ICE agents of the constitutional requirements that the scope of a protective sweep must (a) be limited to a cursory visual inspection, Buie, 494 U.S. at 327, and (b) be limited by the nature of the crime for which agents are conducting their investigation, Ali, 2006 U.S. Dist. LEXIS 21543, at *19.[89]  ICE policy thus authorizes conduct that is contrary to the law, which is precisely the conduct that occurred in this case.  In the warrantless home operations at issue here, including those that purportedly sought "gang members," ICE had no evidence that the targets were engaged in committing any ongoing crimes, much less violent ones.  See, e.g., ICE 27 Tr. 71:14-72:11; 341:13-343:17 (stating that he was unaware that any of these operations were high-risk and that he noted in the TECS database that the operation involved no national security issues nor aliens suspected of having terrorist connections, and no violence was expected).  No ICE agent has testified to finding any indicia of gang activity – weapons, drugs, or hoards of cash – during the home operations at issue.[90]  Indeed, agents have uniformly testified that they did not have any particular reasons to fear for their safety at any of the homes they visited.[91]  Significantly, an Eastern District Court analyzing the conduct of an ICE team – including three individual defendants named in the instant case – found no "logical basis for concluding that an illegal alien who is attempting to evade capture is, as a result, likely to 'launch an attack' on law enforcement officers from a hiding place."  Ali, 2006 U.S. Dist. LEXIS 21543, at * 20.

---

[89] This is not surprising given that Chapter 42 of the Special Agent's Handbook, the operative OI policy manual according to the affidavit attached to Defendants' Motion, which was issued in 1979, has never been amended to reflect any subsequent developments in constitutional law.  30(b)(6) OI Deponent Tr. 77:7-12.

[90] See, e.g., ICE 52  Tr. 181:4-9; ICE 21 Tr. 333:7-18; ICE 45 Tr. 182:8-13; ICE 25 Tr. 175:9-12; ICE 47 Tr. 97:3-10; ICE 18 Tr. 247:21-23; ICE 31 Tr. 114:12-23; ICE 24 Tr. 112:22-113:6; ICE 30 Tr. 201:8-22; ICE 17 Tr. 161:23-162:18; ICE 23 Tr. 164:7-11; ICE 59 Tr. 111:17-112:2; ICE 27 Tr. 197:6-25; ICE 26 Tr. 85:11-86:11; ICE 28 Tr. 145:11-22; ICE 35 Tr. 196:3-12.

[91] See, e.g., ICE 30 Tr. 296:6-10; ICE 26 Tr. 136:20-23; ICE 34 Tr. 109:11-14; ICE 24 Tr. 109:12-16.  And yet, ICE agents admitted to breaking into a locked bedroom upon observing an occupant retreat into the room.  ICE 22 Tr. 168:12-169:9; ICE 20 Tr. 235:21-236:12; ICE 18 Tr. 234:14-236:11.

Notwithstanding the lack of any legitimate basis to conduct protective sweeps in this case, ICE agents routinely swept through homes while purportedly looking for individuals suspected of nothing more than avoiding a deportation order, in compliance with ICE's policy and training.  Thus, although such conduct clearly violates accepted principles of protective sweeps, ICE policy explicitly authorizes it, and agents who engaged in such sweeps believed themselves to be complying with agency directives.

### (c)     ICE Policy Permitted and Encouraged Unlawful Warrantless "Stops" and Seizures of Residents

Absent exigent circumstances, law enforcement may not seize or detain residents inside a home without a warrant, because "searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586 (1980), and the "warrantless entry to seize a person within a home" violates the Fourth Amendment.  LaLonde v. County of Riverside, 204 F. 3d 947, 955 (9th Cir. 2000); see also Lopez-Rodriguez v. Mukasey, 536 F.3d 1012, 1017-1019 (9th Cir. 2008) (finding ICE agents' investigative stop and detention of home occupant during warrantless entry an "egregious" violation of the Fourth Amendment).

Yet ICE training and policy explicitly encouraged ICE agents to conduct unlawful stops and seizures inside homes during warrantless home operations, in violation of these Fourth Amendment principles.  ICE's 30(b)(6) witnesses testified that ICE policy permits agents to conduct investigative stops, including questioning about immigration status, during warrantless home encounters.  30(b)(6) OI Deponent Tr. 138:10-13, 141:22-142:2; 30(b)(6) DRO Deponent Tr. 222:18-223:13, 215:3-5; see also DG Decl. Exh. 25 (training materials instructing ICE agents that they may "briefly detain" individuals for questioning based on "reasonable suspicion").  ICE

specifically trains agents to conduct these stops in homes.[92]  For example, a manual on Basic Tactics instructs ICE agents to "[establish] a Control Point" in homes and "Centralize Subjects." DG Decl. Exh. 22 at US22104.  AFOD Darren Williams has submitted sworn declarations asserting that when DRO agents are instructed to secure locations during warrantless home operations, "it is standard procedure that . . . occupants are not permitted to make calls."  DG Decl. Exh. 5 ¶ 23.  Similarly, OI agents are permitted during warrantless home operations to order individuals not to "move around" when seeking to question them.  30(b)(6) OI Deponent Tr. 147:20-148:15.  Individual defendants confirm that they routinely order occupants out of bedrooms, see, e.g., ICE 21 Tr. 332:2-333:6, and prevent occupants from closing the door to use a bathroom, see, e.g., ICE 6 Tr. 164:17-165:9.  ICE agents themselves have testified that interrogations of non-target residents during these encounters are part of normal practice.[93]

Thus, even if defendants could show that they lawfully obtained entry to plaintiffs' homes – which they cannot – the officially authorized ICE policy of investigative stops inside homes renders these warrantless encounters nonconsensual.  "Even an initially consensual encounter . . . can be transformed into a seizure or detention within the meaning of the Fourth Amendment."  Kaupp v. Texas, 538 U.S. 626, 631-32 (2003) (internal citations omitted).  An encounter becomes non-consensual when "a reasonable person would have believed that he or she was not free to leave" or that his or her "freedom of movement is restrained."  Mendenhall, 446 U.S. at 553-54.

---

[92] In effect, ICE imported the precepts of Terry v. Ohio, 392 U.S. 1 (1968) into the framework of warrantless home operations.  But the law is clear that "[t]he reasons that gave rise to the rule in Terry are simply not applicable" to home entries and searches.  LaLonde, 204 F. 3d at 955.

[93] See, e.g., ICE 18 Tr. 275:3-15, 276:2-19 (OI agents instructed by Resident Agent-in-Charge Joseph Palmese to select individuals for questioning about immigration status based on whether they resided or were present at a target location); G. Bartley Dep. 321:3-18 (OI agent asked a group of males found during a protective sweep about their immigration status); ICE 16 Tr. 173:12-176:8 (during warrantless home operations DRO agents "often" ask non-targets about their immigration status); ICE 6 Tr. 188:25-190:14 (even after locating target, a DRO agent can question non-target home occupants about their identity, and, even if they refuse to identify themselves, to question them about their status).

## II.     PLAINTIFFS HAVE STATED A CLAIM FOR A PERMANENT INJUNCTION

Defendants also move pursuant to Federal Rule of Civil Procedure 12(c) for a judgment on the pleadings dismissing plaintiffs' claim for injunctive relief.  Plaintiffs have more than sufficiently stated a claim for a permanent injunction.

### A.     Standard

The standards governing Rule 12(c) motions for a judgment on the pleadings are the same as those for a motion to dismiss under Rule 12(b)(6).  "Thus, [a court] will accept all factual allegations in the complaint as true and draw all reasonable inferences in [plaintiffs'] favor.  To survive a Rule 12(c) motion, [the plaintiffs'] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010).  When considering a Rule 12(c) motion, courts review "the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 64 (2d Cir. 2010).  Thus, this Court may grant defendants' motion for a judgment on the pleadings only if – accepting as true all the allegations in the complaint, and drawing all reasonable inferences in plaintiffs' favor – plaintiffs have not stated a plausible claim that would entitle them to injunctive relief.  As plaintiffs have stated a plausible claim that their constitutional rights are likely to be violated in the future, defendants' motion for a judgment on the pleadings should be denied.

In order to "obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." UBS Secs. LLC v. Voegeli, 684 F. Supp. 2d 351, 354 (S.D.N.Y. 2010).  Indeed, "[i]f a party can demonstrate that it is likely to be deprived of its constitutional rights in the future by the acts it

seeks to have enjoined, both these requirements are satisfied." Local 32B-32J, SEIU v. Port Auth., 3 F. Supp. 2d 413, 419 (S.D.N.Y. 1998).

Defendants spend the bulk of their moving argument discussing how the Supreme Court in Lyons rejected a request for an injunction. See Defendants' Memorandum in Law In Support of Defendants' Motion to Dismiss Plaintiffs' Claim for Injunctive Relief ("Defs.' Brief") at 31-34. Defendants' reliance on Lyons is misguided. In Lyons, the Supreme Court was reviewing the grant of a *preliminary* injunction, not a motion to dismiss a claim for a permanent one. The Supreme Court dismissed Lyons's claim because he could not show a "real or immediate threat" of future injury. Lyons, 461 U.S. at 111. But, because a permanent injunction is at issue here, imminent harm is not a required showing. Rodriguez v. DeBuono, 175 F.3d 227, 235 n.9 (2d Cir. 1998); CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 562 F. Supp. 2d 511, 573 (S.D.N.Y. 2008).[94] Plaintiffs' allegations demonstrate the absence of an adequate remedy at law, Compl. ¶¶ 464, 478, and that plaintiffs will suffer irreparable harm. Compl. ¶¶ 461, 476. Thus, defendants' motion should be denied.

### B.   Plaintiffs Have Alleged Irreparable Harm

Courts presume irreparable harm where plaintiffs seek injunctive relief to prevent violations of their Fourth and Fifth Amendment rights. Moreover, even without such a presumption, plaintiffs have sufficiently pled facts to demonstrate irreparable harm that is likely to be repeated if an injunction is not granted.

---

[94] The other cases cited by defendants are also inapposite, as they address irreparable harm in the context of a *preliminary* injunction, not a permanent one. See Defs.' Brief at 30; Tom Doherty Assocs., Inc. v. Saban Entertainment, 60 F.3d 27, 37 (2d Cir. 1995) (articulating the factors used in determining irreparable harm for preliminary injunctions); JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 79 (2d Cir. 1990).

### 1.     Constitutional Harm Is Presumed to be Irreparable

Allegations of constitutional violations are presumed to be irreparable.  Conn. Dep't of Envtl. Prot. v. OSHA, 356 F.3d 226, 231 (2d Cir. 2004) ("the alleged violation of a constitutional right triggers a finding of irreparable injury . . . [b]ecause violations of constitutional rights are presumed irreparable"); Johnson v. Miles, 355 Fed. Appx. 444, 446 (2d Cir. 2009) ("Because an alleged violation of a constitutional right triggers a finding of irreparable harm, [the plaintiff] necessarily satisfied the requirement that a party applying for [an] . . . injunction show irreparable harm.").  This doctrine has been specifically applied to allegations of Fourth Amendment and Equal Protection violations, which are likewise presumed irreparable.  See Lynch v. City of New York, 589 F.3d 94, 99 (2d Cir. 2009) (stating that Fourth Amendment violations constitute irreparable harm); Diaz v. New York City Bd. of Elections, 335 F. Supp. 2d 364, 367 (E.D.N.Y. 2004) (stating that the allegation of an equal protection violation is sufficient to show irreparable harm).  Thus, as plaintiffs have sufficiently alleged plausible allegations of constitutional violations, irreparable harm is presumed.  See Compl. ¶¶ 22-41, 190-425.

### 2.     Plaintiffs Have Sufficiently Pled Factual Matter Demonstrating Irreparable Harm

Even if there were no presumption of irreparable harm, plaintiffs have pled sufficient factual matter demonstrating that plaintiffs will suffer irreparable harm if injunctive relief is not granted.  Defendants baldly assert that plaintiffs' allegations that ICE engaged in a pattern, practice and policy of unlawful conduct are "unsupported" and "incredible" and that "the complaint contains no factual allegations to support the conclusory claim" that ICE policy authorizes unconstitutional conduct.  Defs.' Br. at 33-34.  An examination of the complaint demonstrates that this is not the case.  Plaintiffs' complaint sets out detailed allegations of constitutional violations not only at plaintiffs' homes, but throughout the New York area.  See

Compl. ¶¶ 22-41, 190-425.  Further, plaintiffs allege that ICE agents, in fact, returned to one plaintiff home twice in thirteen months, see Compl. ¶ 379, and expressly threatened to return to other homes, see Compl. ¶ 35.  Moreover, plaintiffs set forth extensive allegations regarding ICE's pattern, practice and *de facto* policy of violating the rights of plaintiffs and the putative class.  See, e.g., Compl. ¶¶ 8-10, 41, 434, 459, 472, Exh. 2 (alleging a pattern and practice of discriminatory and coercive conduct and pointing to both memoranda authored by ICE policymakers and academic studies of ICE conduct); Compl. ¶ 12 (alleging discriminatory conduct toward Latinos and noting that ICE agents and local law enforcement personnel complained that agents engaged in racial profiling and used derogatory terms for Latinos); Compl. ¶¶ 11-19, 75, 189, 427, 453, 463 (detailing complaints by the OIG, Nassau County Police Department and various Congressional representatives that ICE's training, databases, and conduct in the field were severely deficient); Compl. ¶¶ 20-21, 76, 80 (describing in detail the failures by ICE officials to respond effectively to allegations of misconduct).

As Point I, supra, demonstrates, these allegations have been amply supported by testimony and evidence not only from plaintiffs, but also from independent witnesses, law enforcement officers, and ICE agents themselves.  Taken as true, these allegations easily demonstrate that plaintiffs face a credible and likely threat of future, irreparable harm.  The allegations are, therefore, far from "unsupported" or "incredible," and are more than sufficient to withstand a Rule 12(c) motion.

### 3.   Plaintiffs Have Suffered Irreparable Harm Because Their Injury Cannot Be Remedied By Mere Money Damages

Irreparable harm has been defined by courts in this Circuit as an injury "requiring a remedy of more than mere money damages."  Leinster Inter S.A. v. Botley Ltd., No. 09 Civ. 3874 (SHS), 2009 U.S. Dist. LEXIS 122628, at *2 (S.D.N.Y. Dec. 30, 2009), citing Ford v.

Reynolds, 316 F.3d 351, 355 (2d Cir. 2003).  Here, plaintiffs are entitled to equitable relief because they do not have an adequate remedy at law.

Defendants make the untenable assertion that plaintiffs do, in fact, have an adequate remedy because they can seek damages under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).  Defs.' Brief at 34-35.  The fact that parties aggrieved by past Fourth Amendment violations can seek damages under Bivens does not mean that Bivens offers an adequate remedy against *future* constitutional violations, and defendants offer no support for their assertion that Bivens offers an adequate remedy at law which would prevent the issuance of an injunction.  Indeed, under defendants' reasoning, no injunction could *ever* issue to prevent Fourth Amendment violations as the aggrieved party would only be entitled to post-injury monetary damages.  That is not the law.  See, e.g., Zepeda, 753 F.2d at 727; Stauber, 2004 U.S. Dist. LEXIS 13350, at *69; Ramirez v. Webb, 787 F.2d 592 (6th Cir. 1986).

Courts across the country have directly held that "[w]here constitutional rights have been violated and are threatened to be violated again, money damages are not an adequate remedy." Mendoza v. INS, 559 F. Supp. 842, 850 (W.D. Tex. 1982) (enjoining INS from conducting warrantless dragnet searches and seizures). This is particularly true where, as here, the plaintiffs allege that there is a pattern of unconstitutional conduct that is likely to recur.  See Compl. ¶¶ 22-41, 190-425, 441; see also Nat'l Congress, 75 F. Supp. 2d at 161 (plaintiffs have suffered and will continue to suffer irreparable harm if defendants are permitted to persist in their pattern, practice and policy of targeting Latinos and raiding homes in violation of the Fourth Amendment); Doe v. Bridgeport Police Dep't., 198 F.R.D. 325, 335 (D. Conn. 2001) ("plaintiffs have alleged systemic or ongoing constitutional violations that can not be remedied with a monetary award.").

Additionally, <u>Bivens</u> actions "do not lie against federal agencies or against federal employees sued in their official capacities." <u>Caraveo v. United States EEOC</u>, 96 Fed. App'x. 738, 740 (2d Cir. 2004), <u>citing</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 484-86 (1994). And in any event, the availability of <u>Bivens</u> relief to compensate for past constitutional violations does not render harm from future constitutional violations any less "irreparable." Plaintiffs commonly and successfully bring both <u>Bivens</u> claims and claims for injunctive relief in the same action. <u>See</u> <u>Illinois Migrant Council v. Pilliod</u>, 398 F. Supp. 882 (N.D. Ill. 1975). As explained in <u>Nat'l Federation of Fed. Employees v. Weinberger, 818 F.2d 935, 941 (D.C. Cir. 1987)</u>, "[t]he availability of a <u>Bivens</u> remedy for a particular wrong simply cannot – and was never intended to – protect an individual who is threatened with future deprivation of a constitutional right. . . . In contrast, that is the precise function of prospective injunctive relief." This is principally because courts have found that the monetary value of future harm is difficult to quantify and have held that where damages are hard to quantify, harm may be irreparable. <u>See</u> <u>Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Excelsior Trading Corp.</u>, No. 07-CV-3224 (CPS)(SMG), 2007 U.S. Dist. LEXIS 69025, at *10 (E.D.N.Y. Sept. 18, 2007) ("damages . . . [that] are not readily quantifiable . . . constitute irreparable harm.").

**III.  IF THIS COURT DOES NOT DENY DEFENDANTS' MOTION IT SHOULD DEFER RULING UNTIL AFTER TRIAL AS THIS MOTION IS INTERTWINED WITH THE MERITS OF THE UNDERLYING CASE AND PLAINTIFFS ARE IN NEED OF FURTHER DISCOVERY**

Plaintiffs have provided ample evidence to support their claim for injunctive relief and to establish their standing to bring a claim for injunctive relief. Thus, defendants' motion should be denied. However, to the extent the Court harbors any doubts in that regard, it should at a minimum defer its ruling until after the close of trial.

The factual issues that must be resolved to decide this motion overlap with issues that must be resolved by the jury in this case; as such, granting defendants' motion to dismiss at this stage would in fact violate plaintiffs' Seventh Amendment right to a jury trial.  Additionally, discovery in this case is not yet complete, and as a result, expert discovery has not yet commenced.  This discovery is vital to plaintiffs' injunctive relief claims.

### A. The Evidence Concerning Standing Overlaps with Issues Reserved for the Jury Under the Seventh Amendment

If the Court has any inclination to grant defendants' motion to dismiss, it should defer its decision until after a jury has issued a verdict in this case, as is required by the Seventh Amendment.  Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 88 (2d Cir. 2006) ("If . . . the overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment to be resolved by a jury, then the Court *must* leave the jurisdictional issue for the trial.") (internal citations omitted) (emphasis added).

Whether defendants engaged in unlawful conduct in connection with the raids at plaintiffs' homes is relevant to both plaintiffs' equitable relief claims as well as their Bivens claims, for which they have a right to a jury trial.  See Ortiz v. Pearson, No. 97 Civ. 0885 (KMW)(THK), 1999 U.S. Dist. LEXIS 22450, at *36 (S.D.N.Y. Nov. 5, 1999) (a "Bivens claim entails the right to a jury trial").  For instance, one of the ways in which plaintiffs will seek to hold certain ICE supervisors individually liable under Bivens is by demonstrating that these defendants created unconstitutional policies and/or condoned unconstitutional conduct.  This same conduct would also support a finding of a likelihood of future harm which, as discussed above, plaintiffs must show in order to demonstrate that they have standing to bring a claim for injunctive relief.  Given the overlap in these claims, the Court should defer a ruling on these

issues until after trial.  Leighton Techs. LLC v. Oberthur Card Sys., 531 F. Supp. 2d 591, 595 (S.D.N.Y. 2008) ("[W]here the relevant facts are dispositive of both the 12(b)(1) motion and portions of the merits, the trial court should grant the motion to dismiss only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.  If the plaintiff presents sufficient evidence to create a genuine dispute of material (jurisdictional) facts, then the case proceeds to trial, so that the factfinder can determine the facts, and the jurisdictional dispute will be reevaluated at that point.").

**B.     Plaintiffs Are in Need of Further Discovery**

The Court should not deny standing without granting plaintiffs leave to obtain further discovery.  Delphi-Delco Elecs. Sys. v. M/V Nedlloyd Europa, 324 F. Supp. 2d 403, 417 (S.D.N.Y. 2004) (denying defendants' motion to dismiss because it was "premature under Rule 56(f)" and allowing additional discovery).  As the attached Rule 56(f) declaration demonstrates, plaintiffs are in need of additional discovery regarding a number of issues.  See Plaintiffs' Rule 56(f) Declaration dated July 9, 2010.  This testimony and documentary evidence will provide further support for plaintiffs' standing to seek injunctive relief.

## <u>CONCLUSION</u>

For all of the foregoing reasons, plaintiffs respectfully request the Court deny Defendants' Motion to Dismiss Plaintiffs' Claim for Injunctive Relief.

Dated: New York, New York
      July 9, 2010

DEWEY & LEBOEUF LLP

By _____
    Aldo A. Badini
    Donna L. Gordon
    Kelly A. Librera
1301 Avenue of the Americas
New York, New York 10019
(212) 259-8000

LATINOJUSTICE PRLDEF

By _____
    Foster Maer
    Ghita Schwarz
    Christina Iturralde
99 Hudson Street, 14th Floor
New York, New York 10013
(212) 739-7504

Attorneys for Plaintiffs

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                       )   SS.:
COUNTY OF NEW YORK     )

      URVASHI SEN, being duly sworn, deposes and says:  I am not a party to the action, am over 18 years of age and am associated with the law firm of Dewey & LeBoeuf LLP.

      On the 10th day of July, 2010 at approximately 12:11 a.m., I served the attached PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CLAIM FOR INJUNCTIVE RELIEF via electronic mail to the attorneys listed below at the address designated for service of papers:

Shane Cargo, Esq.
shane.cargo@usdoj.gov

Allison D. Penn, Esq.
allison.d.penn@usdoj.gov

David Bober, Esq
david.bober@usdoj.gov

Brandon Cowart, Esq.
Brandon.cowart@usdoj.gov

Kristin Vassallo, Esq
Kristin.vassallo@usdoj.gov

 

_____
URVASHI SEN

Sworn to before me this
12th day of July, 2010

_____
NOTARY PUBLIC

ERIC M. LEVINE
NOTARY PUBLIC, State of New York
No. 02LE6202138
Qualified in New York County
Commission Expires March 9, 2013