UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────────

ADRIANA AGUILAR, ET AL.,

                **Plaintiffs,**         **07 Civ. 8224 (JGK)**

      **- against -**            **<u>OPINION AND ORDER</u>**

IMMIGRATION AND CUSTOMS ENFORCEMENT
DIVISION OF THE UNITED STATES OF
AMERICA DEPARTMENT OF HOMELAND
SECURITY, ET AL.,

                **Defendants.**

────────────────────────────────────

**JOHN G. KOELTL, District Judge:**

    The plaintiffs, twenty-five individuals whose homes were searched by agents of the Immigration and Customs Enforcement Division of the Department of Homeland Security ("ICE") during eight operations between February and September of 2007, bring this putative class action against ICE; Michael Chertoff, the former Secretary of the Department of Homeland Security ("DHS"); Julie Myers, the former Assistant Secretary of ICE; John Torres, the former Director of ICE's Office of Detention and Removal Operations (the "DRO"); and Marcy Forman, the former Director of ICE's Office of Investigations (the "OI") (Chertoff, Myers, Torres, and Forman, together, the "Supervisory Defendants"); a number of additional individual defendants, primarily ICE agents, officers, and supervisors; and the United States. The plaintiffs contend, among other things, that the operations at

issue were conducted in a manner that violated their rights under the Fourth and Fifth Amendments to the United States Constitution.  The plaintiffs seek injunctive relief, damages from the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq., and damages from the individual defendants under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971).

The Supervisory Defendants have moved to dismiss the claims against them, and all defendants have moved to dismiss the claims for injunctive relief.


                              I.


On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the allegations in the complaint are accepted as true, and all reasonable inferences must be drawn in the plaintiffs' favor.  Roth v. Jennings, 489 F.3d 499, 501 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."  Velez v. Levy, 401 F.3d 75, 80 (2d Cir. 2005) (internal quotation marks and citation omitted).  The Court should not dismiss the complaint if the plaintiff has alleged

"enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). While detailed factual allegations are not required, the pleading must include more than an "unadorned, the-defendant-unlawfully-harmed-me accusation," "'labels and conclusions,'" "'a formulaic recitation of the elements of a cause of action,'" or "'naked assertion[s].'" Iqbal, 129 S. Ct. at 1949 (alteration in original) (quoting Twombly, 550 U.S. at 555, 557). Accordingly, the basic principle that a court must accept all allegations as true is inapplicable to either legal conclusions or "mere conclusory statements." Id. A court can thus begin its analysis of the sufficiency of pleadings by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 1950. "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

**A.**


The plaintiffs' fourth amended complaint (the "Complaint")
makes the following allegations with respect to the ICE
operations at issue in this case.  The first four searches were
conducted by agents of the DRO.

On February 20, 2007, at 4:30 or 5:00 a.m., the East
Hampton residence of plaintiffs Adriana Aguilar, Andres Leon,
Elena Leon, Erika Gabriela Garcia-Leon, and Carson Aguilar, all
of whom are United States citizens, was raided by agents of the
DRO pursuant to "Operation Return to Sender."  According to the
Complaint, eight armed agents pounded on the front door of the
home, entered and searched the home without a warrant and
without consent, stormed into a bedroom containing a sleeping
mother and her child, and detained and interrogated family
members while blocking exits.  The agents were looking for
Adriana Aguilar's ex-husband, whom she had divorced five years
earlier, and who no longer resided in the house.  As they were
leaving, one of the agents said that they would return.  Fourth
Amended Class Action Complaint ¶¶ 23, 190-241 ("Compl.").

Between 4:00 and 5:00 a.m., on the same date and as a part
of the same operation, the same team of armed agents raided the
East Hampton home of plaintiff Nelly Amaya without requesting or
receiving consent to enter and without showing any warrant,

detained and interrogated residents, and twisted Ms. Amaya's arm, exacerbating a preexisting injury.  Compl. ¶¶ 24-25, 242-85.

On March 19, 2007, at about 4:00 a.m., the Mount Kisco home of plaintiffs David Lazaro Perez, William Lazaro, and Tarcis Sapon-Diaz was raided by armed agents of the DRO pursuant to Operation Return to Sender.  According to the Complaint, ten armed agents invaded the apartment building, burst into apartments and bedrooms by force, without exigent circumstances, consent or a warrant; caused physical damage throughout the building; and detained and arrested Spanish-speaking residents in a state of undress prior to questioning them.  Compl. ¶¶ 29, 307-23.

On April 18, 2007, between 3:00 and 4:30 a.m., the Riverhead house where plaintiffs Mario Pazan DeLeon, Gonzalo Escalante, Victor Pineda Morales, Yoni Revolorio, and Juan Jose Mijangos lived was raided by agents of the DRO pursuant to "Operation Cross Check."  Eight armed agents forcibly entered the house, without showing any warrant, caused physical damage to the doors and walls during entry, and burst into bedrooms without requesting or receiving consent while residents were in a state of undress.  Compl. ¶¶ 27, 286-306.

The following four searches were conducted by agents of the OI.  On September 24, 2007, at about 5:45 a.m., the Westbury

home of plaintiffs Sonia Bonilla, a lawful permanent resident,
and Beatriz and Dalia Velasquez, her United States citizen
daughters, was raided by agents of the OI pursuant to "Operation
Community Shield."   Ten armed agents approached and surrounded
the home while Ms. Bonilla was driving her husband to work.
They pounded on the front door shouting "Police!" and told
Beatriz Velasquez, who was twelve years old, that "someone was
dying upstairs" in order to gain entry.   When Beatriz opened the
door, agents stormed into the house; detained Beatriz and Dalia,
her nine-year-old sister, in their bedroom; searched the entire
house without requesting or receiving consent, and without
showing any warrant; and refused to explain their presence to
Ms. Bonilla when she returned home while the raid was still in
progress.   Compl. ¶¶ 31, 324-42.

On the same date, the Westbury home of plaintiffs Elder
Bonilla, a lawful permanent resident, and Diana Rodriguez was
raided by agents of the OI pursuant to Operation Community
Shield.   According to the Complaint, a team of twelve armed
agents surrounded the home, pounded on the door, and shouted,
"Open the door!"   When Mr. Bonilla opened the front door, an
agent pointed a gun at his chest.   Agents entered and searched
the house without requesting or receiving consent, without
exigent circumstances and without showing a warrant; entered
bedrooms without requesting or receiving consent; handcuffed

residents prior to any questioning; and caused physical damage to doors and walls.  Compl. ¶¶ 33, 343-53.

On September 27, 2007, at approximately 7:30 a.m., the Huntington Station home of plaintiffs Raul Amaya, a United States citizen, and Gloria Vanessa Amaya, a lawful conditional resident, was raided by agents of the OI as a part of Operation Community Shield.  According to the Complaint, ten agents invaded the home, searched through the house without requesting or receiving consent from the Spanish-speaking residents, and without a judicial warrant or exigent circumstances.  The agents allegedly made allegations and used profanities to intimidate the Amayas, attempted to kick open a basement unit, and conducted a full search of the house.  The agents threatened to return.  Compl. ¶¶ 35, 354-76.

According to the Complaint, armed agents also invaded the Huntington home of plaintiffs Pelagia De La Rosa-Delgado, Anthony Jimenez, Christopher Jimenez, and Bryan Jimenez, all of whom are United States citizens, on two occasions, in August 2006 and on September 27, 2007, as part of Operation Community Shield, each time without a judicial warrant or valid consent. Each raid occurred early in the morning.  During the first raid, agents pounded loudly on the door, burst into the home without requesting or receiving consent from the residents, who were in their nightclothes, detained the family in the living room and

basement, and stated that they were searching for someone named "Miguel," a man unknown to the family.  During the second raid, agents looking for the same man surrounded the home, entered by pushing past a seventeen-year-old who opened the door, detained teenagers and adults in a state of undress, and entered the bedroom of a sleeping woman without requesting or receiving consent.  Compl. ¶¶ 37-38, 377-418.

The Complaint alleges that none of the plaintiffs in this case was an intended target of a raid, Compl. ¶¶ 238, 284, 305, 322, 341, 352, 375, 417, and indeed that only a small percentage of the individuals arrested pursuant to the operations were targets, Compl. ¶ 463.  It alleges that the plaintiffs nonetheless remain extremely fearful that ICE agents will return to their homes, Compl. ¶¶ 23, 25, 27, 29, 31, 38, 39, 351, and that "[b]y engaging in such routine, law-abiding activities as living in their homes, Plaintiffs face the potential threat of future violations to their personal safety, security, freedom, and civil and constitutional rights."  Compl. ¶ 441.

In support of these allegations, the Complaint also alleges that, to determine what residences to target during operations, Fugitive Operation Teams ("FOTs") "rely on a database that purports to contain relevant information concerning, among other things, the location of fugitive aliens," but that "[m]uch of the information in this database . . . is outdated, inaccurate

and incomplete." Compl. ¶¶ 184-85.  The Complaint alleges that a 2007 report by the Inspector General of DHS noted that "the DRO immigration database contained inaccurate and incomplete information on fugitive aliens" and "data exchanged between the DRO and its federal partners have not been reconciled on a regular basis to ensure the identity and background information on the fugitive alien is valid." Compl. ¶ 189.  It also alleges that an investigation by the Inspector General into the intelligence supporting raids in Nassau County in October 2007 found that less than 10 percent of administrative warrants contained accurate intelligence.  Compl. ¶ 11.

    The Complaint further alleges that "[d]espite accounts that ICE has erroneously targeted numerous Latino homes, including complaints that they have raided the same home more than once without making any arrests and reports that clearly show ICE has used stale intelligence, ICE has never required agents to document or input information into their records or databases noting incidents of failed attempts to find targets." Compl. ¶ 11.  It alleges that, "[a]s a foreseeable result of these lapses . . . Latinos face the risk of being wrongly and repeatedly targeted for raids." Compl. ¶ 11; see also Compl. ¶¶ 460, 475.

**B.**


The plaintiffs do not allege that any of the Supervisory
Defendants directly participated in the challenged operations.
Rather, they argue that the Supervisory Defendants created the
policies governing how ICE agents operated during the raids at
the plaintiffs' homes, and actively endorsed the
unconstitutional conduct about which the plaintiffs complain.
More specifically, the Complaint makes the following
allegations:

Defendant Chertoff, as the Secretary of DHS, was the
"ultimate decision maker" for the department and its divisions,
including ICE.  Compl. ¶¶ 72-73.  He "created, approved, and
implemented official policies and strategies," and, in concert
with defendant Myers, conceived the Secure Border Initiative
("SBI"), a comprehensive and aggressive immigration enforcement
strategy for the United States pursuant to which operations
Cross Check, Return to Sender, and Community Shield were
conducted.  According to the Complaint, "Defendant Chertoff
intended to violate constitutional rights by . . . implementing
these policies."  Defendant Chertoff was also involved in the
planning and investigation of ICE agents' conduct during raids.
Compl. ¶ 73.  During his tenure, he also approved an eight-fold
increase in the goal for arrests for FOTs.

According to the Complaint, defendant Chertoff "encouraged, endorsed, and thus intended the unconstitutional conduct by ICE during home raids."  Compl. ¶ 75.  This tacit endorsement is allegedly evidenced by his response or lack of response to articles and letters bringing to his attention the unconstitutional nature of the raids.  In particular, the plaintiffs point to the following documents as providing such notice: an April 10, 2007 New York Times article detailing a raid on a home in East Hampton; a May 23, 2007 letter from an attorney alleging that his client's Mt. Kisco home had been entered by ICE agents without a warrant and without consent; an April 27, 2007 San Francisco Chronicle article describing an ICE raid and discussing ICE's practice of permitting agents to use ruses; an April 28, 2007 article in The Daily Review describing raids in the San Francisco area; a July 23, 2007 New York Times article discussing raids in New Haven, Connecticut; a June 11, 2007 letter from Senators Dodd and Lieberman requesting an explanation of the "illegal" New Haven raids; a September 27, 2007 letter from the Commissioner of Police for Nassau County to the resident agent-in-charge of ICE investigations in Bohemia, New York; an October 2, 2007 letter from Nassau County Executive Thomas Suozzi; and letters from various congressmen during 2008.  Compl. ¶¶ 16, 75, 428, 431-32.  The June 2007 letter from Senators Dodd and Lieberman noted that eyewitnesses had seen

agents push their way into homes without consent, and alleged that the operations were carried out in retaliation for a new initiative to issue identification cards to the undocumented community.  Compl. Ex. 5.  Three days after receiving the letter, defendant Chertoff responded to the senators by means of a letter in which he wrote that "[a]t no time did any ICE FOTs enter a dwelling without consent."  Compl. ¶ 75(b).

Of the materials claimed to have given defendant Chertoff notice of the unconstitutional nature of the operations, only the newspaper articles, attorney letter, and letter from Sen. Dodd and Lieberman are alleged to have been available to defendant Chertoff – or even in existence – prior to any of the operations at issue in this case.  See Compl. ¶ 75.

Defendant Myers, as the Assistant Secretary of Homeland Security for ICE, was directly supervised by defendant Chertoff, and directly supervised defendants Torres and Forman.  Compl. ¶ 78.  She also approved the eight-fold increase in FOT apprehension targets, as well as defendant Torres's decision that "collateral" (non-fugitive) arrests would count toward achieving that goal.  Compl. ¶ 80.  According to the Complaint, defendant Myers "condoned and endorsed . . . unconstitutional conduct," Compl. ¶ 81, and "intended to violate constitutional rights by . . . implementing [ICE] policies," Compl. ¶ 80.  In addition, she "vigorously defended ICE in spite of mounting

evidence of repeated and systematic unconstitutional conduct,"
in violation of a duty to take corrective measures.  Compl. ¶
80.  This evidence came in the form of "regular briefings on
newspaper articles concerning ICE's unconstitutional conduct,"
Compl. ¶ 81, and access to the September 27 and October 2, 2007
letters that are alleged to have put defendant Chertoff on
notice of ICE agents' unconstitutional conduct, Compl. ¶ 16-19.
The Complaint also alleges that defendant Myers "coordinated
ICE's response to the [allegations discussed in the October 2,
2007 letter from Nassau County Executive Thomas Suozzi], and
also oversaw a grossly inadequate investigation into internal
allegations of racial profiling."  Compl. ¶ 80.

Defendant Torres, as Director of the DRO,[1] reported to
defendants Chertoff and Myers and was responsible for the
apprehension, detention and removal of foreign nationals charged
with violations of the immigration law and the supervision of
ICE agents assigned to the Detention and Removal field offices,
including the New York field office.  Compl. ¶ 83.  In 2006,
defendant Torres created a new goal of 1,000 arrests per year
for FOTs, an eight-fold increase from what the benchmark had
been two years earlier.  Compl. ¶ 84.  He also indicated that

---

[1]  The DRO is the arm of ICE tasked with apprehending and
removing illegal aliens from the United States, especially those
who have violated removal orders.  Declaration of Darren
Williams ¶¶ 4, 6.

collateral arrests made as part of a headquarters-sponsored operation would count toward that goal, according to the plaintiffs, "knowing and intending that this would lead ICE to design operations to maximize the number of collateral arrests." Compl. ¶ 84.  According to the Complaint, defendant Torres "intended to violate constitutional rights by . . . implementing these policies."  Compl. ¶ 84.

Defendant Torres was the approving official for the operational plans for Return to Sender and Cross Check.  Compl. ¶ 86.  According to the Complaint, the plans "detailed targets, operational planning and execution, tasks for each group or office involved, coordinating instructions, and logistics." Compl. ¶ 86.  The plans called for operations to be conducted by teams of a dozen agents.  Declaration of Donna L. Gordon in Supp. of Pls.' Opp. to Defs.' Mot. to Dismiss the Compl. Against Defs. Michael Chertoff, Julie Myers, John Torres, & Marcy Forman ("Gordon Decl."), Ex. C at 1.  They also indicated that operations should commence in the early morning hours and that agents should wear body armor and fully equipped tactical belts. Gordon Decl. Ex. C at 2-4; Gordon Decl. Ex. D at 3-5, 12-13.

Defendant Torres also contributed to ICE's response to a report by the Inspector General, "An Assessment of [ICE] Fugitive Operations Teams," which the Complaint alleges was highly critical.  Compl. ¶ 87.

Defendant Forman, as Director of the OI,[2] reported to defendants Chertoff and Myers and was responsible for overseeing the investigative arm of ICE and the supervision of agents and officers in New York, Suffolk, Nassau, and Westchester counties. Compl. ¶ 89.  She "played a significant role in the planning of the ICE raids in Nassau County in September 2007," and "was in charge of overseeing training and setting policy regarding ICE agent conduct during home raids."  Compl. ¶ 90.  According to the Complaint, defendant Forman "intended to violate constitutional rights . . . by implementing these policies," Compl. ¶ 90, and failed to take appropriate corrective measures after she was informed of concerns about the constitutionality of ICE agents' conduct, Compl. ¶ 92.

According to the Complaint, working together, defendants Torres and Forman coordinated the efforts of the DRO and OI, and "issued memoranda creating numerous protocols regarding the coordination of raids, case management, [and] procedures for keeping records."  Compl. ¶¶ 85, 91.  They also issued memoranda "stressing the importance of using ruses in operations" and "advocated the use of deception by ICE agents" to gain entry into homes.  Compl. ¶¶ 85, 91; Gordon Decl. Ex. E, F, G.

---

[2]  The OI is ICE's division of criminal investigations; it investigates national security threats, financial crimes, human trafficking, narcotics smuggling, child pornography and exploitation, immigration fraud, and other immigration violations.  Declaration of Jeffrey Knopf ¶ 3.

Finally, according to the Complaint, all of the Supervisory Defendants knew of complaints of racial profiling by ICE officers before the operations at issue in this case took place, and "condoned such unconstitutional conduct by dismissing the internal accusations without conducting proper investigations." Compl. ¶ 12.

## C.

A complaint commencing the present action was filed by several of the plaintiffs involved in the early 2007 operations on September 20, 2007.  On October 4, 2007, an amended complaint was filed, adding the plaintiffs whose homes were searched in September 2007.  An equal protection claim was added in a third amended complaint filed on March 6, 2009.  The plaintiffs were granted leave to file the fourth amended complaint, which is the subject of the present motions, in December 2009.  On December 21, 2009, they filed the Complaint, which added ten additional defendants, including defendants Chertoff, Myers, Torres, and Forman.

By request of the plaintiffs, the time for discovery in the case was enlarged on at least four occasions.  Fifth Am. Scheduling Order, Aguilar v. ICE, No. 07 Civ. 8224 (S.D.N.Y. Dec. 3, 2010).  The defendants represent that, as of the time

16

the fourth amended complaint was filed, the defendants had
produced more than 40,000 pages of documents, including all
relevant policies and approximately 12,000 pages of training
materials; and that the plaintiffs had taken 31 defendant
depositions and 10 third-party depositions.  Mem. of L. in Supp.
of Mot. to Dismiss the Compl. Against Defs. Michael Chertoff,
Julie Myers, John Torrest, & Marcy Forman at 13.  Discovery is
now closed.

## II.

     The Complaint alleges that the searches described above
were conducted in a manner that violated the Fourth and Fifth
Amendments to the United States Constitution.

     The Fourth Amendment provides that "The right of the people
to be secure in their persons, houses, papers, and effects,
against unreasonable searches and seizures, shall not be
violated, and no Warrants shall issue, but upon probable cause,
supported by Oath or affirmation, and particularly describing
the place to be searched, and the persons or things to be
seized."  U.S. Const. amend. IV.  Administrative searches such
as the ones at issue in this case are subject to the warrant
requirement of the Fourth Amendment.  Michigan v. Clifford, 464
U.S. 287, 291 (1984).  All parties agree that the operations did

not occur pursuant to a warrant, and that they were only valid
if they were conducted with the consent of the residents.  See,
e.g., Clifford, 464 U.S. 291, 295; Camara v. Mun. Ct. of S.F.,
387 U.S. 523, 540 (1967).

For a warrantless search justified upon consent to be
valid, the consent must be "'freely and voluntarily given.'"
Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973) (quoting
Bumper v. North Carolina, 391 U.S. 543, 548 (1968)); United
States v. Snype, 441 F.3d 119, 130-31 (2d Cir. 2006).  Whether a
consent to a search "was in fact 'voluntary' or was the product
of duress or coercion, express or implied, is a question of fact
to be determined from the totality of all the circumstances."
Schneckloth, 412 U.S. at 227.  A consent coerced by threats or
force, or granted only in submission to a claim of lawful
authority, is not valid.  Id. at 233.  The plaintiffs contend
that their homes were searched without their consent, and
moreover that the operations were conducted under coercive
circumstances that would have rendered any purported consent
involuntary.

The plaintiffs also assert claims under the Due Process
Clause of the Fifth Amendment, which "contains an equal
protection component prohibiting the United States from
invidiously discriminating between individuals or groups."
Washington v. Davis, 426 U.S. 229, 239 (1976); Bolling v.

18

Sharpe, 347 U.S. 497, 499 (1954).  The plaintiffs claim, among other things, that they were subjected to discriminatory treatment because their residences were identified and targeted for ICE operations because Latinos were believed to reside in them.

The plaintiffs' claims against the Supervisory Defendants arise under Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), which "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights."  Iqbal, 129 S. Ct. at 1947-48 (internal quotation marks omitted).  The plaintiffs argue that the Supervisory Defendants are liable for creating or permitting a policy or custom under which unconstitutional practices flourished, and for failing to intervene to prevent violations of the Constitution, even after they were put on notice that such violations were occurring.[3]

The Supervisory Defendants have moved to dismiss the claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.  They argue that (1) after Iqbal, "knowledge and acquiescence," "failure to train," and similar theories of supervisory liability are not available

---

[3]  The plaintiffs do not assert injunctive relief claims against the Supervisory Defendants.  Pls.' Mem. of L. in Opp. to Defs. Chertoff, Myers, Torres & Forman's Mot. to Dismiss ("Mem. Opp.") at 9 n.7.

in the <u>Bivens</u> context, and (2) even under such theories of
liability, the plaintiffs have failed to allege a facially
plausible claim against the Supervisory Defendants.

**A.**

<u>Iqbal</u> arose out of the federal government's response to the
Septebmer 11, 2001 terrorist attacks.  Iqbal, a Pakastani
Muslim, was arrested on criminal charges and detained under
restrictive conditions.  He brought suit under <u>Bivens</u> against
numerous federal officials, including John Ashcroft, the former
Attorney General of the United States, and Robert Mueller, the
Director of the Federal Bureau of Investigation.  Iqbal alleged
that the defendants had designated him a person of "high
interest" based on his race, religion, or national origin, in
violation of the First and Fifth Amendments; that the defendants
knew of, condoned, and willfully and maliciously agreed to
subject him to harsh conditions of confinement as a matter of
policy, solely on account of discriminatory factors and for no
legitimate penological purpose; and that defendant Ashcroft was
the policy's "principal architect" and defendant Mueller was
"instrumental" in its adoption and execution.

The Supreme Court found that Iqbal had failed to plead
sufficient facts to state a claim for purposeful and unlawful

discrimination.  _Iqbal_, 129 S. Ct. at 1947-1954.  It began by

noting that suits under _Bivens_ are the federal analog of section

1983 suits against state officials, and that as such, government

officials sued under _Bivens_ "may not be held liable for the

unconstitutional conduct of their subordinates under a theory of

respondeat superior."  _Id._ at 1948.  Instead, a plaintiff must

plead that each government-official defendant, through his or

her own actions, has violated the Constitution.  _Id._

The Court continued:

> The factors necessary to establish a _Bivens_
> violation will vary with the constitutional provision
> at issue.  Where the claim is invidious discrimination
> in contravention of the First and Fifth Amendments,
> . . . the plaintiff must plead and prove that the
> defendant acted with discriminatory purpose.  Under
> extant precedent purposeful discrimination requires
> more than "intent as volition or intent as awareness
> of consequences."  It instead involves a
> decisionmaker's undertaking a course of action
> "because of," not merely "in spite of," the actions'
> adverse effects upon an identifiable group.  It
> follows that . . . respondent must plead sufficient
> factual matter to show that petitioners adopted and
> implemented the detention policies at issue not for a
> neutral, investigative reason but for the purpose of
> discriminating on account of race, religion, or
> national origin.
>     Respondent disagrees.  He argues that, under a
> theory of "supervisory liability," petitioners can be
> liable for "knowledge and acquiescence in their
> subordinates' use of discriminatory criteria to make
> classification decisions among detainees."  That is to
> say, respondent believes a supervisor's mere knowledge
> of his subordinate's discriminatory purpose amounts to
> the supervisor's violating the Constitution.  We
> reject this argument.  Respondent's conception of
> "supervisory liability" is inconsistent with his
> accurate stipulation that petitioners may not be held

accountable for the misdeeds of their agents.   In a
section 1983 suit or a _Bivens_ action – where masters
do not answer for the torts of their servants – the
term "supervisory liability" is a misnomer.   Absent
vicarious liability, each Government official, his or
her title notwithstanding, is liable only for his or
her own misconduct. . . .   [P]urpose rather than
knowledge is required to impose _Bivens_ liability on
the subordinate for unconstitutional discrimination;
the same holds true for an official charged with
violations arising from his or her superintendent
responsibilities.

_Id._ at 1948-49 (citations and alterations omitted).

It is thus clear that, in order to assert a claim under the

equal protection component of the Fifth Amendment, a plaintiff

must assert that the defendant intended to discriminate against

the plaintiff because of a prohibited classification.  What is

less clear is what a plaintiff must assert in order to plead a

claim against a supervisory defendant for the violation of a

different constitutional provision.

Long prior to _Iqbal_, in _Colon v. Coughlin_, 58 F.3d 865 (2d

Cir. 1995), the Second Circuit Court of Appeals held that:

[t]he personal involvement of a supervisory defendant
may be shown by evidence that: (1) the defendant
participated directly in the alleged constitutional
violation, (2) the defendant, after being informed of
the violation through a report or appeal, failed to
remedy the wrong, (3) the defendant created a policy
or custom under which unconstitutional practices
occurred or allowed the continuance of such a policy
or custom, (4) the defendant was grossly negligent in
supervising subordinates who committed the wrongful
acts, or (5) the defendant exhibited deliberate
indifference to the rights of [the plaintiffs] by
failing to act on information indicating that
unconstitutional acts were occurring.

Id. at 873.

       The Court of Appeals has not yet definitively decided which
of the Colon factors remains a basis for establishing
supervisory liability in the wake of Iqbal, and no clear
consensus has emerged among the district courts within the
circuit.  But see Rolon v. Ward, 345 Fed. Appx. 608, 611 (2d
Cir. 2009) ("A supervisory official personally participates in
challenged conduct not only by direct participation, but by (1)
failing to take corrective action; (2) creation of a policy or
custom fostering the conduct; (3) grossly negligent supervision,
or deliberate indifference to the rights of others.").  Several
district court decisions have concluded that by rejecting the
argument that "a supervisor's mere knowledge of his
subordinate's discriminatory purpose amounts to the supervisor's
violating the Constitution," Iqbal, 129 S. Ct. 1949, Iqbal
nullified several of the Colon factors.  See, e.g., Bellamy v.
Mount Vernon Hosp., 07 Civ. 1801, 2009 WL 1835939 at *4
(S.D.N.Y. June 26, 2009) ("Only the first and part of the third
Colon categories pass Iqbal's muster – a supervisor is only held
liable if that supervisor participates directly in the alleged
constitutional violation or if that supervisor creates a policy
or custom under which unconstitutional practices occurred.").
Other courts, however, have questioned whether Iqbal changed the

                                   23

standard of supervisory liability outside of the equal

protection context.  As described by the court in Sash v. United

States, 674 F. Supp. 2d 531 (S.D.N.Y. 2009), the line of

decisions that concludes little of Colon survived Iqbal:

> may overstate Iqbal's impact on supervisory liability.
> Iqbal involved alleged intentional discrimination.
> The Supreme Court specifically held that "[t]he
> factors necessary to establish a Bivens violation will
> vary with the constitutional provision at issue."
> Where the alleged constitutional violation involved
> "invidious discrimination in contravention of the
> First and Fifth Amendments, Iqbal held that "plaintiff
> must plead and prove that the defendant acted with
> discriminatory purpose," whether the defendant is a
> subordinate or a supervisor. . . .  Where the
> constitutional claim does not require a showing of
> discriminatory intent, but instead relies on the
> unreasonable conduct or deliberate indifference
> standards of the Fourth and Eighth Amendments, the
> personal involvement analysis set forth in Colon v.
> Coughlin may still apply.

Id. at 544 (citations omitted).  See also Diaz-Bernal v. Myers,

758 F. Supp. 2d 106, 129, 130 (D. Conn. 2010) (applying all

Colon factors to claims against defendants Torres and Myers,

while noting disagreement among courts as to whether they have

survived Iqbal).  This uncertainty is echoed in the decisions of

the courts of appeals for other circuits.  See, e.g., Argueta v.

U.S. Immigration & Customs Enforcement, 643 F.3d 60, 70 (3d Cir.

2011); Dodds v. Richardson, 614 F.3d 1185, 1194 (10th Cir.

2010); Parrish v. Ball, 594 F.3d 993, 1001 (8th Cir. 2010).

    For the purpose of deciding this motion, however, it is not

necessary for the Court to determine the standard for

supervisory liability for violations of the Fourth Amendment after Iqbal.  That is because there is no controversy that allegations that do not satisfy any of the Colon prongs are insufficient to state a claim against a defendant-supervisor. That is the case with respect to defendants Chertoff and Myers. On the other hand, as the district courts that have considered the issue agree, and the Second Circuit Court of Appeals has confirmed in dicta, regardless of the precise contours of supervisors' liability, the plaintiffs have met the applicable standard if they adequately allege that a supervisory defendant created a policy or custom pursuant to which unconstitutional practices occurred.  See, e.g., Bellamy, 2009 WL 1835939 at *4; Scott v. Fischer, 616 F.3d 100, 108-09 (2d Cir. 2010) (noting, in dicta, that "[a] supervisory official may be liable [under section 1983 not only] because he or she created a policy or custom under which unconstitutional practices occurred, [but also because he or she] allowed such a policy or custom to continue" (internal quotation marks and citation omitted)).  The plaintiffs have met this burden with respect to defendants Torres and Forman.[4]

**B.**

---

[4] The defendants conceded that they could be held liable for a violation of the Fourth Amendment under Bivens if they created a custom or policy that caused the unconstitutional practices. Hr'g Tr. 5:1-9, 9:2-7, Mar. 8, 2011.

The Court begins by "identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," Iqbal, 129 S. Ct. at 1950, and disregarding pleadings that constitute no more than "unadorned, the-defendant-unlawfully-harmed-me accusation[s]," "'labels and conclusions,'" "'formulaic recitation[s] of the elements of a cause of action,'" or "'naked assertion[s].'" Id. at 1949 (final alteration in original) (quoting Twombly, 550 U.S. at 555, 557).

In support of their Fourth Amendment claims against defendants Chertoff and Myers, the plaintiffs make a number of allegations that are either conclusory or unsupportably vague. They allege that defendant Chertoff was the "ultimate decision maker" for the Department of Homeland Security ("DHS"), including ICE; that he "created, approved, and implemented official policies and strategies," including the Secure Border Initiative, the comprehensive immigration policy for the United States; and that as the Secretary of DHS, he was "involved in the planning and/or investigation of ICE agents' conduct during raids." Compl. ¶ 73. They allege, moreover, that both defendants Chertoff and Myers "intended to violate constitutional rights by . . . implementing [ICE] policies," Compl. ¶¶ 73, 80, and "encouraged, endorsed, and thus intended

26

the unconstitutional conduct by ICE during home raids," Compl.
¶¶ 75, 80, 81.  These allegations are similar to the conclusory
allegations found insufficient in Iqbal, and under Iqbal, they
are not entitled to any weight.

The plaintiffs do allege, with greater specificity, that
defendants Chertoff and Myers were notified of unconstitutional
conduct by ICE agents and failed to intervene to prevent further
unconstitutional acts, in derogation of a duty to do so.
Specifically, the plaintiffs allege that defendant Chertoff was
put on notice of unconstitutional practices by several articles
in national publications in the spring and summer of 2007; the
May 23, 2007 letter from the attorney of a man whose home had
been raided by ICE agents; the June 11, 2007 letter from
Senators Dodd and Lieberman; the September 27, 2007 letter from
the Nassau County police commissioner; the October 2, 2007
letter from Nassau County Executive Thomas Suozzi; and letters
from various congressmen during 2008.  Compl. ¶¶ 16, 75, 428,
431-32.  As noted above, however, many of these materials were
not in existence at the time the events at issue in this case
occurred, and thus could not have placed defendant Chertoff on
notice of agents' allegedly unconstitutional conduct.  Indeed,
the only materials to which defendant Chertoff could have had
access are the newspaper articles, the May 23 letter, and the

June 11 letter.  Moreover, both letters post-date the raids on four of the eight residences at issue in this case.

The plaintiffs' allegations with respect to defendant Myers are even more scant:  They allege merely that she received "regular briefings on newspaper articles concerning ICE's unconstitutional conduct," Compl. ¶ 81, and that she had access to certain materials that post-dated the raids at issue, Compl. ¶¶ 19, 80, 181.

Under the circumstances, such allegations are not sufficient to "nudge[]" plaintiffs' claims against defendants Chertoff and Myers "'across the line from conceivable to plausible.'"  Iqbal, 129 S. Ct. 1951 (citing Twombly, 550 U.S. at 570).  At best, they suggest that the defendants, officials at the highest level of government in charge of overseeing a bureaucracy of tens of thousands of people, had access to information indicating that a handful of field agents in disparate locations around the country had engaged in constitutionally infirm practices.  Accepted as true, this allegation is insufficient to establish that defendants Chertoff and Myers knew of and failed to intervene to prevent a widespread pattern of constitutional violations.  The plaintiffs' claims against defendants Chertoff and Myers thus fall into the category, discussed in Iqbal, "where the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct," and thus must be dismissed. Iqbal, 129 S. Ct. at 1950.

This conclusion with respect to defendants Chertoff and Myers is in accordance with the recent decision of the Third Circuit Court of Appeals in Argueta v. U.S. Immigration & Customs Enforcement, 643 F.3d 60 (3d Cir. 2011).  The court in that case dismissed nearly identical allegations, levied against defendants Myers and Torres,[5] partly on the ground that the plaintiffs had failed to allege sufficiently that the defendants had notice of the allegedly unconstitutional acts of their charges.  The court wrote:

> Plaintiffs did reference an impressive amount of documentation that allegedly provided notice to Appellants of their subordinates' unconstitutional conduct.  However, these alleged sources of notice were fatally flawed in one way or another.  Broadly

---

[5] Argueta reached a different conclusion as to the potential liability of defendant Torres than does this Court.  It found that the plaintiffs had pleaded insufficient facts to state a claim for supervisory liability under the Fourth Amendment against defendant Torres, and accordingly dismissed the claim against him.  Argueta, 643 F.3d at 74-75.  The facts alleged in that case, however, differ in critical respects from the facts alleged in this one.  Most notably, the complaint in Argueta did not allege that defendant Torres was directly involved in the alleged Fourth Amendment violations by virtue of having authored detailed operational plans.  Rather, the plaintiffs in Argueta alleged principally that defendant Torres knew of and acquiesced in constitutional violations, because he was on notice that they were occurring, and that he had "direct responsibility for the execution of fugitive operations." Id. at 66.  The allegations against defendant Torres that the Argueta court considered were thus similar in kind to those alleged against defendants Chertoff and Myers, and dissimilar from those alleged against defendant Torres, in this case.

speaking, we must point out the typical "notice" case
seems to involve a prior incident or incidents of
misconduct by a specific employee or group of
employees, specific notice of such misconduct to their
superiors, and then continued instances of misconduct
by the same employee or employees.   The typical case
accordingly does not involve a "knowledge and
acquiescence" claim premised, for instance, on reports
of subordinate misconduct in one state followed by
misconduct by totally different subordinates in a
completely different state.   Although there were some
New Jersey-specific allegations in the Second Amended
Complaint, we are generally confronted here with an
attack on the alleged misconduct of numerous ICE
agents at different raids executed across the country
over a period of years.   As Appellants further point
out, the court cases specifically cited in Plaintiffs'
pleading either did not involve individual capacity
claims against Myers and Torres, were filed after at
least some of the New Jersey raids specifically
alleged in the Second Amended Complaint took place, or
did not even involve Operation Return to Sender.   All
of these cases were also filed outside of New Jersey,
and certain other alleged sources of notice implicated
raids that took place in other states, especially in
New Haven, Connecticut.      Likewise, some alleged
sources . . . post-dated most of the specific New
Jersey raids that allegedly harmed Plaintiffs
themselves.   In the end, we conclude that Plaintiffs
did not plausibly allege that the Appellants had
legally sufficient notice of the underlying
unconstitutional conduct of their subordinates.

Id. at 74-75.[6]

---

[6] The Court notes also that this decision conflicts to some
extent with the recent decision of the United States District
Court for the District of Connecticut in Diaz-Bernal, 758 F.
Supp. 2d 106.   In denying the motion to dismiss the complaint
against defendant Myers in that case, the court relied in part
on allegations not present in the Complaint, such as that the
defendant had been placed on notice of ongoing constitutional
violations by the filing of related lawsuits.   Id. at 130.
However, the court also relied in part on Myers' involvement in
the creation of the plan increasing FOT arrest targets.   Id.   To
the extent the court's opinion implied that the creation of such

Because the plaintiffs have failed to plead adequately that defendants Chertoff and Myers knew of and acquiesced in the unconstitutional conduct of their subordinates, or any other possible basis for liability, the motion to dismiss the Fourth Amendment claims as to those defendants is granted.  Because the plaintiffs have been given four opportunities to craft a complaint and have nonetheless failed adequately to allege such claims, this dismissal is with prejudice.

C.

The plaintiffs' allegations with respect to defendants Torres and Forman, however, are of a different character.  With respect to defendant Torres, the plaintiffs allege, among other things: that he increased the apprehension target for FOTs to 1,000 per year, an eight-fold increase over prior targets, and eliminated a restriction that only 25 percent of arrests toward this goal could be "collateral" (non-fugitive) arrests, "knowing and intending that this would lead ICE to design operations to

---

a neutral plan with a valid law enforcement purpose was sufficient to establish the defendant's personal involvement in subsequent constitutional violations, the Court respectfully disagrees.  Accord Argueta, 643 F.3d at 75 ("[A] federal official specifically charged with enforcing federal immigration law appears to be acting lawfully when he or she increases arrest goals, [or] praises a particular enforcement program as a success.").

maximize the number of collateral arrests," Compl. ¶ 84, and
that he approved the operational plans for operations Return to
Sender and Cross Check, which "detailed targets, operational
planning and execution, tasks for each group or office involved,
coordinating instructions, and logistics," and personally
"authored and disseminated a specific memorandum that provided
objectives, target priorities, and reporting requirements for
Operation Cross Check," Compl. ¶ 86.  Similarly, the plaintiffs
allege that defendant Forman "played a significant role in the
planning of the ICE raids in Nassau County in September 2007."
Compl. ¶ 90.  The Complaint charges that, working together,
defendants Torres and Forman issued memoranda "creating numerous
protocols regarding the coordination of raids, case management,
[and] procedures for keeping records," and "stressing the
importance of using ruses in operations," including
"advocat[ing] the use of deception by ICE agents" to gain entry
into homes.  Compl. ¶¶ 85, 91.

In deciding the motion to dismiss, "the Court may consider
documents that are referenced in the complaint, documents that
the plaintiff relied on in bringing suit and that are either in
the plaintiffs' possession or the plaintiffs knew of when
bringing suit, or matters of which judicial notice may be
taken."  In re Loral Space & Commc'ns Ltd. Sec. Litig., No. 01
Civ. 4388, 2004 WL 376442, at *2 (S.D.N.Y. Feb. 27, 2004)

(citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)).  These documents include the operational plans for operations Return to Sender and Cross Check and memoranda from defendants Torres and Forman to all field office directors regarding ICE agents' use of ruses.  See Gordon Decl. Ex. C-G.

These documents indicate that, pursuant to guidance created or approved by Torres and Forman, agents conducted raids at residences in teams of a dozen agents, with body armor and tactical equipment, in the early morning hours.  Gordon Decl. Ex. C at 1, 3-4; Gordon Decl. Ex. D at 3-5, 12-13.  They were instructed on using ruses to gain entry into a home, without being contemporaneously advised that the use of such ruses might undermine a claim of valid consent.  See Gordon Decl. Ex. E, F, G.  Indeed, Courts have noted that each of these practices tends to undermine voluntary, duress-free consent, rendering it more likely that a search purportedly based on consent, like the ones at issue here, has been conducted in an unconstitutional manner. See, e.g., United States v. Mendenhall, 446 U.S. 544, 554 (1980) (noting that the "threatening presence of several officers" is a hallmark of a non-consensual encounter); Kaupp v. Texas, 538 U.S. 626, 631-32 (2003) (finding that search in the "middle of the night" was non-consensual); Hoffa v. United States, 385 U.S. 293, 301 (1966) ("The Fourth Amendment can certainly be violated by guileful as well as by forcible intrusions into a

constitutionally protected area."); <u>United States v. Montes-</u><u>Reyes</u>, 547 F. Supp. 2d 281, 288-290 & n.7, n.10 (S.D.N.Y. 2008) (use of a ruse to gain entry can render consent involuntary under the totality of the circumstances); <u>Djonbalic v. City of</u> <u>New York</u>, No. 99 Civ. 11398, 2000 WL 1146631, at *10 (S.D.N.Y. Aug. 14, 2000).  Under all of the circumstances, the conditions under which the raids were conducted, in accordance with the operational plans and memos, could plausibly be found to have undermined the voluntariness and validity of any consent given.

These allegations are sufficient to state a claim against defendants Torres and Forman under the Fourth Amendment and <u>Bivens</u>, because they constitute an allegation that the defendants personally created a policy pursuant to which unconstitutional practices occurred.  See <u>Colon</u>, 58 F.3d at 873; <u>Bellamy</u>, 2009 WL 1835939 at *4.  The motion to dismiss the plaintiffs' Fourth Amendment claim against defendants Torres and Forman is therefore denied.

D.

The Supervisory Defendants have also moved to dismiss the <u>Bivens</u> claims against them that arise under the Fifth Amendment.

In order to plead a Fifth Amendment claim for discrimination, a plaintiff must allege facts showing one of

three things: (1) that a law or policy is discriminatory on its face, Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999); (2) that a facially neutral law or policy has been applied in an intentionally discriminatory manner, Brown v. City of Oneonta, 221 F.3d 329, 337 (2d Cir. 2000); or (3) that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus," id.  The plaintiffs do not allege that any of the policies at issue "expressly classifies persons on the basis of race."  See Hayden, 180 F.3d at 48.  Accordingly, they are required to plead either that the defendants applied a facially neutral immigration enforcement strategy "in an intentionally discriminatory manner" or that their method of enforcing the immigration laws "has an adverse effect" on Latinos and "was motivated by discriminatory animus."  Brown, 221 F.3d at 337.

     In either case, under Iqbal, the plaintiffs are required to plead that an individual defendant against whom relief is sought "acted with discriminatory purpose."  Iqbal, 129 S. Ct. at 1948.  That requires the plaintiffs to plead "sufficient factual matter to show that [the defendants] adopted and implemented" the challenged policies "not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin."  Id. at 1948-49.  The plaintiffs have

wholly failed to do so with respect to any of the four Supervisory Defendants.

In considering the sufficiency of the Complaint, the Court must first disregard all "bare assertions." Iqbal, 129 S. Ct. at 1951.  In Hayden v. Paterson, 594 F.3d 150 (2d Cir. 2010), the Court of Appeals considered what assertions qualify as "bare" in the equal protection context.  The plaintiffs alleged that felon disenfranchisement violated the Fifth Amendment because it was designed to "deprive minorities of the right to vote" and that New York election laws were enacted "with the intent to disenfranchise Blacks." Id. at 161-62.  The court disregarded these allegations, explaining that the plaintiffs' claims that the defendants intended to discriminate against them, without factual support, amounted to "nothing more than a formulaic recitation of the elements of a constitutional discrimination claim." Id. at 162 (quoting Iqbal, 129 S. Ct. at 1951).

The plaintiffs in this case make similar allegations.  They allege that defendants Chertoff and Myers "intended to violate constitutional rights" by creating and announcing the SBI, Compl. ¶¶ 73, 79; that defendant Torres "intended to violate constitutional rights" when he increased the arrest goal for FOTs, Compl. ¶ 84; and that defendant Forman "intended to violate constitutional rights" while "overseeing training and

setting policy regarding ICE agent conduct," Compl. ¶ 90.  They
also allege, "upon information and belief," that the Supervisory
Defendants "condoned . . . unconstitutional conduct by
dismissing . . . internal accusations without conducting proper
investigations."  Compl. ¶ 12.  These bare assertions are
entitled to no weight.

The Court must next consider whether the remaining factual
allegations plausibly plead intentional discrimination by the
Supervisory Defendants.  See Iqbal, 129 S. Ct. at 1950.  The
plaintiffs allege that the eight-fold increase in FOT arrest
goals "clearly demonstrated an intent and purpose to target
Latino individuals."  Compl. ¶ 8.  However, at the same time
that apprehension goals were increased by 800 percent, funding
for the program increased by 2300 percent, and personnel
increased by 1300 percent.  See Compl. Ex. 1 at 1; Compl. Ex. 16
at 6.  While it might theoretically be possible that the
increase in apprehension goals was driven by the defendants'
discriminatory animus toward Latinos, the far more plausible
inference is that the goals arose from the agency's renewed
emphasis on immigration enforcement in the wake of the September
11, 2001 terrorist attacks.

The plaintiffs also allege that the Supervisory Defendants
knew of complaints of racial profiling by ICE officers before
the operations at issue took place, and "condoned such

37

unconstitutional conduct by dismissing the internal accusations without conducting proper investigations." Compl. ¶ 12. Specifically, they allege that "deposition testimony from a local law enforcement agency" reveals that ICE agents used terms such as "wetback" to refer to Latinos on multiple occasions, and that, during a particular operation that predated the raids at issue, only two of four businesses targeted for raids "were known gang hangouts – the other two were merely establishments frequented by Latinos." Compl. ¶ 12. These allegations are insufficient because, even if taken as true, they do not raise a plausible inference that the Supervisory Defendants intentionally discriminated against Latinos. Inaction or indifference in response to isolated reports of misbehavior by field agents is not sufficient to show that a supervisor knew of and tacitly condoned that conduct for a discriminatory purpose. See, e.g., Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) (noting that a "single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice" to show a policy that violates equal protection).[7]

---

[7] In Argueta, the District Court also found that Iqbal required the dismissal of the equal protection claim against the defendants because the plaintiffs conceded that there was no direct evidence of any purposeful discrimination. Argueta, 643 F.3d at 69. This dismissal was not appealed. Id. at 71-72.

The plaintiffs have failed to plead facts that plausibly suggest that the Supervisory Defendants intended to discriminate against Latinos.  Accordingly, the motion to dismiss the Fifth Amendment claims against those defendants is granted.  As with the Fourth Amendment claims against defendants Chertoff and Myers, the dismissal is with prejudice.

III.

The plaintiffs seek equitable relief in the form of an order permanently enjoining ICE and the other defendants from: (1) "[d]eploying groups of armed agents to descend upon the homes of Latinos in the pre-dawn hours with the intent to" enter or search such homes, or seize or search Latino individuals, without warrants or valid consent; (2) "[u]nlawfully identifying and targeting locations based on the belief that Latino individuals are known to live in or frequent such locations"; (3) "[d]esigning raids with the intent to detain, interrogate and seize Latinos based on their race, national origin or ethnicity"; (4) "[c]onducting raids without performing adequate pre-raid investigations of the targets and/or locations of such raids"; (5) "[c]onducting raids without providing effective and/or adequate training for the agents carrying out such raids"; or (6) "[t]eaching, training, condoning, or encouraging

law enforcement officers to target, enter or search homes or detain, seize or interrogate individuals in the manner described above."  Compl. at 135-37 (prayer for relief).

They also seek an order compelling ICE and the other defendants to: (1) "[i]mplement and ensure compliance with policies that require law enforcement agents to accurately record the consent they receive to enter homes that are targeted as part of ICE initiatives"; (2) "[i]mplement, maintain and update internal ICE databases to ensure that ICE agents do not (i) raid locations unnecessarily and unjustifiably, and/or (ii) repeatedly raid locations unnecessarily and unjustifiably"; (3) "[d]esign and maintain adequate training courses for ICE agents involved in ICE initiatives involving home raids"; and (4) "[i]mplement corrective measures to prevent any policies, patterns and practices that teach, train, condone or encourage law enforcement officers to act in the constitutionally deficient manner" described in the Complaint.  Compl. 137-38 (prayer for relief).

The defendants have moved to dismiss the plaintiffs' claims for injunctive relief under Federal Rule of Civil Procedure 12(b)(1), for lack of standing, and in the alternative for judgment on the pleadings, under Federal Rule of Civil Procedure 12(c).

**A.**

In defending against a motion to dismiss for lack of
subject matter jurisdiction pursuant to Federal Rule of Civil
Procedure 12(b)(1), the plaintiff bears the burden of proving
the Court's jurisdiction by a preponderance of the evidence.
Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  In
considering such a motion, the Court generally must accept the
material factual allegations in the complaint as true.  See J.S.
ex rel. N.S. v. Attica Cent. Schs., 386 F.3d 107, 110 (2d Cir.
2004).  The Court does not, however, draw all reasonable
inferences in the plaintiff's favor.  Id.; Graubart v. Jazz
Images, Inc., No. 02 Civ. 4645, 2006 WL 1140724, at *2 (S.D.N.Y.
Apr. 27, 2006).  Indeed, where jurisdictional facts are
disputed, the Court has the power and the obligation to consider
matters outside the pleadings, such as affidavits, documents,
and testimony, to determine whether jurisdiction exists.  See
Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek (Persero),
600 F.3d 171, 175 (2d Cir. 2010); APWU v. Potter, 343 F.3d 619,
627 (2d Cir. 2003); Filetech S.A. v. France Telecom S.A., 157
F.3d 922, 932 (2d Cir. 1998); Kamen v. Am. Tel. & Tel. Co., 791
F.2d 1006, 1011 (2d Cir. 1986).  In so doing, the Court is
guided by the body of decisional law that has developed under
Federal Rule of Civil Procedure 56.  Kamen, 791 F.2d at 1011;

see also Leyse v. Bank of Am., N.A., No. 09 Civ. 7654, 2010 WL 2382400, at *1 (S.D.N.Y. June 14, 2010).

Once a defendant's Rule 12(b)(1) motion puts a plaintiff's Article III standing in issue, the Court has leeway as to the procedure it wishes to follow to determine the issue of standing. Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates, Co., 436 F.3d 82, 87-88 (2d Cir. 2006) (citing Gibbs v. Buck, 307 U.S. 66, 71-72 (1939) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court.")). "After limited discovery on the jurisdictional issue, the matter might be appropriate for resolution on motion supported by affidavits, or, if a genuine dispute of material fact exists, the Court may conduct a hearing limited to Article III standing." Id. at 88 (internal citations omitted). Where, however, the evidence concerning standing overlaps with evidence on the merits, the Court has the discretion to proceed to trial and make its jurisdictional ruling at the close of evidence. Id. (citing Land v. Dollar, 330 U.S. 731, 739 (1947) ("[T]he District Court has jurisdiction to determine its jurisdiction by proceeding to a decision on the merits.")). Moreover, if "the overlap in the evidence is such that fact-finding on the jurisdictional issue will adjudicate factual issues required by the Seventh Amendment

to be resolved by a jury, then the Court must leave the jurisdictional issue for the trial." Id.

In this case, as discussed further below, the issues relevant to the question of the plaintiffs' standing to seek an injunction overlap substantially with those relevant to their entitlement to an injunction on the merits. Moreover, certain factual determinations bearing on the plaintiffs' standing to seek an injunction – such as the existence of a widespread practice of conducting raids in a manner violative of the plaintiffs' Fourth and Fifth Amendment rights – would appear to overlap substantially with questions for the jury that are raised by the plaintiffs' Bivens claims for damages against the individual defendants.

Accordingly, a decision as to whether the plaintiffs have established their standing to seek injunctive relief by a preponderance of the evidence would be premature. The Court will, however, look to the pleadings to determine whether the plaintiffs have alleged sufficient facts that would suffice to establish their standing to seek injunctive relief.

**B.**

The defendants have moved to dismiss the claims for injunctive relief on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[8]  For the plaintiffs to allege sufficient claims for injunctive relief, they must allege both that they have standing to bring those claims and that they have asserted the necessary elements for a claim of injunctive relief, particularly irreparable harm.

The standards to be applied to a motion pursuant to Federal Rule of Civil Procedure 12(c) are the same as those applied to a motion to dismiss pursuant to Rule 12(b)(6).  See, e.g., Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). "Thus, [a court] will accept all factual allegations in the complaint as true and draw all reasonable inferences in [the plaintiffs'] favor.  To survive a Rule 12(c) motion, [the] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010).  In deciding such a motion, the Court may consider documents that

---

[8] The defendants other than the Supervisory Defendants have answered the Complaint, and there are no claims for injunctive relief asserted against the Supervisory Defendants. Accordingly, the motion is properly classified as one under Federal Rule of Civil Procedure 12(c), for judgment on the pleadings, and not under Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim.

are referenced in the complaint, documents that the plaintiffs
relied on in bringing suit and that either are in the
plaintiffs' possession or were known to the plaintiffs when they
brought suit, or matters of which judicial notice may be taken.
Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002);
see also Brass v. Am. Film Techs., Inc., 987 F.2d 142, 150 (2d
Cir. 1993); Woodhams v.Allstate Fire & Cas. Co., 748 F. Supp. 2d
211, 215 (S.D.N.Y. 2010).


                                  1.


     "[T]hose who seek to invoke the jurisdiction of the federal
courts must satisfy the threshold requirement imposed by Article
III of the Constitution by alleging an actual case or
controversy."  City of Los Angeles v. Lyons, 461 U.S. 95, 101
(1983).  Plaintiffs must demonstrate that they have a "personal
stake in the outcome"; abstract injury is not enough.  Id.
(citing Baker v. Carr, 369 U.S. 186 (1962)).  "[A] plaintiff
must show that he has sustained or is immediately in danger of
sustaining some direct injury as the result of the challenged
official conduct and the injury or threat of injury must be both
real and immediate, not conjectural or hypothetical."  Id.
(internal quotation marks and citations omitted).

The seminal case concerning standing to seek injunctive relief is the Supreme Court's decision in City of Los Angeles v. Lyons, 461 U.S. 95 (1983).  See Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004).  In Lyons, the plaintiff alleged that he had been stopped for a traffic violation, and that without justification or provocation, Los Angeles police officers applied a "chokehold," injuring him and rendering him unconscious.  See Lyons, 461 U.S. at 97-98.  In addition to damages, Lyons sought an injunction barring the police department's use of control chokeholds, which had killed 16 people in Los Angeles between 1975 and 1980.  See id. at 115-16 (Marshall, J., dissenting).  The district court entered a preliminary injunction consistent with the permanent injunction sought, and the court of appeals affirmed.  Id. at 99.

The Supreme Court analogized Lyons' case to those of the plaintiffs in two of its prior decisions, O'Shea v. Littleton, 414 U.S. 488 (1974), and Ashcroft v. Mattis, 431 U.S. 171 (1977) (per curiam).  In O'Shea, the Court had addressed a suit by plaintiffs who claimed that they had been subjected to judicial discriminatory enforcement, by a county magistrate and judge, of criminal laws that the plaintiffs did not contend were invalid. The Court held that the likelihood of future harm was too remote to establish standing because "[t]he most that could be said for plaintiffs' standing was 'that if [plaintiffs] proceed to

46

violate an unchallenged law and _if_ they are charged, held to
answer, and tried in any proceedings before [the magistrate or
judge], they will be subjected to the discriminatory practices
that petitioners are alleged to have followed.'"  Lyons, 461
U.S. at 102-03 (quoting O'Shea, 414 U.S. at 497) (emphasis in
original).

In Mattis, the father of a boy who had been killed by the
police sought a declaration that a Missouri statute authorizing
police officers to use deadly force in apprehending felons was
unconstitutional.  The Court found it insufficient, for standing
purposes, that the plaintiff had "alleged that he had another
son, who 'if ever arrested or brought under an attempt at arrest
on suspicion of a felony, might flee or give the appearance of
fleeing, and would therefore be in danger of being killed by
these defendants or other police officers.'"  Lyons, 461 U.S. at
104-05 (quoting Mattis, 431 U.S. at 172-73, n.2) (emphasis in
original).

The Court found Lyons' injury similarly speculative.  It
reasoned that the fact that Lyons might have been illegally
choked in the past, "while presumably affording Lyons standing
to claim damages against the individual officers and perhaps
against the City, does nothing to establish a real and immediate
threat that he would again be stopped for a traffic violation,
or for any other offense, by an officer or officers who would

47

illegally choke him into unconsciousness without any provocation or resistance on his part." Id. at 105.  In order to establish the requisite likelihood of future harm, the Court thus found that under the circumstances, "Lyons would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either, (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter, whether for the purpose of arrest, issuing a citation or for questioning or, (2) that the City ordered or authorized police officers to act in such a manner." Id. at 105-06 (emphasis in original).  Because Lyons had failed to do so, the Court reasoned, he had not shown that he was "realistically threatened by a repetition of his experience." Id. at 109.

The Second Circuit Court of Appeals has applied Lyons in several cases involving requests for injunctive relief.  In Curtis v. City of New Haven, 726 F.2d 65 (2d Cir. 1984), the plaintiffs sued the City of New Haven and named police officers for damages and injunctive relief arising from the officers' negligent use of mace.  Curtis, 726 F.2d at 65-66.  Following separate trials on the damages claims, and a combined trial on the claim for an injunction, the district court issued an injunction prohibiting the use of mace except under

48

circumstances set forth in international guidelines.  See id. at
66.

        The court of appeals reversed, holding that, under Lyons,
the plaintiffs had failed to establish standing to seek
injunctive relief.  Id. at 69.  The court reasoned that
"[p]laintiffs do not make, in the words of the [Supreme] Court,
the 'incredible assertion' that all City police officers always
assault people they encounter with mace, or that the City
authorizes its police officers to act in such a manner."  Id. at
68 (quoting Lyons, 461 U.S. at 106) (emphasis in original).  The
court noted that, in fact, because the police department's
policy did not authorize officers to use mace offensively, the
officers "appear to have violated" the policy.  Id.  The court
further noted that the plaintiffs "have not alleged that it is
likely that they will be stopped by City police in the future
and, for no reason and without provocation, assaulted with mace
and not given treatment afterward."  Id.  Accordingly, as in
Lyons, the court concluded that the plaintiffs had failed to
show that they were "realistically threatened by a repetition of
[their] experience."  Id. at 67.

        Conversely, in DeShawn E. v. Safir, 156 F.3d 340 (2d Cir.
1998), the Court of Appeals concluded that Lyons did not
preclude the plaintiffs from seeking equitable relief against
the New York City Police Department ("NYPD").  Under New York

49

law, after a juvenile was arrested, he could be released and

issued an "appearance ticket" that directed him to return to

family court for a preliminary conference with probation

services to determine whether delinquency proceedings should be

initiated.  Id. at 342-43.  In 1995, the NYPD's Family Court

Detective Squad began interrogating juveniles, often in the

absence of counsel, when they returned for these conferences.

Id. at 343.  The two named plaintiffs claimed that the Squad had

unconstitutionally coerced involuntary statements, elicited

involuntary waivers of Miranda rights, and questioned juveniles

without counsel present.  Id. at 342-44.  A class of juveniles

who had been interrogated by the Squad was certified, and sought

declaratory and injunctive relief.  Id.  The district court

denied a motion by the plaintiffs for a preliminary injunction,

and granted the defendants' motion for summary judgment.  Id. at

344.

        The Court of Appeals found that the plaintiffs and their

parents had standing to seek injunctive relief.  The Court of

Appeals distinguished Lyons (and Curtis):

> [I]n Lyons, there was no proof of a pattern of
> illegality as the police had discretion to decide if
> they were going to apply a choke hold and there was no
> formal policy which sanctioned the application of the
> choke hold.  In contrast, the challenged interrogation
> methods in this case are officially endorsed policies;
> there is a likelihood of recurring injury because the
> Squad's activities are authorized by a written
> memorandum of understanding between the Corporation

> Counsel and the Police Commissioner.  In addition,
> plaintiffs' complaint alleges that the New York Police
> Department "has plans to and is in the process of
> instituting Detective Squads in the Family Court
> buildings in the Bronx, Brooklyn, and Queens."  Thus,
> unlike Lyons, "the City ordered or authorized [the
> Squad] to act in such a manner," and plaintiffs have
> standing to seek injunctive relief.

Id. at 344-45 (citations omitted) (second alteration in

original).  The court also emphasized that "[u]nlike Lyons, the

plaintiffs in this case allege that they, as a certified class,

are likely to suffer future interrogations by the Squad."  Id.

at 344.  The Court of Appeals cited with approval a case from

the Court of Appeals for the Ninth Circuit that had found that

"[t]he possibility of recurring injury ceases to be speculative

when actual repeated incidents are documented."  Nicacio v. INS,

768 F.2d 1133, 1136 (9th Cir. 1985), amended, 797 F.2d 700, 702

(9th Cir. 1985) (cited in DeShawn, 156 F.3d at 344).

     Finally, the Court of Appeals applied Lyons to deny a claim

for injunctive relief in Shain, 356 F.3d 211.  There, the

plaintiff was arrested by Nassau County police after his then-

wife reported that he had threatened violence during a domestic

dispute.  He was arraigned in court on misdemeanor charges and

remanded to the Nassau County Correctional Center ("NCCC").

Upon his arrival, and again prior to an appearance the next day,

the plaintiff was subjected to a strip/visual cavity search

pursuant to an NCCC policy that "required all admittees to be

51

stripped and searched regardless of the severity of the charge
or whether the admittee was suspected of concealing a weapon or
contraband." Id. at 213. The plaintiff sued the county,
alleging that the policy violated the Fourth Amendment, and
sought, among other relief, a permanent injunction prohibiting
blanket strip searches and body cavity inspections of an
individual "absent a reasonable suspicion that such individual
is concealing weapons or other contraband." Id. at 214.
Without addressing standing, the district court granted the
injunction. Id.

On appeal, the Court of Appeals found that, although he had
standing to seek monetary and declarative relief, the plaintiff
lacked standing to seek injunctive relief because he "failed to
demonstrate a likelihood of future harm." Id. at 216. The
court found that the plaintiff had failed to establish – or even
allege prior to his appeal – "the likelihood of a future
encounter with the Nassau County police likely to result in a
subsequent unconstitutional strip search," because he "was an
attorney admitted to the bar," "had no criminal record" and "had
never been arrested outside the context of his contentious
divorce proceedings," which had since ended. Id. at 215. The
court thus found that the plaintiff was "no more likely to be
subject to misdemeanor arrest and detainment than any other
citizen of Nassau County." Id. It further noted that, even if

52

the plaintiff were arrested again, "it is entirely conjectural
that he would be detained overnight and remanded to the NCCC, as
almost all misdemeanor arrestees are released on their own
recognizance or on bail."  Id.

        The court concluded that:

        Under Lyons, to establish a sufficient likelihood of a
        future unconstitutional strip search, Shain would have
        to show that if he is arrested in Nassau County and if
        the arrest is for a misdemeanor and if he is not
        released on bail and if he is remanded to NCCC and if
        there is no particularized reasonable suspicion that
        he is concealing contraband, he will again be strip
        searched.    Such  an  accumulation  of  inferences  is
        simply  too  speculative  and  conjectural  to  supply  a
        predicate for prospective injunctive relief.

Id. at 216 (citing O'Shea, 414 U.S. at 497) (emphasis in
original).  The court then rejected the plaintiff's reliance on
DeShawn on the ground that DeShawn did not hold that "the
existence of an official policy, on its own, is sufficient to
confer standing to sue on any individual who had previously been
subjected to that policy."  Id.  Rather, "DeShawn . . . suggests
– and Lyons confirms – that a plaintiff seeking injunctive
relief must demonstrate both a likelihood of future harm and the
existence of an official policy or its equivalent."  Id. (citing
Lyons, 461 U.S. at 105-06) (emphasis in original).  The court
concluded: "Here, Shain has failed to demonstrate a likelihood
of future harm and therefore, even if he was subject to an

official policy, he lacks standing to seek injunctive relief."
<u>Id.</u>

2.

The Court thus turns to the critical inquiries:  First, whether the plaintiffs have alleged that they are "realistically threatened by a repetition of [their] experience," <u>Lyons</u>, 461 U.S. at 109, or whether, rather, their fear of future harm is grounded on an "accumulation of inferences" that is "speculative and conjectural," <u>Shain</u>, 356 F.3d at 216 (citing <u>O'Shea</u>, 414 U.S. at 497); and second, whether the plaintiffs have adequately alleged the existence of an official policy or its equivalent, <u>Id.</u> (citation omitted).

It is clear that the plaintiffs have pleaded facts that, if proven, would support their standing to seek injunctive relief. First, the plaintiffs' alleged fear that ICE agents will return to their homes and conduct searches and seizures in an unconstitutional manner, Compl. ¶¶ 23, 25, 27, 29, 31, 38, 39, 351, is not unreasonable or unrealistic.

The Complaint alleges that ICE agents explicitly threatened to return to two of the eight homes in which they conducted operations.  Compl. ¶ 238, 371.  It also alleges that, in another case, agents actually <u>did</u> return to the home, visiting

54

twice in thirteen months.  Compl. 377-418.  Those allegations
alone are enough to remove the plaintiffs' claims that they are
likely to be subject to repeat visits from the category of the
purely speculative.  See Nicacio, 768 F.2d at 1136 ("The
possibility of recurring injury ceases to be speculative when
actual repeated incidents are documented."); National Congress
for Puerto Rican Rights by Perez v. City of New York, 75 F.
Supp. 2d 154, 161 (S.D.N.Y. 1999).  They distinguish the
plaintiffs' case from those in which a plaintiff bringing a
claim for injunctive relief is "no more likely to be subject to
[a challenged governmental practice] than any other citizen."
Shain, 356 F.3d at 215.

    The plaintiffs' standing to seek injunctive relief finds
further support in other allegations in the Complaint.  In
particular, the plaintiffs allege that, to determine what
residences to target during operations, FOTs "rely on a database
that purports to contain relevant information concerning, among
other things, the location of fugitive aliens," but "[m]uch of
the information in this database . . . is outdated, inaccurate
and incomplete."  Compl. ¶¶ 184-85.  According to the Complaint,
the DRO has been criticized by the Inspector General of DHS on
the ground that the database contains inaccurate and incomplete
information and is not regularly updated by DRO and its federal
partners.  Compl. ¶ 189.  The Complaint further alleges that,

"[d]espite accounts that ICE has erroneously targeted numerous Latino homes, including complaints that they have raided the same home more than once without making any arrests and reports that clearly show ICE has used stale intelligence, ICE has never required agents to document or input information into their records or databases noting incidents of failed attempts to find targets." Compl. ¶ 11.

The plaintiffs allege that, "[a]s a foreseeable result of these lapses . . . Latinos face the risk of being wrongly and repeatedly targeted for raids." Compl. ¶ 11; see also Compl. ¶¶ 460, 475. This claim is buttressed by the specific allegations with respect to the plaintiffs' homes. In one case, ICE agents allegedly threatened to return to a home after they were unsuccessful in locating a man who had not resided in the house for several years. Compl. ¶¶ 220-24. In another case, agents allegedly did return to a home, both times searching for the same man, who did not reside in the house and was unknown to the family. Compl. ¶¶ 377-418.

Under the facts alleged in the Complaint, therefore, the fact that a home has been the target of an operation in the past makes it more likely that it will be the target of an operation in the future, because the inaccurate information that leads agents to a home in the first place is likely to remain in the agency's database, and to be relied upon by agents again.

56

The plaintiffs have also adequately alleged the existence of an "official policy or its equivalent" authorizing unconstitutional searches.  See Shain, 356 F.3d at 216.  A policy can be inferred from the informal acts or omissions of supervisors.  Turpin v. Mailet, 619 F.2d 196, 200 (2d Cir. 1980).

As discussed above at length, the plaintiffs have alleged that the operational plans for the raids at issue in these cases called for operations to be conducted by teams of a dozen agents.  Gordon Decl. Ex. C at 1.  The plans also indicated that operations should commence in the early morning hours and that agents should wear body armor and fully equipped tactical belts. Gordon Decl. Ex. C at 2-4; Gordon Decl. Ex. D at 3-5, 12-13. Policy memos also endorsed the use of ruses without explaining how those ruses could undermine voluntary consent.  Compl. ¶¶ 85, 91; Gordon Decl. Ex. E, F, G.

Additionally, the Complaint alleges that the searches of the eight residences in this case were in fact systematically conducted without consent, and in a manner that would have undermined the validity of any consent given.  It alleges, for instance, that the operations at the plaintiffs' homes occurred almost uniformly in the pre-dawn hours, often between 3:00 and 5:00 a.m.  Compl. ¶¶ 192, 245, 289, 309, 326, 355, 395.  It also alleges that, after securing a perimeter around the plaintiffs'

property, visibly armed ICE agents "pounded" on doors or pushed through them, and used ruses to undermine voluntary consent. Compl. ¶¶ 194, 197, 199, 245, 250, 289, 291, 309, 313, 327, 331, 344, 345-46, 380-81, 382, 395-96.

Moreover, the plaintiffs have alleged that searches under the conditions described in the Complaint are condoned, widespread, and ongoing.  Accordingly, the plaintiffs have sustained their burden of alleging both a likelihood of future harm and an official policy or its equivalent.

### 3.

The defendants also argue that the plaintiffs have failed to allege the necessary elements for a claim for injunctive relief.  To obtain a permanent injunction, "a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." Roach v. Morse, 440 F.3d 53, 56 (2d Cir. 2006) (internal quotation marks omitted).  "Irreparable harm is an injury that is not remote or speculative but actual and imminent, and for which a monetary award cannot be adequate compensation." Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 37 (2d Cir. 1995) (internal quotation marks omitted).

Under the circumstances of this case, the plaintiffs have adequately alleged that they will be irreparably harmed if an injunction does not issue, because they have plausibly alleged a violation of their Fourth and Fifth Amendment rights, and allegations of constitutional rights are presumed to be irreparable.  See, e.g., Jolly v. Coughlin, 76 F.3d 468, 482 (2d Cir. 1996) ("[T]he alleged violation of a constitutional right . . . triggers a finding of irreparable harm."); Elrod v. Burns, 427 U.S. 347, 373 (1976); Lynch v. City of New York, 589 F.3d 94, 99 (2d Cir. 2009) (noting that possible violation of Fourth Amendment would satisfy requirement of pleading "irreparable harm"); Diaz v. N.Y.C. Bd. of Elections, 335 F. Supp. 2d 364, 367 (E.D.N.Y. 2004) (noting that allegation of violation of Equal Protection Clause of Fourteenth Amendment satisfies "irreparable harm" standard).

The defendants appear to argue that the plaintiffs are not entitled to this presumption of irreparable harm because the "plaintiffs' alleged injuries, if proven, can be adequately remedied by monetary relief; the Bivens remedy exists precisely to compensate individuals for Fourth Amendment violations by federal agents." Mem. of L. in Supp. of the Gov't's Mot. to Dismiss Pls.' Claim for Inj. Relief at 34.  However, the fact that a party may seek damages under Bivens for a prior constitutional violation does not mean that Bivens constitutes

an adequate remedy against future constitutional violations.  By the defendants' logic, no injunction could ever issue where a damages remedy was available to compensate past harm.  This suggestion is contrary to the entire structure of the injunctive relief inquiry, which requires a court to determine whether "remedies available at law, such as monetary damages, are inadequate to compensate for [an] injury," eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006) (emphasis added) – and not simply whether a remedy at law is available.

Finally, the defendants argue in their reply brief that the injunction the plaintiffs seek would require the defendants simply to "obey the law," and that such an injunction is impermissible.  The defendants cite no controlling authority for this proposition.  In any event, the plaintiffs seek wide-ranging injunctive relief that goes beyond an injunction that simply requires the defendants to obey the law.  Whether the plaintiffs will eventually be able to obtain any injunctive relief, and what the scope of that relief would be, are issues that must await the development of the evidence.  Critically, it is not necessary for the Court to decide at this time the elements of the injunction sought that would be necessary to redress the constitutional violations alleged.  The scope of any injunction is not at issue on this motion to dismiss; what is at issue is the plaintiffs' right to seek one at all.

The plaintiffs have adequately pleaded facts that would support the grant of an injunction, and the defendants' motion for judgment on the pleadings is therefore denied.

### CONCLUSION

The Court has carefully considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the reasons explained above, the defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is **granted with prejudice** with respect to the Fourth Amendment claims against defendants Chertoff and Myers and the Fifth Amendment claims against all of the Supervisory Defendants. The motion to dismiss is **denied** with respect to the Fourth Amendment claims against defendants Torres and Forman. The defendants' motion to dismiss the claims for injunctive relief for lack of standing under Federal Rule of Civil Procedure 12(b)(1) is **denied without prejudice**. Finally, the defendants' motion for judgment on the pleadings dismissing the claims for injunctive relief is **denied**. The Clerk is directed to close **Docket Nos. 220 and 240.**

SO ORDERED.

Dated:     New York, New York
           July 29, 2011

                                        John G. Koeltl
                                   United States District Judge

61