# centerforconstitutionalrights

666 broadway, 7 fl, new york, ny 10012
t 212 614 6464 f 212 614 6499 www.CCRjustice.org

July 17, 2012

**By electronic mail**
The Honorable Katherine B. Forrest
United States District Court
500 Pearl Street
New York, NY 10007-1581

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED AUG 0 6 2012
```

Re:   *Aguilar et al. v. ICE et al.,* 07 Civ. 8224 (KBF) (FM)

Dear Judge Forrest:

Plaintiffs respectfully challenge Defendants' continued use of pseudonyms and designation of the identities of individual ICE agent defendants as "Highly Confidential – Attorneys' Eyes Only." Defendants, all of whom are officials of the United States government who participated in raids in which their identities were not concealed, simply cannot overcome the presumption that the names of parties to civil litigation should be disclosed to the public. The identities of several ICE agents and officers who went to Plaintiffs' homes have been publicly revealed, and the government has not identified a single instance of retaliation against them as a result. Further, Defendants' continued pseudonymity prejudices Plaintiffs.

## 1.     The Defendant Agents' Names Are Not Entitled To Confidentiality Protection

The requirement of Fed. R. Civ. P. 10(a) that parties disclose their identities "serves the vital purpose of facilitating public scrutiny of judicial proceedings and therefore cannot be set aside lightly." *Sealed Plaintiff v. Sealed Defendant #1*, 537 F.3d 185, 188-89 (2d Cir. 2008). The public cannot make an "independent assessment of the facts underlying court cases" without knowledge of who the parties are. *See Doe v. Del Rio*, 241 F.R.D. 154, 157 (S.D.N.Y. 2006) (Lynch, J.). There is no exception for law enforcement officers, and Plaintiffs' counsel cannot find a single decision permitting defendant litigants, much less public employees, to remain unnamed in the public record or hidden from plaintiffs themselves.[1] Indeed, even where agents operate undercover – which no individual defendant did here – courts have found that shielding their names in litigation violates "principles of an open society and the rule of law." *United States v. Napolitano*, 552 F. Supp. 465, 487 (S.D.N.Y. 1982) (Sweet, J.).

It is well established that where "'the confidentiality designation is contested, the party seeking to maintain confidential treatment for the challenged document will have the burden of establishing good cause for the continuation of that treatment.'" *U2 Home Entertainment, Inc. v. KyLin TV, Inc.*, No. 06 CV 2770, 2008 U.S. Dist. LEXIS 30755, at *6 (E.D.N.Y. April 15, 2008) (internal citation omitted); *see also Orwasher v. A. Orwasher Inc.*, 09 Civ. 1081, 2010 U.S. Dist. LEXIS 50036 at *9 (S.D.N.Y. May 20, 2010). Defendants cannot meet their burden.

---

[1] Courts allow *plaintiffs* to proceed anonymously if litigation involves highly sensitive personal matters or the plaintiff fears mental or physical harm. *See Sealed Plaintiff v. Sealed Defendant #1*, 537 F. 3d 185 at190 (articulating factors for granting anonymity).

2.    **ICE Has Published Numerous Individual Defendant Names**

Many of the ICE agents' names and roles in ICE's enforcement operations are already a matter of public record, a crucial factor in determining whether to permit a party to proceed under a pseudonym. *See Doe v. Megless,* 654 F.3d 404, 410 (3d Cir. 2011) (denying leave to proceed under a pseudonym because "at no point has Doe's identity been kept confidential."). Although Defendants' counsel has claimed, without ever making any individualized showing for any agent, that line agents fear retaliation in the event their identities are disclosed, ICE has permitted Defendant agents and officers to disclose their names and job titles (a) on a reality television show aired on the A&E cable network to millions of viewers; (b) in media ride-alongs and ICE press releases; and (c) in publicly available federal district court decisions, including cases in which these agents were held to have violated civilians' Fourth and Fifth Amendment rights. Agent Thomas Kilbride, who participated in the raid of 22 Dogwood Lane during OI's Operation Community Shield, is featured heavily in the reality television show *Manhunters: Fugitive Task Force,* which, he boasts, was seen by 2.2 million viewers. T. Kilbride Dep. Tr. 135:3-7, 244:18-245:15, excerpts attached as Exhibit A. His name, the names of his colleagues, the location of his office, the names of targets, and, in at least one episode, the name of a "dangerous" gang with which the target was allegedly affiliated are prominently featured. *See* T. Kilbride Tr. 243:10-29.[2]  The name of other agents, including Dennis Carroll, who participated in the raids at 30 Copeces Lane and 20 Boatsteerer's Court, are similarly disclosed to millions of viewers. D. Carroll Dep. Tr. 189:13-192:12, excerpt attached as Exhibit B.

Similarly, ICE has made individual Defendants' names available to the press when it suits the agency. Assistant Field Office Director Brian Banks, who participated in DRO raids at 30 Copeces Lane, 20 Boatsteerer's Court, 165 Main Street, and 417 East Avenue, has disclosed his identity to journalists in numerous media-ride-alongs. B. Banks Dep. Tr. 48:14-49:20, excerpt attached as Exhibit C. Agent Leigh Senzatimore, who led the OI raid at 15 West 18th Street, was praised in government news publications for "dismantl[ing] one of the largest human trafficking rings ever uncovered." *See* Timothy B. Clark, "Celebrating Excellence," *Government Executive Magazine,* August 15, 2006, at 3, attached as Exhibit D. Having reaped the benefits of publicizing agents' names when seeking public approval, ICE cannot now hide behind pseudonyms to avoid public criticism.

Several defendants have also been publicly named in federal district court decisions. Officer Jeffrey Grant, the team leader for the DRO raid at 165 Main Street, was identified in a separate Federal Tort Claims Act complaint arising out of the same raid. *See* Complaint ¶ 18 in *Gonzales v. U.S.,* 08-Civ-6845 (S.D.N.Y. 2008) (Dkt. 1), attached as Exhibit E. Agent Marina Vides, who participated in the OI raid at 15 West 18th Street, submitted two publicly filed declarations in federal court in support of a motion to sequester the jury in the trial of the leader of a "powerful, violent cocaine trafficking organization." *See U.S. v. Khan,* 591 F. Supp. 2d 166, 169 (E.D.N.Y. 2008). Judge Irizarry published Agent Vides' name in her decision. *Id.*

Further, in a decision finding that ICE agents, in the course of a purportedly consent-based entry and search, violated the Fourth Amendment rights of a defendant charged with intent

---

[2] Should the Court so request, we are prepared to order a copy of this episode for the Court's review.

to distribute illegal drugs, Judge Gold published the names of Officer Michael Kidd and Agent Hott, who each participated in three raids at issue in this case, as well as that of their supervisor Brian Banks, who participated in four. *See U.S. v. Ali*, No. 05-CR-785 (NG) (SMG), 2006 U.S. Dist LEXIS 21543, at *3 (E.D.N.Y. Mar. 7, 2006), *aff'd and adopted by* 2006 U.S. Dist. LEXIS 21544 (E.D.N.Y. Apr. 7, 2006).   Likewise, Judge Patterson published the name of Officer Dennis Carroll in suppressing evidence gathered in violation of the Fifth Amendment against an attempted robbery suspect. *See U.S. v. Fnu Lnu (Angel Rivera)*, No. 09 CR 1207 (RPP), 2010 U.S. Dist. LEXIS 40416, *4-5 (Apr. 21, 2010). Nowhere do these decisions note attempts by ICE to keep the identities of these agents confidential for safety purposes, even though the criminal defendants in those cases were charged with serious crimes.

### 3.    Plaintiffs Are Prejudiced By the Individual Defendants' Pseudonymity

In addition to being premised on baseless concerns, individual Defendants' continued pseudonymity in contravention of public policy impedes Plaintiffs' ability to prepare for trial. *See U.S. v. Napolitano*, 552 F. Supp. at 487 ("If the agents are permitted to testify under false names, prejudice to the [opposing parties] would result from the necessary limitation concerning the scope of the cross-examination as to the agent's identity, history and credibility, as well as concerning any investigation of the agents in or out of court").

Because of Defendants' pseudonymity, Plaintiffs' counsel cannot inquire into any individual agent's past actions and practices with third parties who may have encountered that agent. Such inquiries are particularly critical in this case. Almost all individual agents and officers claimed in their depositions to remember little about the operations at Plaintiffs' homes. Defendants' counsel has repeatedly informed the Court that because ICE agents cannot testify to the manner of obtaining consent at individual homes, they will testify to their typical practice or "habit" pursuant to Fed. R. Evid. 406.   While Plaintiffs disagree with the contention that Defendants' purported evidence qualifies under Rule 406, Plaintiffs must have the ability to challenge introduction of habit evidence or impeach credibility by demonstrating, for example, that immigration judges have found other instances in which these same agents and officers violated the Fourth Amendment. Given that immigration court proceedings are not available to the public, Plaintiffs will be effectively foreclosed from obtaining impeachment evidence absent an order disallowing continued pseudonymity, because individual Defendants' names cannot be used when Plaintiffs' counsel seeks impeachment information.

There is good reason to believe that such information exists. For example, the Board of Immigration Appeals has affirmed the decision of Immigration Judge Balasquide finding egregious Fourth Amendment violations by ICE agents during a home raid operation in Long Island in March 2007. *See In the Matter of Guevara-Mata*, attached as Exhibit F (stating that the Board was "particularly concerned with the actions of agents – who were in uniform and armed – in breaking down respondents' door" and "seizing their identification cards without permission"). That home raid likely involved officers and agents who were at plaintiffs' homes, and the respondents in that case are certain to have learned the agents' names. Plaintiffs' counsel should be able to inquire from the respondent's attorneys as to whether any of the Defendants in the instant case were involved in the unlawful home raid operation in *In the Matter of Guevara-Mata* and others, but cannot do so without the ability to name individual defendant agents.

4.    **Defendants Should Assign Names to Agent Photographs**

Precluded from showing Plaintiffs publicly available information that identifies agents by name, Plaintiffs' counsel sought photographs of agents to assist in their identification. Judge Maas ordered Defendants to produce photographs of agents without their names attached and under strict limitations for how and where they would be used, but also stated that "once all depositions of the plaintiffs have been completed, I will require you to turn over the information so that counsel are aware whether they have a correct identification or a misidentification." April 20, 2010 Transcript of Hearing before Judge Maas, at 63:13-17, excerpt attached as Exhibit G.   Fact discovery has been closed since August 10, 2010, and Defendants have yet to provide Plaintiffs' counsel with names matched to the photographs pursuant to Judge Maas' verbal order. Defendants never showed any agent photograph to plaintiffs or witnesses during depositions, and cannot justify the continued failure to assign names to photographs now.

\* \* \*

For all these reasons, Plaintiffs respectfully request that 1) the Court remove the designation of "Highly Confidential – Attorneys' Eyes Only" from individual Defendants' identities; and 2) the Court order Defendants to comply with Judge Maas's order of April 20, 2010 by providing Plaintiffs with documentation assigning individual Defendant names to Defendants' photographs.

Thank you for your consideration of this matter.

Very truly yours,

Ghita Schwarz

Cc: Counsel of Record (by electronic mail)

Ordered

1. Defendants' agreement to limited lifting of the confidentiality restrictions regarding identities shall be followed.

2. A new document requiring a matching of photographs with names is not required at this time.

**Highly Confidential – Attorneys' Eyes Only Pursuant to Protective Order    4**

8/6/12   K— B. Forrest
USDJ

# EXHIBIT A

Thomas Kilbride                                      November 24, 2009
HIGHLY CONFIDENTIAL

Page 1

 1

 2                UNITED STATES DISTRICT COURT

 3                SOUTHERN DISTRICT OF NEW YORK

 4                Case No. 07 CIV 8224(JGK)(FM)
     ------------------------------------)
 5   ADRIANA AGUILAR, et al.,

 6                     Plaintiffs,

 7           vs.

 8
     IMMIGRATION AND CUSTOMS ENFORCEMENT
 9   DIVISION OF THE UNITED STATES
     DEPARTMENT OF HOMELAND SECURITY,
10   et al.,

11                     Defendants.
     ------------------------------------)
12

13

14
                  HIGHLY CONFIDENTIAL
15
              VIDEOTAPED DEPOSITION OF
16
                  THOMAS KILBRIDE
17
                New York, New York
18
            Tuesday, November 24, 2009
19

20

21

22

23

24   Reported by:
     Toni Allegrucci
25   JOB NO. 304332

Thomas Kilbride                                                    November 24, 2009
HIGHLY CONFIDENTIAL

Page 134
1    HIGHLY CONFIDENTIAL - T. Kilbride
2        A.  Yes.
3        Q.  Now, do you see the jacket appears
4    to be a blue jacket and says "Police" on the
5    back?
6        A.  Yes.
7        Q.  Do you own a jacket that looks like
8    the jacket shown on Exhibit 297?
9        A.  I guess I do, or I did at that
10   time.  I don't recall any of my current
11   jackets.  Well, not blue anyway.  But, yeah,
12   I guess I owned it at that time.
13       Q.  When you say "at that time," what
14   time are you referring to?
15       A.  The time the photo was taken.
16       Q.  Do you know when the photo was
17   taken?
18       A.  When?  Not specifically.  But I
19   know what it depicts, yes.
20       Q.  What does it depict?
21       A.  It depicts the Manhunters show, a
22   Lloyd Smith case.  That's...
23       Q.  What is the Manhunters show?
24       A.  It's a show on A&E Network that's
25   based on the United States Marshal Service

Page 135
1    HIGHLY CONFIDENTIAL - T. Kilbride
2    Fugitive Task Force, of which I am a member.
3        Q.  And you've appeared on a number of
4    episodes on that show, correct?
5        A.  Four.
6        Q.  Four episodes?
7        A.  Yes.
8        Q.  Now, you testified that Exhibit 297
9    depicts the Lloyd Smith case; is that
10   correct?
11       A.  Yes.
12       Q.  What is the Lloyd Smith episode?
13       A.  One of four episodes.  Lloyd Smith
14   was an illegal reentry into the
15   United States.
16       Q.  Does that help you place this
17   photograph in time approximately?
18       A.  Approximately, yes.  Prior to
19   December of '08, I can say that for sure.
20   Maybe around '07.  I don't know the exact
21   date.
22       Q.  But would it likely have been '07
23   or '08?
24       A.  Oh, it was definitely '07 or '08.
25   Definitely.

Page 136
1    HIGHLY CONFIDENTIAL - T. Kilbride
2        Q.  And you say "definitely" because
3    are those the only two years you were
4    involved with the Manhunters show?
5        A.  No, because this aired in
6    December of '08, so it had to be filmed prior
7    to that.
8            I don't think we started -- well, I
9    know we didn't start in '06, so it's either
10   '07 or '08.  The specific date, I can't tell
11   you.
12       Q.  Just so I'm clear on the show and
13   what it depicts, does the show depict actual
14   cases?
15       A.  Yes.
16       Q.  In other words, they aren't
17   re-enactments, are they?
18       A.  For the most part, no.
19       Q.  So there's a cameraman following
20   you around as you're tracking down a
21   fugitive; is that fair?
22           MR. CARGO:  Objection to the form
23       of the question.
24           You can answer.
25       A.  Sometimes that's true, yes.

Page 137
1    HIGHLY CONFIDENTIAL - T. Kilbride
2        Q.  Okay.  When is it not true?
3        A.  Well, the case may have started
4    before the cameras were ever associated to
5    the case, so it's not always true.  But in
6    this case, it was true.
7        Q.  Okay.
8        A.  In this picture, it was true for
9    sure.
10       Q.  So this picture depicts -- depicts
11   something that was happening in real life,
12   not something you staged as part of a drama,
13   correct?
14       A.  That's correct.
15       Q.  And the jacket you were wearing in
16   this picture, Exhibit 297, was this part of
17   your regular uniform?
18           MR. CARGO:  Objection to the form
19       of the question.
20           You can answer.
21       A.  Well, as I stated before, it varies
22   from time to time.  Most times, just like the
23   picture depicts and like I'm dressed today,
24   that would be the norm.
25           If you're referring to the jacket,

Thomas Kilbride                                                      November 24, 2009

HIGHLY CONFIDENTIAL

Page 242

HIGHLY CONFIDENTIAL - T. Kilbride
1
2    A.  It concerns me a little bit, but
3  we're also on TV itself besides the website.
4  It concerns me a little bit, but we're also
5  on real episodes on TV, so yes.
6         Has it crossed my mind that, you
7  know, everybody knows what I look like?
8  Sure.  My tactics have changed since.
9    Q.  Well, nobody forced you to go on TV
10  on this show, did they?
11    A.  Absolutely not, no.
12    Q.  That was your own free will,
13  correct?
14    A.  Yes, it was.
15    Q.  And you've testified this morning
16  extensively about your career with the U.S.
17  Marine Corps, correct?
18    A.  Correct.
19    Q.  And the things you did to protect
20  this country, including the events you've
21  taken after 9/11; is that right?
22    A.  Thank you, sir.  That's correct.
23    Q.  And you are proud of those, I
24  assume?
25    A.  And proud of my whole life.

Page 243

HIGHLY CONFIDENTIAL - T. Kilbride
1
2    Q.  And you would not intentionally do
3  anything that you thought would endanger the
4  national security of this country, would you?
5    A.  I would not.
6    Q.  And do you think that your
7  appearance on this show in any way endangers
8  the national security of this country?
9    A.  I do not, and my agency does not.
10    Q.  All right.  And did you obtain the
11  permission of your agency to appear on this
12  show before you did?
13    A.  Absolutely.  And the department as
14  well, ICE and the Department of Homeland
15  Security.
16    Q.  And they didn't see anything
17  inconsistent with national security to have
18  you appear on this show?
19    A.  Absolutely they did not.
20    Q.  Nor did they see anything
21  inconsistent with national security to have
22  your name appear on the website, correct?
23    A.  Apparently they did not, because
24  they allowed it to happen.
25    Q.  Would it surprise you to know that

Page 244

HIGHLY CONFIDENTIAL - T. Kilbride
1
2  the A&E Network is now seen in over
3  99 million homes?
4    A.  I didn't know that fact.  If that's
5  a fact, I didn't know it.
6    Q.  I believe it to be a fact.  It's
7  certainly a lot of homes, right?
8    A.  I would imagine millions, sure.
9    Q.  Do you get A&E?
10    A.  Sure.
11    Q.  Do you have the DVDs of the
12  Manhunters episode?
13    A.  I do.
14    Q.  And do you show your family and
15  friends?
16    A.  When they first appeared, my wife
17  showed it to them, yes.
18    Q.  And the Manhunters show itself is
19  viewed by hundreds of thousands of people; is
20  that right?
21    A.  Millions.
22    Q.  Sorry.  Millions of people?
23    A.  2.2, to be exact.
24    Q.  Where did you get that number?
25    A.  They have a method.  It's called --

Page 245

HIGHLY CONFIDENTIAL - T. Kilbride
1
2  it's a well-known method of how you figure
3  out how many people watch it.  It escapes me.
4  Maybe I'll think of it.  But they have a way.
5  They have a way.  That's ratings that they
6  figure out how many people watch.
7    Q.  And 2.2 million people?
8    A.  On the first episode.
9    Q.  On the first episode?
10    A.  That's all I know.
11    Q.  And when was the first episode?
12    A.  December 9th or 10th of 2008.
13    Q.  And you were on the first episode,
14  right?
15    A.  I was.
16    Q.  Do you remember the name of that
17  episode?
18    A.  They name it things that we don't
19  name it.  Sneaking Back In.
20    Q.  I think we may go to the movies in
21  a second, but let me ask some more questions.
22    A.  You already have the pictures.
23    Q.  Before we actually -- we're going
24  to play some videotape, but before we do
25  that, let me show you a still shot or two.

# EXHIBIT B

```
 1              HIGHLY CONFIDENTIAL
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4              Case No. 07 CIV 8224(JGK)(FM)
    ------------------------------------)
 5  ADRIANA AGUILAR, et al.,
 6                   Plaintiffs,
 7         vs.
 8
    IMMIGRATION AND CUSTOMS ENFORCEMENT
 9  DIVISION OF THE UNITED STATES
    DEPARTMENT OF HOMELAND SECURITY,
10  et al.,
11                   Defendants.
    ------------------------------------)
12
13
14       HIGHLY CONFIDENTIAL DEPOSITION OF
15              DENNIS CARROLL
16            New York, New York
17          Tuesday, July 13, 2010
18
19
20
21
22
23
    Reported by:
24  Toni Allegrucci
    JOB NO. 311798
25
```

Dennis Carroll                                                                    July 13, 2010
HIGHLY CONFIDENTIAL

Page 186

1    HIGHLY CONFIDENTIAL - D. Carroll
2  it came up.
3      Q.  So when you asked for consent you
4  never told them in advance that they can
5  refuse giving consent?
6      A.  I don't recall.  It's not common
7  practice to say.
8      Q.  Earlier we were talking about the
9  different kinds of trainings you've been
10 involved in that involve the
11 Fourth Amendment, you mentioned that you had
12 taken classes with trial attorneys; is that
13 right?
14     A.  Yes.
15     Q.  How many of those classes did you
16 take?
17     A.  I want to say two.
18     Q.  When did those take place?
19     A.  I don't recall exactly.  I want to
20 say once in '08, once in '09.
21     Q.  Can you tell me a little bit about
22 the content of those classes?
23     A.  It was the same thing; we discussed
24 certain court cases and probable cause,
25 and...

Page 187

1    HIGHLY CONFIDENTIAL - D. Carroll
2      Q.  Were you given any written
3  materials during these classes?
4      A.  Yeah.  Like not so much written
5  material, but like, if I remember, like a
6  Power Point pamphlet, or something to that
7  extent.
8      Q.  How long did these classes normally
9  take?
10     A.  I want to say like half a day.
11     Q.  So -- I'm sorry, you said you
12 participated in two of these classes, so half
13 a day each?
14     A.  Yeah, I believe so.  I don't
15 remember exactly.
16     Q.  Do you know who attended these
17 classes with you?
18     A.  Excuse me?
19     Q.  Do you know who attended these
20 classes with you?
21     A.  I don't know.  I think it might
22 have been the whole DRO, but I'm not
23 100 percent sure.
24     Q.  Did anything you learned in these
25 classes differ from what you learned in

Page 188

1    HIGHLY CONFIDENTIAL - D. Carroll
2  FLETC?
3      A.  No, it was a refresher, pretty
4  much.
5      Q.  For you, personally, was there
6  anything new that came up during these that
7  you didn't learn before?
8      A.  I don't recall.
9      Q.  You also said that Thomas Kilbride
10 had provided trainings, numerous trainings, I
11 think you said?
12     A.  Yeah.
13     Q.  Can you describe how those
14 trainings would go?
15     A.  Same thing; it's just more of a
16 refresher, go over the cases again.  It's
17 like while we had a meeting, then he would
18 take some time out and go over refresher.
19     Q.  Would this be a formal, like among
20 all the team members or individually?
21     A.  It was our unit.  It was our unit.
22     Q.  The unit?
23     A.  Yeah.
24     Q.  Did he present any written
25 materials to you when you did these

Page 189

1    HIGHLY CONFIDENTIAL - D. Carroll
2  trainings?
3      A.  There was printed out some court
4  cases, it was on Immigration criminal law,
5  some St. Cyr's issues, and stuff like that,
6  for the re-entry cases, he would hand out.
7      Q.  How many times did he do this?
8      A.  Maybe five times a year, maybe
9  four, five times a year.  I can't recall
10 exact.
11     Q.  How far back has he done this?
12     A.  Since September '08, our unit.
13     Q.  Are you aware that Thomas Kilbride
14 is on a television show called Manhunters?
15     A.  Yes.
16     Q.  Have you ever watched the show?
17     A.  Yes.
18     Q.  Have you ever had a chance to
19 appear on the show?
20     A.  Yes.
21     Q.  When?
22     A.  I had a case, I think it was last
23 year sometime, I don't remember the exact
24 date.
25     Q.  What's the purpose of the show?

# EXHIBIT C

```
 1              HIGHLY CONFIDENTIAL
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4              Case No. 07 CIV 8224(JGK)(FM)
    -----------------------------------)
 5  ADRIANA AGUILAR, et al.,
 6                   Plaintiffs,
 7          vs.
 8

    IMMIGRATION AND CUSTOMS ENFORCEMENT
 9  DIVISION OF THE UNITED STATES
    DEPARTMENT OF HOMELAND SECURITY,
10  et al.,
11                   Defendants.
    -----------------------------------)
12
13
14  HIGHLY CONFIDENTIAL VIDEOTAPED DEPOSITION OF
15                   BRIAN BANKS
16              New York, New York
17              Tuesday, June 15, 2010
18
19
20
21
22
    Reported by:
23  Toni Allegrucci
    JOB NO. 310418
24
25
```

Brian Banks                                                                                          June 15, 2010
HIGHLY CONFIDENTIAL

Page 46

```
1       HIGHLY CONFIDENTIAL - B. Banks
2       Q.   And earlier, when you referred to
3    the knowledge of Darren Williams and
4    Jerome White, were you referring to the same
5    scope of knowledge as you just referred to
6    for Michael Kidd?
7       A.   That is correct.
8       Q.   And what is your opinion of the
9    work product of Sean Connelly?
10           MS. PENN: Objection to form.
11      A.   Sean was a very good officer, very
12   good in the field, very good knowledge.
13      Q.   What do you mean by he was "very
14   good in the field"?
15      A.   He would coordinate, he would take
16   charge, he would ensure things go properly.
17      Q.   And what is the basis for your
18   statement?
19           MS. PENN: Objection to form.
20      A.   Me viewing him in the field.
21      Q.   And would the same be true for your
22   statements relating to Michael Kidd,
23   Jerome White and Darren Williams, they are
24   based in part on your viewing them in the
25   field?
```

Page 47

```
1       HIGHLY CONFIDENTIAL - B. Banks
2           MS. PENN: Objection to form.
3       A.   That is correct.
4       Q.   Did you also have an opportunity to
5    view Jerome Grant, Russell Hott, Brian Deever
6    and Tracey Williams, during the course of
7    being in the field?
8       A.   Yes, I have.
9       Q.   And what is your opinion of Jerome
10   Grant's field work -- strike that.
11           What is your opinion of
12   Jeffrey Grant's field work?
13           MS. PENN: Objection to form.
14      A.   Never had a problem with Jeffrey's
15   work, no cases that were referred to me as
16   something that was wrong with him.  He was
17   solid in the field.
18      Q.   And what about Russell Hott, what
19   is your opinion of his work in the field?
20      A.   Rustle was kind of young to the
21   service and he proved himself immediately,
22   excellent officer.
23      Q.   What do you mean by "he proved
24   himself immediately"?
25      A.   How he took charge, how he was able
```

Page 48

```
1       HIGHLY CONFIDENTIAL - B. Banks
2    to put together cases, follow leads of his
3    supervisor.
4       Q.   And what about Brian Deever, what
5    is your opinion of his work in the field?
6           MS. PENN: Objection to form.
7       A.   I would say the same thing,
8    Brian Deever was -- also did his service with
9    years, but with fug ops and same thing.
10      Q.   What about Tracey Williams, what is
11   your opinion of his work in the field?
12      A.   Tracey is female.  Tracey, once
13   again, very good officer, very good casework.
14      Q.   Have you been involved in media
15   ride-along events?
16      A.   Yes, I have.
17      Q.   On how many occasions?
18      A.   I want to say between four and six.
19      Q.   And you've been involved in the
20   media ride-along events, during the course of
21   your position as assistant field office
22   director in the New York field office?
23      A.   That is correct.
24      Q.   Describe for me the four to six
25   times that you've been like in media
```

Page 49

```
1       HIGHLY CONFIDENTIAL - B. Banks
2    ride-alongs?
3           MS. PENN: Objection to form.
4       A.   Could you clarify that, please, I'm
5    sorry.
6       Q.   You've testified that you've been
7    involved in media ride-alongs four to six
8    times; is that correct?
9       A.   That's correct.
10      Q.   Can you tell me when?
11      A.   Between 2004 and 2008.
12      Q.   And what media were you involved
13   with?
14           MS. PENN: Objection to form.
15      A.   I think they were local TV
16   stations, could have been local Fox, local
17   NBC.  There was one with the Wall Street
18   Journal.
19           I don't recall the others.
20      Q.   And all of these were
21   out-in-the-field events?
22      A.   That is correct.
23           MS. PENN: Objection to form.
24      Objection to form.
25      Q.   How would you describe the media
```

# EXHIBIT D

# Government Executive

## Celebrating Excellence

By Timothy B. Clark

August 15, 2006

*Service to America finalists inspire public service.*

Over the past five years, Government Executive has been proud to sponsor the Service to America Medals program, celebrating high achievers in the civil service whose work has been of great benefit to the United States. This year, nearly 500 people were nominated and 30 semifinalists were honored at a congressional breakfast in June. Only nine will win a medal at the Sept. 27 gala we co-sponsor with our partner in the SAM program, the Partnership for Public Service. But all deserve recognition and praise, and I can think of no better way to use this space than to highlight their achievements. Fuller accounts of their contributions can be found at www.servicetoamericamedals.org. The finalists:

- **Raymond Brammer Jr.** of the Social Security Administration led efforts to get benefits to Hurricane Katrina victims and restore SSA operations in Louisiana.
- **Robert J. Brandewie** developed the Defense Department's common access card, providing secure credentials to more than 3 million Defense workers.
- **Brian Bucaro**, Immigration and Customs Enforcement bureau, led an investigation that resulted in the dismantling of an illicit Iranian arms procurement network.
- **Thomas Casadevall** and his Geological Survey team used high-tech mapping techniques to rescue thousands of Katrina victims.

- **Nancy Cox** and the influenza division of the Centers for Disease Control and Prevention are leading preparations for a flu pandemic.
- **George V. DiBiase**, Navy, invented the catapult system that is used on all U.S. aircraft carriers.
- The ICE Cyber Crime Center Team, headed by **Gene Driggers**, provided forensic data to support prosecution of corrupt contracting in Iraq.
- **Alonzo L. Fulgham**, Agency for International Development, led efforts to rebuild agriculture, health care and education infrastructure in Afghanistan.
- **W. Martin Harrell** of the Environmental Protection Agency successfully prosecuted criminals for illegal storage, transportation and export of hazardous waste.
- A Drug Enforcement Administration rescue team led by **Kevin Harrison** rescued 90 seniors abandoned in a nursing home after Katrina.
- **Norden E. Huang** of NASA pioneered research to improve spacecraft, earthquake-proof buildings, bridges, submarines, medicines and more.
- **Betsy M. Kinter**, Internal Revenue Service, set up customer call centers that helped 948,000 Katrina victims receive federal relief.
- **Robert J. Lamb** of the Interior Department pioneered conservation strategies built on cooperation among environmental groups and the private sector.
- **Thomas M. Lastowka** and his team created a Veterans Affairs Department program that provides financial assistance to traumatically injured service members and their families.
- **Matthew D. Lowe**, State Department, laid groundwork for a historic nuclear energy agreement with India.
- **Joseph J. Lusczek Jr.**, Air Force, designed key systems for most Air Force planes flying today.
- **Emily H. Majcher**, Geological Survey, developed new technology to treat contaminated wetlands.
- **Winfred Malone**, National Cancer Institute, pioneered a field of cancer prevention research.
- Defense's **Ron McNeal** designed the military's personnel recovery program that has successfully rescued more than 1,000 people in Iraq and Afghanistan.
- **Suzanne Petrie**, Homeland Security Department, served as principal liaison to Mexico on national and border security.
- **William D. Phillips**, National Institute of Standards and Technology, launched a new subfield of atomic, molecular and optical physics and won a Nobel Prize.
- Ambassador **Nancy Powell** of the National Intelligence Council led diplomatic efforts to organize international preparations for an avian flu pandemic.
- **Mark R. Price** of the Federal Aviation Administration led U.S. efforts to rebuild the Baghdad airport and Iraq's aviation infrastructure.
- **Dr. Stuart Richer** and his team at VA have clinically proved the benefits of nutritional supplements.
- **Christina Sanford**, State Department, provided critical support for Iraq's democratically elected government.

- **Robert A. Schoch** of ICE established a compliance unit to disrupt, target and investigate illegitimate travelers and better enforce immigration laws.
- **Leigh Senzatimore** and an ICE team dismantled one of the largest human trafficking rings ever uncovered.
- **Karen Stewart,** Health Resources and Services Administration, is a key figure in the President's Emergency Plan for AIDS Relief.
- **Mark S. Ward** of AID managed U.S. recovery and reconstruction efforts after the Asia tsunami and South Asia earthquake.
- **Robin E. Ware,** U.S. Postal Service, engineered quick and full recovery of mail service to the region devastated by Katrina.

---

By Timothy B. Clark

August 15, 2006

http://www.govexec.com/magazine/magazine-editors-notebook/2006/08/celebrating-excellence/22542/

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT NEW YORK

ECF Case

REINALDO GONZALES,

Case No. 08 CIV. 6845

Plaintiff,

v.                                                  **JUDGE KARAS**

UNITED STATES OF AMERICA,

Defendant.

## COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT

Reinaldo Gonzales, by and through his attorney, George W. Echevarria, Esq., now comes before this Court and complains of the United States Government, as follows:

I.

### JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

1. Plaintiff is a Guatemalan national and a permanent resident of the United States who at all relevant times lived and still lives at 165 Main Street, Mt. Kisco, New York, 10549 and thus is a resident of the Southern District of New York.

2. The claims herein are brought against the United States of America pursuant to the Federal Tort Claims Act (28 U.S.C. §2671, *et seq.*) and 28 U.S.C. §§1346(b)(1), for money damages as compensation for personal injuries that were caused by the negligent and wrongful acts and omissions of employees of the United States Government while acting within the scope of their offices and employment, under circumstances where the United States, if a private person, would be liable to the Plaintiff in accordance with the laws of the State of New York.

3.  Venue is proper in that all, or a substantial part of the acts and omissions forming the basis of these claims occurred in the Southern District of New York, and arose from the false arrest and improper detention of Mr. Gonzales by the United States Government and its agents, without probable cause.

4.  Plaintiff has fully complied with the provisions of 28 U.S.C. §2675 of the Federal Tort Claims Act.

5.  This suit has been timely filed, in that Plaintiff timely served notice of his claim on the United States Department of Homeland Security ("DHS") and United States Immigration and Customs Enforcement ("ICE") in May, 2007 and by letter dated February 4, 2008 the DHS denied the Plaintiff's claim.

II.

## EVENTS FORMING THE BASIS OF THE CLAIM

1.  On Sunday, March 19, 2007 the Plaintiff was sleeping in his apartment at 165 Main Street, a multi-family dwelling located in Mt. Kisco, NY, when, at approximately 5:00 A.M., he was awakened by a person or persons banging on the door to his apartment.

2.  Thereafter two or three men wearing dark jackets that bore the letters "ICE" in white on the back of the jackets, entered the Plaintiff's apartment and ordered him to get out of bed. Initially the Plaintiff, who was ill and had a fever, was not permitted to get dressed. After pleading with the officers, the Plaintiff was permitted to put on moccasins, a shirt and trousers.

3.  The officers did not identify themselves, did not produce or exhibit a search warrant, did not explain why they were there and did not ask the Plaintiff to produce any identity documents.

2

4.  The Plaintiff was grabbed, herded into a room at the premises along with other tenants and
    handcuffed. When the Plaintiff attempted to ask questions regarding the reason for his
    arrest and detention, he was ordered to "shut up."

5.  As he was waiting, the Plaintiff heard ICE officers shouting and banging on the doors of
    other tenants.

6.  The Plaintiff was terrified about what would happen next and extremely scared for his
    safety.

7.  The Plaintiff's person and, upon information and belief, his apartment were searched. As
    he was being searched there were officers present who had their hands on holstered guns.

8.  After being herded together in a room at the premises with other tenants the officers
    identified themselves as ICE agents.

9.  Thereafter, the Plaintiff, who was still in handcuffs, was taken downstairs and outside to a
    waiting van. The Plaintiff was asked, in Spanish, whether he had ever been arrested and
    when he said "no" he was shoved into the van.

10. Fearful that he would be driven away, the Plaintiff shouted out that he was a permanent
    resident of the United States. The Plaintiff was threatened and told that if he was lying he
    would "regret it."

11. The Plaintiff was eventually permitted to retrieve his wallet from his room and upon
    producing his Alien Registration Card the restraints were cut and he was released.

12. As the ICE officers left, the Plaintiff was ordered to close all of the doors at the premises
    that had been left open during the raid.

13. Plaintiff later learned that the ICE officers were allegedly looking for a 48 year old
    undocumented "fugitive" with "multiple criminal convictions" named "Estanslao Lopez"

3

("Lopez"); at the time of the events complained of herein, the plaintiff was 25 years old.

14. Plaintiff was advised by officers of the Mt. Kisco and Bedford Police Departments, who assisted the ICE officers in the raid, that letters had been sent to Lopez but were returned.

15. Upon information and belief, no one with the name "Estanslao Lopez" has ever resided at the premises.

16. Upon information and belief, neither the local law enforcement agencies nor ICE ever contacted the owner and landlord of the premises to confirm whether anyone with the name "Estanslao Lopez" was residing at the premises on March 19, 2007, or had ever resided at the premises.

17. Upon information and belief, the reasons asserted by the ICE officers and the local law enforcement officers for the raid was merely pretextual and intended solely to justify their improper conduct.

18. The ICE officers who participated in the improper conduct complained of included U.S. Immigration and Customs Enforcement Officer Jeffrey Grant and additional ICE agents whose identities are presently unknown.

19. Officer Grant and the other unidentified ICE officers are "investigative or law enforcement officers" within the meaning of 28 U.S.C. §2680(h), and thus, a claim under the Federal Tort Claims Act may be pursued against the United States.

20. The claims that the Plaintiff would be entitled to pursue under the laws of the State of New York, include, but are not necessarily limited to, claims in the nature of false arrest, false imprisonment, assault, battery, intentional infliction of emotional distress, excessive force, trespass, harassment and abuse of process.

21. The Plaintiff's claim are based upon the acts and events set forth above all of which actions

were taken (and events were caused) by investigative and law enforcement officers of the

United States Government while acting within the scope of their employment.

III.

FIRST CLAIM – VIOLATION OF 28 U.S.C. §2680

1.      Plaintiff incorporates by reference herein all of the allegations set forth above.

2.      The acts and events set forth above constitute false arrest, false imprisonment, assault,

battery, intentional infliction of emotional distress, excessive force, trespass, harassment and

abuse of process under the laws of the State of New York. Because these acts and events were

undertaken and caused by investigative and law enforcement agents of the United States, the

United States Government is liable for all damages caused by such acts, as provided by 28 U.S.C.

§2680(h).

IV.

DAMAGES

Plaintiff has suffered the following injuries for which he seeks full compensation under the law:

mental anguish, mental distress, mental trauma, shame, humiliation, loss of sleep, loss of appetite,

loss of weight, depression, loss of enthusiasm, irritability, nervousness and fear

V.

PRAYER FOR RELIEF

WHEREFORE, the Plaintiff is entitled to damages from the United States, and he does

hereby pray that judgment be entered in his favor and against the United States government as

follows: mental anguish, mental distress, mental trauma, shame, humiliation, loss of sleep, loss of

appetite, loss of weight, depression, loss of enthusiasm, irritability, nervousness and fear in the

5

amount of $1,000,000.00.

Plaintiff is further entitled to and does hereby seek recovery of all costs and attorneys fees

incurred by Plaintiff in this civil action, together with for such further and additional relief at law

or in equity that this Court may deem appropriate or proper.

Dated: Ossining, NY
      July 29, 2008

                                            Respectfully submitted,

                                            George W. Echevarria, Esq.

                                            Attorney for Plaintiff
                                            100 Executive Boulevard
                                            Ossining, NY 10562
                                            Tel: (914) 923-3600
                                            Fax: (914) 923-2556
                                            echevarrialawyer@verizon.net

                                            By: _____
                                            George W. Echevarria, Esq. (GE 6614)

# EXHIBIT F

1

```
     04K4AGUC
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ----------------------------x
 2   ADRIANA AGUILAR, et al.,
 3                Plaintiffs,
 3        v.                              07CV8224(JGK)(FM)
 4   IMMIGRATION AND CUSTOMS,
 4   ENFORCEMENT DIVISION OF THE
 5   UNITED STATES DEPARTMENT OF
 5   HOMELAND SECURITY, et al.,
 6                Defendants.
 6   ----------------------------x
 7                                        New York, N.Y.
 7                                        April 20, 2010
 8                                        10:10 a.m.
 8   Before:
 9
 9                    HON. FRANK MAAS
10                                        Magistrate Judge
10
11                    APPEARANCES
11
12   DEWEY & LeBOEUF
12        Attorneys for Plaintiffs
13   KELLY LIBRERA
13   DONNA GORDON
14   KRISTA ELLIS
14   ADRIENNE HOLLANDER
15   JENNIFER WHITENER
15
16   LATINO JUSTICE
16        Attorneys for Plaintiffs
17   CHRISTINA ITURRALDE
17   GHILA SCHWARZ
18
18   PREET BHARARA
19        United States Attorney for the
19        Southern District of New York
20        U.S. Department of Justice
20   SHANE CARGO
21   KRISTIN VASSALLO
21   ALLISON PENN
22   DAVID BOBER
22   BRANDON COWART
23        Assistant United States Attorneys
23
24
25
```

62

04K4AGUC

1          MS. LIBRERA:  A clarification that we may have to deal
2     with, if a picture is shown during a deposition, for example,
3     we are going to have to come up with some way, a slip sheet.
4          THE COURT:  Deem it marked.  They are going to have
5     agents' names on the back, number them sequentially, the same
6     as a photo spread being shown to a victim.  The witness tells
7     you they do or don't recognize photograph 9 and the record is
8     clear and you don't have it attached to the back of the
9     deposition transcript as an exhibit.
10          MR. CARGO:  On that point, obviously we won't be
11     supplying names with the photographs and we won't be supplying
12     numbers that correspond to names.  We will just be supplying
13     photographs with numbers on them, because that sort of defeats
14     the purpose of the production if we say photograph 1 is agent
15     X, photograph 2 is agent Y.
16          Part of the purpose of seeing the photographs as they
17     have articulated it is being able to identify a particular
18     agent was at their home on a particular day.  We are not going
19     to do that for them; that's an issue in the case.
20          THE COURT:  I am willing to accept that with one
21     modification, which is that at a later stage, the names are
22     going to have to be associated.  You don't want to be in the
23     position where somebody can be prepped by saying there were
24     four agents who went to your house, agent Jones is one of them,
25     here's a picture of agent Jones, do you recognize him.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

63

04K4AGUC
```
 1              That's your concern.
 2              MR. CARGO:  Yes.
 3              MS. LIBRERA:  I am confused.  If there is no concern
 4    as to the plaintiff and no concern as to counsel, why is there
 5    an issue with saying is this ICE 3 or is this the ICE agent
 6    that you remember going to your home.
 7              MR. CARGO:  Because that's going to be an issue for
 8    trial, your Honor, does this plaintiff remember this specific
 9    agent who is our client entering their home without consent,
10    and we are not going to supply them that information so they
11    can burn that person's likeness into their memory and then
12    testify to it.  What we will provide --
13              THE COURT:  As a practical matter, I think once all
14    the depositions of the plaintiffs have been completed, I will
15    require you to turn over the information so that counsel are
16    aware whether they have a correct identification or a
17    misidentification.
18              MS. LIBRERA:  We are talking about having to go
19    through 55 pictures with each individual person to say do you
20    recognize any of these people.
21              THE COURT:  Yes.
22              MS. LIBRERA:  Doesn't that run at odds with the whole
23    purpose of discovery to not leave a surprise for trial.
24              THE COURT:  There won't be a surprise for trial.  At
25    trial, if they identify the photograph of me and I was in
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

64

04K4AGUC

1    Florida on the date of raid at their house, you will know that
2    before trial, you will be able to discuss it with the plaintiff
3    who made the misidentification before trial, but it cuts down
4    on the concern the government has about an unduly suggestive
5    procedure, namely, let me show you 3 photographs, do you
6    recognize these people.
7              MS. LIBRERA:  It would be more like 11 or 12
8    photographs as opposed to 3.
9              THE COURT:  Whatever.
10             I think that's a reasonable accommodation.
11             MS. LIBRERA:  OK, your Honor.
12             THE COURT:  Why don't we adjourn until 2:00.
13             (Recess)
14             (Continued on next page)
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT G



**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

---

*5107 Leesburg Pike, Suite 2000*
*Falls Church, Virginia 22041*

**ANNE PILSBURY, ESQUIRE**
**Central American Legal Assistance**
**240 Hooper Street**
**Brooklyn, NY 11211**

**DHS/ICE Office of Chief Counsel - NYC**
**26 Federal Plaza, Room 1130**
**New York, NY 10278**

Name: **GUEVARA MATA, JUAN CARLOS**
Riders: 097-535-293

A097-535-291

Date of this notice: 6/14/2011

Enclosed is a copy of the Board's decision and order in the above-referenced case.

Sincerely,

*Donna Carr*

Donna Carr
Chief Clerk

RECEIVED
JUN 1 6 2011

Enclosure

Panel Members:
     Greer, Anne J.
     Pauley, Roger
     Wendtland, Linda S.

**U.S. Department of Justice**                     Decision of the Board of Immigration Appeals
Executive Office for Immigration Review

Falls Church, Virginia  22041

Files: A097 535 291 - New York, NY                Date:    JUN 14 2011
       A097 535 293

In re:  JUAN CARLOS GUEVARA-MATA
        ANIBAL JAVIER GUEVARA-MATA

IN REMOVAL PROCEEDINGS

APPEAL

ON BEHALF OF RESPONDENTS:  Anne Pilsbury, Esquire

ON BEHALF OF DHS:          Andrea Cerrito
                           Assistant Chief Counsel

CHARGE:

   Notice:  Sec.   212(a)(6)(A)(i), I&N Act [8 U.S.C. § 1182(a)(6)(A)(i)] -
                   Present without being admitted or paroled (both respondents)

APPLICATION:  Termination


    The Department of Homeland Security ("DHS") appeals an Immigration Judge's decision granting the respondents' motion to suppress and terminate removal proceedings.[1] We will dismiss the DHS's appeal.

    The DHS contends that the Immigration Judge's decision granting the respondents' motion to suppress and terminate proceedings should be vacated, that respondents should be found removable as charged, and that proceedings should be reinstated for both respondents. However, we find insufficient grounds to reverse the Immigration Judge's decision that the respondents made a *prima facie* and unrebutted showing that the search and seizure actions of the Immigration and Customs Enforcement ("ICE") agents were egregious such that evidence obtained through non-independent means thereafter should be suppressed and the proceedings terminated. For the reasons discussed herein, we will affirm the Immigration Judge's decision.

---

[1]  For the purpose of clarity, reference to the Immigration Judge's decision will be based on his January 30, 2009, order unless otherwise noted. In this regard, we note that the Immigration Judge rendered an order on November 21, 2008, which granted the respondents' motion to suppress but postponed a decision on their motion to terminate proceedings in order to provide the DHS with an additional 30 days to come forward with evidence (acquired independently from a search and seizure of the respondents that he found to be unlawful) establishing the respondents' removability (I.J. at 1). Upon finding that the DHS did not present such independent evidence, the Immigration Judge granted the respondents' motion to terminate in a written decision dated January 30, 2009.

A097 535 291 et al.

In removal proceedings, an alien seeking the exclusion of evidence based on the Fourth Amendment bears the burden of establishing a *prima facie* case that evidence should be suppressed. *See Matter of Tang*, 13 I&N Dec. 691 (BIA 1971); *Matter of Wong*, 13 I&N Dec. 820 (BIA 1971). The request to exclude evidence should be made via a motion to suppress that is supported by an affidavit or other objective evidence that explains why suppression is appropriate. *See id.* The affidavit must contain specific, detailed statements based on the personal knowledge of the affiant. Only when an alien has come forward with adequate evidence in support of suppression will the burden shift to the DHS to justify the manner in which it obtained the evidence. *See Matter of Barcenas*, 19 I&N Dec. 609, 611 (BIA 1988).

In addition, we note that while the United States Supreme Court has held that the Fourth Amendment exclusionary rule is generally inapplicable to deportation proceedings, a plurality of the Court suggested that this rule may apply if there are egregious Fourth Amendment violations. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1050-51 (1984). The United States Court of Appeals for the Second Circuit, under whose jurisdiction this case arises, has expressly adopted the plurality's view and has found that the exclusionary rule would apply if there were violations of the Fourth Amendment that were egregious "*either* because the violation 'transgress[ed] notions of fundamental fairness' *or* because the violation 'undermine[d] the probative value of the evidence obtained.'" *See Almeida-Amaral v. Gonzales*, 461 F.3d 231, 234-35 (2d Cir. 2006) (*citing INS v. Lopez-Mendoza, supra*, at 1050-51); *Melnitsenko v. Mukasey*, 517 F.3d 42, 46-47 (2d Cir. 2008). In this regard, while we have consistently held that evidence resulting from a search and seizure in violation of Fourth Amendment rights is not *per se* excludable from civil deportation proceedings, we have determined that "[t]he circumstances surrounding an arrest and interrogation . . . may in some cases render evidence inadmissible under the due process clause of the fifth amendment." *See Matter of Toro*, 17 I&N Dec. 340, 343 (BIA 1980) (" cases may arise in which the manner of seizing evidence is so egregious that to rely on it would offend the fifth amendment's due process requirement of fundamental fairness."). But we note that, in view of the civil nature of deportation (and removal) proceedings, the "identity of an alien (as distinguished from alienage) is not suppressible . . . even if it is conceded that an illegal arrest, search, or interrogation occurred." *See Matter of Sandoval*, 17 I&N Dec. 70, 79 (BIA 1979).

### I. Background

We need not repeat the factual circumstances of this case as described by the Immigration Judge but we will review background information that is particularly relevant for adjudicating the instant appeal. At approximately 5:00 a.m. on March 1, 2007, the respondents–while residing in a two-story house at 111 Sweezy Avenue in Riverhead, New York–heard a banging on the front door and the ringing of the doorbell (Tr. at 45-56, 81-82 . *See* Affidavits of Respondents, dated August 31, 2007 (filed separately), in Support of Motion to Suppress Evidence and/or Terminate Case.[2]  The respondents heard the agents say "immigration" when they were ringing the doorbell and knocking

---

[2] The lead respondent (A097 535 291, "respondent") and the rider respondent (A097 535 293), who are brothers, rented a bedroom in the lower level of this house, which they shared with another brother, Moises, and "a man from Honduras" (Tr. at 47, 70, 82).

2

A097 535 291 et al.

on the front door (Tr. at 47, 92-93). Shortly after the front door was opened by a lady (who also rented a room on the first floor), the officials knocked on the respondents' bedroom door, which was locked, and after receiving no answer, they pushed it "until the latch came out" (Tr. at 46-49, 67-72, 82-83, 93-95).[3] Upon entering the respondents' room, the officials–who did not present a search warrant but were armed and in uniform–ordered everyone to get on the ground, at which point they proceeded to handcuff and ask everyone for their "papers" (Tr. at 48-50, 81-85).[4]

When asked if he gave the agents his papers, the respondent testified that he did not but that the agents "looked for [the] ID in our pants pockets and then they took [it]" (Tr. at 50).[5] The rider respondent, when inquired as to whether he answered the agents' questions, testified that he "didn't understand them very well, so [he] didn't respond" (Tr. at 84-85). The rider respondent explained that "since we weren't wearing any clothes, they started to search" and discovered his "ID and the money that we had" within the clothes in his bedroom (Tr. at 84-85, 103).[6]

Both respondents testified that the agents stated that they were looking for someone named Tony and that this individual was found in the adjacent room after the agents used their pillows to push open the door leading to Tony's bedroom (Tr. at 51-52, 86). Subsequently, the six individuals who were arrested were taken in a van to 26 Federal Plaza in Manhattan (Tr. at 53, 87). During their detention, the respondents were interrogated and fingerprinted and signed their names on documents

---

[3] The rider respondent, who heard the agents knock on the front door while he was in the shower, stated that he observed this lady exit from her room and walk to the front door as he left the bathroom and walked to his bedroom (Tr. at 82-83, 92-94). The owner of the house was on the second floor when the agents entered the front door and apparently told the respondents after their arrest that he had no conversation with the agents (Tr. at 94-97). The respondents testified that they continue to live at this residence (Tr. at 67-68, 90, 95-96).

[4] It appears that Moises was attempting to conceal himself and the man from Honduras was hiding in the closet when they were discovered by ICE agents at this time (Tr. at 70-71, 74, 82, 85, 97-98). See Respondents' Affidavits at 1 (noting that their "other roommate" was hiding in the closet when the agents "pulled him out and threw him down."). The respondents' affidavits also stated that Moises was grabbed by the agents and thrown down on his stomach for attempting to hide behind the boiler. See id.

[5] At this time, neither respondent was dressed (i.e., the respondent was still in bed and the rider respondent had just returned from the shower) and the rider respondent testified that while the officers were primarily speaking in English, he understood that they were asking for his passport (Tr. at 102-103). It also appears that the respondents were allowed to get dressed after they were placed in handcuffs and taken to the hallway outside their bedroom (Tr. at 72-73, 86-87).

[6] While the Immigration Judge's November 21, 2008, decision states that the respondents, upon being asked by ICE agents for their identification, "indicated where their identification was located in the bedroom," the record is not clear as to how the agents found the respondents' identification (I.J. at 3). However, we need not resolve this question as neither party disputes that the agents took the respondents' identification cards without consent (DHS's Br. at 12, 15; Respondents' Br. at 3-4).

A097 535 291 et al.

they allegedly did not understand. The respondents also stated that they were never told that they did not have to answer the questions posed to them and were only informed that they could speak to a lawyer toward the end of the detention after they received "some papers" (Tr. at 53-54, 58, 89-90). While they were asked questions in Spanish, the respondents said that they could not remember all of the questions posed to them or were too nervous to understand the agents' line of questioning (Tr. at 57, 98-99). The respondent testified that he was not threatened during his interrogation but that he felt bad and began to cry whereas the rider respondent stated that he was sad and nervous and added that he felt hungry and desperate at this time (Tr. at 74, 90).[7] Before releasing them, the DHS served each respondent with a Notice to Appear, charging them with being removable under section 212(a)(6)(A)(i) of the Immigration and Nationality Act (Exhs. 1, 1-A). The respondents were released at 5:00 p.m. and struggled to arrange transportation to go back to their home in Riverhead, Long Island (Tr. at 53, 88).

## II. Procedural History

Before the Immigration Judge, the respondents, after denying the factual allegations and removability charge contained in the Notices to Appear, sought suppression of all statements made by them and all documents and other evidence taken from them based on their claim of suffering an unconstitutional search and seizure (Tr. at 3-5). The respondents' motions to suppress stated that despite lacking consent to enter their bedroom, armed ICE agents broke down their door and arrested them. The respondents asserted that all information they disclosed during their arrest and detention was involuntarily given due to the coercion imposed on them by ICE agents (Respondents' Br. at 6). After accepting various briefings by both parties (including the DHS's submission of certified records from the United States Embassy in El Salvador) and conducting several master calendar hearings, the Immigration Judge scheduled a hearing for October 28, 2008, in order to appraise the factual circumstances surrounding the respondents' apprehension and to evaluate their credibility (Tr. at 27-31). In doing so, the Immigration Judge stated that the parties must submit all additional evidence 15 days prior to the October 28, 2008, hearing and that no other matters (such as applications for relief) would be considered during this hearing. The Immigration Judge reiterated to the DHS his desire to see any evidence independent from the information obtained on March 1, 2007, that could support the removability grounds put forth by the DHS (Tr. at 14-22, 28-31).

In the Immigration Judge's November 11, 2008, decision, he found that the respondents provided credible testimony in describing their arrest and detention, while noting that they were consistent with each other and with their previously submitted affidavits (I.J. at 2, 5, 7). The Immigration Judge found that the respondents had met their burden of presenting a *prima facie* case warranting suppression of the evidence due to suffering an egregious constitutional violation. Specifically, the Immigration Judge found that all evidence obtained directly or indirectly as a result of the respondents' arrest, search, and interrogation should be suppressed and held that the DHS failed to justify the manner in which it obtained evidence for purposes of establishing the respondents' alienage (I.J. at 9). The Immigration Judge then granted the DHS 30 days to gather evidence of the respondents' removability independent of their unconstitutional arrest and stated that if no such evidence is presented, the Court would terminate proceedings (I.J. at 8-9).

---

[7] The respondents testified that they were given some bread and water at approximately 3:00 in the afternoon while at 26 Federal Plaza (Tr. at 75, 90).

4

A097 535 291 et al.

In his subsequent decision, the Immigration Judge held that none of the documents presented by the DHS qualified as independent information regarding the respondents' removability. *See* I.J.'s January 30, 2009, decision at 2-4.[8] The Immigration Judge then granted the motion to terminate proceedings, holding that the DHS failed to offer independent evidence of the respondents' removability and finding that no additional hearing was required since the Court provided ample opportunities, including an extra 30-day period, to the DHS "to provide independent evidence of Respondents' removability." *See id.* at 4. In doing so, the Immigration Judge observed that he complied with all procedural requirements that govern the adjudication of a motion to suppress and terminate. *See Matter of Barcenas, supra*, at 611 (noting that one who questions "'the legality of the evidence must come forward with proof establishing a *prima facie* case before the [DHS] will be called on to assume the burden of justifying the manner in which it obtained the evidence'") (*citing, inter alia, Matter of Burgos*, 15 &N Dec. 278, 279 (BIA 1975)).

### III. DHS's Arguments on Appeal

On appeal, the DHS argues that the Immigration Judge made several procedural errors in the below hearing and that he erred by finding that the ICE's conduct amounted to egregious Fourth Amendment violations. The DHS further contends that because the aforementioned documents are admissible in establishing that the respondents are natives and citizens of El Salvador, the burden shifts to the respondents to prove the time, place, and manner of their entry to the United States (DHS's Br. at 9-10) (*citing* section 291 of the Act, 8 U.S.C. § 1362). Inasmuch as the DHS does not challenge the Immigration Judge's fact-finding or credibility analysis, we see no clear error in the Immigration Judge's decision in these respects. *See* 8 C.F.R. §§ 1003.1(d)(3)(i)-(ii) (we review an Immigration Judge's factual-findings, including those relating to credibility, for clear error but examine *de novo* his conclusions of law, discretion, and judgment, and all other issues on appeal).

### A. Contention that Fourth Amendment Issues Should be Reserved for Federal Courts

The DHS first argues that as a rule, neither an Immigration Judge nor the Board should substantively consider a motion to suppress under the Fourth Amendment due to "important legal and prudential considerations" (DHS's Br. at 16-29). We agree with the respondents on appeal that the DHS's argument here amounts to a policy, rather than a legal, recitation as to why the application of the Fourth Amendment's exclusionary rule in civil administrative proceedings should be left to federal courts (Respondents' Br. at 3-4). As discussed above, the exclusionary rule of the Fourth Amendment is generally not applicable in removal proceedings. *See INS v. Lopez-Mendoza, supra; Matter of Sandoval, supra.* Even if the Fourth Amendment's protection against unreasonable searches and seizures was violated during the ICE operation at 111 Sweezy Avenue, suppression of

---

[8] The DHS's evidence consisted of (1) Forms I-213 (Record of Deportable/Inadmissible Alien) for both respondents, which were generated during their custodial interrogation at 26 Federal Plaza; (2) a resubmission of the certified records from the government of El Salvador–which established the respondents' date of birth and nationality–that were obtained from that government's System of Registry at the request of an ICE official at the United States Embassy in El Salvador; (3) arrival/departure records of the respondents from a DHS database; and (4) the asylum applications of the respondents, which were filed on October 7, 2007 (I.J. at 2).

A097 535 291 et al.

any reliable evidence that resulted from the operation will only be necessary if the constitutional violations are "egregious." *See INS v. Lopez-Mendoza, supra,* at 1050-51; *Almeida-Amaral v. Gonzales, supra,* at 234-235; *Melnitsenko v. Mukasey, supra,* at 46-47. The guiding principle–particularly in cases, such as here, where neither party raises doubts about the veracity of the evidence obtained as a result of the seizure–is whether the consideration of the evidence transgresses Fifth Amendment notions of fundamental fairness. Specifically, as the Second Circuit has recognized, "exclusion of evidence is appropriate under the rule of *Lopez-Mendoza* if record evidence established either (a) that an egregious violation that was fundamentally unfair had occurred, or (b) that the violation–regardless of its egregiousness or unfairness–undermined the reliability of the evidence in dispute." *See . Almeida-Amaral v. Gonzales, supra,* at 235. In particular, the Second Circuit emphasized that there are two principles that bear on whether petitioner suffered an egregious violation of his constitutional rights:

> First, the egregiousness of a constitutional violation cannot be gauged solely on the basis of the validity (or invalidity) of the stop, but must also be based on the characteristics and severity of the offending conduct. Thus, if an individual is subjected to a seizure for no reason at all, that by itself may constitute an egregious violation, but only if the seizure is sufficiently severe. Second, even where the seizure is not especially severe, it may nevertheless qualify as an egregious violation if the stop was based on race (or some other grossly improper consideration).

*See id.* We do not find the DHS's account of the supposed dangers of applying the exclusionary rule in immigration proceedings to be persuasive. Most significantly, the DHS appears to recognize the Second Circuit's jurisprudence in authorizing the exclusion of evidence in rare instances (i.e., when the evidence in question was obtained by egregious violations of the Fourth Amendment) but then calls for a suspension of such jurisprudence in this case without explaining why the facts herein should not be subject to binding case law DHS's Br. at 16-18).

We similarly reject the DHS's claim that the Second Circuit has improperly applied the Supreme Court's decision in *INS v. Lopez-Mendoza supra,* or that the pertinent language therein should not be given much weight (DHS's Br. at 18-22). Because the present case arises within the Second Circuit's jurisdiction, we are bound to follow that court's holdings on Constitutional issues. It is also notable that, during the pendency of this appeal, the Eighth Circuit held that "it is reasonable to read *Lopez–Mendoza* as showing that eight justices would have applied the exclusionary rule in circumstances where evidence was obtained through an 'egregious' Fourth Amendment violation." *See Puc-Ruiz v. Holder,* 629 F.3d 771, 77. n.2 (8th Cir. 2010) (noting that "[a]lthough only three other justices joined the part of Justice O'Connor's majority opinion where the exception for 'egregious' constitutional violations appears, the four dissenters contended that the exclusionary rule applies in the civil and the criminal contexts alike, and would have approved any limitation on the majority's decision") (internal citations omitted).

We also find unavailing the DHS's suggestions that it would be exceedingly difficult for an administrative adjudicator to properly apply the Supreme Court's decision in *INS v. Lopez-Mendoza, supra,* or that aliens are not entitled to any protections under the Fourth Amendment (DHS's Br. at 22-23; Respondents' Br. at 4). We recognize that in removal hearings, which are civil proceedings, the respondent does not enjoy the same rights as the accused does in a criminal proceeding. *See*

6

A097 535 291 et al.

*INS v. Lopez-Mendoza, supra,* at 1038 ("Consistent with the civil nature of the proceeding, various protections that apply in the context of a criminal trial do not apply in a deportation hearing."). This, however, does not mean that aliens in removal proceedings do not enjoy any constitutional safeguards to be free from unreasonable searches and seizures, especially those that occur at their home. *See Matter of Sandoval, supra,* at 2 ("We recognize the fundamental right of all persons in this country to [be] free from unreasonable state intrusion."); *Matter of Cervantes-Torres,* 21 I&N Dec. 351, 353 (BIA 1996) (noting that the Supreme Court left open the possibility that the exclusionary rule might apply in immigration proceedings due to egregious violations that may transgress notions of fundamental fairness and stating that "the exclusionary rule would exclude any evidence resulting from [the respondent's] egregious arrest") (*citing INS v. Lopez-Mendoza, supra,* at 1050); *see generally Lopez-Rodriguez v. Mukasey,* 536 F.3d 1012, 1017 (9th Cir. 2008) (holding that the arrest of the petitioner, who did not consent to a warrantless entry of her home, violated her Fourth Amendment rights). To the extent that the DHS proposes the implementation of additional requirements before an alien in removal proceedings may seek to suppress evidence, we need not address the remainder of the DHS's arguments as such criteria are not required by the Supreme Court or the Second Circuit (DHS's Br. at 24-29).

## B. DHS's Claimed Independent Evidence

The DHS argues that the exclusionary rule is not applicable in this case because the government discovered evidence of the respondents' removability from an independent source. *See Segura v. United States,* 468 U.S. 796, 805 (1984) (holding that is well established that evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is sufficiently attenuated, and noting that "[i]t is not to be excluded, for example, if police had an 'independent source' for discover of the evidence") (citations omitted); *see also Matter of Cervantes-Torres, supra,* at 353. Specifically, the DHS cites the identity and nationality documents from the Salvadoran government pertaining to the respondents, arrival/departure records of the respondents from a DHS database, and respondents' asylum applications as independent evidence of their removability (DHS's Br. at 30).

In this regard, the DHS first cites to the respondents' national identity documents that were received from the government of El Salvador, and then cites to the Supreme Court's decision in *INS v. Lopez-Mendoza, supra,* at 1039, for the proposition that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred" (DHS's Br. at 30-31). We recognize that if the respondents' alienage was discovered through truly independent investigatory techniques, the remedy of suppression may be unavailable to the respondents. As we have stated, "[o]nce an alien's identity is learned, the [DHS] can entirely avoid triggering the exclusionary rule . . . where documents lawfully in the [DHS's] possession evidence unlawful presence." *Matter of Sandoval, supra,* at 79. However, as held by the Immigration Judge, the DHS has failed to show how the identity documents it received from the Salvadoran government (which it apparently requested from only that government after it learned the respondents' names *and* nationality) amount to independent evidence of the respondents' removability (I.J. at 3). In particular, the record reflects that ICE agents first learned the respondents' names after seizing their identification documents and then learned their alienage through continued questioning at 26 Federal Plaza (i.e., upon asking the respondents to reveal, *inter alia,* their country of nationality and

A097 535 291 et al.

citizenship as well as their immigration status) (I.J.'s November 21, 2008, decision at 4; Respondents' Br. at 4). *See* Form I-213 for respondent at 2 (stating that the respondent "claims to be a citizen and national of El Salvador who last entered the United States without inspection by crossing the border at El Paso, TX on an unknown date"); Form I-213 for rider respondent at 2 (stating that the rider respondent was residing "with the target subject" and that he was questioned "as to his immigration status in the United States and admitted . . . that he had entered the United States illegally by crossing the border afoot through Mexico" and admitted that he "was a citizen of El Salvador"). As noted by the respondents on appeal, it appears that the DHS "knew nothing" about them prior to their arrest and, moreover, the DHS's proffered I-213 Forms themselves demonstrate that crime, fingerprint, and investigative searches revealed no prior record or warrant for either respondent (Respondents' Br. at 5). *See People v. Tolentino*, 926 N.E.2d 1212, 1214-15 (N.Y. March 30, 2010) (citing *INS v. Lopez-Mendoza, supra,* for the proposition that the identity of a defendant is never suppressible as the fruit of an unlawful arrest and holding that since the defendant's identity led to the discovery of his DMV records, those records were likewise not suppressible as such "records had been compiled *independently* of defendant's arrest") (emphasis added), *cert. granted,* 131 S. Ct. 595 (2010), *cert. dismissed,* 131 S. Ct. 1387 (2011)..

While the DHS also suggests that the custodial interrogation at 26 Federal Plaza should be viewed separately from the respondents' arrest (i.e., because they were not threatened, were given water, and were released on their own recognizance), it has failed to show that the information obtained during their detention was not a continuation of the coercive conduct exhibited by ICE agents at the respondents' home (DHS's Br. at 31-32; Respondents' Br. at 6-7). *See, e.g., Singh v. Mukasey,* 553 F.3d 207, 214-16 (2d Cir 2009) (noting that "[i]t is well established that the Fifth Amendment affords aliens due process of law during deportation proceedings" and finding that the petitioner's statements–which were obtained after officers took control of his car and permanent resident card–should have been suppressed as the conditions of his interrogation (e.g., being held by immigration officers for 4 to 5 hours late at night in a place where armed, uniformed agents were circulating) undermined the reliability of those statements); *Matter of Toro, supra,* at 343 ("To be admissible in deportation proceedings, evidence must be probative and its use fundamentally fair so as to not deprive respondents of due process of law as mandated by the fifth amendment"); *see generally Lopez-Rodriguez v. Mukasey, supra,* at 1018 ("The statements sought to be suppressed were obtained from Gastelum and Lopez [while in] custody [and] immediately follow[ed] the unconstitutional entry of their residence.").

Further, we see no error in the Immigration Judge's finding that the arrival/departure records do not qualify as sufficient evidence of the respondents' removability, since simply proving the lack of a computer-generated result evidencing the respondents' lawful entry to the United States, without more, does not satisfy the DHS's burden to come forward with evidence of the respondents' alienage (I.J. at 3; DHS's Br. at 32-33). The DHS also seeks to rely on the respondents' asylum applications to prove that they are natives and citizens of El Salvador and that they entered the United States without inspection (DHS's Br. at 33-34). However, the DHS has not established any legal error in the Immigration Judge's conclusion that a plain reading of 8 C.F.R. § 1240.11(e) shows that a defensively-filed asylum application cannot be used to obtain a concession of alienage or

8

A097 535 291 et al.

deportability in cases, such as here, where the respondent does not admit his alienage or deportability (I.J. at 3; Respondents' Br. at 5-6).[9]

Additionally, we note that the DHS does not appear to appreciate the Immigration Judge's observation that the respondents do not seek to suppress their identities but evidence of their alienage, which they contend stems from their unconstitutional arrest and detention (I.J.'s November 21, 2008, decision at 4). Further, the DHS conflates the issues of identity and alienage and fails to recognize that courts have treated these as separate and not interchangeable elements (Respondents' Br. at 9; DHS's Br. at 38-41). *See INS v. Lopez-Mendoza* at 1039 (noting that " the [DHS] must show only identity *and* alienage; the burden then shifts to the respondent to prove the time, place, and manner of his entry") (emphasis added); *Almeida-Amaral v. Gonzales, supra,* at 234; *Matter of Sandoval, supra,* at 79; *see generally Puc-Ruiz v. Holder, supra,* at 777 n.1 (noting that "Puc-Ruiz is not seeking to suppress his identity, but rather evidence relating to his alienage, which is suppressible").

Thus, while the DHS raises multiple arguments on the basis that it obtained sufficient evidence establishing the respondents' alienage and removability and that such evidence is either independent or attenuated from the events of March 1, 2007, we are not convinced that the Immigration Judge committed any error in analyzing and rejecting such claims (Respondents' Br. at 8-9). As such, we are not persuaded by the DHS's contention that it met its burden of demonstrating the respondents' alienage such that the burden shifts to the respondents to establish by clear and convincing evidence that they either are "lawfully in the United States pursuant to a prior admission" or are "clearly and beyond a doubt entitled to be admitted to the United States and [are] not inadmissible as charged." 8 C.F.R. § 1240.8(c). *See also* section 240(c)(2) of the Act, 8 U.S.C. § 1229a(c)(2).

## C. Whether Respondents have Demonstrated an Egregious Violation

The Immigration Judge held that the respondents met their burden of making a *prima facie* showing—which the DHS failed to rebut—that the ICE's conduct was egregious. We agree with the Immigration Judge as we conclude—on the basis of the facts found by the Immigration Judge, which have not been shown to be clearly erroneous—that the agents' forced intrusion into the respondents' bedroom, as well as their manner of arresting, transporting, detaining, and interrogating the respondents, were sufficiently shown to be severe and egregious. *See Almeida-Amaral, supra,* at 235.

---

[9] To the extent that the DHS argues that the Forms I-213 are reliable documents that should be admitted into evidence as they are independent or sufficiently attenuated from the respondents' arrest (DHS's Br. at 35-38, 41-42), it has failed to show any error in the Immigration Judge's determination that the respondents' statements during their custodial interrogation—which directly led to the information contained in the Forms I-213—were obtained through an "egregiously unlawful search and seizure" (I.J. at 3). *See Matter of Gomez-Gomez,* 23 I&N Dec. 522 (BIA 2002) (absent sufficient evidence that a Form I-213 contains information that is inaccurate or obtained by coercion or duress, the document is inherently trustworthy and admissible as evidence to prove alienage or removability).

A097 535 291 et al.

We first note that because we are dealing with an early-morning entry and arrest that took place in a private residence, we must be aware of 'the unique and serious considerations present in such an analysis, even in the context of a civil removal proceeding, given that there is a greater expectation of privacy and a heightened interest in preventing unlawful arrests and searches in one's home (I.J.'s November 21, 2008, decision at 7; Respondents' Br. at 9). *See United States v. Hassock*, 631 F.3d 79, 85 (2d Cir. 2011) ("The Fourth Amendment protects '[t]he right of the people to be secure in their person, houses, papers and effects against unreasonable searches and seizures.'" (*citing* U.S. Const. amend. IV)); *see generally Lopez-Rodriguez v. Mukasey, supra,* at 1016 (noting that traditional Fourth Amendment principles dictate that a search and seizure inside a home without a warrant is presumptively unreasonable in the criminal context (*citing Payton v. New York*, 445 U.S. 573, 586 (1980)) and that the presumption of unconstitutionality that accompanies a warrantless entry into a home may be overcome only by showing consent or exigent circumstances (*citing Steagald v. United States*, 451 U.S. 204, 211 (1981)). While the exception of consent could apply equally in removal proceedings, the DHS does not affirmatively argue on appeal that such an exception applies, nor does the DHS contend that the respondents were not subject to an arrest. *See Pinto-Montoya v. Mukasey*, 540 F.3d 126, 132 (2d Cir. 2008).[10]

Further, agents did not present a warrant to enter the respondents' home. While agents were apparently searching for an individual named Tony who also resided in the respondents' residence, the DHS did not offer evidence of any warrant issued for this or any other person who was living at the respondents' address (I.J.'s November 21, 2008, decision at 6). Next, as noted by the Immigration Judge, the DHS has not affirmatively asserted that anyone gave consent to the agents to enter the respondents' house and, even if such consent was given, it is undisputed that the respondents did not consent to any entry (much less a forcible entry) of their locked bedroom (I.J.'s November 21, 2008, decision at 6-8; DHS's Br. at 49).

We conclude that the Immigration Judge properly held that the respondents made a *prima facie* showing of egregiousness and that the DHS submitted inadequate evidence to justify the ICE officers' conduct. We are particularly concerned with the actions of the agents–who were in uniform and armed–in breaking down the respondents' door, seizing their identification cards without permission, and over the course of the next 12 hours, subjecting them to a custodial interrogation in the downtown office about their immigration status, nationality, and manner of entering the United States. *See* Forms I-213 of both respondents; *see also Almeida-Amaral, supra,* at 235-36 ("while the lack of any valid basis whatsoever for a seizure sets the stage for egregiousness, more is needed," and holding that "exclusion may well be proper where the seizure itself is gross or unreasonable in addition to being without a plausible legal ground, e.g., when the initial illegal stop is particularly lengthy, there is a show or use of force, etc."). We further agree with the

---

[10] We note that the DHS has the authority to ask an alien about his alienage (i.e., as to his right to be or remain in the United States) under section 287(a)(1) of the Act, 8 U.S.C. § 1357(a)(1). *See also* 8 C.F.R. § 287.8(b)(2) (allowing immigration officers–when having reasonable suspicion that, *inter alia*, an alien is illegally in the United States–to "briefly detain the person for questioning"). However, the regulations also describe the context of such permissible questioning–i.e., "as long as the immigration officer does not restrain the freedom of [the] individual, not under arrest, to walk away." 8 C.F.R. § 287.8(b)(1).

A097 535 291 et al.

Immigration Judge that the intimidating nature and severity of the ICE's conduct is disconcerting given the respondents' statements that they did not have full understanding of their interrogation and felt constrained (i.e., they did not feel free to end the questioning and go home and were not returned their identity cards) throughout the day until 5:00 p.m. (I.J.'s November 21, 2008, decision at 6-7; Tr. at 54-55, 58). *See generally Matter of Sandoval, supra,* at 83 n.23 (BIA 1979) ("Our decision in this regard, of course, does not affect the inadmissibility . . . of statements or admissions that are involuntary or coerced."); *Matter of Garcia,* 17 I&N Dec. 319, 321 (BIA 1980) (respondent made *prima facie* showing that admissions were given involuntarily and the government presented no contrary evidence; proceedings terminated).

   Also troubling is the DHS's decision to not offer the testimony of the agents who arrested and detained the respondents during the hearing, as such information could have provided clarification regarding the issues of consent, probable cause, or reasonable suspicion (I.J.'s November 21, 2008, decision at 8; Tr. at 20). As such, we conclude that the respondents made a *prima facie* showing that the circumstances surrounding the respondents' arrest and detention were egregious, and that the DHS then failed to show that ICE agents had a lawful reason to search or arrest either respondent (DHS's Br. at 47-50). Therefore, as we find that the DHS did not sufficiently justify the manner in which it obtained evidence against the respondents, any statement or document taken from them during their arrest and detention was in violation of their Fourth Amendment rights and, accordingly, such information should be suppressed.

### D.  Whether a Hearing was Required under 8 C.F.R. § 1240.10(c)

   The DHS argues that the Immigration Judge should have allowed it to question the respondents on the issue of alienage and that a hearing on the respondents' removability was required under 8 C.F.R. § 1240.10(c) (DHS's Br. at 50-52; Tr. at 122-123). *See id.* (stating, *inter alia,* that "[w]hen, pursuant to this paragraph, the immigration judge does not accept an admission of removability, he or she shall direct a hearing on the issues"). We agree with the Immigration Judge that the DHS has not persuasively shown why an additional hearing was necessary as the DHS was given numerous opportunities to present independent evidence of the respondents' removability (I.J. at 4). *Cf. Hoodho v. Holder,* 558 F.3d 184, 191 (2d Cir. 2009). In this regard, we note that the DHS declared near the beginning of proceedings that it did not intend to call any witnesses, including any ICE agents, to provide testimony (Tr. at 20). We also note that while the DHS requested an adjournment to possibly submit "rebuttal evidence" at the end of the merits hearing–despite being previously informed that all such evidence was due prior to the merits hearing–the Immigration Judge exercised his discretion in granting the DHS additional time to submit such evidence (Tr. at 108-113). Further, the DHS has not identified on appeal any new or previously unavailable evidence that it seeks to have considered such that further proceedings would be warranted. Based on this record, we find no error in the Immigration Judge's conclusion that no further hearings are required.

### IV.  Conclusion

   In sum, we will affirm the Immigration Judge's decision that the respondents established that the circumstances surrounding their arrest, detention, and interrogation were sufficiently egregious to warrant a grant of their motion to suppress and that the DHS presented insufficient admissible evidence to support the charges of removability such that the proceedings should be terminated.

A097 535 291 et al.

Contrary to the DHS's brief, we conclude that the Immigration Judge's well-reasoned decision contains no clear error in its description of the relevant facts in this matter and that it correctly analyzed the dispositive legal issues pursuant to binding case law and legal authority.[11] As such, we conclude that the Immigration Judge properly adjudicated the respondents' motions and provided a fundamentally fair hearing to all parties, and that the DHS has not come forward with any valid basis to reverse his decision or to remand the matter for additional proceedings. Accordingly, the DHS's appeal will be dismissed.

ORDER:  The Department of Homeland Security's appeal is dismissed.

FOR THE BOARD

Board Member Roger A. Pauley respectfully dissents and would not find the instant circumstances to even approach the threshold of an "egregious" violation of the Fourth Amendment as contemplated by the Supreme Court or the Second Circuit. The majority's decision transforms what was intended, at most, to be a rare exception to the Supreme Court's holding that the exclusionary rule is inapplicable in immigration proceedings into a rule that ordinary, run-of-the-mine violations will suffice to exclude reliable evidence of alienage. In so doing, and setting the bar so low, the majority's decision wrongly impedes the enforcement of our law and confers a windfall benefit on these undeserving respondents, who as the majority observe have no right to be in the United States.

---

[11] As intimated by the Immigration Judge, neither the Immigration Judge nor the Board may prevent the DHS from initiating removal proceedings against the respondents in the future based on grounds unrelated to the respondents' unlawful search and seizure from March 1, 2007. Further, while we are dismissing the DHS's appeal of the Immigration Judge's decision, the respondents have obtained no lawful basis to remain in the United States as a result of these proceedings (I.J. at 4).

12